# EXHIBIT A

*Confidential*

# JOINT DEVELOPMENT AGREEMENT
### Table of Contents

| Headings | Page |
|---|---|
| ARTICLE 1. - BACKGROUND | 1 |
| ARTICLE 2. - ADMINISTRATION | 1 |
| ARTICLE 3. - EXCLUSIVITY OF DEVELOPMENT EFFORTS | 2 |
| ARTICLE 4. - INTELLECTUAL PROPERTY ALLOCATION AND PROTOCOL | 3 |
| ARTICLE 5. - COMMERCIALIZATION | 5 |
| ARTICLE 6. - CONFIDENTIALITY | 5 |
| ARTICLE 7. - RESPONSIBILITIES | 6 |
| ARTICLE 8. - TERM AND TERMINATION | 7 |
| ARTICLE 9. - GENERAL PROVISIONS | 8 |
| ARTICLE 10. - DEFINITIONS | 10 |

This Joint Development Agreement ("JDA") is between HRD Corporation, trading as Marcus Oil & Chemical, (hereinafter referred to as "HRD"), a corporation of Texas, having a principal place of business at 14549 Minetta St., Houston, Texas 77035, and The Dow Chemical Company, a Delaware corporation (hereinafter referred to as "Dow"), having an office at 2301 N. Brazosport Blvd., Building B-1211, Freeport, Texas 77541-3257. Certain terms used in this JDA are defined in Article 10.

## ARTICLE 1. - BACKGROUND

**1.1.**    HRD sells certain wax products into a variety of end-use applications.

**1.2.**    Dow develops, manufactures, and sells polyolefin-based products, including metallocene polyethylene products.

**1.3.**    The Parties desire to (a) assess an opportunity to collaborate on the development of Polyethylene Waxes and (b) develop jointly Polyethylene Waxes. In particular, the Parties desire that this JDA outline the Parties' respective rights and obligations and the goals to be achieved with respect to the development of Polyethylene Waxes.

Now, therefore, the Parties agree as follows:

## ARTICLE 2. - ADMINISTRATION

**2.1.    Administration**

The Parties will endeavor to perform their respective duties and to meet the Success Criteria of this JDA. Each Party will appoint an Administrator who is responsible to have that Party meet its obligations.

**2.2.    Research and Development ("R&D") Expenses**

Unless otherwise mutually agreed in writing or specifically stated herein, Dow and HRD will jointly (50:50) fund the Research and Development activities under this JDA, which are both (a) performed during the Activity Period of this JDA and (b) relate to process chemistry and design, product/structure characterization, and scale up risk assessment. The expected direct cost of those R&D activities through June 2003 is $2MillionUS, not including general, administrative, overhead, and profit.

Within 14 days of signing this JDA, HRD will pay $600,000US to Dow as partial payment for HRD's share of the expected direct R&D costs. On or before October 1, 2002, HRD will pay $400,000US to Dow as the remainder of HRD's share of the expected direct R&D costs.

JAN-16-2005  10:28          JENNER AND BLOCK LLPC

*Confidential*

When the direct R&D costs reach $1MillionUS, the Parties will meet to discuss the expenditures to date, the projected costs, and the progress of the JDA toward achieving the Success Criteria. The Project Administrators will agree upon the time, location, and format of the meeting. If the total projected costs are expected to exceed $2MillionUS and the total projected costs do not cause the Parties to terminate the JDA, HRD will pay 50% of the additional costs to Dow on or before June 30, 2003.

On or before the anniversary of the Effective Date and until the Activity Period expires, Dow will provide an updated report on the direct R&D costs. If the costs have exceeded the expected direct R&D Costs, HRD will pay 50% of the excess to Dow within 30 days.

If this JDA is terminated before the activities hereunder consume the initial payment of $600,000US, Dow will prepare a final report on direct R&D Costs and repay the unused portion to HRD within 14 days of the date on which this JDA is terminated and the remaining $400,000 USD will not come due on October 1, 2002. If the Activity Period expires and the total R&D costs were below the expected R&D costs, Dow will prepare a final report and refund any HRD overpayment within 14 days.

### 2.3. Records of Direct R&D Costs and Audits

Dow will maintain detailed and accurate records, in accordance with generally accepted accounting principles, consistently applied, sufficient to confirm the basis for the payments to be made for direct R&D Costs under this JDA. Those records will be maintained for the Activity Period, plus the subsequent calendar year. However, if the Parties agree to extend the Activity Period, Dow shall not be required to maintain records for any time period prior to the immediately preceding calendar year of the Activity Period.

HRD has the right to audit (by an independent auditor acceptable to Dow) such records during normal business hours at intervals not more frequently than twice per year to verify their accuracy at any time after giving reasonable notice to Dow. Dow will cooperate with the auditor and will not withhold approval of the independent auditor unreasonably. Dow may impose reasonable conditions on the auditor to protect Dow's Confidential Information. The auditor will report to HRD only the accuracy of the direct R&D Costs reports. HRD will pay the cost of the audit. The obligations of this Paragraph 2.3. end on the first anniversary of the termination of this JDA.

### 2.4. Other Expenses

Unless otherwise mutually agreed in writing, each Party will bear all of its other expenses to develop Polyethylene Waxes under this JDA.

### 2.5. Interim Project Review

As previously mentioned in Paragraph 2.2., the Parties will conduct an Interim Project Review when the R&D costs reach $1MillionUS to evaluate their progress toward achieving the Success Criteria. Either Party may request additional project reviews, which the parties will conduct no later than 30 days after receipt of the request. The Project Administrators will agree upon the time, location, and format of the Project Review(s).

### 2.6. Participation by Affiliates and Third Persons

Any Party's Affiliate may participate in this JDA. Any participation by a Third Person must be mutually agreed in writing. Each Affiliate or Third Person participating in this JDA must be bound by terms substantially the same as this JDA (i.e., ensuring that each of the Parties obtains substantially the same benefits as set forth in this JDA), unless the Parties otherwise agree in writing.

## ARTICLE 3. - EXCLUSIVITY OF DEVELOPMENT EFFORTS

### 3.1. Exclusive Development

The Parties' relationship to develop jointly Polyethylene Waxes that meet the Success Criteria is to be exclusive, during the Activity Period.

JAN-18-2005    10:25        JENNER AND BLOCK LLPC

*Confidential*

### 3.2.    Confidential Information

To avoid any doubt, nothing in this Article 3. authorizes either Party to disclose the other Party's Confidential Information contrary to the provisions of Article 6.

## ARTICLE 4. - INTELLECTUAL PROPERTY ALLOCATION AND PROTOCOL

### 4.1.    Background Information and Background Patent Rights

This JDA does not (a) change the ownership of any Party's Background Information or Background Patent Rights and/or (b) grant to either Party or its Affiliates (or to anyone else) any license (express, implied or otherwise) under any of the Background Information, Background Patent Rights or trademarks of the other Party or its Affiliates. If the Parties agree to any such license, that license will be appropriately defined in a separate written agreement.

### 4.2.    Ownership of Developments

Without regard to which Party's employees are inventor(s) of a particular Development, ownership of Developments will be determined as follows:

(a)    HRD will own Developments that are (1) products made from or containing Polyethylene Waxes, (2) process for making products made from or containing Polyethylene Waxes, and/or (3) methods of use of Polyethylene Waxes; and

(b)    Dow will own all other Developments, including Polyethylene Waxes, processes for making Polyethylene Waxes, and catalysts used for making Polyethylene Waxes.

### 4.3.    Ownership of and Access to JDA Information

Each Party will own all JDA Information that the Party generates. Both Parties (and their Affiliates) may use and/or disclose that JDA Information, subject to the obligations of confidentiality the Parties have undertaken with respect to the other Party's Information under Article 6. Each Party will keep complete and accurate written records of all information developed by or for it. Each Party will make those records available for review by the other Party at any reasonable time during regular working hours. Each Party will furnish copies of all or any part of those records to the other Party upon request for appropriate patent filing, prosecution, and enforcement efforts on Developments owned by that other Party, consistent with the other Party's obligations of confidentiality under Article 6.

### 4.4.    Disclosure of Developments and Inventorship

After a Party becomes aware that an invention has been conceived or first reduced to practice that may be a Development, the Party must promptly deliver a written description of the invention to the other Party's corresponding Administrator. The written description must include sufficient information to enable the Parties, together with their patent counsels, to evaluate the inventorship of the invention. The Parties will attempt to reach a consensus on whether the invention is a Development and who is(are) the inventor(s). The statutory and common law of the United States of America shall govern all determinations of inventorship and reduction to practice of Developments. Each Party is solely responsible for any and all compensation legally due to its employees (who are inventors of any Development), irrespective of which Party owns that Development.

### 4.5.    Filing and Prosecution of Patent Applications

In its sole discretion, the owner of the Development in question may make all decisions on filing, prosecuting, and maintaining patent applications (both domestic and foreign) that claim the Development, with three limitations. The owner must (i) obtain the other Party's approval before using or disclosing the other Party's Confidential Information in the filing or prosecuting of the patent application, (ii) provide the other Party with 30 days to review and comment on the patent application prior to its filing, and (iii) cooperate with the other Party to make related patent application filings concurrently (i.e., on the same day). The other Party will not unreasonably withhold its approval when the owner's use or disclosure of the other Party's Confidential Information is only to the extent necessary to satisfy the statutory requirements of the relevant patent office. The other Party's approval will be deemed granted if the other Party does not object in writing within 30 days of receipt of the owner's request for approval. If the other Party's objects, it will recommend reasonable alternative information for use instead of the objectionable

JHN-16-2005  16:58    JENNER HND BLOCK LLPG

*Confidential*

Information. The owner is solely responsible for paying the expenses for the patent applications. Each Party agrees to cooperate with the other Party, as requested, to establish, acquire, and maintain intellectual-property protection for Developments, JDA Information, and Polyethylene-Wax-Samples. This includes signing assignments and other appropriate documents, as requested.

### 4.6.    Abandonment of JDA Patent Rights

If the owner chooses not to file a patent application directed to its Development or no longer desires to continue prosecution or maintenance of particular JDA Patent Rights in any country, that owner must notify the other Party in writing and offer to assign such Development and/or JDA Patent Rights to the other Party. The other Party may accept such offer anytime within 30 days after receipt of the notification; otherwise, the owner may abandon the Development and/or JDA Patent Rights in question. If the other Party accepts, the owner will promptly assign the Development and/or JDA Patent Rights to the other Party and the other Party may file or continue the prosecution or maintenance at its sole expense. The assignment shall not affect the Parties' fundamental rights (i.e., the rights that each Party would have had the assignment not occurred) with respect to the practice or licensing of the Development and/or the JDA Patent Rights. The Parties may agree in writing to change those fundamental rights.

### 4.7.    Status Reports on JDA Patent Rights

If a Party has JDA Patent Rights, its Administrator will provide semi-annually a status report (in a mutually agreed format and medium) on all of that Party's JDA Patent Rights to the other Party's Administrator. That reporting is required both during the term of this JDA, and for so long thereafter as there are pending patent applications or maintained patents claiming any Development. Unintentional failure to provide this report shall not be deemed a material default under Paragraph 8.3.

### 4.8.    Right to Practice

#### 4.8.1.   Costs/Responsibility

Each Party will bear its own costs and will be solely responsible for determining its freedom to practice. Dow will be responsible for determining its freedom to practice with regard to processes for making and selling Polyethylene Waxes and using catalysts for making Polyethylene Waxes. HRD will be responsible for determining its freedom to practice with regard to selling products made from or containing Polyethylene Waxes and methods of using Polyethylene Waxes.

#### 4.8.2.   No Warranties/Representations during Activity Period

As specifically stated in Paragraph 7.3., neither Party makes any warranties or representations with respect to the freedom from infringement of the activities of either Party or their Related Persons under this JDA with respect to any intellectual property rights of any Third Person. Each Party agrees to assume the risk of any actual or alleged intellectual property infringement by the activities of that Party or its Related Persons under this JDA.

#### 4.8.3.   Outside Counsel

Each Party may disclose the other Party's Confidential Information and/or JDA Information to outside counsel for the purpose of obtaining legal advice or opinion regarding the Party's freedom to practice. The Parties may seek advice and opinions from the same outside counsel (shared counsel). However, each Party shall separately instruct shared counsel on the Party's request for legal assistance and shall bear its own expense. Each Party shall also instruct its outside counsel to provide any advice or opinion solely to the Party requesting such advice or opinion. The shared outside counsel may use technical information provided by any Party in the shared outside counsel's work for either Party, but the shared outside counsel must take care not to share the technical information with the Party that did not provide the information without the approval of the Party providing the information. The Parties shall not share legal advice or opinions with each other so as to protect the attorney-client and work product privileges and opinions of each Party.

*Confidential*

# ARTICLE 5. - COMMERCIALIZATION

### 5.1.   Statement of Intent

The Parties desire to have each Party profit from this collaboration by fostering the development and commercialization of Polyethylene Waxes. The Parties also desire to balance (a) Dow's desire to supply large volumes of Polyethylene Waxes at a reasonable price by the sale to HRD and its Affiliates with (b) HRD's desire for exclusive access to Polyethylene Waxes.

### 5.2.   Commercial Arrangement

The Parties (1) anticipate that the Parties will achieve the Success Criteria and (2) are contemporaneously herewith entering into a commercial arrangement (the "Sarnia PE Wax Supply Agreement"), whereby (a) Dow and its Affiliates will have the exclusive, worldwide obligation to sell Polyethylene Waxes to the order of HRD and HRD's Affiliates and (b) HRD and its Affiliates will have the exclusive, worldwide right (under all JDA Patent Rights) to sell all Polyethylene Waxes to Third Persons and to grant licenses to Third Parties for the use of any and all Polyethylene Waxes. The terms and conditions of the commercial arrangement between Dow and HRD are separately defined in the Sarnia PE Wax Supply Agreement.

# ARTICLE 6. - CONFIDENTIALITY

### 6.1.   Supersede Confidentiality Agreement for Initial Evaluations

The Parties have a separate Confidentiality Agreement, having an effective date of January 8, 2001 (Dow Agreement 202541). The Confidentiality Agreement covered the Parties' initial evaluation of Samples and Information. The Parties expressly make those Samples and Information subject to this JDA. The provisions of this JDA supersede the Confidentiality Agreement with respect to those Samples and Information.

