## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DOW CHEMICAL CANADA INC., on its own behalf and as assignee of THE DOW CHEMICAL COMPANY, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| HRD CORPORATION (d/b/a Marcus Oil & Chemical) | ) ) ) | Case No. 05-023 (JJF) |
| Defendant, Counterclaim Plaintiff, | ) ) | |
| v. | ) ) | |
| DOW CHEMICAL CANADA INC., on its own behalf and as assignee of THE DOW CHEMICAL COMPANY, and THE DOW CHEMICAL COMPANY, | ) ) ) ) ) | |
| Counterclaim Defendants | ) ) | |

## DOW CHEMICAL CANADA INC'S AND THE DOW CHEMICAL COMPANY'S REPLY TO H.R.D. CORPORATION'S COUNTERCLAIMS

Plaintiff, Counter-Defendant, Dow Chemical Canada Inc. ("DCCI"), and Counter-Defendant, The Dow Chemical Company "TDCC"), by and through its undersigned counsel, hereby replies to HRD Corporation's ("HRD") counterclaims as follows:

110. This is an action for breach of contract and for a determination of rights under those contracts. In July 2002, TDCC entered into two contracts regarding Dow's manufacture and supply of polyethylene waxes to HRD. The first contract, the Joint Development Contract ("JDA") obligated TDCC to develop with HRD specifications for a particular kind of polyethylene wax that HRD negotiated to purchase from TDCC. TDCC and HRD entered into a second contract, the Sarnia PE Wax Supply Agreement ("Supply Agreement") under which TDCC, and later DCCI, as assignee of the Supply Agreement agreed to supply HRD with polyethylene waxes which complied with the parties' expectations and the specifications to be developed pursuant to the JDA.

**DCCI Answer:**

DCCI admits that HRD has asserted counterclaims in response to DCCI's complaint filed January 18, 2005, but DCCI denies those counterclaims have any merit.  Further answering, DCCI admits that TDCC and HRD entered into the JDA and a Supply Agreement in July of 2002.  DCCI further admits that TDCC assigned its interests and obligations under the Supply Agreement to DCCI pursuant to the Assignment and Novation Agreement effective March 29, 2003.  ("Assignment Agreement," Pl.'s Compl. Exh. E.)  Further answering, DCCI admits that, pursuant to the Supply Agreement, DCCI was to supply polyethylene wax in accordance with specifications developed pursuant to the JDA.  DCCI further admits that, in May 2004, DCCI commenced production of polyethylene wax.  Except as expressly admitted, DCCI denies each of the allegations in Paragraph 110.

**TDCC Answer:**

TDCC admits that HRD has asserted counterclaims in response to DCCI's complaint filed January 18, 2005, but TDCC denies those counterclaims have any merit.  Further answering, TDCC admits that TDCC and HRD entered into the JDA and a Supply Agreement in July of 2002.  TDCC further admits that in January 2004 TDCC assigned all of its interests and obligations under the Supply Agreement to DCCI pursuant to the Assignment and Novation Agreement effective March 29, 2003.  ("Assignment Agreement," Pl.'s Compl. Exh. E.)  In the Assignment Agreement, HRD released TDCC from all obligations under the Supply Agreement with the exception of paragraph 31, including all claims accruing before or after the effective date of the Assignment Agreement.  (Assignment Agreement, Paragraph 6.)  Further answering, TDCC admits that, pursuant to the assigned Supply Agreement, DCCI was to supply polyethylene wax in accordance with specifications developed pursuant to the JDA.  TDCC

2

further admits that, in May 2004, DCCI commenced production of polyethylene wax. Except as expressly admitted, TDCC denies each of the allegations in Paragraph 110.

111.    TDCC and DCCI, its wholly-owned subsidiary, entered into a joint enterprise for the purpose of their dealings with HRD. The precise details of the arrangement between TDCC and DCCI are known only to those two entities; however, both TDCC employees and DCCI employees participated in the contract negotiation, product development, and manufacturing processes. TDCC and DCCI have worked together pursuant to this arrangement to achieve the common purpose of developing and manufacturing wax to sell to HRD and then to sell to third parties.

**DCCI Answer:**

DCCI admits that DCCI is an indirectly wholly-owned subsidiary of TDCC. DCCI admits that DCCI employees engaged in activities related to the manufacture of PE Wax and product development. DCCI denies that DCCI employees engaged in activities related to negotiation of JDA and Supply Agreement. DCCI defers to TDCC's answer regarding the activities of TDCC employees. Except as expressly admitted, DCCI denies each of the allegations in Paragraph 111.

