# EXHIBIT A

Case 1:05-cv-00023-JJF    Document 30-2    Filed 07/18/2005    Page 1 of 17

LEXSEE 2003 US DIST LEXIS 881

**TRUEPOSITION, INC. and KSI, INC., Plaintiffs/ Counterclaim Defendants v. ALLEN TELECOM, INC. Defendant/ Counterclaim Plaintiff.**

C.A. No. 01-823 GMS

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2003 U.S. Dist. LEXIS 881

January 21, 2003, Decided

**SUBSEQUENT HISTORY:** As Amended September 4, 2003.

**DISPOSITION:** [*1] Motion to dismiss and/ or strike granted in part and denied in part. Claim dismissed.

**LexisNexis(R) Headnotes**

**COUNSEL:** For Trueposition Inc, KSI Inc, PLAINTIFFS: Donald F Parsons, Jr, Morris, Nichols, Arsht & Tunnell, Wilmington, DE USA.

For Allen Telecom Inc, DEFENDANT: John Leonard Reed, Timothy Ryan Dudderar, Duane Morris LLP, Wilmington, DE USA.

For Allen Telecom Inc, COUNTER-CLAIMANT: John Leonard Reed, Timothy Ryan Dudderar, Duane Morris LLP, Wilmington, DE USA.

For Trueposition Inc, KSI Inc, COUNTER-DEFENDANTS: Donald F. Parsons, Jr, Morris, Nichols, Arsht & Tunnell, Wilmington, DE USA.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Gregory M. Sleet

**OPINION:**

MEMORANDUM AND ORDER

**I. INTRODUCTION**

On December 11, 2001, the plaintiffs, TruePosition, Inc. and KSI, Inc. (collectively "TruePosition") filed a complaint against the defendant, Allen Telecom, Inc. ("Allen"). In the complaint, TruePosition alleges that Allen has infringed three of its patents, namely U.S. Patent No. 4,728,959 ("the '959 patent"), U.S. Patent No. 6,108,555 ("the '555 patent"), and U.S. Patent No. 6,119,013 ("the '013 [*2] patent"). Each of these patents discloses a technology for locating cellular phones. In its Answer and Counterclaims (D.I. 6, 48), the defendant asserted six affirmative defenses to the plaintiffs' claims, as well as five counterclaims.

Presently before the court is TruePosition's Motion to Dismiss and/ or Strike the Defendant's Counterclaims III, IV, and V, and Affirmative Defenses III and VI (D.I. 58). For the following reasons, the court will grant in part and deny in part the plaintiffs' motion.

**II. STANDARDS OF REVIEW**

The plaintiffs move to dismiss Counterclaims III, IV, and V pursuant to *Federal Rule of Civil Procedure 12(b)(6)*. Dismissal is appropriate pursuant to this Rule if the complaint fails "to state a claim upon which relief can be granted." *FED. R. CIV. P. 12(b)(6)*. In this inquiry, the court must accept as true and view in the light most favorable to the non-movant the well-pleaded allegations of the complaint. *Doug Grant, Inc. v. Greate Bay Casino Corp., 232 F.3d 173, 183-84 (3d Cir. 2000)*. The court 'need not accept as true "unsupported conclusions and unwarranted inferences."' *Id.* (quoting *City of Pittsburgh v. West Penn Power Co., 147 F.3d 256, 263 n.13 (3d Cir. 1998))* [*3] (quoting *Schuylkill Energy Res., Inc. v. Pennsylvania Power & Light Co., 113 F.3d 405, 417 (3d Cir. 1997))*. However, it is the duty of the court 'to view the complaint as a whole and to

Case 1:05-cv-00023-JJF   Document 30-2   Filed 07/18/2005   Page 3 of 17

Page 2
2003 U.S. Dist. LEXIS 881, *

base rulings not upon the presence of mere words but, rather, upon the presence of a factual situation which is or is not justiciable.' *232 F.3d at 184* (quoting *City of Pittsburgh, 147 F.3d at 263*).

The plaintiffs rely upon *Federal Rules of Civil Procedure 8* and *12(f)* for their motion to strike Affirmative Defenses III and VI. Rule 8 requires a "short and plain" statement of a claim or defense. *FED. R. CIV. P. 8(a)* and *(b)*. It is well settled that the Federal Rules intend a liberal pleading standard. *See Leatherman v. Tarrant county Narcotic Intelligence & Coordination Unit, 507 U.S. 163, 168, 122 L. Ed. 2d 517, 113 S. Ct. 1160 (1993)* (holding that federal courts may not impose a more demanding standard of pleading beyond "the liberal system of 'notice pleading' set up by the Federal Rules"). Indeed, Rule 8 expressly mandates that "each averment of a pleading shall be simple, concise, and direct." *FED. R. CIV. P. 8(e)*.

Rule 12(f) allows a court to [*4] strike "any insufficient defense" from any pleading. *FED. R. CIV. P. 12(f)*. Motions to strike affirmative defenses are disfavored. *Proctor & Gamble Co. v. Nabisco Brands, Inc., 697 F. Supp. 1360, 1362 (D. Del. 1988)*. When ruling on such a motion, "the court must construe all facts in favor of the nonmoving party ... and deny the motion if the defense is sufficient under the law." *Id.*

### III. DISCUSSION

#### A. Counterclaim III

Counterclaim III alleges tortious interference with a contract. The plaintiffs move to dismiss the counterclaim pursuant to Rule 12(b)(6) on the grounds that it fails to plead an essential element of the alleged tort, namely, a breach of the relevant contract.

The tort of interference with a contract requires "an intentional act that is a significant factor in causing the breach of the contract." n1 *Cantor Fitzgerald, L.P. v. Cantor, 724 A.2d 571, 584 (Del. Ch. 1998)*. Without a breach, there is no viable tortious interference claim. As to this point, Delaware law is well-settled. *See id.; see also Associated/Acc Int'l, LTD. v. Dupont Flooring Sys. Franchise Co., 2002 U.S. Dist. LEXIS 6464, at *27-28 (D. [*5] Del. 2002); DeBakey Corp. v. Raytheon Serv. Co., 2000 Del. Ch. LEXIS 129, 2002 WL 1273317 (Del. Ch. 2000); Boyer v. Wilmington Materials, 1997 Del. Ch. LEXIS 97, 1997 WL 382979 (Del. Ch. 1997); Irwin & Leighton, Inc. v. W.M. Anderson Co., 532 A.2d 983, 992 (Del. Ch. 1987)*. There is no discussion in these cases as to behavior that could constitute tortious interference when no breach of contract occurs. Presumably, this is because there is no conduct that could constitute the tort of interference with a contract, unless a breach of that contract results. n2

n1 Contrary to the defendant's paraphrasing, the court did not style this element as requiring only some kind of interference and no resultant breach. *See* Answering Brief at 9 n2 Although the defendant acknowledges that "a review of the relevant case law shows that the cases are universally precipitated by a breach of contract," it maintains that "the absence of a total breach does not foreclose recovery for damages caused by improper interference." Answering Brief at 10-11. This assertion is unpersuasive as it applies to interference with a contract, particularly given Allen's conspicuous failure to cite any supporting caselaw for it. Furthermore, Allen's contention that a breach of contract is not required in such a case because "the applicable tort here is, for a reason, labeled 'tortious *interference* with contractual relations' not 'tortious *breach* of contractual relations,'" Answering Brief at 12 n.5 (emphasis added), is astounding in its fatuity. The tort is not labeled "tortious breach of contractual relations" because a non-party to a contract generally is not bound by the contract and thus can not breach the contract. *See, e.g., Traffas v. Bridge Capital Investors II, 1993 U.S. Dist. LEXIS 12028, 1993 WL 339293 (D. Kan 1993)*, at *3 ("It would be a novel holding for the court to rule that a breach of contract action can be maintained against a person who is not a party to the contract being sued upon ... A party to a contract cannot sue a person who is not a party to that contract for breach of contract."); *Credit Gen. Ins. Co. v. Midwest Indem. Corp, 916 F. Supp. 766, 772 (N.D. Ill. 1996)* (finding "ludicrous" the defendants' contention that a non-party to a contract can breach that contract).

