# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| DOW CHEMICAL CANADA INC. on its own behalf and as assignee of THE DOW CHEMICAL COMPANY, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | |
| HRD CORPORATION (d/b/a Marcus Oil & Chemical) | ) ) ) | Case No. 05-023 (JJF) |
| Defendant, Counterclaim Plaintiff, | ) ) ) | |
| v. | ) ) ) | |
| DOW CHEMICAL CANADA INC., on its own behalf and as assignee of THE DOW CHEMICAL COMPANY, and THE DOW CHEMICAL COMPANY, | ) ) ) ) ) | |
| Counterclaim Defendants. | ) ) ) ) ) | |

## DOW'S BRIEF IN SUPPORT OF ITS MOTION
## FOR A PROTECTIVE ORDER REGARDING HRD'S EXPORTING TO IRAN

Harry J. Roper
Raymond N. Nimrod
Aaron A. Barlow
JENNER & BLOCK LLP
330 N. Wabash Ave.
Chicago, IL 60611
Telephone: 312 222-9350

December 22, 2006

MORRIS, NICHOLS, ARSHT &
TUNNELL LLP
Kenneth Nachbar (#2067)
Samuel T. Hirzel (#4415)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
Attorneys for Plaintiff Dow Chemical Canada Inc.
and Counterclaim Defendant The Dow Chemical Company

## TABLE OF CONTENTS

I.    NATURE AND STAGE OF THE PROCEEDINGS ...............................................3

II.   SUMMARY OF THE ARGUMENT ...............................................................4

III.  STATEMENT OF FACTS ...........................................................................5

    A.    HRD's family of companies .........................................................5

    B.    The behavior of the Hassans and HRD raises red flags that Dow
        technology may be transferred to Iran ..............................................6

        1.    HRD reveals it intends to become a prospective manufacturer
              preferably using Dow's metallocene wax technology...............................6

        2.    HRD Admitted To Having Previously Violated Iranian
              Transactions Regulations ....................................................8

        3.    Review of materials with knowledge of the red flags shows HRD
              has made further misrepresentations...........................................10

        4.    HRD also misrepresented essential facts to this Court .............................12

    C.    HRD refuses to provide information in response to Dow's inquiries...................12

IV.   ARGUMENT ........................................................................................13

    A.    The Iranian Transactions Regulations prohibit exporting technology with a
        "reason to know" it is intended for Iran.............................................13

    B.    Requiring Dow to produce confidential documents under circumstances
        that violate U.S. law places an undue burden on Dow ................................16

        1.    Requiring Dow to produce confidential documents to HRD, the
              Hassans, or HRD's consultants would constitute an undue burden
              and cause substantial prejudice..............................................16

        2.    The form of the order should allow HRD's outside counsel and
              approved independent experts to have access to the documents ...............17

CONCLUSION...........................................................................................19

# TABLE OF AUTHORITIES

**Cases**

*Credit Suisse v. U.S. Dist. Court for the Cent. Dist. of Cal.,*
    130 F.3d 1342 (9th Cir. 1997) .................................................................. 16

*Flatow v. Iran,* 196 F.R.D. 203 (D.D.C. 2000)
    *aff'd in part, vacated in part on other grounds,*
    305 F.3d 1249 (D.C. Cir. 2002) ............................................................... 16

*Indep. Serv. Orgs. Antitrust Litig., In re,*
    162 F.R.D. 355 (D.Kan. 1995)................................................................. 18

*Kashani v. Tsann Kuen China Enterprise Co.,*
    118 Cal. App. 4th 531 (Ct. App. 2004)..................................................... 14

*Pennzoil Shareholders Litig., In re,*
    1997 WL 770663 (Del. Ch. 1997) ............................................................ 18

*Safe Flight Instrument Corp. v. Sundstrand Data Control, Inc.,*
    682 F.Supp. 20 (D.Del. 1988)................................................................... 17

*United States v. Ehsan,*
    163 F.3d 855 (4th Cir. 1998) .................................................................... 13

*Zoltek v. U.S.,*
    61 Fed. Cl. 12 (2004) ................................................................................ 16

**Statutes**

31 C.F.R. § 560 (2006) ........................................................................... passim

50 U.S.C. § 1701 (2006) ................................................................................ 13

Executive Order 12,959,
    60 Fed. Reg. 14,615 (March 15, 1995)...................................................... 13

Dow Chemical Canada Inc. and its parent The Dow Chemical Company (collectively referred to as "Dow") seeks a protective order precluding HRD Corporation (d/b/a Marcus Oil & Chemical) ("HRD" or "Marcus Oil US"), its two owners, Abbas and Aziz Hassan, and its business consultants from having access to Dow's confidential documents. Disclosure of confidential U.S. technology to the Hassans may violate the Iranian Transactions Regulations. Based on the guidance from the federal agencies that enforce those regulations, Dow is prohibited from disclosing technology to HRD unless several abnormal and suspicious facts about HRD's business can be explained. HRD has refused to provide any information relevant to those suspicious facts.

