# EXHIBIT 1

pounds/year. Marcus Oil has a global customer base and sells products in more than 100 countries. Sales are both direct and through an extensive network of distributors and agents.

The Polyolefins and Elastomers Business Group of Dow Chemical Company recently announced that it had entered into an agreement to supply PE waxes to Marcus Oil and to develop a portfolio of PE waxes for Marcus. Marcus Oil will market and sell 100% of the PE wax produced by Dow under the agreement.

Additional information on Marcus Oil and its wax technology can be found on the company's website at www.marcusoil.com.

<u>Iranian-Origin Technology</u>

HRD Corporation (owned by the Hassan brothers), which owns Marcus Oil, has made an investment in an Indian company named Marcus Oil India Ltd. ("Marcus Oil India"), which like Marcus Oil in the United States is also engaged in the production and sale of specialty waxes. Marcus Oil India was established and is operated by Indian citizens and is incorporated under Indian law. The investment by HRD Corporation does not give HRD Corporation any rights to control Marcus Oil India. Other than this investment, Marcus Oil India is not affiliated with Marcus Oil in the United States. Marcus Oil India would not be considered a "United States person" as defined at ITR § 560.314.

In the course of dealing with various companies that Marcus Oil India also deals with, Mr. Abbas Hassan, Chairman and CEO of Marcus Oil in the United States, learned of a new technology that NPC had developed involving the conversion of methane directly into ethylene and for which NPC had recently filed for a patent in Canada on April 29, 2003 with the Canadian Intellectual Property Office titled "Preparation of Catalyst and Use for High Yield Conversion of Methane to Ethylene."

Realizing the potential impact of such technology on the global plastics markets, Mr. Hassan traveled to Tehran, and met with representatives of NPC to investigate the technology.[1] Upon observing the technology, Mr. Hassan returned to the US and shared his observations with several companies involved in the plastics industry including Dow. The consensus was that this technology has the potential to significantly alter the economics of making such plastics as polyethylene, PVC, styrene and other ethylene derived plastics. Conversely, should plastics companies outside the United States gain access to and implement this technology while the US plastics industry remains with the current technology, the economics of the industry would drastically change, which would have a dramatic destabilizing effect on the majority of US plastic producers. The technology has the potential to significantly reduce the capital and operating cost of producing ethylene that is the building block for most plastics in use today.

Mr. Hassan returned to Tehran for a follow up meeting with NPC and was informed that NPC was investigating sale of this technology to several non-US based companies including Shell Oil. Mr. Hassan subsequently assisted in arranging an agreement between Marcus Oil India and NPC

---

[1] Travel transactions involving Iran by US persons are exempted from the Iranian Transactions Regulations under ITR § 560.210(d).

2

that would allow a fixed period of time (weeks not months) for Marcus Oil India to evaluate the technology and resolve any issues that may prevent US companies from benefiting from this technology. The agreement does not provide for any payments to NPC.[2]

At present, however, it is not known whether the technology is viable and, if so, what its full potential might be. Marcus Oil is seeking at this time only to evaluate the catalyst technology. Other US companies including Dow and UOP have expressed interest in evaluating the technology as well. If it appears from this evaluation that the technology is as valuable as it seems, Marcus Oil will seek further advice from OFAC regarding permissible licensing arrangements. It is not necessary at this time to address issues related to licensing the technology and any benefit that NPC may receive as a consequence.[3] All that is at issue now is the importation of the technology into the United States for the purpose of evaluation.

<u>Regulatory Interpretation</u>

It appears that imports of Iranian-origin technology into the United States, unlike imports of Iranian-origin goods or services, are not prohibited by the Iranian Transactions Regulations. We seek your confirmation of this interpretation of the regulations.

ITR § 560.201 prohibits the importation into the United States of goods or services of Iranian origin or owned or controlled by the Government of Iran, other than information informational materials exempted under the Berman Amendment at Section 203(b) of the International Emergency Economic Powers Act, 50 U.S.C. 1702(b)(3).[4] Implementing the statute, ITR § 560.210 exempts from the sanctions the importation and exportation of information and informational materials as defined in ITR § 560.315 "whether commercial or otherwise, regardless of format or medium of transmission." The definition of information and informational materials at ITR § 560.315 includes publications, films posters, etc., but does not include items controlled under the Export Administration Act.

By its terms, this prohibition on imports applies to "goods or services." By contrast, the prohibitions on exports and reexports at ITR §§ 560.204 and 560.205 apply to goods, *technology, or services*[5] (emphasis added), implying that technology is not covered by the import prohibition.[6] Furthermore, information contained in a patent application would, as such, be

---

[2] ITR § 560.208 prohibits US persons from approving or facilitating any transaction by a foreign person where the transaction by that foreign person would be prohibited if performed by a US person or within the US. However, if importing Iranian technology to the United States would not be prohibited (see discussion below), facilitating the import of Iranian technology to India would not be prohibited either.

[3] Depending on how the situation is viewed, a license between Marcus Oil and NPC, or between Marcus Oil and Marcus India which would in turn receive certain license rights from NPC, could be interpreted as the exportation of a service to or for the benefit of Iran or the Government of Iran, which would be prohibited by ITR § 560.204. On the other hand, if the technology covered by the patent application is considered information or informational materials as defined in ITR § 560.315, the importation of the technology would be exempt under ITR § 560.210.

[4] ITR § 560.534 contains a limited exemption from this import prohibition for certain foodstuffs (pistachios) and carpets.

[5] ITR § 560.306 defines Iranian-origin goods to include goods grown, produced, manufactured, extracted, or processed in Iran and goods which have entered into Iranian commerce. Iranian-origin services include services performed in Iran or by an entity organized under the laws of Iran, or a person residing in Iran and services performed outside Iran by a citizen, national or permanent resident of Iran who is ordinarily resident in Iran or by

We seek a timely response from your office regarding this interpretation of the regulations or, if needed, the issuance of a license that would permit Marcus Oil to move forward with the evaluation of the NPC technology.

If you have any questions about this request for interpretation, please feel free to contact our attorney with respect to this matter, Christopher R. Wall at Pillsbury Winthrop LLP, 1133 Connecticut Avenue, NW, Washington, DC 20036 (telephone 202-775-9850; telefax 202-833-8491; email cwall@pillsburywinthrop.com).

Sincerely,


Aziz Hassan

# EXHIBIT 2



## Markus Oil & Gas Chemical
### Iran

October 21, 2003

**Dow Chemical Company**
**400 W. Sam Houston Pkwy S.**
**Houston, TX 77042-1299**

**Attn: Mr. Tony Frencham**

Dear Tony,

Thank you for your kind letter dated Oct. 15, 2003. It was indeed a great pleasure for me to meet you and your distinguished colleagues in Dubai, during the 2nd International Middle East Petrochemical Conference.

Please be assured that we in Marcus Oil & Chemical (Iran) will do our best to promote Dow Chemical Company's products & services in Iran, when the appropriate conditions prevail in due course. However, in the meantime we will be more than happy to assist you in establishing a sound base in our region.

Hope to see you soon.

Best regards.

