# EXHIBIT 10

**iP**Australia

*Data loaded on 18/Dec/2006 22:00*

## Standard Complete Application Details

| | |
|---|---|
| **Patent Application Type** | **Standard Complete** |
| Australian Application Number | 2004255149 |
| PCT Number | PCT/US2004/013098 |
| WIPO Number | WO2005/005042 |
| Applicant | HRD Corp.<br>National Petrochemical Company,<br>Petrochemical Research & Technology<br>Company |
| Inventor | Abbas, Hassan<br>Azziz, Hassan<br>Bagherzadeh, Ebrahim |
| Title | Perovskite-based catalyst, its<br>preparation and its use for conversion of<br>methane to ethylene |
| First IPC | *B01J 21/06* (2006.01) |
| Status | Filed |
| Filing Date | 28 April 2004 |
| Date of Patent | 28 April 2004 |
| National Phase Date | 23 November 2005 |
| Earliest Priority Date | 29 April 2003 |
| Australian OPI Date | 20 January 2005 |
| OPI notified in Journal | |
| PCT OPI Date | 20 January 2005 |
| Date Accepted | |
| Acceptance Advertised Date | |
| Under Opposition | No |
| Date Sealed | |
| In Force To Date | 28 April 2009 |
| Agent /<br>Address for Legal Service | A.P.T. Patent and Trade Mark Attorneys<br>383 Goodwood Road Westbourne Park<br>SA 5041 Australia |

Additionals/Divisionals

| | Application<br>Number | Status |
|---|---|---|

## Applicant Details

| **Applicant Name** | **Applicant Address** |
|---|---|
| HRD Corp. | P.O. Drawer 450267<br>Houston TX 77245<br>United States of America |
| National Petrochemical Company, | A division of National Petrochemical |

Petrochemical Research &
Technology Company

Company, 12 Sarv
South Shizaz, Mollasadra, Tehran
Iran 14358
Iran (Islamic Republic of)

## IPC Details

| Int Cl. | | | First Mark |
|---------|---|---|------------|
| **B01J** | **21** / **06** | (2006.01) | Y |
| **B01J** | **23** / **00** | (2006.01) | N |
| B01J | 35 / 00 | (2006.01) | N |
| B01J | 37 / 08 | (2006.01) | N |
| **C04B** | **35** / **634** | (2006.01) | N |
| **C07C** | **2** / **84** | (2006.01) | N |
| **C04B** | **35** / **636** | (2006.01) | N |
| **C01G** | **23** / **00** | (2006.01) | N |
| **B01J** | **37** / **00** | (2006.01) | N |
| B01J | 27 / 08 | (2006.01) | N |
| **B01J** | **23** / **02** | (2006.01) | N |
| **B01J** | **23** / **14** | (2006.01) | N |

## Examination Details

| | |
|---|---|
| IPER Demanded | Yes |
| IPER Received Date | 18 March 2006 |
| Direction Date | |
| Exam Request Filing Date | |
| Request Type | |
| Exam Request Fee Paid Date | |
| Deferment Date | |
| First Report Date | |
| Further Report Date | |
| Date Sent to Examination | |
| Reason Sent to Examination | |
| Examiner Exam Section | |
| Acceptance Postponed | N |
| Search Results Received Date | 24 November 2005 |
| Third Party Examination Request Date | |
| Re-examination Request Date | |

## Acceptance Details

Acceptance Date

Acceptance Advertised Date

Acceptance Type

Final Date for Acceptance

Amendments considered up to item #

Prior Art

## Sealing Details

| | |
|---|---|
| Deferment of Sealing | No |
| Sealing Date | |
| Sealed Advertised Date | |

## Status Details

Date Lapsed

Reason for Lapsing

Date Ceased

Reason for Ceasing

Lapsed Advertisement Date

Withdrawn Advertised Date

Refused Advertised Date

Ceased / Expired Advertised Date

## Priority Details

Earliest Priority Date                    29 April 2003

| Priority Date | Application No. | Country of Application | Filing Date |
|---|---|---|---|
| 29-APR-03 | 2,427,722 | Canada | 29-APR-03 |

## PCT Details

| | |
|---|---|
| PCT Number | PCT/US2004/013098 |
| WIPO Number | WO2005/005042 |
| PCT Filing Date | 28 April 2004 |
| Earliest Priority Date | 29 April 2003 |
| National Phase Date | 23 November 2005 |
| PCT Advertisement Withdrawn Date | Field not populated |
| PCT OPI Date | 20 January 2005 |

## Publication History

| Vol/Iss | Publication Date | Kind | Publication Action |
|---|---|---|---|
| 19/49 | 15 Dec 2005 | A1 | National Phase Entry |
| Reason: | | | |

## Continuation/Renewal Fee History

| | |
|---|---|
| Date Paid | Field not populated |
| Service Description | Field not populated |
| In Force To Date | 28 April 2009 |

## Details of Change of Name of Applicant, Section 104

**Record #**

New Name

Old Name

Change of Name of Applicant
Advertised Date

## Extension of Time, Section 223

**Record #**

Status of Extension

Extension Type

Date of Application

Application Advertised

Opposition Lodged

Opposition Decided

Opposition Decision

Date of Allowance

Allowance Advertised

First Extension Date

Extension Expired

## Voluntary Amendment Details, Section 104

**Record #**

Status

Type

Voluntary Amendment Request Date

Request Advertised Date

Opposition Lodged                    Field not populated

Opposition Decision                  Field not populated

Opposition Status                    Field not populated

S112 Requested

S112 Received

S112 Requested at Allowance

S112 Received at Allowance

Date of Allowance

Allowance Advertised

## Extension of Term

There is no data in the system for this process.

Granted / Published                  Field not populated

TGA Date                             Field not populated

Final Expiry Date                    Field not populated

Date of Lodgement of Application     Field not populated

Date Lodgement Advertised            Field not populated

Date of Acceptance                   Field not populated

Date Acceptance Advertised           Field not populated

Date of Lodgement of Opposition      Field not populated

Opposition Allowed                   Field not populated

Decision Date                        Field not populated

Date of Refusal                      Field not populated

Date Refusal Advertised              Field not populated

Date Application Withdrawn           Field not populated

Date Withdrawal Advertised           Field not populated

Date Extension Granted               Field not populated

Date Granting Advertised             Field not populated

Address for Legal Service            Field not populated

Extension Description                Field not populated

## Licence Details

**Record #**

Status

Licence Request Date

Licensee(s)

## Mortgage Details

Status
Mortgage Request Date
Mortgagee

## Associated Provisional Application Details

**Provisional Number**        **Application Title**            **Date Filed**

## Change of Ownership Details

**Assignment Before Grant, Section 113**
**Record #**
New Name
Old Name
S113 Request Date
Date of Registration
Date Advertised

**Assignment After Grant, Section 187, Reg 19.2**
**Record #**
New Name
Old Name
S187 Request Date
Date of Registration
Date Advertised

## Section 105 Amendment Details

There is no data in the system for this process.

| | |
|---|---|
| Court Order Date | Field not populated |
| Court Order Number | Field not populated |
| Court | Field not populated |

## Conversion Details

**Record #**
**Date Converted:**
**Converted from:**
Application Number
Status
Type
**Converted to:**
Application Number
Status
Type

