# EXHIBIT 24



About BIS | News | Policies | Licensing | Enforcement | Seminars & Training | Int'l Programs
e Programs

## EXPORTER RESOURCES

## BIS PUBLICATIONS

December 19, 2006

## IN THE NEWS

Search

What's New

Export Control Basics

FAQs on Export Licensing

Guidance on Reexports

Lists To Check

Advisory Opinions

On-Line Submissions

Report Suspected Violations

Reading Room

Email Notification Services
Web Site Changes|Seminars

Resource Links

ExpectMore.gov NEW


## EXPORT GUIDELINES

Pautas sobre el control de exportacion







Assistant Secretary Darryl Jackson, Acting Under Secretary Foulon, Secretary Christopher Padilla speak at the BIS Update. *Highli*

**Simplified Network Application Process Redesign (SNAP-R)**
SNAPR includes enhanced security, the ability to attach supporting documentation electronically, user access rights, and the ability for BIS Licensing Officers to view work items and supporting documents electronically.
*Access SNAP-R*
*SNAP-R User Manual*

December 14, 2006
Remarks of Assistant Secretary Chris Padilla to the Washington International Trade Association
*Speech*

December 6, 2006
Address of Assistant Secretary Chris Padilla to the 11th Session of the Conference of States Parties to the Chemical Weapons Convention
*Speech*

December 6, 2006
BIS publishes final rule in the Federal Register on the Addition of "Montenegro" and "Serbia" as Separate Countries in the EAR Based on U.S. Recognition of Montenegro as a

**Export Administration Regulations**

**Go Directly to Commerce Control List**



**Exporter User Manual**



**Don't Let This Happen to You!**



Sovereign State
_HTML_ | _PDF_

**More Stories...**

# OTHER ITEMS OF INTEREST

Statement by U.S. Commerce Secretary
Gutierrez on Luxury Goods Ban to North
Korea

Implementation of United Nations
Security Council Resolution 1718
(UNSCR 1718)

U.S.-India High Technology Cooperation

Hurricane Contracting Information
Center

Defense Priorities and Allocation System
Assistance for Hurricane Victims



FOIA | Disclaimer | Privacy Policy Statement |
Information Quality
Department of Commerce | BIS Jobs | Contact Us

**Major Cases**



**Introduction to the
Commerce Department's
Export Controls**



**How to Request an Export
Control Classification
Number (ECCN)**



**Guidance on the Commerce
Department's Reexport
Controls**



**Bureau of Industry and
Security Brochure**



**Licensing FAQ**



| About BIS |
| News |
| Policies And Regulations |
| Licensing |
| Compliance And Enforcement |
| About Export Enforcement |
| Lists To Check |
| Reporting Possible Violations |
| Enforcement Hotline 1-800-424-2980 |
| Business Executives Enforcement Team |
| Antiboycott Compliance |
| Boycott Request Reporting Forms |
| Export Management Systems |
| Seminars And Training |
| International Programs |
| Defense Industrial Base Programs |

Home >**Compliance And Enforcement** >Enforcement

# The Export Enforcement Program

The Bureau of Industry and Security (BIS) is responsible for the regulation of exports for national security, foreign policy, and nonproliferation reasons and the enforcement of those regulations. BIS's Special Agents for Export Enforcement carryout these responsibilities. This page provides links to information on BIS's enforcement activities.

- A summary of the BIS Enforcement program

- Know Your Customer Guidance
- "Red Flags" to Export Transactions
- Freight Forwardar Guidance
- How to Recognize and Report Possible Violations
- Don't Let This Happen To You! [MS Word | PDF]
- Selected Export Enforcement Case Summaries
- Penalty Guidance for Settlement of Enforcement Cases
- How Do I Avoid Dealing with Unauthorized Parties

- Denied Persons List
- Unverified List

- Business Executive Enforcement Team (BEET) (and the schedule of Town Hall Meetings)
- Fastener Quality Act Compliance
- Antiboycott Compliance

- Automated Export System Option 4
- Enforcement Case Review Board FAQ

### Related Links

- Recognizing Violations
- Red Flags
- Reporting Violations
- Know Your Customer
- Don't Let This Happen To You! [MS Word | PDF]
- Enforcement Program
- BEET Info

## Note:

If you suspect that questionable, unauthorized, or illegal activities may have taken place, or that someone is asking you to participate in such activities, you should contact BIS's local Export Enforcement field offices, call its headquarters in Washington, DC at (202) 482-1208, call its 24 hour Hot Line (800) 424-2980, or use this Web site to report the suspected activity *(The information you provide will be handled confidentially and to ensure your confidentiality you will not receive an e-mail response to your Tip/Lead).*

Case 1:05-cv-00023-JJF    Document 73-5    Filed 12/22/2006    Page 5 of 23

- Denial List
- Boycott Prohibitions
- Fastener Quality Act

FOIA | Disclaimer | Privacy Policy Statement | Information Quality
Department of Commerce | Contact Us



| About BIS | Home >Compliance And Enforcement >Red Flag Indicators |
| --- | --- |
| **News** | |
| **Policies And Regulations** | |
| **Licensing** | |
| **Compliance And Enforcement** | |

**Home >Compliance And Enforcement >Red Flag Indicators**

# Red Flag Indicators

## Things to Look for in Export Transactions

Use this as a check list to discover possible violations of the Export Administration Regulations. You may also wish to visit our page that provides "Know Your Customer Guidance".

- The customer or its address is similar to one of the parties found on the Commerce Department's [BIS's] list of denied persons. Case example.
- The customer or purchasing agent is reluctant to offer information about the end-use of the item.
- The product's capabilities do not fit the buyer's line of business, such as an order for sophisticated computers for a small bakery.
- The item ordered is incompatible with the technical level of the country to which it is being shipped, such as semiconductor manufacturing equipment being shipped to a country that has no electronics industry.
- The customer is willing to pay cash for a very expensive item when the terms of sale would normally call for financing.
- The customer has little or no business background.
- The customer is unfamiliar with the product's performance characteristics but still wants the product.
- Routine installation, training, or maintenance services are declined by the customer.
- Delivery dates are vague, or deliveries are planned for out of the way destinations.
- A freight forwarding firm is listed as the product's final destination.

- The shipping route is abnormal for the product and destination.
- Packaging is inconsistent with the stated method of shipment or destination.
- When questioned, the buyer is evasive and especially unclear about whether the purchased product is for domestic use, for export, or for reexport.

