# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DOW CHEMICAL CANADA, INC. | § | |
| on its own behalf and as assignee of | § | |
| THE DOW CHEMICAL COMPANY | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | C.A. No. 05-23 (JJF) |
| | § | |
| HRD CORPORATION (d/b/a | § | |
| Marcus Oil & Chemical) | § | |
| Defendant, Counterclaim Plaintiff | § | |
| | § | |
| VS. | § | |
| | § | |
| DOW CHEMICAL CANADA, INC. | § | |
| on its own behalf and as assignee of | § | |
| THE DOW CHEMICAL COMPANY and | § | |
| THE DOW CHEMICAL COMPANY, | § | |
| Counterclaim Defendants. | § | |

## NOTICE OF SERVICE

The undersigned, counsel for Defendant HRD Corporation, hereby certifies that true and correct copies of HRD CORPORATION'S SUPPLEMENTAL RESPONSES TO PLAINTIFF/COUNTERCLAIM DEFENDANTS' FIRST SET OF INTERROGATORIES and HRD CORPORATION'S REQUEST FOR PRODUCTION OF DOCUMENT TO DOW CHEMICAL CANADA, INC. AND THE DOW CHEMICAL COMPANY were caused to be served on April 6, 2006 on the attorneys of record at the following addresses as indicated:

**VIA HAND DELIVERY**

Kenneth Nachbar
David J. Teklits
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
PO Box 1347
Wilmington, DE 19899-1347

**VIA FACSIMILE**

Donald R. Cassling
Christopher Tompkins
Zachary V. Moen
Jenner & Block LLP
One IBM Plaza
Chicago, IL 60611

**POTTER ANDERSON & CORROON LLP**

By: _Suzanne M. Hill_
Richard L. Horwitz (#2246)
Suzanne M. Hill (#4414)
1313 North Market Street
Hercules Plaza, 6th Floor
P.O. Box 951
Wilmington, DE 19889-0951
(302) 984-6000 (Tel)
(302) 658-1192 (Fax)
rhorwitz@potteranderson.com
shill@potteranderson.com
*Attorneys for Defendants HRD Corporation
d/b/a Marcus Oil & Chemical, Inc.*

OF COUNSEL:
WILLIAM C. FEREBEE
Texas Bar No. 06907500
MICHAEL L. LANDRUM
Texas Bar No. 11868300
O'DONNELL FEREBEE MEDLEY & KEISER, PC
450 Gears Rd. #800
Houston, Texas 77067
281-875-8200 (Telephone)
281-875-4962 (Facsimile)

Dated: April 6, 2006

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, Suzanne M. Hill, hereby certify that on April 6, 2006, the attached document was

hand delivered and electronically filed with the Clerk of the Court using CM/ECF which

will send notification of such filing(s) to the following and the document is available for

viewing and downloading from CM/ECF:

Kenneth Nachbar
David J. Teklits
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
PO Box 1347
Wilmington, DE 19899-1347

I hereby certify that on April 6, 2006, I have faxed the document to the following

non-registered participants:

Donald R. Cassling
Christopher Tompkins
Zachary V. Moen
Jenner & Block LLP
One IBM Plaza
Chicago, IL 60611

By:    *Suzanne M. Hill*
       Richard L. Horwitz (#2246)
       Suzanne M. Hill (#4414)
       W. Harding Drane, Jr. (#1023)
       Hercules Plaza, 6th Floor
       1313 North Market Street
       P.O. Box 951
       Wilmington, DE 19889-0951
       (302) 984-6000 (Tel)
       (302) 658-1192 (Fax)
       rhorwitz@potteranderson.com
       shill@potteranderson.com
       wdrane@potteranderson.com

## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DOW CHEMICAL CANADA, INC. | § | |
| on its own behalf and as assignee of | § | |
| THE DOW CHEMICAL COMPANY | § | |
|     Plaintiff, | § | |
| | § | |
| VS. | § | C.A. No. 05-23 (JJF) |
| | § | |
| HRD CORPORATION (d/b/a | § | |
| Marcus Oil & Chemical) | § | |
|     Defendant, Counterclaim Plaintiff | § | |
| | § | |
| VS. | § | |
| | § | |
| DOW CHEMICAL CANADA, INC. | § | |
| on its own behalf and as assignee of | § | |
| THE DOW CHEMICAL COMPANY | § | |
| and THE DOW CHEMICAL, | § | |
| COMPANY | § | |
|     Counterclaim Defendants. | § | |

## HRD CORPORATION'S REQUEST FOR PRODUCTION OF DOCUMENTS TO DOW CHEMICAL CANADA, INC. AND THE DOW CHEMICAL COMPANY

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure and Local Rule 26.1 of the United States District Court for the District of Delaware, HRD Corporation requests that Plaintiff/Counterclaim Defendants produce for inspection and copying all of the following documents and other tangible things that are in their possession, custody or control. The following instructions and definitions apply:

### DEFINITIONS

1.     "Dow" refers to both Dow Chemical Canada, Inc. and The Dow Chemical Company.

2.     "You" or "your" shall refer to Dow.

3.     "Marcus" refers to HRD Corporation d/b/a Marcus Oil & Chemical.

4.     "Metallocene Polymers" shall refer to olefin based polymers that were synthesized using single site catalyst.

5.     "Adhesive company" refers to any company with a majority of sales to the adhesive industry, or a company that has a division or affiliate with sales to the adhesive industry that is ranked among the top 20 suppliers to the adhesive industry by Adhesive Age Magazine.

6.     "Adhesive markets" includes hot melt adhesives used in the packaging, personal care, construction or other markets where two items are to be bound.

7.     The term "communication" shall mean any correspondence, contact, discussion, or exchange between any two or more persons, whether written or oral. Without limiting the foregoing, the term "communication" includes all documents, telephone conversations, face-to-face conversations, meetings or conferences, and any other means of transmitting a message.

8.     The term "document" shall mean anything discoverable under Rule 34 of the Superior Court Civil Rules. Further, the term "document" shall be used in the broad and liberal sense and means written, typed, printed, recorded or graphic matter, however produced or reproduced, of any kind and description and whether an original, master, duplicate or copy, including papers, notes of conversations, contracts, agreements, purchase orders, invoices, payment vouchers, credit memos, credit policies, payment receipts, bills of lading, delivery receipts, service tickets, field service reports, drawings, telegrams, tape recordings, communications (including inter-office and intra-

office memoranda), analytical reports, studies, UCC searches, security agreements,
working papers, corporate records, minutes of meetings, notebooks, wire transfers, bank
deposit slips, bank checks, canceled checks, diaries, diary entries, appointment books,
desk calendars, photographs, transcriptions or sound recordings of any type of personal or
telephone conversations, negotiations, meetings, conferences, or things similar to any of
the foregoing, and data, information or statistics contained within any data storage
module, tape, disc or other memory device, or other information retrievable from storage
systems including computer generated reports and print-outs and electronic
communication, including e-mail and facsimile transmissions. The term "document"
shall also include data compilations from which information can be obtained and
translated, if necessary, through detection devices in a reasonably usable form. The term
"document" shall also mean any English translation of a document in another language.
If any "document" has been modified by the addition of notations or otherwise, or has
been prepared in multiple copies which are not identical, each modified copy or non-
identical copy is a separate "document."

        9.     The term "JDA" shall refer to the Joint Development Agreement
executed in July 2002. This term shall include any addendums, amendments or schedules
to the JDA.

        10.    The term "Supply Agreement" shall refer to the Sarnia PE Wax
Supply Agreement that was executed in July 2002, and any schedules, amendments or
addendums thereto.

        11.    The term "Light Ends" shall refer to the waste byproducts of the
manufacturing process for polyethylene wax.

3

12.    The term "PFD" shall refer to process flow diagrams.

13.    The term "P&ID" shall refer to piping and instrument diagrams.

14.    The term "MOC" shall refer to Management of Change.

15.    The term "SOP" shall refer to standard operating procedures.

16.    The term "SOC" shall refer to standard operating conditions.

## INSTRUCTIONS

1.    Answer each of the attached Requests for Production so that your response identifies to which production request(s) the item applies.

2.    You are reminded that your written response: to this Request for Production shall state, with respect to each category of items that inspection and other requested action will be permitted as requested, except to the extent that you make objections in writing to particular items or categories.

3.    Your written response:s and/or objections, if any, shall be served on the opposing attorney no later than thirty (30) days after service of same.

4.    You are required to make all documents or items subject to this Request for Production, available for inspection and copying in the offices of O'Donnell, Ferebee, Medley & Keiser, P.C., 450 Gears Road, Suite 800, Houston, Texas 77067.

5.    If you contend that you may partially or entirely withhold a requested document because of a rule, privilege, immunity, or other reason, for each document partially or entirely withheld provide the following information: identify the document; and state the factual basis on which you claim the privilege or immunity.

6.    This request does not seek correspondence between you and your attorneys that was made in anticipation of litigation or in the course of this lawsuit.

4

7.    This discovery request is continuing.   In the event that any information or material comes to your attention, possession, custody or control, or the attention, possession, custody or control of your agents, employees, affiliates, subsidiaries, accountants, partners, officers, directors, or attorneys subsequent to the filing of your response:, which material or information is responsive to any interrogatory or request for production you are required to furnish said additional information, answers, or material to the opposing attorney as soon as possible.

## DOCUMENT REQUESTS

### REQUEST FOR PRODUCTION NO. 1

With respect to the JDA, all documents relating to the following:

a.    business objectives that Dow sought to achieve by entering into the JDA;

b.    negotiation of the JDA;

c.    execution of the JDA; and

d.    technical or business probems that arose during the performance of the JDA.

### RESPONSE:

### REQUEST FOR PRODUCTION NO. 2

With respect to the Supply Agreement, all documents relating to the following:

a.    business objectives that Dow sought to achieve by entering into the SupplyAgreement;

b.    negotiation of the Supply Agreement;

c.    execution of the Agreement;

d.    technical or business problems that arose during the performance of the Supply Agreement.

5

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 3**

  All documents relating to sales calls made by Dow employees concerning any products that Dow was to produce for Marcus.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 4**

  All documents relating to market analyses that Dow conducted concerning any products Dow was to produce for Marcus.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 5**

  All documents relating to Dow's business plans for the adhesive market for the years 1999 through 2006.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 6**

  All documents evidencing the volume of sales and the revenue generated for each product sold to the following businesses:

    a.  H.B. Fuller;

    b.  National Starch;

    c.  Findley; and

    d.  Henkel.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 7**

All documents relating to Dow's business plans for the adhesive industry from 2001 through 2006 that contain references to Metallocene Polymers.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 8**

Documents relating to communications between Dow and Adherent Technologies or Eastman Chemical Company on the topic of Metallocene Polymers.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 9**

Documents relating to communications between Dow and any adhesive companies that mentions Marcus or Metallocene Polymers.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 10**

With respect to the agreement of January 8, 2001, documents relating to all communications between Dow employees concerning the following:

    a.    business objectives that Dow sought to achieve by entering into the January 8, 2001 agreement;

    b.    negotiation of the January 8, 2001 agreement;

    c.    execution of the January 8, 2001 agreement; and

    d.    technical or business problems that arose during the performance of the January 8, 2001 agreement.

**RESPONSE:**

## REQUEST FOR PRODUCTION NO. 11

With respect to the Assignment and Novation Agreement, documents relating to all communications between Dow employees concerning the following:

    a.    business objectives that Dow sought to achieve by entering into the Assignment and Novation Agreement;

    b.    negotiation of the Assignment and Novation Agreement;

    c.    execution of the Assignment and Novation Agreement; and

    d.    technical or business problems that arose during the performance of the Assignment and Novation Agreement.

