## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DOW CHEMICAL CANADA, INC.<br>on its own behalf and as assignee of<br>THE DOW CHEMICAL COMPANY, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| HRD CORPORATION<br>(d/b/a Marcus Oil & Chemical), | ) ) ) | C.A. No. 05-23 (JJF) |
| Defendant, Counterclaim Plaintiff, | ) ) | |
| DOW CHEMICAL CANADA, INC.<br>on its own behalf and as assignee of<br>THE DOW CHEMICAL COMPANY and<br>THE DOW CHEMICAL COMPANY, | ) ) ) ) ) | |
| Counterclaim Defendants. | ) ) | |

**HRD CORPORATION'S MEMORANDUM OF LAW IN OPPOSITION TO (I) DOW'S MOTION FOR A PROTECTIVE ORDER REGARDING HRD'S EXPORTING TO IRAN [D.I. 72] AND (II) DOW'S MOTION FOR A PROTECTIVE ORDER REGARDING HRD'S NON-INDEPENDENT EXPERT AND APPROVAL PROCEDURE FOR INDEPENDENT EXPERTS [D.I. 77]**

OF COUNSEL:

Michael Landrum
William C. Ferebee
O'DONNELL FEREBEE MEDLEY
  & KEISER, PC
450 Gears, Eighth Floor
Houston, TX 77067-4512
(281) 875-8200 (telephone)
(281) 875-4962 (facsimile)

W. Harding Drane, Jr. (#1023)
Richard L. Horwitz (#2246)
Suzanne M. Hill (#4414)
Jennifer C. Wasson (#4933)
POTTER ANDERSON & CORROON LLP
1313 North Market Street
Hercules Plaza, 6th Floor
P.O. Box 951
Wilmington, DE 19889-0951
Telephone: (302) 984-6000
Facsimile: (302) 658-1192

*Attorneys for HRD Corporation*

Dated: January 23, 2007

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................ iii

NATURE AND STAGE OF PROCEEDINGS ............................................................ 1

STATEMENT OF FACTS .................................................................................. 3

SUMMARY OF ARGUMENT ............................................................................ 11

LEGAL STANDARD......................................................................................... 12

ARGUMENT................................................................................................... 15

I.    DOW'S PROPOSED MODIFICATIONS TO THE PROTECTIVE
      ORDER UNREASONABLY PREJUDICE HRD AND WILL UNDULY
      TAX JUDICIAL RESOURCES. ..................................................................... 15

      A.    Given the Unique Circumstances of the Case, HRD Will Be
            Severely Prejudiced If Its Designated Experts And Consultants Are
            Precluded From Accessing Highly Confidential Documents
            ...................................................................................................15

      B.    Dow's Alleged Fear of Competitive Harm From Disclosure of
            Highly Confidential Information To HRD's Experts and
            Consultants Is Overstated, And Its Proposed Modifications To The
            Protective Order Are Unnecessary ..................................................... 18

      C.    There Are No Changed Circumstances Justifying Departure From
            the Parties' Voluntarily Executed and Negotiated Protective Order,
            On Which HRD Has Relied............................................................... 22

      D.    Dow's Proposed Modification to the Protective Order Will Result
            In Prolonged Ancillary Disputes That Will Unnecessarily Tax
            Judicial Resources ......................................................................... 24

      E.    Dow's Cases Do Not Support The Relief It Seeks Under The Facts
            Present Here.................................................................................. 25

II.   DOW'S UNSUBSTANTIATED CONCERNS REGARDING IRAN ARE
      INSUFFICIENT TO SHOW GOOD CAUSE JUSTIFYING
      MODIFICATION OF THE PROTECTIVE ORDER .................................................... 27

      A.    Dow's Characterization of Facts Unrelated To This Case As "Red
            Flags" Is Inaccurate and Misleading.................................................. 28

i

B.    Dow's Document Production Is Not An Undue Burden Because The Production Will In No Way Violate Federal Law ........................................ 33

CONCLUSION.................................................................................................................. 35

## TABLE OF AUTHORITIES

<u>Cases</u>                                                                                                    <u>Page</u>

*Cincinnati Bell Cellular Sys. Co. v. Ameritech Mobile Phone Serv.,*
    1994 Del. Ch. LEXIS 105 (Del. Ch. June 30, 1994) ............................................16, 21, 33

*Cipollone v. Liggett Group, Inc.,*
    785 F.2d 1108 (3d Cir. 1986)...........................................................................................13

*Cone Mills Corp. v. Joseph Bancroft & Sons Co.,*
    33 F.R.D. 318 (D. Del. 1963) .........................................................................................16

*E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.,*
    1982 U.S. Dist. LEXIS 10258 (D. Del. May 17, 1982)...............................................16, 21

*Fisher v. Borden, Inc.,*
    1994 U.S. Dist. LEXIS 21273 (D.N.J. Oct. 26, 1994)......................................................16

*Heintz Corp. v. Judson,*
    1995 U.S. Dist. LEXIS 16328 (E.D. Pa. Nov. 3, 1995).........................................18, 19, 21

*Max's Seafood Café v. Quinteros,*
    176 F.3d 669 (3d Cir. 1999)............................................................................................33

*Medtronic Ave, Inc. v. Advanced Cardiovascular Sys., Inc.,*
    2004 U.S. Dist. LEXIS 670 (D. Del. Jan. 13, 2004)...................................................23, 34

*Pansy v. Borough of Stroudsburg,*
    23 F.3d 772 (3d Cir. 1994); ....................................................................................12, 13, 27

*In Re Plastics Additives Antitrust Litig.,*
    2005 U.S. Dist. LEXIS 23771 (E.D. Pa. Aug. 24, 2005)..................................................24

*Safe Flight Instrument Corp. v. Sunstrand Data Control, Inc.,*
    682 F. Supp. 20 (D. Del. 1988).......................................................................................25

*United States v. Dentsply Int'l, Inc.,*
    187 F.R.D. 152 (D. Del. 1999) ..................................................................................13, 24

## RULES

F.R.C.P. 26(c) ..................................................................................................................12

## NATURE AND STAGE OF PROCEEDINGS

On January 18, 2005, Plaintiff/Counterclaim Defendant, Dow Chemical Canada, Inc.

("Dow Canada") on its own behalf and as assignee of The Dow Chemical Company (together

with Dow Canada, "Dow"), filed its Complaint against defendant/counterclaimant, HRD

Corporation d/b/a Marcus Oil & Chemical ("HRD"), asserting a claim for breach of contract,

based upon the Supply Agreement[1] that Dow and HRD executed in July 2002. (D.I. 1). On

March 31, 2005, HRD answered the Complaint and filed counterclaims against Dow Canada for

breach of the Supply Agreement, breach of the related Joint Development Agreement,

misappropriation of trade secrets, and failure to give adequate assurance of future performance.

(D.I. 15). On June 6, 2005, HRD filed its First Amended Answer and Counterclaims, asserting

similar counterclaims against both Dow entities (D.I. 25).[2] In November 2005, Dow served its

first set of discovery requests on Defendant. (D.I. 38).

In January 2006, to ensure that proprietary information was adequately protected, the

parties negotiated for and entered into a protective order, entitled "Stipulation and Order

Governing Discovery Materials" (the "January 2006 Protective Order"). (D.I. 43; Ex. A hereto).

The January 2006 Protective Order governs the disclosure and dissemination of "confidential"

and "highly confidential" documents to be produced during discovery in this matter. On January

20, 2006, the Court entered the January 2006 Protective Order. (D.I. 43).[3] Shortly thereafter, in

---

[1] Copies of the Supply Agreement and the related Joint Development Agreement are attached as exhibits to the Complaint (D.I. 1)

[2] HRD's amended counterclaims against Dow included all of the same claims that were included in the original counterclaims, plus an additional count of "engaging in a joint enterprise." (D.I. 25).

[3] For ease of reference, a copy of the January 2006 Protective Order is attached as Exhibit 1 hereto.

1

reliance on the protections afforded by the January 2006 Protective Order, HRD served its responses to Dow's first set of discovery requests. (D.I. 54; 56).