### 6.2.   Disclosure and Use of Confidential Information

For a period of 5 years from the end (either completion or earlier termination) of this JDA, the Party ("Recipient") who receives the other Party's ("Discloser's") Confidential Information agrees that (a) the Recipient will maintain that Confidential Information in confidence and prevent the disclosure of the same to others, and (b) the Recipient will use that Confidential Information exclusively for the JDA, or to carry out the Recipient's obligations under this JDA, or to exercise the rights or licenses expressly granted under this JDA.

### 6.3.   Duty of Care

In fulfilling the Recipient's obligations under this Article, the Recipient shall use the same degree of care as that Recipient uses to protect its own confidential information of a like nature. In no event shall the Recipient take less than reasonable precautions to protect the Discloser's Confidential Information.

### 6.4.   Permitted Disclosures

Notwithstanding anything to the contrary in this Article, either Recipient may disclose the other Party's Confidential Information:

(a)    as may be required to comply with a court order or subpoena so long as the Recipient secures whatever confidentiality protections are available under that law, and gives to the Discloser both reasonably prompt notice and an opportunity to intervene, and/or

(b)    to the Recipient's Affiliates, and/or to Third Persons, as may reasonably be required to carry out the Recipient's obligations and/or to exercise the rights or licenses expressly granted under this JDA, provided that each such Affiliate or Third Person undertakes obligations of confidentiality which are at least as stringent to those undertaken by the Parties hereunder, and obligations of limited use which are reasonably appropriate for the situation, and/or

(c)    in a patent application for which the filing is authorized by Paragraph 4.5., but only to the extent that such Confidential Information is reasonably necessary to provide enabling support for any patent claim covering a Development owned by the Recipient, and/or

(d)    to the Recipient's legal counsel in confidence, and/or

*Confidential*

(e)  to appropriate governmental agencies (and to Recipient's relevant governmental-approval consultants) as, and when, reasonably required for regulatory review or approval of the Polyethylene Wax, so long as Discloser is first consulted and has been provided a reasonable time to perform any associated patent filings on Discloser-owned Developments or related background technologies. Where appropriate, a claim of confidentiality will be made by Recipient.

### 6.5.    Limited Analysis and Return of Samples

During the JDA, it is anticipated that HRD may receive one or more of Dow's Samples for evaluation. Except with the Dow's prior written consent, HRD will:

(a)  use Dow's Samples exclusively for this JDA; and

(b)  promptly return to Dow, at its request, all of Dow's unconsumed Samples; and

(c)  not analyze those Samples to determine their chemical composition or physical properties (other than those physical analyses reasonably necessary for the JDA); and

(d)  not make Samples available (e.g., by sale or otherwise) to anyone (other than the Parties and any Affiliate or Third Person participating in the JDA as agreed in Paragraph 2.6.), except as authorized under Paragraph 6.6. or 6.7.

### 6.6.    Sampling of Polyethylene Waxes to HRD's Customers

HRD may distribute Polyethylene-Wax-Samples to its potential customers, provided (1) its potential customers have undertaken confidentiality obligations at least as stringent as the obligations undertaken by HRD in this JDA and (2) HRD warrants the compliance of its customers with the terms of this JDA.

### 6.7.    Sampling of Polyethylene Waxes –Without Obligations of Confidentiality

Before either Party distributes Polyethylene-Wax-Samples to anyone (other than an Affiliate or Third Person participating in the JDA as agreed in Paragraph 2.6.) without obligations of confidentiality, the Parties must first agree upon the timing and terms under which those Polyethylene-Wax-Samples are to be provided in order to achieve the goals of the JDA, while protecting the Parties' intellectual assets.

### 6.8.    Pre-approval Required For Publicity and Publications

Except with the other Party's prior written consent, each Party must not use the other Party's name(s) or trademark(s) or issue any press release or public announcement of the Parties' relationship under this JDA. Both Parties must approve technical publications disclosing results of the JDA before being presented or submitted for publication, whichever is earlier.

## ARTICLE 7. - RESPONSIBILITIES

### 7.1.    The Parties' Roles

This JDA is an experimental program that involves the manufacture and testing of chemical products and/or physical structures, some of which are experimental in nature. NEITHER PARTY MAKES ANY WARRANTIES OR REPRESENTATIONS OF ACCURACY, RELIABILITY, COMPLETENESS, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE WITH RESPECT TO ANY SAMPLES OR TECHNICAL INFORMATION, WHICH IT SUPPLIES TO THE OTHER PARTY HEREUNDER. ALL INFORMATION AND SAMPLES SUPPLIED HEREUNDER ARE PROVIDED ON AN "AS IS" BASIS AND EACH PARTY SUPPLYING THE SAME EXPRESSLY DISCLAIMS ANY AND ALL WARRANTIES WITH RESPECT TO THE SAME. Accordingly, each Party will be responsible for taking all reasonable precautions in using, handling, and/or evaluating the same. Each Party will take reasonable steps to ensure that its Related Persons observe the appropriate safety and operational rules of the host location at which that work is being done. Each Party agrees that it is in the best position to protect its property, its Related Persons, the property of its Related Persons against injury, illness, death, damage, or loss, and to insure against any of the same which may occur. Based upon the foregoing, the Parties agree that the following provisions are a reasonable allocation of the responsibilities, risks and liabilities with respect to their relationship under this JDA.

*Confidential*

### 7.2.    Parties' Own People and Property

Except to the extent arising from the other Party's gross negligence or willful misconduct, each Party assumes the risk of personal injury (including illness) or death of its Related Persons and the risk of any damage to, or loss of, its property and the property of its Related Persons arising out of this JDA or the use of any Samples or Information received hereunder. Each Party agrees to release, defend, and indemnify the other Party and the other Party's Related Persons from and against any and all losses and/or liabilities (including but not limited to attorneys' fees and other litigation costs) arising out of any such injury, illness, death, damage, or loss for which that Party has assumed the risk. It is the express intent of the Parties that the foregoing release and indemnity shall apply notwithstanding any negligence, strict liability, or breach of warranty of that other Party or of that other Party's Related Persons.

### 7.3.    Intellectual Property Responsibility

Each Party agrees to advise the other Party of any potential intellectual property infringement problem of which it becomes aware which might adversely affect either Party's ability to perform its activities or exercise any of its rights or licenses under this JDA. However, neither Party makes any warranties or representations with respect to (a) the validity, scope or enforceability of any of its intellectual property rights, and/or (b) the freedom from infringement of the activities of either Party or their Related Persons under this JDA with respect to any intellectual property rights of any Third Person. Each Party agrees to assume the risk of any actual or alleged intellectual property infringement by the activities of that Party or its Related Persons under this JDA.

### 7.4.    Third Person Injury and Property Damage

With respect to any damage to or loss of the property of Third Persons, as well as any personal injury (including illness) or death of Third Persons, any of which damage, loss, injury or death arises out of this JDA or the use of any Samples or Information received hereunder from the other Party or its Affiliates, each Party will indemnify the other Party and the other Party's Related Persons (a) for the indemnifying Party's (or its Related Persons') share of any comparative negligence or breach of warranty, which negligence or breach was the proximate cause of that liability, as well as (b) for the indemnifying Party's (or its Related Persons') share of any strict liability.

### 7.5.    Indemnity Effectiveness

Any indemnity that is provided under this Article shall be effective to the maximum extent, scope, and amount permitted by the applicable law.

### 7.6.    Disclaimer of Consequential Damages

The Parties agree that neither Party nor its Related Persons will be liable to the other Party or its Related Persons for any indirect, incidental, special, exemplary, punitive, or consequential damages arising out of or in connection with the execution, performance, or nonperformance of this JDA, regardless of whether the other Party's or its Related Persons' cause of action resides in breach of contract or warranty, negligence, strict liability or other tort.

## ARTICLE 8. - TERM AND TERMINATION

### 8.1.    Agreement Term and Extensions

Unless earlier terminated under Paragraphs 8.2. or 8.3. or by mutual agreement, the term of this JDA will be for the Activity Period. The term of this JDA may be extended by mutual written agreement of the Parties.

### 8.2.    Termination of Prior to Completion

If the Success Criteria are not met within 60 days of the mutually agreed time schedule or the reports of direct R&D Costs indicate the direct R&D Costs will exceed the expected costs by 25%, either Party may terminate JDA upon 10 business days written notice. Moreover, if this JDA is terminated before achieving all of its Success Criteria, then the Parties will negotiate a reasonable royalty bearing license under which Dow shall have the non-exclusive, worldwide right (under all JDA Patent Rights) to grant sublicenses to Third Parties for (a) making, selling, and using any and all products made from or containing Polyethylene Waxes and (b) using any and all Polyethylene Waxes. If (a) either Party terminates the agreement

JAN-18-2005  10:53    JENNER AND BLOCK LLPC

*Confidential*

because the Success Criteria are not met, (b), within two years of the JDA's termination, Dow achieves the Success Criteria, (c) Dow desires to make and sell the Polyethylene Waxes, and (d) Dow has a suitable manufacturing facility available for the production of Polyethylene Waxes, then Dow agrees to negotiate with HRD to supply the Polyethylene Wax(es) to HRD at terms and conditions consistent with the Sarnia PE Wax Supply Agreement. If HRD and Dow do not execute a supply agreement within 30 days, Dow may offer the Polyethylene Wax(es) to Third Parties.

Additionally, the Parties may, by mutual written agreement, terminate this JDA early.

### 8.3.    Termination for a Material Default

If either Party defaults on any of its obligations hereunder, the other Party may give written notice to the defaulting Party specifying the particulars of that default. If the defaulting Party does not remedy a material default within 30 days after the date of that notice (unless such remedy is not reasonably capable of being completed within 30 days, and, to the reasonable satisfaction of the non-defaulting party, the other Party is diligently pursuing such remedy), the other Party shall have the right to terminate this JDA, by giving to the defaulting Party 10 days' further written notice. Minor, readily remediable defaults (such as failure to provide a report under Paragraph 4.7.) do not give rise to a right of termination of this JDA.

### 8.4.    Rights and Obligations Surviving Termination

Any termination of this JDA shall not:

(a)    release either Party or its Related Persons from any claim of the other Party accrued hereunder prior to the effective date of that termination; or

(b)    affect the respective rights or obligations of either Party or its Related Persons under Articles 4., 6. or 7., or under Paragraph 9.12.

## ARTICLE 9. - GENERAL PROVISIONS

### 9.1.    Assignment

Either Party may assign this JDA to any one or more of its Affiliates. No Party shall otherwise assign this JDA or that Party's rights or obligations hereunder without the other Party's prior written approval, which approval will not be withheld unreasonably. When properly assigned, this JDA shall be binding upon the assignor's respective successors and assigns. However, where such an assignment might materially affect either Party's rights or obligations under this JDA, the non-assigning Party may elect to terminate this JDA.

### 9.2.    Extension to Affiliates

A Party's rights and obligations under this JDA may be extended by that Party to any one or more of its Affiliates, provided that each such Affiliate agrees in writing to abide and be bound by the terms of this JDA. Each Party will be primarily responsible to ensure the compliance of its Affiliates who agree to be bound by this JDA.

### 9.3.    Subcontracting

Any subcontracting by either Party (to anyone other than that Party's Affiliates) must be pre-approved by the other Party, which approval will not be withheld unreasonably. Subject to that limitation, each Party may designate one or more Third Persons (e.g., a contractor or an Affiliate) to fulfill one or more of that Party's obligations, or to exercise Party's rights, provided that the Third Person agrees in writing to abide and be bound by the corresponding terms of this JDA. No Party shall otherwise subcontract its rights or obligations hereunder without the other Party's written approval.

### 9.4.    Effect of Assignment, Subcontract or other Transfers

Any assignment, subcontract, or other transfer shall not release the involved Party or its Affiliates from any claim of the other Party accrued hereunder prior to the effective date of that transaction, or their respective obligations under Articles 4., 6., or 7. or under Paragraph 9.12.

*Confidential*

### 9.5.  Force Majeure

If the performance of a Party is delayed hereunder as a result of any event or circumstance beyond its reasonable control, that Party's performance may be postponed until such time as the cause of that delay has been removed, provided that if a Party's performance is delayed for more than 90 consecutive days the other Party may terminate this JDA without penalty by giving written notice to the other Party.

### 9.6.  Governing Law

Except as set forth in Paragraph 4.4., the Parties desire that any reviewing court or arbitrator(s) use the plain meaning of this JDA. Only in the event that such meaning is not clear, should such court or arbitrator(s) refer to the laws of any jurisdiction to resolve any ambiguity, in which case the Parties select the laws of the State of Delaware, United States of America (exclusive of such State's laws relating to the choice of a different jurisdiction's laws) to resolve such ambiguity.

### 9.7.  Severability

In the event that any provision of this JDA is declared null and void, that provision will be struck from this JDA. The remaining provisions of this JDA will remain in full effect. The Parties will seek in good faith to negotiate terms to replace any provision so struck, so as to restore the balance of equities and the consideration present in the original Agreement terms.

### 9.8.  Disclaimer of Waivers

No omission or delay by either Party at any time to enforce any right or remedy, or to require performance of any obligations of this JDA, will constitute a waiver of the same.

### 9.9.  No Partnership, Joint Venture or Fiduciary Relationship

No partnership, joint venture or fiduciary relationship is created by this JDA. Neither Party has, and neither Party will attempt to assert, the authority to act as an agent for the other Party.