**TDCC Answer:**

TDCC admits that DCCI is an indirectly wholly-owned subsidiary of TDCC. TDCC admits that TDCC employees engaged in activities related to negotiation of the JDA and Supply Agreement, product development, and manufacture of PE Wax. TDCC defers to DCCI's answer regarding the activities of DCCI employees. Except as expressly admitted, TDCC denies each of the allegations in Paragraph 111.

112.    DCCI commenced production of polyethylene wax in May 2004. HRD has complied with all of its obligations under the Supply Agreement. However, the wax manufactured by Dow failed to conform to either the specifications or parties' expectations and did not meet commercial standards for wax production. In accordance with the Delaware Uniform Commercial Code, HRD notified Dow that the product did not meet the parties' expectations or specifications and requested that Dow cure the manufacturing defect. Dow

3

refused to do so, which constituted a material breach of both the Joint Development Agreement and Supply Agreement. Dow also misappropriated HRD's proprietary information, despite the execution of a confidentiality agreement, in violation of the Delaware Uniform Trade Secrets Act, 6 Del, C. §2001 et. seq. As a result of Dow's wrongful actions, HRD has suffered extensive damages.

**DCCI Answer:**

DCCI admits that DCCI began production of polyethylene wax in May 2004. Except as expressly admitted, DCCI denies each of the allegations in Paragraph 112.

**TDCC Answer:**

TDCC admits that DCCI began production of polyethylene wax in May 2004. Except as expressly admitted, TDCC denies each of the allegations in Paragraph 112.

## JURISDICTION AND VENUE

113.    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. Section 1332(a)(2) in that it is an action between a foreign citizen and a citizen of a state and the amount in controversy exceeds $75,000 exclusive of interest and costs.

**DCCI Answer:**

DCCI admits that this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(3) in that this action is between citizens of different states and a citizen of a foreign state, and the amount in controversy exceeds $75,000.

**TDCC Answer:**

TDCC admits that this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(3) in that this action is between citizens of different states and a citizen of a foreign state, and the amount in controversy exceeds $75,000.

114.    The Court has personal jurisdiction over Dow, because in Paragraph 23 of the Supply Agreement, both TDCC and HRD agreed to submit to the exclusive jurisdiction of the

court of Delaware or Michigan.  DCCI is also bound by this section of the Supply Agreement as assignee of TDCC's rights and obligations under the contract.

**DCCI Answer:**

DCCI admits that the Court has personal jurisdiction over DCCI pursuant to Paragraph 23 of the Supply Agreement.  Except as expressly admitted, DCCI denies the allegations in Paragraph 114.

**TDCC Answer:**

TDCC admits that this court has personal jurisdiction over TDCC given that TDCC is a Delaware corporation.  TDCC denies that it is bound by Paragraph 23 of the Supply Agreement, as a result of HRD's release of TDCC pursuant to the Assignment Agreement.  Except as expressly admitted, TDCC denies each of the allegations in Paragraph 114.

115.    Venue is proper in this District pursuant to 28 U.S.C. Section 1391 because TDCC agreed to submit to the exclusive jurisdiction of the Courts of Delaware or Michigan. DCCI is bound by this section of the Supply Agreement as assignee of TDCC's rights and obligations under the contract.

**DCCI Answer:**

DCCI admits that venue is proper in this district pursuant to Paragraph 23 of the Supply Agreement.  Except as expressly admitted, DCCI denies the allegations in Paragraph 115.

**TDCC Answer:**

TDCC admits that venue is proper in this district.  TDCC denies that it is bound by Paragraph 23 of the Supply Agreement, as a result of HRD's release of TDCC pursuant to the Assignment Agreement.  Except as expressly admitted, TDCC denies each of the allegations in Paragraph 115.

## PARTIES

116.    Counter-Plaintiff HRD is a Texas corporation with its principal place of business in Houston, Texas.  HRD sells polyethylene waxes under the name Marcus Oil and Chemical.

### DCCI Answer:

DCCI admits the allegations in Paragraph 116.

### TDCC Answer:

TDCC admits the allegations in Paragraph 116.

117.    Counter-Defendant DCCI is a Canadian corporation with its principal place of business in Calgary, Alberta, Canada. DCCI is an indirectly wholly owned subsidiary of TDCC and produces chemical, plastic and agricultural products for a variety of industrial and consumer uses. DCCI is the assignee of the contract at issue that was originally executed by TDCC and HRD.

### DCCI Answer:

DCCI admits the allegations in Paragraph 117.

### TDCC Answer:

TDCC admits the allegations in Paragraph 117.