[*6]

In this case, the contract at issue is between AT&T Wireless Services, Inc. ("AT&T") and Allen for the purchase of Allen's wireless location systems, which systems are the subject of the present patent infringement suit. In its counterclaim, Allen alleges that the plaintiffs, by filing the present suit and by publicizing it, intended to cause a breach of the AT&T contract. Answer and Counterclaims (D.I. 48) PP 17-18. This is insufficient to state a claim of tortious interference with a contract because, as the defendant concedes, there has been no breach of the AT&T contract. n3 Answering Brief at 10. Therefore, Counterclaim III must be dismissed.

n3 The court is mindful of Allen's contention that "much of this may .... be a matter of semantics." Answering Brief at 12 n.6. Allen argues that, because the original AT&T contract was modified subsequent to TruePosition's initiation of the present suit, it suffered a complete loss of the original anticipated contract. *Id.* Apparently, Allen wishes the court to view this "loss" as a breach. However, a mutual modification of a contract certainly is not a breach. *See, e.g., Anderson v. Golden, 569 F. Supp. 122, 140 (S.D. Ga. 1982)* (distinguishing between breach and mutual modification). To the extent such a loss represents the loss of an economic expectation, the corresponding tort is interference with a prospective business opportunity. The court reiterates that Delaware law requires a breach to sustain the tort of interference with a contract.

[*7]

### B. Counterclaim IV

Counterclaim IV alleges tortious interference with prospective business opportunities. The elements of this tort are: '(a) the reasonable probability of a business opportunity, (b) the intentional interference by defendant with that opportunity, (c) proximate causation, and (d) damages, all of which must be considered in light of a defendant's privilege to compete or protect his business interests in a fair and lawful manner.' *DeBonaventura v. Nationwide Mut. Ins. Co., 428 A 2d 1151, 1153 (Del. 1981)* (quoting *DeBonaventura v. Nationwide Mut. Ins. Co., 419 A.2d 942, 947 (Del. Ch. 1980))* (citations omitted). The plaintiffs move to dismiss the counterclaim on the grounds that the defendant cannot prove all of the required elements, namely, a prospective business opportunity, or an interference with that opportunity.

The only "prospective business opportunity" at issue in the counterclaim is the AT&T contract. As stated above, the defendant acknowledges a completed and continuing contract with AT&T. Allen's expected business opportunity, thus, appears to have been consummated before the allegedly tortious conduct of the plaintiffs. [*8] This is particularly true because "the probability of the business opportunity must be assessed at the time of the alleged interference." *Malpiede v. Townson, 780 A.2d 1075, 1099 (Del. 2001).* In this case, the alleged interference occurred after Allen had been awarded the contract with AT&T. Answer and Counterclaims (D.I. 48) P 17.

Allen maintains, however, that the plaintiffs' interference caused a modification of the expected contract terms. Following TruePosition's commencement of a patent infringement action against Allen and a press release announcing the same, Allen allegedly incurred additional legal expenses in renegotiating certain provisions of the AT&T contract, more onerous indemnification terms in the contract, and damages to its reputation. Thus, Allen contends, TruePosition's actions interfered with its expected business opportunity in that the final terms of the AT&T contract differed from the original terms. For purposes of this motion only, this is sufficient to state a claim of tortious interference with prospective business opportunities. *See McHugh v. Board of Educ., 100 F. Supp. 2d 231, 247 n.15 (D. Del. 2000)* (noting that the [*9] tort requires "a valid business relationship or expectancy" and citing cases).

Assuming that these facts constitute a sufficient interference, the counterclaim may be challenged on other grounds, namely, that Allen has not shown that the plaintiffs engaged in any wrongful conduct. To sustain the tort of interference with a business opportunity, the interference must have been improper. *Bohatiuk v. Delaware Chiropractic Servs. Network, L.L.C., 1997 Del. Super. LEXIS 215, at *8-10 (Del. Super. 1997).* The conduct at issue is the filing of a patent infringement suit and the public announcement of the suit by a press release. Normally, lawful actions cannot form the basis of a claim of tortious interference, particularly in light of TruePosition's "privilege to compete and protect its own business interests." *Acierno v. Preit-Rubin, Inc., 199 F.R.D. 157, 164-65 (D. Del. 2001)* (dismissing tortious interference with contractual relations claim because defendant corporation and real estate investment trust, in failing to affirmatively suggest to County that competitor plaintiff's property be included in a traffic impact study, committed no wrongful conduct) [*10] (citing caselaw). In this case, however, the defendant also has alleged the counterclaim of "sham litigation." In the sham litigation context, the mere initiation of a lawsuit may be wrongful if it constitutes unlawful antitrust activity. Because the court will allow the "sham litigation" counterclaim to stand, *see infra* Section I.C., the tortious interference with a prospective business opportunity claim must survive as well. It is axiomatic that if the defendant can prove that the instant lawsuit is merely a "sham" and violative of antitrust law, then the filing of the lawsuit constitutes improper conduct. Therefore, in the interest of consistency, and viewing the pleadings in the light most favorable to Alien, Counterclaim IV survives the instant motion to dismiss.

### C. Counterclaim V

TruePosition moves for the dismissal of Counterclaim V, which alleges "sham litigation," on the grounds that such a cause of action does not exist. The term "sham litigation" refers to an exception to the doctrine of antitrust immunity. Immunity to certain antitrust suits was established by the Supreme Court in

Case 1:05-cv-00023-JJF    Document 30-2    Filed 07/18/2005    Page 5 of 17

Page 4
2003 U.S. Dist. LEXIS 881, *

*Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 5 L. Ed. 2d 464, 81 S. Ct. 523 (1961), [*11] and *Mine Workers v. Pennington*, 381 U.S. 657, 14 L. Ed. 2d 626, 85 S. Ct. 1585 (1965). These cases established that "the Sherman Act does not prohibit ... persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly." *Noerr*, 365 U.S. at 136. The Supreme Court refused to "impute to Congress an intent to invade" the First Amendment right to petition. *Id. at 136.* Thus, the *Noerr-Pennington* doctrine protects those who petition the government from antitrust liability.

Later caselaw extended *Noerr* antitrust immunity to "the approach of citizens ... to administrative agencies ... and to courts." *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510, 30 L. Ed. 2d 642, 92 S. Ct. 609 (1972). However, such immunity is not afforded to "sham" petitioning that is only "an attempt to interfere directly with the business relationships of a competitor." *Noerr*, 365 U.S. at 144. Litigation is a mere "sham" if it is objectively baseless and subjectively motivated to interfere [*12] with business competition by using a governmental process 'as an anticompetitive weapon.' *Professional Real Estate Investors v. Columbia Pictures Indus.*, 508 U.S. 49, 123 L. Ed. 2d 611, 113 S. Ct. 1920 (1993) (quoting *Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 380, 113 L. Ed. 2d 382, 111 S. Ct. 1344 (1991)).

The plaintiffs urge that "sham litigation" is not a cognizable cause of action. The court cannot agree. A counterclaim of sham litigation is, essentially, an assertion that antitrust law has been violated. Indeed, in litigation leading to the Court's decision in *Professional Real Estate Investors*, Columbia Pictures had sued the defendant, PRE, for copyright infringement. 508 U.S. at 52. The defendant counterclaimed, accusing Columbia of violations of §§ 1 and 2 of the Sherman Act, 26 Stat. 209, as amended, 15 U.S.C. §§ 1-2. *Id.* "In particular, PRE alleged that Columbia's copyright action was a mere sham that cloaked underlying acts of monopolization and conspiracy to restrain trade." *Id.* Although the counterclaim did not survive summary judgment on the facts of the case, the Court upheld the validity [*13] of the sham counterclaim itself. Indeed, in announcing a two-part test for its application, the Court only clarified the existence and context of the sham litigation exception. n4

n4 Of course, as already stated, a violation of antitrust law underlies any sham exception to antitrust immunity. Although the defendant has not specifically pled a violation of the Sherman Act in Counterclaim V, the invocation of the sham litigation doctrine is sufficient to give notice of the basis of its claim. This is particularly true in the context of a Rule 12(b)(6) motion to dismiss, and in light of both the liberal pleading philosophy of the Federal Rules and the court's responsibility 'to examine the complaint to determine if the allegations provide for relief on any possible theory.' *O'Boyle v. Jiffy Lube Int'l, Inc.*, 866 F.2d 88, 93 (3d Cir. 1989) (quoting C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE, § 1357, at 601-02 (1969) (footnotes omitted)).