Very recently, HRD revealed its intention to become a manufacturer of metallocene polymer waxes, demanding the right to use "Dow plant designs, plant specifications, plant operating manuals and manufacturing procedures." Because the manufacturing facilities at HRD's U.S. division ("Marcus Oil US") are closed indefinitely, HRD cannot make the metallocene waxes in the United States. However, the Hassans have an Iranian company called Marcus Oil & Chemical (Iran).

Based on these facts, Dow requested information on what Marcus Oil Iran does and on HRD's and the Hassans' plans for manufacturing metallocene waxes. HRD refused to provide the information. HRD even refused to agree to limit access to Dow's confidential documents to HRD's outside attorneys and approved independent experts until this export control issue is resolved.

According to guidance from the federal agencies that enforce the export control and economic sanctions laws, these facts are "red flags" that Dow may not ignore. If Dow produces any technology--either "Confidential" or "Highly Confidential"--to HRD without first conducting due diligence to explain these red flags, federal agencies warn, Dow "run[s] the risk of having had 'knowledge' that would make [Dow's] action a violation." The current Protective Order is inconsistent with Dow's obligations under the

Iranian Transactions Regulations, because it allows the Hassans and its business consultants to have access to confidential documents.

The red flags continue with HRD making misrepresentations to this Court in HRD's motion to compel, filed December 18, 2006. There, HRD attempts to disparage Dow and its concerns by telling the Court that HRD's "business operations in Iran and India" are **businesses that have nothing to do with wax.**" (D.I. 71 [HRD Corporation's Motion to Compel] at 4).[1] However, HRD filed a document with the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") stating the exact opposite--that HRD's Indian company "like Marcus Oil in the United States is **also engaged in the production and sale of specialty waxes.**" (Exh. 1 at 2). And Marcus Oil Iran's letterhead identifies only one product: "Superior Quality High Performance Waxes." (Exh. 2). Moreover, HRD's concession that it--a U.S. company--has "business operations in Iran" is troubling by itself.

Red flags also exist that call into question whether one could believe the Hassans even if they promised to abide by the protective order. The Hassans admitted that they violated the Iranian Transactions Regulations in connection with a different technology developed by Iran's National Petrochemical Company ("NPC"), the state-owned oil company of Iran. In particular, the Hassans assigned patent rights to NPC, which they admit was "illegal." (Exh. 3; Exh. 4 at HRD00000057).

The Hassans also made misrepresentations in an agreement with Dow when they attempted to convince Dow to develop a new methane conversion technology:

- In the agreement, HRD "represents and warrants" that an Iranian employee of HRD made an invention **while residing in the U.S.**; however, the inventor's oath states that he was a resident of **Tehran, Iran** at the time he filed a patent application on this invention.

---

[1] All emphasis added unless otherwise noted.

2

- In the agreement, HRD "represents and warrants" that the technology was entirely of U.S. origin and not owned by *Iran's NPC*; however, the broad claims in HRD's pertinent U.S. patent application are *identical* in scope to the claims of a Canadian application owned solely by *Iran's NPC*.

- HRD's U.S. patent application pending as of the agreement was originally assigned to Iran's NPC and HRD, and its foreign counterparts still are.

HRD now refuses to produce any documents to explain the relationship of any of the Hassans or the Marcus companies with Iran's NPC.

Furthermore, the protective order also allows the same consultants HRD would use to build its own metallocene wax plant to have access to all of Dow's confidential information. Even consultants who work on a regular and ongoing basis in HRD's business operations could have full access to Dow's technology. While such non-independent consultants may agree to try to use this information "only for purposes of this action," it is simply impossible for them to put out of their minds what they have learned from Dow when they later work with HRD on other projects. Moreover, once an HRD consultant completes a project for HRD, the Hassans could use the consultant's work product however they choose, for India or Iran.

The foregoing facts demonstrate that HRD, the Hassans, and HRD's non-independent consultants should not be permitted to have access to Dow's technology. Dow therefore seeks an order limiting access to Dow's Confidential information and Highly Confidential information to outside counsel and approved independent experts.

## I.    NATURE AND STAGE OF THE PROCEEDINGS

Dow Chemical Canada Inc. ("Dow Canada") filed its Complaint on January 18, 2005 against HRD seeking recovery of payments expressly set forth in a supply agreement between Dow Canada and HRD, as well as other relief. On March 31, 2005, HRD counterclaimed against Dow Chemical Canada and on June 6, 2005 added its parent The Dow Chemical Company ("Dow Chemical") as a counterclaim defendant.