H. Zaheri

Cc: Mr. Abbas Hassan
    Chairman & President
    Marcus Oil & Chemical

*Superior Quality High Performance Waxes*
No.5, 6th floor, Sayeh Tower, Vali-e-Asr St., Tehran - Iran
Tel.:(+9821) 2044245 - 2043288  Fax:(+9821) 2044270  e-mail:hzaheri@pim-iran.com  www.marcusoil.com

# EXHIBIT 3

FROM :NEW MILLENNIUM          FAX NO. :973 635 7845          Apr. 28 2004 10:08AM P2

**Attorney Docket: BSN10PCT**

## ASSIGNMENT

WHEREAS, I, BAGHERZADEH EBRAHIM, of 125 Dastjerdi Avenue, Tehran 19187 IRAN (Islamic Republic of), as assignor, have invented certain improvements on Preparation of Catalyst and Use for High Yield Conversion of Methane to Ethylene, for which an application for United States Letters Patent has been executed by me to be filed with the United States Patent and Trademark Office, claiming priority from Canadian Application No. 2,427,722 filed April 29, 2003; and whereas HRD Corp., having an office in Houston, Texas and having a mailing address of P.O. Box Drawer 450267, Houston, Texas, 77245, and NATIONAL PETROCHEMICAL COMPANY, PETROCHEMICAL RESEARCH & TECHNOLOGY COMPANY a division of NATIONAL PETROCHEMICAL COMPANY; 12 Sarv, South Shiraz, Mollasadra, 14358 — Tehran, Iran (Islamic Republic of), as assignees, are desirous of acquiring all right, title and interest in and to said invention and any letters Patent that may be granted therefore.

NOW, THEREFORE, in consideration of One Dollar ($1.00) and other good and valuable consideration, the receipt of which is hereby acknowledged, we, as assignor hereby sell, assign and set over jointly to said assignees the entire right, title and interest for the United States and all other countries in and to said invention and the aforesaid application for Letters Patent, all original, divisional, continuation, substitute or reissue applications and patents applied for or granted therefore in the United States and the Commissioner of Patents is hereby authorized and requested to issue all patents on said improvements or resulting therefrom to said assignees herein, as assignees of the entire interest therein; and we for ourselves and our legal representatives, heirs and assigns do hereby agree and covenant without further remuneration, to execute and deliver all divisional, continuation, reissue and other applications for Letters Patent on said improvements and all assignments thereof to said assignees or their assigns, to communicate to said assignees or their representatives all facts known to the undersigned respecting said improvements, whenever requested, to testify in any interferences or other legal proceedings in which any of said applications or patents may become involved, to sign all lawful papers, make all rightful oaths, and to do generally everything necessary to aid assignees, their successors, assigns and nominees to obtain patent protection for said improvements in all countries, the expenses incident to said applications to be borne and paid by said assignees.

APR 28 2004 7:12AM  HP LASERJET 3200

PATENT
REEL: 015275 FRAME: 0646

FROM :NEW MILLENNIUM          FAX NO. :973 635 7645          Apr. 28 2004 10:09AM  P3



BAGHERZADEH EBRAHIM

Date: _04·27·04_

State of _TEXAS_  ) SS:

County of _FT. BEND_ )

Before me personally appeared said BAGHERZADEH EBRAHIM and acknowledged
the foregoing instrument to be his free act and deed this _27th_ day of _April_
2004.

Seal

_____
Notary Public

AMIR ALI HASSAN
MY COMMISSION EXPIRES
May 09, 2005

p.2

APR 28 2004 7:12AM   HP LASERJET 3200

PATENT
REEL: 015275 FRAME: 0647

# EXHIBIT 4

6/3/2005                              HRD Corp. Confidential

The following is my personal synopsis of chronological activities related to filing of Intellectual Property Rights by HRD Corp. in the technology areas of processes and catalyst to convert natural gas into more valuable commodities. This is not a legal view, as I am not a Lawyer and I have no authority to speak on behalf of Baker Botts who conducted much of the communication with OFAC.

- July, 2003 – HRD secures Pillsbury Winthrop as legal counsel to represent them in this matter. HRD tried to gain clarification from OFAC regarding importation of technology from Iran and §560.509 of the ITR that allowed "Certain transactions related to patent, trademarks and copyrights authorized."

- December 2003 – HRD Corp. contracts with Dr. Anthony of Texas A&M to conduct evaluations of new technology from Iran.

-Letter Dated January 23, 2004 OFAC to C. Wall – stated that "importation of Iranian – origin product is, as (we) state in (our) application, limited to goods and services and does not expressly apply to technology." This allowed HRD Corp to conduct the evaluations of the Iranian technology developed by Dr Bagherzadeh (formerly of NPC of Iran).

March 23, 2004 - Dr Bagherzadeh travels to the US and applies for Green Card.

-April 28, 2004 HRD Corp/DBA Marcus Oil & Chemical files a U.S. Patent Application Serial No. 10/833,735, and a PCT Application Serial No. PCT/US/2004/013098, both claiming priority from Canadian Patent Application Serial No. 2,427,722, filed April 29, 2003.  The Canadian Application was assigned to National Petrochemical Company et al. (hereinafter NPC).  The U.S. Application and any foreign rights such as the PCT Application were assigned jointly to NPC and HRD Corp.

-May 24, 2004 HRD Corp writes letter to OFAC asking for guidance under the Iranian Transaction Regulations (ITR) regarding interacting with National Petroleum Corp. of Iran.

-June 8 , 2004 ; HRD drops Pillsbury Winthrop and shortly thereafter secures Baker Botts as legal council for this matter.

-July 23, 2004 – representatives from Baker Botts met with the Director of OFAC, Richard Newcomb and members of his staff on the behalf of HRD Corp. to review 'factual developments' of HRD and gain further clarification and explain to OFAC what has transpired previously with regards to HRD and the subject technology issues.

-August 6, 2004 – Baker Botts writes letter to OFAC summarizing 'factual background' that was apparently discussed in the July 23rd meeting. My synopsis of what transpired is as follows – OFAC claimed that it was prohibited under the ITR to file a patent in the US

Page 1 of 2

HRD 00000056

6/3/2005                              HRD Corp. Confidential

that would benefit anyone or any entity in Iran. Therefore it was viewed by our counsel
that any assignment to an Iranian or Iranian entity was illegal and therefore not valid.
Because of this, it is my understanding that Baker Botts filed with the U.S. Patent Office
an instrument rescinding the assignment to NPC of the April 28, 2004 U.S. Application
and the PCT Application. Baker Botts also took the position that US patent law required
the inventor – in this case – Dr. Bagherzadeh – to be listed on the invention and that since
they summarized that Dr Bagherzadeh was in the US at the time of filing seeking a US
Green card and had severed relations with Iran's NPC – that he was not and 'Iranian
entity' and that the filing was legitimate and legal under US laws.


- October, 2004 – OFAC sends letter to Baker Botts (in the interim a new Director,
Robert Werner is appointed at OFAC). – gave guidance that any form of work with or
for a "person in Iran is prohibited" and asks several additional new questions regarding -
what Baker Botts considered – not so relevant to the present issues.


- November 4' 2004- Baker Botts letter to OFAC– Paul Luther of Baker Botts tells
OFAC that "As we have determined that OFAC apparently is not prepared to offer
meaningful guidance on this matter, we have so advised Marcus. Consequently, please
consider our request of August 6 withdrawn."

- Since November 2004 – HRD has been operating under the premise that the work
conducted at Texas A&M which includes work by Dr Bagherzadeh – is being conducted
by a US entity (HRD Corp.) with no involvement by Iranian entities.

- December 2004 – Work conducted at Texas A&M has resulted in the discovery of a
new invention. The new invention is viewed as significantly different from that filed
April 28, 2004 and is filed as an independent application. It is determined that the
following contributed to the invention and were included as Inventors: Ebrahim
Bagherzadeh; Abbas Hassan; Rayford G. Anthony; and Xianchun Wu. The title of the
new provisional patent is filed is 'Catalyst and Method for Converting Low Molecular
Weight Paraffinic Hydrocarbons Into Alkenes'. This patent application is assigned to
HRD Corp.

-Since December 2004 - development at Texas A&M has continued. As of this writing a
new provisional patent application has been drafted that may or may not claim priority
with the December 2004 filing. It is this invention that had been observed by The Dow
Chemical Company at Texas A&M during April – May of this year.