## Restoration Details

There is no data in the system for this process.

| | |
|---|---|
| Status of Restoration | Field not populated |
| Date of Application | Field not populated |
| Date of Acknowledgment | Field not populated |
| Application Advertised | Field not populated |

| | |
|---|---|
| Opposition Lodged | Field not populated |
| Opposition Decided | Field not populated |
| Opposition Decision | Field not populated |
| Date of Fee Reminder | Field not populated |
| Date Restored | Field not populated |
| Restoration Notified | Field not populated |
| Restoration Advertised | Field not populated |
| Address for Legal Service | Field not populated |

# EXHIBIT 11



中华人民共和国国家知识产权局
STATE INTELLECTUAL PROPERTY OFFICE OF P.R.C

申请(专利)号：200480011706.2

专利检索

申请公开说明书 (30页)

| 申 请 (专利) 号： | 200480011706.2 | 申 请 日： | 2004.04.28 |
|---|---|---|---|
| 名 称： | 以钙钛矿为基础的催化剂、其制备方法以及其在甲烷转化到乙烯中的应用 | | |
| 公 开 (公告) 号： | CN1787877 | 公开(公告)日： | 2006.06.14 |
| 主 分 类 号： | B01J23/00(2006.01) I | 分案原申请号： | |
| 分 类 号： | B01J23/00(2006.01) I ; C04B35/465 (2006.01) I ; C07C2/84 (2006.01) I | | |
| 颁 证 日： | | 优 先 权： | 2003.4.29 CA 2,427,722 |
| 申请(专利权)人： | HRD公司;国家石化产品总公司;石化产品研究和技术公司 | | |
| 地 址： | 美国得克萨斯州 | | |
| 发 明 (设计)人： | H·阿巴斯;H·阿齐伊;E·巴盖伊德 | 国 际 申 请： | 2004-04-28 PCT/US2004/0130 |
| 国 际 公 布： | 2005-01-20 WO2005/005042 英 | 进入国家日期： | 2005.10.31 |
| 专利 代 理 机构： | 北京纪凯知识产权代理有限公司 | 代 理 人： | 程 伟 |

摘要

本发明涉及一种制备钙钛矿催化剂的方法，包括：形成含有碱土金属盐、粉状金属盐和粉状过渡金属氧化物的水性泥浆；
成该水性泥浆：将选自钡、钙或锶盐的粉状碱金属盐分散在水中；将粉状金属盐加入到水中；将为氧化钛的粉状过渡金属氧化
然后将聚合粘合剂加入到泥浆中以形成糊；干燥该糊以形成粉末；在与聚合粘合剂相称的预定的升高的温度上，加热粉末；对
行煅烧以形成钙钛矿催化剂。本发明还公开了如此方法形成的催化剂在甲烷氧化偶合方面的应用。

主权项

1. 一种制备钙钛矿催化剂的方法，包括： 形成含有碱土金属盐、粉状金属盐和粉状过渡金属氧化物的水性泥浆； 通过以
性泥浆： 将选自钡、钙或锶盐的粉状碱土金属盐分散在水中； 将粉状金属盐加入到水中； 将为氧化钛的粉状过渡金属氧化
聚合粘合剂加入到泥浆中以形成糊； 干燥该糊以形成粉末； 在与聚合粘合剂相称的预定的温度曲线下升高温度，加热粉末；
进行煅烧以形成钙钛矿催化剂。



主办单位：国家知识产权局 ｜ 网站管理：国家知识产权局办公室 ｜ 网站维护，知识产权出版社

版权所有，未经许可不得复制

URL:HTTP://WWW.SIPO.GOV.CN

COPYRIGHT(C) STATE INTELLECTUAL PROPERTY OFFICE OF P.R.C ALL RIGHTS RESERVED

# EXHIBIT 12

(Translation)

## STATE INTELLECTUAL PROPERTY OFFICE OF P.R.C.

Application (Patent) No. **200480011706.2**

Patent search

Public explanation of application (30 pages)

| Application (Patent) No.: | 200480011706.2 | Application Date: | 2004.04.28 |
|---|---|---|---|
| Name: | Perovskite-based catalyst, its preparation and application in the conversion from methane to ethylene | | |
| Public (Publication) No.: | CN1787877 | Public (Publication) Date: | 2006.06.14 |
| Major Classification No.: | B01J23/00(2006.01)I | Original Application Classification No.: | |
| Classification No.: | B01J23/00(2006.01)I; C04B35/465 (2006.01)I; C07C2/84 (2006.01)I | | |
| Date Certification Awarded: | | Right of Priority: | 2003.4.29 CA 2,427,722 |
| Applicant (Patent Holder): | HRD Company, National Petrochemical Product Company, Petrochemical Product Research and Technology Company | | |
| Address: | Texas, U.S.A. | | |
| Inventor (Designer): | H. Abbas; H. Azziz; E. Bagherzaden | International Application: | 2004-04-28 PCT/US2004/013098 |
| International Publication: | 2005-01-20 W02005/005042 England | Date of National Entry: | 2005.10.31 |
| Patent Agent : | Beijing Jeekai Intellectual Property Agency Ltd. | Agent: | Wei Chen |

# DECLARATION OF INTERPRETER/TRANSLATOR

I, Shiru C. Hong, say: I am a Certified Interpreter/Translator for the State of California and have been approved by the U.S. District Court for the Central District of California as a Contract Interpreter/Translator; I am familiar with the English and Chinese languages; I have translated the attached document identified as

Patent Application (No. 200480011706.2) as published by the State Intellectual Property Office of the People's Republic of China,

consisting of one page, from Chinese to English. The foregoing is a true and correct translation of said document.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on:  December 19, 2006 in Los Angeles, California

(Signature)
CA Certified Interpreter Number: 301046

# EXHIBIT 13

*Dow Confidential*

# EVALUATION AGREEMENT
(Dow Agreement No. 213642AA)

THIS AGREEMENT, is made by and between HRD Corporation, a Texas corporation having its principal office at 14549 Minetta, Houston, Texas 77035 USA ("HRD"), and THE DOW CHEMICAL COMPANY, a Delaware corporation having its principal office at 2030 Dow Center, Midland, Michigan 48674, USA ("Dow"). This agreement is effective as of the date ("Effective Date") upon which it is signed by the last Party to sign. Dow and HRD are referred to as the "Parties" and each of them is a "Party."