If you have reason to believe a violation is taking place or has occurred, you may report it to the Department of Commerce by calling its 24 hour hot line number: 1 (800) 424-2980. Or if you prefer use our form to submit a confidential tip.

**About Export Enforcement**
Lists To Check
Reporting Possible Violations
Enforcement Hotline 1-800-424-2980
Business Executives Enforcement Team
Antiboycott Compliance
Boycott Request Reporting Forms
Export Management Systems

**Seminars And Training**
**International Programs**
**Defense Industrial Base Programs**

**Related Links**

- Recognizing Violations
- Red Flags
- Reporting Violations
- Know Your Customer
- Don't Let This Happen To You! [Microsoft Word | Adobe PDF]
- Enforcement Program

- BEET Info
- Denial List
- Boycott Prohibitions
- Fastener Quality Act
- Enforcement Home



| | |
|---|---|
| **About BIS** | Home > **Compliance And Enforcement** > Know Your Customer Guidance |
| **News** | |
| **Policies And Regulations** | |
| **Licensing** | |
| **Compliance And Enforcement** | |
| About Export Enforcement | |
| Lists To Check | |
| Reporting Possible Violations | |
| Enforcement Hotline 1-800-424-2980 | |
| Business Executives Enforcement Team | |
| Antiboycott Compliance | |
| Boycott Request Reporting Forms | |
| Export Management Systems | |
| **Seminars And Training** | |
| **International Programs** | |
| **Defense Industrial Base Programs** | |

**Related Links**

- Recognizing Violations
- Red Flags
- Reporting Violations
- Know Your Customer
- Don't Let This Happen To You! [Microsoft Word | Adobe PDF]
- Enforcement Program

# Know Your Customer Guidance

Certain provisions in the Export Administration Regulations (EAR) require an exporter to submit an individual validated license application if the exporter "knows" that an export that is otherwise exempt from the validated licensing requirements is for end-uses involving nuclear, chemical, and biological weapons (CBW), or related missile delivery systems, in named destinations listed in the regulations.

BIS has issued the following guidance on how individuals and firms should act under this knowledge standard. This guidance does not change or revise the EAR.

1. **Decide whether there are "red flags."**

   Take into account any abnormal circumstances in a transaction that indicate that the export may be destined for an inappropriate end-use, end-user, or destination. Such circumstances are referred to as "red flags." Included among examples of red flags are orders for items which are inconsistent with the needs of the purchaser, a customer's declining installation and testing when included in the sales price or when normally requested, or requests for equipment configurations which are incompatible with the stated destination (e.g.--120 volts in a country with a standard of 220 volts). Commerce has developed lists of such "red flags" which are not all-inclusive but are intended to illustrate the types of circumstances that should cause reasonable suspicion that a transaction will violate the EAR.

2. **If there are "red flags."**

   If there are no "red flags" in the information that comes to your firm, you should be able to proceed with a transaction in reliance on information you have received. That is, absent "red flags" (or an express requirement in the EAR), there is no affirmative duty upon exporters to inquire, verify, or otherwise "go behind" the customer's representations. However, when "red flags" are raised in the information that comes to your firm, you have a duty to check out the suspicious circumstances and inquire about the end-use, end-user, or ultimate country of destination.

   The duty to check out "red flags" is not confined to the use of general licenses affected by the "know" or "reason to know" language in the EAR. Applicants for validated licenses are required

- BEET Info
- Denial List
- Boycott Prohibitions
- Fastener Quality Act
- Enforcement Home

by the EAR to obtain documentary evidence concerning the transaction, and misrepresentation or concealment of material facts is prohibited, both in the licensing process and in all export control documents. You can rely upon representations from your customer and repeat them in the documents you file unless "red flags" oblige you to take verification steps.

3. **Do not self-blind.**

Do not cut off the flow of information that comes to your firm in the normal course of business. For example, do not instruct the sales force to tell potential customers to refrain from discussing the actual end-use, end-user and ultimate country of destination for the product your firm is seeking to sell. Do not put on blinders that prevent the learning of relevant information. An affirmative policy of steps to avoid "bad" information would not insulate a company from liability, and it would usually be considered an aggravating factor in an enforcement proceeding.

Employees need to know how to handle "red flags." Knowledge possessed by an employee of a company can be imputed to a firm so as to make it liable for a violation. This makes it important for firms to establish clear policies and effective compliance procedures to ensure that such knowledge about transactions can be evaluated by responsible senior officials. Failure to do so could be regarded as a form of self-blinding.

4. **Reevaluate all the information after the inquiry**

The purpose of this inquiry and reevaluation is to determine whether the "red flags" can be explained or justified. If they can, you may proceed with the transaction. If the "red flags" cannot be explained or justified and you proceed, you run the risk of having had "knowledge" that would make your action a violation of the EAR.

5. **Refrain from the transaction, disclose the information to BIS and wait.**
[See how to report a possible violation]

If you continue to have reason for concern after your inquiry, then you should either refrain from the transaction or submit all the relevant information to BIS in the form of an application for a validated license or in such other form as BIS may specify.

Industry has an important role to play in preventing exports and reexports contrary to the national security and foreign policy interests of the United States. BIS will continue to work in partnership with industry to make this front line of defense effective, while minimizing the regulatory burden on exporters. If you have any question about whether you have encountered a "red flag," you may contact BIS's Office of Export Enforcement or use this form to submit a confidential tip. [Please note that use of the form will not generate any return e- mail to you so that the information you submit will remain confidential.]

FOIA | Disclaimer | Privacy Policy Statement | Information Quality
Department of Commerce | Contact Us

# EXHIBIT 25

**Westlaw.**

61 Fed.Cl. 12                                                                    Page 1
61 Fed.Cl. 12
**(Cite as: 61 Fed.Cl. 12)**

**H**
Zoltek Corp. v. U.S.Fed.Cl.,2004.
United States Court of Federal Claims.
ZOLTEK CORPORATION, Plaintiff,
v.
The UNITED STATES, Defendant.
No. 96-166 C.

April 13, 2004.

**Background:** Patent holder brought suit against the
United States, alleging that its patent directed to a
carbon fiber product made by a particular process
was infringed by the government when it used sheet
products made by the patented methods on the B-2
bomber. Plaintiff moved to compel discovery of
documents from main government contractor on the
B-2 bomber, and deposition testimony by its
employees.