**RESPONSE:**

## REQUEST FOR PRODUCTION NO. 12

Documents relating to any communication between Dow employees that discusses the benefits, costs or risks associated with producing products for Marcus.

**RESPONSE:**

## REQUEST FOR PRODUCTION NO. 13

All "call" reports that mention Marcus.

**RESPONSE:**

8

**REQUEST FOR PRODUCTION NO. 14**

Documents reflecting calls made jointly with Marcus personnel to adhesive companies.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 15**

Documents that discuss the effect of the Marcus products on other Dow sales.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 16**

Documents relating to communications between Dow technical personnel and Marcus.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 17**

Documents relating to communications between Dow technical personnel and adhesive companies, adhesive consultants, and adhesive labs, during the period from January 8, 2001, to January 1, 2006.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 18**

Produce copies of all patents filed from January 8, 2001 until the present that include claims dealing with Metallocene Polymers, and/or which mention their use in adhesive or wax applications.

**RESPONSE:**

### REQUEST FOR PRODUCTION NO. 19

Produce copies of all lab notebooks related to the development of products supplied to Marcus.

### RESPONSE:


### REQUEST FOR PRODUCTION NO. 20

Produce the results of all experiments conducted by Dow for stripping Light Ends from polymer made by Dow for Marcus, including lab produced and Sarnia-produced samples.

### RESPONSE:


### REQUEST FOR PRODUCTION NO. 21

All documents relating to Dow project reviews relating to the JDA and the Supply Agreement.

### RESPONSE:


### REQUEST FOR PRODUCTION NO. 22

All documents relating to of all agreements between Dow and other companies from January 8, 2001 to the present that mention adhesive applications and/or Metallocene Polymers.

### RESPONSE:


### REQUEST FOR PRODUCTION NO. 23

All documents that discuss Dow's metallocene catalysts and their ability to produce polyethylene copolymer with a molecular weight distribution (Mz) below 2.2.

### RESPONSE:

**REQUEST FOR PRODUCTION NO. 24**

Documents that discuss Dow's metallocene catalysts versus Exxon's metallocene catalysts.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 25**

Documents that discuss any limitations of the products that could be produced at Sarnia.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 26**

A 500 gram sample of every product produced for Marcus pursuant to the JDA and/or the Supply Agreement, whether in the lab or at Sarnia.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 27**

All PFD's and P&ID's for the Sarnia plant at the time production for Marcus commenced.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 28**

All documents relating to MOC for changes made to the plant during production for Marcus, including all changes to PFDs and/or P&IDs.

**RESPONSE:**

## REQUEST FOR PRODUCTION NO. 29

The final drawings of the Sarnia plant.

## RESPONSE:

## REQUEST FOR PRODUCTION NO. 30

The design and modeling calculations for devolatilization of Marcus products at Sarnia.

## RESPONSE:

## REQUEST FOR PRODUCTION NO. 31

All SOPs and all SOCs for the Sarnia plant at the time of production for Marcus commenced.

## RESPONSE:

## REQUEST FOR PRODUCTION NO. 32

All changes to the SOPs and SOCs during pendency of the production for Marcus.

## RESPONSE:

## REQUEST FOR PRODUCTION NO. 33

All documents relating to communication regarding proposed and/or actual changes made to PFDs, P&IDs, SOPs and SOCs during production for Marcus.

## RESPONSE:

## REQUEST FOR PRODUCTION NO. 34

The operational procedures for devolatilization of Marcus products at Sarnia.

### RESPONSE:


## REQUEST FOR PRODUCTION NO. 35

The design criteria for conversion of devolatilization units before and after the Sarnia retrofitting.

### RESPONSE:


## REQUEST FOR PRODUCTION NO. 36

All procedures for initial start-up of the plant for production for Marcus

### RESPONSE:


## REQUEST FOR PRODUCTION NO. 37

All temporary operating procedures and/or all procedures for non-standard conditions during the production for Marcus

### RESPONSE:


## REQUEST FOR PRODUCTION NO. 38

All shift logs for each shift during production for Marcus.

### RESPONSE:

**REQUEST FOR PRODUCTION NO. 39**

All daily production reports for each day during production for Marcus.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 40**

All weekly, monthly, quarterly, and annual production reports for the period of time in which Dow was producing products for Marcus.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 41**

All reports documenting unusual events during production for Marcus including safety, environmental, production and/or quality events.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 42**

The quality control logs and analytical lab notebooks for the Marcus products produced by Dow.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 43**

The material balance for production at Sarnia.

**RESPONSE:**

14

### REQUEST FOR PRODUCTION NO. 44

The solvent and polymer mass balance calculations conducted during the Sarnia operations.

### RESPONSE:

### REQUEST FOR PRODUCTION NO. 45

The analytical procedures for analyzing the effectiveness of the Sarnia devolatilization units.

### RESPONSE:

### REQUEST FOR PRODUCTION NO. 46

The data accumulated for analyzing the effectiveness of the Sarnia devolatilization units.

### RESPONSE:

### REQUEST FOR PRODUCTION NO. 47

The operations logs from Sarnia.

### RESPONSE:

### REQUEST FOR PRODUCTION NO. 48

The production schedules from Sarnia.

### RESPONSE:

15

<u>**REQUEST FOR PRODUCTION NO. 49**</u>

The in-process product analysis from Sarnia.

<u>**RESPONSE:**</u>

<u>**REQUEST FOR PRODUCTION NO. 50**</u>

The grading logs and/or off grade production logs for Sarnia.

<u>**RESPONSE:**</u>

<u>**REQUEST FOR PRODUCTION NO. 51**</u>

Documents concerning the segregation procedure for non conforming production.

<u>**RESPONSE:**</u>

<u>**REQUEST FOR PRODUCTION NO. 52**</u>

The regrading procedure and logs.

<u>**RESPONSE:**</u>

<u>**REQUEST FOR PRODUCTION NO. 53**</u>

The scrapped materials log.

<u>**RESPONSE:**</u>

<u>**REQUEST FOR PRODUCTION NO. 54**</u>

The reworking procedure and reworking logs.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 55**

The Marcus requests for product as referenced in Paragraph 53 of your Complaint.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 56**

Produce all records on the trial production runs at Sarnia.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 57**

A 500 gram sample of off spec material shipped May 5, 2004.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 58**

A 500 gram sample of each off spec material shipped May 14, 2004.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 59**

A 500 gram sample of the Prime product produced May 9, 2004.

**RESPONSE:**


17

## REQUEST FOR PRODUCTION NO. 60

A 500 gram sample of the off spec materials shipped June 10 and 11, 2004.

## RESPONSE:


## REQUEST FOR PRODUCTION NO. 61

A 500 gram sample of any other material shipped to Marcus from Sarnia.

## RESPONSE:


## REQUEST FOR PRODUCTION NO. 62

The document where you disclosed Patent Application No. 10/509,212 to Marcus.

## RESPONSE:


## REQUEST FOR PRODUCTION NO. 63

The disclosures to Marcus made pursuant to Paragraph 4.4 of the JDA.

## RESPONSE:


## REQUEST FOR PRODUCTION NO. 64

The disclosures to Marcus made pursuant to Paragraph 4.5 or 4.7 of the JDA.

## RESPONSE:


## REQUEST FOR PRODUCTION NO. 65

All documents relating to communications between Dow and Marcus regarding the success or lack of success of the products created pursuant to the JDA.

Case 1:05-cv-00023-JJF    Document 78-2    Filed 12/28/2006    Page 23 of 54

APR. 6. 2006  6:37PM    POTTER ANDERSON & CORROON LLP    NO. 7353  P. 23.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 66**

All documents relating to communications regarding the initial samples referred to in Paragraph 6.1 of the JDA.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 67**

Documents concerning the methods Dow uses to protect confidential information as described in Paragraph 6.3 of the JDA.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 68**

Documents in which the confidential information was shared with Marcus.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 69**

Documents concerning any developments as defined by Paragraph 10.7 of the JDA.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 70**

The Profit and Loss Statement and Balance Sheets for the Sarnia plant for the years 2000-2006.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 71**

The documents showing the Research and Development Expenses incurred pursuant to the Joint Development Agreement.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 72**

The invoices to Marcus for Research and Development Expenses.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 73**

The Profit and Loss statements showing the profit Dow made on the Research and Development part of the JDA.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 74**

The Profit and Loss statements showing the profit Dow made on the Supply Agreement.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 75**

Documents reflecting the amount of money Marcus paid Dow pursuant to the JDA.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 76**

All documents showing the amount of money Marcus paid Dow pursuant to the Supply Agreement.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 77**

All documents detailing the damages you are claiming in this lawsuit.

**RESPONSE:**

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Michael Landrum
William C. Ferebee
O'DONNELL FEREBEE MEDLEY &
KEISER, PC
450 Gears, Eighth Floor
Houston, TX 77067-4512
(281) 875-8200 (telephone)
(281) 875-4962 (facsimile)

By: _Suzanne M. Hill_
Richard L. Horwitz (#2246)
W. Harding Drane, Jr. (#1023)
Suzanne M. Hill (#4414)
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
wdrane@potteranderson.com
shill@potteranderson.com

Dated: April 6, 2006

*Attorneys for HRD Corporation (d/b/a Marcus Oil & Chemical)*

726474

# EXHIBIT 2

**JENNER&BLOCK**

July 20, 2006

Jenner & Block LLP     Chicago
One IBM Plaza          Dallas
Chicago, IL 60611-7603  New York
Tel 312 222-9350       Washington, DC
www.jenner.com

**VIA FACSIMILE**

Michael L. Landrum
O'Donnell Ferebee Medley & Keiser, P.C.
450 Gears
Eight Floor
Houston, TX  77067-4512

Aaron A. Barlow
Tel  312 923-8308
Fax  312 923-8408
abarlow@jenner.com

Dear Michael:

I am writing in response to your letter of July 17, 2006 to Don Cassling, Chris Tompkins and Ken Nachbar. With respect to your complaints about our document production, we are in the process of collecting and reviewing many documents in an effort to produce documents to you. I think when the documents are produced you will see that our objections are not unreasonable. However, I have no problem spending a day with you going over your concerns, although I don't believe it will take a day.

Perhaps you do not realize how broad your requests are in some respects. For example, your request for various types of documents relating to metallocene polymers would cover hundreds of thousands of documents that are totally irrelevant to any issue in this case and would not conceivably lead to anything admissible. Consequently, we have objected to these document requests. I suspect your concern about this objection, as well as all of our other objections is based on a simple misunderstanding that we can clear up when we talk.

However, because your document requests are in many respects so broad, so vague and not reasonably tailored to obtain information relevant to the issues in this case, it has been difficult for us to conduct a manageable search in the time you think we should have. We are, however, almost ready to produce documents collected in an attempt to find all communications between Dow and HRD. Those should be produced to you shortly. The broader search is also underway, but will take longer.

Several of your statements regarding discovery are simply inaccurate. Your accusation that we are stone walling is completely false. And your position that the Federal Rules of Civil Procedure require us to conduct all of our document searching before serving our objections and written responses is simply not the law. However, I think if we discuss this matter, we can move beyond these statements.

Finally, because your document requests seek information that is of a very confidential nature beyond what we anticipated would be sought when we agreed to the protective order in this case, we need to amend the protective order prior to producing these confidential documents. Specifically, the current protective order would allow HRD to show highly confidential Dow

Michael L. Landrum
July 20, 2006
Page 2

**JENNER&BLOCK**

information to any consultant HRD chooses, with Dow having no ability object. This is obviously inadequate for many of the types of documents Dow has agreed to produce. Consequently, we propose adding a provision to the protective order requiring each side to disclose its intended consultants who will be shown highly confidential information at least 14 days prior to doing so, giving the other side time to object. The disclosure must include the recent employment and consulting history of the consultant. This is invariably done in patent cases and in my experience works very well.