In April 2006, HRD served its Request for Production of Documents on Dow. (D.I. 49). HRD granted Dow, at Dow's request, two extensions to respond to discovery, the last of which expired on June 30, 2006. In July 2006, after Dow still had not produced documents responsive to HRD's requests, the parties held a face-to-face meeting in Chicago to discuss outstanding discovery issues. Although HRD believed this meeting had been fruitful, Dow's documents still were not forthcoming after the parties' conference. For the next four months, HRD attempted to work with Dow in an effort to jump-start Dow's document production. Dow, however, failed to produce any documents during this time other than emails that HRD had already produced to Dow, making various objections and demands discussed more fully in the Statement of Facts below and in HRD's Motion to Compel. (D.I. 71).

On December 18, 2006, HRD filed a four-page Motion to Compel the production of Dow's responsive documents (D.I. 71), in accordance with the procedures set forth in Paragraph 5 of the Amended Rule 16 Case Scheduling Order. (D.I. 57). In response, Dow filed a four-page response to HRD's Motion to Compel (D.I. 76), and also filed two motions, each supported by a lengthy brief, seeking to modify the January 2006 Protective Order. First, on December 22, 2006, Dow filed a motion to modify the January 2006 Protective Order, based on alleged concerns regarding the possibility that HRD would violate the January 2006 Protective Order and export Dow's technology to Iran (the "Dow Iran Motion"). (D.I. 73). Second, on December 27, 2006, Dow filed a motion to modify the January 2006 Protective Order, based on its asserted concerns that unless Dow is authorized to approve in advance all HRD experts in this case, HRD's experts might violate the January 2006 Protective Order by disclosing confidential or

2

highly confidential information contrary to the existing restrictions in such order (the "Dow Expert Motion." (D.I. 77).

This brief addresses the issues raised in both of Dow's pending motions, and opposes the relief requested in those motions.

**STATEMENT OF FACTS**

**A.    General Background**

HRD, which is based in Houston, Texas, is in the business of refining and packaging polyethylene waxes for sale to a variety of industrial end-users. (Affidavit of Abbas Hassan ("Hassan Aff."), ¶ 13). HRD's owners, brothers Abbas Hassan and Aziz Hassan, are residents of Houston, Texas, and citizens of the United States, who have ownership interests in two other incorporated entities, one in India ("Marcus Oil India") and one in Iran ("Marcus Oil Iran") (Hassan Aff. ¶ 1).

As Dow well knows from its six-year long association with HRD, HRD does not "manufacture" wax of any kind; rather, HRD has been in the business of *refining* polyethylene wax. (Hassan Aff. ¶ 13). The distinction is this: HRD's plant in Houston refines polyethylene wax feedstock through what is essentially a distillation process that removes impurities from the feedstock, and then HRD blends various different waxes to get an end product tailored to the needs of its customers. (Id.) Marcus Oil India does the same thing. (Id.) In contrast, the manufacture of wax through the process developed jointly with Dow makes wax from ethylene through a catalytic process that actually constructs hydrocarbon molecules of a specific configuration. (Id.) The manufacture of wax can only be accomplished at chemical facilities that cost hundreds of millions of dollars to construct. (Id.) In contrast, distillation and blending

3

facilities such as those at HRD's plant in Houston and at Marcus Oil India cost less than ten million dollars. (Id.)

In 2001, HRD sought to pursue the development of an economic means of producing metallocene waxes, which are high-quality, non-volatile waxes with a high melting point. Because HRD does not have the in-house capability to manufacture waxes and had no future intent to do so, the Hassan brothers and Gregory Borsinger, a part-time consultant for HRD with specialized knowledge of the wax industry, approached Dow about jointly developing metallocene waxes. (Hassan Aff. ¶ 12).

To this end, the parties entered into two related contracts in July 2002: a Joint Development Agreement, in which they covenanted to work collaboratively to design a production process for metallocene waxes at an existing Dow facility in Sarnia, Ontario, Canada; and a Supply Agreement, under which HRD agreed to fund certain additions to Dow's Sarnia plant with the intention that the plant would produce metallocene wax according to HRD's needs. See note 1 supra. In good faith reliance on these contracts and on a confidentiality agreement designed to protect both parties' proprietary information, HRD shared its confidential customer information with Dow after Dow represented that it would be better able to develop a workable product for HRD's end-users with this confidential information. During each phase of the parties' negotiation and agreement, HRD's consultant Mr. Borsinger played an integral role, assisting the Hassans with determining the potential needs of the end-users and the desired chemical properties of the ultimate products to be developed. (Affidavit of Gregory Borsinger ("Borsinger Aff."), ¶¶ 3, 5).

In 2003, the parties' relationship soured when Dow's Sarnia plant did not produce wax with the high-quality properties for which HRD had contracted. (D.I. 15 ¶ 103). Instead, the

4

wax from Dow's plant contained volatile, rapidly-oxidizing molecules (known as "light ends") that constituted impurities and rendered the wax unfit to sell to HRD's customers. (D.I. 15 ¶¶ 103-105). Dow continued to produce wax containing these light ends even after HRD paid to modify Dow's plant to meet production specifications and agreed to pay the costs of disposal and removal of the light ends. (D.I. 15 ¶ 105). HRD experienced further hardship in December 2004, when it suffered an explosion and fire at its Houston facility. This fire resulted in the destruction of most of HRD's business records, including those pertaining to its dealings with Dow. (D.I. 15, p.3 n.1).

This litigation arises out of the parties' dispute over the poor quality of Dow's wax production under the Joint Development Agreement and the Supply Agreement, and the extent to which Dow misappropriated HRD's confidential technological and customer information in designing and marketing a new "Dow" wax product virtually identical to the product envisioned by the parties' Joint Development Agreement.

**B.    The Parties' Dealings Related To Iran**

The parties' metallocene wax project was not the only instance when Dow and HRD have collaborated on technological endeavors. In November 2004, Dow and HRD entered into an Evaluation Agreement to jointly analyze the propriety of converting natural gas to ethylene. (D.I. 73, Exhibit 13). At that time, Dow, having reviewed various documents and other information HRD had provided to Dow, was well aware that some of the ethylene technology may have originated in Iran. (Hassan Aff. ¶ 16). Cognizant of the restrictive federal trade regulations pertaining to Iran, the parties sought to ensure that any transactions related to Iran were lawful, and Dow supported HRD's efforts to obtain any necessary licenses from the U.S. Office of Foreign Assets Control ("OFAC"). See July 23, 2003 Letter from Savage to

Newcomb, Hassan Aff. Ex. 1. Dow also requested and HRD provided an opinion letter from

Baker Botts LLP, a reputable law firm with substantial expertise in international trade,

confirming that HRD was not in violation of trade regulations. (Hassan Aff. ¶¶ 5, 6, 16); (D.I.

73, Exhibit 14).

This ethylene project, in which Dow participated and from which it benefited, continued

more than 36 months until the summer of 2006. Over this time period, representatives from both

Dow and HRD met with various individuals from Iran concerning this project.  (Hassan Aff. ¶¶

9, 10). Dow had full knowledge of HRD's activities in Iran before and throughout the entire

period of time when the parties' Evaluation Agreement was in effect. (Hassan Aff.  ¶¶ 16, 17).

During the pendency of the Evaluation Agreement, Dow never once notified HRD of any "red

flags" on which it now bases its Iran Motion, or suggested that HRD was involved in any

wrongful conduct related to Iran, even though it had virtually all of the documents it now calls

"red flags." (Hassan Aff. ¶¶ 16, 17).

The entity known as Marcus Oil & Chemical (Iran) is merely a rented office established

for the purpose of maintaining a minimal presence in Iran against the possibility that relations

between the U.S. and Iran might change in the future. (Hassan Aff. ¶ 18).  Marcus Oil &

Chemical (Iran) has no contracts with any Iranian entity; it does not conduct any business, and it

generates no income.  (Id.)  None of the activities in which HRD has engaged regarding Iran,

including many contacts involving Dow, have been in violation of any U.S. statute or regulation.

(Id.)  All of those activities have been undertaken with the advice of counsel.  (Id.)