### 9.10.  Notice

Any notice or correspondence shall be given to the Parties at the following addresses, and will be effective when actually received:

|   |   |   |
|---|---|---|
| (a) | If to HRD: | Marcus Oil & Chemical<br>14549 Minetta Street<br>Houston, Texas 77035<br>Facsimile No. (713) 726-9885<br>Telephone No. (713) 721-9131, Ext. 102<br>Attention: Mr. Aziz Hassan, Vice President<br>e-mail: Marcusoil@aol.com |
|   | With a copy to: | O'Donnell Ferebee & McGonigal<br>450 Gears, Sixth Floor<br>Houston, Texas 77067-4584<br>Facsimile No. (281) 875-4962<br>Telephone No. (281) 875-8200<br>Attention: Mr. Michael L. Landrum<br>e-mail: mlandrum@ofmslaw.com |
| (b) | If to Dow: | The Dow Chemical Company<br>2301 N. Brazosport Boulevard<br>Building B-1470<br>Freeport, Texas 77541-3257<br>Facsimile No. 979-238-0942<br>Phone: 979-238-2897<br>Attention: Mr. Kurt W. Swogger<br>e-mail: kwswogger@dow.com |

JAN-18-2005  16:54          JENNER AND BLOCK LLPC

*Confidential*

With a copy to:          The Dow Chemical Company
                         2301 N. Brazosport Boulevard
                         Building B-1211
                         Freeport, Texas  77541-3257
                         Facsimile No. 979-238-0878
                         Phone:  979-238-9041
                         e-mail: krhansbro@dow.com
                         Attention: Kevin R. Hansbro, Intellectual Property Attorney

In addition, a copy of any such notice or correspondence will also be given to the other Party's Administrator. Either Party may change its contacts and addresses by notice in writing under this Paragraph.

### 8.11.    Entire Agreement and Amendments

This JDA constitutes the entire understanding and agreement between the Parties relating to the subject matter of this JDA, and supersedes all other understandings and/or agreements relating to that subject matter. Additionally, the provisions of this JDA shall supersede any standard form language which any Party or Related Person of that Party has signed, or in the future may be asked or required to sign, as a condition of admittance to the premises of the other Party or its Affiliates in connection with the Related Person's work relating to this JDA. No waiver, modifications or amendments to this JDA will be valid unless made in writing specifying the particular waiver, modification or amendment and signed by an authorized representative of each Party.

### 9.12.    Export Control and Customs Regulations

Each Party agrees that it will not export or re-export any U.S.-source technology, software or products received from the other Party or the direct products of such technology or software or products to any country, person or entity, or for any use, prohibited by the export control regulations of the United States.

## ARTICLE 10. - DEFINITIONS

As used herein, the following terms will have the following meanings:

### 10.1.    "Activity Period" means the period of time for performing the JDA activities from the Effective Date of this JDA until the earlier of (a) June 30, 2003, or (b) the Success Criteria are achieved, unless earlier terminated or extended.

### 10.2.    "Administrator" means the person designated as such by each Party. Dow hereby designates Michael J. Levinson as its Administrator. He may be contacted at The Dow Chemical Company, 400 W. Sam Houston Pkwy. South, Houston, TX 77042, Phone: (713) 978-2291, Facsimile: (713) 978-3279, e-mail: mjlevinson@dow.com. HRD hereby designates Mr. Aziz Hassan as its Administrator. He may be contacted at Marcus Oil & Chemical, 14549 Minetta Street, Houston, TX 77035, Phone (713) 721-9131, ext. 102, Facsimile (713) 726-9885, e-mail: Marcusoil@aol.com.

### 10.3.    "Affiliate" means any entity that directly or indirectly owns, is owned by, or is under the common ownership with a Party, at any time during the term of this JDA. "Owns", "owned", or "ownership" means direct or indirect possession of at least 50 percent of the votes of holders of a corporation's voting securities, or a comparable equity or other ownership interest in any other type of entity.

### 10.4.    "Background Information," as used with respect to a designated Party, means any information owned or controlled by that Party or its Affiliates prior to the Effective Date, as well as any information developed by or for that Party or its Affiliates independently of this JDA. By definition, JDA information is not Background Information.

### 10.5.    "Background Patent Rights," as used with respect to a designated Party, means those claims of any patents or patent applications, owned or controlled by that Party or its Affiliates at anytime during the term of this JDA, that define any invention other than a Development.

### 10.6.    "Confidential Information," as used with respect to a designated Party, shall mean

*Confidential*

Background Information of the designated Party and/or its Affiliates (collectively the **"Discloser"**), as well as JDA Information first developed or discovered by the Discloser, which is disclosed or otherwise made available to the other Party and/or its Affiliates (collectively the **"Recipient"**) pursuant to this JDA, provided that such Information is:

(1)    disclosed in writing or other tangible form and labeled "[Discloser's name] - confidential," or

(2)    disclosed orally or by observation and confirmed to the Recipient in writing as being "[Discloser's name] - confidential" within 30 days after the initial disclosure,

except with respect to any particular Information that Recipient can prove:

(a)    was available to the public through no fault of Recipient, or

(b)    Recipient already possessed prior to receipt from Discloser, or

(c)    Recipient acquired from a Third Person without obligation of confidence, or

(d)    was independently developed by or for Recipient by one who did not have access to Discloser's Confidential Information or Samples.

Specific Information is not within any of the above exclusions merely because it is within the scope of more general information within an exclusion. A combination of features is not within any of the above exclusions unless the combination itself, including its principles of operation, is within the above exclusions.

     **10.7.**    **"Development"** means any invention, whether patentable or unpatentable, that is:

(a)    a Polyethylene Wax (as defined in 10.13.), and/or

(b)    any method of use for a Polyethylene Wax, and/or

(c)    a product made from or containing a Polyethylene Wax; and/or

(d)    a process for making a product made from or containing a Polyethylene Wax; and/or

(e)    a process for making a Polyethylene Wax; and/or

(f)    a catalyst for making a Polyethylene Wax,

which invention is first actually reduced to practice by a Party (and/or by its participating Affiliates or subcontractors), alone or with others, and which reduction to practice occurs both during the Activity Period and as a result of work performed in connection with this JDA.

     **10.8.**    **"Effective Date"** shall mean July 1, 2002.

     **10.9.**    **"Information"** means technical or business information pertaining to (a) the composition, structure and/or properties of any Polyethylene Wax (including but not limited to the Success Criteria), (b) the use of a Polyethylene Wax in any end-use application, (c) any product made from or containing a Polyethylene Wax, (d) any process for making a product made from or containing a Polyethylene Wax, (e) any process for making any Polyethylene Wax, and/or (f) any catalyst for making any Polyethylene Wax as well as Information as defined in the separate Confidentiality Agreement, having an effective date of January 8, 2001 (Dow Agreement 202541). Under the separate Confidentiality Agreement, Dow's Information includes (a) information relating to and/or derived from the Samples (such as chemical or physical properties or processing information), (b) other information relating to Dow-proprietary polymers, blends, formulations, compounds, fabricated articles, polymer-design tools, test procedures, fabrication equipment or techniques, and/or other article designs or structures, and (c) any other information provided by Dow pertaining to the Purpose. Under the separate Confidentiality Agreement, HRD's Information includes (a) information relating to HRD-proprietary test procedures, fabrication equipment or techniques, end use applications, article designs and/or structures pertaining to the Purpose, and (b) information relating to HRD's business or research and development plans pertaining to the Purpose.

     **10.10.**    **"JDA Information"** means any new Information, owned or controlled by either Party or by its participating Affiliates, that is first developed or acquired both (a) during the Activity Period, and (b) in

*Confidential*

connection with work performed on this JDA.

**10.11.** "JDA Patent Rights" means any claim of any patent or patent application, owned or controlled by either Party or its Affiliates, that defines a Development.

**10.12.** "Party" means HRD or Dow, and "Parties" means HRD and Dow.

**10.13.** "Polyethylene Wax(es)" means metallocene ethylene homopolymers and copolymers having a number average molecular weight ("Mn") within the range of 600-9,000, a density > 0.900g/cc, and Melting Temperature ("$T_m$") above 50°C, and blends thereof.

Notwithstanding Paragraph 9.11., the Parties' Administrators may mutually agree to evaluate specific grades of ethylene homopolymers and copolymers having a broader Mn and/or a lower density than those polymers included in this definition of Polyethylene Wax, for substitution of micro-crystalline waxes. However, the Exclusive Development relationship described in Paragraph 3.1. shall not preclude Dow's development efforts with third parties with those mutually agreed upon polymers for other applications and HRD will not withhold unreasonably its consent with regard to the release of any those polymers which is of no further significant interest in the JDA.

**10.14.** "Polyethylene-Wax-Sample" means a sample of any Polyethylene Wax that has not been sold commercially prior to the time when it is first sampled to the other Party hereunder.

**10.15.** "Product Mix" means the grades of Polyethylene Wax satisfying the mutually agreed upon product specifications, including viscosity and melting point. HRD will bear its costs for supporting Dow in Dow's requests on Product Mix specifications.

**10.16.** "Related Persons," as used with respect to a designated Party, shall mean (a) that Party's Affiliates, and (b) the officers, directors, and employees of that Party and/or that Party's Affiliates.

**10.17.** "Samples" means Polyethylene-Wax-Samples and Samples as defined in the separate Confidentiality Agreement, having an effective date of January 8, 2001 (Dow Agreement 202541 – "Dow-proprietary experimental and/or developmental polyolefin–based polymers and/or blends, sampled under a Dow-proprietary alpha-numeric code designation, and/or any blends, formulations, compounds and/or fabricated articles that contain, or are made from, those polymers or blends").

**10.18.** "Sarnia PE Wax Supply Agreement" means a separate, written agreement between the Parties for Dow to (1) supply one or more Polyethylene Waxes to HRD and (2) convert an existing manufacturing plant to the manufacture of Polyethylene Wax.

**10.19.** "Success Criteria" means the technical and business parameters to be met for the JDA to be considered successfully completed. The Project Administrators will agree upon a specific project plan for achieving the Success Criteria.

| 10.19.1. | **Deliverables for the Sarnia PE Wax Supply Agreement:** |
|---|---|
| 10.19.1.1 | Complete specifications for "Product Mix," including, but not limited to, (a) physical property ranges for each "Prime Product," (b) analytical methods, (c) estimated production volume for each "Prime Product" for each 12-month period of the anticipated 48-month manufacturing period, (d) raw material requirements for each "Prime Product," and (e) acceptable proportion of "Off Spec Product" for each "Prime Product." For this subparagraph, the terms "Product Mix," "Prime Product," and "Off Spec Product" have the same definition as provided in the Sarnia PE Wax Supply Agreement. |
| 10.19.1.2 | Determine process/equipment modifications necessary for making the Product Mix (as defined in Paragraph 10.15. of this JDA) in the Sarnia plant. |

*Confidential*

| 10.19.1.3 | Complete Schedules 1-3 of Samia PE Wax Supply Agreement within 90 days of this JDA's Effective Date. |
| 10.19.2. | **Polyethylene Wax Performance Parameters:** |
| 10.19.2.1 | Other evaluations and development efforts as mutually agreed by Project Administrators. |
| 10.19.3. | **Safety parameters:** |
| 10.19.3.1. | Dow will conduct an internal process/product risk review. The process and product must comply with Dow's guidelines and policies, including Dow's safety and loss prevention policies and product stewardship policies. |

**10.20.** "Third Person" shall mean any natural person or legal entity, which is neither a Party nor a Party's Related Person.

Each Party has caused this JDA to be executed by its respective authorized representative.

**THE DOW CHEMICAL COMPANY**

By _____

Name   Kurt W. Swogger

Title:   Vice President,
         Polyolefins & Elastomer R&D

Date   *June 28, 2002*

**HRD CORPORATION**

By _____

Name   ABBAS A. HASSAN

Title   President

Date   *July 1st 2002*



The Dow Chemical Company
2301 N. Brazosport Blvd.
Freeport, Texas 77541-3257

July 2, 2002

Marcus Oil & Chemical
14549 Minetta Street
Houston, Texas 77035
Attn: Mr. Aziz Hassan, Vice President

Re:    Limited Release from Certain Confidentiality Obligations of Joint Development Agreement (Dow Agreement No. 202541AA)

Dear Mr. Hassan:

Kindly refer to the subject Joint Development Agreement ("JDA") between the parties, having an effective date of July 1, 2002, under which the parties have begun certain development activities.

We understand that HRD would like to disclose certain Dow Confidential Information to Clariant Corporation ("Clariant") for the following purposes: (1) permit HRD to determine its freedom to practice with regard to (a) selling products made from or containing Polyethylene Waxes and (b) methods of using Polyethylene Waxes, in view of Clariant-owned intellectual property; and (2) permit HRD and Clariant to determine their mutual interest in HRD acquiring rights under and/or to Clariant-owned intellectual property relating to HRD's previously described freedom to practice.

Dow is willing to permit HRD's disclosure of Dow Confidential Information to the extent reasonably necessary to accomplish the previously described purposes subject to the following terms and conditions:

(1)    HRD has a confidentiality agreement with Clariant, wherein Clariant has undertaken obligations of confidentiality which are at least as stringent to those undertaken by HRD in the JDA; and

(2)    HRD does not disclose any of the terms or conditions of the Sarnia PE Wax Supply Agreement.

This Limited Release does not authorize Clariant to participate in the JDA as a Third Person pursuant to Paragraph 2.6 of the Joint Development Agreement.

If you should have any questions, please feel free to call Kevin R. Hansbro in Freeport, Texas, USA at (979) 238-9041 or by e-mail at krhansbro@dow.com.

THE DOW CHEMICAL COMPANY

By
Name    Kurt W. Swogger
Title    Vice President, Polyolefins & Elastomers R&D
Date    July 5, 2002

cc:    O'Donnell Ferebee & McGonigal
       450 Gears, Sixth Floor
       Houston, Texas 77067-4584
       Attn: Mr. Michael L. Landrum

Marcus Oil 202541AA 1st LREL.doc                    - 1 -                            July 2, 2002

# ADDENDUM TO JOINT DEVELOPMENT AGREEMENT

THIS ADDENDUM TO JOINT DEVELOPMENT AGREEMENT effective this 26th day of March, 2003, by and between **THE DOW CHEMICAL COMPANY** ("DOW"), having an office at 2301 N. Brazosport Blvd., Freeport, Texas 77541-3257, Attn: Lee Spencer, Intellectual Property Section, Dow Legal Department, Bldg. B-1211, and **HRD Corporation** ("HRD"), having an office at 14549 Minetta St., Houston, TX 77245 Attn: Abbas Hassan, President.