118.    Counter-Defendant TDCC is a Delaware corporation with its principal place of business in Midland, Michigan.  TDCC produces chemical, plastic and agricultural products for a variety of industrial and consumer uses.  TDCC may be served with citation by serving its registered agent for service in Delaware,  The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

### DCCI Answer:

DCCI admits the allegations in Paragraph 118.

### TDCC Answer:

TDCC admits the allegations in Paragraph 118.

119.    HRD is suing both TDCC and DCCI, individually and jointly as participants in a joint enterprise.  TDCC and DCCI are collectively known herein as "Dow."

**DCCI Answer:**

DCCI admits that HRD has asserted claims against both TDCC and DCCI.  DCCI denies that such claims have any merit.  DCCI denies that TDCC and DCCI are participants in a joint enterprise, or have any joint liability to HRD.  Except as expressly admitted, DCCI denies each of the allegations in Paragraph 119.

**TDCC Answer:**

TDCC admits that HRD has asserted claims against both TDCC and DCCI.  TDCC denies that such claims have any merit.  TDCC denies that TDCC and DCCI are participants in a joint enterprise, or have any joint liability to HRD.  Except as expressly admitted, TDCC denies each of the allegations in Paragraph 119.

## COUNT 1: BREACH OF THE SUPPLY AGREEMENT

120.    Dow materially breached the Supply Agreement such that the value of the entirety of the contract was substantially impaired. Dow's material breach occurred prior to any alleged breach of HRD. Dow deliberately included solvents, or light ends, in the product. Inclusion of this impurity made the product commercially useless in its entirety. Dow's adulteration of the wax created a product that was far more likely to smoke and/or catch fire under the elevated temperatures used in transportation, storage and end use. Dow was aware of the end use application and the application temperatures to which the wax would be subjected. Upon HRD's notifying Dow of the serious departure from the specifications, Dow refused to supply conforming product without additional substantial consideration from Defendant/Counter-Plaintiff HRD, including accelerated payments of the costs to retrofit the plant, payments for the costs of producing non-conforming product, and a guarantee of over $30 million for future payments.

**DCCI Answer:**

DCCI denies each of the allegations in the first five sentences of Paragraph 120.  DCCI has simultaneously moved to strike the last sentence of Paragraph 120, which reflects settlement

7

proposals or statements made in compromise negotiations in contravention of Fed.R.Evid. 408.
Subject to the pending motion and expressly reserving all protections of Fed.R.Evid. 408, DCCI
denies HRD's characterizations in the last sentence of Paragraph 120.

### TDCC Answer:

TDCC denies each of the allegations in the first five sentences of Paragraph 120. Further
answering, TDCC denies any liability for any alleged breach of the assigned Supply Agreement
given the unequivocal release provided by HRD to TDCC for all obligations and claims arising
under the Supply Agreement, with the exception of the exclusivity provision in Paragraph 31.
(Assignment Agreement ¶ 3, Pl.'s Compl. Exh. E.) TDCC has simultaneously moved to strike
the last sentence of Paragraph 120, which reflects settlement proposals or statements made in
compromise negotiations in contravention of Fed.R.Evid. 408. Subject to the pending motion
and expressly reserving all protections of Fed.R.Evid. 408, DCCI denies HRD's
characterizations in the last sentence of Paragraph 120.

121.    HRD complied with its obligations under the Supply Agreement. HRD paid
millions of dollars to retrofit Dow's plant to produce a high-quality wax. The manufacturing
process requires equipment to remove these light ends from the wax, and HRD happily paid for
that equipment. Because of either Dow's failure to eliminate these light ends or Dow's
intentional recombination of the waste material back into the product, all the wax that Dow sent
HRD contained this impurity. This waste material made the product completely worthless.
Because the material Dow shipped to HRD failed to conform in all material respects to the
specifications, Dow breached Section 9.1.1 of the Supply Agreement.

### DCCI Answer:

DCCI admits that, in accordance with the terms of the Supply Agreement, HRD made
certain payments, and that the amount of some of these payments was calculated based on
alterations to DCCI's Sarnia facility. Except as expressly admitted, DCCI denies each of the
allegations in Paragraph 121.

8

**TDCC Answer:**

TDCC admits that, in accordance with the terms of the assigned Supply Agreement, HRD made certain payments, and that the amount of some of these payments was calculated based on alterations to DCCI's Sarnia facility.  Further answering, TDCC denies any liability for any alleged breach of the assigned Supply Agreement given the unequivocal release provided by HRD to TDCC for all obligations and claims arising under the Supply Agreement, with the exception of the exclusivity provision in Paragraph 31.  (Assignment Agreement ¶ 3, Pl.'s Compl. Exh. E.)  Except as expressly admitted, TDCC denies each of the allegations in Paragraph 121.