Since *Professional Real Estate Investors*, [*14] the sham litigation exception has been invoked in varied contexts. For example, in a recent case, the Supreme Court refused to strip antitrust immunity from an employer who filed a losing and retaliatory lawsuit where the suit was not objectively baseless. *BE&K Constr. Co. v. NLRB*, 536 U.S. 516, 153 L. Ed. 2d 499, 122 S. Ct. 2390 (2002). In so doing, the Court implicitly held that the sham litigation exception applies to the National Labor Relations Act in the same way it applies to the Sherman Act. *See* 122 S. Ct. at 2402 (Scalia, J., concurring) ("The implication of our decision today is that ... we will construe the National Labor Relations Act ... in the same way we have already construed the Sherman Act: to prohibit only lawsuits that are *both* objectively baseless *and* subjectively intended to abuse process.") (emphasis in original). Other courts have applied the immunity principles *of Noerr-Pennington* to other contexts. *See, e.g., State of Missouri v. National Organization of Women*, 620 F.2d 1301, 1318-19 (8th Cir. 1980) (applying *Noerr-Pennington* liability principles to state tort laws); [*15] *Video International Production, Inc. v. Warner-Amex Cable Communications, Inc.*, 858 F.2d 1075, 1084 (5th Cir. 1988) (holding that *Noerr-Pennington* doctrine applies to Civil Rights Act liability); *Gorman Towers, Inc. v. Bogoslavsky*, 626 F.2d 607, 614-15 (8th Cir. 1980) (same). It follows that if the *Noerr-Pennington* immunity principles apply in these contexts, the sham litigation exception to immunity applies as well. n5 Other cases have explicitly or implicitly accepted the sham exception in the patent infringement context. *See, e.g., Carroll Touch, Inc. v. Electro Mechanical Sys.*, 15 F.3d 1573 (D.C. Cir. 1993) (discussing sham litigation counterclaim in patent infringement context); *U.S. Philips Corp. v. Sears Roebuck & Co.*, 55 F.3d 592, 597 (Fed. Cir. 1995) (rejecting sham counterclaim on the facts of the case).

n5 Unlike the defendant, however, the court recognizes a distinction between the *Noerr-Pennington* doctrine, which shields petitioners from antitrust liability, and the sham litigation exception, which strips this immunity when the petition is meritless and anticompetitive in nature. *See, e.g.,* Answering Brief at 15 ("... the Noerr-Pennington [i.e., "sham litigation"] doctrine ...").

[*16]

In sum, the court can find no justification for refusing to allow the sham exception to be litigated in the instant case. Indeed, a copyright infringement action, like that at issue in *Professional Real Estate Investors,* and a patent infringement action such as the one at issue here present such analogous contexts regarding the application of the sham litigation exception that it would strain credibility to announce a relevant and dispositive difference between them. Thus, Counterclaim V may remain, to succeed or fail as it may in the ensuing litigation. n6

n6 In this vein, the court stresses that the defendant, of course, will be tasked in the ensuing litigation with proving the elements of the sham litigation exception, namely, that the present patent infringement suit is objectively baseless and subjectively motivated by an intent to interfere with competition. *See Carroll Touch, 15 F.3d at 1583* (holding that sham litigation counterclaim could not survive summary judgment because defendant did not establish a genuine issue regarding whether the patent infringement action was baseless).

[*17]

### D. Affirmative Defense III

As its third affirmative defense, Alien alleges that TruePosition engaged in "fraud and/ or inequitable conduct" in acquiring the relevant patents. The plaintiffs move to strike the defense, as well as Counterclaim I, which is predicated on the inequitable conduct defense, on the grounds that the affirmative defense does not meet the pleading requirements of *Federal Rule of Civil Procedure 9(b)*.

Rule 9 requires that all pleadings of fraud or mistake "be stated with particularity." *FED. R. CIV. P. 9(b).* n7 These averments, however, remain subject to the liberal pleading standard of Rule 8, which requires only a "short and plain" statement of a claim or defense. *See In re Westinghouse Sec. Litig., 90 F.3d 696, 703 (3d Cir. 1996)* (citing cases); *see generally Leatherman, 507 U.S. at 168* (holding that federal courts may not impose a more demanding standard of pleading beyond "the liberal system of 'notice pleading' set up by the Federal Rules"); 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER FEDERAL PRACTICE AND PROCEDURE § 1281, at 520-21 (1990) (pleading with particularity under Rule 9(b) should be done consistently with [*18] the general philosophy of Rule 8); 2A JAMES W. MOORE, MORRE'S FEDERAL PRACTICE P 8.13, at 8-58 (2d ed. 1995) (the mandate of Rule 8 applies "even where the Rules command particularity, as in the pleading of fraud under Rule 9(b)") (footnote omitted).

n7 Because the court has found that Alien's pleadings satisfy the heightened pleading requirements of Rule 9(b), it need not address the defendant's argument that Rule 9(b) may not apply to allegations of inequitable conduct.

The pleading requirements are satisfied by Alien's third affirmative defense. The defense constitutes one paragraph which names the title and publication date of at least one allegedly withheld material prior art publication. In the context of alleged inequitable conduct before the PTO during a patent prosecution, "pleadings that disclose the name of the [allegedly withheld] relevant prior art and disclose the acts of the alleged fraud fulfill the requirements of Rule 9(b)." *EMC Corp. v. Storage Tech. Corp., 921 F. Supp. 1261, 1263 (D. Del. 1996).* [*19] The third affirmative defense discloses at least this much, and thus suffices "to apprise the other party of what is being alleged in a manner sufficient to permit responsive pleadings" as Rule 9 requires. 5 WRIGHT & MILLER § 1296 (1990).

TruePosition objects that the named publication is relevant to only certain of their patents and, therefore, the defendant has not sufficiently pled the defense of inequitable conduct as to the other patents. The court declines, however, to weigh the relevance and materiality of the allegedly withheld prior art for purposes of this motion. It is the court's duty for purposes of this motion only to test the sufficiency of the pleading, not to resolve disputed facts or decide the merits of the case. *Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993).* Furthermore, the Third Circuit has made clear that, although "it is certainly true that allegations of 'date, place or time'" satisfy the pleading requirements, "nothing in [Rule 9] requires them." *Seville Industrial Machinery v. Southmost Machinery, 742 F.2d 786, 791.* The affirmative defense, as pled, suffices to place the plaintiffs on notice of the misconduct with [*20] which they are charged. *Id.; see also Scripps Clinic and Research Found., et al. v. Baxter Travenol Lab., et al,*

*1988 U.S. Dist. LEXIS 1972, 1988 WL 22602*, at *3 (D. Del.) (defense of inequitable conduct sufficiently pled when defendant simply "alleged that [the plaintiff] failed to identify to the PTO relevant prior art of which it was aware").

The motion to strike the third affirmative defense, and to dismiss Counterclaim I, which is at least partially premised on the defense of inequitable conduct, is denied.

### E. Affirmative Defense VI

Finally, the plaintiffs move to strike Affirmative Defense VI, abuse of process, on the grounds that it is not a defense to a patent infringement action, and that, in any event, it has not been pled properly.

The plaintiffs are correct that abuse of process is not a defense to a patent infringement action. Rather, it is a tort, *see* PROSSER, LAW OF TORTS, § 121 (4th Ed. 1971), which should have been pled as a counterclaim. This mistake is not fatal, however. *Federal Rule of Civil Procedure 8(c)* states that "when a party has mistakenly designated ... a counterclaim as a defense, the court on terms, if justice so requires, shall treat the pleading [*21] as if there had been a proper designation." *FED. R. CIV. P. 8(c)*. The court will view the defendant's averment of the "defense" of abuse of process as a counterclaim.