In January 2006, the parties entered into a stipulated protective order. (D.I. 43 [Stipulation and Order Governing Discovery Materials, "Protective order"]). That protective order allows HRD's employees to have access to all Dow information designated "Confidential," and any technical consultant identified by outside counsel who is not an employee of HRD to have access to all materials designated "Highly Confidential"--even consultants working with HRD in connection with day-to-day operations. (*Id.* at 7-9).

On April 19, 2006, one month before fact discovery was scheduled to close, HRD served document requests on Dow that sought detailed manufacturing process information and catalyst information. The parties agreed to extend the close of fact discovery until November 17, 2006. (D.I. 51B [Agreed Motion to Amend the Rule 16 Scheduling Order, "Scheduling Order"]).

In September 2006, HRD and Dow discussed the possibility of settling the case. The parties agreed to hold off on discovery activities, such as document production, pending settlement discussions. The parties conducted two meetings concerning terms for settlement and exchanged draft settlement agreements. However, in late October 2006, settlement discussions broke down.

## II.    SUMMARY OF THE ARGUMENT

1.    Under the Iranian Transaction Regulations, if Dow suspects HRD or the Hassans may export technology, either directly or indirectly, to Iran, then Dow may not disclose that technology to HRD, the Hassans, or its technical consultants for its ongoing business operations. Guidance from the federal agencies that enforce U.S. export control and economic sanctions laws, including the Iranian Transactions Regulations prohibit the disclosure of technology where there are unexplained "red flags" suggesting prohibited Iranian activity. Here, HRD's activities constitute red flags that HRD or the Hassans may export technology to Iran.

2.      The courts recognize that requiring a party to produce documents under circumstances that may violate the law creates an undue burden justifying a protective order.  Here, HRD's refusal to accept Dow's confidential documents on an outside-counsel/independent-expert-only basis puts Dow in the position of potentially violating U.S. export laws if Dow discloses confidential documents to HRD. Consequently, Dow seeks a protective order limiting access to its confidential documents.

## III.    STATEMENT OF FACTS

### A.    HRD's family of companies

HRD is a privately held corporation owned exclusively by two brothers, Abbas and Aziz Hassan.  (D.I. 56 [HRD Corporation's Objections and Responses to DCCI's and TDCC's Third Request for Production of Documents and Things] at Rsp. 64).  In this country, HRD does business as Marcus Oil & Chemical ("Marcus Oil US"), which is a division of HRD.  (Exh. 1 at 1).  Marcus Oil US made polyethylene waxes at its Houston plant from 1987 until 2004.  HRD did not manufacture metallocene polymers at that facility or any other facility.

HRD also has an undisclosed interest in an Indian company called Marcus Oil & Chemical India Ltd. ("Marcus Oil India").  (Exh. 1 at 2).  Marcus Oil India is also engaged in the manufacture and sale of waxes.  Marcus Oil India does business with Iran. (*Id.*).  The Hassans and HRD have taken the position that because Marcus Oil India is not "controlled" by HRD or the Hassans, it "would not be considered a United States person" under the Iranian Transactions Regulations and that Marcus Oil India is not a restricted entity under those regulations.  (*Id.*; Exh. 5 at 2).

There is a third company related to HRD located in Iran.  Its letterhead is captioned "Markus Oil & Gas Chemical - Iran," but it is also referred to as Marcus Oil & Chemical (Iran) ("Marcus Oil Iran").  (Exh. 2).  Marcus Oil Iran's letterhead bears the phrase, "Superior Quality High Performance Waxes" at the bottom.  (*Id.*).  HRD has

refused to disclose the businesses that Marcus Oil Iran is involved in, explain the ownership of Marcus Oil Iran, or explain the connection between Marcus Oil Iran and the Hassans or HRD, and Marcus Oil India and the Hassans or HRD. (Exh. 5).

**B.    The behavior of the Hassans and HRD raises red flags that Dow technology may be transferred to Iran**

The metallocene waxes at issue in this case were originally made at Dow Canada's plant in Sarnia, Ontario, Canada. HRD, through its Marcus Oil US division, was to sell these products to its customers. (D.I. 01 [Exhs. A & B to Complaint]). The agreements never contemplated that HRD would manufacture metallocene waxes or have anyone other than Dow do so. The agreements also never contemplated that Dow would share its trade secrets regarding catalysts or manufacturing processes with HRD.