HRD 00000057

# EXHIBIT 5

# O'Donnell, Ferebee, Medley & Keiser, P.C.

ATTORNEYS AND COUNSELORS AT LAW
450 GEARS - EIGHTH FLOOR
HOUSTON, TEXAS 77067-4584
www.ofmklaw.com

Telephone: (281) 875-8200                    Telecopier: (281) 875-4962

## TELEFAX TRANSMISSION SHEET

### DATE:        December 13, 2006

**TO:**    AARON BARLOW

**FROM:**    WILLIAM C. FEREBEE

**FAX #: (312) 923-8408    PHONE #: (312) 923-8308**

**RE:  Dow v. HRD Corporation**

**OUR FILE #:    M313.00026**

**NUMBER OF PAGES, INCLUDING THIS PAGE:        __3__**

---

**CONFIDENTIALITY NOTICE**

The information contained in this facsimile message is legally privileged and confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this telecopy is strictly prohibited. If you have received this telecopy in error, please immediately notify us by telephone and return the original message to us at the address above, via the United States Postal Service. We will gladly reimburse any expenses attendant to the return of the original message.

---

MESSAGE:

If you have problems receiving this transmission, please call (281) 875-8200



# O'DONNELL FEREBEE MEDLEY & KEISER, P.C.

William C. Ferebee

## ATTORNEYS AT LAW

(281) 875-8200

December 13, 2006

Mr. Aaron Barlow
Jenner & Block LLP
One IBM Plaza
Chicago, IL 60611-7603

VIA FAX (312) 923-8408

RE:    Dow v. HRD Corporation; *Our File No. M313.00026.*

Dear Mr. Barlow:

I am in receipt of your letter dated December 8, 2006. My client finds your irrelevant inquiries to be very offensive and just another excuse not to produce documents.

As I said to you on the telephone, there is no legal relationship between Marcus Oil & Chemical (Iran) and HRD. They are not affiliates or subsidiaries. Since there is no relationship, there are no documents. Since there is no legal relationship, any additional inquiry about Marcus Oil & Chemical (Iran) is irrelevant to this litigation.

Likewise, the business of any Indian company owned in whole or in part by Abbas and Aziz Hassan is irrelevant. Your prior correspondence expressed concerns about dealings that violate U.S. law, in particular, with Iran. There are not any U.S. restrictions on dealing with India, therefore, this inquiry is totally irrelevant.

As I have repeatedly told you, HRD has no current plans for commercializing the two pack product. Therefore, there are no documents to give you. Frankly, it would be ridiculous for HRD to have any such plans since this matter has been in dispute for over two years with no end in sight.

Finally, I am intrigued by your question on dual citizenship. Abbas and Aziz are U.S. citizens. Please explain the relevance of dual citizenship.

You claim that you have reliable information that my clients are going to illegally export wax technology to Iran. I have repeatedly asked you for the source of that information. You refuse to give it to me. I cannot (and will not attempt to) answer false accusations unless I am given the source.

450 Gears - Eighth Floor ▪ Houston, Texas 77067-4512 ▪ Fax (281) 875-4962 ▪ Email: wferebee@ofmklaw.com

- 2 -

Very Truly Yours,

O'DONNELL, FEREBEE, MEDLEY & KEISER, P.C.

*WC Ferebee*

WILLIAM C. FEREBEE

cc:    CLIENT, *via fax*

WCF/cm

# EXHIBIT 6

10/13/06

DRAFT ONLY – SUBJECT TO MANAGEMENT APPROVAL

## CONFIDENTIAL SETTLEMENT AGREEMENT
## AND MUTUAL GENERAL RELEASE

This Confidential Settlement Agreement and Mutual General Release (this "Settlement Agreement") is entered into among Dow Chemical Canada Inc. and The Dow Chemical Company, their subsidiaries and affiliates, ("Dow") and HRD Corporation, Marcus Oil & Chemical, a division of HRD, and Abbas Hassan and Aziz Hassan ("HRD"). This Settlement Agreement is deemed effective as of the ___ day _____ 2006 (the "Effective Date").

### BACKGROUND

A.    Since 1984 HRD has been a producer of waxes used in the hot melt adhesive industry. A hot melt adhesive being an adhesive comprised of primarily resin, wax and tackifier In the 1990's HRD began research on the use of polyethylene waxes produced in such a way to act a partial or complete wax and resin component for use as a hot melt adhesives and in other applications. This was referred to as a "two pack". In July 2002, Dow and HRD Corporation entered into two agreements relating to polyethylene wax and the development of a commercially viable "two pack" for use in the hot melt and other markets. Under the first agreement, the Joint Development Agreement, as may have been amended from time to time (the "JDA"), Dow desired to collaborate on developing polyethylene waxes, as HRD intended to foster the commercialization of polyethylene waxes and Dow desired to manufacture such products. In addition, the parties agreed that certain patent and intellectual property rights would belong to each of the parties. In anticipation of the successful development of products under the JDA, Dow also executed a second agreement, the Supply Agreement, as may have been amended from time to time (the "Supply Agreement").

At the time of signing the JDA, Dow had an agreement with a major hot melt adhesive producer, H.B.Fuller Corp. that restricted Dow from selling polyethylene resin produced with Dow metallocene technology to anyone other than H.B. Fuller. Therefore, Dow was not actively selling polyethylene to the hot melt industry, other than as a manufacturer for H.B.Fuller. The JDA was written to avoid conflict with pre-existing agreements that Dow had with H.B. Fuller and allow HRD to exploit the 'two pack' technology.

B.    Dow commenced an action against HRD Corporation in January 2005, seeking damages for HRD's alleged material breach of the Supply Agreement related to HRD Corporation's failure to pay amounts due under the Supply Agreement. HRD counterclaimed against DCCI and TDCC in March 2005, for, *inter alia*, alleged breach of the JDA and the Supply Agreement. This dispute is more fully described in the action entitled *Dow Chemical Canada Inc. v. HRD Corporation v. Dow Chemical Canada Inc. and The Dow Chemical Company*, Civil Action

10/13/06

DRAFT ONLY – SUBJECT TO MANAGEMENT APPROVAL

No. 05-023 (JJF), pending in the United States District Court for the District of Delaware (the "Litigation").

C.    During negotiations of this settlement agreement, and as a material inducement to HRD, Dow has assured HRD that it has no intention of developing or selling a "two pack" product or selling its own products in the hot melt industry. Dow has assured HRD that it will cease any prior or existing efforts to develop, market or sell any two pact product or any product in the hot melt industry.

D    Based upon the representations contained herein, Dow and the HRD Parties have agreed to settle and resolve their disputes, including the Litigation and all claims and counterclaims that were asserted or could have been asserted in the Litigation.

E.    In consideration of the mutual promises contained in this Settlement Agreement and for good and valuable consideration, the adequacy and receipt of which are acknowledged, the Dow Parties and the HRD Parties agree as follows.

## DEFINITIONS

"Affiliate" means (a) parent companies (if any) that own, directly or indirectly, a majority of a Party and (b) any other company that is majority-owned, directly or indirectly, by a Party or by its parent companies. "Dow" means DCCI and TDCC, collectively, and "Dow " means either TDCC or DCCI, individually, including any subsidiaries and affiliates.

"Dow Patent Rights" means both: (a) the "JDA Patent Rights" owned or controlled by a Dow Party under the HRD JDA, and (b) the claims of any other patent application or patent: (b.1) that was owned or controlled by a Dow on or before October 18, 2006, or (b.2) that covers the manufacture of Two-Pack Products and/or their application and (c) any patent that uses metallocene technology to manufacture the product. At a minimum and without limitation this includes the following patents:

******description******

"Effective Date" means the date identified above.

"Fuller-JDA Patent Rights" means those claims of certain patent applications or patents: (a) under which Dow has the right to grant certain immunities from suit subject to the payment of royalties to H.B. Fuller Licensing and Financing, Inc. ("Fuller") as a consequence of the 1995 joint development agreement between Dow and Fuller, and/or (b) that covers the manufacture of Two-Pack Products and/or the use of the Two-Pack Products in the Two-Pack HMA Applications.