## ARTICLE 1 - REPRESENTATIONS

**1.1**    HRD represents and warrants each of the following:

**(A)**    HRD owns, and has the exclusive rights to develop and commercialize, certain catalysts and processes for the direct conversion of paraffinic hydrocarbons to alkenes and/or liquid hydrocarbons ("Technology"), and

**(B)**    One of the inventors of the Technology, Dr. Ebrahim Bagherzadeh, is an Iranian citizen and an employee of HRD, but he has resided in the United States under an H1-B visa (Control Number 20040422280003) since prior to the invention of the Technology; and he has no intention of returning to Iran, and he is not acting on behalf of or for the benefit of the Iranian government or any other Iranian entity, and

**(C)**    the Technology is entirely of United States origin, and

**(D)**    the Technology is not based (in whole or in any part) on any unpublished information obtained directly or indirectly from Iran, the Iranian government, or any Iranian entity (except for the information developed by Dr. Bagherzadeh after his arrival in the United States, as per (B) above), and

**(E)**    HRD does not have, nor will it have, any obligation to Iran, the Iranian government, or any other Iranian entity with respect to the Technology, including but not limited to any obligation to pay royalties or other compensation, or any obligation to assign to Iran or any Iranian entity any ownership of, or rights in, the Technology, with the sole exception of HRD's commitment to compensate Dr Bagherzadeh as an employee of HRD, and

**(F)**    HRD has filed one or more United States patent applications disclosing and claiming the Technology, and HRD intends to file additional United States patent applications on HRD's improvements to the Technology from time to time, and

**(G)**    HRD has the right to grant the option and other rights, and to undertake the obligations, as set forth in this Agreement, and

**(H)**    HRD has the right to disclose the Stage One Information to Dow pursuant to the terms of this Agreement, without any restriction or proscriptions imposed by any third party, and

**(I)**    HRD has not taken or authorized, and HRD will not take or authorize, any action that would (G.1) conflict with its obligations under this Agreement, or (G.2) in any way inhibit Dow's exclusive evaluation of the Technology, or Dow's rights under Article 3.

**1.2**    Dow represents and warrants that, if HRD's above representations are true, Dow has the right to undertake the obligations set forth in this Agreement.

## ARTICLE 2 - STAGED EVALUATION

**2.1**    **Stage One – Economic Viability:**  The Parties are interested in having Dow evaluate the Technology in a staged manner, strictly in accordance with the terms of this Agreement, as amended from time to time. This Agreement covers only the first stage ("Stage One") of the evaluation, in which Dow will make an initial assessment of the economic viability of the Technology using Dow-requested information to be provided by HRD.  In Stage One of Dow's evaluation, the Parties agree to limit the information provided to Dow strictly to that specific information identified in the attached Schedule A

*213642 AA*

*Dow Confidential*

("Stage One Information"), which Dow considers important to assess initially the economic viability of the Technology.

    2.2    **Stage One – Disclosure Protocol:** In order to facilitate Dow's compliance with this Agreement, and to avoid unnecessary contamination with Stage One Information of Dow personnel not involved in the Stage One evaluation, the Parties agree as follows:

(A)    All Stage One Information must be disclosed in writing and prominently marked as follows:
    "HRD-CONFIDENTIAL STAGE ONE INFORMATION:
    Disclosed to Dow under Dow Agreement No. 213642AA"

(B)    Stage One Information must be delivered by HRD <u>ONLY</u> directly to the one Dow representative ("Designated Representative") to be designated by Dow in writing, and not to any other Dow representative. The only exception to the foregoing restriction is where Dow elects to have one or more Dow representatives other than the Designated Representatives observe the operation of the Technology at Contractor's laboratory, in which case the information received still must be limited to that defined as Stage One Information.

(C)    *HRD must not provide to Dow any confidential information other than the Stage One Information, as defined.*

(D)    *With respect to any information that is provided to Dow under this Agreement by HRD that (D.1) is not within the definition of Stage One Information, and/or (D.2) is not provided in accordance with this disclosure protocol, Dow shall have no obligation to keep the same in confidence, or restrict Dow's use or disclosure of the same.*

    2.3    **Stage One – Supply of Information and Timing:** HRD will use its best efforts to provide to Dow's Representative all of the Stage One Information as soon as possible after the Effective Date. The Stage One evaluation is anticipated be conducted during a period ("Stage One Period") of no more than about 60 days after the Effective Date. The Parties understand that HRD may be required to run experiments to generate portions of the Stage One Information, so the Stage One Period may be extended by mutual agreement, if necessary for HRD to generate that information. Within 30 days after Dow has received the last of the Stage One Information, Dow will complete its Stage One evaluation.

    2.4    **Stage One – Data Validation:** The Parties agree that Dow (through the Dow Representative) may request that specific information concerning the experimental procedures (such as analytical techniques, sampling methodology, etc.) and experimental data used to generate the Stage One Information be provided to Dow by HRD's experimental contractor ("Contractor") so that Dow can assess the validity of the Stage One Information. HRD shall authorize the Contractor to provide such information directly to Dow.

    2.5    **Stage One – Termination:** In its sole discretion, Dow may terminate its evaluation of the Technology and the Stage One Period at any time prior to completion of the Stage One Period upon giving written notice to HRD. Such termination also terminated any rights Dow may have under Paragraph 3.1 to negotiate for further evaluation or commercialization of the Technology.

## ARTICLE 3 - FUTURE STAGES OF EVALUATION

    3.1    **Future Stages – Separate Agreement:** If Dow notifies HRD in writing that Dow desires to further evaluate the Technology, the Parties agree to negotiate in good faith and attempt to conclude, within 30 days after the Stage One Period ends, a mutually acceptable, separate written agreement to cover that further evaluation, which agreement will include a letter of intent regarding Dow's desire to purchase exclusive rights to the Technology.

    3.2    **Exclusivity of Evaluation:** During the Stage One Period plus the period of negotiation under Paragraph 3.1, HRD agrees that (a) HRD will not disclose or offer the Technology to anyone other than Dow, and (b) HRD will not participate in, or authorize, the evaluation of the Technology by anyone other than Dow. To be clear, this exclusivity does not preclude HRD retaining research-contractors (such as the Contractor) to further develop the Technology.

*Dow Confidential*

## ARTICLE 4 - INTELLECTUAL PROPERTY

**4.1    Inventions:** The Parties do not anticipate Dow's evaluation resulting in any inventions or improvements to the Technology.  Any inventions made by HRD or its Contractor in generating Stage One information shall be owned by HRD.

**4.2    No licenses:**  This Agreement does not grant to either Party any rights under the other Party's patents or technology, excepting only the right for Dow to evaluate the Technology as expressly stated herein.

## ARTICLE 5 - CONFIDENTIALITY

**5.1    Press Releases and Publicity:**  There must be no press release or other public announcement concerning the Parties' relationship under this Agreement, unless and until the Parties agree in writing on the contents and the timing of any press release or other public announcement.  Either Party may decline to allow such a press release or other public announcement.

**5.2    Confidentiality of Stage One Information:**  Unless HRD specifically authorizes in writing, Dow must:

(a)    not use Stage One Information, except for Dow's evaluation under this Agreement;

(b)    not make Stage One Information available to others, except as expressly authorized under Paragraph 5.4;

(c)    limit access to Stage One Information to persons requiring that access for Dow's evaluation under this Agreement;

(d)    deliver to HRD or destroy all of Dow's copies of Stage One Information (except for one archival copy for record purposes only), when requested by HRD; and

(g)    not file any patent, utility model, or design application based upon or disclosing any Stage One Information.

**5.3    Exclusions from Confidentiality:**  The obligations of Paragraph 5.2 do not apply to any portion of Stage One Information that Dow can prove:

(a)    was available to the public through no fault of Dow, or

(b)    Dow already possessed prior to receipt from HRD, or

(c)    Dow acquired from a third party without obligation of confidence, or

(d)    was independently developed by or for Dow (i.e., separate and apart from the evaluation under this Agreement).