**Holdings:** The Court of Federal Claims, Damich,
Chief Judge, held that:

(1) subpoenas imposed undue burden on contractor
insofar as they required disclosure of classified
material concerning carbon fiber sheets used in
manufacture of bomber;

(2) subpoenas were facially overbroad insofar as they
sought information pertaining to other projects of
contractor; and

(3) use of written interrogatories was appropriate in
depositions of contractor's to ensure that no classified
security information was released.

Motion granted in part and denied in part.
West Headnotes
**[1] Federal Courts 170B ⊙—1112**

170B Federal Courts
    170BXII Claims Court (Formerly Court of
Claims)
        170BXII(B) Procedure
            170Bk1112 k. Discovery, Subpoenas, and
Compelling Production of Evidence. Most Cited
Cases
Subpoenas commanding deposition testimony and

production of documents from main government
contractor on the B-2 bomber imposed undue burden
on contractor insofar as they required disclosure of
classified material concerning carbon fiber sheets
used in manufacture of bomber, as contractor was
placed in impossible position, forcing it to literally
choose between violating a court order, or disclosing
highly classified information which it had a duty to
refrain from disclosing.

**[2] Federal Courts 170B ⊙—1112**

170B Federal Courts
    170BXII Claims Court (Formerly Court of
Claims)
        170BXII(B) Procedure
            170Bk1112 k. Discovery, Subpoenas, and
Compelling Production of Evidence. Most Cited
Cases
Government contractor did not waive its right to
object to subpoena duces tecum and subpoenas for
deposition testimony issued by plaintiff in patent
infringement suit against the government by failing to
timely object to them, where subpoena was never
properly served because contractor's counsel never
stated that he was authorized to accept service;
moreover, upon receipt of the subpoenas, contractor's
counsel informed plaintiff that he believed that the
subpoenas were overbroad and raised security
concerns. RCFC, Rule 45(c)(2)(B), 28 U.S.C.A.

**[3] Federal Courts 170B ⊙—1112**

170B Federal Courts
    170BXII Claims Court (Formerly Court of
Claims)
        170BXII(B) Procedure
            170Bk1112 k. Discovery, Subpoenas, and
Compelling Production of Evidence. Most Cited
Cases
Even if government released some classified
information regarding the B-2 bomber to patent
holder which brought infringement claim against the
government, that disclosure did not waive its right to
restrict release of other classified information
regarding the bomber.

**[4] Federal Courts 170B ⊙—1112**

170B Federal Courts
    170BXII Claims Court (Formerly Court of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Claims)
　　　170BXII(B) Procedure
　　　　　170Bk1112 k. Discovery, Subpoenas, and
Compelling Production of Evidence. Most Cited
Cases
Fact that government contractor on B-2 bomber
project solicited patent holder to sell it controlled
resistivity carbon fibers did not show that contractor
waived any confidentiality regarding the program
outside of what was revealed in its solicitation, with
respect to subpoenas issued by patent holder in its
infringement suit which sought production of
documents and deposition testimony from contractor.

[5] Federal Courts 170B ☜1112

170B Federal Courts
　　170BXII Claims Court (Formerly Court of
Claims)
　　　170BXII(B) Procedure
　　　　　170Bk1112 k. Discovery, Subpoenas, and
Compelling Production of Evidence. Most Cited
Cases
Government contractor's participation in television
documentary about the B-2 bomber did not waive
contractor's right to refuse to disclose classified
information in response to subpoenas issued by
patent holder who alleged that processes used in
production of bomber infringed its patent, even
assuming that waiver of duty to maintain secrecy of
national security information could be waived, where
documentary provided only very general unclassified
information about the bomber.

[6] Federal Courts 170B ☜1112

170B Federal Courts
　　170BXII Claims Court (Formerly Court of
Claims)
　　　170BXII(B) Procedure
　　　　　170Bk1112 k. Discovery, Subpoenas, and
Compelling Production of Evidence. Most Cited
Cases
Discovery rules are designed to assist a party in
proving a claim it reasonably believes to be viable
without discovery, not to find out if the party has any
basis for a claim.

[7] Federal Courts 170B ☜1112

170B Federal Courts
　　170BXII Claims Court (Formerly Court of
Claims)
　　　170BXII(B) Procedure

　　　　　170Bk1112 k. Discovery, Subpoenas, and
Compelling Production of Evidence. Most Cited
Cases
Subpoenas in patent infringement suit against the
government seeking production of documents and
deposition testimony from government contractor on
B-2 bomber project were facially overbroad insofar
as they sought information pertaining to other
projects of contractor, where plaintiff did not point to
specific facts suggesting infringement by any other
project beyond that of the B-2 project. RCFC, Rule
26(b)(1), 28 U.S.C.A.

[8] Federal Courts 170B ☜1112

170B Federal Courts
　　170BXII Claims Court (Formerly Court of
Claims)
　　　170BXII(B) Procedure
　　　　　170Bk1112 k. Discovery, Subpoenas, and
Compelling Production of Evidence. Most Cited
Cases
Use of written interrogatories was appropriate in
depositions of employees of government contractor
on B-2 bomber project to ensure that no classified
security information was released.

Patents 291 ☜328(4)

291 Patents
　　291XIII Decisions on the Validity, Construction,
and Infringement of Particular Patents
　　　291k328 Patents Enumerated
　　　　　291k328(4) k. Reissue. Most Cited Cases
34,162. Cited.

*14 Dean A. Monco and John S. Mortimer, Chicago,
IL, for plaintiff. James F. Davis, Washington, DC,
of counsel.
Gary L. Hausken, Commercial Litigation Branch,
Civil Division, United States Department of Justice,
Washington, DC, for defendant, with whom were
Vito J. DiPietro, Director; and Robert D. McCallum,
Jr., Assistant Attorney General.

OPINION
DAMICH, Chief Judge.
Plaintiff Zoltek Corporation (hereinafter "Zoltek")
filed this Motion to Compel Discovery on July 30,
2002, and asks the Court to compel discovery of
certain documents and deposition testimony of
employees of Northrop Grumman Corporation
(hereinafter "Northrop"), the main government

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

61 Fed.Cl. 12
61 Fed.Cl. 12
(Cite as: 61 Fed.Cl. 12)

contractor on the B-2 Bomber. These documents and testimonies relate to the Government's alleged infringement of Zoltek's United States Patent No. Re. 34,162 (hereinafter "Re. '162 patent"). For the reasons discussed below, Zoltek's motion is GRANTED IN PART and DENIED IN PART.