Turning to HRD's discovery responses to Dow, we also have a number of concerns with them, and we need to discuss them at the same time we discuss your concerns about Dow's production. These concerns are as follows.

First, you have never provided any written responses or objections to our first or second set of document requests, or our second set of interrogatories. (Copies attached.) As you know, under the law, any objections you may have had are waived, including attorney-client privilege and work product objections. Please let us know when you plan to produce the requested documents and answer the interrogatories.

Second, your objections to our third set of document requests are patently unreasonable. For example, Request No. 91 seeks documents relating to "stopping operations at the plant located at the Marcus Oil facility in Houston, Texas from December 3, 2004 to date." You objected to this request on the grounds that it does not seek information relevant to this case. However, HRD in its amended answer raised a *force majeure* defense based on the allegation, "On December 3, 2004, there was an explosion and fire at HRD's main offices.... Any injury or damage Plaintiff claims occurred after December 3, 2004, was caused by an Act of God or Force Majeure for which Defendant cannot be held legally responsible according to the express terms of the parties' agreement." Dow's document request no. 91 obviously seeks documents relevant to this allegation. Please agree to withdraw your objection and produce all relevant documents.

Third, you have objected to our requests seeking information on HRD's business relations with entities outside the United States. Your document requests seek certain discovery of Dow's technology that we believe may trigger concerns regarding obligations to the U.S. Government (Departments of Treasury, State and Justice). These obligations pertain to commodity control issues and the potential for possible overseas disclosure of proprietary information developed in the U.S. Please reconsider your objections to our document requests.

Turning to the issue of the samples, I tried to contact you twice in June regarding these and you never replied. Enclosed is a copy of my email to you from June 30, 2006. We have the samples and have been and are ready to exchange them. When we have our discussion we should talk about a date for exchange. It is premature to discuss joint tests and where to conduct them until we know what tests will be run and what samples to run them on. If you already know what tests you would like to run, please let us know so we can begin considering them. Once we have received the samples from you and had time to examine them, we will be in a position to discuss joint testing.

Michael L. Landrum
July 20, 2006
Page 3

**JENNER & BLOCK**

As for a date for our meeting, you are welcome to come to Chicago and meet with me on July 24, 27 or 31, 2006. Alternatively, I can discuss with you these issues over the phone on any of those days.

Very truly yours,

Aaron A. Barlow

AAB:pts

# EXHIBIT 3

REDACTED

| | |
|---|---|
| **From:** | Barlow, Aaron A |
| **Sent:** | Tuesday, August 22, 2006 9:32 AM |
| **To:** | 'William C. Ferebee' |
| **Cc:** | Nimrod, Raymond N |
| **Subject:** | RE: Marcus v Dow |

Bill,

I am out of the office this week. I did not send the samples out yesterday. I have been trying to arrange the sample exchange for several weeks now, with several letters, voice mails and emails asking you or your partner when you wanted to make the exchange, but I never received a response until yesterday, when I was out of the office. I will try to send them out as soon as possible, but being out of the office it may take time to coordinate. Hopefully, I will try to send them out today. I will let you know later today whether I can send them out today.

On the confidentiality, my understanding is that all the documents we marked confidential contained information that was either confidential to Dow (albeit previously disclosed to HRD under a confidentiality agreement) or confidential to HRD (also disclosed previously to Dow under a confidentiality agreement) or both. If you want to expressly waive all of HRD's rights to confidentiality in the documents, we can go through them again and de-designate the ones that only contain what we understand to be HRD confidential information, if any. However, my understanding is that the current protective order provides client personnel limited access rights for confidential information (although not highly confidential information) that I had thought was adequate for your purposes, so I'm not sure what the issue is.

I disagree with your suggestion that the documents we produced are not meaningful. We expect to produce more documents over the course of the next month. But before that we need to revise the protective order as I discussed at our meeting in Chicago.

Aaron

---

**From:** William C. Ferebee [mailto:wferebee@ofmklaw.com]
**Sent:** Tue 8/22/2006 8:36 AM
**To:** Barlow, Aaron A
**Subject:** Marcus v Dow

Aaron

       Yesterday I called to tell you that we were sending our samples. They are being sent Fed Ex, tracking number 8546 3617 0741. Hopefully you sent yours yesterday. Please send me your tracking number.

       On another matter, I received your CD with some documents. However they appear mostly to be just a copy of the emails we sent you. When can we expect to receive meaningful documents?

       Also I have a real problem with every document being marked "confidential". Most of these emails do not contain anything confidential. Is it Dow's intention to just mark every single document as confidential?

**William C. Ferebee**
O'Donnell, Ferebee, Medley & Keiser, P.C.
450 Gears Road, Suite 800
Houston, TX  77067
(281) 875-8200

12/26/2006

(281) 875-4962 facsimile
wferebee@ofmklaw.com

12/26/2006

# EXHIBIT 4

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 1999 WL 33454801 (D.N.J.), 45 Fed.R.Serv.3d 1056
(Cite as: Not Reported in F.Supp.2d)

**H**

Biovail Corp. Intern. v. Hoechst
AktiengesellschaftD.N.J.,1999.
United States District Court, D. New Jersey.
BIOVAIL CORPORATION INTERNATIONAL,
Plaintiff,
v.
HOECHST AKTIENGESELLSCHAFT, Hoechst
Marion Roussel, Inc., Hoechst Marion Roussel North
America, Inc., Carderm Capital L.P., Horst Waesche,
Daniel Camus, Richard J. Markham, Peter W. Ladell,
Gerald P. Belle, and Jurgen Dormann, Defendants.
No. Civ.A. 98-1434(MTB).

Nov. 12, 1999.

*OPINION*

BARRY, J.

**\*1** This matter comes before the court on a motion to
vacate the August 9, 1999 [FN1] order of the Honorable
Stanley R Chesler, U.S.M.J., pursuant to
Fed.R.Civ.P. 72,(a) filed by defendants Hoechst
Aktiengeselschatt("Hoechst AG"), Hoechst Marion
Roussel, Inc. ("HMRI"), Hoechst Marion Roussel
North America, Inc., Carderm Capital L.P.
("Carderm"), Horst Waesche ("Waesche"), Daniel
Camus ("Camus"), Richard J. Markham
("Markham"), Peter W. Ladell ("Ladell"), Gerald P.
Belle ("Belle"), and Jurgen Dormann ("Dormann")
(collectively as "defendants" or "Hoechst".
Defendants request that this court reverse that order
which requires each party to disclose the identities of
nontestifying experts and consultants prior to their
review of certain confidential documents. For the
following reasons, this court will affirm.

FN1. The order was dated August 9, 1999,
filed on August 10, 1999, and entered on the
docket on August 11, 1999.

*I. Statement of Facts*

The facts of this case are long and complicated, and
have been previously set forth at length by this court.
*See Biovail Corp. Int'l v. Aktiengesellschaft, 49
F.Supp.2d 750, 755-59 (D.N.J.1999)*. Only those
facts essential to this limited appeal, therefore, will
be discussed here.

Biovail Corporation International ("Biovail") is a
Canadian pharmaceutical company involved in the
manufacture and development of drugs for the
treatment of chronic conditions such as high blood
pressure. *See* Compl. ¶ 4. Defendants are also
engaged in the production and sale of pharmaceutical
products. *Id.* ¶¶ 5-10.

Marion Merrell Dow initially introduced a pioneer
drug which used diltiazem, a calcium channel
blocker, as an active ingredient to treat high blood
pressure and angina. *Id.* ¶¶ 21-22. The brand name
of the drug was Cardizem. *Id.* In June of 1993,
Hoechst-Roussel Pharmaceuticals, Inc. ("HRP"), a
subsidiary of Hoechst AG and a company associated
with Hoechst-USA, entered into a Rights Agreement
with Biovail by which the companies would jointly
develop diltiazem-based drugs that would compete
with Cardizem. *Id* . ¶ 29. The first such product
developed was a once-daily form of diltiazem to be
sold under the name of Tiazac. *See id.* ¶ 29. HRP
filed a New Drug Application ("NDA") for Tiazac
with the FDA certifying its safety and effectiveness.
*Id.*

In late 1994, Hoechst AG announced that it planned
to acquire Marion Merrell Dow and thereafter HRP
terminated its joint venture with Biovail. *Id.* ¶ 31.
Biovail sued Hoechst AG for contract and antitrust
violations and on April 28, 1995, the parties entered
into a settlement agreement. *Id.* ¶¶ 32-33. Among
other things, the settlement agreement assigned
Biovail the rights to the Tiazac NDA. *See* Compl. 35.

The Federal Trade Commission ("FTC") initiated an
investigation into the proposed acquisition of Marion
Merrell Dow by Hoechst AG. *Id.* ¶ 36. This
investigation was settled by a consent order that
became final on April 17, 1996 ("FTC Order"). *Id.* In
order to rectify the potential anticompetitive effects
of the acquisition, the FTC ordered, *inter alia,* that
Hoechst and Marion Merrell Dow give Biovail a
right of reference to the pharmacology and
toxicology data filed with the FDA in support of
Marion Merrell Dow's NDA covering Cardizem.

**\*2** On December 18, 1995, a representative of
Hoechst-USA provided Biovail with the FTC
mandated "right of reference" letter to the FDA. *See
id.* ¶ 55. The reference letter, however, did not
permit reference for any once-a-day formulation of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 2
Not Reported in F.Supp.2d, 1999 WL 33454801 (D.N.J.), 45 Fed.R.Serv.3d 1056
**(Cite as: Not Reported in F.Supp.2d)**

diltiazem. Thus, in November 1997, when Biovail attempted to file an NDA (No. 20-939) with the FDA for a generic version of Cardizem CD, the once-daily dosage form of Cardizem, it was rejected because it did not contain nonclinical pharmacology or toxicology data.

On March 27, 1998, Biovail filed this action against Hoechst asserting antitrust violations, breach of contract, violations of the New Jersey Consumer Fraud Act, and unfair competition. Biovail claims, *inter alia,* that Hoechst interfered with the regulatory approval process in the United States by repudiating the FTC Order. In addition, Biovail contends that Hoechst interfered with the regulatory approval process of Tiazac by Canada's Health Protection Branch ("HPB") by sending a letter to the HPB expressing "specious safety concerns" regarding the non-bioequivalence of Tiazac to Cardizem CD. *See id.* ¶¶ 41-53.

During the discovery period, Biovail and Hoechst agreed that a protective order would be required to maintain the confidential nature of the information being exchanged by the parties. *See* Spears Decl. ¶ 3. Among the materials sought to be protected were Biovail's regulatory files and other correspondence relating to its diltiazem product, as well as its filings with the FDA and the Canadian Health Protection Branch. *See* Def. Br. Supp. at 3. Notwithstanding Biovail's argument that the materials were nondiscoverable and confidential, this court had previously ordered their production. *See* Order, Mar. 17, 1999.