In the declaration furnished by Tony Frencham, the Director of Business Development

for Dow (D.I. 74), there is a statement to the effect that Aziz Hassan on behalf of Marcus Oil

India entered into an agreement with an affiliate of NPC, Iran's state-owned oil company.  As

explained in Abbas Hassan's affidavit in this matter, there was at one time in 2003 an agreement

in principal with an NPC affiliate. (Hassan Aff. ¶ 19). When Mr. Hassan was informed that

there might be regulations prohibiting trade with Iran, however, he sought qualified legal

counsel, Baker Botts, LLP ("Baker Botts") and immediately took the corrective action counsel

prescribed. (Id.) The agreement is void as a matter of law and is of no effect. (Id.) There are no

other agreements by the Hassans, HRD, or any affiliates, whether written or verbal, that relate in

any fashion to any Iranian entity. (Id.) Mr. Frencham and Dow were aware of those facts at the

time Dow signed the Evaluation Agreement in 2004. (Id.)

     Dow also complains that the Hassans are owners of an interest in Marcus Oil & Chemical

India, Ltd. Their ownership in that organization and its operation has been disclosed to the

United States government and to Baker Botts in connection with its legal representation related

to the Iranian trade sanctions. (Hassan Aff. ¶ 20). Dow is fully aware of the nature of the

operations of Marcus Oil & Chemical India, Ltd. (Id.) As a result, Dow knows that the plant in

India is incapable of manufacturing wax using any Dow technology, and that it, like the Houston

plant, merely refines and packages wax products using universally known and commonly-used

techniques. (Id.) If Dow has construed any previous statement made by Mr. Hassan or HRD to

mean that the plant in India "has nothing to do with wax," as opposed to "nothing to do with the

manufacture of wax," that is mistaken. (Id.) To Mr. Hassan's knowledge, Marcus Oil &

Chemical India, Ltd. is not violating any laws concerning doing business in or with Iran. (Id.)

    **C.**    **Distinguishing the Technologies Involved in this Case**

     The manufacture of polyethylene wax using metallocene catalyst, which is the subject of

the Joint Development Agreement and Supply Agreement, and of this litigation, is totally

separate from the methane to ethylene manufacturing process, which was the subject of the November 2004 Evaluation Agreement and raised issues related to Iran. (Hassan Aff. ¶ 3).

Ethylene is the chemical compound with the formula, CH2CH2. (Id.) It is used primarily as an intermediate in the manufacture of many other chemicals. Ethylene is currently produced by steam-cracking large hydrocarbon molecules. (Id.) The HRD-Dow Evaluation Agreement involved a new method of creating ethylene. (Id.) Rather than cracking large molecular weight hydrocarbons, the HRD method would combine small natural gas molecules to create ethylene. (Id.) While Dow improperly attempts to inject this technology into the litigation by raising unfounded concerns about Iran, this joint project between HRD and Dow is completely unrelated to the facts at issue in this case, and the documents Dow has yet to produce.

As noted, the current litigation involves the production of polyethylene wax, which is a component used to make hot melt adhesives. (Hassan Aff. ¶ 4). Hot melt adhesives are used to rapidly glue together items such as cardboard boxes. (Id.) Dow and HRD had agreed in the Supply Agreement and the Joint Development Agreement to work together to produce a superior product in the hot melt industry. (Id.) The current dispute involves whether Dow added impermissible "light ends" to the HRD product, which Dow knew would make it unusable in the hot melt industry. (Id.)

In addition, HRD asserts in this case that Dow is now testing a 2-pack product for use in the hot melt industry, and that the concept for that product originated with HRD. (Id.) The 2-pack product consists of wax and resin in a single product, and represents an improvement, because previously in this application the wax and resin were separate ingredients, each used to make hot melt adhesives. (Id.) This metallocene wax technology, and the parties' understanding of it as related to their contractual agreements, is integrally important to the parties' claims.

8

Despite its obvious relevance and importance, Dow has refused to produce documents related to this technology, and other issues, in response to HRD's good faith discovery requests.

### D.    **The Instant Motions**

The parties' present dispute centers on Dow's inadequate discovery responses and unwillingness to produce its relevant documents to HRD. This dispute arose after the parties negotiated the terms of and entered into the January 2006 Protective Order. In January 2006, the parties already were a year into this litigation. As such, Dow was well aware of HRD's legal defenses and counterclaims, the potentially responsive documents that could support or discredit those defenses and counterclaims, and the key players to the parties' business dealings, including HRD's consultant Greg Borsinger.

As noted earlier, the January 2006 Protective Order, the terms of which Dow and HRD negotiated voluntarily, governs the disclosure of confidential and proprietary information produced in the case. It sets forth two distinct categories of protected information: "confidential" information, which the parties' employees and owners may view, and "highly confidential" information, which only the parties' counsel, experts, and consultants may view. As part of a good faith effort to compromise during the negotiation process, HRD authorized Dow's in-house counsel to review its "highly confidential" documents under the agreement. (D.I. 43 ¶ 6(c)). In turn, though Dow insisted that the Hassans and HRD could not see Dow's highly confidential documents, Dow agreed that HRD's experts and consultants, including Mr. Borsinger, could see them. HRD never would have executed the parties' protective order if it precluded Mr. Borsinger, its consultant, from reviewing Dow's documents.[4]

---

[4] It is especially crucial that Mr. Borsinger be available to assist HRD's counsel in reviewing Dow's documents, because HRD lacks virtually all of its own documents, which were destroyed in the explosion and fire at HRD's Houston headquarters in December 2004. In addition, Mr. Borsinger is critical to counsel's ability to understand

In reliance on the January 2006 Protective Order, HRD subsequently produced approximately 5,000 email documents and reasonably expected that Dow would produce documents in response to HRD's April 2006 discovery requests. Dow's written responses to the document requests cited a number of vaguely-worded general objections, but promised to produce responsive, non-privileged documents. (D.I. 54). Despite two extensions to the production deadline, however, Dow failed to produce any documents, except for copies of emails HRD previously produced to Dow.

By letter dated July 17, 2006, HRD advised Dow that its discovery responses were insufficient and requested a meet and confer session to discuss the progress of discovery. (D.I. 71, Exhibit C). The parties met on July 31, 2006, and HRD believed Dow would then promptly produce documents pursuant to agreements reached at their meeting. On August 29, 2006, when the documents were not forthcoming from Dow, HRD sent another letter to Dow requesting that it produce responsive documents. (D.I. 71, Exhibit D). Dow still produced no documents in response to this letter. The parties then entered into settlement negotiations and agreed to delay document production until November 7, 2006. When settlement talks broke down in late October 2006, HRD once again asked Dow to comply with its discovery obligations. (D.I. 71, Exhibit G).

Instead, Dow proposed that the parties amend the January 2006 Protective Order to preclude Mr. Borsinger's access to its highly confidential documents, and refused to produce documents until HRD agreed to its amendments. Dow waited months to propose this amendment despite knowing that HRD had lost much of its relevant information in the explosion

---

Dow's business and other documents, based on his familiarity with markets for PE wax, the needs of users of PE wax for waxes having various qualities, the PE wax produced by Dow at the Sarnia facility, and his participation in numerous meetings with Dow with regard to its production of metallocene wax. (See Borsinger Affidavit ¶¶ 3, 5)

and fire at its plant, knowing the importance to HRD of Mr. Borsinger's availability to review and interpret documents for HRD's counsel, and knowing the nature of the documents HRD was seeking from Dow in order to support its defenses and counterclaims. Accordingly, HRD strongly opposes Dow's effort to change the parties' agreement and the January 2006 Protective Order. Nonetheless, at that time, in the interest of cooperation, HRD agreed to a temporary stipulation barring its experts from reviewing Dow's documents until the Court ruled on Dow's expert objections. (D.I. 71, Exhibit H). By allowing Dow's document production to go forward, this proposal would, at a minimum, have allowed Dow's and HRD's counsel to better determine the actual nature and scope of any dispute regarding disclosure of Dow's "Confidential" and "Highly Confidential" documents.