## WITNESSETH:

WHEREAS, DOW and HRD have previously entered into a Joint Development Agreement ("JDA") having an effective date of July 1st, 2002 (Dow Agreement Number 202541AA) and

WHEREAS the JDA defines Polyethylene Wax(es) in Paragraph 10.13 as

"metallocene ethylene homopolymers and copolymers having a number average molecular weight ("Mn") within the range of 600-9,000, a density > 0.900g/cc and Melting Temperature ("Tm") above 50°C, and blends thereof".

and

WHEREAS the efforts of the JDA has yielded results indicating a technically viable Polyethylene Wax for use in Hot Melt Adhesive (HMA) products may ultimately be discovered. and

WHEREAS Parties have discovered that the optimal product for use in **HMA** may be a Polyethylene Wax with a density as low as 0.890 g/cc. and

WHEREAS DOW has expressed concerns regarding preexisting agreements of DOW with undisclosed parties that may require royalty payments for Polyethylene Wax with densities in the 0.890 g/cc range.

NOW, THEREFORE, in consideration of the premises and mutual covenants herein contained, the Parties hereto agree to the following:

1. Paragraph 10.13 shall be replaced with the following:

    "Polyethylene Wax(es)" means metallocene ethylene homopolymers and copolymers having a number average molecular weight ("Mn") within the range of 600-9,000, a density > 0.890g/cc and Melting Temperature ("Tm") above 50°C, and blends thereof".

2.  The following paragraph shall be added to Article 9.

**9.13. Preexisting Agreements**
Parties acknowledge that royalty payments may be sought or due to third parties in the event that a Polyethylene Wax is commercialized as a result of successful JDA development. Any payments would be conditional on a Polyethylene Wax having properties that fall within the range of a preexisting agreement that specifies royalty payments.
Either Party may request a review of preexisting agreements by independent counsel to determine if royalty payments are due third parties. If Counsel agrees that royalty payments are due to third parties, then Parties will discuss in good faith a mechanism that results in satisfying royalty payments as defined in the preexisting agreements.

3.  All other terms and conditions of the JDA apply.

**Addendum Modification**

Any agreement to change the terms of this Addendum in any way shall be valid only if the change is made in writing and approved by mutual agreement of authorized representatives of the parties hereto.

**Notices**

Notices, invoices, and communications hereunder shall be deemed made if given by registered or certified envelope, postage prepaid, and addressed to the party to receive such notice, invoice, or communication at the address given below, or such other address as may hereafter be designated by notice in writing:

**Addendum Controlling.** In the event there is a conflict between the terms and conditions of the JDA and this Addendum, this Addendum shall control.

Each Party has caused this ADDENDUM TO JOINT DEVELOPMENT AGREEMENT to be executed by its respective authorized representative.

THE DOW CHEMICAL COMPANY                HRD CORPORATION

| By | | By | |
|---|---|---|---|
| Name | Kurt W. Swogger | Name | ABBAS ALI HASSAN |
| Title | Vice President, Polyolefins and Elastomers R&D | Title | President |
| Date | Mar, 26, 2003 | Date | March 31st 2003 |



The Dow Chemical Company
2301 N. Brazosport Blvd.
Freeport, Texas 77541-3257

17 June, 2003

HRD Corporation c/o Marcus Oil & Chemical,
14549 Minetta St.
Houston, Texas 77035,
Attn: Mr. Aziz Hassan

Re:    Amendment and Extension of Joint Development Agreement (Dow Agreement No. 202541AA)

Kindly refer to the subject Joint Development Agreement between HRD Corporation, trading as Marcus Oil & Chemical, (hereinafter referred to as "HRD"), a corporation of Texas, having a principal place of business at 14549 Minetta St., Houston, Texas 77035, and The Dow Chemical Company, a Delaware corporation (hereinafter referred to as "Dow"), having an office at 2301 N. Brazosport Blvd., Building B-1211, Freeport, Texas 77541-3257, having an effective date of July 1st,2002. We understand that the parties desire to continue this exchange beyond the activity period set forth in that Joint Development Agreement (currently due to expire on June 30, 2003), and/or to make other amendments as specified below. Accordingly, it is proposed that the parties agree as follows:

A.    Replace Section 10.1 with the following:

   10.1    "Activity Period" means the period of time for performing the JDA activities from the Effective Date of this JDA until December 30th, 2003, unless earlier terminated or amended

B.    Replace Section 2.2 with the following:

   2.2    Research and Development ("R&D") Expenses

   Unless otherwise mutually agreed in writing or specifically stated herein, Dow and HRD will jointly (50:50) fund the Research and Development activities under this JDA, which are both (a) performed during the Activity Period of this JDA and (b) relate to process chemistry and design, product/structure characterization, and scale up risk assessment. The expected direct cost of those R&D activities through December 2003 is $2MillionUS, not including general, administrative, overhead, and profit.

   Within 14 days of signing this JDA, HRD has paid $600,000US to Dow as partial payment for HRD's share of the expected direct R&D costs. On or before July 15, 2003, HRD will pay $400,000US to Dow as the remainder of HRD's share of the expected direct R&D costs.

   When the direct R&D costs reach $1.6 Million US, the Parties will meet to discuss the expenditures to date, the projected costs, and the progress of the JDA toward achieving the Success Criteria. The Project Administrators will agree upon the time, location, and format of the meeting. If the total projected costs are expected to exceed $2MillionUS and the total projected costs do not cause the Parties to terminate the JDA, HRD will pay 50% of the additional costs to Dow on or before December 30, 2003.

   On or before the anniversary of the Effective Date and until the Activity Period expires, Dow will provide an updated report on the direct R&D costs. If the costs have exceeded the expected direct R&D Costs, HRD will pay 50% of the excess to Dow within 30 days.

   If the Activity Period expires and the total R&D costs were below the expected R&D costs, Dow will prepare a final report and refund any HRD overpayment within 14 days.

B.   Replace Section **2.5** with the following:

2.2   **Interim Project Review**

As previously mentioned in Paragraph 2.2, the Parties will conduct an Interim Project Review when the R&D costs reach $1.6 Million US, to evaluate their progress toward achieving the Success Criteria. Either Party may request additional project reviews, which the parties will conduct no later than 30 days after receipt of the request. The Project Administrators will agree upon the time, location, and format of the Project Review(s).

If the foregoing is acceptable, kindly sign and return both originals of this Amendment to Mrs. Tammy Tipps, The Dow Chemical Company, Intellectual Property Section, Dow Legal Department, Bldg. B-1211, 2301 N. Brazosport Blvd., Freeport, Texas 77541-3257, for Dow's signature. After Dow signs the agreement, we will return one fully signed original to you.

If you should have any questions, please feel free to call Lee Spencer in Freeport, Texas, USA at (979) 238-2886 or by e-mail at Lspencer@dow.com.

THE DOW CHEMICAL COMPANY                    HRD CORPORATION

By _____               By _____
Name  Kurt W. Swogger                       Name  AZIZ A. HASSAN.
Title  Vice President, Polyolefins & Elastomers R&D   Title  V. President
Date _____             Date  6/25/2003

JAN-16-2005  16:56          JENNER AND BLOCK LLPC                     312 527 0404     P.042 103



The Dow Chemical Company
Midland, Michigan 48667

December 12, 2003

HRD Corporation c/o Marcus Oil & Chemical,
14549 Minetta St.
Houston, Texas 77035,

Attn: Mr. Aziz Hassan

Re:     Amendment and Extension of Joint Development Agreement (Dow Agreement No. 202541AA)

Kindly refer to the subject Joint Development Agreement between HRD Corporation, trading as Marcus Oil & Chemical, (hereinafter referred to as "HRD"), a corporation of Texas, having a principal place of business at 14549 Minetta St., Houston, Texas 77035, and The Dow Chemical Company, a Delaware corporation (hereinafter referred to as "Dow"), having an office at 2301 N. Brazosport Blvd., Building B-1211, Freeport, Texas 77541-3257, having an "Effective Date" of July 1st,2002.

We understand that the parties desire to continue this exchange beyond the "Activity Period" set forth in that Joint Development Agreement (currently due to expire on December 30, 2003), and/or to make other amendments as specified below.  Accordingly, it is proposed that the parties agree as follows:

A.      Replace Section 10.1 with the following:

   10.1   "Activity Period" means the period of time for performing the JDA activities from the Effective Date of this JDA until June 30, 2004, unless earlier terminated or amended

B.      Replace Section 2.2 with the following:

   2.2    **Research and Development ("R&D") Expenses**
   Unless otherwise mutually agreed in writing or specifically stated herein, Dow and HRD will jointly (50:50) fund the Research and Development activities under this JDA, which are both (a) performed during the Activity Period of this JDA and (b) relate to process chemistry and design, product/structure characterization, and scale up risk assessment. The expected direct cost of those R&D activities through June 30, 2004 is $2.8 Million US, not including general, administrative, overhead, and profit.

   On or before January 31, 2004, in addition to the $1.0 Million US that HRD has paid previously for earlier direct R&D costs, HRD will pay $400,000.-- US to Dow for HRD's share of the additional $800,000.—US in expected direct R&D costs.

   When the direct R&D costs reach $2.8 Million US, the Parties will meet to discuss the expenditures to date, the projected costs, and the progress of the JDA toward achieving the Success Criteria. The Project Administrators will agree upon the time, location, and format of the meeting.  If the total projected costs are expected to exceed $2.8 Million US and the total projected costs do not cause the Parties to terminate the JDA, HRD will pay 50% of the additional costs to Dow on or before June 30, 2004.

   On or before the anniversary of the Effective Date and until the Activity Period expires, Dow will provide an updated report on the direct R&D costs.  If the costs have exceeded the expected direct R&D Costs, HRD will pay 50% of the excess to Dow within 30 days.

   If the Activity Period expires and the total R&D costs were below the expected R&D costs, Dow will prepare a final report and refund any HRD overpayment within 14 days.

DOW RESTRICTED - For internal use only

B.     Replace Section 2.5 with the following:

2.5     **Interim Project Review**
As previously mentioned in Paragraph 2.2, the Parties will conduct an Interim Project Review when the R&D costs reach $2.8 Million US, to evaluate their progress toward achieving the Success Criteria. Either Party may request additional project reviews, which the parties will conduct no later than 30 days after receipt of the request. The Project Administrators will agree upon the time, location, and format of the Project Review(s).

If the foregoing is acceptable, kindly sign and return both originals of this Amendment to Mrs. Tammy Tipps, The Dow Chemical Company, Intellectual Property Section, Dow Legal Department, Bldg. B-1211, 2301 N. Brazosport Blvd., Freeport, Texas 77541-3257, for Dow's signature. After Dow signs the agreement, we will return one fully signed original to you.

If you should have any questions, please feel free to call Dow's Project Administrator, Michael J. Levinson in Midland, Michigan at (989) 636-1050 or contact him by e-mail at mjlevinson@dow.com .

**THE DOW CHEMICAL COMPANY**

By _____

Name   Kurt W. Swogger

Title   Vice President, Polyolefins & Elastomers R&D

Date   Feb 20, 2004

**HRD CORPORATION**

By _____

Name   Abbas Ali Hirsan

Title   President

Date   Feb. 19 | 2004.

[ One of Two Originals ]

DOW RESTRICTED - For Internal use only

# EXHIBIT B

DATE      July 1, 2002

# THE DOW CHEMICAL COMPANY

## AND

# HRD CORPORATION

## SARNIA PE WAX SUPPLY AGREEMENT

## Table of Contents

| *Clause* | | *Page* |
|---|---|---|
| 1. | Definitions | 3 |
| 2. | Duration | 7 |
| 3. | Conversion of the Facility | 7 |
| 4. | Products, Product Mix and Performance Criteria | 8 |
| 5. | Supply Chain Team | 9 |
| 6. | Forecasting, Ordering, and Supply | 9 |
| 7. | Delivery | 10 |
| 8. | Price, Price Adjustment and Payment Terms | 11 |
| 9. | Product Warranty | 13 |
| 10. | Acceptance | 13 |
| 11. | Liability, Indemnification and Limitation of Remedies | 14 |
| 12. | Changes to Production | 16 |
| 13. | Hardship | 16 |
| 14. | Performance Warranties | 17 |
| 15. | Force Majeure and Government Controls | 17 |
| 16. | Intellectual Property | 18 |
| 17. | Notices | 20 |
| 18. | Variation | 22 |
| 19. | Confidentiality | 22 |
| 20. | Assignment | 23 |
| 21. | Termination | 23 |
| 22. | Severability | 25 |
| 23. | Law | 26 |
| 24. | Alternative Dispute Resolution | 26 |
| 25. | Parties in Interest | 26 |
| 26. | Survival of Certain Terms | 26 |
| 27. | Construction | 27 |
| 28. | Headings | 27 |
| 29. | Entire Agreement | 27 |
| 30. | Non Waiver | 27 |
| 31. | Exclusivity | 27 |

Schedule 1 – Product Specifications
Schedule 2 – HRD Product Estimates
Schedule 3 – Variable Cost Formulas

**THIS SUPPLY AGREEMENT** ("Agreement") is made and entered into the 1st day of July, 2002 ("Effective Date") between **THE DOW CHEMICAL COMPANY**, a Delaware corporation located in Midland, Michigan ("TDCC") and **HRD CORPORATION**, trading as Marcus Oil & Chemicals, a Texas corporation located in Houston, Texas ("HRD") (together the "Parties" or individually a "Party").

**WHEREAS:**

(A)   TDCC has the manufacturing expertise and "know how" to make PE Wax.

(B)   HRD & TDCC have separately entered into a Joint Development Agreement ("JDA") to collaborate on the development of PE Wax.

(C)   HRD wishes to purchase PE Wax manufactured consistent with certain mutually agreed upon specifications ("Product") from TDCC, and TDCC is willing to supply HRD with Product under the terms and conditions as are more particularly described below.

(D)   TDCC is willing to convert an existing manufacturing plant ("Facility") at its Sarnia Site to manufacture sixty (60) million pounds a year of PE Wax for a period not to exceed forty eight (48) months while HRD determines if further expansion is commercially reasonable. HRD is willing to repay TDCC its investment costs in converting the facility under the terms and conditions as are more particularly described below.