122.    Failure to remove the light ends, or deliberately recombining them, constitutes a breach of Dow's contractual obligations. All the wax that DCCI shipped was this adulterated product, and HRD never received any usable product that complied with the contractual specifications. HRD sought to ensure that the plant would produce high-quality product, which is why HRD paid handsomely for the retrofitting, including equipment to remove this waste by-product. DCCI's production of contaminated wax violates Section 12.1 of the Supply Agreement, which requires Dow to obtain HRD's consent to alter the production facilities and raw materials.

**DCCI Answer:**

DCCI denies each of the allegations in Paragraph 122.

**TDCC Answer:**

TDCC denies any liability for any alleged breach of the assigned Supply Agreement given the unequivocal release provided by HRD to TDCC for all obligations and claims arising under the Supply Agreement, with the exception of the exclusivity provision in Paragraph 31. (Assignment Agreement ¶ 3, Pl.'s Compl. Exh. E.)  TDCC denies each of the allegations in Paragraph 122.

123.   Dow also obligated itself to cooperate in minimizing the production of Off-Spec product.  TDCC agreed to use all reasonable efforts to minimize the percentage of Off-Spec product, and, as part of Dow's purported good manufacturing practices, including to constantly seek to improve prime product consistency and reduce percentage Off-Spec product.  TDCC also agreed that should the percentage Off-Spec product remain above the expected level for a sustained period then Dow agreed to cooperate to determine a remedy.  Such a remedy would include changes to the Prime Product Specifications, changes to the expected percentage Off-Spec product and changes to the plant configuration.  Dow failed to cooperate to address the failure of its product to meet specifications, which constitutes a breach of Section 8.1.3 of the Supply Agreement.

**DCCI Answer:**

DCCI admits that Paragraph 8.1.3 of the Supply Agreement, and Schedule 3 to the Supply Agreement, contain provisions regarding Off-Spec Product.  DCCI denies that HRD has accurately described the legal effect of such provisions.  Except as expressly admitted, DCCI denies each of the allegations in Paragraph 123.

**TDCC Answer:**

TDCC admits that Paragraph 8.1.3 of the assigned Supply Agreement, and Schedule 3 to the assigned Supply Agreement, contain provisions regarding Off-Spec Product.  TDCC denies that HRD has accurately described the legal effect of such provisions.  Further answering, TDCC denies any liability for any alleged breach of the assigned Supply Agreement given the unequivocal release provided by HRD to TDCC for all obligations and claims arising under the Supply Agreement, with the exception of the exclusivity provision in Paragraph 31. (Assignment Agreement ¶ 3, Pl.'s Compl. Exh. E.)  Except as expressly admitted, TDCC denies each of the allegations in Paragraph 123.

124.   Dow also obligated itself under the Supply Agreement to produce the wax in accordance with good manufacturing practices. Dow failed to meet good manufacturing practices by providing unusable product and failing to cooperate to produce product to conform to the parties' specifications.  Such good manufacturing practices do not include leaving a waste byproduct in the polyethylene wax that makes the wax both entirely unusable and significantly more flammable and therefore more hazardous to transport and use.  Dow's failure to remove

this impurity, or deliberate recombination of it, constitutes a breach of Section 9.1.3 of the Supply Agreement.

**DCCI Answer:**

DCCI admits that Paragraph 9.1.3 of the Supply Agreement provides that    ". . . all Products sold pursuant to this Agreement . . . will be manufactured in accordance with Dow good manufacturing practices. . ."   Except as expressly admitted, DCCI denies each of the allegations in Paragraph 124.

**TDCC Answer:**

TDCC admits that Paragraph 9.1.3 of the assigned Supply Agreement provides that   ". . . all Products sold pursuant to this Agreement . . . will be manufactured in accordance with Dow good manufacturing practices. . ."   Further answering, TDCC denies any liability for breach of the assigned Supply Agreement given the unequivocal release provided by HRD to TDCC for all obligations and claims arising under the Supply Agreement, with the exception of the exclusivity provision in Paragraph 31.   (Assignment Agreement ¶ 3, Pl.'s Compl. Exh. E.)   Except as expressly admitted, TDCC denies each of the allegations in Paragraph 124.