Abuse of process may be alleged in a patent infringement case as in any other. *See, e.g., Bayer AG v. Sony Elecs., Inc., 229 F. Supp. 2d 332 (D. Del. 2002)*. A claim of abuse of process is established when "the defendant ... proves that the plaintiff had an 'ulterior purpose' and committed 'a willful act in the use of the process that is not proper in the regular conduct of the proceedings.'" *Id. at 368* (quoting *Feinman v. Bank of Delaware, 728 F. Supp. 1105, 1115 (D. Del. 1990), aff'd, 909 F.2d 1475 (3d Cir. 1990))*. "There must be 'some definite act or threat not authorized by the process or aimed at an objective not legitimate in the use of process ... there is no liability where the [plaintiff] has done nothing more than carry out the process to its authorized conclusion.'" *Id.* (citations omitted).

The defendant has asserted that the "plaintiffs have abused the judicial process by bringing the present action based on the patents that plaintiffs [*22] know are invalid, unenforceable, and/ or not infringed." Answer and Counterclaims (D.I. 48) at 8. There is no elaboration in the Answer and Counterclaims. The defendant's briefing, however, contends that "the same averments with regard to TruePositions tortious interference with Allen's business contracts and relations also establish a basis to proceed against TruePosition for abuse of process." Answering Brief at 17-18 n.10.

The defendant's averments are sufficient to sustain a Rule 8, Rule 12(f), or Rule 12(b)(6) motion to strike and/ or dismiss. Allen has offered a "short and plain" statement of the claim and has presented a factual context that, viewed in the light most favorable to Allen, states an abuse of process claim. Again, it is the court's duty for purposes of this motion only to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case. *Kost, 1 F.3d at 183*. Despite the defendant's anemic presentation of its abuse of process claim, the facts presented in the context of its sham litigation and tortious interference claims suffice to state a claim for relief for abuse of process as well. The plaintiffs' motion to [*23] dismiss the claim is denied.

### IV. CONCLUSION

The court concludes that the defendant's tortious interference with a contract claim can not be sustained because there has been no breach of contract. Allen's other counterclaims of tortious interference with prospective business opportunities, sham litigation, declaratory judgment, and abuse of process survive this motion to dismiss. Likewise, the defendant's third affirmative defense of fraud and/ or inequitable conduct may remain.

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. TruePosition's Motion to Dismiss and/ or Strike (D.I. 58) is GRANTED IN PART and DENIED IN PART.

2. Counterclaim III, alleging tortious interference with a contract, is DISMISSED.

Dated: January 21, 2003

    Gregory M. Sleet

    UNITED STATES DISTRICT JUDGE

# EXHIBIT B

LEXSEE 2002 US DIST LEXIS 12203

SPECIALTY INSURANCE, ET AL. v. ROYAL INDEMNITY COMPANY

CIVIL ACTION NO. 00-2482

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

*2002 U.S. Dist. LEXIS 12203*

March 22, 2002, Decided
March 22, 2002, Filed; March 25, 2002, Entered

**SUBSEQUENT HISTORY:** Summary judgment denied by *Specialty Ins. v. Royal Indem. Co., 2004 U.S. Dist. LEXIS 13376* (E.D. Pa., July 9, 2004)

**DISPOSITION:** [*1] Defendants' Motion to Dismiss granted in part and denied in part.

**LexisNexis(R) Headnotes**

**COUNSEL:** For SPECIALTY INSURANCE AGENCY, INC., SECURITY INDEMNITY INSURANCE COMPANY, PLAINTIFFS: HERBERT C. KLEIN, NOWELL AMOROSO KLEIN BIERMAN, HACKENSACK, NJ USA.

For SPECIALTY INSURANCE AGENCY, INC., SECURITY INDEMNITY INSURANCE COMPANY, PLAINTIFFS: MICHAEL J. PALMA, WILLIAM D. BIERMAN, NOWELL AMOROSO KLEIN BIERMAN, P.A., HACKENSACK, NJ USA.

For ROYAL INDEMNITY COMPANY, DEFENDANT: KENNETH T. LEVINE, NELSON, LEVINE, de LUCA & HORST, L.L.C, BLUE BELL, PA USA.

**JUDGES:** R. Barclay Surrick, Judge.

**OPINIONBY:** R. Barclay Surrick

**OPINION:**

**MEMORANDUM & ORDER**

SURRICK, J.

**MARCH 22, 2002**

Plaintiffs Specialty Insurance Agency, Inc. ("Specialty") and Security Indemnity Insurance Company ("Security") bring this diversity action against Defendant Royal Indemnity Company ("Royal") for breach of contact, breach of the covenant of good faith and fair dealing, violations of New York Insurance Law, and negligence. Plaintiffs request both compensatory and punitive damages. Currently before the Court is Defendant's Rule 12(b)(6) Motion to Dismiss (the "Motion to Dismiss," Docket No. 8). For the following [*2] reasons, the Motion to Dismiss will be granted in part and denied in part.

**I. STATEMENT OF FACTS**

The following facts, as alleged in the Complaint, are taken as true and in the light most favorable to Plaintiffs. In 1985, Specialty and Royal entered into a written agreement by which Specialty would serve as the Managing General Agent for Royal in a program of property and casualty insurance for the restaurant industry (the "Restaurant Program"). Cmpl. P 7. Under this agreement, Specialty was responsible for generating business and acting as an underwriter by using its knowledge and skill to determine which restaurants to insure. Id. In 1988, Specialty and Royal renewed the Managing General Agent Agreement (the "MGA Agreement"). Id. at P8.

Pursuant to the MGA Agreement, Specialty was responsible for the administration of the Restaurant Program. The responsibilities given to Specialty included producing insurance policies, underwriting, binding and issuing insurance policies, and collecting the premiums

Case 1:05-cv-00023-JJF    Document 30-2    Filed 07/18/2005    Page 10 of 17

Page 2
2002 U.S. Dist. LEXIS 12203, *

due. Id. at P 9. Royal's responsibilities under the MGA Agreement included licensing Specialty in each state where the Restaurant Program was to be in effect. [*3] Id. at P 23; MGA Agreement P 6. This relationship continued until June 30, 1997. Id. at P 10.

In 1994, Royal forced Specialty to increase its rates to its policyholders, even though the Restaurant Program was profitable at the current rates. Id. at P 22(a). This caused Specialty to lose a major portion of the business which it had built over a number of years. Id. Royal also increased claims reserves without any justification. Id. at P 22(b). This led to the creation of fictitious losses, which were the justification for the increase in the rates. Id. When Specialty showed Royal that the Restaurant Program would still be profitable at the reduced rates and told Royal that the rate increases would destroy the Restaurant Program, Royal ignored Specialty's warnings. Id. at PP 22(c)-(d). Royal forced Specialty to cancel business, including a policy with one of Specialty's best customers, causing irreparable damage to Specialty's reputation in the industry. Id. at PP 22(e), (h).

Prior to the termination of the MGA Agreement, Royal directed Specialty to stop underwriting policies. This also caused irreparable damage to Specialty's relationships within the [*4] industry. Id. at P 22(f). In addition, prior to 1996, Royal began a scheme whereby it would accept premiums on a policy and, then, if a significant loss occurred, Royal would either try to avoid payment or claim that Specialty was responsible for payment of the claim due to Specialty exercising bad judgment about which policies to underwrite. Id. at P 22(g). Moreover, Royal failed to renew Specialty's license in the state of Massachusetts, causing Specialty to be sanctioned, fined and barred from doing business in Massachusetts. Id. at PP 26-27. This failure resulted in Security, which had also retained Specialty as its managing agent, being denied the ability to write policies in Massachusetts. Id. at PP 34-34. Finally, Royal refused to pay Specialty a profit contingency which was due under the MGA Agreement. Id. at P 22(i).

## II. NATURE AND STAGE OF PROCEEDINGS

Plaintiffs' Complaint was filed in the District of New Jersey on August 2, 1999. The action was transferred to the Eastern District of Pennsylvania in May, 2000. This Court has jurisdiction pursuant to *28 U.S.C. § 1332*.

Count I of the Complaint is a claim by Specialty [*5] for breach of the duty of good faith and fair dealing. In Count II, Specialty claims Royal violated various sections of New York's Insurance Law. Count III is an additional claim by Specialty for breach of the duty of good faith and fair dealing. Count IV is a claim by Specialty for breach of contract. In Count V, Specialty brings a claim for negligent failure to obtain an insurance license for Specialty in the State of Massachusetts. In Count VI, Security advances a negligence claim also based on Royal's failure to obtain a license for Specialty in the State of Massachusetts.