**1.    HRD reveals it intends to become a prospective manufacturer preferably using Dow's metallocene wax technology**

In October 2006, the parties met to settle the case and subsequently exchanged draft settlement agreements.[2] HRD revealed for the first time its intention to become a manufacturer of metallocene waxes, either alone or with a partner.[3] In HRD's

---

[2] Dow and HRD agreed that none of the settlement discussions would be used in court for any purpose. However, such an agreement may not be used to prevent disclosure of intention to commit a crime. *See, e.g., Lachman v. Sperry-Sun Well Surveying Co.*, 457 F.2d 850, 853-54 (10th Cir. 1972) (refusing to enforce non-disclosure agreement because "[i]t is public policy … everywhere to encourage the disclosure of criminal activity"); *Chambers v. Capital Cities/ABC*, 159 F.R.D. 441, 444 (S.D.N.Y. 1995) (stating that "it is against public policy for parties to agree not to reveal … facts relating to alleged or potential violations of [federal] law"). Here, Dow would be in an impossible position if it could not disclose these demands to the Court. The U.S. Government, if HRD does export the technology to Iran, would certainly point to the settlement information revealed by HRD as evidence suggesting Dow had "reason to know" HRD was interested in using the technology somewhere, potentially in Iran.

[3] In April 2006, HRD's actions caused Dow concern that HRD might be seeking information as a prospective manufacturer. Specifically, HRD propounded specific document requests seeking information related to Dow's metallocene catalysts, as well as detailed process information, including plant diagrams. (D.I. 49 [HRD Corporation's Request for Production of Documents to Dow Chemical Canada, Inc. and the Dow

(continued on next page)

version of the settlement agreement, HRD demanded that Dow provide to HRD *or to any manufacturer of HRD's choosing* Dow's metallocene "catalysts, formulae, processes and/or techniques" as well as "the use of *Dow plant designs*, plant specifications, *plant operating manuals* and manufacturing procedures." (Exh. 6 at ¶3.5).

Eventually, settlement discussions broke down. However, HRD's revelation raised a red flag about where the Hassans intended to manufacture the metallocene waxes.

Dow knew that the Hassans could not use the technology at the facilities of Marcus Oil US. On December 3, 2004, there was a massive explosion at the Marcus Oil US polyethylene wax plant in Houston, Texas. (Exh. 7). The Chief of the Houston Fire Department was quoted in Houston news as saying, "We, the Fire Department, are not going to allow them to reopen" because there were "just too many red flags." (*Id.*). The article noted concerns about HRD's use of equipment and chemicals without getting approval. "So," the Fire Chief continued, "it looks like they just have a poor track record … and we don't feel comfortable allowing them to open back up. Period." (*Id.*).

Nor does Dow have any basis to believe the Hassans could make metallocene waxes in India. Even if Marcus Oil India were capable of using the technology, that would not resolve the export control issue here, because Marcus Oil India does business with Iran. (Exh. 1). It is illegal for Dow to provide the Hassans technology if Dow has reason to know the technology or goods made from that technology will wind up in Iran, even through an Indian intermediary. 31 C.F.R. §§ 560.204, 560.407 (2006).

---

(continued from previous page)
Chemical Company, "HRD production request"] at Req. 23, 24, 27). However, HRD backed off from many of those requests at a subsequent meet and confer in July 2006.

7

That left Marcus Oil Iran. A letter received by Dow on Marcus Oil Iran stationery bears the slogan, "Superior Quality High Performance Waxes." (Exh. 2). Furthermore, Dow is aware that Iran has recently begun efforts to become more than just an oil exporter. Iran is trying to develop its downstream petrochemical industry--i.e., the industry that makes products by processing oil and gas into plastics, polymers and waxes. (Exh. 8).

These facts caused Dow to be concerned that any technology disclosed in this litigation to HRD, the Hassans, or its consultants could be transferred to Iran.

**2. HRD Admitted To Having Previously Violated Iranian Transactions Regulations**

Dow's suspicions were heightened by existing knowledge that HRD and the Hassans have ties to Iran. Dow also has information that Abbas and Aziz Hassan, if not HRD itself, had likely violated the Iranian Transactions Regulations.

Specifically, in 2003, Dow learned that Abbas Hassan had signed an agreement with a company in Iran associated with the National Petrochemical Company ("NPC"), Iran's state-owned oil company. (Frencham Dec. ¶ 3). The agreement related to technology for converting methane to olefins--technology totally distinct from metallocene wax technology. While it is permissible to *import* technology from Iran into the U.S., it is illegal to enter into an agreement that provides virtually any benefit to Iran or the Government of Iran. *See e.g.*, 31 C.F.R. §§560.207, 560.316 (prohibiting investment in Iran, which is defined to include a commitment or contribution of funds or other assets or the provision of loans or other extensions of credit); §§560.204, 560.206, 560.416 (prohibiting trade-related transactions with Iran, including acting as a broker for the provision of goods, services or technology, from whatever source, to or from Iran or the Government of Iran). Therefore, Abbas Hassan's execution of this agreement, which undoubtedly provided consideration to NPC, appears to have violated U.S. law.