"Hot Melt Adhesive" means a material which quickly melts upon heating and then, upon cooling, rapidly sets to form a firm bond between a substrate and a second item. For the purposes of this Agreement, the term "Hot Melt Adhesive" means (a) a Two-Pack Product alone,

10/13/06

DRAFT ONLY – SUBJECT TO MANAGEMENT APPROVAL

and/or (b) a blend consisting of a Two-Pack Product plus a Tackifier, or (c) a blend consisting of a Two-Pack plus a Tackifer plus a wax or a resin..

"**HRD**" means HRD Corporation and Marcus Oil & Chemical, collectively.

"**HRD Parties**" means HRD Corporation, Marcus Oil & Chemical, and The Hassans, collectively, and "**HRD Party**" means HRD Corporation, Marcus Oil & Chemical, or The Hassans, individually.

"**JDA**" is as defined in the Background of this Settlement Agreement.

"**Litigation**" is as defined in the Background of this Settlement Agreement.

"**Party**" means either Dow Party or any HRD Party, individually, and "**Parties**" means the Dow Parties and the HRD Parties, collectively.

"**Related Persons**" as used with respect to a designated Party, shall mean (a) that Party's Affiliates, and (b) the officers, directors, employees, agents, and other representatives of that Party or of that Party's Affiliates. In addition, any third party that manufactures or sells Two-Pack Products for, or on behalf of, HRD or HRD's Affiliates is also HRD's "Related Person" for the purposes of this Patent Agreement.

"**Third Person**" means any person or legal entity which is neither a Party, nor a Related Person of either Party.

"**Supply Agreement**" is as defined in the Background of this Settlement Agreement.

"**TDCC**" means The Dow Chemical Company.

"**The Hassans**" means Abbas Hassan and Aziz Hassan and their successors, assigns, heirs, executors, estate administrators, or personal representatives (or the equivalent thereto).

"**Two-Pack HMA Application**" means (a) the use of the Two-Pack Product as a Hot Melt Adhesive, or (b) the use of the Two-Pack Product when blended with a Tackifier as a Hot Melt Adhesive or blended with a Tackifer and/or a wax or polyethylene resin. The definition of Two-Pack Product is not affected by additional minor ingredients such as anti oxidants, plasticizers and colorants.

"**Two-Pack Product**" means an ethylene copolymer that is designed to fulfill the performance requirements of some or all of the polymeric resin and wax components of a typical hot melt adhesive product as of October 31, 2006.

## AGREEMENT

1.    Settlement and Dismissal of the Litigation

10/13/06

## DRAFT ONLY – SUBJECT TO MANAGEMENT APPROVAL

The Dow Parties and the HRD Parties agree to settle and dismiss the Litigation based on the terms set forth in this Settlement Agreement.

2.    <u>Settlement Amount and Intellectual Property Agreement</u>

a.    HRD agrees to pay Dow a settlement amount of $11,573,000 Canadian Dollars. HRD will make the payment to DCCI by wire transfer to _____ on the Effective Date before 5 p.m. Central Standard Time.

b.    Dow agrees to sell, assign and convey all of its intellectual property rights in polyethylene waxes, their manufacture and the use of a "two pack" in the hot melt industry and related applications to HRD.

During the period from the Effective Date until January 22, 2027, the Dow Parties agree, on behalf of themselves, their Related Parties and their Affiliates, that they will not develop, manufacture or sell Two-Pack Products and will not develop, manufacture or sell ethylene copolymers for use in hot melt adhesive applications, other than for companies disclosed in this agreement.

## <u>ARTICLE 3 - GRANT OF CERTAIN PATENT ASSIGNMENTS AND IMMUNITIES</u>

3.1    **Dow Patent Rights:** In consideration of the settlement amount to be paid by HRD to Dow under this Agreement, Dow hereby assigns to HRD all of its intellectual property, patents and patent rights that apply or might apply to the development of a Two Pack product and further grants to HRD a worldwide, nonexclusive, immunity from suit for infringement of Dow Patent Rights for HRD to manufacture, or have manufactured, Two-Pack Products. In addition, Dow hereby assigns to HRD the unrestricted right to use its metallocene technology to manufacture Two Pack products.

3.2    **Fuller-JDA Patent Rights:** Dow hereby grants to HRD a worldwide, nonexclusive, immunity from suit for infringement of Fuller-JDA Patent Rights for HRD to manufacture, or have manufactured, Two-Pack Products.

3.3    The above immunities are assignable, licensable and transferable.

3.4    **Technology Provided:** Dow is obligated to provide to HRD or to any Two-Pack-Product-manufacturer for HRD, any technology concerning Two-Pack Products, and/or their manufacture and/or use. In addition, Dow agrees to provide HRD with all of its development work from the beginning date of the JDA until the present that relates to the development, manufacturing or sale of Two Pack products. This includes all laboratory notes, plant design, plant specifications, plant operating manuals, manufacturing procedures, all laboratory tests, all manufacturing tests and the right to interview Dow employees concerning the development, manufacture and sale of Two Pack products.

3.5    Without limiting the generality of the foregoing, Dow expressly grants to HRD and any third party contracted by HRD for the production of Two-Pack Products the right to produce and use metallocene catalysts using formulae, processes and/or techniques

10/13/06

DRAFT ONLY – SUBJECT TO MANAGEMENT APPROVAL

developed by Dow, whether or not same are the subject of any of the Dow Patent Rights or the Fuller-JDA Rights.  This includes the use of Dow plant designs, plant specifications, plant operating manuals and manufacturing procedures as well as the right to interview Dow employees concerning how to manufacture Two Pack products using metallocene technology.

## ARTICLE 4 - WARRANTIES, DISCLAIMERS, AND RESPONSIBILITIES

4.1     **Warranties of the Dow Parties:** Dow warrants that:  (a) Dow has the right to grant the assignments and immunity set forth above, and (b) **Dow warrants that it is the owner of the intellectual property rights and patents the subject of this agreement, that the patents are valid and enforceable against infringement.**

4.2     **HRD's Responsibility:** As between the Parties, HRD is in control of the activities of HRD and HRD's Related Persons, and the Dow's' role is simply that of a party granting HRD an assignment and immunity from suit for infringement of Dow Patent Rights. Therefore, and as a material consideration for the Dow Parties' commitments under this Agreement, the Parties agree that:

(a)     **Release - Property Damage:** HRD hereby assumes the risk (and agrees to release, and hereby releases, the Dow Parties and their Related Persons from any and all responsibility) for any damage to or loss of any and all property owned or otherwise under the care and/or custody of HRD or HRD's Related Persons.

(b)     **Release – Personal Injury or Death:** HRD hereby assumes the risk (and agrees to release, and hereby releases, the Dow Parties and their Related Persons from any and all responsibility) for any personal injury (including illness) to, and/or death of, HRD's Related Persons.

(c)     **Indemnity - Various Claims, Damages, Liabilities and Losses:** HRD must defend, and HRD must also indemnify, the Dow Parties and their Related Persons against any and all claims, damages, liability, and/or loss (including but not limited to reasonable attorneys' fees and other litigation expenses and/or damages) arising out of the operations of HRD or HRD's Related Persons (which operations include, but are not limited to, the design, construction, startup, safety, and operation of plants for the manufacture and/or use of Two-Pack Products, and the manufacture, sale, quality, safety, and/or performance of Two-Pack Products, any injury to, or death, of any Third Person, as well as the handling and/or use of the Two-Pack Products by HRD, HRD's Related Persons, and/or any Third Person).