Moreover, Dow may comply with a court order compelling production of Stage One Information, but Dow must give HRD reasonable prior notice and use reasonable efforts to obtain confidential protection for that information.  Detailed information is not excluded from the obligations of Paragraph 5.2 merely because that detailed information is embraced by more general information excluded under (a), (b), (c) or (d).  Information concerning combinations of items is not excluded unless the combination itself and its principles of operation fall within (a), (b), (c), or (d).  Furthermore, even if Stage One information is determined to fall within one of the above exclusions, Dow agrees that it will not identify that information as having been received from, or considered proprietary by, HRD.

**5.4    Permitted Disclosures:**  Notwithstanding Paragraph 5.2, Dow may disclose Stage One information to HRD's Contractor and (if approved by HRD) those Dow-consultants or Dow-contractors to whom Dow deems such disclosure reasonably appropriate for the Stage One evaluation under this Agreement, provided that such third party is first obligated to maintain that Stage One Information in confidence under terms no less restrictive than similar, Dow-confidential information being provided to that third party.

*213642AA*

*Dow Confidential*

**5.5** **Confidentiality Period:** The confidentiality and restricted use obligations under this Article expire 5 years after Dow's receipt of the information in question.

## ARTICLE 6 - TERM AND TERMINATION

**6.1** **Term of this Agreement:** This Agreement is effective on the Effective Date and, unless earlier terminated under this Article, continues in effect until the later of (a) 30 days after the end of the Stage One Period, or (b) the end of the Parties' negotiations under Paragraph 3.1.

**6.2** **Surviving Obligations:** Termination of this Agreement does not release either Party from (a) any obligations accrued prior to the effective date of that termination, or (b) either Party's rights or obligations under Articles 5 or 7, or under Paragraph 3.3.

## ARTICLE 7 - ASSIGNMENT

**7.1** **Certain Assignments Permitted without Prior Consent:** The rights and obligations inuring to Dow hereunder may be assigned, in whole or in part, by Dow to a wholly-owned affiliate of Dow, provided that such affiliate agrees to be bound by the corresponding obligations under this Agreement.

**7.2** **All Other Assignments Require Prior Consent:** Other than as expressly authorized under this Article, neither Party may assign this Agreement to any third party without the prior written consent of the other Party. Such consent will not be withheld unreasonably. Any other attempted assignment of this Agreement is void.

**7.3** **Effects of Assignment:** Any assignment of this Agreement does not release the assigning Party from any of its obligations (a) accrued prior to the effective date of such assignment, or (b) under Articles 3, 5 or 7.

## ARTICLE 8 - MISCELLANEOUS

**8.1** **Governing Law:** In construing and enforcing this Agreement, the Parties desire that the reviewing court or arbitrator(s) use the plain meaning of the Agreement. Only in the event that such meaning is not clear, should such court or arbitrator(s) refer to the laws of any jurisdiction to resolve any ambiguity, in which case the Parties select the laws of the State of Texas, United States of America (exclusive of such State's laws relating to the choice of a different jurisdiction's laws) to resolve such ambiguity.

**8.2** **Force Majeure:** Neither Party will be held responsible for any delay or failure in performance of this Agreement caused directly or indirectly by the following events beyond the reasonable control of that Party: natural disaster (e.g., earthquakes), fires, explosion, wars, civil disturbances, insurrections, governmental acts or acts authorized by the government, accidents, labor conflicts, shortage of materials, incapability of acquiring materials, equipment, or transportation.

**8.3** **Compliance with Laws:** Each Party must comply with all applicable laws relating to the import, export, or re-export of technology, products, and/or information into or out of the United States of America. This obligation survives any termination of this Agreement.

**8.4** **Notices:** Any notice to a Party under this Agreement must be in writing and must be delivered (or sent by facsimile), to that Party at the following address(es):

HRD:    HRD Corporation
        14549 Minetta, Houston, Texas 77035 USA
        Phone: 713-721-9131 Facsimile: 713-726-9885
        Attention: Aziz Hassan, Vice President

*Dow Confidential*

DOW:          The Dow Chemical Company
              2020 Dow Center, Room A260
              Midland, Michigan 48674 USA
              Phone: 989-636-4826  Facsimile: 989-638-9839
              Attention: Paula Ruhr

    **8.5**     **Entire Agreement:** This Agreement is the entire agreement of the parties on the subject matter. The only enforceable obligations and liabilities of the parties in relation to the subject matter are those that arise out of the provisions contained in this Agreement. All representations, communications and prior agreements in relation to the subject matter are merged in and superseded by this Agreement. In particular, as to the Parties' prior Non-Disclosure Agreement [Dow Agreement No. 213642], having an effective date of January 9, 2004, the Parties agree that such Non-Disclosure Agreement is void *ab initio*. This Agreement can not be modified except by a writing signed by each Party's authorized representative.

    **8.6**     **Evaluation Costs:** Each Party shall have full discretion over their own expenditures during Stage One evaluations and shall not seek compensation from the other Party.

**THE DOW CHEMICAL COMPANY**          **HRD CORPORATION**

By: _Richard W. Gilcott_              By: _____

Name: RICHARD W. GILCOTT              Name: HARRIS ALI HASSAN

Title: R&D DIRECTOR                   Title: President

Date: 11/2/04                         Date: 10/39/04

*Dow Confidential*

## SCHEDULE A – STAGE ONE INFORMATION

During Stage One, the intention is for Dow to receive only the following information concerning the Technology -- in essence treating the Technology as a "black box" for which Dow only is to receive the inputs and outputs of the black box and a few defined process parameters, so that Dow may make an initial assessment of the economic viability of the Technology.

"Stage One Information" means only the following information as disclosed by HRD (or Contractor) to Dow under this Agreement:

1.    **Inputs into the black box**
      Identity, quality, and quantity of each feed-gas stream (including detailed stream compositions),

2.    **Process Evaluation parameters**
      Catalytic-reactor temperature, pressure, and space velocity for each of the various feed-gas streams

3.    **Outputs from the black box**
      Identity, quality, and quantity of all output streams (including detailed stream compositions, conversions, product selectivities, and impurity levels)

4.    **Measurement procedures**
      Specifics of the data-collection and sample-collection procedures, and process- or analytical-measurements used by Contractor in generating the above inputs and outputs.

5.    **Previously Disclosed Information**
      That information identified as HRD-Confidential by HRD to Dow in HRD's letter dated August 23, 2004 from Aziz Hassan, HRD Vice President, to Dow's Sharon Cole, Technology Director.