## I. Background

Zoltek brought this action seeking compensation for use of its methods claimed in the Re. '162 patent. Second Amended Complaint at 2. The patent-in-suit is directed to a carbon fiber product made by a particular process. *Id.* Zoltek specifically asserts infringement by "at least ... the B-2 Stealth Bomber." *Id.* The United States denies infringement, and denies using sheet products made by the patented methods on the B-2 Bomber.

On October 31, 2001, Zoltek served three subpoenas upon Northrop, which is not a party to this litigation. Zoltek's Motion to Compel Discovery (hereinafter "Motion to Compel"), at Ex. 1. These subpoenas commanded deposition testimony from two Northrop employees, Michael Capoccia and George Rodgers; testimony from a Northrop employee having relevant knowledge pursuant to Rule 30(b)(6), Rules of the Court of Federal Claims (hereinafter "RCFC"); and the production of documents and things pertaining to this litigation, also pursuant to RCFC 30(b)(6). *Id.*

After several delays in action on the subpoenas for a variety of reasons, Northrop refused to provide any witnesses in connection with the 30(b)(6) subpoena in a letter dated April 26, 2002. Opposition, at Ex. 11. This letter stated that the subpoena, in addition to being overbroad, was "unduly burdensome ... ambiguous, would require the disclosure of information which is classified and/or otherwise protected from discovery, and seeks information irrelevant to the subject of the litigation." *Id.*

On May 17, 2001, Zoltek objected to Northrop's "inordinate delay" in scheduling a conference call to discuss these issues. Motion to Compel, at Ex. 12. Zoltek argued that several facts contradicted Northrop's security concerns: (1) the patent in suit was never classified by the U.S. in any way, even though the parent patent was reviewed by members of the Air Force and Navy during the early stages of the application process; (2) Northrop employee Michael Cappoccia, solicited Zoltek in February, 1997 to produce partially carbonized fibers for the B-2 division and never mentioned any security

concerns; and (3) Northrop participated in the production of a made-for-TV documentary on the History Channel dealing with stealth technology and the B-2 Bomber, and this documentary specifically refers to the capability of carbon fiber sheets to absorb radar waves as an important characteristic of the B-2 Bomber. *Id.* Zoltek also reminded Northrop that discovery is subject to the terms of the protective order in this case. *Id.*

On June 12, apparently in an effort to compromise on the discovery impasse, Zoltek prepared a letter containing twenty questions that it would like to see answered by Mr. Capoccia and Mr. Rodgers, and specifically requested that the U.S. consult with its security officer to determine what questions the *15 security officer would permit Northrop to answer. *Id.* at Ex. 17. In its response, the U.S. stated that Northrop would not be permitted to answer eleven of the questions. *Id.* at Ex. 18. In response, Zoltek filed this motion to compel the production of these witnesses and documents from Northrop on July 30, 2002.

## II. Classified Material

Zoltek advances four arguments in support of its motion: (1) Zoltek seeks only "information relating to Zoltek's patent-in-suit, a public document never restricted in any way by the U.S.,"; (2) any argument that material cannot be released because it is classified "has been waived by more than six (6) years of discovery, including production of material specifications regarding materials used on the B-2 Bomber"; (3) Northrop allegedly solicited Zoltek to produce partially carbonized fibers for the B-2 program with no mention made of security concerns; and (4) Northrop participated in the making of a documentary about the B-2 Bomber for the History Channel cable television channel. Motion to Compel, at 1-2, 6-7.

### A. Patent-in-Suit as a Public Document

[1] Zoltek seems to believe that because the Re. '162 patent was never classified, all material related to the patent in this litigation must also be unclassified. This is simply not the case. While Zoltek's Re. '162 patent on its own may not be worthy of classification, work done related to it may very well implicate national security issues. The uses to which the carbonized fibers are put, the ways they are modified, and other factors that allow the carbonized fibers to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

make the B-2 Bomber what it is, could all implicate national security. This idea is acknowledged by Executive Order 12598, which states in part:

Sec. 1.8. Classification Prohibitions and Limitations ...

(e) Compilations of items of information which are individually unclassified may be classified if the compiled information reveals an additional association or relationship that: ...

(2) is not otherwise revealed in the individual items of information.

Exec. Order No. 12598, 60 Fed.Reg. 19825 (Apr. 17, 1995). Thus, even if some of the material related to Zoltek's patent in this litigation is unclassified, its release in conjunction with already available information could well implicate national security. The fact that the Government was able to release some information does not show that all material connected with this litigation is unclassified. To the contrary, this action shows only that *some* unclassified information exists on the B-2 program.

Northrop argues that Zoltek's subpoena imposes an undue burden because "[g]ranting Zoltek's motion would place Northrop in an impossible position, forcing it to literally choose between violating a court order, or disclosing highly classified information which Northrop has a duty to refrain from disclosing, and producing Government property which Northrop is not entitled to produce." Opposition, at 1-2. If the information in question is in fact classified, disclosure to unauthorized parties could both violate the Espionage Act and constitute an unlawful conversion of Government property. 18 U.S.C. § 793, 794, 798; United States v. Fowler, 932 F.2d 306, 309-10 (4th Cir.1991). Subpoenas that direct a party to violate federal law are generally found to constitute an undue burden. See e.g., Flatow v. The Islamic Republic of Iran, 196 F.R.D. 203, 207 (D.D.C.2000) (portion of subpoena commanding production of IRS records which the IRS was prohibited by statute from releasing "surely" imposed an undue burden by demanding a violation of federal law); Linder v. National Security Agency, 94 F.3d 693 (C.A.D.C.1996) (subpoena imposes an undue burden where it demands the release of classified national security information). If the material that Zoltek is seeking is in fact classified, granting Zoltek's motion would place Northrop in a "Catch-22" situation similar to that in Flatow, 196 F.R.D. at 207.

Government officials have confirmed that the information sought by Zoltek is classified and that access to it requires a security clearance by submitting the declaration of John B. Hennessey, Director of Security and *16 Special Programs, Department of the Air Force, who is familiar with the B-2 program. Statement of the United States with Respect to Zoltek's Motion to Compel Discovery (hereinafter "Statement of the United States"), at Ex. 1. His declaration explains that the B-2 aircraft is subject to the Special Access Program, which controls "access, distribution, and protection of particularly sensitive classified information," and functions as another level of control beyond classification of documents. Declaration of John B. Hennessey, at ¶ 3-4. In fact, this Court has already found that portions of the B-2 program are a Special Access Program. McDonnell Douglas Corp. v. United States, 37 Fed.Cl. 270, 276 (1996). While classified material is designated "Confidential", "Secret", or "Top Secret", special access programs require an additional level of security for access. Id. The measures taken by the Government to protect information related to this program clearly indicate that some of it is classified.