The parties ultimately negotiated a Stipulated Protective Order ("Protective Order") pursuant to Fed.R.Civ.P. 26(c), which the court approved on August 25, 1998. The Protective Order basically sets up a two-tier system whereby a party producing a document containing confidential information may designate that document as either "Confidential Subject to Protective Order" ("Confidential") or "Restricted Confidential, Attorneys Eyes Only" ("Restricted Confidential"). *See* Protective Order ¶¶ 1-2. Where the document "contains or reveals any trade secrets, confidential business information, know-how or confidential matter that may be protected pursuant to Fed.R.Civ.P. 26(c)," it is to be labeled Confidential. *Id.* ¶ 1. Alternatively, if it contains "sensitive business strategic plans and/or competitive analyses, the parties may designate" it as Restricted Confidential. *Id.* ¶ 3. Whether designated as Confidential or Restricted Confidential, all of the documents are collectively referred to as

"Confidential Information" throughout the Order. *See id.*

Paragraphs Four through Six of the Protective Order indicate who may view the Confidential Information, and are the ones at issue in this case. Paragraph Four states:

*\*3* 4. Confidential Information shall be used by any person receiving it for no purpose other than prosecution or defense of this action and shall be disclosed by the party receiving it to no one except (i) to the Court presiding over this action and its personnel; (ii) to any court to which an appeal in this action might lie and its personnel; (iii) court and deposition stenographers and videographers; (iv) to outside counsel engaged by a party, including paralegal, secretarial and clerical personnel; (v) to independent outside consultants and/or experts provided that such outside counsel and independent outside consultants and/or experts sign an Undertaking ... before such disclosure. *Such executed affidavit or declaration shall be maintained on file by the receiving party and shall only be made available to the producing party if the individual to whom the Confidential Information has been disclosed is designated as a trial witness in the manner set forth in paragraph 4 infra or for good cause shown by the producing party* [.]

*Id.* ¶ 4 (emphasis added).

Paragraph Five sets forth the procedures for objecting to the disclosure of Confidential Information to an outside expert or consultant who has been designated as an expert witness. *See id.* ¶ 5. Paragraph Six relates to "any individual defendant as well as in-house counsel and certain designated executives" who will be reviewing the Confidential Information and requires them to also sign an Undertaking that is to be submitted to counsel for the opposing party at least fourteen days prior to the disclosure of any information to that party. *See id.* The party receiving the Undertaking may then object to the disclosure of such information and, as in the case of trial experts, any unresolved disputes may be submitted to the court for resolution. *See id.*

As is evident from Paragraph Four, a party will not be notified of the identity of an outside consultant or expert *unless* that individual is designated as a witness for trial. *See* Protective Order ¶ 4. Biovail attempted to include in the Protective Order a provision for the disclosure of the identity of a nontestifying expert or consultant, *see* Pl. Br. Opp. at 3; Def. Br. Supp. at 3-4. It is not entirely clear why,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                 Page 3
Not Reported in F.Supp.2d, 1999 WL 33454801 (D.N.J.), 45 Fed.R.Serv.3d 1056
**(Cite as: Not Reported in F.Supp.2d)**

but the issue was not addressed in the final draft of the Protective Order.

In accordance with the terms of the Protective Order, Hoechst has produced "in excess of 61 boxes of documents." Spears Decl. ¶ 14. Biovail also produced some documents, but none designated as Restricted Confidential and, perhaps most important, has never produced the regulatory materials it was required to produce pursuant to this court's order of July 6, 1998. Spears Decl. ¶ 14. Instead, Biovail sought modification of the Protective Order to provide for the disclosure of the identity of a nontestifying expert or consultant prior to the release of Confidential Information to that person. *See* Def. Br. Supp. at 4; Pl. Br. Opp. at 3.

**\*4** On March 29, 1999, Biovail wrote to Hoechst expressing concern that the Protective Order "is not adequate to protect Biovail's interest in confidentiality regarding the orange jacket materials." Landrey Decl., Exh. 3. [FN2] Biovail asked that the orange jacket materials be designated as Restricted Confidential and "that materials so designated cannot be shown to non-testifying consultants or testifying experts without prior notice to the producing party; and that such consultants and experts must be unaffiliated with any company in the business of manufacturing and marketing pharmaceuticals." *Id.* Biovail subsequently sent to Hoechst a proposed stipulation and order modifying the Protective Order to include several provisions addressing Biovail's concerns. *See id.,* Exhs. 4, 5. The proposed modifications added "sensitive confidential scientific information" to the documents that the parties could designate as Restricted Confidential, required the disclosure of the "name, employment history and curriculum vitae of [any] outside consultant and/or expert" without regard to whether he or she would be testifying at trial, and severally restricted the individuals who could be obtained as outside [FN3] consultants or experts. *See id.* The parties were not, however, able to reach a compromise and the issue was submitted to the court for resolution.

FN2. The term "orange jacket materials" refers to the standardized, color-coded system by which the FDA organizes the section of each drug application. Orange jacket materials are the data that relates to human pharmacokinetics and bioavailability. *See* Order, Mar. 17, 1999.

FN3. The proposed modification restricting

the employment of consultants and experts provided that "outside experts and consultants and their respective staffs shall not include anyone who is or has been within the last three years an officer, director or employee of any of the parties or their affiliated entities .... [nor] anyone who is an officer, director, or employee of any entity or the affiliate of any entity that manufacturers or markets or is developing any hypertension or angina product, or that has engaged within the last five years in a Transaction (as defined below) with a party, nor anyone who is engaged in providing services of any kind concerning the manufacture, marketing, or development of any hypertension or angina product." Landrey Decl. Exh. 4.

On June 14, 1999, Magistrate Judge Chesler heard oral argument on Biovail's motion for modification of the Protective Order. *See* Transcript of Hearing, June 14, 1999 (cited as "T"). Biovail argued that modification was required to cure "a flaw or an anomaly in the existing Protective order." T3:17. It explained that although the Protective order addresses the "concern about protection of confidential information" to outside experts who will testify, it fails to do the same with regard to outside experts who will only consult. T4:8-16. Biovail argued that there is a risk that a party could select "business people or product development people or scientists at a competitor ... designate them as consultants" and expose them to "highly confidential and sensitive information [that] the parties have." T5:4-12. Biovail submitted that the risk is substantial given the fact that "it is common in litigation of this sort for the parties to work with experts on a consulting basis and ... decide later whether or not they will be testifying experts." T5:19-22. By that time, however, it would be too late to object to the disclosure of confidential information. Accordingly, Biovail asserted that there was "good cause" for modifying that Protective Order. *See* T6-7.

Defendants vigorously objected to that modification, contending that Biovail "failed or refused to demonstrate good cause required ... before any Protective Order may be modified." T10:19-21. Moreover, because the modification would require the disclosure of the identity of nontestifying consultants or experts, Hoechst argued that Biovail must show exceptional circumstances. T10:23-25. In response to the alleged "anomaly," Hoechst explained that it "does nothing more than mimic the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 4
Not Reported in F.Supp.2d, 1999 WL 33454801 (D.N.J.), 45 Fed.R.Serv.3d 1056
(Cite as: Not Reported in F.Supp.2d)

Federal Rules of Civil Procedure ... where the party has a right to object to the use of a particular testifying expert under Rule 26(a)(2)(6), but which protects the identity and work of non-testifying consulting experts under Rule 26(b)(4)(b)." T12:4-10. Hoechst then asserted that the modification, it adopted, would strip away a party's protection under the Federal Rules, *see* T19:7, would "make the pool of potential experts much smaller because they are the ones who will only consult based on a promise that their identity will not be disclosed," T19:9-12, and would reveal to the other party what strategies are being considered based on which experts are being consulted, T19:18-23.

**\*5** Magistrate Judge Chesler concluded that regardless of whether the standard of good cause or exceptional circumstances is applied, "there is a sufficient basis under the facts of this case to warrant the requirements that nontestifying experts be disclosed before they get information which is covered by the Protective Order ." T27:1-6. He explained "that given the highly proprietary nature of the information which is at stake in this case, that which ever of those standards utilized is met by the need of both parties to preserve the confidential nature of their information." T27:6-10. Although he recognized that disclosing the identity of an expert would "provide the opposition with at least a hint of where" a party is heading, he concluded that "at a minimum ... it is only appropriate that each side know at least the identity of an expert before the information covered by the Protective Order is provided." T27:17-20. He was not, however, convinced that "there is any particular need for the extensive resume information" which Biovail sought. T27:21-22. He also did not accept Biovail's request that outside consultants or experts be limited in the manner it proposed and he denied Biovail's request that scientific information be designated as Restricted Confidential. T30:20-23; *see also* Order, Aug. 9, 1999.

Hoechst now moves to have the Order of Magistrate Judge Chesler vacated. It argues that Magistrate Judge Chesler clearly erred in granting the modification as to the identity of a non-testifying consultant because Biovail "did not, and cannot, show good cause or exceptional circumstances to justify its proposed intrusion into the defendants' trial preparation." Def. Br. Supp. at 2-3.

II. *Discussion*

A district court may reverse a magistrate judge's order regarding a nondispositive issue if it is "clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A); Fed. P. Civ. P. 72(a). Findings of fact are reviewed for clear error and legal conclusions are reviewed *de novo. See Cooper Hospital/University Medical Center v. Sullivan,* 183 F.R.D. 119, 127 (D.N.J.1998). Where the only issue is the exercise of a magistrate judge's order will only be reversed if there was an abuse of that discretion. *Id.*

First, Hoechst argues that Biovail has failed to articulate good cause for modifying the Protective Order. *See* Def. Br. Supp. at 9. It contends that Biovail's "broad and unsubstantiated allegations of injury are insufficient," particularly "in light of the defendant's reliance upon the existing order" when they produced numerous documents designated as Restricted Confidential. *Id.* Hoechst also notes that "Biovail did not, and cannot, point to a single change in circumstances that would justify modification." *Id.* at 10. Second, Hoechst submits that modification requires a showing of exceptional circumstances because it calls for the identification of defendants' nontestifying experts or consultants. *See id.* Hoechst reasons that although Fed.R.Civ.P. 26(b)(4)(b) does not refer to the identification of such persons, several courts addressing the issue have concluded that a party must "make a showing of exceptional circumstances before it could discover the identification of its opponent's nontestifying experts." *Id.* at 11. Last, Hoechst contents that "[f]orced disclosure of the identities of the defendants' consultants represents an unwarranted intrusion into the defendants' litigation strategy." *Id.* at 15.

**\*6** Biovail counters that, although the proper standard should be good cause, the evidence, nonetheless, supports both good cause and exceptional circumstances. *See* Pl. Br. Opp. at 10. Biovail argues that "under the initial Protective Order the Hoechst defendants could hire a competitor of Biovail ... to be their consultant and then freely disclose to that competitor Biovail's most sensitive confidential information without Biovail knowing or having the opportunity to object." *Id.* at 10-11. Biovail also asserts that modification is necessary to correct the anomaly that "permit[ted] virtually unrestricted disclosure of confidences to a consultant," but "then, when the party determines to designate the consultant as a testifying expert," the opposing party gets the chance to object to the disclosure of confidences to that expert. *Id.* at 11. Biovail submits that at the time the consultant is designated an expert the confidences may have already been disclosed and the opportunity

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                              Page 5
Not Reported in F.Supp.2d, 1999 WL 33454801 (D.N.J.), 45 Fed.R.Serv.3d 1056
**(Cite as: Not Reported in F.Supp.2d)**

to object becomes moot. *See id.*

The Court of Appeals for the Third Circuit has stated that in determining whether to modify an already existing confidentiality order pursuant to Fed.R.Civ.P. 26(c), the court should employ the same factors that are "used in determining whether to grant such orders in the first instance." *Pansy v. Borough of Stroudsburg,* 23 F.3d 772, 790 (3d Cir.1994). The court, therefore, should consider whether the party seeking the order has made " 'a showing that disclosure will work a clearly defined and serious injury.' " *id.* at 786 (quoting *Publicker Indus, Inc. v. Cohen,* 733 F.2d 1059, 1071 (3d Cir.1984)); *see also Glenmede Trust Co. v. Thompson,* 56 F.3d 476, 483 (3d Cir.1995) (clarifying that "[b]road allegations of harm, unsubstantiated by specific examples ... will not suffice"). The analysis requires " 'a judicial balancing of the harm to the party seeking protection (or third person) and the importance of disclosure to the public.' " *Pansy,* 23 F.3d at 787 (quoting Arthur R. Miller, *Confidentiality, Protective Orders, and Public Access to the Courts,* 105 Harv. L.Rev., 427, 432-33 (1991) (footnotes omitted)). Additionally, where the party is seeking a modification, the opposing party's reliance on the original order is a relevant factor. *See id.* at 789. Such reliance, however, is not to "be outcome determinative" and "should only be one factor to be considered." *Id.* at 790.