Only two days after the parties executed this temporary stipulation, however, Dow disavowed it, and proffered another stipulation, seeking to modify the January 2006 Protective Order to prohibit dissemination of both confidential and highly confidential information to HRD and Mr. Borsinger. (D.I. 71, Exhibit I). This time Dow alleged that it could not produce its documents because it claimed HRD might export Dow technology to Iran. (Id.) Dow demanded further that HRD produce four more witnesses for deposition before it would produce any documents. (D.I. 71, Exhibits J, K). Dow would not retreat from its escalating and unreasonable demands, even after HRD offered to sign yet another agreement stipulating that HRD would not export any information to Iran. (Id. ¶ 10). Although the parties exchanged frequent correspondence on these outstanding discovery issues (as explained in greater detail in HRD's Motion to Compel (D.I. 71)), and HRD attempted to resolve these matters throughout December 2006, Dow remained adamant that it would not produce documents unless HRD bowed to its demands.

## SUMMARY OF THE ARGUMENT

Neither of Dow's motions demonstrates the good cause necessary to justify modification of the January 2006 Protective Order, which Dow voluntarily executed more than one year ago. As detailed herein, the prejudice to HRD should Dow be permitted to exercise veto power over its experts and consultants far outweighs Dow's unsubstantiated fears that, notwithstanding the existing protections for confidential and highly confidential information in the January 2006 Protective Order, HRD will somehow export Dow technology to a company in Iran with no manufacturing capability, and its baseless concerns that HRD experts or consultants will disclose, and HRD would and could use, Dow's confidential information. Dow's proposed modifications also are inadvisable, as they will result in protracted, ancillary disputes that will inevitably delay this litigation and draw unnecessarily on judicial resources. In short, Dow's motions do not compel judicial reformation of the parties' contract. Instead, they merely attempt to shift the focus from the real subject at issue -- Dow's ongoing refusal, more than two years after Dow commenced this action, to participate in discovery, as detailed in HRD's Motion to Compel. (D.I. 71). The facts show that HRD is entitled to the documents it requested, whether highly confidential, confidential or otherwise, subject to the provisions of the January 2006 Protective Order, and that Dow's demand to pre-screen and veto HRD's selection of experts and consultants is unwarranted.

## LEGAL STANDARD

Under well-established Third Circuit law, a party seeking to modify an existing confidentiality order must demonstrate "good cause" for its proposed amendments. Pansy v. Borough of Stroudsburg, 23 F.3d 772, 790 (3d Cir. 1994); see F.R.C.P. 26(c). Good cause exists only when "disclosure will work a clearly defined and serious injury" to the moving party. Id. at

12

786; United States v. Dentsply Int'l, Inc., 187 F.R.D. 152, 158 (D. Del. 1999). Broad, unsubstantiated allegations of harm are insufficient to show good cause; an asserted injury will support a good cause showing only if it is demonstrated with specificity. See Pansy, 23 F.3d at 786; Cipollone v. Liggett Group, Inc., 785 F.2d 1108, 1121 (3d Cir. 1986).

In determining good cause, the Court must balance the movant's interests with the interests of the opposing party. Pansy, 23 F.3d at 790. The Court also should weigh the extent of the parties' reliance on their existing agreement. Id. at 789. Under this flexible balancing test, the Court is given wide discretion "to evaluate the competing considerations in light of the facts of the individual cases." Id. at 789 (internal citations omitted).

As discussed below, application of the balancing test to the particular facts of this case reveals that the prejudice to HRD resulting from Dow's proposed amendments to the January 2006 Protective Order far outweighs Dow's speculative assertions of harm involving trade regulations and rogue disclosure leading to imagined misuse of its technical information. In essence, Dow's proposed "veto power" over expert and consultant disclosures seeks to deprive HRD of its right to choose its own experts and consultants, and to deprive HRD's counsel of the ability to effectively navigate the complexities of this litigation, especially given that HRD's key documents and data have been largely destroyed in a fire. Dow should not be permitted to hamstring HRD's preparation based on nothing more than baseless assertions. Furthermore, when the parties first executed the January 2006 Protective Order, Dow already was well aware of the issues it now raises as justification for its proposed amendments to that order. Dow delayed in presenting those issues to the Court, however, until HRD filed its Motion to Compel and after HRD already produced nearly 5,000 emails in reliance on the parties' agreement. Dow

should not be rewarded for its attempt to sidestep its discovery obligations and further complicate this already-protracted litigation.

## ARGUMENT

I.  **DOW'S PROPOSED MODIFICATIONS TO THE PROTECTIVE ORDER UNREASONABLY PREJUDICE HRD AND WILL UNDULY TAX JUDICIAL RESOURCES**

    A.  **Given the Unique Circumstances of the Case, HRD Will Be Severely Prejudiced If Its Designated Experts And Consultants Are Precluded From Accessing Highly Confidential Documents**

Central to resolving the parties' breach of contract and trade secrets dispute is gaining a fundamental understanding of the development of polyethylene wax and the ways in which that development impacted the parties' business relationship. The parties' understanding and interpretation of the business and scientific facts surrounding the negotiation process are crucial to determining liability on both Dow's breach of contract claims and HRD's misappropriation of trade secrets and other counterclaims. An unknown number of Dow's documents evidencing these facts apparently will be shielded by Dow from HRD and the Hassan brothers under the terms of the existing January 2006 Protective Order as "Highly Confidential." While HRD of course remains willing to withhold "highly confidential" documents from the Hassan brothers in accordance with the terms of the January 2006 Protective Order, HRD is not willing to also give Dow veto power over its experts and consultants, who will play a crucial role in understanding and interpreting the technologies and documents underlying this litigation.[5]

There is no question that to accurately comprehend the issues implicated by Dow's confidential business and technical documents, HRD's counsel must rely on the expertise and assistance of individuals with relevant knowledge. To date, HRD has identified two individuals

---

[5] At the time the parties negotiated the January 2006 Protective Order, Dow's counsel indicated that it would only be designating "business plans" and similar documents as "highly confidential." Based on Dow's refusal to date to produce any meaningful number of documents, HRD cannot know now what number or types of documents Dow will initially seek to designate as "highly confidential" or "confidential."

who can provide such assistance, Greg Borsinger and Dr. John Ewen.[6]  Dow has objected to Mr. Borsinger in its Expert Motion, and HRD has reason to believe Dow may, for reasons unknown to HRD, voice objections to Dr. Ewen as well.  Dow now seeks to modify the January 2006 Protective Order to preclude any HRD expert's review of Dow's highly confidential documents until Dow exercises a sweeping and unjustified veto power.

In specialized cases such as this one, however, courts have recognized the necessity of counsel's uninhibited consultation with technical experts, some of whom have been "insiders." See, e.g., E.I. du Pont de Nemours & Company v. Phillips Petroleum Co., 1982 U.S. Dist. LEXIS 10258, at *4 (D. Del. May 17, 1982) (Ex. B hereto) (allowing disclosure of confidential information to "inside" experts and consultants given the need for technical assistance in development of the issues); Cone Mills Corp. v. Joseph Bancroft & Sons Co., 33 F.R.D. 318, 322 (D. Del. 1963) (authorizing disclosure of confidential interrogatory response to "technical experts assisting in the preparation of the case"); see also Fisher v. Borden, Inc., 1994 U.S. Dist. LEXIS 21273, at *11 (D.N.J. Oct. 26, 1994) (Ex. C hereto) (finding that plaintiff's need for expert with specialized and extensive experience outweighed defendant's need for protection of documents against disclosure, even when expert was employed by competitor); Cincinnati Bell Cellular Sys. Co. v. Ameritech Mobile Phone Serv., 1994 Del. Ch. LEXIS 105, at *6 (Del. Ch. June 30, 1994) (Ex. D hereto) (reasoning that outside experts might not be as valuable as

---

[6] Dr. Ewen is the President of Catalyst Research Corporation. He first developed the principles of metallocene catalysts, the substances central to this litigation, during his work for Exxon Corporation. Dr. Ewen wrote what many knowledgeable persons in the chemical world consider to be the seminal manuscript in the area of metallocene catalysts, entitled "Mechanism of Stereochemical Control in Propylene Polymerizations in Soluble Group 4b Metallocene-Methylalumoxane Catalysts." Gregory Borsinger is a part-time consultant for HRD. He owns and is a full-time employee of New Millennium Development Corporation, a company that provides web design and support for small to mid-size companies. Mr. Borsinger is familiar with the markets, and uses, production costs, and other matters related to ethylene polymerization and the wax industry through his former employment with AlliedSignal. See Aff. of Gregory Borsinger.

plaintiff's staff member given her prior involvement in case and speculative nature of defendant's fears of competitive disadvantage from disclosure).