**NOW IT IS HEREBY AGREED** as follows:

1.   **DEFINITIONS**

In this Agreement the following terms shall, unless the context requires otherwise, have the meanings respectively assigned thereto below:

| | |
|---|---|
| "Affiliate(s)" or "Affiliated Companies" | Any entity that directly or indirectly owns, is owned by, or is under the common ownership with a Party, at any time during the term of this Agreement. "Owns", "owned", or "ownership" means direct or indirect possession of more than 50 percent of the votes of holders of a corporation's voting securities, or a comparable equity or other ownership interest in any other type of entity. |
| "Agreement" | This Supply Agreement between TDCC and HRD including the Schedules hereto. |
| "Annual Capacity" | Sixty (60) million pounds of Product. |
| "Annual Operating Payment" or "AOP" | The payment due from HRD for operation of the |

3

|                                    | Facility as set forth in Clause 8.1.2. |
|------------------------------------|----------------------------------------|
| "Background Information"           | Background Information is any Information owned or controlled by a Party or its Affiliates prior to the Effective Date, as well as any Information developed by or for a Party or its Affiliates independent of this Agreement. |
| "Background Patent Rights"         | Background Patent Rights are those claims of any patents or patent applications, owned or controlled by a Party or its Affiliates at anytime during the term of this Agreement, that define any invention other than a Development. |
| "Beneficial Manufacture"           | TDCC' first Delivery of Product to HRD. |
| "Business Day"                     | Business Day shall mean any day other than a Saturday, Sunday, bank holiday or national holiday in the United States. |
| "Capacity Rights Payment" or "CRP" | The payment due from HRD to TDCC for the exclusive right to the Annual Capacity as set out in Clause 8.1.1. |
| "Conversion Period"                | Conversion Period has the meaning ascribed to it in Clause 3.1 of this Agreement. |
| "Delivery"                         | Delivery has the meaning ascribed to it in Clause 7.3 of this Agreement. |
| "Development"                      | Development has the meaning ascribed in Clause 16.2. |
| "Effective Date"                   | Effective Date has the meaning ascribed to it in the Preamble. |
| "Estimated CRP Payment"            | The initial payment due from HRD to TDCC as described in Clause 8.1.1 |
| "Facility"                         | The plant(s), items of equipment, warehouses, and other manufacturing and storage facilities that are located on the Sarnia Site, owned by TDCC or an Affiliate of TDCC, used solely in connection with the manufacture of the Product that is (i) capable of producing at least two (2) different grades of Prime Product and (ii) capable of producing the Annual Capacity |

| | |
|---|---|
| "Final CRP Payment" | The payment made by either HRD or TDCC to reflect the difference between the Estimated CRP Payment and the actual costs incurred by TDCC in converting the Facility as set out in Clause 8.1.1. |
| "Force Majeure" | Force Majeure has the meaning ascribed to it in Clause 15.2 of this Agreement. |
| "Implementation Date" | The date upon which the Parties agree in writing that the (i) JDA has produced the necessary Development outcomes to warrant the commencement of the Conversion Period, (ii) Schedules 1-3 have been completed and (iii) the estimates of the conversion costs supplied by TDCC are acceptable to HRD. |
| "Indemnified Party" | Indemnified Party has the meaning ascribed to it in Clause 11.3.3 of this Agreement. |
| "Indemnifying Party" | Indemnifying Party has the meaning ascribed to it in Clause 11.3.3 of this Agreement. |
| "Information" | Information has the meaning ascribed to it in Clause 16.3 of this Agreement. |
| "Joint Development Agreement" or "JDA" | That Joint Development Agreement for PE Wax between the Parties with an effective date of July 1, 2002. |
| "Off Spec Product" | Product that does not meet one or more of the specifications in Schedule 1. |
| "Patent Rights" | Patent Rights means any claim of any patent or patent application, owned or controlled by either Party or its Affiliates, that defines a Development. |
| "PE Wax" | Metallocene ethylene homopolymers and copolymers having a Mn within the range of 600-9,000, a density > 0.900g/cc, and $T_m$ above 50°C. |
| "Price" | Price is the amount of money in United States dollars that HRD will pay TDCC to manufacture Product, the components of which are set out in Clauses 8.1 of this Agreement. |

5

| | |
|---|---|
| "Prime Product" | PE Wax that meets the specifications set out in Schedule 1 as determined in accordance with the analytical methods also set out in Schedule 1 or such alternative analytical methods as shall from time to time be agreed in writing between the parties. |
| "Product" | All PE Wax manufactured with the intent to (i) be delivered to HRD and (ii) to meet the specifications set out in Schedule 1 as determined in accordance with the analytical methods also set out in Schedule 1 or such alternative analytical methods as shall from time to time be agreed in writing between the parties. Product includes Off Spec Product. Transition material produced when changing between PE Wax manufactured for HRD and that output to be consumed by TDCC is not Product. |
| "Product Mix" | The specific PE Waxes produced at the Facility. |
| "Project Threatening Event" | Project Threatening Event has the meaning ascribed in Clause 3.2.1 of this Agreement. |
| "Sarnia Site" | The Sarnia, Ontario, Canada manufacturing site owned and operated by TDCC or an Affiliate of TDCC and on which the Facility is to be located. |
| "Supply Chain Team" or "SCT" | SCT has the meaning ascribed to it in Clause 5.1 of this Agreement. |
| "Supply Period" | Supply Period has the meaning ascribed to it in Clause 2 of this Agreement. |
| "Variable Costs Payments" or "VCP" | Variable Costs has the meaning ascribed to it in Clause 8.1.3 of this Agreement. |
| "Vendor Schedule" | Vendor Schedule has the meaning ascribed to it in Clause 6.4 of this Agreement. |
| "Year" | The successive periods of twelve months commencing on each 1st January. |
| "Yearly Forecast" | Yearly Forecast has the meaning ascribed to it in Clause 6.3 of this Agreement. |

6

## 2.  DURATION

2.1  This Agreement shall commence on the Effective Date and shall continue in force for forty eight (48) months from the date of Beneficial Manufacture at the Facility (the "Supply Period") unless terminated earlier pursuant to the terms of the Agreement. If not terminated earlier, the Parties agree to meet at least twelve (12) months prior to the expiration of the Supply Period and discuss whether they want to extend the Agreement and, if so, upon what terms.

2.2  If the Implementation Date is not reached six (6) months after the Effective Date then this Agreement shall terminate unless the Parties mutually agree to extend.

## 3.  CONVERSION OF THE FACILITY

3.1  Subject to the Parties agreeing in writing that the JDA has produced the necessary Development outcomes ("Implementation Date"), TDCC shall immediately commence and, with all reasonable commercial diligence, proceed with preparing plans and engineering studies and obtaining all engineering, planning, regulatory and all other approvals, and doing all such other things, advisable or necessary, for the conversion and operation of the Facility for the commercial manufacture of the Product, and shall, subject to Clauses 3.2 and 15, use its best efforts to complete conversion of the said Facility within twelve (12) months of the Implementation Date ("Conversion Period"). For purposes of this Clause 3, the phrase "best efforts" shall mean TDCC's timely pursuit and exhaustion of all commercially prudent and reasonable activities ordinarily available for the conversion of a manufacturing facility. TDCC shall have the sole responsibility and discretion for all decisions related to the conversion of the Facility including but not limited to those decisions related to equipment specifications, manufacturing quality and contractors.

3.2  <u>Termination due to Project Threatening Event</u>

3.2.1.  At any time prior to the date of Beneficial Manufacture for the Facility, TDCC shall, following a determination by TDCC, acting reasonably and properly and taking into account all relevant circumstances, that (i) there has occurred one or more events during the conversion of the Facility beyond the reasonable control of TDCC and which TDCC reasonably believes, either singly or as a whole, are reasonably likely to threaten or imperil TDCC's ability to achieve Beneficial Manufacture within the Conversion Period or (ii) subject always to TDCC having complied with the provisions of Clause 3.1, it would not be possible for TDCC, despite using its best efforts, to operate the Facility in a safe and proper manner (each a "Project Threatening Event"), notify HRD in writing of such Project Threatening Event, specifying in summary fashion the nature of the Project Threatening Event and the expected period of delay beyond the Conversion Period in achieving Beneficial Manufacture from the Facility that is due to such Project Threatening Event. Provided, however, that a TDCC decision to not notify HRD of a potential Project Threatening Event will not be considered a material breach of this Agreement unless it is objectively certain that the circumstances potentially constituting a Project Threatening Event would in fact be reasonably likely to

7

threaten or imperil TDCC's ability to Beneficial Manufacture from Facility within the Conversion Period.

3.2.2    Upon receipt of such notice by HRD of a Project Threatening Event, unless HRD disputes that a Project Threatening Event has occurred, in which case such dispute may be resolved pursuant to Clause 24, the parties will promptly meet, through each Party's respective SCT representatives or through such other representatives as each Party may designate, and discuss in good faith to further identify and outline: (i) the nature of the Project Threatening Event, (ii) the potential time period of delay, if any, to TDCC's achieving Beneficial Manufacture within the Conversion Period due to the Project Threatening Event, (iii) the potential solutions to such Project Threatening Event, and (iv) the time frame for implementing a solution to such Project Threatening Event, if any. Following the conclusion of such discussions to the reasonable satisfaction of both parties, HRD shall, subject to Clause 15, have the right to (i) accept the risk, if any, such Project Threatening Event (and the corresponding delay to the achievement of Beneficial Manufacture within the Conversion Period due to such Project Threatening Event) presents, in which case TDCC shall have no liability to HRD for the impact of the Project Threatening Event provided that TDCC uses its best efforts to complete conversion or (ii) to terminate this Agreement pursuant to the provisions of Clause 21.4.

3.2.3    If both parties acting reasonably cannot reach a mutually agreeable plan of action to overcome such a Project Threatening Event pursuant to 3.2.2 above or TDCC, despite using its best efforts, cannot implement the said plan so as to address and/or overcome the said Event to HRD's satisfaction TDCC may terminate this Agreement in accordance with the provisions of Clause 21.4.

3.3    It is understood between the Parties that any changes to the Product Mix, the specifications in Schedule 1 or HRD's requirement's set out in Schedule 2 during the Conversion Period may result in an extension of the Conversion Period, a change in the CRP, the AOP or the VCP or any combination of the above.

## 4.    PRODUCTS, PRODUCT MIX AND PERFORMANCE CRITERIA

4.1    The specifications for the Prime Products to be produced at the Facility are as set out in Schedule 1. The specific Prime Products to be produced at the Facility shall be known as the "Product Mix". The specification of any Prime Product and the resultant Product Mix for the Facility shall be subject to approval of the Supply Chain Team.

4.2    HRD's currently estimated annual need for Product from TDCC is as set out in Schedule 2. Conversion of the Facility as outlined in Clause 3 will use Schedule 1 and Schedule 2 as the basis for designing the necessary changes to, and estimating the capabilities of, the Facility. For the avoidance of doubt, such estimate in Schedule 2 is indicative only and shall not constitute an obligation on the part of HRD to purchase or take delivery of the estimated quantities.

8

5.    **SUPPLY CHAIN TEAM**

5.1    Creation and Responsibilities of SCT.  The parties have formed a Supply Chain Team ("SCT") for the purpose of facilitating communication between the parties concerning the conversion and operation the Facility and the production of the Product. Specifically, it is the intention of the parties that such SCT shall, among other things, (1) review the progress of the conversion of the Facility against TDCC-established milestones, (2) review TDCC' costs relative to the conversion and operation of the Facility, (3) provide recommendations to TDCC concerning the conversion of the Facility, (4) approve changes to Product specifications and the Product Mix, (5) approve changes to the VCP, (6) review TDCC' costs relative to maintaining or repairing the Facility and/or proposed capital expenditures required attributable to regulatory concerns, (7) provide recommendations to TDCC concerning the quality of Product supplied to HRD, (8) develop and oversee the forecasting, order call-off, and delivery procedures, (9) work together to manage Product inventory, and (10) work together to co-ordinate HRD's production forecasting with TDCC' periodic need for shutdown at the Sarnia Site or Facility.

5.2    Relationship Created.  Notwithstanding anything to the contrary in this Agreement: (i) TDCC shall retain complete discretion and authority over the conversion and operation of the Facility and HRD shall have no authority over the conversion or operation of the Facility; (ii) HRD shall bear no liability or risk of loss (other than payment of the CRP) in the event the Facility or Sarnia Site is damaged or demolished during such conversion or operation; and (iii) the establishment of any such SCT shall not limit or prejudice either Party's respective obligations and responsibilities under this Agreement at law or in equity.

5.3    HRD Right to Inspect Facility.  HRD shall have the right, upon ten (10) business days prior notice and during normal business hours, for up to three (3) HRD personnel to inspect the Facility once per calendar quarter prior to the date of Beneficial Manufacture and twice per year following the date of Beneficial Manufacture.  All such HRD personnel who visit the Facility shall adhere to the confidentiality obligations contained in Clause 19 of this Agreement and shall comply with all safety and operational policies and/or procedures established by TDCC with regard to the Facility and/or the Sarnia Site where located.  TDCC reserves the right however, to deny access to any HRD personnel whom TDCC reasonably believes imposes an information security risk to the TDCC technology.

6.    **FORECASTING, ORDERING, AND SUPPLY**

6.1    During the period of this Agreement and subject to the terms and conditions of this Agreement, HRD shall annually accept and purchase from TDCC the output of the Facility up to the Annual Capacity, and shall have the optional and exclusive right to purchase any additional annual output available beyond the Annual Capacity at a price set out in Schedule 3.

6.2    During the period of this Agreement and subject to the terms and conditions of this Agreement TDCC shall sell and deliver to HRD the output of the Facility up to the

Annual Capacity in such quantities of the Product as shall be ordered by HRD from time to time in accordance with the provisions of this Clause 6. Subject to Clause 15, TDCC will use its best efforts to prevent, curtail and/or rectify any failure of supply of Product as soon as possible. For purposes of this Clause 6.2, the phrase "best efforts" shall mean TDCC's timely pursuit and exhaustion of all commercially prudent and reasonable measures ordinarily available for the operation of a manufacturing facility.

6.3    Not later than each 31 October following Beneficial Manufacture, HRD shall provide TDCC with a non-binding forecast of HRD's aggregate monthly requirements for Products from TDCC during the following calendar year (the "Yearly Forecast"). Before submitting the Yearly Forecast HRD undertakes to discuss in good faith and as far as practicable to take account of TDCC's production needs (including plant shutdown, and/or maintenance) or other legitimate non-production needs of the Facility or Site including its effect on annual operating costs. The SCT will then meet and discuss in good faith any changes which would be appropriate to the Yearly Forecast for the following Year.