125.    Counter-Defendants TDCC and DCCI breached multiple provisions of the Supply Agreement. These breaches substantially impaired the value of the whole contract. Counter-Plaintiff HRD has suffered damages because of these breaches. Furthermore, the Supply Agreement provides in Section 21.4.2.2 and 21.5.2.2 that wrongful termination of the Supply Agreement by Dow prevents Dow from selling polyethylene wax to anyone for a period of 2 years if the parties have not achieved Beneficial Manufacture, or a period of three years if the parties have achieved Beneficial Manufacture. HRD therefore requests that the Court enjoin Dow from selling polyethylene wax to anyone for a period of 2 years, pursuant to Section 21.4.2.2 of the Supply Agreement or, should the finder of fact determine that the parties achieved Beneficial Manufacture, the Court enjoin Dow from selling polyethylene wax to anyone for a period of 3 years, pursuant to 2 1.5.2.2 of the Supply Agreement.

**DCCI Answer:**

DCCI admits that the Supply Agreement contains provisions regarding exclusivity. DCCI denies that HRD has accurately described the legal effect of those provisions. Except as expressly admitted, DCCI denies each of the allegations in Paragraph 125.

**TDCC Answer:**

TDCC admits that the assigned Supply Agreement contains provisions regarding exclusivity. TDCC denies that HRD has accurately described the legal effect of those provisions. Further answering, TDCC denies any liability for breach of the assigned Supply Agreement given the unequivocal release provided by HRD to TDCC for all obligations and claims arising under the Supply Agreement, with the exception of the exclusivity provision in Paragraph 31. (Assignment Agreement ¶ 3, Pl.'s Compl. Exh. E.) Except as expressly admitted, TDCC denies each of the allegations in Paragraph 125.

## COUNT 2: BREACH OF THE JOINT DEVELOPMENT AGREEMENT

126.    Counter-Defendants TDCC and DCCI materially breached the Joint Development Agreement such that the value of the entirety of the contract was substantially impaired. TDCC and DCCI's material breach occurred before any alleged breach by HRD. The Joint Development Agreement imposed the obligation of good faith and fair dealing on both parties, and Counter-Plaintiff HRD complied with its obligations under the Joint Development Agreement. TDCC and DCCI, however, breached their obligations by failing to collaborate to produce conforming goods in good faith. TDCC and DCCI gained confidential information from Defendant regarding Defendant's business dealings, clients, and products, on the premise that TDCC and DCCI would collaborate with Defendant to produce a commercially viable product.

**DCCI Answer:**

DCCI admits that DCCI employees received certain limited information regarding HRD, however DCCI denies that it breached any obligation under the JDA. DCCI defers to TDCC's answer regarding information received by TDCC employees. Further answering, DCCI admits

that the JDA contained provisions regarding confidentiality, but DCCI denies that HRD has accurately summarized those provisions. Further answering, DCCI denies that it breached the JDA because it is not a party to the JDA. Except as expressly admitted, DCCI denies each of the allegations in Paragraph 126.

**TDCC Answer:**

TDCC admits that TDCC employees received certain limited information from HRD, however TDCC denies that it breached any obligation under the JDA. TDCC defers to DCCI's answer regarding information received by DCCI employees. Further answering, TDCC admits that the JDA contained provisions regarding confidentiality, but TDCC denies that HRD has accurately summarized those provisions. Except as expressly admitted, TDCC denies each of the allegations in Paragraph 126.

127. Instead of performing under the contracts, Dow delivered non-conforming, entirely unusable product to HRD. HRD timely inspected the goods and promptly informed Dow that the product was seriously defective and had no commercially viable use. Nevertheless, Dow failed to provide any conforming goods. In fact, Dow declined to provide conforming goods unless HRD modified its obligations to Dow such that HRD's contractual burdens were increased, making the contracts far more favorable to Dow. Dow sought to use the JDA and Supply Agreement as leverage because HRD had relied on Dow's promises that it would supply HRD with product in a quantity and quality to meet its needs. Its refusal to comply with these obligations constituted a breach of the duty of good faith and fair dealing.

**DCCI Answer:**

DCCI has simultaneously moved to strike the fourth sentence of Paragraph 127, which reflects settlement proposals or statements made in compromise negotiations in contravention of Fed.R.Evid. 408. Subject to the motion and expressly reserving the protections of Fed.R.Evid 408, DCCI denies each allegation in Paragraph 127. Further answering, DCCI denies that it breached the JDA because it is not a party to the JDA.

**TDCC Answer:**

TDCC has simultaneously moved to strike the fourth sentence of Paragraph 127, which reflects settlement proposals or statements made in compromise negotiations in contravention of Fed.R.Evid. 408. Subject to the motion and expressly reserving the protections of Fed.R.Evid 408, TDCC denies each allegation in Paragraph 127.