## III. APPLICABLE LAW

A federal court exercising diversity jurisdiction must apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 497, 85 L. Ed. 1477, 61 S. Ct. 1020 (1941); Kruzits v. Okuma Machine Tool, Inc., 40 F.3d 52, 55 (3d Cir. 1994)*. Accordingly, we apply Pennsylvania's choice of law rules in this case. "Both Pennsylvania law and the Restatement of Conflict of Laws provide that the first question to be answered in addressing a potential conflict of laws dispute is whether the parties explicitly or implicitly [*6] have chosen the relevant law." *Assicurazioni Generali, S.P.A. v. Clover, 195 F.3d 161, 164 (3d Cir. 1999)*. When parties have contracted for a specific body of law, the "choice of law provisions in [the] contracts will generally be given effect." *Smith v. Commonwealth Nat'l Bank, 384 Pa. Super. 65, 557 A.2d 775, 777 (Pa. Super. Ct. 1989); Kruzits, 40 F.3d at 55*.

Plaintiffs and Defendant have conceded in their briefs that New York law applies to the substantive issues in this case. See Pls. Mem. in Opp. at 1-2. The MGA Agreement provides that the "Agreement shall be interpreted and enforced in accordance with the laws of the State of New York." MGA Agreement P16(e). Thus, with respect to the contract issues, all of which arise from the MGA Agreement, the Court will defer to the choice of law indicated by the parties in the MGA Agreement and apply New York law. Moreover, because the claims for negligence arise out of an alleged duty arising from the parties' contractual relationship under the MGA Agreement, we will also apply New York law to those claims.

## IV. STANDARD

A court may dismiss a complaint under *Rule 12(b)(6)* [*7] *of the Federal Rules of Civil Procedure* for failure to state a claim only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. *Hishon v. King & Spalding, 467 U.S. 69, 73, 81 L. Ed. 2d 59, 104 S. Ct. 2229 (1984); Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957); In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1420 (3d Cir. 1997)* (citing *Bartholomew v. Fischl, 782 F.2d 1148, 1152 (3d Cir. 1986))*. Although a court need not credit a plaintiff's "bald assertions" or "legal conclusions" when deciding a motion to dismiss, *Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997)*, the court must accept

Case 1:05-cv-00023-JJF    Document 30-2    Filed 07/18/2005    Page 11 of 17

Page 3
2002 U.S. Dist. LEXIS 12203, *

as true all the allegations set forth in the complaint, and must draw all reasonable inferences in the plaintiff's favor. *Ford v Schering-Plough Corp., 145 F.3d 601, 604 (3d Cir. 1998)*. "'The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" Id. (quoting *Scheuer v. Rhodes, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683, 71 Ohio Op. 2d 474 (1974))*. [*8]

## V. ANALYSIS

**A. The Statutory Claims under New York Insurance Law Must be Dismissed.**

Defendant argues that Specialty's claims under the New York Insurance Law (Count II) must be dismissed because Specialty has not identified any specific provision, statute or code which Royal is alleged to have violated, or which provides Specialty with a private cause of action. In fact, no specific statutes or codes were cited in Plaintiffs' Complaint. However, Plaintiffs contend, in their Memorandum of Law in Opposition to Defendant's Motion, that Royal violated Sections 2123 and 2304 of the New York Insurance Law. In addition, Plaintiffs claim Royal violated Article 24, *N.Y. Ins. Law § 2401 et seq. (McKinney 2000)*, by engaging in deceptive or unfair business practices. For the following reasons, Specialty's claims under the New York Insurance Law will be dismissed.

**1. Section 2123 does not apply to Specialty's claim.**

Section 2123 of the New York Insurance Law provides a private cause of action for certain misrepresentations and misleading statements by an agent or representative of any insurer authorized to transact life, accident or health insurance business [*9] in New York. *N.Y. Ins. Law § 2123 (McKinney 2000)*. This statutory provision is very specific in limiting the types of policies or contracts to which it applies. It covers "life, accident or health insurance, any annuity contract or any health maintenance organization contract." *N.Y. Ins. Law § 2123(a)(1)*. Specialty admits that it was involved in selling "property and casualty insurance" for the Restaurant Program. Cmpl. P 7. Because "property and casualty insurance" is not "life insurance" or "accident and health insurance," *N.Y. Ins. Law §§ 1113(a)(1), (3)*, Plaintiffs' claim under Section 2123 n1 must be dismissed.

> n1 Moreover, Section 2123 applies only to insurance agents or representatives, and not to an insurer, such as Royal. *N.Y. Ins. Law § 2123; Dornberger v. Metropolitan Life Ins. Co., 961 F. Supp. 506, 547 (S.D.N.Y. 1997)* (dismissing Section 2123 claim against insurer); *Buccino v. Continental Assur. Co., 578 F. Supp. 1518, 1526 (S.D.N.Y. 1983)* (same); *Goshen v. The Mutual Life Ins. Co. of New York, 997 N.Y. Misc. LEXIS 486, 1997 WL 710669 (N.Y. Sup. Ct. Oct. 21, 1997)*. We note that Section 4226 of the New York Insurance Law provides a private cause of action against an insurer for certain misrepresentations and misleading statements, *N.Y. Ins. Law § 4226 (McKinney 2000)*. However, it applies only to insurers authorized to transact "life" or "accident and health" insurance and, as with Section 2123, does not pertain to property or casualty insurance. *N.Y. Ins. Law § 4226(a)(1)*. In addition, Section 4226 does not provide a basis for recovery by an insurance agent against an insurer. *Slote v. Equitable Life Assur. Soc. of U.S., 78 Misc. 2d 462, 356 N.Y.S.2d 812 (N.Y. Sup. Ct. 1974)* (insurance agent was not an aggrieved person within meaning of Section 211, now Section 4226).

[*10]

**2. Section does not provide a private cause of action.**

Specialty purports to bring a cause of action against Royal pursuant to and, thus, Article 23 of the New York Insurance Law. Section 2304 *N.Y. Ins. Law § 2301 et seq. (McKinney 2000)*, Article 23 covers property and casualty insurance and has the following purposes: (1) to promote the public welfare by regulating insurance rates to the end that they not be excessive, inadequate or unfairly discriminatory, (2) to promote price competition and competitive behavior among insurers, (3) to provide rates that are responsive to competitive market conditions, (4) to improve the availability and reliability of insurance and (5) to authorize and regulate cooperative action among insurers within the scope of this article. *N.Y. Ins. Law § 2301 (McKinney 2000)*. Neither Article 23 nor, in particular, Section 2304 provides a private right of action.

Typically, New York courts do not construe the Insurance Law to provide a private right of action in the absence of express language authorizing such enforcement. *Bauer v. Mellon Mortgage Co., 178 Misc. 2d 234, 680 N.Y.S.2d 397, 400 (N.Y. Sup. Ct. 1998)* (citing *Rocanova v. Equitable Life Assur. Society, 83 N.Y.2d 603, 634 N.E.2d 940, 612 N.Y.S.2d 339 (N.Y. 1994)* [*11] (no private right of action under Insurance Law § 2601); *Kurrus v. CNA Ins. Co., 115 A.D.2d 593, 496 N.Y.S.2d 255 (N.Y. App. Div. 1985))*. When a statute is silent as to whether it grants a private right of action for civil damages, courts apply a three-part inquiry to determine whether such an action is permitted under its terms. The inquiry is: (1) whether the plaintiff is one of the class for whose particular benefit the statute was

Case 1:05-cv-00023-JJF   Document 30-2   Filed 07/18/2005   Page 12 of 17

Page 4
2002 U.S. Dist. LEXIS 12203, *

enacted; (2) whether recognition of a private right of action would promote the legislative purposes; and (3) whether creation of such a right would be consistent with the legislative scheme. Id. (citing *Sheehy v. Big Flats Community Day*, 73 N.Y.2d 629, 541 N.E.2d 18, 543 N.Y.S.2d 18 (N.Y. 1989); *Burns Jackson Miller Summit & Spitzer v. Lindner*, 59 N.Y.2d 314, 451 N.E.2d 459, 464 N.Y.S.2d 712 (N.Y. 1983)); see also *Sparkes v. Morrison & Foerster Long-Term Disability Ins. Plan*, 129 F. Supp. 2d 182, 187 (N.D.N.Y. 2001) (applying same tripartite test) (citing *Uhr v. East Greenbush Central Sch. Dist.*, 94 N.Y.2d 32, 720 N.E.2d 886, 698 N.Y.S.2d 609 (1999)).