8

After becoming aware of Abbas Hassan's actions, Dow advised the Hassans to disclose their actions to the Department of Treasury's Office of Foreign Assets Control ("OFAC"), the agency that enforces the Iranian Transactions Regulations. HRD told Dow that it made a full disclosure to OFAC. However, Dow subsequently learned that the Hassans apparently never fully disclosed their dealings with this Iranian entity. For example, instead of disclosing that Abbas Hassan signed the agreement with the Iranian entity, Marcus Oil US stated he "facilitated" the agreement. (Exh. 1 at 2).

Furthermore, Dow later learned that, in admitted violation of U.S. law, the Hassans had filed a patent application on methane conversion technology in the United States and assigned a portion of their rights in this application to the Iranian entity. (Exh. 3). HRD admitted this act was illegal because "any assignment to an Iranian or an Iranian entity [is] illegal." (Exh. 4 at HRD00000057).

The Hassans' "fix" for this violation was to unilaterally take the position that because this assignment was "illegal and therefore not valid," it could therefore be ignored. (Exh. 4 at HRD00000057). The Hassans thus entered a "revocation and rescission," not signed by the Iranian entity, that stated the assignments were "void ... *ab initio*." (Exh. 9 at 1).

As far as Dow knows, the Hassans and/or Marcus Oil India still have agreements existing today with NPC conveying rights to the methane conversion technology to Marcus Oil India in return for future benefits. In fact, in both Australia and China, where the Hassans' agreements with NPC are not void *ab initio*, the Hassans' patent rights are still co-owned by NPC and HRD. (Exh. 10; Exh. 11; Exh. 12). Thus, both the Hassans and HRD still have arrangements with NPC, in violation of U.S. law.

Furthermore, common sense dictates that NPC did not give the technology away for free for use in the United States and the Hassans and/or Marcus owe something back to NPC if the technology is successful.

9

### 3.    Review of materials with knowledge of the red flags shows HRD has made further misrepresentations.

Further, in comparing statements made by HRD and the Hassans in preparing to file this motion, other red flags became apparent.

On November 2, 2004, Dow entered into an Evaluation Agreement with HRD so that Dow could evaluate the methane conversion technology, completely unrelated to wax technology. (Exh. 13 at 5). In the agreement, HRD made a number of express representations that now appear to be false.

To address Dow's concerns about the methane conversion technology from Iran, HRD represented to Dow that it had developed *new* methane conversion technology that was "entirely of United States origin." (Exh. 13 at 1). HRD represented that the Hassans and a Dr. Ebrahim Bagherzadeh, an Iranian citizen residing in the United States, developed this technology. (*Id.*). HRD also represented that as of November 2, 2004, it had already filed "one or more patent applications" on this technology in the United States. (*Id.*).

However, the only application pending as of November 2, 2004 was the one referred to above: namely, the one that was co-owned by NPC and HRD and that was the subject of the unilateral "revocation and rescission" based on the fact that the assignment to NPC was "illegal and therefore invalid." (Exh. 3; Exh. 9 at 1; Exh. 4 at HRD00000057). Furthermore, the methane conversion technology is also disclosed in a Canadian patent application. This Canadian patent application is owned exclusively by NPC and admittedly represents *technology developed* by Dr. Bagherzadeh *in Iran while employed by NPC*. (Exh. 14; Exh. 15).

Contrary to HRD's misrepresentations in the Evaluation Agreement, the two patent applications are both directed to the same technology. The broadest claims of NPC's Canadian patent application and this U.S. patent application are identical in scope.

For example, the terms of claim 1 of each of these applications are shown below with the only differences emphasized:

| NPC's Canadian patent application Claim 1 | HRD's U.S. patent application Claim 1 |
|---|---|
| A method of producing a perovskite catalyst comprising: | A method of producing a perovskite catalyst comprising: |
| forming *a slurry in water of* an alkaline earth metal salt, a powdered metal salt and a powdered transition metal oxide, and | forming *an aqueous slurry comprising* an alkaline earth metal salt, a powdered metal salt and a powdered transition metal oxide; and |
| adding a polymeric binder to the slurry to form a paste; | adding a polymeric binder to the slurry to form a paste; |
| drying the paste for forming a powder; | drying the paste for forming a powder; |
| heating the powder at increasing temperatures at a predetermined profile commensurate with the polymeric binder; | heating the powder at increasing temperatures at a predetermined profile commensurate with the polymeric binder; |
| and calcining the heated powder to form the perovskite catalyst. | and calcining the heated powder to form the perovskite catalyst. |

(Exh. 16; Exh. 17 at 3 lines 5-14). There is no difference whatsoever in scope between these two claims: an aqueous slurry is a slurry in water.