*THE ABOVE ASSUMPTIONS OF RISK, RELEASES, AND OBLIGATIONS TO DEFEND AND INDEMNIFY EACH APPLY IRRESPECTIVE OF ANY ACTUAL OR ALLEGED NEGLIGENCE (ACTIVE OR PASSIVE, SOLE, JOINT, OR CONCURRENT) OR STRICT LIABILITY OR BREACH OF WARRANTY (EXPRESS, IMPLIED, OR OTHERWISE) OR BREACH OF ANY DUTY (DELEGABLE, NONDELEGABLE, STATUTORY, OR OTHERWISE) OR OTHER LEGAL RESPONSIBILITY OF THE DOW PARTIES AND/OR THEIR RELATED PERSONS.*

10/13/06

### DRAFT ONLY – SUBJECT TO MANAGEMENT APPROVAL

**4.3    Scope of the Indemnification:** The Parties intend that the assumptions of risk, releases, and obligations to defend and indemnify set forth in this Agreement shall be effective to the maximum extent, scope, and amount permitted by the applicable law.

**4.4    Indemnity Agreement.** Dow agrees to defend, indemnify and save HRD harmless from any and all claims brought or asserted by any Third Party for infringement of any of the Dow Patent Rights or intellectual property assigned hereunder. Dow's indemnity obligation shall include the payment of all losses, damages and costs incurred or sustained by HRD, including but not limited to HRD's attorney fees and court costs, resulting from any such third party claims.

## ARTICLE 5 – HRD'S RELEASES

Except for the obligations created by this Settlement Agreement, each HRD Party releases, waives, disclaims, and discharges the Dow Parties from the Litigation, all claims and counterclaims that were asserted or could have been asserted in the Litigation, any and all claims arising from any dealings or activities involving either a Dow Party or any Affiliate of a Dow Party and any of the HRD Parties regarding the JDA, the Supply Agreement or the litigation on or before the Effective Date, and any and all claims, counterclaims, actions, causes of action, lawsuits, proceedings, liens, adjustments, offsets, obligations, liabilities, damages, interest, controversies, costs, expenses, attorneys' fees, and losses whatsoever (whether known or unknown, foreseen or unforeseen, patent or latent), whether in law or in equity, arising on or before the Effective Date related to the JDA and the Supply Agreement and/or the litigation. The HRD Parties' release will apply to each Dow Party's representatives, predecessors, successors, assigns, Affiliates, parents, subsidiaries, present or former officers, directors, employees, representatives, agents and attorneys, This release shall in no manner affect the rights of the HRD Parties respecting any transaction between any of the parties not concerning the subject matter of the JDA, the Supply Agreement and/or the litigation. Nothing herein shall constitute a release by the HRD Parties of any claim against Dow respecting the violation of the Confidentiality Agreement and/or protective order entered inn connection with the Litigation.

## ARTICLE 6 – DOW'S RELEASES

Except for the obligations created by this Settlement Agreement and the Patent Agreement, each Dow Party releases, waives, disclaims, and discharges the HRD Parties from the Litigation, all claims and counterclaims that were asserted or could have been asserted in the Litigation, any and all claims arising from any dealings or activities involving either a Dow Party or any Affiliate of a Dow Party and any of the HRD Parties on or before the Effective Date, and any and all claims, counterclaims, actions, causes of action, lawsuits, proceedings, liens, adjustments, offsets, obligations, liabilities, damages, interest, controversies, costs, expenses, attorneys' fees, and losses whatsoever (whether known or unknown, foreseen or unforeseen, patent or latent), whether in law or in equity, arising on or before the Effective Date. The Dow Parties' release will apply to each HRD Party's representatives, predecessors, successors, assigns, Affiliates, parents, subsidiaries, present or former officers, directors, employees, representatives, agents and attorneys, customers, suppliers, manufacturers, co-manufacturers, marketing partners, joint venture partners, business partners, and its/their respective officers, directors, agents, employees, servants, and attorneys.

10/13/06

DRAFT ONLY – SUBJECT TO MANAGEMENT APPROVAL

## ARTICLE 7 – GENERAL PROVISIONS

**No Admission of Liability.** This Settlement Agreement and the Patent Agreement are entered into solely by way of compromise and settlement. The Parties agree that this Settlement Agreement, the Patent Agreement, and any actions taken pursuant to this Settlement Agreement or the Patent Agreement will not be treated as an admission of liability or a statement or admission as to any particular contention or issue by any Party for any purpose, other than the liability of a Party to perform in accordance with the terms of this Settlement Agreement and the Patent Agreement.

**Dismissal of Action.** No later than 7 days after the Effective Date, the Dow Parties and HRD will execute and file the necessary dismissals with prejudice in the Litigation. Exhibit A is the Stipulation and Order of Dismissal in the Litigation. Each Party will bear its own costs and attorneys' fees.

**Governing Law.** This Settlement Agreement will be governed by, and construed in accordance with, the internal laws of Delaware.

**Enforcement.** The Parties agree that any controversy or dispute between any or all of the Parties arising from, concerning, or in any way related to this Settlement Agreement, including without limitation any claim challenging the validity or enforceability of this Settlement Agreement, will be brought exclusively in the state or federal courts of Delaware. The Parties hereby consent to the jurisdiction of such courts, and each Party covenants and agrees to refrain from filing any such action in any other court. Each Party hereby waives and agrees not to assert by way of motion, as a defense, or otherwise in any such action brought under this Section that the state or federal courts of Delaware lack personal jurisdiction, that the action is brought in an inconvenient forum, that the venue of the action is improper, or that this Settlement Agreement may not be enforced in or by such courts. The prevailing Party shall be entitled to recover its reasonable attorneys' fees and costs in any action arising from, concerning, or in any way related to this Settlement Agreement.

**Successors and Assigns.** This Settlement Agreement will be binding upon and inure to the benefit of the Parties and their respective successors in interest, heirs, estates, predecessors, employees, directors, officers, shareholders, lawyers, assigns, and agents.

**Confidentiality Provisions.** As further and material consideration of this Settlement Agreement, each Party will keep the terms of this Settlement Agreement and the Patent Agreement confidential and will not disclose any of the terms of this Settlement Agreement or the Patent Agreement to any person unless specifically required to disclose such information by legal process. The Parties also agree that the Protective Order agreed to by the Parties and entered by the court in the Litigation (the "Protective Order") will remain in effect. If any of the terms of this Settlement Agreement, the Patent Agreement or any of the information covered by the Protective Order is requested through subpoena, summons, discovery request, or other legal process, before disclosure of such information, the Party subject to the request will provide

10/13/06

## DRAFT ONLY – SUBJECT TO MANAGEMENT APPROVAL

written notice to the other Party as soon as reasonably possible. The Parties and their attorneys may, however, respond to any inquiry about the Litigation by stating only that "the matter has been resolved through settlement." Nothing in this Section will prevent any Party from disclosing, to the extent necessary for legitimate business or tax reasons, the terms of this Settlement Agreement or the Patent Agreement to its insurers, attorneys, auditors, accountants, business managers, executives, or other similar persons. Nothing in this Section will prevent a Dow Party from disclosing information to the extent necessary to satisfy obligations owed to a third party with respect to the immunity from suit granted to HRD Corporation under the Patent Agreement. Moreover, nothing in this Section will prevent any Party from disclosing to any person the U.S. federal income tax treatment or tax structure of this Settlement Agreement or the Patent Agreement.

**Entire Agreement.** This Settlement Agreement and the Patent Agreement contain the entire agreement among the Parties with respect to the matters covered in this Settlement Agreement and the Patent Agreement and supersede all previous and contemporaneous written, oral, or implied understandings, representations, or agreements among them with respect to such matters. Each Party acknowledges and agrees that this Settlement Agreement and the Patent Agreement are not made with reliance upon any inducement, statement, promise, or representation other than those contained within this Settlement Agreement and the Patent Agreement. No supplement, modification, or waiver of this Settlement Agreement or the Patent Agreement will be binding unless executed in writing by the Parties. No waiver of any of the provisions of this Settlement Agreement or the Patent Agreement will be deemed or will constitute a waiver of any other provision of this Settlement Agreement or the Patent Agreement (whether or not similar), nor will such waiver constitute a continuing waiver unless otherwise expressly provided.