*To be clear, the Parties agree that the term "Stage One Information" does NOT include any of the following information, nor any samples of the catalysts:*

*   *The identity of the catalyst(s) used in the Technology*
*   *The details of the processes used in the Technology (other than the specifics identified in item 2 above)*
*   *The details of the equipment used in the Technology*

213642 1714

# EXHIBIT 14

09/10/2004 17:59 FAX

## BAKER BOTTS LLP

THE WARNER
1299 PENNSYLVANIA AVE , NW
WASHINGTON, D.C.
20004-2400
202.639.7700
FAX 202 639.7890

AUSTIN
BAKU
DALLAS
HOUSTON
LONDON
MOSCOW
NEW YORK
RIYADH
WASHINGTON

September 10, 2004

BY HAND DELIVERY

Marcus Oil and Chemical
14549 Minetta
Houston, Texas 77035

Re:    Iranian Transactions Regulations

Gentlemen:

We have acted as counsel to Marcus Oil and Chemical Co. ("Marcus" or the "Company"), a division of HRD Corp. ("HRD"), in connection with its dealings with the U.S. Department of the Treasury Office of Foreign Assets Control ("OFAC") regarding the prosecution by Marcus of the U.S. patent application, Ser. No. 10/833,735, drawn to certain perovskite catalysts for use in synthesis of ethylene from methane, filed April 28, 2004, and designating Dr. Ebrahim Bagherzadeh, Mr. Abbas Hassan, and Mr. Aziz Hassan (the "Hassans") as joint inventors (the "U.S. Patent Application"). In respect of our representation of Marcus, you have requested our legal opinion with regard to certain questions of law, and this opinion letter is delivered to you pursuant to such request.

In connection with our rendering of the opinions set forth below, we have examined the following materials:

1. the Iranian Transactions Regulations, 31 C.F.R. Part 560 (the "ITR");

2. that letter dated July 10, 2003 from Marcus to OFAC concerning the importation of certain Iranian-origin technology and the testing and evaluation thereof and the OFAC response thereto dated January 23, 2004;

3. those letters dated February 11 and February 17, 2004 from Marcus to OFAC seeking information concerning the requirements for securing a license to permit the payment of royalties to an Iranian party and the OFAC response thereto dated May 18, 2004;

4. the U.S. Patent Application;

5. the pending patent application previously filed by Dr. Bagherzadeh in Canada and entitled "Preparation of Catalyst and Use For High Yield Conversion of Methane to Ethylene," Ser. No. 2,427,722, filed April 29, 2003 (the "Canadian Patent Application");

6. the H1-B visa obtained by Dr. Bagherzadeh dated March 21, 2004 (control number 20040422280003).

DC01:397322.4

09/10/2004 17:58 FAX          BAKER BOTTS LLP

**BAKER BOTTS** LLP

Marcus Oil and Chemical              - 2 -                     September 10, 2004

In deriving the opinions set forth below, we have assumed with your consent the following, based upon the representations of the Company, Messrs. Abbas and Aziz Hassan and Dr. Bagherzadeh regarding certain facts and circumstances, such representations not having been subject to our independent investigation as to accuracy or veracity:

1. that Dr. Bagherzadeh was the original, first, and true inventor of the subject matter of the Canadian Patent Application, and that any incremental subject matter not disclosed or claimed in the Canadian Patent Application but disclosed or claimed in the subsequent U.S. Patent Application was conceived and reduced to practice by Messrs. Hassans and Dr. Bagherzadeh in the course of certain joint efforts to optimize and further develop the technology claimed in the Canadian and U.S. Patent Applications;

2. that there is not currently and will not be any assignment directly or indirectly of patent or other intellectual property rights under the U.S. Patent Application to an individual or entity in Iran or to the Government of Iran;

3. that neither HRD nor Marcus has made or will make, directly or indirectly, any payment of royalties to any person or entity in Iran or to the Government of Iran;

4. that prior to his arrival in the U.S., Dr. Bagherzadeh severed his relationship with the Iran Polymer and Petrochemicals Institute and all other Iranian entities with which he was previously associated;

5. that Dr. Bagherzadeh resides in the United States currently, and that he has no intention of returning to Iran;

6. that Dr. Bagherzadeh is not acting on behalf or for the benefit of an entity in Iran or the Government of Iran.

As to other questions of fact material to our opinions, we have relied on various representations of the Company made by Messrs. Abbas and Aziz Hassan as to the Company's activities in respect of the importation and evaluation of the technology underlying the U.S. Patent Application without independent investigation of the accuracy or veracity thereof.

Based on the foregoing and subject to the limitations set forth below, we are of the opinion that:

1. The U.S. Patent Application was properly, and necessarily, made in the names of Dr. Ebrahim Bagherzadeh and Messrs. Abbas and Aziz Hassan, who jointly made the invention as disclosed and claimed in the U.S. Patent Application.

DC01:397122.4

08/10/2004 17:59 FAX                    BAKER BOTTS LLP                          @003/005

**BAKER BOTTS** LLP

Marcus Oil and Chemical                    - 3 -                          September 10, 2004

    2.  The naming of Dr. Ebrahim Bagherzadeh on the U.S. Patent Application does not require a specific license from OFAC because (a) Dr. Bagherzadeh was a U.S. person, as that term is defined under section 560.314 of the ITR, at the time that the U.S. Patent Application was filed; and (b) the naming of Dr. Bagherzadeh does not constitute the exportation of a service to Iran or the Government of Iran within the meaning of section 560.204 of the ITR.

    In addition to the qualifications, assumptions and limitations set forth above, we do not express herein any opinion as to whether the U.S. Patent Application or the Canadian Patent Application will be allowed and/or will issue as patents, what the scope of the claims of such issued patent would be, whether the claims as currently pending in such Applications are patentable over prior art, or whether some or all of the claims of any issued patent would be subject to a successful challenge or defense based upon an allegation that such patent or its claims were: (a) invalid; (b) not applicable to particular accused technology; (c) subject to ownership rights of another; or (d) unenforceable due to inequitable conduct in prosecution, patent misuse, or other equitable or legal doctrine.

    The opinions expressed in this letter are limited to the matters expressly set forth, and are rendered to the Company for its exclusive benefit and may not be relied upon or described or quoted from by any other persons without our prior written consent. No other opinions are implied or should be inferred beyond the matters expressly stated. The opinions herein are rendered as of the date hereof, and we disclaim any obligation to update them.

                  Best Regards

                  *Baker Botts LLP*

                  BAKER BOTTS L.L.P.

DC01:397122.4

# EXHIBIT 15

CIPO - Patent - 2427722



Canadian Intellectual Property Office    Office de la propriété intellectuelle du Canada

Canada

| Français | Contact Us | Help | Search | Canada Site |
| Strategis | Site Map | What's New | About Us | Registration |

strategis.gc.ca

CIPO    OPIC
CIPO Home



Canadian Intellectual Property Office

# Canadian Patents Database

(12) **Patent Application:**    (11) **CA 2427722**

(54) PREPARATION OF CATALYST AND USE FOR HIGH YIELD CONVERSION OF METHANE TO ETHYLENE

(54) PREPARATION D'UN CATALYSEUR ET SON UTILISATION POUR LA CONVERSION A HAUT RENDEMENT DE METHANE EN ETHYLEN

Representative Drawing:



View or Download Images

View Administrative Status

---

ABSTRACT:

A perovskite catalyst is prepared using a ceramic sol-sol methodology comprising preparing slurry in water of an alkaline earth metal salt, a powdered metal salt and a powdered transition metal oxide, adding a polymeric binder to form a paste, drying and comminuting the paste into a powder and heating the powder with a temperature profile to calcination temperatures. Preferably the slurry is formed of titanium oxide with barium carbonate and tin chloride in deionized water, and more specifically by a mixture according to Ba $(1-0.05x)$ + $TiO_2$ + $SnCl_2$ $(0.05x)$ where x is in moles. The perovskite catalyst is preferably used in a process for oxidative coupling of methane. Catalyst performance is enhanced through the addition of

halides to the feed gas in the reaction.