As the Government has made an official determination that the requested material is classified, this Court will not ask Northrop to act in contradiction of this determination. As a nonparty who is involved in this dispute only as a result of its contract with the Government, Northrop is in no position to challenge the Government's judgment as to what information is properly classified. Ordering Northrop to do so would impose an undue burden. See Flatow 196 F.R.D. at 207; Linder, 94 F.3d at 693.

As a side note, it should also be mentioned that Zoltek's counsel was warned of potential security problems when the subpoenas were issued, and "encouraged" to fill out an application to obtain the requisite security clearance as early as 2001. Coyne Decl., at ¶ 5. Had Zoltek's counsel heeded this advice, this opinion may have been unnecessary. However, Zoltek's attorneys did not apply to the appropriate executive agency to allow it to determine whether a security clearance was appropriate. Therefore, at least some of the reason for Zoltek's lack of access to the information in question can be laid at the feet of Zoltek's counsel.

*B. Waiver*

Zoltek's second argument claims that concerns about

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

61 Fed.Cl. 12

61 Fed.Cl. 12

(Cite as: 61 Fed.Cl. 12)

the release of classified information "has been waived by more than six (6) years of discovery ...." Motion to Compel at 2. Apparently, Zoltek believes that Northrop's and the Government's release of non-classified information relating to the B-2 program constitutes a waiver of classification regulations for classified documents related to this case.

[2] As a threshold matter, Northrop did not waive it's right to object to Zoltek's subpoenas by failing to timely object to them. The time allowed for an objection to a subpoena *duces tecum* is measured from the date the subpoena was served. RCFC, Rule 45(c)(2)(B). Here, the subpoena was never properly served because Northrop's counsel never stated that he was authorized to accept service. Coyne Decl., ¶ 7. Further, upon receipt of the subpoenas, Northrop's counsel informed Zoltek that he believed that the subpoenas were overbroad and raised security concerns. *Id.* While the parties negotiated as if the subpoenas were properly served, objections were raised throughout the process. Under these circumstances, it seems clear that Northrop did not waive its right to object to the subpoenas. *See Concord Boat Corp. v. Brunswick Corp.,* 169 F.R.D. 44, 48-51 (S.D.N.Y.1996) (A District Court allowed a nonparty to object to a subpoena where the nonparty attempted to negotiate the scope of that subpoena for several months, even though the nonparty failed to strictly adhere to the time limits for objection.).

Waiver is defined as "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). In the present case, Northrop is not asserting that it has a right or privilege to refuse to release the information in question. To the contrary, Northrop refuses to reveal the information in question because it is *required* by law to refuse to disclose classified information to parties without proper authorization to view it. Under the Espionage Act, 18 U.S.C. § 793, the willful transmission of classified information to any person not entitled to receive it is a criminal offense. Thus, in *17 refusing to reveal classified information, Northrop is merely obeying a federal law, rather than asserting a privilege.

[3] We must also, however, examine whether or not the United States has waived any privilege it may have because, as the U.S. asserts, it "owns or controls much of the information which is sought in Zoltek's motion to compel." Statement of the United States at 1. The U.S. has expressed security concerns

throughout discovery, although it readily admits to "providing all available unclassified information" to Zoltek. Statement of the United States at 2-3. While Zoltek seems to believe that this action waives the right of the U.S. to withhold additional, classified information, the reverse is true. In fact, the Government's behavior is completely consistent with the actions it would be expected to take if it chose to invoke the state secrets privilege. In *Ellsberg v. Mitchell,* 709 F.2d 51, 57 (D.C.Cir.1983), the Court of Appeals for the District of Columbia Circuit examined the application of the state secrets doctrine and held that "whenever possible, sensitive information must be disentangled from nonsensitive information to allow for the release of the latter," While the U.S. has not yet invoked the state secrets doctrine in this case, it is an apt analogy.

Even if the U.S. had released some classified information to Zoltek, that action does not waive the Government's continued control over other classified information relevant to this case. The disclosure of documents for which the executive privilege could be claimed only waives the privilege with respect to the documents specifically released. *In re Sealed Case,* 121 F.3d at 729, 741 (D.C.Cir.1997). In sum, it is clear that the Government has not "waived" the right to restrict the release of classified information through its actions.

### C. Solicitation to Purchase Partially Carbonized Fibers

[4] In 1997, Northrop solicited Zoltek to sell controlled resistivity carbon fibers to Northrop. The solicitation was made on the letterhead of Northrop's B-2 Division. In Zoltek's view, this act apparently indicates that all of Northrop's activities involving these fibers were unclassified or that such a solicitation waived Northrop's or the U.S.'s right to keep such information classified. The existence of carbon fibers and their particular traits are not classified. Nor, apparently, is the fact that Northrop chose to purchase them under the auspices of the B-2 program. The use to which these fibers are put by Northrop, however, is a different matter. Northrop did not indicate how it would use the requested fibers, what processes might be applied to them, what they may be made into, or how precisely they were relevant to the B-2. Another supplier of these fibers characterized Northrop as " '[A] black box,' th[at] did not reveal why they were buying carbon fibers or how they intended to use those fibers." Statement of the United States at 6.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

61 Fed.Cl. 12                                                    Page 6
61 Fed.Cl. 12
**(Cite as: 61 Fed.Cl. 12)**

It is entirely possible that the Government has strong reasons for keeping this material secret. Even if some of this information is publicly available, the totality of its use and how it is incorporated in the B-2 could be of national security concern. As was noted above, even unclassified material, if collected and organized in a particular way, can be considered classified material. Exec. Order No. 12598, Sec. 1.8(e)(2), 60 Fed.Reg. 19825 (Apr. 17, 1995). Therefore, the fact that Zoltek was solicited by Northrop to sell certain types of fibers does not show that Northrop waived any confidentiality regarding the B-2 program outside of what was revealed in Northrop's solicitation.