The parties have discussed at length, in their submissions to this court, whether the proper standard for modification in this case should be "good cause" or "exceptional circumstances." *See* Def. Br. Supp. at 8-14; Pl. Br. Opp. at 5-10. As discussed above, there is no doubt that only good cause is required for modification of a protective order. *See Pansy,* 23 F.3d at 789-90. The issue of a heightened standard, however, arises in this case because the disclosure mandated by the modification at issue here relates to the identify of a nontestifying consultant or expert and Hoechst submits that, pursuant to Fed.R.Civ.P. 26(b)(4)(b), such disclosure requires extraordinary circumstances. In support, Hoechst relies on several cases that have held "that the 'proper showing' required to compel discovery of a nonwitness expert retained or specially employed in anticipation of litigation corresponds to a showing of 'exceptional circumstances.' " *Ager v. Jane C. Stormont Hosp. & Training School for Nurses,* 622 F.2d 496, (10th Cir.1980) (footnote omitted); *see also Cooper v. Paul Revere Life Ins. Co.,* 1997 WL 289706, at *1 (E.D.La. May 28, 1997); *Bove v. Worlco Data Sys., Inc.,* 1987 WL 5715, at *2-3 (E.

D.Pa. Jan. 21, 1987); *In re Pizza Time Theatre Secs. Litig.,* 113 F.R.D. 94, 97 (N.D.Cal.1986).

**\*7** This court, however, is not entirely convinced that a heightened showing must be made in order to obtain a modification of an already existing order simply because it would entail the disclosure of a nontestifying consultant or expert's identity. Although, as Hoechst points out, there are cases which have required a showing of extraordinary circumstances, there are also many cases which have rejected the heightened standard. *See, e.g., MacGillivray v. Consolidated Rail Corp.,* 1992 WL 57915, at *3 (E.D.Pa. Mar. 17, 1992) (recognizing that "[t]he identify of experts who have been retained or specially employed by a party has been found to be discoverable"); *Threlkeld v. Haskins Law Firm,* 1990 WL 124876, at *1 (E.D.La. Aug. 21, 1990) ("Rule 26(b)(4)(b) .... does not explicitly preclude discovering the identity of such experts and, therefore, the overarching policy of encouraging broad discovery practices weighs in favor of allowing discovery[.]") (citation omitted); *Butler v. Harrah's Marina Hotel Casino,* 1987 WL 16691, at *2 (E.D.Pa. Sept. 8, 1987) ("This Court believes that the proper interpretation of Rule 26 allows for the discovery of the identities of experts who are not expected to testify as witnesses.").

Moreover, even assuming that a showing of extraordinary circumstances is required pursuant to Fed.R.Civ.P. 26(b)(4)(b), it does not necessarily follow that such a showing would also be mandated where the issue is the modification of a protective order. Rule 26(b)(4)(b) "was largely developed around the doctrine of unfairness designed to prevent a party from building his own case by means of his opponent's financial resources, superior diligence and more aggressive preparation." *Ager,* 622 F.2d at 502. By preventing the disclosure of the identity of a party's consultants, the rule prevents a party from discovering his or her opponent's trial strategy. By contrast, where a party is seeking a protective order because the documents that will be exchanged between the parties contain highly confidential information, the same concerns are not present, at least as a primary consideration. In such instances, the desirability, if not necessity, of obtaining the identity of an opponents' consultants rests primarily on the need to ensure the confidentiality of the information and not on an attempt to gain an unfair advantage. *See In re Neubauer,* 173 B.R. 505, 507-08 (D.Md.1994) (holding that "[e]ven assuming ... that the scope of the discovery procedures set forth in [Fed.R.Civ.P. 26(b)(4)(b) ] extends to the discovery

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                      Page 6
Not Reported in F.Supp.2d, 1999 WL 33454801 (D.N.J.), 45 Fed.R.Serv.3d 1056
**(Cite as: Not Reported in F.Supp.2d)**

of the identity of ... experts," it is not implicated where the party seeking the identity "only wants the opportunity to prevent competitors from gaining access to its confidential business information").

Nonetheless, given the fact that the exceptional circumstances standard requires a greater showing than good cause, and because Magistrate Judge Chesler explicitly employed the heightened standard in reaching his decision [FN4] this court will review the order granting the modification at issue here pursuant to the heightened standard. After doing so, this court concludes that Magistrate Judge Chesler's finding that the facts satisfied a showing of exceptional circumstances, *see* T27:2-6, is not clearly erroneous.

> FN4. Magistrate Judge Chesler concluded that "whether the standard is good cause or exceptional cause or exceptional circumstances test ... there is a sufficient basis under the facts of this case to warrant the [modification]." T27:1-4.
> Parenthetically, it should be noted that this court relied, in part, on the existence of the Protective Order and the fact that it would "protect the parties' trade secrets and confidential business information" when it ordered Biovail to produce the orange jacket materials. Order, Mar. 17, 1999.

**\*8** The facts in this case support the conclusion that disclosure of the identity of nontestifying consultants or experts is necessary to protect the confidentiality of the documents. The parties themselves recognize that the information each side is producing is highly confidential; it is the very reason that they negotiated a protective order in the first instance. *See* Spears Decl. ¶ 3 ("counsel agreed that a protective offer was necessary to ensure confidentiality of information exchanged between the parties"). Paragraph Five of that Protective Order requires the disclosure of the identity of an outside consultant or expert designated as an expert witness for trial prior to him or her obtaining confidential information. *See* Protective Order ¶ 5. The purpose of that provision is to prevent the disclosure of confidential information to an individual when the opposing party determines it to be "injurious or prejudicial." *Id.* Biovail states that it was concerned with preventing highly confidential and sensitive information from reaching individuals associated with its competitors. *See* T5:4-12. Clearly, that risk would be equally present whether the consultant or expert is designated as an expert witness for trial or whether he or she remains merely

a consultant. Moreover, the opportunity to object to the disclosure of confidential information to a consultant or expert who is designated as an expert witness for trial pursuant to Paragraph Five of the Protective [FN5] Order becomes meaningless if the information has already been disclosed to that individual prior to his or her designation as an expert witness.

> FN5. Further evidence of the fact that this and other of Magistrate Judge Chesler's findings were not clearly erroneous and that, when discretionary calls were made, Magistrate Judge Chesler did not abuse his discretion is seen in his refusal to grant Biovail the overly intrusive information it sought, *i.e.*, the consultant's employment history and curriculum vitae and the curricula vitae of the consultant's staff members. *See* T28:14-18. Instead, he limited the modification to that which is necessary to ensure that the parties' confidentiality interests are protected, *i.e.*, the consultant's identity.

Magistrate Judge Chesler properly evaluated "the highly proprietary nature of the information which is at stake in this case" and concluded that "at a minimum ... it is only appropriate that each side know at least the identity of an expert before the information covered by the Protective Order is provided." T27:6-20. He acknowledged that the information would, to some extent, "provide the opposition with a least a hint of where ... [the other] party is looking to go in this litigation." T27:25. Nonetheless, he concluded that modification was warranted. In light of the fact that the purpose of the disclosure of identity at issue here is to prevent the parties' competitors from gaining access to its confidential business information, that finding is not clearly erroneous

### III. Conclusion

For the above reasons, this court will affirm the order dated August 9, 1999. An appropriate order will issue.

D.N.J.,1999.
Biovail Corp. Intern. v. Hoechst Aktiengesellschaft
Not Reported in F.Supp.2d, 1999 WL 33454801
(D.N.J.), 45 Fed.R.Serv.3d 1056

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                     Page 7
Not Reported in F.Supp.2d, 1999 WL 33454801 (D.N.J.), 45 Fed.R.Serv.3d 1056
**(Cite as: Not Reported in F.Supp.2d)**

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 5

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2002 WL 32349383 (E.D.Pa.)
**(Cite as: 2002 WL 32349383 (E.D.Pa.))**

H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
GREENE, TWEED OF DELAWARE, INC.
v.
DUPONT DOW ELASTOMERS, L.L.C., et al.
**No. Civ.A. 00-3058.**

Feb. 6, 2002.

David P. Callet, Akin Gump Strauss Hauer & Feld,
Washington, DC, Kevin R. Hamel, Akin, Gump,
Strauss, Hauer & Field, LLP, Kristyne A. Bullock,
Lynda L. Calderone, Philadelphia, PA, Michael S.
Caldwell, Akin Gump Strauss Hauer & Feld, Nicole
H. Sprinzen, Akin, Gump, Strauss, Hauer & Feld,
L.L.P., Washington, DC, Ronald L. Panitch Akin
Gump Strauss Hauer & Feld LLP, Philadelphia, PA,
Shari L. Fleishman Akin Gump Strauss Hauer &
Feld, Washington, DC, for Plaintiff.

Christopher Serbagi, Gerard P. Norton, Jacqueline
M. Vernon, Clifford Chance Rogers & Wells LLP,
Leora Ben-Ami, Kaye Scholer LLP, New York, NY,
Mark S. Stewart, Ballard Spahr Andrews & Ingersoll,
LLP, Philadelphia, PA, Neer Gupta, Philip E. Roux,
Samuel Waxman, Steven J. Lever, Clifford Chance
Rogers & Wells LLP, Thomas F. Fleming, Kaye
Scholer LLP, New York, NY, for Defendant.

*MEMORANDUM AND ORDER*

WELSH, Magistrate J.

*1 Plaintiff, Greene, Tweed of Delaware, Inc.
("Greene, Tweed"), brought this action alleging that
defendants, DuPont Dow Elastomers, L.L.C.
("DuPont Dow") and E.I. Du Pont de Nemours and
Co., Inc. ("DuPont"), have infringed and continue to
infringe United States Patent No. 5,461,107 ("the
'107 patent"). [FN1] Specifically, plaintiff alleges
that defendants have infringed the '107 patent by,
among other things, manufacturing, using, and selling
various products, including, but not limited to,
products under the names Kalrez 8101, 4120, and
325ZR and Kalrez Sahara 8375 and 8385.

FN1. The '107 patent relates to
perfluoroelastomeric compositions and seals
having improved chemical resistance and
methods of making the same. At issue in this
case are specially formulated O-rings that
are highly resistant to heat and chemical
attack.

Presently before the Court is Defendants'
"Emergency Motion to Modify the Stipulation and
Protective Order [by] Precluding Felix A. Paino
From Having Access to Defendants' Customer
Names and Sales Information." Specifically,
defendants request that the Court modify the existing
Stipulation and Protective Order [FN2] by
precluding Felix A. Paino, President of Greene,
Tweed, "from having access to defendants' customer
names and sales information" which defendants were
ordered to produce to plaintiff pursuant to the Court's
January 8, 2002 Order and "any further discovery
flowing from" the production of this information.
[FN3] See Defs.' Br. at 4. In opposition to defendants'
motion, plaintiff argues that defendants "have not met
their high burden to show why the Stipulation and
Protective Order entered in this case on March 16,
2001 is not sufficient to protect this information and
why they have a compelling need for the additional
measure of protection." See Pl.'s Br. at 2.