HRD's counsel's need for specialized expertise is heightened in light of HRD's unique and unfortunate evidentiary position vis-a-vis Dow. As Dow is well aware, HRD suffered an unexpected explosion and fire at its Houston facility in December 2004, resulting in the destruction of virtually all of the business records pertaining to the dealings between Dow and HRD at issue in this case. While Dow's counsel easily can access notes and other documents in Dow's possession concerning the disputed transactions, HRD has little choice but to rely on the documents produced by Dow and information from third-party sources. Under the January 2006 Protective Order, HRD's counsel cannot share Dow's highly confidential documents with the Hassan brothers or any other HRD employee, and unlike Dow, HRD has no in-house counsel to consult for guidance.

Given the significant and unavoidable handicap resulting from its document loss, HRD's counsel should be permitted to consult with Mr. Borsinger, a part-time consultant for HRD, regarding Dow's highly confidential documents. In the absence of HRD's own notes and records, Mr. Borsinger will have invaluable insights into the lengthy negotiations and business dealings that resulted in any of the "highly confidential" documents Dow is likely to produce. He can articulate for HRD's counsel HRD's "side of the story" in lieu of records or an in-house counsel that would serve the same purpose. Significantly, HRD agreed to the provision in the January 2006 Protective Order that grants Dow's in-house counsel a special dispensation to review HRD's highly confidential documents (D.I. 43 ¶ 6(c)), but Dow now seeks to modify the January 2006 Protective Order to bar Mr. Borsinger, a non-employee consultant, from accessing its own highly confidential documents, to HRD's prejudice. Dow, of course, also has the same

17

rights as HRD under the January 2006 Protective Order to share confidential and highly confidential documents with its own experts and consultants, as well as its in-house counsel.

Moreover, Dow's instant motions seek the power to prevent HRD from consulting with Mr. Borsinger (and/or Dr. Ewen), and to force HRD to accept some other expert or consultant Dow deems more appropriate. However, even assuming one were available in this highly-specialized field of metallocene wax production and marketing, another expert would need months of preparation, at HRD's expense, to fully understand the complex issues raised in this litigation. Even so, such an expert unnecessarily would lack Mr. Borsinger's experience to explain the business and financial implications of the confidential documents, which Dow knows are crucial to both parties' claims. See Heintz Corp. v. Judson, 1995 U.S. Dist. LEXIS 16328, at *23 (E.D. Pa. Nov. 3, 1995) (Ex. E hereto) (affirming order authorizing plaintiff's expert, a former employee and current consultant, to access defendant's confidential information in part because he had experience in both the technical and business aspects of the jet engine industry that academic experts lacked). It would be highly prejudicial and unfair to HRD if it were forced to waste time and resources in selecting other experts and consultants (if they were available, which given Mr. Borsinger's unique experience and qualifications, they are not) simply to satisfy Dow's untimely and unjustified proposals to amend to the existing protective order. Thus, under the unique circumstances of this case, Dow should not be permitted to "veto" Mr. Borsinger, or any other well-qualified expert or consultant HRD proposes, under a modified protective order.

**B.    Dow's Alleged Fear of Competitive Harm From Disclosure of Highly Confidential Information To HRD's Experts Is Overstated, And Its Proposed Modifications To The Protective Order Are Unnecessary**

In its brief (D.I. 77), Dow contends incorrectly that Mr. Borsinger should not be permitted to access Dow's highly confidential information because he invariably will disclose

18

such information to HRD or the Hassan brothers, whether intentionally or inadvertently. Asserting this rationale, Dow has completely refused to produce <u>any</u> additional documents to HRD, even documents that are not highly confidential, and even after HRD's counsel offered to shield any highly confidential documents from Mr. Borsinger until this issue was resolved by the Court. (D.I. 71, Exhibit H). In addition to being an inadequate legal defense to HRD's Motion to Compel, Dow's argument on this point ignores the crucial and unique role that Mr. Borsinger fills in assisting HRD's counsel, as well as the procedural mechanisms that effectively allay Dow's concerns.

The case of <u>Heintz Corp. v. Judson</u> is instructive on the issue of alleged competitive harm by disclosure of confidential information to a consultant. In <u>Heintz</u>, defendants objected to a magistrate order permitting plaintiff's consultant to review highly confidential documents under a confidentiality agreement in a misappropriation case involving jet engines. <u>Heintz</u>, 1995 U.S. Dist. LEXIS 16328, at *1-2 (Ex. E hereto). The consultant, who had once worked for plaintiff, had extensive experience in the aerospace industry. <u>Id.</u> at *6. Like Dow in this case, the defendants in <u>Heintz</u> expressed concern that disclosure of their confidential technical information to this consultant would result in future competitive harm. In considering the defendants' argument under the good cause standard, however, the court declined to bar the consultant from accessing the disputed documents. <u>Id.</u> at *12. Among other things, the court found it significant that the manufacturing processes detailed in defendant's documents were capital-intensive, that the consultant had no intention of actively competing with defendants with regard to the specific manufacturing processes implicated, and that the consultant had signed confidentiality/ exclusivity agreements precluding him from working for another entity on the technology at issue. <u>Id.</u> at *15-21.

19

Each of these considerations is relevant in adjudicating Dow's contentions regarding Mr. Borsinger. In his affidavit, Mr. Borsinger testifies that, "I have no interest in ever participating in the manufacture or production of metallocene wax." (Aff. of Gregory Borsinger, ¶ 6). He also avers that "a plant or facility that could produce metallocene wax would cost over one hundred million dollars to design and build and require ongoing support that would be impractical for a company like HRD to undertake." (Id. ¶ 6). If, as Mr. Borsinger believes, the production of metallocene wax is impractical for HRD, it is many times more so for Mr. Borsinger himself, whose principal occupation is to run a small web design company. (Id. ¶¶ 1, 6).

To the extent Dow is concerned that Mr. Borsinger will disclose its wax-making technology to HRD or the Hassans (whom Dow incorrectly asserts have the capacity to produce metallocene waxes), or to other competitors, this concern is alleviated through Mr. Borsinger's execution of the "Agreement To Be Bound By Stipulation And Order Governing Discovery Materials" (hereinafter "the January 2006 Non-Disclosure Agreement"), which is appended as Exhibit A to the January 2006 Protective Order. (D.I. 43, Exhibit A). Under the terms of the January 2006 Protective Order, HRD's counsel may not share highly confidential information with Mr. Borsinger or other experts and consultants, unless they first agree to abide by the terms of the January 2006 Protective Order, and confirms such agreement by executing the January 2006 Non-Disclosure Agreement. Individuals signing this agreement aver that: "I understand that any violation of the terms of the [January 2006 Protective Order] may be punishable by money damages, sanctions, contempt of court citation, or other or additional relief as deemed appropriate by the Court." (D.I. 43, Exhibit A). Mr. Borsinger has signed confidentiality agreements at various times throughout his employment and has always honored his

commitments pursuant to those covenants. (Borsinger Aff. ¶ 7). Dow has presented no evidence whatsoever to indicate that Mr. Borsinger will not honor his obligations (and risk the sanctions that may be imposed were he to violate a court-approved order) in this instance.

On numerous occasions, courts have found confidentiality agreements sufficient to adequately protect the parties' interests, even with regard to disclosures to "insiders." See Heintz, 1995 U.S. Dist. LEXIS 16328, at *20 (rejecting defendants' assertions that plaintiff's consultant would not refrain from disclosing confidential information in future assignments, despite execution of confidentiality and exclusivity agreements, because "Defendants [sic] assertions are nothing more than bare allegations" insufficient to satisfy the Rule 26(c) test); Phillips, 1982 U.S. Dist. LEXIS 10258, at *4 ("The Court is unable to perceive that there would be any greater possibility of abuse of the confidential information if disclosed to inside experts and consultants than might exist with outside experts and consultants, provided that those in both groups are required to execute a sworn statement to abide by the terms of the protective order and submit for enforcement purposes to the jurisdiction of the Court"); Cincinnati Bell, 1994 Del. Ch. LEXIS 105, at *6 (noting that concerns about disclosure of proprietary materials to plaintiff's employee could be allayed by plaintiff taking "necessary steps" to ensure confidentiality).