6.4    HRD shall by the fifteenth (15th) day of each month provide TDCC with a schedule comprising a non-binding rolling forecast of HRD's requirements from TDCC during each of the six (6) months commencing with the month immediately following the month in which such schedule is provided (hereinafter referred to as the "Vendor Schedule"). TDCC will plan to manufacture Product within +/- 10% of the Vendor Schedule in any given month.

6.5    HRD shall provide TDCC with firm call off order(s) for Product in accordance with the then current requirements of the SCT. Such firm call off order(s) for Product will be consistent with the Yearly Forecast agreed upon by TDCC and HRD pursuant to Clause 6.3 or otherwise mutually agreeable to TDCC and HRD.

6.6    Notwithstanding anything to the contrary in this Agreement, TDCC shall not be obliged to supply more than (i) 5,000,000 pounds of Product during each calendar month following Beneficial Manufacture and (ii) 60,000,000 total pounds of Product during each calendar year following Beneficial Manufacture. TDCC will, subject to the shutdown, maintenance, or other legitimate non-production needs at the Facility or Sarnia Site, use commercially reasonable efforts to supply to HRD such quantities of the Product from time to time ordered by HRD from TDCC in excess of the said monthly and total annual maximum quantities referred to in this Clause 6.6, but in no event shall TDCC be liable to HRD for its failure to deliver quantities of the Product in excess of such maximum amounts.

6.7    If and to the extent that HRD's forecast offtake of Product will be less than 50% of the Annual Capacity in any year then HRD and TDCC shall discuss in good faith TDCC's utilization of any resulting excess Product capacity for other uses.

7.    DELIVERY

7.1    The Product manufactured at the Facility shall be transferred immediately in molten form to railcars at the Facility. HRD is responsible for supplying railcars that are

10

certified clean or are dedicated to the same grade of PE Wax. Additionally HRD shall be responsible for managing the railcars as well as the timely transportation of the Product from the Facility according to the then current requirements of the SCT.

7.2     Title to and risk of loss for the Product shall pass to HRD upon Delivery of the Product.

7.3     "Delivery" shall be deemed to occur when (i) the Product is declared by TDCC to be Prime Product or Off-Spec Product and (ii) when the Railcar is full or otherwise declared by TDCC to be ready to be transported.

## 8.     PRICE, PRICE ADJUSTMENT AND PAYMENT TERMS

8.1     The Price which HRD shall pay to TDCC for the Product taken from the Facility is equal to (a) the initial Capacity Rights Payment (CRP), plus (b) the Annual Operating Payment (AOP), plus (c) the Variable Costs Payment (VCP).

8.1.1   Subject to Clauses 21 and 15.3, the CRP is a non-refundable payment for the right to purchase up to the Annual Capacity of Product from the Facility for the Supply Period. It is comprised of an Estimated CRP Payment of $4,000,000 and a Final CRP Payment. The CRP is intended to equal the actual costs to engineer and build the Facility including but not limited to those costs incurred for procurement, materials, equipment, expendable supplies, construction and conversion, commissioning, start up and a 10% project management fee but excluding (i) those costs charged in the JDA and (ii) the capital associated with activities outside boundary limits (OSBL) of the Facility as defined in TDCC's drawings and nomenclature. TDCC will collect all of the actual costs incurred in converting the Facility according to TDCC standard procedures for capital projects. Within ninety (90) days after the date of Beneficial Manufacture TDCC will "true up" the actual costs incurred with the CRP and issue either an invoice to HRD or advise HRD that payment from TDCC will be forthcoming pursuant to 8.2.4 for the difference between the Estimated CRP Payment and the actual costs incurred by TDCC as defined by TDCC's standard processes for capital projects ("Final CRP Payment").

8.1.1.1  Right to Audit – HRD shall have the right to have an independent certified public accounting firm ("CPA firm"), mutually acceptable to the Parties, audit TDCC's books of account and other records pertaining to the conversion of the Facility pursuant to this Agreement. Prior to commencing its audit, the CPA firm shall execute a confidentiality agreement reasonably acceptable to TDCC. Upon completing its audit, the CPA firm shall report only whether or not the charges resulting from the "true up" by TDCC hereunder were correct or, if not, the amount of any overcharge or undercharge. The Parties agree to accept the determination of the CPA firm as binding and final. The cost of such audit shall be borne by HRD.

8.1.1.2  Any subsequent capital expenditure for enhancing production capability (such as expanded capacity, improved quality, changed product mix, etc.) shall require the agreement of the Parties and be subject to payment from

11

HRD to TDCC in a manner similar to that for the original CRP. Any such additional payment is due to TDCC prior to the commencement of any additional conversion activity on the Facility.

8.1.2   The AOP is an annual fee of C$16,500,000 (only the AOP shall be paid in Canadian currency) payable regardless of the amount of Product taken by HRD in the year. The AOP is a fee paid by HRD to TDCC to operate the Facility each year, and is represents those costs incurred by TDCC for labor, maintenance, overhead and includes a profit margin for TDCC. The AOP shall include provision for capital expenditures associated with plant health (such as general maintenance, and achieving TDCC or regulatory environment, health and safety requirements). Should the Canadian Consumer Price Index experience an annual increase of five percent (5%) or more in any Year then the AOP shall increase by ½ of the increase. In the event of any such increase HRD shall have the exclusive right to terminate the Agreement.

8.1.3   The VCP represents the actual full variable market cost of raw materials for the Product, based on a formula that references pre-agreed market cost sources. The formula will differ for each grade based on the raw materials (ethylene, co-monomer, catalyst, additives) consumed. Schedule 3 will set out the Product formulae and market cost sources, as well as the maximum allowable Off-Spec Product volume and discount on the VCP for volumes of Off-Spec Product beyond the maximum allowable. The VCP invoiced will be according to Schedule 3 or any updates thereto agreed by the Parties.

8.2    Payment.

8.2.1   The Estimated CRP Payment is due within fifteen (15) days of the Implementation Date.

8.2.2   1/12 of the AOP shall be invoiced on a monthly basis commencing on the first month after the date when TDCC first produces two (2) railcars of Prime Product meeting the specifications for one of the Products in Schedule 1.

8.2.3   The VCP shall be invoiced on a weekly basis commencing on the first week after Beneficial Manufacture for the Facility.

8.2.4   All payments are due thirty (30) days from the invoice date. Payment hereunder shall be made by the Parties by transfer to such account with such bank as shall have been notified by the receiving Party in writing.

8.2.5   TDCC may charge HRD interest at the rate of one and one half percent (1-1/2%) per month, or the maximum amount of interest allowed by law, whichever is less, on all undisputed overdue amounts. HRD agrees to pay all costs and expenses (including court costs and reasonable attorneys' fees) incurred by TDCC in the collection of any amounts due this Agreement or in the protection of TDCC's interest during any bankruptcy proceeding involving HRD.

9. **PRODUCT WARRANTY**

9.1    TDCC hereby warrants that on Delivery, all Products sold pursuant to this Agreement:

9.1.1    Prime Product shall conform in all material respects to the specification set out in Schedule 1 as determined in accordance with the analytical methods also set out in Schedule 1, and Off-Specification Product shall be so designated and the relevant characteristics identified according to the then current requirements of the SCT; and

9.1.2    will be conveyed with good title, free from any lawful lien or encumbrance (including the license to practice under any claim of a Dow-owned Background Patent Right, wherein the claim is directed to a PE Wax);

9.1.3    will be manufactured in accordance with Dow good manufacturing practices and TDCC will, where appropriate, provide production information to HRD relating to FDA food contact requirements;

9.1.4    will be appropriately placarded for flammability;

**EXCEPT AS PROVIDED HEREIN, TDCC GIVES NO OTHER WARRANTY WITH REGARD TO THE QUALITY, MERCHANTABILITY, OR FITNESS FOR THE PURPOSE OF THE PRODUCT, AND ALL SUCH OTHER REPRESENTATIONS AND WARRANTIES WHETHER EXPRESS OR IMPLIED ARE HEREBY EXCLUDED. IT IS EXPRESSLY UNDERSTOOD THAT HRD HAS THE SOLE RESPONSIBILITY FOR DETERMINING THE APPLICABILITY OF PRODUCT FOR A PARTICULAR APPLICATION AND THAT HRD WILL OBTAIN ANY AND ALL APPROVALS REQUIRED FOR ANY PARTICULAR USE OF THE PRODUCT.**

9.2    Each railcar of Prime Product Delivered hereunder shall be accompanied by a Certificate of Analysis, signed and dated on behalf of TDCC, which indicates the relevant order number and details all matters described in the specification set out in Schedule 1. TDCC shall retain a sample from each shipment of Product supplied to HRD for at least one (1) year after shipment, and if HRD shall contest the quality of any such shipment, until any dispute with regard thereto has been finally determined.

9.3    HRD warrants that it will not use Product in an application that violates the then current TDCC Medical Application Policy.

10.    **ACCEPTANCE**

10.1    Promptly following each Delivery of the Product, HRD shall examine the Product.

10.2    If HRD, upon examination in accordance with Clause 10.1, becomes aware of any defect in the Product, it shall notify TDCC within sixty (60) days of Delivery of such Product.

10.3  If and to the extent that HRD has failed to timely examine the Product upon Delivery in accordance with Clause 10.1, or if it has failed to notify TDCC in accordance with Clause 10.2, such failure shall be deemed an irrevocable acceptance by HRD of the Product in satisfactory condition in respect of all defects which would have reasonably been discovered upon such examination and a waiver of all claims with respect thereto.

## 11.  LIABILITY, INDEMNIFICATION AND LIMITATION OF REMEDIES

11.1  In the event of a breach of warranty contained in Clause 9.1, HRD shall be entitled to, at TDCC's option, either (i) the costs of disposal by HRD, (ii) to sell the material and retain the proceeds or (iii) to a refund of the VCP associated with the production of the Product that breaches the warranty.

11.2  TDCC's and its Affiliates' total liability for claims related to Product supplied to HRD or its Affiliates shall be exclusively limited to the remedies specified in Clause 11.1 of this Agreement.

11.3  Indemnification.

11.3.1  By HRD. Subject to the provisions of Clause 11.3.3 below, HRD agrees to indemnify and defend TDCC, its Affiliated Companies, officers, directors, employees and agents, from and against any and all third party claims, demands, suits, causes of action at law or in equity, expenses (including reasonable attorney's and expert's fees), and liability of any nature on account of any damage or destruction of property, injury or death of persons, or action of any foreign, federal, state or local governmental agency arising out of HRD's or its Affiliates' failure to (i) familiarize itself with any Product literature or information TDCC provides under TDCC's product stewardship program, including the MSDS for each Product, (ii) follow safe handling, use, selling, storage, transportation and disposal practices including any special practices as HRD's use of each Product requires and instruct its employee, contractors, agents and customers in these practices, and (iii) take appropriate action to avoid spills or other dangers to persons, property or the environment.

11.3.1.1  At all times while the Agreement is in effect, HRD will insure the risk imposed by this Clause 11.3.1 by procuring and maintaining, at its own expense and for its own benefit, Comprehensive/Commercial General Liability Insurance (including contractual liability, products liability, and completed operations coverage) with a bodily injury, death, and property damage combined single limit of $5,000,000 per occurrence. The scope of this coverage is to be equivalent to standard ISO forms (e.g., 1996 Commercial General Liability ISO form # CG 00 01 01 96, etc. or CG 00 02 01 96). If the insurance to be provided is in the form of ISO Form CG 00 02 01 96 (claims made), the policy shall contain an extended reporting period of at least five (5) years; any Retroactive Date under said policy shall be no later than the Effective Date of the Agreement

11.3.1.2  HRD will furnish TDCC a certificate(s) from an insurance carrier (having a minimum AM Best rating of A) showing all insurance set forth above. The certificate(s) will include the following statement: "The insurance certified

14

hereunder is applicable to all contracts between The Dow Chemical Company and the Insured. This insurance may be canceled or altered only after thirty (30) days written notice to DOW." The insurance, and the certificate(s), will (1) name TDCC (including TDCC's officers, directors, employees, affiliates, agents, subsidiaries, successors, and assigns) as additional insureds with respect to matters arising from this Agreement, (2) provide that such insurance is primary and non contributing to any liability insurance carried by TDCC, and (3) provide that underwriters and insurance companies of HRD may not have any right of subrogation against TDCC (including TDCC's officers, directors, employees, affiliates, agents, subsidiaries, successors, and assigns). The insurance will contain no more than an ordinary deductible. HRD agrees to waive any right of recovery against TDCC (including TDCC's officers, directors, employees, affiliates, agents, successors, and assigns) for any loss or damage of the type covered by the insurance to be procured and maintained under this Clause, regardless of whether or not such insurance is so maintained. Failure of any of the terms and conditions of this Clause will be considered a material breach under this Agreement.

11.3.2 <u>Patent Indemnity</u>. Subject to the provisions of Clause 11.3.3 below, TDCC agrees to indemnify and defend HRD, its Affiliated Companies, officers, directors, employees and agents from all liability, damages, costs, and expenses incurred by HRD, its Affiliated Companies, officers, directors, employees, and agents arising from any cause of action based on a claim that the Product in the form delivered to HRD infringes any United States or Canadian patent. If the use or sale of the Product furnished hereunder becomes, or in the opinion of TDCC is likely to become, the subject of any claim of infringement of any United States or Canadian patent or in the event an injunction or order is obtained against HRD's use of the Product by reason of a judicial determination of infringement of a valid United States or Canadian patent by use of the Product, TDCC may at its option and expense either (i) obtain a license on commercially reasonable terms to permit sales of the Product to HRD or (ii) modify such Product so as to make it non-infringing or replace such Product with non-infringing substitutes provided that such modified Product or replacement shall be at least of equivalent efficacy as the Product in the manufacture, formulation and use. If TDCC is unable to exercise either of such options, after employing reasonable efforts to do so, TDCC shall be entitled to terminate the Agreement and cease supplying the Product without obligation or liability to HRD other than that contained in Clause 21.4 or 21.5.