128.    HRD had developed a profitable business in the manufacture and sale of hot melt adhesives. Both TDCC and DCCI gained proprietary information, such as HRD's customers and manufacturing processes, from HRD pursuant to the Joint Development Agreement. HRD disclosed this information relying on Dow's agreement in Section 6.2 of the JDA that it would maintain this information in confidence and use it only for activities pursuant to the JDA. Despite this contractual obligation, Dow misused HRD's proprietary information to develop a plan to enter into direct competition with HRD. Once Dow learned of this highly profitable market, it refused to provide HRD with product that was commercially usable. Instead Dow used HRD's confidential business information to begin its entrance into the market. Dow used HRD's confidential information in a manner entirely inconsistent with the provisions of the contract.

**DCCI Answer:**

DCCI admits that DCCI employees received certain limited information regarding HRD, however DCCI denies that it breached any obligation under the JDA. DCCI defers to TDCC's answer regarding information received by TDCC employees. Further answering, DCCI admits that the JDA contained provisions regarding confidentiality, but DCCI denies that HRD has accurately summarized those provisions. Further answering, DCCI denies that it breached the JDA because it is not a party to the JDA. Except as expressly admitted, DCCI denies each of the allegations in Paragraph 128.

**TDCC Answer:**

TDCC admits that TDCC employees received certain limited information from HRD, however TDCC denies that it breached any obligation under the JDA. TDCC defers to DCCI's answer regarding information received by DCCI employees. Further answering, TDCC admits

that the JDA contained provisions regarding confidentiality but TDCC denies that HRD has accurately summarized those provisions.    Except as expressly admitted, TDCC denies each of the allegations in Paragraph 128.

129.    Both TDCC and DCCI breached the Joint Development Agreement by failing to execute their obligations under that contract in good faith. They also breached the confidentiality agreement by using proprietary information to compete directly with HRD. HRD has suffered and will suffer damages because of Dow's breach.

**DCCI Answer:**

DCCI denies each of the allegations in Paragraph 129.   Further answering, DCCI also denies that it breached the JDA because it is not a party to the JDA.

**TDCC Answer:**

TDCC denies each of the allegations in Paragraph 129.

## COUNT 3 MISAPPROPRIATION OF - TRADE SECRETS BY IMPROPER MEANS

130.    HRD had developed a highly profitable business in the manufacture and sale of hot melt adhesives. TDCC and HRD entered into a confidentiality agreement as part of the Joint Development Agreement to protect HRD's trade secrets, including end-use applications, HRD's business plans, manufacturing processes, associated technical information, and identities of customers.   The JDA confidentiality provision permitted TDCC to share HRD's confidential information with its affiliates, including DCCI, if such disclosure is reasonably required for TDCC to perform its obligations under the contract.   If the affiliate accepts such confidential information, it is bound by the confidentiality and limited use terms under the JDA.   DCCI, the recipient of HRD's confidential information from TDCC, became a third-party beneficiary of HRD and TDCC's contract and thereby bound itself to the contract obligations.

**DCCI Answer:**

DCCI admits that HRD is involved in the sale of Polyethylene waxes.  DCCI admits that TDCC and HRD entered into the JDA, and that the JDA contained provisions regarding

confidentiality.   DCCI denies that HRD has accurately described the legal effect of those

provisions.   Further answering, DCCI admits that DCCI employees received certain limited

information regarding HRD, however DCCI denies that it breached any obligation under the

JDA.  DCCI defers to TDCC's answer regarding information received by TDCC employees.

Except as expressly admitted, DCCI denies each of the allegations in Paragraph 130.

**TDCC Answer:**

TDCC admits that HRD is involved in the sale of Polyethylene waxes.  TDCC admits

that TDCC and HRD entered into the JDA, and that the JDA contained provisions regarding

confidentiality.   TDCC denies that HRD has accurately described the legal effect of those

provisions.  Further answering, TDCC denies that HRD has accurately described the legal effect

of those provisions.  Further answering, TDCC admits that TDCC employees received certain

limited information from HRD, however TDCC denies that it breached any obligation under the

JDA.  TDCC defers to DCCI's answer regarding information received by DCCI employees.

Except as expressly admitted, TDCC denies each of the allegations in Paragraph 130.

131.    During the course of their business relationship and under the protection of this
confidentiality agreement, HRD shared this information with TDCC and DCCI in furtherance of
their joint development and production of polyethylene wax. HRD disclosed this information to
facilitate the manufacture of polyethylene wax that would be well-suited to HRD's purposes, of
which Dow was fully aware. Dow, however, proceeded to ship HRD "product" that was entirely
unfit for any commercial use, resisted remedying the defective and dangerous product, made
unreasonable monetary demands on HRD, and contacted one or more of HRD's customers.
Then DCCI filed suit against HRD for breach of contract.