Section 2304 [*12] cannot be read to create a private cause of action because such a right would be inconsistent with the legislative scheme provided by Article 23. As stated in Sparkes:

> An implied right of action would not be consistent with the legislative scheme. Section 109 of the Insurance Law establishes the procedures for enforcement of various provisions of the Insurance Law by the Superintendent of Insurance. It does not provide for a private right of action. *Buccino v. Continental Assur. Co.*, 578 F. Supp. 1518, 1526 (S.D.N.Y.1983). Where the legislature intended that a particular provision of the Insurance Law be enforced through a private right of action, it expressly so provided in the terms of the statute. See, e.g., Insurance Law § § 3420, 4226.

*Sparkes*, 129 F. Supp. at 188. Section 2304 establishes the requirements for determining rates to be assessed by an insurer and what information an insurer must provide in the form of a filing to the New York Department of Insurance. Neither Section 2304 nor Article 23 as a whole explicitly provides a private cause of action for damages. We will not read such a right into the statute where [*13] other sections of the New York Insurance Law expressly provide a private right of action. Id.

Furthermore, the sections within Article 23 providing for enforcement and penalties, as well as the rights of aggrieved parties, are all tied to the powers of the Superintendent of Insurance. Section 2319 permits any party affected by the action of an insurer to appeal to the Superintendent. *N.Y. Ins. Law § 2319* (McKinney 2000). Sections 2320 and 2321 address the Superintendent's power to impose penalties for violations of Article 23. *N.Y. Ins. Law § 2320, 2321* (McKinney 2000). n2 As the legislature of the State of New York has provided express administrative remedies for violations of Article 23, enforcement is more appropriately within the jurisdiction of the Superintendent of Insurance. See *Bauer*, 680 N.Y.S.2d at 400 (denying private right of action under Insurance Law) (citing Kurrus). Accordingly, we conclude that a private right of action for damages does not exist under Article 23 of the New York Insurance Law, and Specialty's claim under Section 2304 must be dismissed.

- - - - - - - - - - - - - - - - - -

n2 *N.Y. Ins. Law § 2320* expired on August 2, 2001. *N.Y. Ins. Law § 2342*.

- - - - - - - - - - - - - - - - - -

[*14]

3. No private cause of action exists under Article 24.

The purpose of Article 24 of the New York Insurance Law is to "regulate trade practices in the business of insurance" and prohibit all "unfair methods of competition or unfair or deceptive acts or practices" as defined within the Article. *N.Y. Ins. Law § § 2401*, 2403 (McKinney 2000). As with Article 23, a private cause of action does not exist under Article 24. *Pepsico, Inc. v. Continental Casualty Co.*, 640 F. Supp. 656, 664-65 (S.D.N.Y. 1986), disagreed with on other grounds by *Waltuch v. Conticommodity Servs., Inc.*, 88 F.3d 87, 92 n.8 (2d Cir. 1996); *Huckission v. Sentry Insurance*, 123 A.D.2d 832, 507 N.Y.S.2d 447, 449 (N.Y. App. Div. 1986) (holding that Article 24 does not create a private right of action or provide a compensatory remedy for insurance agents whose contracts have been terminate); *Kurrus v. CNA Ins. Co.*, 115 A.D.2d 593, 496 N.Y.S.2d 255, 256 (N.Y. App. Div. 1985) (explaining that enforcement by Superintendent of Insurance and administrative review procedures are exclusive remedies under Article 24). n3 Accordingly, Specialty's claim under [*15] Article 24 will be dismissed.

- - - - - - - - - - - - - - - - - -

n3 Enforcement of Article 24 is within the jurisdiction of the Superintendent of Insurance, who is specifically conferred the power to examine and investigate the activities of an insurer to determine whether the individual is in violation of this Article. *N.Y. Ins. Law § 2404*. To this end, the Superintendent can impose civil penalties on any insurer who does not comply with the Article. Id. The Article establishes a procedure by which affected parties may pursue judicial review of the Superintendent's actions. *N.Y. Ins. Law § § 2405-2408*.

Case 1:05-cv-00023-JJF    Document 30-2    Filed 07/18/2005    Page 13 of 17

Page 5
2002 U.S. Dist. LEXIS 12203, *

**B. Specialty Has Sufficiently Pled a Claim for Breach of Contract (Count IV).**

In its Complaint, Specialty alleges that Royal, under the MGA Agreement, "was obligated to make the Restaurant Program available in accordance with the terms of the MGA Agreement, and implicitly, to avoid any acts that would interfere with or compromise Specialty's ability to administer the Restaurant Program as contemplated by the MGA Agreement." Cmpl [*16] P 51. Specialty then alleges the following:

> Royal entered into a course of conduct that was specifically designed and intended to damage, and had the effect of damaging, the interests of Specialty under the MGA Agreement, to interfere with Specialty's conduct of business under the authority of the MGA Agreement, and to exploit its power as insurer under the MGA Agreement, all to Specialty's substantial injury.

Id. at P 52. Specialty claims that the above actions constitute a breach of the contractual obligations. Id. at P 53. In addition, Specialty claims Royal breached the MGA Agreement by failing to renew a license necessary for Specialty to underwrite insurance policies in Massachusetts. Id. at PP 23-28.

We are satisfied that Specialty has alleged a cause of action for breach of Paragraph 6(e) of the MGA Agreement for failing to renew Specialty's license in Massachusetts. n4 Although the allegations supporting a breach of sections (a), (b) and (g) of Paragraph 6 are less precise than the claim under section (e), we will deny the Motion to Dismiss with respect to Count IV and will permit Specialty to pursue its claim for breach of contract.

---

n4 Royal briefly argues that Paragraph 3 of the MGA Agreement specifically identifies a territory consisting only of New York, Connecticut, New Jersey and Pennsylvania, and, therefore, this claim should be dismissed because there is no obligation, under the MGA Agreement, that would pertain to licensing in Massachusetts. Def. Mem. at 13. Royal's argument is unpersuasive because Paragraph 3 explicitly states that the territory "may be changed by addendum of additional states," and the Complaint specifically alleges that the Restaurant Program was in effect in Massachusetts. Cmpl. P 24. In addition, Royal argues that a release executed by Specialty discharges Royal from any liability arising out Specialty selling insurance in Massachusetts without a license. We will reserve judgment on the meaning and effect of the release, which was neither incorporated in nor attached to the Complaint. Cf. *Cohen v. Duane, Morris & Heckscher*, 1991 U.S. Dist. LEXIS 18287, 1991 WL 269994, *3 (Gawthrop, J.) (E.D. Pa. 1991) (defendant must resort to Rule 56 to assert defense based on release that is neither attached to nor incorporated in the complaint); *Neuman v. Harmon*, 965 F. Supp. 503, (S.D.N.Y. 1997) (factual issues existed as to meaning and enforceability of mutual release); *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 945 F. Supp. 693, 731 (S.D.N.Y. 1996) (dispute as to material issue regarding affirmative defense of release precluded summary judgment on breach of contract claim).

---

[*17]

**C. Breach of Duty of Good Faith and Fair Dealing (Counts I and III).**

Royal contends that Specialty's claims for breach of the duty of good faith and fair dealing must be dismissed for two reasons. First, Royal contends that the way Royal would make a profit was to have Specialty sell the insurance and that it would, therefore, be illogical for Royal to sabotage the Restaurant Program. Second, Royal contends that because the contract was terminable at will, no duty of good faith and fair dealing existed under the contract.