Furthermore, in its Evaluation Agreement with Dow, HRD made express representations that Dr. Bagherzadeh *"has resided in the United States ... since prior to the invention of the Technology*." (Exh. 13 ¶ 1.1(B)). HRD also represented that Dr. Bagherzadeh *moved* from Iran to the United States prior to the invention of the technology in the United States. (*Id.* ¶ 1.1(B) & (D)).

However, the file history for HRD's U.S. patent application shows that as of the filing date of the application, Dr. Bagherzadeh was not a U.S. resident at all. In his oath, signed under penalty of perjury, Dr. Bagherzadeh swears that his residence is Tehran, Iran. (Exh. 18 at 2).

HRD's representations and warranties in the Evaluation Agreement also included a statement that HRD has no obligation to make any payments, directly or indirectly, to any Iranian entity, such as NPC, for use of the invention. (Exh. 13

11

¶ 1.1(E)). This too, however, appears to have been untrue. HRD and NPC still co-own the Australian and Chinese counterpart patent applications to the above U.S. application, suggesting that HRD, contrary to their statements in the Evaluation Agreement, may be providing payments to NPC.

### 4. HRD also misrepresented essential facts to this Court

Further showing their willingness to say anything to obtain access to Dow's confidential documents, HRD, as recently as four days ago, misrepresented central facts related to Dow's concerns regarding Iran. Specifically, HRD attempted to cast Dow as unreasonable, stating: "With respect to Dow's irrelevant objection based upon HRD having business operations in Iran and India (***businesses that have nothing to do with wax***) ...." (D.I. 71 [HRD Motion to compel] at 4).

However, the stationery of Marcus Oil Iran states very prominently "Superior Quality High Performance Waxes" at the bottom. (Exh. 2). And HRD has represented to OFAC that Marcus Oil India is engaged in the manufacture and sale of wax:

> HRD Corporation (owned by the Hassan brothers), which owns Marcus Oil [US], has made an investment in an Indian company named Marcus Oil India Ltd. ("***Marcus Oil India***"), which ***like Marcus Oil in the United States is also engaged in the production and sale of specialty waxes.***

(Exh. 1 at 2). In addition, a directory of Indian corporations lists as the only activity of Marcus Oil India, "Mfg. Of Refined Poly Ethylene Wax." (Exh. 19).

### C. HRD refuses to provide information in response to Dow's inquiries

Because of Dow's suspicions, Dow requested information on HRD's Iranian affiliate--what its businesses are and its corporate relations to the Hassans' other companies. (Exh. 20). Dow also requested copies of any agreements between NPC and

any Marcus Oil company--US, Indian, or Iranian--or with the Hassans. (*Id.*). HRD refused to provide any of this information, stating it was "irrelevant." (Exh. 5 at 2).

To proceed with discovery, Dow proposed that, until this issue is resolved, access to all confidential documents be limited to outside counsel and approved independent experts. (Exh. 21). However, HRD rejected this proposal. (Exh. 22).

## IV.    ARGUMENT

As discussed in more detail in the subsections below, the Iranian Transactions Regulations prohibit providing technology to anyone with "reason to know" the technology will end up in Iran. Guidance from the agencies that enforce these regulations indicates that Dow has "reason to know" the Hassans will export wax technology to Iran because of "red flags" described by those agencies. And, as also discussed below, requiring a litigant to produce documents under circumstances that would violate federal law constitutes an undue burden justifying a protective order.

### A.    The Iranian Transactions Regulations prohibit exporting technology with a "reason to know" it is intended for Iran

The Iranian Transactions Regulations were promulgated pursuant to the authority granted the Executive Branch by the International Emergency Economic Powers Act (50 U.S.C. § 1701 *et seq.* (2006)) ("IEEPA") and by Executive Order 12,959, 60 Fed. Reg. 14,615 (March 15, 1995) as well as other statutes and orders. Those regulations state, in part:

> [T]he exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, *technology*, or services to Iran or the Government of Iran *is prohibited*....

31 C.F.R. § 560.204 . The courts have upheld these regulations and stated they are consistent with the broad goal of isolating Iran from trade with the United States. *United States v. Ehsan*, 163 F.3d 855, 859 (4th Cir. 1998). Furthermore, it is not only federal agencies that enforce the regulations. All courts will enforce the Iranian Transactions

Regulations wherever appropriate. *See Kashani v. Tsann Kuen China Enterprise Co.*, 118 Cal. App. 4th 531 (Ct. App. 2004) (affirming summary judgment of no breach of contract where performance of the contract would violate the Iranian regulations).