**Severability.** The invalidity of any portion of this Settlement Agreement or the Patent Agreement will not affect the validity, force, or effect of the remaining portions of this Settlement Agreement or the Patent Agreement, except that the settlement amount and the Patent Agreement cannot be severed from the release provisions. If it is ever held that any restriction under this Settlement Agreement or the Patent Agreement is too broad to permit enforcement of such restriction to its fullest extent, such restriction will be enforced to the maximum extent permitted by law.

**Headings.** The titles to the Sections of this Settlement Agreement are solely for the convenience of the Parties and will not be used as an aide in the interpretation or construction of this Settlement Agreement.

**No Prior Assignment.** Each Party represents and warrants that it has not assigned or transferred, or purported to assign or transfer, to any person any claim or cause of action released in this Settlement Agreement or any interest in any claim or cause of action released in this Settlement Agreement.

**Warranty of Authority.** Each Party represents and warrants that it has full authority to execute, deliver, and be bound by this Settlement Agreement and to release all claims released in

Settlement Agreement                                                    Page of
FOR PURPOSES OF SETTLEMENT DISCUSSIONS – SUBJECT TO FED.R.Evid.408 Rev GGB1

10/13/06

DRAFT ONLY – SUBJECT TO MANAGEMENT APPROVAL

this Settlement Agreement. Each Party further represents and warrants that the execution of this Settlement Agreement and the performance of the obligations under this Settlement Agreement do not conflict or violate the provisions of any agreement or other obligation of such Party, including obligations arising from contract or by operation of law.

**Voluntary.** This Settlement Agreement and the Patent Agreement are executed voluntarily and without any duress or undue influence on the part or behalf of any Party to this Settlement Agreement or the Patent Agreement with the full intent of releasing all claims. Each Party acknowledges that it has read this Settlement Agreement and the Patent Agreement, it has been represented in the preparation, negotiation, and execution of this Settlement Agreement and the Patent Agreement by legal counsel of its own choice, that it understands the terms and consequences of this Settlement Agreement and the Patent Agreement and of the releases contained in the Settlement Agreement, and that it is fully aware of the legal and binding effect of this Settlement Agreement and the Patent Agreement.

**Construction.** This Settlement Agreement and the Patent Agreement are the product of negotiation and preparation by and among the Parties and their respective attorneys. This Settlement Agreement and the Patent Agreement will be interpreted and construed neutrally as to all Parties without any Party being deemed to be the drafter of this Settlement Agreement or the Patent Agreement.

IN WITNESS WHEREOF, the Parties to this Settlement Agreement have caused this Settlement Agreement to be duly executed as of the day and year first above written.

HRD Corporation

By:_____
     Name:
     Title:


Marcus Oil & Chemical

By:_____
     Name:
     Title:


Abbas Hassan


_____

10/13/06

**DRAFT ONLY – SUBJECT TO MANAGEMENT APPROVAL**

Aziz Hassan

_____


Dow Chemical Canada Inc.

By:_____
    Name:
    Title:


The Dow Chemical Company

By:_____
    Name:
    Title:

10/13/06

**DRAFT ONLY – SUBJECT TO MANAGEMENT APPROVAL**

**EXHIBIT A**

**STIPULATION AND ORDER OF DISMISSAL**

# EXHIBIT 7

**Page    8**

Citation                    Search Result        Rank(R)  3 of 5            Database
4/1/05 HSTNCHRON B4                                                          HSTNCHRON

4/1/05 Hous. Chron. B4
2005 WLNR 24648557

Houston Chronicle
Copyright 2005 Houston Chronicle

April 1, 2005

Section: B

Facility where blast occurred being shut / HFD cites 'too many red flags' at
**Marcus    Oil** , the site of a December explosion

THOM MARSHALL

thom.marshall@chron.com

The  **Marcus    Oil**  and Chemical plant, where an explosion rocked  southwest
Houston in December, will not be allowed to resume  production, a city fire
official said Thursday.

"We, the Fire Department, are not going to allow them to **reopen**," said George
Meadows, chief inspector in charge of hazardous material inspections. "There are
just too many red flags coming up."

He said his staff is going through reports on the plant, including one that
dealt with "substandard air quality" caused by plant emissions.

He said that other concerns involve the plant's use of certain equipment and
chemicals without getting approval.

"So it looks like they just have a poor track record," Meadows said, "and we
don't feel comfortable allowing them to **open** back up. Period. We're also going
to have to try to figure out some way to make sure that when they do close down
that they don't leave a mess behind."

 No permits will be issued

Meadows said he plans to send written notification next week to Marcus
officials, telling them they will not be issued any permits and asking them to
submit a facility closure plan.

"That's good news," said the Rev. Janice Caslin, pastor of the New Deliverance
Church at 14538 Minetta.

She said that just a few hours before the explosion at 6 p.m. Dec. 3, the church
got a check from the plant to settle claims resulting from an explosion Dec. 20,
2003.

"The first explosion we didn't have any structural or physical damage," Caslin

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

4/1/05 HSTNCHRON B4

said.

"The people suffered respiratory problems. But after the second one, we have structure damage, a cracked slab, the walls are cracked and have shifted, the foundation is cracked, a lot of my instruments got damaged."

  Company makes waxes

Marcus Oil and Chemical manufactures polyethylene waxes used in products such as paints, asphalt, polishes, printing inks and high-gloss fruit coatings.

The plant apparently had been operating at a reduced level for a few weeks.

An announcement on its Web site said that "as of February 10th, 2005, U.S. production of polyethylene waxes has resumed."

  Cease and desist order

However, City Councilman Michael Berry, who is serving as the city administration's point man on the issue, said a cease and desist order was issued last week to stop "any operations at the plant."

The owners of the plant, Abbas and Aziz Hassan, had no comment Thursday about the city's decision to prevent them from reopening.

The blast was heard by residents miles away from the plant near Fondren and Main, and a fire burned for hours.

Residents of houses and apartments in the area reported broken windows and damage to walls, ceilings and roofs.

No life-threatening injuries caused by the blast were reported but several people complained about loss of hearing and headaches and one complaint alleged chemical burns.

EDITION: 3 STAR

Word Count: 559
4/1/05 HSTNCHRON B4

END OF DOCUMENT

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

# EXHIBIT 8

FOCUS - 17 of 65 DOCUMENTS

Copyright 2006 Reed Business Information Limited
All Rights Reserved
Chemical News & Intelligence

November 8, 2006 Wednesday

**LENGTH:** 356 words

**HEADLINE:** INTERVIEW: Iran to draw more derivative projects

**BODY:**

By Florence Tan

TEHRAN (ICIS news)--The startup of new olefins and aromatics units in Iran next year is expected to push the private sector into pursuing more downstream projects, a senior industry official said on Tuesday.

More raw materials such as different grades of polymers, glycols, aromatics will be available when Olefins No 7, 9, 10 and Aromatics No 4 start operations next year, MH Peyvandi, director of planning and development at National Petrochemical Co (NPC) said.

"This will create a big momentum for the private sector to invest downstream" as raw materials can be obtained in local currency, he said at the sidelines of Iran Plast 2006 exhibition.

Iranian companies have found it difficult to import raw materials which are based on the US dollar due to sanctions.

With the start-up of the above projects, NPC is expected to start the ball rolling next year for projects under its 5th five year plan (2010-2014). These include Olefins No 8, 11, 12, 15 and 11 affiliated projects along the proposed West ethylene pipeline.

Contracts have been awarded for five of the affiliated projects while most of the remaining projects are in the bidding phase.

  

The petrochemical industry could also ride on the country's refinery expansion plan and build units downstream of refineries.

"We prefer downstream projects with refineries such as getting propylene from fluid catalytic cracking (FCC) units which can produce PP," Peyvandi said.