CLAIMS: Show all claims

\*\*\* Note: Data on abstracts and claims is shown in the official language in which it was submitted.

| | | |
|---|---|---|
| (72) Inventors (Country): | **BAGHERZADEH, EBRAHIM   (Iran)** | |
| (73) Owners (Country): | **NATIONAL PETROCHEMICAL COMPANY, PETROCHEMICAL RESEARCH & TECHNOLOGY COMPANY   (Iran)** | |
| (71) Applicants (Country): | **NATIONAL PETROCHEMICAL COMPANY, PETROCHEMICAL RESEARCH & TECHNOLOGY   (Iran)** | |
| (74) Agent: | **GOWLING LAFLEUR HENDERSON LLP** | |
| (45) Issued: | | |
| (22) Filed: | **Apr. 29, 2003** | |
| (41) Open to Public Inspection: | **Oct. 29, 2004** | |
| Examination requested: | **Apr. 29, 2003** | |
| (51) International Class (IPC): | **B01J 37/08 (2006.01)** | |
| | **B01J 37/04 (2006.01)** | |
| | **B01J 37/00 (2006.01)** | |
| | **B01J 23/14 (2006.01)** | |
| | **B01J 23/02 (2006.01)** | |
| | **B01J 23/00 (2006.01)** | |
| | **C07C 2/84 (2006.01)** | |
| | **C04B 35/636 (2006.01)** | |
| | **C04B 35/634 (2006.01)** | |
| | **C01G 23/00 (2006.01)** | |
| | **B01J 21/06 (2006.01)** | |
| | **B01J 6/00 (2006.01)** | |
| | **B01J 27/08 (2006.01)** | |
| | **B01J 35/00 (2006.01)** | |
| Patent Cooperation Treaty (PCT): | **No** | |
| (30) Application priority data: | **None** | |
| Availability of licence: | **N/A** | |
| Language of filing: | **English** | |

View or Download Images :

CIPO - Patent - 2427722                                                                  Page 3 of 3

- ◉ Cover Page Image
- ○ Abstract Image
- ○ Claims Image
- ○ Disclosures Image
- ○ Drawings Image
- ○ Representative Drawing Image

| View the Image |
| Download in Adobe PDF |

---

Last Updated: 2006-12-08                    ▲                          Important Notices

# EXHIBIT 16

 

Canadian Intellectual    Office de la propriété
Property Office          intellectuelle du Canada          Canada

Français      Contact Us      Help          Search        Canada Site
Strategis     Site Map        What's New     About Us      Registration

strategis.gc.ca

CIPO    OPIC
CIPO Home

Canadian Intellectual Property Office

# Canadian Patents Database

**Patent Document Number 2427722 :**
PREPARATION OF CATALYST AND USE FOR HIGH YIELD CONVERSION OF METHANE
TO ETHYLENE

PREPARATION D'UN CATALYSEUR ET SON UTILISATION POUR LA CONVERSION A
HAUT RENDEMENT DE METHANE EN ETHYLEN

## CLAIMS:

THE EMBODIMENTS OF THE INVENTION IN WHICH AN
EXCLUSIVE PROPERTY OR PRIVILEGE IS CLAIMED ARE DEFINED AS
FOLLOWS:

1. A method of producing a perovskite catalyst comprising: forming a slurry in water of
an alkaline earth metal salt, a powdered metal salt and a powdered transition metal
oxide, and adding a polymeric binder to the slurry to form a paste; drying the paste for
forming a powder; heating the powder at increasing temperatures at a predetermined
profile commensurate with the polymeric binder; and calcining the heated powder to
form the perovskite catalyst.

2. The method of claim 1 wherein the slurry is formed by a mixture according to Ba (1-
0.05x) + TiO2 + SnCl2(0.05x) where x is in moles.

3. The method of claim 1 or 2 further comprising sizing the catalyst for a catalytic
reactor.

4. The method of claim 1, 2 or 3 wherein the slurry is formed by: dispersing a powdered
alkaline earth metal salt in the water, adding a powdered metal salt to the water, and
adding a powdered transition metal oxide to the water.

5. The method of any one of claims 1 to 4 wherein the polymeric binder is selected
from the group of polymer binders including vinyl acetate dibuthyl acrylate and methyl
hydroxyl ethyl cellulose.

6. The method of any one of claims 1 to 5 wherein the metal oxide is titanium oxide and
the metal salts are barium and tin.

7. The method of any one of claims 1 to 6 wherein the temperature of the powder is heated by raising the temperature in temperature profile comprising a series of successive ramping and holding stages up to the calcination temperature.

8. The method of claim 7 wherein the temperature is increased to the final calcination temperature at an increasing rates ranging from about to 400 °C per hour.

9. The method of claim 7 further comprising: ramping the temperature from ambient to about 200 °C for about1/4 hour and holding for a hold period; ramping the temperature to about 400 °C over about a further 1/4 hour and holding for a hold period; ramping the temperature to about 600 °C over about a further 1/4 hour and holding for a hold period; ramping the temperature to the final calcination temperature over about a further1/4 hour and holding for over about 8 hours..

10. The method of claim 9 wherein each hold period is about 1/4 hour.

11. The method of any one of claims 7 to 10 wherein the calcination temperature is between about 700 to 1000 °C.

12. The method of claim 11 wherein the calcinction temperature is held for between about 8 - 12 hours.

13. The method of claim 12 wherein the slurry is formed by a mixture according to Ba (1-0.05x) + TiO + SnCl2(0.05x) where x is in moles.

14. The method of claim 7 further comprising: tamping the temperature from ambient to about 100 °C for about 1/4 hour and holding for about a further1/44 hour; tamping the temperature to about 200 °C over about a further 1/4 hour and holding the temperature for about a further 1/4 hour; tamping the temperature to the calcination temperature over about a further 1/4 hour; holding the temperature at the calcination temperature for over about 8 hours.

15. The method of claim 14 wherein the calcination temperature is between about 800 to 1000 °C.

16. The method of claim 14 wherein the calcination temperature is held for between about 8 - 12 hours.

17. The method of claim 16 wherein the slurry is formed by a mixture according to Ba (1-0.05x) + TiO2 - SnCl2(0.05x) where x is in moles.

18. A method of oxidative coupling of methane for the formation of heavier hydrocarbons comprising: producing a perovskite catalyst comprising forming a slurry in water of an alkaline earth metal salt, a powdered metal salt and a powdered transition metal oxide, adding a polymeric binder to the slurry to form a paste; drying the paste for forming a powder; heating the powder at increasing temperatures at a predetermined profile commensurate with the polymeric binder; and calcining the heated powder; and contacting a feed gas stream containing methane and oxygen in an oxidative coupling reactor under oxidative coupling conditions in the presence of the perovskite catalyst.