### D. Documentary for the History Channel

[5] Zoltek also alleges that Northrop's participation in a documentary about the B-2 Bomber for the History Channel waives Northrop's right to refuse disclosure of classified information. The documentary in question provided very general information about the B-2 Bomber, and cautioned that most information about the B-2 Bomber is classified. According to Northrop, the most specific statement concerning the use of carbon fiber technology provided in the documentary states that "in addition to making the plane more fuel efficient, the carbon fiber epoxy composites help absorb radar rather than reflect it." Opposition, at 15. The documentary*18 also provides that "nearly every important detail about the B-2 is still top secret." Id. Finally, there is no way to determine the source of the information used in the documentary, which makes consideration of this factor questionable on hearsay grounds. Id. While Zoltek asserts that the documentary "specifically refers to the capability of carbon fiber sheet products to absorb radar waves as an important component in the low observable characteristics of the B-2 Bomber...", this statement is far too general to be considered a waiver of the duty to maintain the secrecy of national security information, even if such a duty could be waived.

### III. Other Information Requested Through Subpoena

#### A. Relevance

Northrop objects to the portion of the 30(b)(6) subpoena that seeks information about the total cost

of the B-2 Bomber. Northrop argues that this information is not relevant to the present action because compensation under 28 U.S.C. § 1498 is determined by what the patentee has lost, and not what the Government has gained. Opposition, at 18. (citing Leesona Corp. v. United States, 220 Ct.Cl. 234, 599 F.2d 958, 969 (1979)). Zoltek argues that the total cost is relevant because it is relying on the "willing buyer-willing seller" standard, instead of the "benefit conferred" rationale. Reply, at 22-23.

This debate is premature. Currently, Zoltek is attempting to establish liability. If liability is not established, then issues relating to damages are irrelevant. The proper time to explore this issue is when, and if, this court considers damages for proven infringement. Zoltek has not demonstrated the relevance of this inquiry to the issue of liability, and it is therefore disallowed.

#### B. Breadth of Subpoenas

Northrop believes that Zoltek's subpoenas are "facially over broad." Opposition at 15. Zoltek may obtain discovery of any matter relevant to its claim that is not otherwise privileged. See RCFC 26(b)(1). Zoltek's complaint in this case alleges infringement by "at least ... the B-2 program." Complaint, at 1. On its face, this complaint suggests that Zoltek is unsure that it possesses the proper evidence to support a claim against any other program conducted by Northrop. Northrop therefore argues that the subpoenas are overbroad because they seek information pertaining to programs far beyond the B-2 program. The Government adds to this argument by stating that "Zoltek is searching for infringement, not trying to support claims it reasonably believes to exist." Statement of the United States, at 14.

[6][7] Discovery rules are designed to assist a party in proving a claim it reasonably believes to be viable without discovery, not to find out if the party has any basis for a claim. Micro Motion, Inc. v. Kane Steel Co., Inc., 894 F.2d 1318, 1327 (Fed.Cir.1990). Many of Zoltek's requests reach beyond the B-2 program. See Opposition, (Ex. 1). For example, Zoltek's 30(b)(6) subpoena lists the following as a subject for deposition: "The use of partially carbonized fibers ... on any and all products produced on behalf of or for the United States Government." Opposition, (Ex. 1)(emphasis added). To prove that this discovery is permissible, at a minimum, Zoltek must show either that it has a claim

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

61 Fed.Cl. 12                                                                                                                    Page 7
61 Fed.Cl. 12
(Cite as: 61 Fed.Cl. 12)

that it reasonably believes to exist against a Northrop program other than the B-2 program, or that its requests are relevant to Zoltek's claim against the B-2 program. Zoltek does not point to specific facts suggesting infringement by any other Northrop program, which is necessary to show that discovery should be expanded beyond the B-2 program. Zoltek further admits that it would be willing to narrow requests to the B-2 program "if appropriate." Zoltek's Reply Memorandum (hereinafter "Zoltek's Reply"), at 6. This course of action seems appropriate at this stage. If Zoltek can credibly assert a claim against another Northrop program, this issue can be revisited.

In light of the fact that Zoltek has not offered evidence of infringement by any other program, this Court hereby confines discovery to the subject matters in the 30(b)(6) subpoena relating to the B-2 program. Accordingly, each item of subject matter listed for deposition on the 30(b)(6) subpoena **19** should be altered as followed (added portions are italicized):
(1) The use of partially carbonized fibers and sheets/mats/coatings containing partially carbonized fibers on *the B-2 Bomber.* (instead of any and all products on behalf of the United States)
(2) The purchase by the U.S. Government and/or its contractors, sub-contractors, or agents of partially carbonized fibers and sheets/mats/coatings containing partially carbonized fibers for use *on the B-2 Bomber.*
(3) (Should be deleted entirely).
(4) (Should be deleted entirely).
(5) All tests regarding the use of partially carbonized fibers and sheets/mats/coatings containing partially carbonized fibers on *the B-2 Bomber.* (instead of any products produced on or behalf U.S. Government)
(6) (Remains the same).
(7) (Remains the same).
(8) (Remains the same).

The "List of Documents and Things" attached to the 30(b)(6) subpoena should also be limited to materials relevant to infringement by the B-2 program as follows:
(1) (Remains the same)
(2) All documents and things relating to partially carbonized fibers, and sheets/mats/coatings containing partially carbonized fibers *used on the B-2 Bomber.*
(3) All documents and things relating to manufacture, purchase and/or use of partially carbonized fibers and sheets/mats/coatings containing partially carbonized fibers *on the B-2 Bomber* (not "on any Government

weapons systems").
(4) Any and all documents regarding the purchase by Northrop Grumman Corporation, *for use on the B-2 Bomber,* of partially carbonized, i.e. not fully carbonized, fibers and/or partially carbonized sheets/mats/coatings.
(5) All documents and things relating to tests conducted regarding partially carbonized fibers and/or sheets/mats/coatings containing partially carbonized fibers for use *on the B-2 Bomber.*
(6) A sample of each and every type of partially carbon fiber made by or for Northrop Grumman for use *on the B-2 Bomber.*
(7) A sample of each and every type of sheet/mat/coating purchased or used by or for Northrop Grumman for use *on the B-2 Bomber.*

*C. Request for Cumulative Discovery*

Northrop objects to Zoltek's subpoenas as being "cumulative of discovery already conducted by Zoltek." Opposition at 17. Northrop argues that the Government has already provided documents and relevant physical samples relating to the B-2 program, and thus the subjects listed in the 30(b)(6) subpoena are cumulative of the information already discovered. *Id.* at 17-18. Specifically, Northrop identifies information on the price of the B-2 Bomber, physical samples of each and every type of carbon fiber sheet/mat used in any capacity on the B-2 Bomber, and the 41 documents relating to the use of carbon fiber materials produced for inspection on March 25, 1999. *Id.* The issue of price of the B-2 Bomber has already been addressed.