FN2. A Stipulation and Protective Order
was negotiated and entered into by the
parties and approved and issued by this
Court on March 16, 2001.

FN3. By Memorandum and Order dated Jan.
8, 2002, the Court granted Plaintiff's Motion
to Compel Production of Customer Names
and Sales Information. Pursuant to that
Order, defendants were directed to produce
the following discovery to plaintiff: (1) the
names of all customers (distributors, end
users, and any other individuals or entities)
that purchase any product alleged by
plaintiff to be made by a process that
infringes the '107 patent; (2) the names of all
customers (distributors, end users, and any
other individuals or entities) that have
purchased any product alleged by
defendants to be an acceptable non-
infringing alternative; (3) information

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 2
Not Reported in F.Supp.2d, 2002 WL 32349383 (E.D.Pa.)
(Cite as: 2002 WL 32349383 (E.D.Pa.))

sufficient to correlate customer names with customer codes used in existing discovery materials; and, (4) documents reflecting the intended or actual end use, process, and/or application of any allegedly infringing product and/or any product alleged to be an acceptable non-infringing substitute.

## DISCUSSION

"In the context of discovery, it is well-established that a party wishing to obtain an order of protection over discovery material must demonstrate that 'good cause' exists for the order of protection." *Pansy v. Borough of Stroudsburg,* 23 F.3d 772, 786 (3d Cir.1994) (citing Fed.R.Civ.P. 26(c)); *see Glenmede Trust Co. v. Thompson,* 56 F.3d 476, 483 (3d Cir.1995). In describing a party's burden in demonstrating good cause, the Third Circuit stated: "Good cause is established on a showing that disclosure will work a clearly defined and serious injury to the party seeking closure. The injury must be shown with specificity." *Publicker Indus., Inc. v. Cohen,* 733 F.2d 1059, 1071 (3d Cir.1984). "Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning," do not support a good cause showing. *Cipollone v. Liggett Group, Inc.,* 785 F.2d 1108, 1121 (3d Cir.1986), *cert. denied,* 484 U.S. 976, 108 S.Ct. 487, 98 L.Ed.2d 485 (1987). The burden of justifying the confidentiality of each and every document sought to be covered by a protective order remains on the party seeking the order. *Id.* at 1122. *Pansy,* 23 F.3d at 786-87; *see Glenmede Trust,* 56 F.3d at 483.

In order to determine whether "good cause" exists for a protective order, the Third Circuit has adopted a balancing approach under which the district court must balance the "need for information against the injury that might result if uncontrolled disclosure is compelled." *Pansy,* 23 F.3d at 787 (quoting Arthur R. Miller, Confidentiality, Protective Orders, and Public Access to the Courts, 105 Harv. L.Rev. 427, 432-33 (1991)). In *Pansy,* the Court identified several factors, which are neither mandatory nor exhaustive, that may be considered in evaluating whether good cause exists: (1) whether disclosure will violate any privacy interests; (2) whether the information is being sought for a legitimate purpose or for improper interests; (3) whether disclosure of the information will cause a party embarrassment; (4) whether confidentiality is being sought over information important to public health and safety; (5) whether the sharing of information among litigants will promote fairness and efficiency; (6) whether a party

benefitting from the order of confidentiality is a public entity or official; and (7) whether the case involves issues important to the public. *Glenmede Trust Co.,* 56 F.3d at 483; *Pansy,* 23 F.3d at 788-89.

**\*2** The Third Circuit has recognized that the district court is best situated to determine what factors are relevant to the dispute. *Glenmede Trust Co.,* 56 F.3d at 483. The district court also has wide discretion in weighing the relevant factors and deciding whether to grant a motion for a protective order. *Pansy,* 23 F.3d at 789.

In the present case, defendants request that the Court *modify* the existing protective order. [FN4] Specifically, defendants' motion is limited to a request that the protective order should be modified by precluding Mr. Paino from having access to the specific discovery which defendants were ordered to produce pursuant to the Court's January 8th Memorandum and Order, *see supra* note 3. Thus, the present motion requests that the Court provide *more* protection than the protective order currently provides with regard to the aforementioned discovery, *i.e.,* protection from disclosure of the relevant information to Mr. Paine.

> FN4. It is noted that the factors establishing "good cause" for the existing protective order include the following factors: the parties in the present case are private litigants; the case concerns matters of little legitimate public interest, and the relevant information is of no apparent importance to public health and safety, *see Pansy,* 23 F.3d at 787-88 ("[I]f a case involves private litigants, and concerns matters of little legitimate public interest, that should be a factor weighing in favor of granting or maintaining an order of confidentiality."); the protective order promotes fairness and efficiency in the sharing of information among the litigants, since the parties have been able to rely on the existing protective order in exchanging proprietary and confidential information with the understanding that such information would, pursuant to agreement of the parties, not be disclosed to the public and would only be disclosed to those individuals identified in the protective order.

"It is well-established that a district court retains the power to modify or lift confidentiality orders that it has entered." *Pansy,* 23 F.3d at 784. With regard to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 3
Not Reported in F.Supp.2d, 2002 WL 32349383 (E.D.Pa.)
(Cite as: 2002 WL 32349383 (E.D.Pa.))

the burden which must be met for the Court to modify an existing protective order, the parties in the present case appear to be in agreement that this Court should "allow modification of [the] protective order[ ] upon a showing of 'compelling need.' ' *See* Defs.' Br. at 5 (citing *Federal Deposit Ins. Corp. v. Ernst & Ernst,* 677 F.2d 230, 232 (2d Cir.1982)); *see also* Pl.'s Br. at 2 ("Defendants have not met their high burden to show ... why they have a compelling need for the additional measure of protection."); Defs.' Br. at 5 ("Here, the compelling need standard is met ..."). Indeed, the Second Circuit has held that a confidentiality order can only be modified "if an extraordinary circumstance or 'compelling need' warrants the requested modification." [FN5] *Ernst & Ernst,* 677 F.2d at 232.

> FN5. "[T]he Sixth Circuit has apparently adopted the Second Circuit's standard." *Pansy,* 23 F.3d at 789 n. 24 (citing *United States v. Kentucky Utils., Co.,* 927 F.2d 252, 255 (6th Cir.1991)).

However, in *Pansy v. Borough of Stroudsburg,* 23 F.3d 772 at 784, the Court of Appeals for the Third Circuit rejected the standard applied by the Second Circuit, stating that "the standard of the Court of Appeals for the Second Circuit for modification [of a confidentiality order] is too stringent." *Id.* at 789-90. Pursuant to *Pansy,*

> [t]he appropriate approach in considering motions to modify confidentiality orders is to use the same balancing test that is used in determining whether to grant such orders in the first instance, with one difference: one of the factors the court should consider in determining whether to modify the order is the reliance by the original parties on the confidentiality order.

*Id.* at 790. [FN6] Thus, unlike the "extraordinary circumstance or 'compelling need' ' standard applied in the Second and Sixth Circuits, *see Ernst & Ernst,* 677 F.2d at 232; *see also supra* note 5, in the Third Circuit, "good cause is required for modification of a protective order." *Bjovail Corp. Int'l v. Hoechst Aktiengesellschaft,* 1999 WL 33454801, at *6 (D.N.J. Nov.12, 1999) (citing *Pansy,* 23 F.3d at 789-90).

> FN6. The Court noted that "[t]he parties' reliance on an order ... should not be outcome determinative, and should only be one factor that a court considers when determining whether to modify an order of confidentiality." *Pansy,* 23 F.3d at 790.

*\*3 In the present case, in support of their request to modify the protective order, defendants argue that "[a]llowing Mr. Paino to have access to defendants' customer names and sales information as well as any further third-party discovery into the customer preferences and desires constitutes a clearly defined and serious injury to defendants," including "the risk of [plaintiff] obtaining an unfair business advantage." *See* Defs.' Br. at 6-7. Defendants further assert that, "the need for this ... information can be met by allowing outside counsel and expert access to the documents." *See* Defs.' Br. at 8.

In applying the good cause balancing test in the present case, it is initially noted that to the extent that defendants assert "[b]road allegations of harm, unsubstantiated by specific examples or articulated reasoning," those assertions "do not support a good cause showing." *See Pansy,* 23 F.3d at 786- 87 (quoting *Cipollone,* 785 F.2d at 1121). Rather, a "clearly defined and serious injury ... must be shown *with specificity." See Pansy,* 23 F.3d at 786-87 (quoting *Publicker Indus.,* 733 F.2d at 1071) (emphasis added).

It is further noted that the Court has already found that the discovery at issue has been sought for a legitimate purpose. *See* Mem. and Order dated 1/8/02. Specifically, the discovery ordered to be produced in the January 8, 2002 Order is relevant to the issue of whether plaintiff can establish lost profits damages, and in particular, the absence of acceptable non-infringing substitutes to the patented products. *Id.* at 3, 7-8.

In addition, plaintiff has a legitimate purpose in wanting Mr. Paino to have access to the discovery. Under the existing protective order, defendants have designated three "in-house" individuals--James MacLachlan, Marilyn Bromels, and Andrew Schaeffer--who have access to all of plaintiff's confidential discovery produced in this case. [FN7] Plaintiff has only one "in-house" individual-- Felix Paino--designated under the protective order to have access to defendants' confidential discovery in order to aid outside counsel in the case. *See* Stip. and Prot. Order dated 3/16/01, ¶ 6(b).

> FN7. Although the original Stipulation and Protective Order dated March 16, 2001 identified only Mr. MacLachlan as the "in-house" person designated to see confidential information on behalf of defendants, *see* Stip. and Prot. Order dated 3/16/01, ¶ 6(b), Ms. Bromels and Mr. Schaeffer were

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                    Page 4
Not Reported in F.Supp.2d, 2002 WL 32349383 (E.D.Pa.)
(Cite as: 2002 WL 32349383 (E.D.Pa.))

subsequently also designated to such status, *see* Order dated 9/5/01, ¶ 3. Ms. Bromels is DuPont Dow's in-house patent attorney, and Mr. MacLachlan is the Technology Manager for Fluoroelastomers within DuPont Dow, *see* N .T. MacLachlan Dep. 6/6/01, at 236-40 (attached to Pl.'s Br. at Ex. 3). According to plaintiff, Andrew Schaeffer is in-house counsel for DuPont. *See* Pl.'s Br. at 5.

Although defendants assert in conclusory fashion that, plaintiff's "need for this ... information can be met by allowing [merely] outside counsel and expert access to the documents," *see* Defs.' Br. at 8, the parties have already mutually agreed to permit specifically identified "in-house" individuals to have access to all confidential discovery. This was an *acknowledgment* by the parties who entered into the Stipulation and Protective Order of the necessity of having respective "in-house" individuals able to view the confidential documents to aid in each party's case and settlement considerations. Indeed, courts have observed that parties "are entitled to participate in the preparation of their own defense." *See Merit Indus., Inc. v. Feuer,* 201 F.R.D. 382, 385 (E.D.Pa.2001) (finding that "the information which Defendants seek in discovery is for a legitimate purpose and that the interests of fairness and efficiency will be served by allowing them to have access to the documents"); *see also Schofield v. Trustees of Univ. of Pennsylvania,* 161 F.R.D. 302, 303 (E.D.Pa.1995) (holding that plaintiff's motion to preclude defendant's representatives from having access to confidential discovery "would unduly hamper Defendant's ability to defend the action.").