Finally, Dow's asserted fear of competitive disadvantage resulting from disclosure of highly confidential information is overblown, given the particular facts of this case. For all the concern Dow evidences about its data, a primary issue in the parties' dispute is whether Dow misappropriated HRD's trade secrets or other confidential information rightfully belonging to HRD. Accordingly, it is likely that many of Dow's highly confidential documents actually contain information that was developed jointly by the parties or independently by HRD, and that

Mr. Borsinger (and the Hassans) already know about this data. Thus, though Dow would have the Court believe that disclosure of its wax-related information would supply HRD, through Mr. Borsinger's hypothesized violation of a Court Order, with a wealth of advantageous information, the reality is that many of these documents may be nothing more than data HRD itself has participated in developing and rightfully owns. Given these facts, Dow's allegations of competitive harm do not evidence the good cause necessary to justify its proposed modifications to the parties' existing protective order.

### C. There Are No Changed Circumstances Justifying Departure From the Parties' Voluntarily Executed and Negotiated Protective Order, On Which HRD Has Relied

In the brief supporting its motion (D.I. 77), Dow asserts that "[a]t the time that the parties agreed on the current protective order, HRD had not indicated that it would seek the type of highly sensitive technical information that it now requests." (D.I. 78 at 2). This assertion is incredible given that much of the business and technological information relevant to this case pertains to Dow's own claims under the parties' Joint Development Agreement and Supply Agreement. [7] Dow also had full knowledge of the nature of HRD's trade-secret counterclaims from the time they were first filed in March 2005 (D.I. 15) and amended in June 2005 (D.I. 25), and thus long before the parties executed the January 2006 Protective Order. Indeed, Dow entered into the January 2006 Protective Order well aware of the disputed claims, the types of documents that would relate to or support those claims, and the identity of the individuals involved in the relevant negotiations and transactions, including Mr. Borsinger.

---

[7] Dow filed the Complaint (D.I. 1) in this action, based upon the Joint Development Agreement and the Supply Agreement, on January 18, 2005, a full year before the parties filed the January 2006 Protective Order (D.I. 43) on January 19, 2006.

Dow asserts that it first had concerns about Mr. Borsinger's review of confidential documents by the summer of 2006. (D.I. 78 at 3). In fact, however, Dow knew well before the summer of 2006 that Mr. Borsinger would be one of HRD's consultants integrally involved in this case. Dow had ample opportunity to raise any concerns about Mr. Borsinger at the time the parties executed the January 2006 Protective Order, but did not do so. Moreover, even if Dow only became concerned about Mr. Borsinger's involvement in the summer of 2006, the fact remains that Dow did not seek Court intervention until now despite multiple impasses with HRD on this issue since that time.

Similarly, as discussed more fully below, Dow had knowledge of the transactions it characterizes as "red flags" well before the initiation of this lawsuit, but again failed to present those alleged concerns to the Court at any time prior to the instant motions. Only after HRD filed its Motion to Compel and Dow could no longer delay its document production did Dow bring these alleged issues to the Court's attention, and Dow now seeks to use them to justify a wholesale overhaul of the parties' protective order, and to seize control over HRD's choice of experts and consultants, and to severely prejudice HRD in litigating its case.

This tactic should not be countenanced, especially in light of HRD's reasonable reliance for now more than one year on the parties' agreement. HRD has produced nearly 5,000 paper copies of electronic documents in good faith under the existing protective order. As this Court has recognized, a party "cannot now ignore the protective order it agreed to abide by earlier in the litigation and from which it gleaned [sic] discovery [from defendant]." Medtronic Ave, Inc. v. Advanced Cardiovascular Sys., Inc., 2004 U.S. Dist. LEXIS 670, at *9 (D. Del. Jan. 13, 2004) (Ex. F hereto). Dow executed the existing protective order voluntarily, after having ample opportunity to negotiate favorable terms and ample opportunity to address the concerns it now

23

raises. Dow also has reaped the benefit of reviewing HRD's documents under the January 2006

Protective Order, but now refuses to produce its own documents on the same terms. The Court

should not reward Dow's delay and lack of diligence by modifying the protective order to the

detriment of HRD.

**D.    Dow's Proposed Modifications to the Protective Order Will Result in Prolonged Ancillary Disputes That Will Unnecessarily Tax Judicial Resources**

Dow seeks to modify the January 2006 Protective Order by giving each party the right to

object to the other's proposed experts and consultants, and seek a court order forbidding

disclosure to that expert. D.I. 77-2). This proposed "veto power" would unduly complicate the

case by injecting side issues into the forefront of the litigation, of which Dow's present motions

are an example. See In Re Plastics Additives Antitrust Litig., 2005 U.S. Dist. LEXIS 23771, at

*11 (E.D. Pa. Aug. 24, 2005) (Ex.G hereto) (rejecting parties' proposed "veto power" over

disclosures to in-house counsel as modification to protective order in favor of alternate proposal

that would better streamline document discovery and avoid prolonged negotiations and disputes).

If the January 2006 Protective Order is modified as Dow requests to permit parties to seek the

Court's intervention to exclude proposed experts and consultants, judicial resources invariably

will be spent on ancillary issues having little relation to the parties' claims, and the progress of

this litigation will be further significantly impeded. Indeed, HRD has reason to believe that Dow

will object to Dr. Ewen, even though it has no reasonable basis for barring this independent

expert. See, e.g., Dentsply, 187 F.R.D. at 164 (noting in context of nonparty modifications to

protective order that "provisions calling for the Court refereeing confidentiality disputes have

enormous potential for overwhelming scarce judicial resources"). The parties' present order, to

which Dow voluntarily agreed, provides sufficient protections to ensure the confidentiality of

24

secret information and sets a reasonable framework for expert disclosures without the need for Court involvement. As such, the practical effect of Dow's proposed amendments is only to further stall this already-delayed case and draw unnecessarily on judicial resources.

### E. Dow's Cases Do Dot Support The Relief It Seeks Under The Facts Present Here

In support of its Expert Motion, Dow cites several cases in which courts have found that "insiders" could not mentally segregate the confidential information of the disclosing party from that of the party they represented, resulting in a competitive disadvantage to the disclosing party. See, e.g., Safe Flight Instrument Corp. v. Sunstrand Data Control, Inc., 682 F. Supp. 20, 22 (D. Del. 1988). The cases Dow cites, however, differ in several key respects from the instant matter, and therefore, are not persuasive or controlling.

First, unlike the corporate officer at issue in Safe Flight, Mr. Borsinger is not an officer or employee of HRD. In contrast, he is an outside, part-time consultant of whom Dow was aware, and to whom Dow raised no objection at the time the parties negotiated the January 2006 Protective Order. As already mentioned, HRD would never have entered into the existing protective order had it known that Dow would seek to veto Mr. Borsinger's review of "highly confidential" information as a consultant in this case, and Dow never represented its present intent to limit Mr. Borsinger's access when the parties executed their agreement. Given its foreknowledge of Mr. Borsinger's role in the litigation, Dow cannot now claim that Mr. Borsinger is an unacceptable, "non-independent" expert.

Second, though Dow attempts to argue otherwise, disclosure of Dow's confidential documents to HRD will not place Dow at a competitive disadvantage with regard to the technology at issue. This is because HRD (either on its own or in partnership with another company) is not, and cannot realistically become, Dow's competitor in the production and

25

manufacture of metallocene wax. As explained in the Affidavit of Abbas Hassan and the Statement of Facts above, none of HRD's facilities, whether in the U.S. or overseas, has the capability to produce the wax products that are the subject of this lawsuit, and Dow is protected by its countless patents in this area. HRD's facilities in Houston and India are equipped only to refine polyethylene to meet the specific needs of end-users, not to engage in production of metallocene wax.[8] (Hassan Aff. ¶ 13). Modification of either of these facilities to enable wax production would be both unduly expensive and logistically unfeasible.