11.3.3 <u>Tender of Defense</u>. Each Party's indemnification obligations under Clauses 11.3.1 and 11.3.2 of this Agreement are subject to the following conditions: (I) the Party seeking indemnification (the "Indemnified Party") notifies the Party to provide the indemnification (the "Indemnifying Party") of such claim in writing promptly after the Indemnified Party becomes aware of such claim; (ii) the Indemnifying Party is permitted to defend, control, conduct, and prosecute, in its sole discretion and by counsel of its own choosing, the defense of any such claim brought against the Indemnified Party provided that the Indemnified Party may participate in such defense through separate counsel at its own expense; (iii) the Indemnifying Party shall not settle, compromise or otherwise terminate the cause of action without the written approval of the Indemnified Party (which approval

15

shall not be unreasonably withheld); provided, however, that if the Indemnified Party refuses to approve the Indemnifying Party's proposed settlement, the Indemnified Party shall be liable to the Indemnifying Party for any and all liability, cost or expense which is incurred by the Indemnifying Party after the Indemnified Party's refusal, is associated with such claim, and is in excess of the settlement amount; (iv) the Indemnified Party shall refrain from settling any actions based on such claim without the Indemnifying Party's consent; (v) the Indemnified Party shall not intentionally and materially compromise the position of the Indemnifying Party by admissions, statements, or conduct in a way that could prejudice the defense, control, conduct or prosecution of such action; and (vi) the Indemnified Party cooperates with the Indemnifying Party in the defense, conduct, prosecution, or termination of such actions, including the furnishing of information and assistance of employees of the Indemnified Party at the Indemnifying Party's request and at no charge to the Indemnifying Party.

11.4    <u>Limitation of Remedies and Liabilities</u>.  Neither Party shall be liable to pay consequential, special, punitive, exemplary or incidental damages to the other Party arising out of the performance or nonperformance of this Agreement.  TDCC' and its Affiliates' total liability for claims related to Product supplied to HRD or its Affiliates is limited to the remedies specified in Clause 11.1 of this Agreement.

12.    **CHANGES TO PRODUCTION**

12.1    TDCC shall not, without the prior written consent of HRD, which consent shall not be unreasonably withheld, make any change in the production facilities or raw materials used by TDCC to manufacture the Product.  TDCC acknowledges that HRD may require TDCC to produce samples of the Product manufactured using the changed production facilities or raw materials in sufficient quantities to enable HRD to establish the effect of the change on the manufacturing process in which HRD employs the Product.  Without prejudice to TDCC's ongoing obligations under this Agreement, in particular those under Clause 9.1 above, if HRD's consent to such change is forthcoming, the specification set out in Schedule 1 shall be amended to the extent required by the change.

12.2    Should HRD desire that Product be certified according to an external organization, i.e. ISO, then the Parties agree to meet and discuss the request, the financial impact of the request and the allocation of costs for such a certification.

13.    **HARDSHIP**

If at any time by reason of any changed circumstances the performance of this Agreement results in undue hardship to either Party, such Party may notify the other Party in writing specifying the reasons considered to result in undue hardship and require the other Party to confer and to decide what, if any, amendment of the provisions of this Agreement (whether on a temporary or permanent basis) would be appropriate, equitable and mutually acceptable to remedy such undue hardship.  The other Party shall in good faith consider such a request and any proposals but shall be under no obligation to accept or implement any such request or proposal.

16

## 14.    PERFORMANCE WARRANTIES

14.1    TDCC and HRD each hereby warrants and undertakes to the other that:

14.1.1  it is the lawful owner, lessee or licensee of all plant, equipment, machinery, technology, intellectual property and know-how and all other assets required to enable it to perform its obligations under this Agreement;

14.1.2  the performance by it of its obligations to the other Party hereunder will not breach any covenant or obligation of it to any third party, or infringe any rights of any third party;

and that the above warranty and undertaking will be correct and complied with in all respects so long as any obligation of either Party hereunder remains to be performed. TDCC and HRD each hereby undertakes that if it should at any time become aware that any of the above warranties and undertakings is not correct or complied with, it shall promptly make a full disclosure to the other Party of all relevant facts or circumstances.

## 15.    FORCE MAJEURE AND GOVERNMENT CONTROLS

15.1.   If one or more events of Force Majeure as defined in Clause 15.2 affect the conversion or operation of any of TDCC's facilities at which the Product and/or raw materials are manufactured, TDCC shall nonetheless use best efforts to re-establish as soon as possible and to continue to supply Product sufficient to enable TDCC to meet its obligations to sell and deliver Product to HRD under this Agreement.  Provided, however, that TDCC shall not, as a part of its best efforts under this Clause 15.1, be required to settle or resolve any labor dispute that affects the conversion or operation of any of the TDCC facilities at which the Product and/or raw materials are or will be manufactured.  For purposes of this Clause 15, the phrase "best efforts" shall mean TDCC's timely pursuit and exhaustion of all commercially prudent and reasonable measures ordinarily available for the operation of a manufacturing facility.

15.2    Except as provided for in Clause 15.3, if either Party to this Agreement is prevented or delayed in the performance of any of its obligations hereunder by Force Majeure and if such Party gives written notice thereof to the other Party within fifteen (15) business days of the first day of such event specifying the matters constituting Force Majeure, together with such evidence thereof as it reasonably can give, then the Party so prevented or delayed will be excused from the performance or punctual performance, as the case may be, of such obligations, as from the date of such event for so long as such cause of prevention or delay continues.

For the purpose of this Agreement, the term "Force Majeure" shall be deemed to be any cause which affects the performance of this Agreement, arising or attributable to acts, events, non happenings, omissions or accidents beyond the reasonable control of the Party affected and shall include, but not be limited to, acts of God, war, hostilities, riot, fire, explosion, accident, flood, sabotage, lack of adequate fuel, power, raw materials,

17

labor, strike, lock-out or injunction, compliance or non-compliance with new governmental laws, regulations, permits or orders.

15.3 HRD Payment Obligations During Force Majeure Period

15.3.1 Notwithstanding the provisions of Clauses 15.2 and 15.4, if HRD is the Party claiming Force Majeure, HRD shall be required to continue to pay as required under Clause 8.1 of this Agreement throughout such period of Force Majeure.

15.3.2 Notwithstanding the provisions of Clauses 15.2 and 15.4, if TDCC is the Party claiming Force Majeure, HRD's payment obligations shall be as follows:

15.3.2.1    All of the CRP, if any, not yet paid;

15.3.2.2    The AOP scheduled except that 1/12 of the AOP is excused for every 30 days that Force Majeure continues; and

15.3.2.3    All of the VCP, if any.

15.4 Except as provided in Clause 15.3, if any Force Majeure prevails for a continuous period in excess of six (6) months the parties shall (a) enter into bona fide discussions with a view to alleviating its effects, and (b) at the request of the Party not affected by the Force Majeure terminate this Agreement forthwith should such discussions not provide a readily satisfactory solution to the Force Majeure event. Provided, however, that the Party not affected by the Force Majeure may not terminate this Agreement where the Party claiming Force Majeure has identified a readily achievable solution to the Force Majeure event and is taking the necessary steps to implement such solution.

15.5 If TDCC is the Party that declares the Force Majeure, then the Agreement shall, at HRD's option, be extended one month for every month that the Force Majeure continues

15.6 The Annual Capacity shall be reduced by 1/12 for every 30 days that a Force Majeure continues.

16.    INTELLECTUAL PROPERTY

16.1 Except as specifically stated in Clause 9.1.2. and with regard to PE Wax purchased from Dow, this Agreement does not (a) change the ownership of any Party's Background Information or Background Patent Rights and/or (b) grant to either Party or its Affiliates (or to anyone else) any license (express, implied or otherwise) under any of the Background Information, Background Patent Rights or trademarks of the other Party or its Affiliates. If the Parties agree to any such license, that license will be appropriately defined in a separate written agreement.

16.2 Without regard to which Party's employees are inventor(s) of a particular Development, ownership of Developments will be determined as follows:

18

(a)    HRD will own Developments that are (1) products made from or containing PE Wax, (2) process for making products made from or containing PE Wax, and/or (3) methods of use of PE Wax; and

(b)    Dow will own all other Developments, including PE Waxes, processes for making PE Waxes, and catalysts used for making PE Waxes.

For the purpose if this Agreement "Development" means any invention, whether patentable or unpatentable, that is: (a) a PE Wax, and/or (b) any method of use for a PE Wax, and/or (c) a product made from or containing a PE Wax; and/or (d) a process for making a product made from or containing a PE Wax, (e) a process for making a PE Wax; and/or (f) a catalyst for making a PE Wax, which invention is first actually reduced to practice by a Party (and/or by its participating Affiliates or subcontractors), alone or with others, and which reduction to practice occurs after the Effective Date and as a result of work performed in connection with this Agreement.

16.3    Each Party will own all Information that the Party generates. Both Parties (and their Affiliates) may use and/or disclose that Information, subject to the obligations of confidentiality the Parties have undertaken with respect to the other Party's Information under Clause 19. Each Party will keep complete and accurate written records of all Information developed by or for it. Each Party will make those records available for review by the other Party at any reasonable time during regular working hours. Each Party will furnish copies of all or any part of those records to the other Party upon request for appropriate patent filing, prosecution, and enforcement efforts on Developments owned by that other Party, consistent with the other Party's obligations of confidentiality under Clause 19.

For the purpose of this Agreement "Information" means technical or business information pertaining to (a) the composition, structure and/or properties of any PE Wax (including but not limited to the Product Specifications) (b) the use of a PE Wax in any end-use application, (c) any product made from or containing a PE Wax, (d) any process for making a product made from or containing a PE Wax, (e) any process for making any PE Wax, and/or (f) any catalyst for making any PE Wax as well as Information as defined in the separate Confidentiality Agreement between the Parties, having an effective date of January 8, 2001 (Dow Agreement 202541).

16.4    After a Party becomes aware that an invention has been conceived or first reduced to practice that may be a Development, the Party must promptly deliver a written description of the invention to the other Party's contact as detailed in Clause 17.2.1. The written description must include sufficient information to enable the Parties, together with their patent counsels, to evaluate the inventorship of the invention. The Parties will attempt to reach a consensus on whether the invention is a Development and who is(are) the inventor(s). The statutory and common law of the United States of America shall govern all determinations of inventorship and reduction to practice of Developments. Each Party is solely responsible for any and all compensation legally due to its employees (who are inventors of any Development), irrespective of which Party owns that Development.

16.5    In its sole discretion, the owner of the Development in question may make all decisions on filing, prosecuting, and maintaining patent applications (both domestic and foreign)

that claim the Development, with three limitations. The owner must (i) obtain the other Party's approval before using or disclosing the other Party's Confidential Information in the filing or prosecuting of the patent application, (ii) provide the other Party with 30 days to review and comment on the patent application prior to its filing, and (iii) cooperate with the other Party to make related patent application filings concurrently (i.e., on the same day). The other Party will not unreasonably withhold its approval when the owner's use or disclosure of the other Party's Confidential Information is only to the extent necessary to satisfy the statutory requirements of the relevant patent office. The other Party's approval will be deemed granted if the other Party does not object in writing within 30 days of receipt of the owner's request for approval. If the other Party's objects, it will recommend reasonable alternative information for use instead of the objectionable Information. The owner is solely responsible for paying the expenses for the patent applications. Each Party agrees to cooperate with the other Party, as requested, to establish, acquire, and maintain intellectual-property protection for Developments and Information. This includes signing assignments and other appropriate documents, as requested.

16.6    If the owner chooses not to file a patent application directed to its Development or no longer desires to continue prosecution or maintenance of particular Patent Rights in any country, that owner must notify the other Party in writing and offer to assign such Development and/or Patent Rights to the other Party. The other Party may accept such offer anytime within 30 days after receipt of the notification; otherwise, the owner may abandon the Development and/or Patent Rights in question. If the other Party accepts, the owner will promptly assign the Development and/or Patent Rights to the other Party and the other Party may file or continue the prosecution or maintenance at its sole expense. The assignment shall not affect the Parties' fundamental rights (i.e., the rights that each Party would have had the assignment not occurred) with respect to the practice or licensing of the Development and/or the Patent Rights. The Parties may agree in writing to change those fundamental rights.

## 17.    NOTICES

17.1    All notices and other communications given or made in relation to this Agreement

17.1.1    shall be in English and in writing;

17.1.2    shall be delivered by hand or sent by first class registered post, facsimile or e-mail;

17.1.3    shall be delivered or sent to the Party concerned at the relevant address or facsimile or telex number, shown in Clause 17.2 subject to such amendments as may be notified in writing from time to time in accordance with this Clause by the relevant Party to the other Party by no less than five (5) Business Days' notice; and

17.1.4    shall be deemed to have been duly given or made if addressed in the aforesaid manner:

20

(i)    if delivered by hand, upon delivery;

(ii)    if posted by first class registered post, at the earlier of the time of delivery or 10:00 a.m. on the tenth (10th) Business Day after posting;

(iii)    if sent by facsimile, when a complete and legible copy of the communication has been received at the appropriate address; and

(iv)    if sent by e-mail, when sent;

provided that if any notice or other communication would otherwise become effective on a non-Business Day or after 5:00 p.m. on a Business Day, it shall instead be deemed to be given or made at 10:00 a.m. on the next Business Day.