**DCCI Answer:**

DCCI admits that DCCI employees received certain limited information regarding HRD,

however DCCI denies that it breached any obligation under the JDA.  DCCI defers to TDCC's

answer regarding information received by TDCC employees.  Further answering, DCCI admits

that DCCI employees may have had communications with one or more HRD customers, however DCCI denies that it breached either the JDA or Supply Agreement. DCCI defers to TDCC's answer regarding communications of TDCC employees. Except as expressly admitted, DCCI denies each of the allegations in Paragraph 131.

**TDCC Answer:**

TDCC admits that TDCC employees received certain limited information from HRD, however TDCC denies that it breached any obligation under the JDA. TDCC defers to DCCI's answer regarding information received by DCCI employees. Further answering, TDCC admits that TDCC employees may have had communications with one or more HRD customers, however TDCC denies that it breached either the JDA or Supply Agreement. TDCC defers to DCCI's answer regarding communications of DCCI employees. Except as expressly admitted, TDCC denies each of the allegations in Paragraph 131.

132.    The information that HRD shared with Dow was information that is not generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, that has independent economic value given the lucrative opportunities in HRD's industry and by virtue of its not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and is the subject of extensive efforts on the part of HRD to maintain its secrecy. HRD kept this information secret until TDCC signed the contracts, which included confidentiality clauses. Dow obtained this information through improper means, including numerous misrepresentations to HRD and breach of its contractual duties to maintain the secrecy of these trade secrets. Despite Dow's contractual obligations to the contrary, Dow used HRD's proprietary information to develop a plan to enter into direct competition with HRD, with the aid of the information Dow misappropriated from HRD.

**DCCI Answer:**

DCCI admits that DCCI employees received certain limited information regarding HRD, however DCCI denies that it breached any obligation under the JDA. DCCI defers to TDCC's answer regarding information received by TDCC employees. DCCI denies that such information

was not generally known or not readily ascertainable by proper means by other persons. Except as expressly admitted, DCCI denies each of the allegations in Paragraph 132.

**TDCC Answer:**

TDCC admits that TDCC employees received certain limited information from HRD, however TDCC denies that it breached any obligation under the JDA. TDCC defers to DCCI's answer regarding information received by DCCI employees. TDCC denies that such information was not generally known or not readily ascertainable by proper means by other persons. Except as expressly admitted, TDCC denies each of the allegations in Paragraph 132.

133.    Because of TDCC's and DCCI's wrongful actions, HRD has suffered damages. HRD requests that this Court grant HRD damages pursuant to the Delaware Uniform Trade Secrets Act, 6 Del. C. §2003. HRD also requests this Court to grant HRD injunctive relief pursuant to 6 Del, C. §2002 to prevent Dow from using this wrongfully acquired information to its commercial advantage. Furthermore, Dow's conduct was willful and malicious, and Dow's actions were taken in bad faith. HRD therefore requests exemplary damages pursuant to 6 Del. C. §2003(b) and an award of attorney's fees pursuant to pursuant to 6 Del. C. §2004.

**DCCI Answer:**

DCCI denies each of the allegations in Paragraph 133.

**TDCC Answer:**

TDCC denies each of the allegations in Paragraph 133.

## AFFIRMATIVE DEFENSES

143.    TDCC asserts the affirmative defense of Release and Novation. Pursuant to the Assignment Agreement, HRD unequivocally released TDCC from all obligations under the Supply Agreement, with the exception of Paragraph 31:

18

> TDCC shall, except as otherwise expressly stated under point 6. [sic] below, be released and discharged from the observance and performance of the terms, obligations and provisions that arise or accrue under the Agreement on and after the Effective Date and Dow Canada shall be liable for the observance and performance of such terms, obligations and provisions that have arisen prior to the Effective Date, as if Dow Canada was the original party to the agreement.

(Assignment Agreement, ¶ 3, Pl.'s Compl. Exh. E.)  Accordingly TDCC cannot be found to be liable for any alleged breach of the Supply Agreement.