Specialty apparently concedes that the covenant of good faith and fair dealing does not apply to the termination of at-will contracts. *Wieder v. Skala*, 80 N.Y.2d 628, 634, 609 N.E.2d 105, 593 N.Y.S.2d 752 (N.Y. 1992) (holding that termination of at-will employment does not give rise to a claim for breach of covenant of good faith and fair dealing); *Murphy v. Am. Home Prod. Corp.*, 58 N.Y.2d 293, 304-05, 448 N.E.2d 86, 461 N.Y.S.2d 232 (N.Y. 1983) (same); *Lake Erie Distributors, Inc. v. Martlet Importing, Inc.*, 221 A.D.2d 954, 956, 634 N.Y.S.2d 599 (N.Y. App. Div. 1995) (dismissing claim for breach [*18] of covenant of good faith and fair dealing for termination of a franchise agreement that was terminable at-will). However, Specialty opposes Royal's Motion to Dismiss on the basis that its claim for breach of implied duty of good faith and fair dealing is based not on the termination of the MGA Agreement but rather on the bad faith behavior exhibited by Royal during its performance of the contract.

Case 1:05-cv-00023-JJF    Document 30-2    Filed 07/18/2005    Page 14 of 17

Page 6
2002 U.S. Dist. LEXIS 12203, *

The case of *Copy-Data v. Toshiba Am., Inc., 582 F. Supp. 231 (S.D.N.Y. 1984)* is instructive in this regard. In Copy-Data the district court recognized that the duty of good faith and fair dealing may extend to contracts for distributorships which are terminable at-will. *Id. at 236.* In that case, Copy-Data entered into a contract with Toshiba for exclusive distributorship rights for Toshiba's copy machines. *Id. at 233.* The court stated that, although the contract was terminable at-will, implicit in the agreement was that it be for a reasonable period of time and that reasonable notice be given prior to the termination of the contract. *Id. at 236.* The court held that although there was no obligation for Toshiba to continue [*19] the exclusive distributorship with Copy-Data, there was an underlying obligation to deal with Copy-Data in a manner exhibiting good faith, and that Toshiba had breached that implied duty. *Id. at 236-37.* The Second Circuit reversed, holding that Toshiba did not breach an implied covenant by obtaining Copy-Data's customer list because the customers were not end users of Toshiba's products. *755 F.2d 293.* More significantly, however, the Second Circuit did not reject the district court's assertion that an implied duty of good faith and fair dealing existed between Copy-Data and Toshiba, notwithstanding the at-will nature of their contractual relationship. *Id.*

We are satisfied that under New York law, a duty of good faith and fair dealing exists in at will contracts. n5 However, in the instant case, Specialty's claims for breach of duty of good faith and fair dealing amount to nothing more than a duplication of its claims for breach of contract under the MGA Agreement. As such, they must be dismissed. *Harris v. Provident Life & Accident Ins. Co., 166 F. Supp. 2d 733, 735 n.1 (N.D.N.Y. 2001)* (citing *Fasolino Foods Co. v. Banca Nazionale de Lavoro, 961 F.2d 1052, 1056 (2d Cir. 1992)*); [*20] *D'Accord Financial Servs., Inc. v. Metsa-Serla Oy, 1999 WL 58916, *2-3 (Cote, J.) (S.D.N.Y. Feb. 8, 1999); Centre-Point Merchant Bank Ltd. v. American Express Bank Ltd., 913 F. Supp. 202, 209 (S.D.N.Y. 1996).*

---

n5 A plethora of cases under New York law have held that every contract implies a covenant of good faith and fair dealing, see, e.g., *Travellers Int'l, A.G. v. Trans World Airlines, Inc., 41 F.3d 1570, 1575 (2d Cir. 1994)* (citing *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publishing Co., 30 N.Y.2d 34, 281 N.E.2d 142, 144, 330 N.Y.S.2d 329 (N.Y.), cert. denied, 409 U.S. 875, 34 L. Ed. 2d 128, 93 S. Ct. 125 (1972)); M/A-Com Security Corp. v. Galesi, 904 F.2d 134, 136 (2d Cir. 1990); Harris v. Provident Life & Accident Ins. Co., 166 F. Supp. 2d 733, 735 n.1 (N.D.N.Y. 2001).* However, we note that there are also a significant number of cases holding that New York law does not create an implied duty of good faith and fair dealing in an at-will employment contract. See, e.g., *Nunez v. A-T Financial Information, Inc., 957 F. Supp. 438, 443 (S.D.N.Y. 1997);* see also *Wieder v. Skala, 80 N.Y.2d 628, 634, 609 N.E.2d 105, 593 N.Y.S.2d 752 (N.Y. 1992); Murphy v. Am. Home Prod. Corp., 58 N.Y.2d 293, 304-05, 448 N.E.2d 86, 461 N.Y.S.2d 232 (N.Y. 1983).*

---

[*21]

Specialty has alleged that Royal interfered in the conduct of business under the MGA Agreement, Cmpl. P 37, and engaged in a course of deceptive and unfair business practices. Cmpl. PP 22(b), 46. The conduct which Plaintiffs contend is a breach of Defendant's duty of good faith and fair dealing is exactly the same conduct which Plaintiffs contend constitutes a breach of contract. In fact, Plaintiffs specifically so allege in their claim for breach of contract in Count IV. See, e.g., Cmpl. PP 49, 52. Moreover, all of the allegations that support Plaintiffs' claims in Count I and Count III are included in the claim against Royal for breach of its obligations under Paragraph 6 of the MGA Agreement. Accordingly, we will dismiss Counts I and III.

**D. Specialty's Negligence Claim is Dismissed.**

In Count V, Specialty claims that Royal had a duty to exercise reasonable care to procure all licenses necessary for Specialty to administer the Restaurant Program and that the failure to exercise reasonable care led to Specialty not being able to underwrite insurance in Massachusetts. Cmpl. PP 56-59. Royal responds that this negligence claim must be dismissed because Defendant [*22] does not owe Specialty or Security a legal duty independent of the MGA Agreement. We agree.

The New York Court of Appeals has stated, "it is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated." *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 389, 516 N.E.2d 190, 521 N.Y.S.2d 653 (1987).* "Merely charging a breach of a 'duty of due care', employing language familiar in tort law, does not, without more, transform a simple breach of contract into a tort claim." *Id., at 390.* Rather, it is "the very nature of a contractual obligation, and the public interest in seeing it performed with reasonable care, [that] may give rise to a duty of reasonable care in performance of the contract obligations, and the breach of that independent duty will give rise to a tort claim." *New York Univ. v. Continental Ins. Co., 87 N.Y.2d 308, 316, 662 N.E.2d 763, 639 N.Y.S.2d 283 (N.Y. 1995).* "Conversely, where a party is

merely seeking to enforce its bargain, a tort claim will not lie." Id.

In determining whether a tort obligation [*23] is present, courts must consider the relationship of the parties, the nature of the injury, the manner in which the injury occurred and the resulting harm. *Sommer v. Federal Signal Corp., 79 N.Y.2d 540, 551-52, 593 N.E.2d 1365, 583 N.Y.S.2d 957 (N.Y. 1992)*. The New York Court of Appeals elaborated:

> A legal duty independent of contractual obligations may be imposed by law as an incident to the parties' relationship. Professionals, common carriers and bailees, for example, may be subject to tort liability for failure to exercise reasonable care, irrespective of their contractual duties. In these instances, it is policy, not the parties' contract, that gives rise to a duty of due care.

Id. Furthermore, a party may be liable in tort if the party has "fraudulently induced the plaintiff to enter into a contract" or engaged in "conduct outside the contract but intended to defeat the contract" in a manner resulting in the wilful destruction of another's property. *New York Univ., 87 N.Y.2d at 316; Albemarle Theatre, Inc. v. Bayberry Realty Corp., 277 N.Y.S.2d 505, 27 A.D.2d 172, 177 (N.Y. App. Div. 1967)*.

These factors [*24] are not present in the instant action. Specialty asserts its negligence claim on grounds that Royal failed to renew Specialty's license in Massachusetts. Specialty has not pled a claim of fraud against Royal. Specialty has not alleged acts by Royal extraneous to the contract that would constitute the willful destruction of Specialty's property. Nor is this a case where Specialty could be said to have relied upon Royal to exercise due care based on an inherent public interest in seeing Royal adhere to a recognized standard.