Furthermore, the regulations prohibit Dow from releasing technology to any other person who transfers technology to Iran, directly or indirectly, if Dow has "reason to know" that person intends to bring the technology to Iran:

> The release of technology or software in the United States, or by a United States person wherever located, *to any person violates the prohibitions* of this part *if made with knowledge or reason to know* the technology is intended for Iran or the Government of Iran, unless that technology or software meets the definition of *information and informational materials* in § 560.315.

31 C.F.R. § 560.418 (2006) (bold-italics added for emphasis; italics in original). Thus, the question is not one of actual knowledge, but "reason to know."

The federal agencies that enforce the U.S. export control and economic sanctions laws, including the Iranian Transactions Regulations, provide guidance on the meaning of "reason to know." These agencies are the Office of Foreign Assets Control ("OFAC") in the Department of the Treasury and the Bureau of Industry and Security ("the BIS") in the Department of Commerce.

Specifically, OFAC's guidance warns that "reason to know" can be established by circumstantial evidence of any kind:

> "Reason to know" that the seller's goods are intended for Iran can be established through a variety of *circumstantial evidence*, such as: course of dealing, general knowledge of the industry or customer preferences, working relationships between the parties, or *other criteria far too numerous to enumerate*.

Office of Foreign Assets Control, "Guidance on Transshipments to Iran" Ref. 020722-IR-01 (July 22, 2002) (Exh. 23). The BIS publishes a list of what it calls "red flags"

14

suggesting abnormal or suspicious situations that are instructive for OFAC purposes. These red flags include when:

- The customer or purchasing agent is reluctant to offer information about the end-use of the item.

- When questioned, the buyer is evasive and especially unclear about whether the purchased product is for domestic use, for export, or for reexport.

(Exh. 24). The BIS also explains that if there are red flags, they must be looked into. After an inquiry into the red flags is undertaken, the company must determine whether the red flags "can be explained or justified." (Exh. 24). If the red flags cannot be explained, and the company proceeds with the transaction in question, the BIS warns, "you run the risk of having had 'knowledge' that would make your action a violation." (*Id.*).

The red flags raised by HRD's behavior are discussed in detail in the fact section. The key red flags are as follows:

- HRD announced they intend to manufacture metallocene waxes;

- HRD has no facility in the U.S. to manufacture metallocene waxes;

- HRD's and/or the Hassans' other facilities are in India and Iran;

- Dow requested information on Marcus Oil Iran's business and HRD's plans for the metallocene technology, but HRD refused to provide any information;

- HRD refused to accept Dow's confidential documents on an outside-counsel/independent-expert-only basis;

- HRD admitted that it violated the Iranian Transactions Regulations in the past; and

- HRD misrepresented to this Court that Marcus Oil Iran and Marcus Oil India have nothing to do with wax.

Based on these facts, Dow cannot justifiably produce documents to HRD without risking being in violation of U.S. law.

15

**B.    Requiring Dow to produce confidential documents under circumstances that violate U.S. law places an undue burden on Dow**

As discussed in the subsections below, requiring Dow to produce documents under circumstances that could violate U.S. law places an undue burden on Dow, and the appropriate way to address this undue burden is with a protective order limiting access to confidential discovery material.

**1.    Requiring Dow to produce confidential documents to HRD, the Hassans, or HRD's consultants would constitute an undue burden and cause substantial prejudice**

The present circumstances place an undue burden on Dow.  The courts have recognized that "[i]t is surely an undue burden for a subpoena to demand a violation of federal law." *Flatow v. Iran*, 196 F.R.D. 203, 207 (D.D.C. 2000), *aff'd in part, vacated in part on other grounds*, 305 F.3d 1249 (D.C. Cir. 2002).  Discovery that directs a party to violate federal law constitutes an undue burden and creates a "Catch-22" situation. *Zoltek v. U.S.*, 61 Fed. Cl. 12, 15 (2004) (copy attached as Exh. 25).  Even requiring a litigant to violate another country's law creates severe prejudice.

> It is undisputed that provision of the requested information, and production of the requested documents, would violate *Swiss banking secrecy and other laws …. Requiring the Banks to choose between being in contempt of court and violating Swiss law clearly constitutes severe prejudice* that could not be remedied on direct appeal.

*Credit Suisse v. U.S. Dist. Court for the Cent. Dist. of Cal.*, 130 F.3d 1342 (9th Cir. 1997).