"NPC will be overloaded on projects because of the availability of feedstocks and the intention of the government and private sector to use relatively competitive feedstocks for development in the petrochemical industry," he added.

"We like the private sector to be active in the downstream industry, but if they need assistance in technical matters, we'll support," he said.

Iran is also expected to be self-sufficient in polyethylene (PE), polypropylene (PP), polystyrene (PS) and polyethylene terephthalate (PET) next year, he said.

"What Iran needs is specific polymers, fine chemicals. I hope we'll develop in the next five years," he added.

Iran Plast 2006 started on Tuesday and ends on Saturday.

LOAD-DATE: November 16, 2006

  

FOCUS - 9 of 65 DOCUMENTS

Copyright 2006 Reed Business Information Limited
All Rights Reserved
Chemical News & Intelligence

November 22, 2006 Wednesday

**LENGTH:** 584 words

**HEADLINE:** INSIGHT: Sanctions against Iran open doors for some

**BODY:**

By Florence Tan

TEHRAN (ICIS news)--Economic sanctions may have made life harder for **Iran** and shunted investment from most western countries but they are opening doors for others to come in and become partners in the booming chemicals sector.

One of them is Venezuela which has signed a series of bilateral deals with on oil, gas and **petrochemicals** development. These include a $1.6bn (EUR1.2bn) joint venture between **Iran's National Petrochemical Co (NPC)** and its Venezuelan counterpart Pequiven to build 3.3m tonnes/year of methanol capacity.

China has also fast tracked to becoming a close partner. Besides buying large quantities of crude oil, Chinese **petrochemical** major Sinopec is working closely with the National Iranian Oil Co (NIOC) to build new refineries in **Iran** to help alleviate the country's gasoline shortage.

**Iran's petrochemical** industry, which is in dire need of technologies to expand its production range, has also turned to searching for licensors in China.

It found acetic acid technology but the search is still on for vinyl acetate monomer (VAM), polyvinyl alcohol (PVA) and phenol/acetone processes as it seeks to leverage further it's position as the holder



of the world's second largest conventional oil reserves.

Most developed countries have closed their doors as Iran pushes on with its nuclear energy programme. Trading in US dollars is near impossible and obstacles abound for traders looking for banks to open letters of credit or for petrochemical technology licensors.

Nuclear sanctions have made it tough, for instance for Fanavaran Petrochemical to import the much needed zirconium and hastelloy plant needed for its acetic acid project.

If further sanctions are imposed that bar imports of chemicals such as additives, more petrochemical producers will be hit.

The situation also doesn't bode well for development in downstream industries. Investors, even rich Iranians, are deterred by geopolitical risks and local banks have become reluctant to hand out loans following a recent move by the government to lower interest rates.

But the industry is hopeful that when new petrochemical capacities eventually come on stream, prices will become more competitive and draw investors to the downstream industries.

However, the much anticipated avalanche of petrochemicals from Iran has not yet begun. Problems plague NPC's plans, pushing back the start-up of its Olefins No 7, 9 and 10 projects.

The recent [1]management changes at NPC have also put paid to some initial studies and put foreign projects on hold. One of these is a fertilizer joint venture with India which could be [2]revived under the new management

Iran's private sector, however, is still keen to join the petrochemicals race and some companies have started their search for technologies. The going is expected to be tough with sanctions on-going. One investor has already been turned down by a Japanese licensor.

But this will not stop Iranians who are used to navigating their way around obstacles, not unlike attempts to get out of daily traffic jams

  

in Tehran.

**Iran's** abundant resources will continue to prove attractive. They will help draw in new friends such as China to replace the old and provide much needed technologies to help push the **petrochemicals** expansion along.

References

1. file://localhost/home/cni/cnistories/Articles/2006/11/15/1106147/focus-ir-ans-npc-awaits-more-changes.html
2. file://localhost/home/cni/cnistories/2006Nov/(../Articles/2006/11/09/1104889/irans-npc-could-revive-mega-methanol-project.html

**LOAD-DATE:** November 30, 2006

  

FOCUS - 31 of 65 DOCUMENTS

Copyright 2006 Chemical Week Associates
Chemical Week

July 26, 2006 / August 2, 2006

SECTION: NEW CONSTRUCTION PROJECTS; Pg. 20

LENGTH: 217 words

HEADLINE: Iran's NPC Plans More Investments At Bandar Assaluyeh

BYLINE: NATASHA ALPEROWICZ

BODY:

   National Petrochemical Co. (NPC; Tehran) says it plans to spend $ 14 billion over the next five years to expand the Bandar Assaluyeh, Iran petrochemical complex. NPC's projects director Mahdi Saqafi says engineering work on some of the projects is under way.  They include Mehr Lavan Urea and Ammonia Co.'s fertilizer complex, and Mobin UT's second-phase utilities complex. Further details were not disclosed, however.

   Separately, NPC says construction work on Jam Petrochemical Co.'s Olefins 10 complex at Bandar Assaluyeh is nearing completion.  Jam's 1.32-million m.t./year ethylene plant is being delivered by Technip and Nargan (Tehran), and is more than 90% complete.  Construction on the downstream units is also more than 90% complete, NPC says. They will be designed to produce 300,000 m.t./year each of high-density polyethylene and polypropylene, as well as 443,000 m.t./year of ethylene glycol.

   Iran's petrochemical exports are rising rapidly, NPC says.  Exports will reach "at least $ 4 billion" in the Iranian year ending March 2007, says NPC president Asghar Ebrahimi Asl.  The country exported $ 2.3 billion of petrochemicals last year, including $ 1.9 billion of NPC's products.  Former NPC subsidiaries that have been privatized made up the balance, Ebrahimi Asl says.

GRAPHIC: Picture, Big expansion: Several more projects at Bander Assaluyeh.

LOAD-DATE: August 8, 2006

  

FOCUS - 18 of 65 DOCUMENTS

Copyright 2006 Reed Business Information Limited
All Rights Reserved
Chemical News & Intelligence

November 8, 2006 Wednesday

LENGTH: 192 words

HEADLINE: IRANPLAST: Jam studies second phase projects

BODY:

TEHRAN (ICIS news)--Jam Petrochemical, a subsidiary of Iran's National Petrochemical Co (NPC), plans to widen its product slate by building more downstream units in a second phase, a senior company official

said on Tuesday.

These include a 200,000 tonnes/year acrylonitrile butadiene styrene (ABS) unit, a 100,000 tonnes/year butene-1 unit, an 80,000 tonnes/year butanediol (BDO) unit, a 4,000 tonnes/year tetrahydrofuran (THF) unit.

"We are conducting feasibility studies, economic evaluation and entering into negotiations with potential licensors for technology and engineering," Hassan Beigi, the company's managing director, said on the sidelines of Iran Plast 2006.

The company will need 60,000 tonnes/year of acrylonitrile (ACN) feedstock and it is looking for a partner with technology to jointly build such a unit, he added. It could, in exchange, sell butadiene to the partner, he said.

Some Taiwanese and South Korean firms could be potential partners, he added.

Invitation-to-bid documents for the ABS project could be issued within three months, depending on the licence agreement, Beigi said.

Iran Plast 2006 started on Tuesday and ends on Saturday.



**LOAD-DATE:** November 16, 2006

  

# EXHIBIT 9

Ser. No. 10/833,735
FILE NO.: JDS – H.R.D, CORP.