19. The method of claim 18 further comprising adding chloride into the feed gas stream.

20. The method of claim 18 wherein the chloride is in the gas phase as methane or ethane chloride.

Last Updated: 2006-12-08                    ▲                    Important Notices

# EXHIBIT 17





**IN THE UNITED STATES PATENT AND
TRADEMARK OFFICE**

5  Applicant: BAGHERZADEH, EBRAHIM. et al          Atty. Docket No: BSN10
   Serial No: 10/833,735                          Examiner: TIMOTHY C. VANOY
   Filed: 28 April 2004                           Group Art Unit: 1754

   For: PEROVSKITE-BASED CATALYST, ITS PREPARATION AND ITS USE FOR
10    CONVERSION OF METHANE TO ETHYLENE


   MAIL STOP: AMENDMENT
   Commissioner for Patents
15 P.O. Box 1450
   Alexandria VA 22313-1450



20  **CERTIFICATE OF MAILING (First Class Mail) or TRANSMISSION UNDER 37 CFR
    1.8**

   I hereby certify that this correspondence is being deposited with the United States Postal
   Service with sufficient postage as first class mail in an envelope addressed to Mail Stop:
25 Amendment, Commissioner for Patents, P.O. Box 1450, Alexandria VA 22313-1450 or
   being facsimile transmitted to 1-571-273-8300, to the attention of Examiner Timothy C.
   Vanoy, Group Art Unit 1754, of the U.S. Patent and Trademark Office on the date shown
   below

30 on _____11/17/06_____

35 THOMAS L. ADAMS
   Reg. No. 27,300


40
   _____

        Re: Office Paper No./Mail Date: 20060711, mailed 11/09/2006

           **AMENDMENT UNDER 37 C.F.R. §1.111**



   U.S. S.N. 10/833735    112006
   BSN10

                                                                            1

## INTRODUCTORY COMMENTS and PETITION FOR EXTENSION OF TIME

Sir:

5       Applicant herewith petitions the Commissioner for Patents to extend the time for response to the Office Paper mailed 19 July 2006, to which a reply was due by 19 October 2006, for an additional one (1) month to 19 November 2006. Because 19 November 2006 is a Sunday, the response is due the next business day, 20 November 2006. Submitted herewith is a PTO Form 2036 (Credit Card Payment Form) to charge

10      the payment of the $60.00 fee (small entity) for this extension to a credit card.

IN THE CLAIMS

CLAIMS

5   What is claimed is:


1. (Original)  A method of producing a perovskite catalyst comprising:

   forming an aqueous slurry comprising an alkaline earth metal salt, a
powdered metal salt and a powdered transition metal oxide; and

10      adding a polymeric binder to the slurry to form a paste;

   drying the paste for forming a powder;

   heating the powder at increasing temperatures at a predetermined
profile commensurate with the polymeric binder; and

   calcining the heated powder to form the perovskite catalyst.

15
2. (Original)  The method of claim 1, wherein the aqueous slurry is formed by:

   dispersing a powdered alkaline earth metal salt in water,

   adding the powdered metal salt to the water; and

   adding the powdered transition metal oxide to the water.

20
3. (Original)  The method of claim 2 wherein the alkaline earth metal salt is
selected from the group consisting of barium, calcium and strontium salts.


4. (Original)  The method of claim 2 wherein the metal oxide is titanium oxide.

25
5. (Original)  The method of claim 3,  wherein the slurry comprises a mixture
including Ba $(0.5x -1x)$ + $TiO_2$, wherein x is in moles.


6. (Original)  The method of claim 3, wherein the slurry comprises a mixture
30  including Ba $(0.5x -1x)$ + $TiO_2$ and either $Ca_x$ or $Sr_x$, wherein x is in moles.


U.S. S.N. 10/833735     112006
BSN10

3

7. (Original)  The method of claim 5, wherein the slurry is formed by a mixture according to Ba (0.5-0.95x) + $TiO_2$ + R(0.05 – 0.5x),  wherein x is in moles, and wherein R is selected from the group consisting of $BaCl_2$,  LiCl,  $MgCl_2$,  NaCl, and $SnCl_2$.

5

8. (Original)  The method of claim 7, wherein the slurry comprises a mixture including Ba (0.5x –0.95x) + $TiO_2$+ $SnCl_2$(0.05), wherein x is in moles.

9. (Original)  The method of claim 8, wherein the slurry is formed by a mixture
10   according to Ba (0.95x) + $TiO_2$ + $SnCl_2$(0.05x), wherein x is in moles.

10. (Original)  The method of claim 3, wherein the polymeric binder is selected from the group of polymer binders consisting of vinyl acetate dibutyl acrylate and methyl hydroxyl ethyl cellulose.

15

11. (Original)  The method of claim 10, further comprising sizing the catalyst to a size suitable for a catalytic reactor.

12. (Original)  The method of claim 11, wherein the powder is heated by raising
20   the temperature of the powder in a temperature profile comprising a series of successive ramping and holding stages up to the calcining temperature.

13. (Original) The method of claim 12, wherein the temperature is raised to the calcining temperature at an increasing rate ranging from about 200°  to about 400
25   °C per hour.

14. (Original) The method of claim 12, wherein the temperature profile further comprises:
        ramping the temperature from ambient to about 200 °C for about ¼
30   hour and holding for a hold period;

U.S. S.N. 10/833735       112006
BSN10

4

ramping the temperature to about 400 °C over about a further ¼ hour and holding for a hold period;

ramping the temperature to about 600 °C over about a further ¼ hour and holding for a hold period;

5    ramping the temperature to the calcination temperature over about a further ¼ hour and holding for ranging from about 8 hours to about 24 hours.

15. (Original) The method of claim 14, wherein each hold period ranges from about ¼ hour to about 1 hour.

10

16. (Original) The method of claim 15, wherein the hold period is about ¼ hour

17. (Original) The method of claim 14, wherein the calcining temperature is between about 700°C to about 1000 °C.

15

18. (Original) The method of claim 17, wherein the calcining temperature is held for between about 8 hours to about 12 hours.

19. (Original) The method of claim 12, further comprising:

20    ramping the temperature from ambient to about 100 °C for about ¼ hour and holding for about a further ¼ hour;

ramping the temperature to about 200 °C over about a further ¼ hour and holding the temperature for about a further ¼ hour;

ramping the temperature to the calcining temperature over about

25    a further ¼ hour;  and

holding the temperature at the calcining temperature for over about 8 hours.

20. (Original) The method of claim 19, wherein the calcining temperature is

30    between about 800° C to about 1000 °C.

21. (Original) The method of claim 20, wherein the calcining temperature is held for between about 8 hours to about 12 hours.

5      22-27. (Cancelled)

28. (Currently Amended) A composition produced by a method comprising the steps of:

forming an aqueous slurry comprising an alkaline earth metal salt, a 10  powdered metal salt and a powdered transition metal oxide; and

adding a polymeric binder to the slurry to form a paste;

drying the paste for forming a powder;

heating the powder at increasing temperatures at a predetermined profile commensurate with the polymeric binder;

15      calcining the heated powder to form the composition, and

sizing the composition to a size suitable for a catalytic reactor, wherein the powder is heated by raising the temperature of the powder in a temperature profile comprising a series of successive ramping and holding stages up to the calcining temperature, and wherein the temperature is raised to the calcining 20  temperature at an increasing rate ranging from about 200° to about 400 °C per hour[[.]] and

wherein the alkaline earth metal salt is selected from the group consisting of barium, calcium and strontium salts, wherein the metal oxide is titanium oxide, and wherein the slurry comprises a mixture including $Ba(0.5x-0.95x) + TiO_2$ and 25  either $Ca_x$ or $Sr_x$, wherein x is in moles, and wherein R is selected from the group consisting of $BaCl_2$, LiCl, $MgCl_2$, NaCl, and $SnCl_2$.