Many of Northrop's remaining objections are based on the fact that on March 16, 2001, this Court ordered that the Government produce "a sample of each and every type of carbon fiber sheet/mat used in any capacity on the B-2 Stealth Bomber." *Id.* at Ex. 23. The Government responded by producing numerous samples for testing. *Id.* at Ex. 24. The Government also produced 41 documents relating to the use of carbon fiber materials on March 25, 1999. Opposition Ex. at 19.

Discovery rules empower this Court to restrict discovery of information that is "unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive." RCFC 26(b)(2)(i); *Florsheim Shoe Co. v. United States,* 744 F.2d 787, 797 (Fed.Cir.1984) ("Questions of the scope and

61 Fed.Cl. 12                                                      Page 8
61 Fed.Cl. 12
(Cite as: 61 Fed.Cl. 12)

conduct of discovery are, of course, committed to the discretion of the trial court"). Northrop, particularly as a nonparty, should not be burdened by being forced to produce materials that have already been provided by **20** the Government. Therefore, Northrop need not comply with the 30(b)(6) subpoena to the extent the subpoena seeks information duplicative of that already provided by the Government. If Northrop wishes to argue that it is unduly burdensome to determine which requested information is duplicative and which requested information is not duplicative, Northrop should submit to this Court an estimate of the number of man-hours necessary to make this determination. *See Northrop Corp. v. McDonnell Douglas Corp., 751 F.2d 395, 405 (C.A.D.C.1984).*

### D. Depositions on Written Questions

[8] The Government requests that the depositions be limited to written interrogatories to ensure that no classified security information is released. Statement of the United States, at 20-21. Zoltek argues that Depositions upon written questions are simply impractical, given the length of this litigation and the probability that further disputes will arise. Reply, at 23-24. Additionally, Zoltek seeks to have this Court available during live interrogatories to resolve issues over the scope of classified disclosures. *See* Reply, at 24.

Given the circumstances of this case, written interrogatories are appropriate to ensure either that no classified information is inadvertently released. If discovery disputes do arise, they can be addressed by this Court in the same way it addresses other discovery disputes.

### IV. Conclusion

This Court hereby:

(1) Denies discovery of classified information that is properly designated as such by the appropriate executive official;

(2) Orders that discovery is limited to information pertaining to the use of carbon fiber sheet products on the B-2 program;

(3) Orders that Northrop either reveal all information demanded by the subpoenas except information that is classified, not related to the use of carbon fiber

sheet products, or identical to that already provided; or submit an estimate detailing the number of man-hours required to do so;

(4) Orders that Zoltek conduct the depositions of Northrop employees upon written interrogatories; and

(5) Orders that a status conference will be held within 14 days of the issuance of this Order to determine how to proceed.

It is so ordered.

Fed.Cl.,2004.
Zoltek Corp. v. U.S.
61 Fed.Cl. 12

**END OF DOCUMENT**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 26

Westlaw.

Not Reported in A.2d                                                                                    Page 1
Not Reported in A.2d, 1997 WL 770663 (Del.Ch.)
(Cite as: Not Reported in A.2d)

C
In re Pennzoil Co. Shareholders Litig.
Cons.Del.Ch.,1997.Only the Westlaw citation is
currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
In re PENNZOIL COMPANY SHAREHOLDERS
LITIG.
UNION PACIFIC GROUP INC., et al.
v.
PENNZOIL CO., et al.
No. 15764, 15755.

Oct. 27, 1997.

Edward P. Welch, Esquire, Andrew J. Turezyn,
Esquire, Skadden, Arps, Slate, Meagher & Flom,
Wilmington, DE.
Charles F. Richards, Jr., Esquire, Thomas A. Beck,
Esquire, Daniel A. Dreisbach, Esquire, Robert J.
Stearn, Jr., Esquire, Richards, Layton & Finger,
Wilmington, DE.
James C. Strum, Esquire, Chimicles, Jacobsen &
Tikellis, Wilmington, DE.
Joseph A. Rosenthal, Esquire, Rosenthal, Monhait,
Gross & Goddess, Wilmington, DE.
CHANDLER.
*1 Dear Counsel:

Three discovery motions are before the Court. I
have considered your briefs and your letters
concerning the motions. In the interest of advancing
this litigation as efficiently as possible, I think it is
appropriate to rule on the motions now, without the
benefit of oral argument.

First, defendant Pennzoil has filed a motion for a
protective order (Docket Item No. 51) that seeks to
limit the number of plaintiff UPR's interrogatories
and requests for admission. UPR has submitted (to
date) 69 interrogatories, with subparts bringing the
total number to 228 interrogatories. UPR also has
submitted 108 requests for admission, each of which
is accompanied by an interrogatory seeking further
information on any requests to which the response is
anything other than an unqualified admission.
Pennzoil claims this brings the total interrogatories to
336.

Pennzoil does not object to any particular
interrogatory or request for admission. Instead, it
asserts that the discovery as a whole is unduly
burdensome and oppressive, requiring 200 to 400
hours of lawyer time to complete. Pennzoil notes
that UPR's requests far exceed the number of
interrogatories (50) allowed under the local rules of
the Delaware District Court, that it is more
appropriate to obtain this information via depositions,
and that UPR already has conducted extensive
discovery in the Texas litigation which may be used
in this action.

UPR insists that Pennzoil has not shown good cause
for refusing to respond to the disputed discovery.
UPR also argues that it is not an adequate response
for Pennzoil to assert that depositions may be used as
an alternative means to acquire the information. The
interrogatories and requests for admission are
designed to save time and expense at the upcoming
trial, UPR argues, and depositions would be no more
efficient than written questions. UPR also accuses
Pennzoil of delay, claiming it waited two weeks to
file this motion and has refused to provide any
responses in the meantime.

Court of Chancery Rule 26(a) allows parties to obtain
discovery by written interrogatories. Rule 26
contains the following limitation:
The frequency or extent of use of the discovery
methods set forth in paragraph (a) shall be limited by
the Court if it determines that: ... (iii) the discovery
is unduly burdensome or expensive, taking into
account the needs of the case, the amount in
controversy, limitations on the parties' resources, and
the importance of the issues at stake in the litigation.