*4 Furthermore, the interests of fairness and efficiency and the parties' reliance on the protective order which has been in place since March of last year are factors which weigh against the requested modification to the protective order. The fact discovery deadline has passed, and almost all discovery other than expert discovery has already been exchanged by the parties under the conditions of the existing protective order. Therefore, under the negotiated and *agreed upon* protective order, the parties have already exchanged much highly confidential business information, to which all individuals "qualified" under the protective order, including "in-house" individuals, have had access.

Furthermore, the information which defendants presently seek to preclude Mr. Paino from seeing is the very type of information to which the parties *agreed to allow* Mr. Paino access. In particular,

included in the categories of information which the parties contemplated and agreed was subject to the existing protective order is *"customer information (including lists, preferences,* purchases, sales, margins, volumes, profits and terms of specific customer accounts)." *See* Stip. and Prot. Order dated 3/16/01, Ex. "A," ¶ 9 (emphasis added). Indeed, plaintiff argues, *see* Pl.'s Br. at 8, and defendants have not denied that, in addition to the parties having already exchanged business and marketing plans, research and development information, and detailed sales and financial information, the parties have already exchanged many documents containing customer identification information, in reliance on the Stipulation and Protective Order. In any event, *defendants'* "in-house" individuals who are specifically identified in the protective order, as with plaintiff's designated "in-house" individual, have already had access to all of the highly confidential discovery exchanged. [FN8]

> FN8. Although defendants complain that Mr. Paino has "responsibility for competitive decision making," *see* Defs.' Br. at 7, Mr. MacLachlan, one of DuPont Dow's "in-house" individuals permitted access to plaintiff's confidential discovery, testified that he manages employees, budgets, and programs of the technology organization of DuPont Dow, and that he is a member of the "leadership team" which manages the *business strategies* for DuPont Dow's Kalrez business. *See* N.T. MacLachlan Dep. 6/6/01, at 236-40.

Defendants have expressed concern that under the existing protective order Mr. Paino would have access to "further discovery" if plaintiff "depos[es] individual customers" based on the discovery produced pursuant to the January 8, 2002 Order. *See* Defs.' Br. at 6. However, as plaintiff acknowledges: "Fact discovery closed on November 20, 2001, except for the limited additional discovery ordered by the Court in its January 8 and 16, 2002 orders and during the hearing on January 10, 2002. Thus, Greene, Tweed cannot take any third party discovery at this point." *See* Pl.'s Br. at 6. Therefore, at this stage in the proceedings, it appears that defendants' concerns regarding plaintiff's opportunity to conduct further discovery are baseless.

Having applied the good cause balancing test in the present case, and after considering the factors relevant to the present dispute, *see Glenmede Trust Co.,* 56 F.3d at 483; *Pansy,* 23 F.3d at 789, I find that

Not Reported in F.Supp.2d                                                                                Page 5
Not Reported in F.Supp.2d, 2002 WL 32349383 (E.D.Pa.)
**(Cite as: 2002 WL 32349383 (E.D.Pa.))**

defendants have failed to show good cause to preclude Mr. Paino from having access to the discovery ordered to be produced in the Court's January 8, 2002 Order. [FN9] Accordingly, defendants' motion to modify the Stipulation and Protective Order is denied.

> FN9. Under the March 16, 2001 Stipulation and Protective Order, "[a]ny information designated pursuant to this Stipulation and Protective Order as Confidential Information ... shall be used ... solely for the preparation, trial and appeal of this lawsuit; settlement discussions and negotiations pertaining to this lawsuit; or any form of alternative dispute resolution of this lawsuit; and for no other purpose or publication whatsoever, whether directly or indirectly." *See* Stip. and Prot. Order dated Mar. 16, 2001, ¶ 2.

**\*5** An implementing Order follows.

Not Reported in F.Supp.2d, 2002 WL 32349383 (E.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

• 2003 WL 25283062 (Trial Motion, Memorandum and Affidavit) Defendants' Reply Memorandum in Further Support of Their Motion for Judgment as a Matter of Law on Certain Issues (Oct. 16, 2003)Original Image of this Document (PDF)

• 2003 WL 24305854 (Expert Trial Transcript) (Transcript) (Jun. 10, 2003)Original Image of this Document (PDF)

• 2003 WL 24305855 (Expert Trial Transcript) (Transcript) (Jun. 10, 2003)Original Image of this Document (PDF)

• 2003 WL 24305852 (Expert Trial Transcript) (Transcript) (Jun. 9, 2003)Original Image of this Document (PDF)

• 2003 WL 24305853 (Expert Trial Transcript) (Transcript) (Jun. 6, 2003)Original Image of this Document (PDF)

• 2003 WL 24309462 (Partial Expert Testimony) (Partial Testimony) (Jun. 5, 2003)Original Image of this Document (PDF)

• 2003 WL 24305856 (Partial Expert Testimony) (Partial Testimony) (Jun. 4, 2003)Original Image of

this Document (PDF)

• 2003 WL 24305857 (Expert Trial Transcript) (Transcript) (May 30, 2003)Original Image of this Document (PDF)

• 2003 WL 24305858 (Expert Trial Transcript) (Transcript) (May 30, 2003)Original Image of this Document (PDF)

• 2003 WL 24305859 (Expert Trial Transcript) (Transcript) (May 22, 2003)Original Image of this Document (PDF)

• 2003 WL 24308921 (Trial Motion, Memorandum and Affidavit) Defendants' Motion for Judgment as A Matter of Law on the Issues of Infringement, Inducement, Lost Profits, Willfulness and the On-Sale Bar. (Mar. 30, 2003)Original Image of this Document (PDF)

• 2002 WL 33005379 (Expert Report and Affidavit) Report of William H. Murray for Greene, Tweed of Delaware, Inc (Mar. 13, 2002)Original Image of this Document (PDF)

• 2001 WL 34904702 (Trial Pleading) Injunctive Relief Sought (Jun. 4, 2001)Original Image of this Document (PDF)

• 2001 WL 35821967 (Trial Motion, Memorandum and Affidavit) Plaintiff's Reply in Support of Its Motion to Compel Documents Identified in Defendant Dupont Dow's Second Privilege Log and Relating to Dupont Dow's Opinion of Counsel Upon Which It Intends to Rely to Rebut a Charge of Willful Infringement (Apr. 10, 2001)Original Image of this Document (PDF)

• 2001 WL 35821966 (Trial Motion, Memorandum and Affidavit) Dupont Dow Elastomers' Reply to Greene Tweed's Opposition to Dupont Dow Elastomers' Motion to Preclude (Apr. 2, 2001)Original Image of this Document (PDF)

• 2001 WL 35821968 (Trial Motion, Memorandum and Affidavit) Plaintiff/Counter-Defendant Greene, Tweed of Delaware, Inc.'s Motion to Compel Responses to Interrogatories 1, 4- 6, 8-10, 11, 13, and 15-18 (Jan. 25, 2001)Original Image of this Document (PDF)

• 2001 WL 35838395 (Partial Expert Testimony) (Partial Testimony of Dr. James MacLachlan) (2001)Original Image of this Document (PDF)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 6
Not Reported in F.Supp.2d, 2002 WL 32349383 (E.D.Pa.)
**(Cite as: 2002 WL 32349383 (E.D.Pa.))**


• 2:00CV03058 (Docket) (Jun. 14, 2000)

• 2000 WL 35447044 (Trial Pleading) Complaint
(Jun. 10, 2000)Original Image of this Document
(PDF)

• 2000 WL 34616683 (Partial Expert Testimony)
(Partial Testimony) (2000)Original Image of this
Document (PDF)

• 2000 WL 34616684 (Expert Trial Transcript)
(Transcript) (2000)Original Image of this Document
(PDF)

• 2000 WL 34616685 (Partial Expert Testimony)
(Partial Testimony) (2000)Original Image of this
Document (PDF)

• 2000 WL 35443547 (Partial Expert Testimony)
(Partial Testimony of Dr. James Maclachlan)
(2000)Original Image of this Document (PDF)

• 2000 WL 35443548 (Partial Expert Testimony)
(Partial Testimony of Dr. James Maclachlan)
(2000)Original Image of this Document (PDF)

• 2000 WL 35443549 (Partial Expert Testimony)
(Partial Testimony of Dr. Michael Cdughlin)
(2000)Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 6

Westlaw.

Not Reported in A.2d                                                                                      Page 1
Not Reported in A.2d, 1997 WL 770663 (Del.Ch.)
(Cite as: Not Reported in A.2d)

C

In re Pennzoil Co. Shareholders Litig.
Cons.Del.Ch.,1997.Only the Westlaw citation is
currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
In re PENNZOIL COMPANY SHAREHOLDERS
LITIG.
UNION PACIFIC GROUP INC., et al.
v.
PENNZOIL CO., et al.
No. 15764, 15755.

Oct. 27, 1997.

Edward P. Welch, Esquire, Andrew J. Turezyn,
Esquire, Skadden, Arps, Slate, Meagher & Flom,
Wilmington, DE.
Charles F. Richards, Jr., Esquire, Thomas A. Beck,
Esquire, Daniel A. Dreisbach, Esquire, Robert J.
Stearn, Jr., Esquire, Richards, Layton & Finger,
Wilmington, DE.
James C. Strum, Esquire, Chimicles, Jacobsen &
Tikellis, Wilmington, DE.
Joseph A. Rosenthal, Esquire, Rosenthal, Monhait,
Gross & Goddess, Wilmington, DE.
CHANDLER.
*1 Dear Counsel:

Three discovery motions are before the Court. I
have considered your briefs and your letters
concerning the motions. In the interest of advancing
this litigation as efficiently as possible, I think it is
appropriate to rule on the motions now, without the
benefit of oral argument.

First, defendant Pennzoil has filed a motion for a
protective order (Docket Item No. 51) that seeks to
limit the number of plaintiff UPR's interrogatories
and requests for admission. UPR has submitted (to
date) 69 interrogatories, with subparts bringing the
total number to 228 interrogatories. UPR also has
submitted 108 requests for admission, each of which
is accompanied by an interrogatory seeking further
information on any requests to which the response is
anything other than an unqualified admission.
Pennzoil claims this brings the total interrogatories to
336.

Pennzoil does not object to any particular
interrogatory or request for admission. Instead, it
asserts that the discovery as a whole is unduly
burdensome and oppressive, requiring 200 to 400
hours of lawyer time to complete. Pennzoil notes
that UPR's requests far exceed the number of
interrogatories (50) allowed under the local rules of
the Delaware District Court, that it is more
appropriate to obtain this information via depositions,
and that UPR already has conducted extensive
discovery in the Texas litigation which may be used
in this action.

UPR insists that Pennzoil has not shown good cause
for refusing to respond to the disputed discovery.
UPR also argues that it is not an adequate response
for Pennzoil to assert that depositions may be used as
an alternative means to acquire the information. The
interrogatories and requests for admission are
designed to save time and expense at the upcoming
trial, UPR argues, and depositions would be no more
efficient than written questions. UPR also accuses
Pennzoil of delay, claiming it waited two weeks to
file this motion and has refused to provide any
responses in the meantime.

Court of Chancery Rule 26(a) allows parties to obtain
discovery by written interrogatories. Rule 26
contains the following limitation:
The frequency or extent of use of the discovery
methods set forth in paragraph (a) shall be limited by
the Court if it determines that: ... (iii) the discovery
is unduly burdensome or expensive, taking into
account the needs of the case, the amount in
controversy, limitations on the parties' resources, and
the importance of the issues at stake in the litigation.