Equally untenable is the contention that HRD or Mr. Borsinger would (1) violate this Court's order, and then (2) market Dow's technology to a competitor that actually could manufacture metallocene wax. Given the highly-specialized and costly nature of this technology, only large, international chemical companies possess the capital and resources necessary to successfully implement Dow's technology. It is misguided to think that these few competitors, who are well aware of Dow's position in the marketplace, would summarily endeavor to work jointly with HRD on a project of this nature without carefully seeking assurances that they could insulate themselves from liability for misappropriation. (Hassan Aff. ¶ 12). Thus, Dow's contention that Mr. Borsinger or HRD will be able to shop this information to other competitors, to Dow's prejudice, is totally unrealistic, and Dow, who has the burden of proof in this case, has made, and can make, no showing otherwise. Consequently, Dow's concerns about economic injury from disclosure to "competitors" are overstated.

Further distinguishing Dow's cases from the instant case is HRD's distinct disadvantage in defending this litigation given its lack of documents and in-house counsel. These important factors, as discussed above, are not implicated in any of Dow's cited cases and is a substantial

---

[8] The Hassan brothers' Iranian entity is unable to produce any products whatsoever; it is merely rented office space. (Hassan Aff. ¶ 18).

hardship that the Court should take into account.  See Pansy, 23 F.3d at 789 (emphasizing that

motion to modify protective order should be considered in light of individual facts and

circumstances of case).  Also differentiating the present case is Mr. Borsinger's unique ability to

assist counsel, given his business experience in the PE wax markets, and knowledge of the

dealings between HRD and Dow that have given rise to this case.  In short, Dow's cases do not

control the outcome of the instant motion.

**II.    DOW'S UNSUBSTANTIATED CONCERNS REGARDING IRAN ARE
INSUFFICIENT TO SHOW GOOD CAUSE JUSTIFYING MODIFICATION OF
THE PROTECTIVE ORDER**

In its brief (D.I. 72), Dow alleges that it cannot produce documents to HRD,

notwithstanding the January 2006 Protective Order, because it is concerned that HRD or Mr.

Borsinger, or both, will intentionally violate federal trade restrictions and the terms of the 2006

Protective Order, and will illegally export technological information in Dow's documents to Iran.

This, notwithstanding the fact that HRD has no manufacturing facility in Iran, and therefore

could not take advantage of the technological information in Iran, even if HRD or Mr. Borsinger

were so foolish or devious to risk Court and prosecutorial sanctions to carry out such a fantastic

plot.  As will be further shown below, Dow's allegations regarding imagined, illegal exportation

of technology to Iran are totally without merit.  Dow cannot produce one document, because

none exists, to support its false claim that HRD has any intention to export metallocene wax

technology to Iran.  To the contrary, the documents Dow cites show that HRD has complied and

continues to comply with laws and regulations regarding exports to Iran.  Moreover, Dow is

amply protected from unauthorized disclosures and "trade violations" by the parties' existing

protective order, and has refused to agree to an additional order HRD proposed specifically to

alleviate Dow's unfounded concerns.  Dow's allegations on Iran are nothing more than an

27

attempt to sidestep the real issue precipitating its motion – Dow's continuing, unreasonable delay in complying with HRD's discovery requests.

###### A.   Dow's Characterization of Facts Unrelated To This Case As "Red Flags" Is Inaccurate and Misleading

Dow alleges that it must not produce documents to HRD because it has suspicions that the information contained in those documents might be disclosed to persons allegedly doing business in Iran, specifically HRD's owners, Abbas Hassan and Aziz Hassan. Dow identifies what it calls "red flags," which it claims create a presumption that any documents disclosed to HRD, its counsel, and retained experts or consultants will be used in violation of the law and the January 2006 Protective Order. Supposedly to prove its accusations, Dow attached 25 exhibits to its motion. The vast number of those exhibits are years old and were given to Dow years ago by HRD in connection with an Evaluation Agreement, which relates to Dow's and HRD's joint evaluation of the possible conversion of methane to ethylene.

As explained more fully in the Statement of Facts, this methane-to-ethylene technology ("the Technology") has nothing to do with metallocene or polyethylene wax. After Dow and its counsel fully examined these documents and others in 2004, Dow determined that there were no "red flags" related to US trade restrictions with Iran, and entered into the Evaluation Agreement with HRD. The parties extended that agreement into the summer of 2006. At no time during the pendency of the Evaluation Agreement did Dow ever suggest to HRD that HRD had done or planned to do anything illegal, or that HRD's conduct might constitute a "red flag." Now Dow is claiming those very same documents are the "red flags" that prevent it from complying with HRD's discovery requests.

A review of the "evidence" Dow has submitted in support of its motion clearly shows that its accusations have no merit. Exhibits 1, 3, 4, 9, 10, 11, 12, 13, 14, 15, 16, 17 and 18 all pertain to the Evaluation Agreement, which, as previously noted, has nothing to do with the issues in this case involving metallocene or polyethylene wax. The agreement itself is marked as Exhibit 13 to Dow's brief in support of its Iran Motion and is dated November 2, 2004. (D.I. 73, Exhibit 13). At the time of the agreement, Dow was aware that "one of the inventors of the Technology [that was the subject of the Evaluation Agreement]" was a citizen of Iran. (D.I. 73, Exhibit 13, Section 1.1(B)). Prior to signing the Evaluation Agreement, Dow requested and HRD provided an opinion letter on matters related to the Technology and United States trade regulations regarding Iran. The opinion letter was prepared by Baker Botts LLP ("Baker Botts"), a law firm that regularly represents Dow, and has substantial expertise in the area of the US trade regulations regarding Iran. (D.I. 73, Exhibit 14). Baker Botts issued its opinion that HRD was acting lawfully. Dow also had in its possession and examined Exhibits 1, 3, 9, 10, 11, 12, 14, 15, 16 and 17 before deciding to sign the Evaluation Agreement. Dow cannot legitimately assert that these documents are now "red flags" when Dow possessed them for years without issue while enjoying the benefits of the Evaluation Agreement.

Exhibit 4 is a confidential synopsis of the activities regarding the Technology. HRD believes this document was given to Dow in 2005. If Exhibit 4 or any of the other listed exhibits ever constituted a "red flag," the Evaluation Agreement should have been cancelled at that time. Surely Dow cannot now claim with any credibility that the exact documents it used to determine there were no "red flags" now constitute evidence that there are "red flags."

The so-called "red flag" exhibits listed above prove not that HRD will violate the law, but rather that it is following the law. And Dow knows that. On their face, the documents show that

29

the Hassans have sought the approval of the U.S. Office of Foreign Assets Control ("OFAC") for their interest in dealing with Iran, and not that they have demonstrated any intent to trade illegally. In fact, Dow wrote a letter to OFAC, dated July 23, 2003, in support of HRD's request for OFAC approval, stating, in part: "[Dow] supports OFAC's granting of any appropriate license for the import of this methane to ethylene technology." (Hassan Aff. Exhibit 1). Dow's "red-flag" exhibits also show that the Hassans' interest in dealing with Iran relates solely to technology for the "conversion of natural gas [i.e. methane] into more valuable commodities [i.e. ethylene]" (D.I. 73, Exhibit 4), and does not involve metallocene wax. Most significantly, the documents clearly establish that the Hassans were working jointly with Dow in connection with the methane-to-ethylene technology. This is clear and convincing evidence that HRD and the Hassans are abiding by the law.

Dow's next "red flag," (Dow Exhibit 2), is a letter dated October 2003 showing again that Dow wanted to do business in Iran and met with Iranians in Dubai to discuss that desire. (D.I. 73, Exhibit 2). If this is evidence of wrongdoing, it would be evidence of Dow's wrongdoing. Since the letter is addressed to Dow and dated well before the Evaluation Agreement was executed, it is clear Dow did not consider this a "red flag" in 2004.