17.2    The initial details for all notices are:

17.2.1    Legal Notices. Any legal notices, demands or requests required or which may be given hereunder to the respective parties including, without limitation, notices of Force Majeure or material breach, termination, or amendment of this Agreement shall be delivered as follows:

For TDCC    Michael J. Levinson
Global Business Development Manager – Polyethylene
The Dow Chemical Company
400 W. Sam Houston Pkwy. S.
Houston, TX   77042
(713) 978-2291
E-mail: mjlevinson@dow.com

Copy to:

Lynn Schefsky
The Dow Chemical Company
2040 Dow Center
Midland, MI  48674
(989) 636-0523
laschefsky@dow.com

For HRD    Aziz Hassan
Vice President
Marcus Oil & Chemical
14549 Minetta
P. O. Drawer 450267
Houston, TX 77245
(713) 721-9131 Ext. 102
E-Mail : Marcusoil@aol.com

Copy to:

Michael L. Landrum
O'Donnell Ferebee & McGonigal
450 Gears

21

Houston, TX 77067-4584
(281) 875-8200
E-Mail : Mlandrum@ofmslaw.com

17.2.2 <u>Day to Day Communications and Notices</u>. All other non-legal notices and day-to-day communications shall be delivered as follows:

For TDCC Michael J Levinson
Global Business Development Manager – Polyethylene
The Dow Chemical Company
400 W. Sam Houston Pkwy. S.
Houston, TX   77042
(713) 978-2291
E-mail: mjlevinson@dow.com

For HRD Aziz Hassan
Vice President
Marcus Oil & Chemical
14549 Minetta
P. O. Drawer 450267
Houston, TX 77245
(713) 721-9131 Ext. 102
E-Mail : Marcusoil@aol.com

## 18. VARIATION

The terms of this Agreement shall govern all HRD's purchases of the Product from TDCC under this Agreement and shall not be varied by any printed conditions submitted or referred to by either Party in any acceptance of order, delivery note, acceptance of delivery, invoice or otherwise howsoever unless the parties so agree in writing.

## 19. CONFIDENTIALITY

19.1 Any process know-how or other valuable information proprietary to either Party to this Agreement which is disclosed by that Party to the other Party in connection with this Agreement shall remain the property of the Party making the disclosure and shall not, without the prior written consent of that disclosing Party, be disclosed to any third party or used by the other Party except for the performance of that other Party's obligations under this Agreement. The obligations of non-use and confidentiality contained in this Clause shall not apply to any information which (i) was already in the possession of the recipient or in the public domain prior to its disclosure by the other Party, or (ii) is purchased or otherwise legally acquired by the recipient at any time from a third party having good title thereto, or (iii) comes into the public domain otherwise than through the fault of the recipient, or (iv) is disclosed under compulsion of law to any court or government or regulatory authority. All documents supplied by either Party to this Agreement to the other Party which contain information within the scope of this Clause shall be promptly returned by the recipient to the Party which supplied them upon the expiry or earlier termination of this Agreement and the obligations of each Party under

22

this Clause shall survive such expiry or termination for a period of five (5) years thereafter. The Parties will continue to adhere to their respective obligations under the confidentiality provisions of the JDA between the Parties which will remain in full force and effect and governed by their own terms following the execution of this Agreement.

19.2   The Parties will not use the other Party's name(s) or trademark(s) or issue any press release or public announcement of the Parties' relationship under this Agreement except with the other Party's prior written consent, such consent not to be unreasonably withheld.

## 20.   ASSIGNMENT

The rights and obligations of each of the Parties to this Agreement hereunder are personal to that Party and shall not be assigned, licensed, charged, delegated or transferred in any way whatsoever by that Party without the prior written consent of the other Party. HRD does agree to the assignment of some of the obligations contained in the Agreement to TDCC's wholly owned Canadian subsidiary.

## 21.   TERMINATION

21.1   Either Party shall be entitled to terminate this Agreement immediately by written notice to the other if:

21.1.1   that other Party or a domestic Affiliate goes into voluntary liquidation or bankruptcy proceeding (except for the purpose of an amalgamation or reconstruction and in such a manner that the company resulting therefrom effectively agrees to be bound by or assume the obligations of that other Party under this Agreement) or has a receiver or administrator appointed in respect of the whole or any part of its assets or a court shall make an order to that effect or if that other Party shall pass a resolution for winding-up (other than a winding-up for the purposes of or in connection with any amalgamation or reconstruction and in such manner that the company resulting therefrom effectively agrees to be bound by or to assume the obligations imposed on that other Party under this Agreement) or a Court shall make an order to that effect, or if that other Party shall cease to carry on business; except that in the event that an involuntary case or other proceeding shall be commenced against a Party or any domestic Affiliate seeking liquidation, reorganization or other relief with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, the affected Party shall have sixty (60) days to obtain a dismissal or stay of proceeding or an order for relief under the Federal bankruptcy laws as now or hereafter in effect; or

21.1.2   that other Party commits any material breach of this Agreement and fails to remedy such breach within sixty (60) days after the date of service of a written notice giving full particulars of such material breach and requesting it to be remedied; provided, however, that the Party not causing such material breach of this Agreement may not terminate this Agreement where the Party materially

23

breaching this Agreement has identified a readily achievable solution to the event giving rise to the material breach and is taking the necessary steps to implement such solution.

21.1.3 Terminations that occur pursuant to Clause 21.1 shall, for the purposes of computations under Clauses 21.4 and 21.5, be treated as though the Party who commits the act that provides the basis for the termination has terminated the Agreement. That is for example, if a Party commits a material breach that leads to a termination pursuant to the provisions of 21.1.2, the Party that has committed the material breach shall be deemed to have terminated the Agreement for the purposes of computing compensation pursuant to Clauses 21.4 and 21.5.

21.2 In addition, either Party may terminate this Agreement as provided for under Clause 15.4 or upon 180 days notice for any reason;; HRD may terminate this Agreement as provided for under Clauses 3.2.2, 8.1.2 and 11.3.2. TDCC may terminate this Agreement as provided for under Clause 3.2.3.

21.3 If the Agreement is terminated prior to the Implementation Date, then neither Party has any obligations hereunder.

21.4 The following shall apply if the Agreement is terminated after the Implementation Date but prior to the date of Beneficial Manufacture for the Facility:

21.4.1 Termination by HRD:

21.4.1.1    HRD shall pay to TDCC:

21.4.1.1.1    the CRP, if any; and

21.4.1.1.2    $0.05 per pound times twice the Annual Capacity.

21.4.1.2    Provided that HRD has paid all amounts due TDCC, TDCC will not sell PE Wax to anyone for a period of two (2) years.

21.4.2 Termination by TDCC:

21.4.2.1    TDCC will refund the CRP paid by HRD;

21.4.2.2    TDCC will not sell PE Wax to anyone for a period of two (2) years.

21.4.3 All amounts under this Clause 21.4 are due within forty-five (45) days of such notice of termination.

21.5 The following shall apply if the Agreement is terminated after the date of Beneficial Manufacture for the Facility:

24

21.5.1  Termination by HRD:

    21.5.1.1      HRD shall pay to TDCC:

        21.5.1.1.1     the CRP, if any;

        21.5.1.1.2     the remainder of the AOP for the Year; and

        21.5.1.1.3    · $0.05 per pound times three (3) times the Annual Capacity.

    21.5.1.2      Provided that HRD has paid all amounts due TDCC, TDCC will not sell PE Wax to anyone for a period of three (3) years.

21.5.2  Termination by TDCC:

    21.5.2.1      TDCC will refund the CRP paid by HRD;

    21.5.2.2      TDCC will not sell PE Wax to anyone for a period of three (3) years.

21.5.3  All amounts under this Clause 21.5 are due within forty-five (45) days of such notice of termination.

21.6  Any waiver by either Party of a breach of any provision of this Agreement shall not be construed to be a waiver of any other breach of the same or any other provision.

21.7  Upon the termination of this Agreement pursuant to this Clause 21 no Party shall have any further rights, claims or remedies against any other Party as a result of this Agreement.

21.8  Except as provided herein and in Clause 26, upon termination of this Agreement for any reason, save as otherwise provided by this Agreement and subject to any rights or obligations which have accrued prior to termination, neither Party shall have any further obligation to the other under this Agreement. Notwithstanding the foregoing, HRD shall take delivery of and pay TDCC the VCP for all inventory of the Product ordered by HRD or produced by TDCC in good faith for HRD under this Agreement as of the date of such termination of this Agreement

## 22. SEVERABILITY

22.1  Should any provision of this Agreement be held to be illegal, invalid or unenforceable in any respect by any judicial or other competent authority under the law of any jurisdiction:

    22.1.1  such provision shall, so far as it is illegal, invalid or unenforceable in any jurisdiction, be given no effect by the parties and shall be deemed not to be included in this Agreement in that jurisdiction;

22.1.2  the other provisions of this Agreement shall be binding on the parties in that jurisdiction as if such provision were not included herein;

22.1.3  the legality, validity and enforceability of the provision in any other jurisdiction shall not be affected or impaired; and

22.1.4  the parties agree to negotiate in good faith to amend such provision for incorporation herein in such reasonable manner as most closely achieves the intention of the parties and without rendering such provision invalid or unenforceable.

## 23.    LAW

This Agreement shall be governed by and construed in accordance with the laws of the state of Delaware without regard to its provisions concerning the conflicts of law, and the parties hereby submit to the exclusive jurisdiction of either the courts of Michigan or Delaware. The United Nations Conventions on Contracts for the International Sale of Goods shall not apply to this Agreement.

## 24.    ALTERNATIVE DISPUTE RESOLUTION

24.1    The parties shall negotiate in good faith to resolve any dispute arising out of or relating to this Agreement. In the event that the parties fail to resolve a dispute by good faith negotiations or if either Party deems a resolution by such means to be improbable, either Party may initiate litigation of the dispute. Alternatively, but only upon the written agreement of both parties, the parties may submit any such dispute to mediation or arbitration before an appropriate dispute resolution firm or body.

24.2    Unless this Agreement has been properly terminated, each Party shall continue to perform its obligations under this Agreement pending final resolution of any dispute.

## 25.    PARTIES IN INTEREST

This Agreement shall be binding upon and shall inure solely to the benefit of the Parties and their successors and permitted assigns. Nothing in this Agreement, express or implied, is intended to or will confer upon any other person or company any rights, benefits, or remedies of any nature whatsoever under or by reason of this Agreement.

## 26.    SURVIVAL OF CERTAIN TERMS

The rights and obligations of the parties described in Clauses 11,16 and 19 above shall survive the expiration or termination of this Agreement in accordance with their respective terms and conditions. Other provisions of this Agreement which by their nature would reasonably be expected to survive expiration or termination shall so survive.

## 27.    CONSTRUCTION

This Agreement shall not be construed more strictly against one Party than against the other Party merely by virtue of the fact that the Agreement may have been prepared primarily by counsel for one of the Parties. It is understood and agreed that both Parties have contributed substantially and materially to the preparation and execution of the Agreement.

## 28.    HEADINGS

The descriptive headings and titles contained in this Agreement are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

## 29.    ENTIRE AGREEMENT

This document, together with its Schedules, and the JDA constitutes the complete and exclusive understanding between the Parties concerning the subject matter expressed herein. Except to the extent provided for in this Agreement and the JDA, any additional or different terms contained in subsequent purchase orders, invoices, or other documents shall not be binding. This Agreement may only be modified by an amendment, expressly stated as such, signed by both Parties.

## 30.    NON WAIVER

Subject to Clauses 9.1, 10.3, and 11.3, failure of either Party to exercise any of its rights under this Agreement on one occasion shall not waive, or be deemed a waiver of, its right to exercise the same on another occasion.

## 31.    EXCLUSIVITY

31.1    TDCC promises that it will sell PE Wax only to HRD for as long as the Agreement is in effect. Should the Agreement be terminated for any reason other than a reason set out in Clause 21.1 after the Implementation Date but prior to the date of Beneficial Manufacture, this promise shall continue for an additional two (2) years from the date of the termination. Should the Agreement be terminated for any reason other than a reason set out in Clause 21.1 after the date of Beneficial Manufacture this promise shall continue for an additional three (3) years from the date of the termination. At the expiry of the Agreement, TDCC will not sell PE Wax for an additional three (3) years.

31.2    TDCC will provide HRD an exclusive right to negotiate for the construction of a new PE Wax production plant during the first twelve (12) months after Beneficial Manufacture.

31.3    Should the Parties proceed with the construction of a new PE Wax production facility, TDCC will promise exclusivity on the same basis as Clause 31.1 except that the exclusivity period prior to plant start-up would be three (3) years and after plant start-up would be five (5) years.

31.4    All of the promises by TDCC contained in this Clause 31 are contingent upon HRD having fully paid all amounts due to TDCC under this Agreement.

IN WITNESS whereof this Agreement has been entered into by the Parties hereto the day and year first above written.

SIGNED for and on behalf of:                     SIGNED for and on behalf of:

**THE DOW CHEMICAL COMPANY**               **HRD CORPORATION**

Len Azzaro
Business Vice President
Polyethylene

July 1, 2002

ABBAS    A.    HASSAN: Presid

July 1st 2002.

28

## SCHEDULE 1
### Specification and Analytical Methods
### (Clause _____ )


## SCHEDULE 2
### HRD Estimated Requirements

### (Clause _____ )


| Year | Volume pounds |
|------|---------------|
| 2003 | |
| 2004 | |
| 2005 | |
| 2006 | |

## SCHEDULE 3
## Variable Cost Formulas

### Introduction

Schedule 3 will be established as an outcome of the JDA, will then be subject to update from time to time by the SCT, and references in the Supply Agreement to Schedule 3 shall mean to apply to the most recent update approved by the SCT.

### Variable Cost Formulas (to be established for each grade)

| Raw Materials | Grade Description |
|---|---|
| Ethylene | Benchmark cost * ethylene proportion/ethylene yield |
| Propylene | Benchmark cost * propylene proportion/propylene yield |
| Catalyst & Additives | $0.0xx/lb |
| Hydrogen | $0.0yy/lb |
| Utilities | $0.0zz/lb |
| Packaging | n/a |

Where:
(1)  Ethylene Benchmark cost = US Gulf Delivered Contract Price CMAI ($/lb)
(2)  Propylene Benchmark cost = Polymer Grade US Gulf Contract Price CMAI ($/lb)
(3)  VCP = total unit cost of component Raw Materials ($/lb)

### Off-Spec Product

The Parties agree to establish a mutually agreeable mechanism as an outcome of the JDA for specifying acceptable % range of Off-Spec Product, and a pricing mechanism that reflects a discount for volumes below the acceptable % range, and a bonus for volumes above the acceptable % range. The Parties acknowledge that the acceptable % range will be impacted by Product Mix and other HRD and Dow-related variables, and as such will be subject to update by the SCT.

### Cost of Volume additional to the Annual Capacity

Unless otherwise amended by the SCT due to contributing factors such as slow run rates etc, any volume provided above the Annual Capacity shall be priced $0.10/lb above the applicable VCP.