144.  DCCI asserts the affirmative defense of waiver.  In its First Amended Answer and Counterclaims, HRD has asserted that DCCI delivered defective Product.  (*See, e.g.,* Def.'s First Am. Answer and Countercl., ¶¶ 120-21.)   DCCI disputes that any of the Product it delivered to HRD was defective, and further asserts that the Product it delivered was either in accordance with the Supply Agreement or was in accordance with experimental wax runs at Sarnia that HRD specifically requested.   However, even assuming DCCI had supplied defective Product, Paragraph 10.2 of the Supply Agreement requires HRD to notify DCCI of defective Product within sixty (60) days of delivery.  (Supply Agreement, Paragraph 10.2.)   Under the express terms of the Supply Agreement, failure to provide proper notice results in irrevocable acceptance of the Product by HRD, and waiver of all claims arising from the claimed delivery of defective Product.  (Supply Agreement, Paragraph 10.3).  HRD has failed to provide DCCI timely or proper notice that any Product delivered by DCCI is defective.  Accordingly, assuming defective Product was delivered (which DCCI contests) HRD has waived any claim arising from any claimed delivery of defective Product.  To the extent that HRD claims that TDCC is jointly liable under the Supply Agreement, TDCC also asserts this defense.

145.  DCCI  asserts the defense of waiver of the HRD plant fire as a Force Majeure Event.  In its First Amended Answer and Counterclaims, HRD claims that a fire at its Houston plant constituted a Force Majeure Event, which excuses HRD's performance under the Supply

Agreement. (Def.'s First Am. Answer and Countercl., ¶ 109.) DCCI denies that the HRD plant fire constitutes a Force Majeure Event, as defined by the Supply Agreement. However, even if a Force Majeure Event had occurred, Paragraph 15.2 of the Supply Agreement requires that the party relying on the Force Majeure Event must notify the other party within fifteen (15) business days of the first day of any claimed Force Majeure Event, and that such notice must specify that a Force Majeure Event has occurred and provide evidence that its performance has been prevented or delayed by the claimed Force Majeure Event. (Supply Agreement, Paragraph 15.2). HRD has not provided DCCI with timely or proper notice that its performance has been prevented or delay by a Force Majeure Event. Accordingly, even assuming a Force Majeure event has occurred (which DCCI contests), HRD has waived any assertion that a claimed Force Majeure Event excuses its performance under the Supply Agreement. To the extent that HRD is also claiming Force Majuere excuses any duty to TDCC, TDCC also asserts waiver of Force Majuere.

146. DCCI asserts the affirmative defense of waiver or estoppel. In its First Amended Answer and Counterclaims, HRD has made various assertions that it was supplied with product that was adulterated with "light end" material, or that DCCI failed to remove "light-end" material. (*See, e.g.,* Def.'s First Am. Answer and Countercl., ¶¶ 120-21.) DCCI disputes these allegations. However, even assuming these allegations had been true, HRD has waived or is estopped from asserting that the product supplied failed to meet specifications. HRD was supplied with samples pursuant to the JDA with materially the same properties as the products supplied pursuant to the Supply Agreement. HRD was provided multiple opportunities to test those samples, and yet HRD never notified TDCC or DCCI that it could not use products materially similar to the samples provided prior to the execution of the schedules to the Supply

Agreement. Moreover, even when HRD executed written product specifications based on those product samples, HRD said nothing regarding "light end" material. In light of HRD's responsibility to evaluate the acceptability of product samples under the JDA, and HRD's complete failure to notify DCCI or TDCC that it considered "light end" material to constitute a material defect, HRD is now estopped, or has waived, its ability to assert that product delivered pursuant to the Supply Agreement failed to meet specifications. To the extent that HRD claims that TDCC is jointly liable under the Supply Agreement or the Joint Development Agreement, TDCC also asserts this defense.

MORRIS NICHOLS ARSHT & TUNNELL

_____

Kenneth Nachbar (#2067)
David J. Teklits (#3221)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 575-7294
knachbar@mnat.com
dteklits@mnat.com
    *Attorneys for Dow Chemical Canada, Inc. and*
    *The Dow Chemical Company*

OF COUNSEL:

Donald R. Cassling
Christopher Tompkins
Zachary V. Moen
JENNER & BLOCK LLP
One IBM Plaza
Chicago, IL  60611
(312) 923-2951

July 1, 2005

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on July 1, 2005 I electronically filed DOW
CHEMICAL CANADA, INC.'S AND THE DOW CHEMICAL COMPANY'S REPLY TO
H.R.D. CORPORATION'S COUNTERCLAIMS with the Clerk of the Court using CM/ECF
which will send notification of such filing to the following

        Richard I. Horwitz
        Suzanne M. Hill
        Potter Anderson & Corroon LLP
        Hercules Plaza, 6th Floor
        1313 North Market Street
        Wilmington, DE  19899-0951

        Kenneth J. Nachbar (#2067)
        Morris, Nichols, Arsht & Tunnell
        1201 North Market Street
        P.O. Box 1347
        Wilmington, DE  19899-1347
        (302) 658-9200
        knachar@mnat.com