In this regard, we do not overlook the New York Court of Appeals' holding in Sommer, which imposed a duty of care upon a fire alarm company that had contracted with a building owner to monitor its building and report fires as required by local law. *79 N.Y.2d 552-53*. The court held that prior to entering into the contract, the fire alarm company did not owe the plaintiffs any duty. *Id. at 551*. However, once the contract had been entered into, there were duties which arose from the contract. Id. The issue was whether the defendant's failure to perform its duties constituted a breach of contract, a tort, or both. Id. The New [*25] York Court of Appeals found that an independent duty existed separate from the terms of the contract. The court cited a comprehensive fire-safety scheme, under which a fire alarm company could be penalized, as demonstrating the public interest in the careful performance of a fire alarm services contract. *Id. at 552-53*. The court also emphasized that the nature of the injury from a failure to perform carefully and completely could result in catastrophic consequences. *Id. at 553*. The plaintiffs' negligence claim was therefore upheld. Id.

More recently, however, in New York Univ. v. Continental Ins. Co., the New York Court of Appeals declined an opportunity to extend Sommer to a case brought by an insured against its insurer for breach of contract. *87 N.Y.2d at 316-18* (rejecting the existence of a duty governing an insurer's conduct independent from the terms of the insurance contract and thus finding no basis for an actionable, independent tort). The Court of Appeals explained that, in Sommer, it "did not . . . suggest that statutory provisions necessarily or generally impose tort duties independent of contractual obligations. [*26] " *Id. at 317*. The court continued:

> To be sure, the provisions of the Insurance Law reflect State policy that insurers must deal fairly with their insureds and the public at large. But governing the conduct of insurers and protecting the fiscal interests of insureds is simply not in the same league as the protection of the personal safety of citizens. As compared to the fire-safety regulations cited in Sommer, the provisions of the Insurance Law are properly viewed as measures regulating the insurer's performance of its contractual obligations, as an adjunct to the contract, not as a legislative imposition of a separate duty of reasonable care . . .

Id. Because the public interests involved in the instant action are more akin to those implicated in New York Univ. than in Sommer, we conclude that Specialty cannot state a legal duty owed by Royal to Specialty that is independent from Royal's contractual obligations under the MGA Agreement. Count V will therefore be dismissed.

E. Security's Negligence and Third Party Beneficiary Claims are Dismissed.

Security has brought its only claim on a theory of negligence. In Count VI, [*27] Security claims that Royal had knowledge that Specialty was the Managing

Case 1:05-cv-00023-JJF   Document 30-2   Filed 07/18/2005   Page 16 of 17

Page 8
2002 U.S. Dist. LEXIS 12203, *

General Agent for Security and that, if Specialty were to lose its license in any state, there would be an adverse impact on Security. Cmpl. PP 62-68. In addition, in its Memorandum of Law in Opposition to the Motion, Security argues that it is entitled to recover for its loss as a third-party beneficiary to the MGA Agreement. Royal contends it had no contractual relationship with Security and was under no obligation to obtain a license for Specialty for the benefit of Security.

As above indicated, there was no independent duty outside the MGA Agreement for Royal to obtain licenses. Royal cannot owe a duty to Security beyond what was intended under the MGA Agreement. Security's claim, if any, against Royal must sound in contract rather than tort. Because Security was not a direct party to the MGA Agreement, we must determine whether Security was a third-party beneficiary of the contract. n6

> n6 In doing so, we may consider surrounding circumstances in addition to the agreement, *In re Houbigant, Inc*, 914 F. Supp. 964, 985 (S.D.N.Y. 1995); *Belgrave Owners, Inc. v. Or Holding Corp*, 233 A.D.2d 352, 650 N.Y.S.2d 249, 250 (N.Y. App. Div. 1996) (citing *Aievoil v. Farley*, 223 A.D.2d 613, 636 N.Y.S.2d 833 (N.Y. App. Div. 1996); *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*, 66 N.Y.2d 38, 45, 485 N.E.2d 208, 495 N.Y.S.2d 1 (N.Y. 1985)), and the obligation to the third party need not be expressly stated in the contract. Id. But see *Piccoli, 19 F. Supp. 2d 157, 164 n.41* (comparing cases and noting that there is considerable dispute concerning whether a court may consider extrinsic evidence).

[*28]

New York law allows a third party to enforce a contract only if the third party is an intended beneficiary of the contract. *Flickinger v. Harold C. Brown & Co., Inc.*, 947 F.2d 595 (2d Cir. 1991) (follows the Restatement (Second) of Contracts § 302 (1979)); *Piccoli A/S v. Calvin Klein Jeanswear Co., 19 F. Supp. 2d 157, 162 (S.D.N.Y. 1998).* Plaintiffs cite *Internationale Nederlanden (U.S.) Capital Corp. v. Bankers Trust Co., 261 A.D.2d 117, 689 N.Y.S.2d 455 (1999)* as providing a three-part test to determine whether an individual should be considered a third-party beneficiary if the party is not specifically named as a third-party beneficiary. *Internationale Nederlanden, 261 A.D.2d at 123.* See also *State of California Public Employees' Retirement System v. Shearman & Sterling, 95 N.Y.2d 427, 741 N.E.2d 101, 104, 718 N.Y.S.2d 256 (N.Y. 2000).* The third party must show that (1) a binding contract exists between the other parties, (2) the contract was intended for the benefit of the third party and (3) the benefit to the third party is direct and immediate instead of incidental. Id.

Applying this [*29] test to the facts of this case, Security is unable to show that the MGA Agreement was entered into for the benefit of Security. Plaintiffs allege that Specialty provided insurance through Security to restaurants which were not acceptable to Royal. Cmpl. P 62. Plaintiffs further allege that Royal knew that Specialty was Security's Managing General Agent and that, if Specialty was not licensed to underwrite insurance in a specific state, Security would not be able to conduct its insurance business in that state. Id. P 63. These allegations suggest nothing more than that Royal, as a party to the MGA Agreement, knew Security would benefit from Royal obtaining licenses for Specialty. What is lacking from both the Complaint and Plaintiffs' Memorandum of Law is any allegation regarding the intent of the parties to the MGA Agreement concerning whether it was entered into with an expressed purpose of benefitting Security. *In re Houbigant, 914 F. Supp at 986* (holding that expressed intent of the promissee is of primary importance) (citing *Drake v. Drake, 89 A.D.2d 207, 455 N.Y.S.2d 420, 422 (N.Y. App. Div. 1982)).* Plaintiffs have failed to appreciate the [*30] difference between a known but incidental beneficiary and one that is intended. Security's claim against Royal will therefore be dismissed.

F. Plaintiffs may not Recover Punitive or Exemplary Damages.

Royal also moves pursuant to *Fed. R. Civ. Proc. 12(f)* to strike Specialty's claim for exemplary damages. We have dismissed all claims with the exception of Specialty's claim for breach of contract. Clearly, Specialty would not be entitled to exemplary damages on its claim for breach of the MGA Agreement. *New York University v. Continental Ins. Co., 87 N.Y. 2d 308, 639 N.Y.S.2d 283, 662 N.E.2d 763.*

## VI. CONCLUSION

For these reasons, Defendant's Motion to Dismiss is granted in part and denied in part. The Complaint fails to allege a proper cause of action under the New York Insurance Laws, and the Motion is granted with respect to Count II. The Complaint sufficiently states a claim for breach of contract, and the Motion is denied with respect to Count IV. The claims for breach of the duty of good faith and fair dealing are duplicative of the breach of contract claim, and the Motion is granted with respect to Counts I and III. Plaintiffs have failed [*31] to show a duty independent of the contract which would give rise

to a claim for negligence, and the Motion is granted with respect to Counts V and VI. Finally, the Complaint fails to allege sufficient facts to support an award of exemplary damages.

An appropriate Order follows.

**ORDER**

AND NOW, this 22ND day of March 2002, it is hereby ORDERED that, upon consideration of Defendants' Motion to Dismiss (Docket No. 8), and all papers filed in support thereof or in opposition thereto, the Motion to Dismiss is **GRANTED in Part** and **DENIED in Part**, as follows:

1. Counts I, II, III, V and VI are **DISMISSED**.

2. The Motion to Dismiss is **DENIED** in all other respects.

**AND IT IS SO ORDERED.**

R. Barclay Surrick, Judge