Here, Dow is subject to competing and inconsistent obligations that merit entry of a protective order.  Specifically, if Dow produces the documents and the Hassans export the metallocene wax technology to Iran, OFAC may prosecute Dow for violation of the Iranian Transactions Regulations.  However, if Dow refuses to produce the documents, Dow may be in violation of its discovery obligations in this action.

Consequently, a protective order is appropriate.

2.    **The form of the order should allow HRD's outside counsel and approved independent experts to have access to the documents**

Here, the appropriate remedy to this problem is to limit access to Dow's "Confidential" and "Highly Confidential" documents to outside counsel and approved independent experts. Dow proposed this solution to HRD prior to filing this motion, but HRD rejected it. HRD argued that HRD's counsel would have no-one to help him understand the technical contents of the documents. However, Dow's proposal permits HRD's counsel to retain an independent expert and is therefore adequate. *See Safe Flight Instrument Corp. v. Sundstrand Data Control, Inc.*, 682 F.Supp. 20, 22 (D.Del. 1988) (denying the plaintiff company's president the right to view defendant company's confidential documents where outside experts could potentially be retained to assess them).

HRD also argued that the current protective order should provide all the assurances Dow needs, because the Hassans only receive "Confidential" information, not "Highly Confidential." However, once red flags arise, Dow is prohibited from producing any technology to the Hassans. 31 C.F.R. § 560.418. HRD further argues that Dow is protected because the Hassans have agreed to use Dow confidential information "only for purposes of this action and not for any other purpose." (D.I. 43 [Exh. A to Protective Order]). However, even if one could expect the Hassans to comply with the protective order, it would be impossible for them to mentally segregate their own technical knowledge from what they learn from Dow's documents. The *Safe Flight* court, confronted with a similar situation, concluded that it would not be humanly possible for the plaintiff's president "during future years of research to separate the applications he has extrapolated from Sunstrand's documents from those he develops from his own ideas." *Id.*, 682 F. Supp. at 22.

Moreover, the Hassans have repeatedly shown they are willing to violate U.S. law and make misrepresentations to Dow, OFAC and this Court. In addition, they

17

previously attempted to get this information from Dow for their business purposes. *See,*

*e.g. In re Indep. Serv. Orgs. Antitrust Litig.*, 162 F.R.D. 355, 357-58 (D.Kan. 1995)

(finding that disclosure of the plaintiff's trade secrets pursuant to a protective order could

be harmful where evidence demonstrated the defendant had made efforts to obtain the

same information through other means).

   Finally, the current protective order allows Highly Confidential

information to be shown to consultants who are not employees of HRD without providing

any notice to Dow of these parties' identity or affiliation. HRD has designated Greg

Borsinger as such a consultant. He is integrally involved in all aspects of HRD's

business operations and has been for many years. (Frencham Dec. ¶ 4). In *In re Pennzoil*

*Shareholders Litig.*, 1997 WL 770663 (Del. Ch. 1997) (copy attached as Exh. 26), the

court applied the logic of the *Safe Flight* decision to a situation involving consultants.

The *Pennzoil* court viewed a consultant's purported ability to mentally segregate

confidential information reviewed during litigation when switching to his role as a

consultant to be "an epistemological leap of heroic proportions". *Id.* at *3. If Mr.

Borsinger has Dow's technology in his head, and he is asked to work on a project on

behalf of HRD, he could not segregate what he learned from Dow from HRD's own

technology. The Hassans could then use his work product however they choose, for India

or Iran. Dow therefore cannot disclose this technology to Mr. Borsinger according to 31

C.F.R. § 560.204 (2006).

   Furthermore, Dow has no idea who else may be allowed to review Dow's

confidential documents under the protective order. Dow cannot satisfy its obligations

under the Iranian Transactions Regulations to follow-up diligently on red flags if Dow

has no idea who will be reviewing these documents. Dow is skeptical that HRD can

adequately explain these red flags, because it appears the Hassans truly have done

improper business with Iran and have made repeated misrepresentations. However,

whether HRD can explain the red flags need not be addressed at this juncture, provided

the Court enters a protective order limiting access to its confidential documents as described above.

## CONCLUSION

For all of the foregoing reasons, Dow's motion for a protective order should be granted. The Court should enter an order limiting access to Dow's Confidential information and Highly Confidential information to outside counsel and approved independent experts.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Kenneth Nachbar (#2067)
Samuel T. Hirzel (#4415)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200

Attorneys for Plaintiff
    Dow Chemical Canada Inc.
and Counterclaim Defendant
    The Dow Chemical Company

OF COUNSEL:

Harry J. Roper
Raymond N. Nimrod
Aaron A. Barlow
JENNER & BLOCK LLP
330 N. Wabash Ave.
Chicago, IL 60611
(312) 222-9350

Dated:  December 22, 2006

19