## REVOCATION AND RESCISSION OF ASSIGNMENT
## AND INSTRUMENT OF SUBSEQUENT ASSIGNMENT

WHEREAS, WE, THE UNDERSIGNED, EBRAHIM BAGHERZADEH, AZIZ HASSAN, and ABBAS HASSAN, residing at *225 Fluor Daniel Dr. Apt. 14202 Sugarland, Texas 77479* 1127 Sugar Creek Boulevard, Sugarland, Texas, 77478, and 2 Wedgewood Court, Sugarland, Texas, 77478, respectively, have made an invention entitled "PREPARATION OF CATALYST AND USE FOR HIGH YIELD CONVERSION OF METHANE TO ETHYLENE," as set forth and described in patent application Serial No. 10/833,735, filed April 28, 2004 (the "Application"); and

WHEREAS, on or around April 27, 2004, we, the said inventors, EBRAHIM BAGHERZADEH, AZIZ HASSAN, and ABBAS HASSAN, executed for filing with the United States Patent Office (on April 28, 2004) certain assignment documents (the "Prior Assignment") purporting to assign certain interests in or to the Application and the invention disclosed and claimed therein to H.R.D. Corporation, a corporation organized and existing under the laws of Delaware, and having an office for the transaction of business at 14549 Minetta, Houston, Texas 77035 and to the National Petrochemical Company, Petrochemical Research & Technology Company, a division of National Petrochemical Company, both having an office for the transaction of business at 12 Sarv, South Shiraz, Mollasadra, 14358, Tehran, Iran (Islamic Republic of); and

WHEREAS, due to the operation and application of U.S. laws and regulations regarding transactions involving the Islamic Republic of Iran and persons and entities thereof and located therein, the Prior Assignment was and is as a matter of law and policy void, non-operative, invalid, ineffective, and without force *ab initio* as to National Petrochemical Company, Petrochemical Research & Technology Company; and

WHEREAS, H.R.D. Corporation, a corporation organized and existing under the laws of Delaware, and having an office for the transaction of business at 14549 Minetta, Houston, Texas 77035, is desirous of acquiring the whole right, title and interest in and to said application for Letters Patent, and any continuations, divisions, extensions, substitutions, reissues and reexaminations thereof;

## REVOCATION AND RESCISSION

NOW, THEREFORE, TO ALL WHOM IT MAY CONCERN, BE IT KNOWN, that WE, the said inventors, EBRAHIM BAGHERZADEH, AZIZ HASSAN, and ABBAS HASSAN, hereby REVOKE, DISCLAIM, AND RESCIND the Prior Assignment, and any and

-1-

ny02/493566

PATENT
REEL: 014960 FRAME: 0183

Ser. No. 10/833,735
FILE NO.: JDS – H.R.D. CORP.

all other earlier-made or given assignments relating to the Application and the invention disclosed and claimed therein;

## SUBSEQUENT ASSIGNMENT

AND FURTHER, for and in consideration of the sum of One Dollar ($1.00), lawful money of the United States, to us in hand paid by said H.R.D. CORPORATION, and other valuable considerations unto us moving from said H.R.D. CORPORATION, at or before the ensealing and delivery of these presents, the receipt and sufficiency of which are hereby acknowledged, we have SOLD, ASSIGNED, TRANSFERRED AND CONVEYED AND BY THESE PRESENTS DO SELL, ASSIGN, TRANSFER AND CONVEY, unto said H.R.D. CORPORATION, its successors and lawful assigns, the entire right, title and interest in and to the said invention "PREPARATION OF CATALYST AND USE FOR HIGH YIELD CONVERSION OF METHANE TO ETHYLENE" and any and all improvements thereon, and in and to said Application and any division, continuation, or continuation-in-part thereof, and in and to any Letters Patent of the United States that may be issued on any of said applications, and any reissues thereof, and in and to any and all applications for Letters Patent filed in foreign countries for said invention or improvements, and any and all Letters Patent which may be granted in foreign countries therefor, TO HAVE AND TO HOLD THE SAME to the full end of the term or terms for which any and all said Letters Patent may be granted;

AND WE, the said inventors, EBRAHIM BAGHERZADEH, AZIZ HASSAN, and ABBAS HASSAN, do hereby authorize and request the Commissioner of Patents and Trademarks to issue the said Letters Patent of the United States to said H.R.D. CORPORATION, as the assignee of the entire right, title and interest in and to the same, for the sole use and benefit of said H.R.D. CORPORATION, its successors and lawful assigns;

AND WE, the said the said inventors, EBRAHIM BAGHERZADEH, AZIZ HASSAN, and ABBAS HASSAN, for the considerations aforesaid, do hereby covenant and agree to and with said H.R.D. CORPORATION, its successors and lawful assigns, that we have the full power to revoke and rescind the Prior Assignment and to make the assignment evidenced by this instrument, and that the rights assigned hereby are not encumbered by any effective, valid, or in-force grant, license or right heretofore given, and that we, and our executors or administrators, shall and will do all lawful acts and things and make, execute and deliver without further compensation, any and all other instruments in writing, further applications, papers, affidavits, powers of attorney, assignments, and other documents that, in the opinion of counsel for said H.R.D. CORPORATION, its successors and assigns, may be required or necessary more effectively to secure to and vest in said H.R.D. CORPORATION, its successors and lawful assigns, the entire right, title and interest in and to said invention and improvements, applications, Letters Patent, rights, titles, benefits, privileges, and advantages hereby sold,

-2-

ny02/493566

Ser. No. 10/833,735
FILE NO.: JDS – H.R.D. CORP.

assigned, transferred and conveyed, and that each of us will sign any applications for reissue which may be desired by the owner of the patent or patents which may be issued for the said invention or improvements.

-3-

ny02/493566

PATENT
REEL: 014960 FRAME: 0185

Ser. No. 10/833,735

FILE NO.: JDS — H.R.D. CORP.

IN WITNESS WHEREOF, I, the said inventor, EBRAHIM BAGHERZADEH, have hereunto set my hand and seal.

By

EBRAHIM BAGHERZADEH

STATE OF )

:ss:

COUNTY OF )

BE IT KNOWN, that on this 4ᵗʰ day of *August*, 2004, before me personally came EBRAHIM BAGHERZADEH, to me known and known to me to be the person mentioned in and who executed the foregoing assignment, and he acknowledged to me that he executed the same as his free act and deed for the use and purposes therein mentioned. SUBSCRIBED AND SWORN before me, the undersigned authority, by on this 4ᵗʰ day of *August*, 2004.

Notary Public

AMIR ALI HASSAr
MY COMMISSION EXPIRES
May 09, 2005

-4-

ny02/493566

**PATENT**
**REEL: 014960 FRAME: 0186**

Ser. No. 10/833,735
FILE NO.: JDS – H.R.D. CORP.

IN WITNESS WHEREOF, I, the said AZIZ HASSAN, have hereunto set my hand and seal.

AZIZ HASSAN

STATE OF            )
                   :ss:
COUNTY OF           )

BE IT KNOWN, that on this _4th_ day of _August_, 2004, before me personally came AZIZ HASSAN, to me known and known to me to be the person mentioned in and who executed the foregoing assignment, and he acknowledged to me that he executed the same as his free act and deed for the use and purposes therein mentioned. SUBSCRIBED AND SWORN before me, the undersigned authority, by on this 4th day of _August_, 2004.

Notary Public

AMIR ALI HASSAN
MY COMMISSION EXPIRES
May 09, 2005

-5-

ny02/493566

Ser. No. 10/833,735
FILE NO.: JDS – H.R.D. CORP.

IN WITNESS WHEREOF, I, the said ABBAS HASSAN, have hereunto set my hand and seal.

_____
ABBAS HASSAN

STATE OF          )
                 :ss:
COUNTY OF       )

BE IT KNOWN, that on this 4th day of August , 2004, before me personally came ABBAS HASSAN, to me known and known to me to be the person mentioned in and who executed the foregoing assignment, and he acknowledged to me that he executed the same as his free act and deed for the use and purposes therein mentioned. SUBSCRIBED AND SWORN before me, the undersigned authority, by on this 4th day of August , 2004.

_____
Notary Public

AMIR ALI HASSAN
MY COMMISSION EXPIRES
May 09, 2005

-6-

ny02/493566