29-31. (Cancelled)

30    32. (Currently Amended)   The composition of claim 28 [[31]], wherein the slurry

comprises a mixture including Ba (0.5x –0.95x) + $TiO_2$+ $SnCl_2$(0.05x), wherein x is in moles.

33.  (Original)  The composition of claim 32, wherein the slurry is formed by a
5   mixture according to Ba (0.95x) + $TiO_2$ + $SnCl_2$(0.05x), wherein x is in moles.

34. (Original) The composition of claim 28, wherein the polymeric binder is selected from the group of polymer binders consisting of vinyl acetate dibutyl acrylate and methyl hydroxyl ethyl cellulose.

10

35.  (Original)  The composition of claim 34, wherein the temperature profile further comprises:

ramping the temperature from ambient to about 200 °C for about ¼ hour and holding for a hold period;

15          ramping the temperature to about 400 °C over about a further ¼ hour and holding for a hold period;

ramping the temperature to about 600 °C over about a further ¼ hour and holding for a hold period;

ramping the temperature to the calcination temperature over about a
20   further ¼ hour and holding for ranging from about 8 hours to about 24 hours.

36. (Original)  The composition of claim 35, wherein each hold period is about ¼ hour.

25   37. (Original)  The composition of claim 36, wherein the calcining temperature is between about 700ºC to about 1000 °C., and  wherein the calcining temperature is held for between about 8 hours to about 12 hours.

**REMARKS**

    The comments of the Examiner as set forth in the Office Paper mailed 19 July 2006 have been carefully studied and reviewed.

5

    Claims 1-37 are pending in the application.

    Claims 1-21 have been allowed.

    Claims 22-27 have been withdrawn from consideration.

    Claims 28-37 have been rejected.

10    Claims 1-37 have been subjected to a restriction requirement.

**Election/Restrictions**

    Claims 22-27 are hereby cancelled without prejudice, as being drawn to a nonelected invention.

15

**Priority**

    A certified copy of the Canadian application is attached hereto.

**Oath/Declaration**

20    A new oath, signed and dated by all the inventors, and Mr. Aziz Hassan in particular, identifying this application by application number and filing date is attached hereto.

**Claim Rejections- 35 U.S.C. §112**

25    Claims 28-37 were rejected under 35 U.S.C. §112, second paragraph as being indefinite for failing to particularly point out and distinctly claim the subject matter which applicant regards as the invention, because it is alleged that the claims do not particularly point out and distinctly set forth the composition that is being claimed.

    Claim 28 has been amended to further define the invention, incorporating

30 language from Claims 29 through 31. Claims 29 -31 have been cancelled without prejudice to avoid being duplicative. Claim 32 has been amended so as not to depend from a cancelled claim.

    Applicant submits that the amended independent claim is definite, and defines patentable subject matter. Because the independent claim is definite, therefore the

U.S. S.N. 10/833735    112006
BSN10

8

claims dependent thereon are definite, and the rejection of all these claims under 35 U.S.C. §112, second paragraph must therefore be withdrawn.

## Claim Rejections- 35 U.S.C. §102

5   ## Claims 28, 29, 31, 34, 36-37

Claims 28,29, 31, 34, 36 and 37 were rejected under 35 U.S.C. §102(b) as being anticipated by the Yamamura et al. reference, which at p. 270 allegedly describes a $BaTiO_3$ composition where some of the Ti may be substituted with Mg.

10   Applicant respectfully traverses the rejections of these claims. In order to be a proper reference under 35 U.S.C. §102(b), a reference must teach each and every aspect of the claimed invention either expressly or impliedly, and any feature not directly taught must be inherently present. MPEP §706.02.

15   The Yamamura et al. reference fails to teach a composition containing either tin (Sn) or strontium (Sr), as in the claimed composition. The reference also explicitly states that magnesium (Mg) is substituted for the $TiO_3$ in the composition.

Thus, the Yamamura et al. reference fails to be a proper reference under 35 20   U.S.C. §102(b), and therefore the rejection of Claims 28, 29, 31 and 34-37 must respectfully be withdrawn.

### Claims 28, 34, 35 and 36-37

Claims 28, 34, 35 and 36-37 were rejected under 35 U.S.C. §102(b) as being 25   anticipated by the Golpasha et al. reference, which at Table 1 allegedly describes a $CaTiO_3$ composition where some of the Ca may be substituted with elements such as Ti, Ca, Na, Li and Mg.

Applicant traverses these rejections for the same reasoning as the prior 35 30   U.S.C. §102(b) rejections, because the Golpasha et al. reference fails to teach a composition including either tin (Sn) or strontium (Sr), as in the claimed composition. All the compositions listed in the cited Table include elements which are not part of the

claimed composition; these CaTiO₃ compositions all contain both magnesium (Mg) and silicon (Si); and sodium (Na) or lithium (Li) can be added as additional components.

Thus, the Golpasha et al. reference fails to be a proper reference under 35
5   U.S.C. §102(b), and therefore the rejection of Claims 28 and 34-37 must respectfully be withdrawn.

**Claims 28 – 37**

Claims 28-37 were rejected under 35 U.S.C. §102(b) as being anticipated by the
10  Shirakawa patent application (U.S. Pat. App. Pub. No. 2003/0044347), in which Claim 12 allegedly describes a barium titanate composition that may be substituted with elements such as Sn, Ca and Mg.

Applicant traverses these rejections for the same reasoning as the prior 35
15  U.S.C. §102(b) rejections. All of the Examples cited in the reference are barium titanate compositions produced under different reaction conditions, such as different temperatures (Examples 1-6); different pH's; with or without tetramethylammonium hydroxide ("TMAH", defined in ¶67); and with varying amounts of carbonate. The mere listing of elements which can be substituted is merely a laundry list. Even if the
20  additional element were present in the compositions as alleged by the Examiner, the reference also explicitly limits that element to be in an amount of less than about 5 mol % on the basis of the entirety of the BaTiO₃ (see ¶36).

The Shirakawa et al. reference fails to be a proper reference under 35 U.S.C.
25  §102(b), and therefore Applicants respectfully submit that the rejection of Claims 28-37 must be withdrawn.

**Conclusion**

Applicant thanks the Examiner for his thoughtful review of this application, and
30  respectfully requests the Examiner review the pending Claims and to find that they define patentable subject matter. Thus, it is respectfully requested that the present pending Claims be allowed.

U.S. S.N. 10/833735    112006
BSN10

10

In the event that this response does not place the application in condition for allowance, the Examiner is respectfully requested to telephone the undersigned in order that an attempt can be made to place the application in condition for allowance as expeditiously as possible.

5

Respectfully submitted,

10

THOMAS L. ADAMS
Attorney for Applicant
Reg. No. 27,300

DATED: November 17, 2006

15

Thomas L. Adams
Attorney-At-Law
120 Eagle Rock Avenue
P.O. Box 340
20    East Hanover, New Jersey 07936
Tel:(973)-463-0100
Fax:(973)-463-0150

25

30

BSN10 AMD1 112006

U.S. S.N. 10/833735    112006
BSN10

11