Ct. Ch. R. 26(b)(1)(iii). This litigation is complex
and hard fought, involving UPR's effort to acquire
control of Pennzoil. Pennzoil is an oil and gas
company with an aggregate stock value of over 6
billion dollars. Until recently, the battle has been
fought principally in the Federal Courts, with the
United States District Court for the Northern District
of Texas (Fort Worth Division) as the main arena.
Extensive discovery has been taken, and fought over,
in the Texas action, with the Texas District Court
issuing over 100 orders deciding various discovery
disputes.

*2 I have already ruled that discovery taken in the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 2
Not Reported in A.2d, 1997 WL 770663 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Texas litigation can be used in this action. Given the scope of discovery already taken in Texas, and considering the early December trial date that UPR pressed for in this Court, I think the discovery process in the Court of Chancery should be carefully supervised to avoid wasteful duplication and to avoid the risk that discovery will become a strategic weapon, rather than a legitimate method to flesh out issues for the impending trial. As Vice Chancellor Steele concluded in *Lorch v. Dyson-Kissner-Moran,* Del. Ch., C.A. No. 12879, Steele, V.C. (May 31, 1995), slip op. at 3, "a reasonable approach can be devised by plaintiffs which will not require the massive response necessary to comply with answers to the written interrogatories currently requested." UPR can, of course, submit supplemental interrogatories after depositions if deposition responses are evasive or otherwise inadequate. Therefore, because I agree that the interrogatories and requests for admission are excessive and unnecessarily burdensome, I grant Pennzoil's motion for a protective order and direct UPR to confine its interrogatories to 100, including subparts, and 50 requests for admission (with permission to include a blanket interrogatory requiring an explanation with regard to every request that is denied).

Second, UPR has moved for a protective order (Docket Items No. 58) seeking to withhold from production to Pennzoil 289 documents listed on a "privilege log." These documents, UPR contends, are protected either by the attorney-client privilege, work product doctrine, or the business strategy immunity. The 289 documents are listed in an attachment to the motion, identified only briefly by date, type of document, subject, author and recipient. Pennzoil opposes the motion on several grounds, including that the motion is premature because Pennzoil has not moved to compel production of any of the listed documents, that this Court's Confidentiality Order and Discovery Order prohibit relitigation of discovery issues already resolved in the Texas action, and that UPR has not met its burden as to its asserted privileges.

The short answer to this dispute is that the issue is not ripe for decision. No effort has been made, as far as I can tell, to determine whether Pennzoil seeks production of any or all of the 289 documents listed in UPR's motion. Nor does it appear that the parties have attempted in good faith to narrow the list of disputed documents. Before this Court is burdened with deciding whether various privileges apply to almost 300 documents, some or all of which may have to be reviewed by the Court *in camera,* I think

the parties have an obligation to meet and confer in a good faith effort to resolve as many differences as possible. Such an effort should be made especially regarding those documents on UPR's list that have not already been the subject of motion practice in the Texas action, for I think this Court's Confidentiality Order and the Discovery Order can easily be read to foreclose relitigation of discovery rulings already made in the Texas action. For the moment, however, I need not reach all of the arguments by Pennzoil concerning the substantive inadequacy of UPR's motion. UPR's motion for a protective order (Docket Item No. 58) is denied.

**\*3** The third motion before me is UPR's motion to compel production of documents (Docket Item No. 63) that Pennzoil is withholding because Pennzoil believes UPR will give the documents to Smith Barney, Inc. (UPR's financial advisor in connection with UPR's hostile tender offer to acquire Pennzoil). This motion turns on the interpretation of paragraph 6(A) of the Confidentiality Order, which provides:
6. (A) Notwithstanding anything contained in the foregoing paragraphs 4 and 5, Confidential or Highly Confidential Discovery Material may be provided to persons listed in Paragraphs 4(b) and 5(c) above only to the extent necessary for such expert or consultant to prepare a written opinion, to prepare to testify, or to assist counsel in the prosecution of this Litigation, and only *provided* that such expert or consultant (i) is using said Confidential or Highly Confidential Discovery Material solely in connection with this Litigation; and (ii) will not use any Highly Confidential Discovery Information for the purpose of providing financial advice to any party and *further provided* that such expert or consultant signs an undertaking in the form attached as Exhibit A hereto, agreeing in writing to be bound by the terms and conditions of this Stipulation and Order, consenting to the jurisdiction of the Court for purposes of the enforcement of this Stipulation and Order, and agreeing not to disclose or use any Confidential or Highly Confidential Discovery Material for purposes other than those permitted hereunder, including after the conclusion of this Litigation.

Pennzoil interprets this language to prohibit an expert or consultant who has reviewed confidential or highly confidential material from using that information to provide financial advice. UPR does not dispute that Smith Barney has been shown confidential and highly confidential information or that Smith Barney has provided UPR with financial advice in connection with UPR's attempt to acquire Pennzoil. UPR's position is that paragraph 6(A) does not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                 Page 3
Not Reported in A.2d, 1997 WL 770663 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

prohibit *who* may serve as a financial or litigation consultant. Instead, UPR insists that the Order allows financial advisors to the parties to act also as litigation consultants, so long as the consultant who sees highly confidential information signs an agreement not to use the information "for the purpose of providing financial advice to any party." Thus, UPR believes Smith Barney personnel can segregate mentally Pennzoil's confidential and highly confidential information, depending on whether they are wearing their "financial advisor" hat or their "litigation consultant" hat.

UPR's interpretation of paragraph 6(A) of the Order is not a tenable or realistic one. Paragraph 6(A) unmistakably states that confidential information may be provided to experts or consultants in connection with the litigation, but shall not be given to consultants or experts rendering financial advice. The Order thus affords each party a choice, either to withhold confidential information from financial advisors so they can continue to solicit financial advice from them, or to provide confidential information to an advisor and use the advisor *solely* as a litigation consultant. This makes sense from the standpoint of practice, theory and public policy. UPR's assertion that "litigation consultants" would be able to "segregate mentally" confidential financial information when they switch into their role as "financial consultants" is, in my opinion, an epistemological leap of heroic proportions. But the underlying assumptions about human behavior implicit in UPR's interpretation need not be tested because paragraph 6(A), in my opinion, cannot be fairly or reasonably read in the manner UPR urges here. Therefore, I deny UPR's motion to compel production of documents (Docket Item No. 63).

*4 The parties should advise me promptly if other issues or motions (such as Pennzoil's motion seeking leave to file an amended and supplemental answer and counterclaim) need the Court's attention.

IT IS SO ORDERED.

Del.Ch.,1997.
In re Pennzoil Co. Shareholders Litig. Cons.
Not Reported in A.2d, 1997 WL 770663 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.