Ct. Ch. R. 26(b)(1)(iii). This litigation is complex
and hard fought, involving UPR's effort to acquire
control of Pennzoil. Pennzoil is an oil and gas
company with an aggregate stock value of over 6
billion dollars. Until recently, the battle has been
fought principally in the Federal Courts, with the
United States District Court for the Northern District
of Texas (Fort Worth Division) as the main arena.
Extensive discovery has been taken, and fought over,
in the Texas action, with the Texas District Court
issuing over 100 orders deciding various discovery
disputes.

*2 I have already ruled that discovery taken in the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1997 WL 770663 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Texas litigation can be used in this action. Given the scope of discovery already taken in Texas, and considering the early December trial date that UPR pressed for in this Court, I think the discovery process in the Court of Chancery should be carefully supervised to avoid wasteful duplication and to avoid the risk that discovery will become a strategic weapon, rather than a legitimate method to flesh out issues for the impending trial. As Vice Chancellor Steele concluded in *Lorch v. Dyson-Kissner-Moran,* Del. Ch., C.A. No. 12879, Steele, V.C. (May 31, 1995), slip op. at 3, "a reasonable approach can be devised by plaintiffs which will not require the massive response necessary to comply with answers to the written interrogatories currently requested." UPR can, of course, submit supplemental interrogatories after depositions if deposition responses are evasive or otherwise inadequate. Therefore, because I agree that the interrogatories and requests for admission are excessive and unnecessarily burdensome, I grant Pennzoil's motion for a protective order and direct UPR to confine its interrogatories to 100, including subparts, and 50 requests for admission (with permission to include a blanket interrogatory requiring an explanation with regard to every request that is denied).

Second, UPR has moved for a protective order (Docket Items No. 58) seeking to withhold from production to Pennzoil 289 documents listed on a "privilege log." These documents, UPR contends, are protected either by the attorney-client privilege, work product doctrine, or the business strategy immunity. The 289 documents are listed in an attachment to the motion, identified only briefly by date, type of document, subject, author and recipient. Pennzoil opposes the motion on several grounds, including that the motion is premature because Pennzoil has not moved to compel production of any of the listed documents, that this Court's Confidentiality Order and Discovery Order prohibit relitigation of discovery issues already resolved in the Texas action, and that UPR has not met its burden as to its asserted privileges.

The short answer to this dispute is that the issue is not ripe for decision. No effort has been made, as far as I can tell, to determine whether Pennzoil seeks production of any or all of the 289 documents listed in UPR's motion. Nor does it appear that the parties have attempted in good faith to narrow the list of disputed documents. Before this Court is burdened with deciding whether various privileges apply to almost 300 documents, some or all of which may have to be reviewed by the Court *in camera,* I think

the parties have an obligation to meet and confer in a good faith effort to resolve as many differences as possible. Such an effort should be made especially regarding those documents on UPR's list that have not already been the subject of motion practice in the Texas action, for I think this Court's Confidentiality Order and the Discovery Order can easily be read to foreclose relitigation of discovery rulings already made in the Texas action. For the moment, however, I need not reach all of the arguments by Pennzoil concerning the substantive inadequacy of UPR's motion. UPR's motion for a protective order (Docket Item No. 58) is denied.

**\*3** The third motion before me is UPR's motion to compel production of documents (Docket Item No. 63) that Pennzoil is withholding because Pennzoil believes UPR will give the documents to Smith Barney, Inc. (UPR's financial advisor in connection with UPR's hostile tender offer to acquire Pennzoil). This motion turns on the interpretation of paragraph 6(A) of the Confidentiality Order, which provides:
6. (A) Notwithstanding anything contained in the foregoing paragraphs 4 and 5, Confidential or Highly Confidential Discovery Material may be provided to persons listed in Paragraphs 4(b) and 5(c) above only to the extent necessary for such expert or consultant to prepare a written opinion, to prepare to testify, or to assist counsel in the prosecution of this Litigation, and only *provided* that such expert or consultant (i) is using said Confidential or Highly Confidential Discovery Material solely in connection with this Litigation; and (ii) will not use any Highly Confidential Discovery Information for the purpose of providing financial advice to any party and *further provided* that such expert or consultant signs an undertaking in the form attached as Exhibit A hereto, agreeing in writing to be bound by the terms and conditions of this Stipulation and Order, consenting to the jurisdiction of the Court for purposes of the enforcement of this Stipulation and Order, and agreeing not to disclose or use any Confidential or Highly Confidential Discovery Material for purposes other than those permitted hereunder, including after the conclusion of this Litigation.

Pennzoil interprets this language to prohibit an expert or consultant who has reviewed confidential or highly confidential material from using that information to provide financial advice. UPR does not dispute that Smith Barney has been shown confidential and highly confidential information or that Smith Barney has provided UPR with financial advice in connection with UPR's attempt to acquire Pennzoil. UPR's position is that paragraph 6(A) does not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1997 WL 770663 (Del.Ch.)
(Cite as: Not Reported in A.2d)

prohibit *who* may serve as a financial or litigation consultant. Instead, UPR insists that the Order allows financial advisors to the parties to act also as litigation consultants, so long as the consultant who sees highly confidential information signs an agreement not to use the information "for the purpose of providing financial advice to any party." Thus, UPR believes Smith Barney personnel can segregate mentally Pennzoil's confidential and highly confidential information, depending on whether they are wearing their "financial advisor" hat or their "litigation consultant" hat.

UPR's interpretation of paragraph 6(A) of the Order is not a tenable or realistic one. Paragraph 6(A) unmistakably states that confidential information may be provided to experts or consultants in connection with the litigation, but shall not be given to consultants or experts rendering financial advice. The Order thus affords each party a choice, either to withhold confidential information from financial advisors so they can continue to solicit financial advice from them, or to provide confidential information to an advisor and use the advisor *solely* as a litigation consultant. This makes sense from the standpoint of practice, theory and public policy. UPR's assertion that "litigation consultants" would be able to "segregate mentally" confidential financial information when they switch into their role as "financial consultants" is, in my opinion, an epistemological leap of heroic proportions. But the underlying assumptions about human behavior implicit in UPR's interpretation need not be tested because paragraph 6(A), in my opinion, cannot be fairly or reasonably read in the manner UPR urges here. Therefore, I deny UPR's motion to compel production of documents (Docket Item No. 63).

**\*4** The parties should advise me promptly if other issues or motions (such as Pennzoil's motion seeking leave to file an amended and supplemental answer and counterclaim) need the Court's attention.

IT IS SO ORDERED.

Del.Ch.,1997.
In re Pennzoil Co. Shareholders Litig. Cons.
Not Reported in A.2d, 1997 WL 770663 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 7

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 1996 WL 33167789 (Del.Ch.)
(Cite as: Not Reported in A.2d)

H

Nippon Chemicals Sales Co., Ltd. v. Texaco Inc.Del.Ch.,1996.Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Court of Chancery of Delaware.
NIPPON CHEMICALS SALES CO., LTD.
v.
TEXACO INC.
No. CIV.A. 14786.

Presented: June 5, 1996.
Decided: June 14, 1996.

R. Franklin Balotti, Esquire, Jesse A. Finkelstein, Esquire, Richards, Layton & Finger, Wilmington.
William O. LaMotte, III, Esquire, Karen Jacobs Louden, Esquire, Morris, Nichols, Arsht & Tunnell, Wilmington.
CHANDLER, Vice-Chancellor.
*1 Dear Counsel:

The parties to this action have abided by the terms of an interim confidentiality agreement as they pursue discovery. The interim agreement provides that each side may designate documents and information as either "Confidential" or "Highly Confidential." If a document is designated as "Confidential,"then in-house counsel, outside attorneys, as well as the parties to the litigation may review that document. Alternatively, if a document is deemed "Highly Confidential", then only outside counsel may study it.

The parties have agreed to formulate a protective Order for the Court to enter and currently before me is defendants' motion and suggested form of Order. For the most part, the parties agree as to the contents of the Order. For example, they have agreed to maintain two levels of confidentiality. Further, they agree that anyone who has access to confidential materials must first read the protective Order and agree to be bound by its provisions. The parties, however, do not agree on all the terms of the Order, and seek the Court's intervention on two issues.

First, the parties disagree as to whether the Order should allow in-house counsel or business persons to review "Highly Confidential" materials. The interim confidentiality agreement provides that only outside counsel may access this type of information.

Defendants, who employ in-house counsel, note that the in-house counsel are under the same ethical constraints against disclosure of the materials as outside counsel. They believe that the Order should allow in-house attorneys to review highly confidential matters because their own in-house counsel are participating in the litigation.

Plaintiff argues that allowing in-house counsel to review highly confidential materials is inappropriate because, unlike defendants, it does not employ a staff of in-house attorneys. In plaintiff's view, allowing defendants to use their in-house counsel places plaintiff at a disadvantage. As an alternative, plaintiff proposes for each side to designate a client representative of its choice who will act as a liaison between outside counsel and the parties. Under plaintiff's proposal, the representative may be a member of the in-house attorney staff or a business person. Plaintiff suggests that it would select the company's founder as its client representative.

The provisions of the interim agreement indicate that each side's primary concern is to ensure that the commercially sensitive information they exchange will not be used for any purpose but this litigation. To that end, they agreed to preclude officers of the companies as well as in-house counsel from reviewing "Highly Confidential" documents. This stipulation created a level playing field so that the parties could proceed with discovery.

Clearly it would assist the outside counsel in litigating this matter if the parties agreed to allow each side to consult with a liaison from inside the company who is knowledgeable in the business. However, the parties have been unsuccessful in determining how to change their agreement in a fair manner, and have not demonstrated that this is possible without sharing commercially sensitive information with each other. Thus, the most reasonable solution is to maintain the level playing field that the parties created. Since plaintiffs do not employ a staff of attorneys, and defendants refuse to agree to plaintiff's proposal that each side designate one individual to act as a liaison, I conclude that the Order should maintain the *status quo*. Accordingly, if a document is designated as "Highly Confidential," then neither in-house counsel nor the parties

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 2
Not Reported in A.2d, 1996 WL 33167789 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

themselves may review that document.                              END OF DOCUMENT

**\*2** The second issue that the parties ask the Court to
resolve is whether the parties must provide each other
with advance notice that a party intends to share
"Confidential" or "Highly Confidential" information
with an expert or consultant who will not testify. This
notice would include the non-testifying expert's
name, business address, employer, and curriculum
vitae. The notice provides the parties with time to
object and apply to the Court for relief. The parties
have agreed to provide notice before disclosing
sensitive material to testifying experts, but disagree
as to whether the Order should provide a similar
provision for non-testifying experts.

Defendants ask the Court to include this type of
provision with respect to non-testifying experts
because they are concerned that non-testifying
experts may make unfair use of these materials. They
are especially concerned because they are obligated
to a third party to keep certain information
confidential. Plaintiff opposes this notification
requirement because it believes such notice will
provide defendants with a road map of their litigation
strategy and invade their work product. Further,
plaintiff notes that requiring notification may slow
down the discovery process.

In a civil action, the discovery process usually
prevents the parties from surprising one another
during the course of the trial. Generally each side is
well aware of the other's position, yet attorneys
maintain the integrity of their work product. I do not
believe that the notification in question will
compromise this ability, especially since the parties
need not disclose the substance of the communication
or reason for seeking advice from that individual.

Further, while I agree that the procedure is somewhat
cumbersome, it is not unduly burdensome.
Nonetheless, the parties should not slow the
discovery process by over-utilizing the Court as a
litigation tactic. Hence, I anticipate that the parties
will seek judicial assistance only in limited
circumstances, such as when obligations to third
parties are implicated.

Counsel shall submit a form of order consistent with
this opinion.

Del.Ch.,1996.
Nippon Chemicals Sales Co., Ltd. v. Texaco Inc.
Not Reported in A.2d, 1996 WL 33167789 (Del.Ch.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.