Dow's next "red flag," Exhibit 7, is a 22 month-old newspaper article suggesting that HRD's plant in Houston would not reopen. However, contrary to Dow's purported evidence, HRD's plant in Houston resumed operation months ago. (Hassan Aff. ¶ 15). The other newspaper articles Dow cites as Exhibit 8 to its Iran Brief discuss possible developments in the chemical industry in Iran. They make no mention of HRD, or metallocene or polyethylene wax. It is unclear what those articles tend to prove other than the inconsistent news being reported from Iran. For example, on November 8, 2006, one article reported the planned startup of new

30

olefin units in Iran next year. Two weeks later, the same publication stated that, "problems plague NPC's plans, pushing back the start-up of its Olefins No. 7, 9 and 10 projects." These exhibits are irrelevant, and do nothing to substantiate Dow's concerns in this case.

Dow's "red flag," Exhibit 6, is its version of a failed confidential settlement agreement (the "Draft Settlement Agreement") with HRD. If anything, Dow's disclosure of the Draft Settlement Agreement in a public filing proves only that Dow has not abided by its obligation to keep documents confidential. If Dow believed in good faith that this confidential document had any relevance, notwithstanding the protections accorded to settlement discussions under Federal Rule of Evidence 408, Dow would have filed it with the Court as a "sealed" document.

Further, Dow incorrectly asserts that in connection with confidential negotiations related to the Draft Settlement Agreement, "HRD revealed for the first time its intention to become a manufacturer of metallocene waxes either alone or with a partner," (D.I. 73 at 6), and then goes on recklessly to allege that discussions related the agreement are evidence of HRD's "intention to commit a crime." (Id. at n.2). In fact, the Draft Settlement Agreement and related discussions revealed nothing of the sort. (Hassan Aff. ¶ 14).

HRD has never stated to Dow or anyone else that it intends to become a manufacturer of metallocene polymer waxes and HRD has no such intent or capability to do so. (Hassan Aff. ¶¶ 12, 13). In those confidential settlement discussions, HRD made a demand that Dow assign all rights to manufacture the parties' contemplated "2 Pack" product to HRD, in consideration for HRD's payment of a substantial sum of money. (Hassan Aff. ¶ 14). Dow represented that it had the authority to do so, when in fact it was bound by an agreement concerning the "2 Pack" product with another company, HB Fuller. (Id.) HRD suspected in advance Dow's relationship with Fuller, and Dow's later demand for the payment of a royalty to Fuller proves Dow's

31

deceptive intent. (Id.) HRD has never had any plans to manufacture metallocene wax, either by constructing its own plant or through any joint venture with another. (Hassan Aff. ¶ 12). The value to HRD in obtaining the exclusive control over the technology was to preclude Dow's entry into the market, either alone or with another, in competition with HRD's existing wax products. (Hassan Aff. ¶ 14).

Exhibits 5, 20, 21, 22, 23, 24 and 25 are either attorney correspondence or case law, and therefore are not evidence to support Dow's allegations.

Dow also contends that a "red flag" exists because of questions regarding Dr. Bagherzadeh's residence address. However, Dow knows that Dr. Bagherzadeh has resided in the United States throughout the year and a half the Evaluation Agreement was in effect. In fact, Dow has met with Dr. Bagherzadeh in this country on several occasions. (Hassan Aff. ¶ 17).

In summary, the litany of alleged "red flags" listed in support of Dow's Iran Motion not only are irrelevant but also are misconstrued to support inferences that are either demonstrably untrue or strongly prove that HRD and the Hassans are following U.S. law. Quite simply, Dow has attempted to smear HRD and its owners in the eyes of the Court by casting a net of false innuendo, and cynically assuming that mere mention of anything to do with Iran will be accepted, ipso facto, as an excuse for Dow's avoidance of its discovery obligations and for its disregard of the existing protections set forth in the January 2006 Protective Order. As Dow is well aware, however, a simple meeting with an Iranian is not illegal, and Dow's own personnel also have met with Iranian representatives on several occasions both in Dubai and in Tehran. (Hassan Aff. ¶¶ 9, 10). In short, Dow's exhibits undercut and provide no support for its irresponsible charges about alleged trade violations and its insistence on amending the January

2006 Protective Order. There are no "red flags," and Dow should be ordered to produce non-privileged documents responsive to HRD's requests forthwith.

**B.    Dow's Document Production Is Not An Undue Burden Because The Production Will In No Way Violate Federal Law**

After setting forth its alleged "proof" concerning HRD's technology exportation, Dow proclaims that its production of confidential documents constitutes an undue burden because Dow's disclosure might violate federal law. This assertion is flawed for several reasons. As an initial matter, none of Dow's exhibits, whether singly or in combination, support the notion that HRD has illegally exported technology to Iran in the past, much less that it will do so in the future. "Speculation . . . does not provide a proper basis for the institution of a protective order." Cincinnati Bell, 1994 Del. Ch. LEXIS 105, at *6.

Furthermore, Dow's argument falsely and irresponsibly presumes that HRD, its counsel, and its experts will freely disregard their legal obligations and violate a court order prohibiting unauthorized disclosure of Dow's information. Even if this assumption were legitimate, and it is not, Dow could not be held legally responsible for trade violations resulting from HRD's contravention of a court order, especially one that is specifically designed to protect Dow's information from such abuse. See, e.g., Max's Seafood Café v. Quinteros, 176 F.3d 669, 673-74 (3d Cir. 1999) (reversing trial court decision holding individual liable for his business associate's violation of consent order because order did not impose duty to police others' compliance and because individual did not violate the order himself or aid/abet associate in doing so).

Additionally, though Dow would like the Court to believe that any information it produces to HRD invariably will be disseminated to the Hassan brothers, and from them somehow to Iran, that is not the case. Under the January 2006 Protective Order, Dow has the discretion to shield bona fide, "trade secrets, or sensitive sale, financial and marketing

33

information, or future business plans" from HRD and the Hassan brothers by designating this information as "highly confidential." (Exhibit A, ¶ 3(a)).  See Medtronic, 2004 U.S. Dist. LEXIS 670, at *8-9 (Ex. F hereto) (drawing distinction in protective order dispute that, "disclosure [of confidential information] to limited persons as in the instant case is not the same as disclosure to Medtronic personnel").  Dow attempts to convince the Court that this designation is insufficient because Mr. Borsinger or other consultants will intentionally or inadvertently disclose Dow's secrets to HRD, which then will illegally convey the secrets to Iran.  As discussed above, however, this concern is alleviated through Mr. Borsinger's execution of the Non-Disclosure Agreement and the sanctions that inevitably will accompany violation of a court order.

Finally, HRD has made good faith efforts to address Dow's alleged concerns about Iran.  In December 2006, HRD attempted to resolve this issue without Court intervention by proposing that the parties execute an Agreed Order governing this matter.  The Order stipulated that neither party would export wax technology to any foreign country illegally.  See D.I. 71 ¶ 10.  Dow flatly rejected HRD's Agreed Order and continued to delay its production.  Now, despite HRD's offers to compromise, Dow seeks to modify the January 2006 Protective Order on its own terms, in a way that will impose substantial hardship on HRD's ability to effectively litigate its case.  Dow's transparent attempt to create an illegal exportation issue as a pretext for its delay does not justify modifying the January 2006 Protective Order and does not warrant the amendments Dow seeks to impose.

## CONCLUSION

As discussed above, Dow has failed to show the good cause necessary to justify modification of the January 2006 Protective Order. Consequently, its motions should be denied, and Defendant's Motion to Compel should be granted.


OF COUNSEL:

Michael Landrum
William C. Ferebee
O'DONNELL FEREBEE MEDLEY & KEISER, PC
450 Gears, Eighth Floor
Houston, TX 77067-4512
(281) 875-8200 (telephone)
(281) 875-4962 (facsimile)

POTTER ANDERSON & CORROON LLP

By: _W. Harding Dan_

W. Harding Drane, Jr. (#1023)
Richard L. Horwitz (#2246)
Suzanne M. Hill (#4414)
Jennifer C. Wasson (#4933)
1313 N. Market Street
Wilmington, DE 19899-0951
(302) 984-6000
wdrane@potteranderson.com
rhorwitz@potteranderson.com
shill@potteranderson.com
jwasson@potteranderson.com

Dated: January 23, 2007

*Attorneys for HRD Corporation*

772344v6

35