# EXHIBIT A

## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DOW CHEMICAL CANADA INC. on its own behalf and as assignee of THE DOW CHEMICAL COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>HRD CORPORATION (d/b/a Marcus Oil & Chemical)<br><br>Defendant, Counterclaim Plaintiff,<br><br>v.<br><br>DOW CHEMICAL CANADA INC., on its own behalf and as assignee of THE DOW CHEMICAL COMPANY, and THE DOW CHEMICAL COMPANY,<br><br>Counterclaim Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )   C.A. No. 05-023 (JJF) |

## STIPULATION AND ORDER
## GOVERNING DISCOVERY MATERIALS

Pursuant to Fed.R.Civ.P. 26(c), and upon agreement of the parties and their counsel, it is hereby ORDERED that:

    1.    This Stipulation and Order Governing Discovery Materials ("Stipulation and Order") governs the treatment of all information, documents, and things within the scope of discovery in this action, including depositions and deposition exhibits, interrogatory answers, responses to requests to admit and other written, recorded, computerized, electronic or graphic matter ("Discovery Material") produced by or obtained from any party or non-party who agrees to the terms of this Stipulation and

Order (the "Producing Person"). "Discovery Material" includes "Confidential Discovery Material" defined in paragraph 2 and "Highly Confidential Discovery Material" defined in paragraph 3.

2.    Any Producing Person may designate any Discovery Material as "Confidential" under the terms of this Stipulation and Order if such person (the "Designating Person") in good faith believes that such Discovery Material contains non-public, confidential, proprietary or commercially sensitive information that requires the protections provided in this Stipulation and Order ("Confidential Discovery Material"). For purposes of this Stipulation and Order:

(a)    Confidential Discovery Material includes information maintained by the Producing Person that is not publicly available including without limitation trade secrets or other confidential research, development, or commercial information, and financial information.

(b)    Confidential Discovery Material shall not include any information which:

(i)    at the time of the production hereunder is available to the public; or

(ii)    after production hereunder becomes available to the public through no act, or failure to act, by the Receiving Party; or

(iii)    the Receiving Party can show (a) was already known to the Receiving Party; (b) was independently developed by the Receiving Party; or (c) was received by the Receiving Party, after the time of production hereunder, from a third party having the right to make such disclosures.

(c)    The Designating Person shall mark the copies of such documents or things deemed in good faith to be Confidential Discovery Material by placing on each page a stamp or notice (insofar as possible) stating:

CONFIDENTIAL DISCOVERY MATERIAL
Subject to Protective Order in C.A. No. 05-023 (JJF)

To the extent it is not possible to mark such documents or things designated as Confidential Discovery Material, counsel may designate such documents or things as Confidential Discovery Material in the accompanying transmittal letter.

(d)    Information provided in a deposition may be designated "Confidential" by a Designating Person either (i) during the deposition, in which case the transcript of the testimony containing the information shall be marked "Confidential" by the reporter, or (ii) by written notice to all counsel of record within seven (7) days after the deponent or its counsel receives the transcript. Pending the expiration of seven (7) days after a deposition transcript is received by the deponent or his counsel, the parties and their counsel shall treat the deposition transcript as if it had been designated as "Confidential." A Designating Person shall have the right to have all persons not permitted to view Confidential Discovery Material under the terms of this Stipulation and Order excluded from a deposition, or any portion thereof, before the taking of testimony which has been designated "Confidential" under this Stipulation and Order.

(e)    A Producing Person may designate any Discovery Material that already has been produced as "Confidential" by notifying the party to whom the production has been made that such Discovery Material constitutes Confidential Discovery Material; the Producing Person must provide such notice promptly

3

upon discovering that it produced Discovery Material that should have been identified as "Confidential" and, in any event, may not designate Discovery Material that has already been produced as "Confidential" less than 30 days before summary judgment motions are due.

(f)    A party shall not be obligated to challenge the propriety of a designation of Discovery Material as "Confidential" at the time made, and the failure to do so shall not preclude a subsequent challenge thereto. In the event that any party to this litigation disagrees at any point in these proceedings with the designation by a Designating Person of any information as "Confidential," it shall notify the Designating Person in writing, and the challenging party and the Designating Person shall try to resolve such dispute in good faith on an informal basis. If the dispute cannot be resolved, the Receiving Party may seek appropriate relief from this Court. While such a motion remains pending, the Discovery Material shall be treated as Confidential Discovery Material pursuant to this Stipulation and Order.

(g)    The Confidential Discovery Material designation shall also apply to any notes or summaries prepared based on Confidential Discovery Materials.

3.    Any Producing Person may also designate information that otherwise qualifies as Confidential Discovery Material as "Highly Confidential" if such person (the "Designating Person") in good faith believes that disclosing such information to persons to whom Confidential Material may be disclosed will or may cause injury to the Producing Person ("Highly Confidential Discovery Material"). For the purpose of this Stipulation and Order:

4

(a)    Highly Confidential Discovery Material includes particularly sensitive Confidential Discovery Materials that relate to trade secrets, or sensitive sales, financial and marketing information, or future business plans within the meaning of Fed.R.Civ.P. 26(c)(7).

(b)    The Designating Person shall mark the copies of such documents or things deemed in good faith to be Highly Confidential Discovery Material  by placing on each page a stamp or notice (insofar as possible) stating:

HIGHLY CONFIDENTIAL DISCOVERY MATERIAL
Subject to Protective Order in C.A. No. 05-023 (JJF)

To the extent it is not possible to mark such documents or things deemed to be Highly Confidential Discovery Material, counsel may designate such documents or things as Highly Confidential Discovery Material in the accompanying transmittal letter.

(c)    Information provided in a deposition may be designated "Highly Confidential" by a Designating Person either (i) during the deposition, in which case the transcript of the testimony containing the information shall be marked "Highly Confidential" by the reporter, or (ii) by written notice to all counsel of record within seven (7) days after the deponent or its counsel receives the transcript.  A Designating Person shall have the right to have all persons not permitted to view Highly Confidential Discovery Material under the terms of this Stipulation and Order excluded from a deposition, or any portion thereof, before the taking of testimony which has been designated " Highly Confidential" under this Stipulation and Order.

5

(d)    A Producing Person may designate any Discovery Material that already has been produced as "Highly Confidential" by notifying the party to whom the production has been made that such Discovery Material constitutes Highly Confidential Discovery Material; the Producing Person must provide such notice promptly upon discovering that it produced Discovery Material that should have been identified as "Highly Confidential" and, in any event, may not designate Discovery Material that has already been produced as "Highly Confidential" less than 30 days before summary judgment motions are due.

(e)    A party shall not be obligated to challenge the propriety of a designation of Discovery Material as "Highly Confidential" at the time made, and the failure to do so shall not preclude a subsequent challenge thereto. In the event that any party to this litigation disagrees at any point in these proceedings with the designation by a Designating Person of any information as "Highly Confidential," it shall notify the Designating Person in writing, and the challenging party and the Designating Person shall try to resolve such dispute in good faith on an informal basis. If the dispute cannot be resolved, the Receiving Person may seek appropriate relief from this Court. While such a motion remains pending, the Discovery Material shall be treated as Highly Confidential Discovery Material pursuant to this Stipulation and Order.

(f)    The Highly Confidential Discovery Material designation shall also apply to any notes or summaries prepared based on Highly Confidential Discovery Materials.

4.    Confidential Discovery Material and Highly Confidential Discovery Material shall be used by a party (the "Receiving Party") solely for purposes of the above-captioned litigation and shall not be used for any other purpose during or after this litigation, unless the Court so allows; nor shall it be disclosed to any third parties, with the exception of the individuals listed in paragraphs 5 and 6 below; provided, however, that the Receiving Party may make any and all use of Confidential Discovery Material or Highly Confidential Discovery Material which becomes public through the acts of persons other than the Receiving Party, which is obtained by the Receiving Party from a source not bound by the terms of this Stipulation and Order, or which the Receiving Party independently derives or develops from non-confidential sources. Nothing herein is intended to waive any objections to the admissibility or discoverability of any Discovery Material in this case or any other action or proceeding or any other objections to such Discovery Material or the production thereof, all such objections being specifically preserved.

5.    For the purposes set forth in Paragraph 4 above, without written consent from the Designating Person, Confidential Discovery Material or information derived therefrom may be disclosed or made available only to the following persons:

(a)    outside counsel to the undersigned parties, who also sign a confidentiality non-disclosure agreement as further described in paragraph 7 below, and the clerical, paralegal and secretarial and other staff employed by such counsel including outside vendors involved in the production, reproduction, organization, filing, coding, cataloging, converting, storing, retrieving and review of Discovery Material;

7

(b)    experts or consultants retained in good faith to assist counsel in these cases, who also sign a confidentiality non-disclosure agreement as further described in paragraph 7 below, and the clerical, paralegal and secretarial and other staff employed by such experts or consultants;

(c)    the undersigned parties and inside counsel, officers, directors, board members and representatives, trustees, partners, employees, and counsel to board committees or sub-committees of such parties to the extent reasonably necessary to assist in the investigation, prosecution or defense of the claims, who also sign a confidentiality non-disclosure agreement as further described in paragraph 7 below;

(d)    potential witnesses or deponents and their counsel in connection with the claims, when such disclosure is reasonably necessary for the purposes of trial preparation, factual investigation, or discovery, who also sign a confidentiality non-disclosure agreement as further described in paragraph 7 below;

(e)    such other persons as the Designating Person agrees in writing may receive Confidential Information pursuant to paragraph 10 and who also signs a confidentiality non-disclosure agreement as further described in paragraph 7 below; and

(f)    the Court and its support personnel.

6.    For the purposes set forth in Paragraph 4 above, without written consent from the Designating Person, Highly Confidential Discovery Material or information derived therefrom may be disclosed or made available only to the following persons:

8

(a)    outside counsel to the undersigned parties, who also sign a confidentiality non-disclosure agreement as further described in paragraph 7 below, and the clerical, paralegal and secretarial and other staff employed by such counsel including outside vendors involved in the production, reproduction, organization, filing, coding, cataloging, converting, storing, retrieving and review of Discovery Material;

(b)    experts or consultants retained in good faith to assist counsel in these cases, who also sign a confidentiality non-disclosure agreement as further described in paragraph 7 below, and the clerical, paralegal and secretarial and other staff employed by such experts or consultants;

(c)    Dow Chemical Canada Inc and The Dow Chemical Company in-house counsel Steve Arnosky and Shelley Storer, who also sign a confidentiality non-disclosure agreement as further described in paragraph 7 below, and the clerical, paralegal and secretarial and other staff employed by such in-house counsel including outside vendors involved in the production, reproduction, organization, filing, coding, cataloging, converting, storing, retrieving and review of Discovery Material;

(d)    the author(s) or prior recipient(s) of a document containing Highly Confidential Discovery Material, provided it is established in the document or by agreement of the parties that the person is an author or prior recipient of the document, who also sign a confidentiality non-disclosure agreement as further described in paragraph 7 below;

(e)    such other persons as the Designating Person agrees in writing may receive Highly Confidential Information pursuant to paragraph 10 and who also sign a confidentiality non-disclosure agreement as further described in paragraph 7 below; and

(f)    the Court and its support personnel.

7.    Before a party or its counsel may show or disclose Confidential Discovery Material or Highly Confidential Discovery Material designated by another party or a non-party to any person except (a) the Court and its support personnel, and (b) clerical, paralegal and secretarial and other staff employed by individuals listed in paragraphs 5 and 6, that person shall be advised that the material or information is being disclosed pursuant to and subject to the terms of this Stipulation and Order and may not be disclosed other than pursuant to the terms of this Stipulation and Order and shall be required to confirm his or her understanding and agreement to abide by the terms of this Stipulation and Order by signing a copy of Exhibit A hereto, which copy shall be maintained by counsel for the disclosing party. If a non-party witness declines to sign a copy of Exhibit A, Confidential Discovery Material or Highly Confidential Discovery Material may be shown or disclosed to such person if a court with jurisdiction over the person orders the person to maintain the Confidential Discovery Material or Highly Confidential Discovery Material in confidence, not to disclose the Confidential Discovery Material or Highly Confidential Discovery Material and to deliver any documents prepared relating thereto to the person who conveyed the Confidential Discovery Material or Highly Confidential Discovery Material. Clerical, paralegal and secretarial and other staff employed by persons identified in Paragraphs 5 and 6,

10

including outside vendors involved in the production, reproduction, organization, filing, coding, cataloging, converting, storing, retrieving and review of Discovery Material, shall be deemed to be subject to this order by virtue of their employment with a person listed in Paragraphs 5 and 6.

8.    Any person receiving Confidential Discovery Material or Highly Confidential Discovery Material shall be bound by the terms of this Stipulation and Order. In the absence of written permission from the Designating Person, Confidential Discovery Material may be disclosed only to the persons identified in paragraph 5, and Highly Confidential Discovery Material may be disclosed only the persons identified in paragraph 6, and then only for the investigation, prosecution and/or defense of any claims in this proceeding, including any appeals, retrials, and enforcement of any judgments in respect of the claims, providing that counsel, before disclosing Confidential Discovery Material or Highly Confidential Discovery Material to such persons, shall inform such persons that this Stipulation and Order has been entered and provide any such persons with a copy of this Stipulation and Order.

9.    Nothing in this Stipulation and Order shall prevent disclosure of any Confidential Discovery Material or Highly Confidential Discovery Material:  (1) by the Designating Person; (2) to any employee or officer of the Designating Person; or (3) to any person no longer affiliated with the Designating Person who either authored, in whole or in part, or received the Confidential Discovery Material prior to the initiation of this litigation.

10.    In the event counsel for a party deems it necessary to disclose any Confidential Discovery Material or Highly Confidential Discovery Material to any person

11

not designated in paragraphs 5 and 6, said counsel shall notify counsel for the Designating Person in writing at least 10 days prior to the proposed disclosure of (1) the information or documents to be disclosed; and (2) the person(s) to whom such disclosure is to be made, and shall attempt to reach agreement regarding such disclosure. If agreement cannot be reached, the Receiving Person may make an appropriate motion to modify the terms of this Stipulation and Order with respect to the proposed disclosure and whether any restrictions or limitations should be placed on the disclosure of the Discovery Material at issue. While such motion remains pending, the Discovery Material shall be treated as Confidential Discovery Material or Highly Confidential Discovery Material.

11.    Any filings with the Court containing Confidential Discovery Material or Highly Confidential Discovery Material shall be filed under seal in accordance with the Court's electronic filing system (the "CM/ECF System") or such other procedures adopted by the Court. This paragraph shall not prevent a second copy of any such pleading or other documents specifically intended for review by the Court from being hand-delivered to chambers to assure prompt attention thereto, as long as reasonable safeguards are observed to maintain the confidentiality of the documents.

12.    The Clerk of the Court is directed to place and maintain under seal any such pleading or other document filed with or delivered to this Court pursuant to paragraph 11 and in accordance with this Order and the practices of this Court, and in accordance with procedures for filing sealed documents using the Court's CM/ECF System or other procedures adopted by the Court.

13.     Nothing in this Order shall prevent a party from using any Confidential Discovery Material or Highly Confidential Discovery Material at trial, during a hearing, or during any other court proceeding. However, the party intending to make such use of Confidential Discovery Material or Highly Confidential Discovery Material at a court proceeding must notify the Designating Person at the start of such proceeding of the intention to use such Confidential Discovery Material or Highly Confidential Discovery Material before revealing the Confidential Discovery Material or Highly Confidential Discovery Material in open court, to allow the Designating Person an opportunity to request that the portion of the proceeding where use is to be held in camera and that the transcript of that portion of the proceeding be maintained under seal and in camera in accordance with paragraph 11 of this Stipulation and Order.

14.     The parties agree that the following shall govern issues related to the assertion and/or waiver of claims that documents or things are protected from disclosure on the basis of privilege or some other ground:

(a)     The parties agree that due to the volume of Discovery Material, particularly electronic Discovery Material, Producing Parties may conduct privilege screening through reliance on electronic searches to identify potentially privileged documents rather than by document by document review. As provided in subparagraph (b) below, such method of privilege screening shall not constitute a waiver of any claim that Discovery Material produced by the Producing Party is protected from disclosure on the basis of privilege or some other ground. Such method of privilege screening shall not abrogate the duty of the Producing Party to assert a claim of privilege with respect to each privileged responsive document

13

or thing withheld and provide a privilege log as provided in subparagraph (c) below.

(b)     The production of Discovery Material in this litigation shall not, in and of itself, prejudice or otherwise constitute a waiver of, or estoppel as to, any claim that the particular Discovery Material is privileged or otherwise protected from disclosure on the basis of the attorney-client privilege, attorney work product, or on the basis that it was prepared in anticipation of litigation, or on any other ground.

(c)     The parties agree to prepare a privilege log listing responsive documents or things withheld from production on the basis of attorney-client privilege, attorney work product, on the basis that it was prepared in anticipation of litigation, or on any other ground ("Privilege Log"). The parties agree that a Privilege Log need not list communications with, or other work product prepared by, counsel to the parties after commencement of the litigation on January 18, 2005. The parties also agree that a Producing Party's Privilege Log need not list the internal working files of counsel for the Producing Party.

(d)     If notice is given pursuant to this paragraph that particular Discovery Material that is privileged or otherwise protected from disclosure was produced and is in the custody of another party, such party shall promptly either destroy or return to the Producing Party that Discovery Material (and any copies) which the Producing Party has provided notice is privileged or otherwise protected from disclosure. In addition, the Receiving Party shall destroy all notes or work product reflecting the contents of such Discovery Material, and shall not

14

use such Discovery Material, or the information contained therein, for any purpose in this action or in any other action. Such notice shall also provide a privilege log entry for such material so that the Receiving party can evaluate the Producing Party's claim that the material is privileged or otherwise protected from disclosure.

(e)     Nothing in this paragraph prevents a Receiving Party from seeking to compel production of Discovery Material which a Producing Party claims is privileged or otherwise protected from disclosure.

15.     This Stipulation and Order has no effect upon, and its scope shall not extend to, any Producing Person's use of its own Discovery Material.

16.     This Stipulation and Order or the existence of such shall not be offered or admitted into evidence at trial, argued to the jury, or otherwise disclosed to the jury. This Stipulation and Order shall have no effect on the admissibility or discoverability of any Discovery Material.

17.     After the termination of these proceedings, this Stipulation and Order shall continue to be binding upon the parties hereto, and upon all persons to whom the Discovery Material has been disclosed or communicated, and this Court shall retain jurisdiction over the parties for enforcement of its provisions.

18.     Within sixty (60) days after the final conclusion of all aspects of the claims by judgment not subject to appeal, by settlement, or abandonment, all Confidential Discovery Material or Highly Confidential Discovery Material supplied by a Producing Person and all copies thereof (including, without limitation, copies provided to testifying or consulting experts) shall be returned to the Producing Person, or the party's counsel

15

shall confirm in writing to the Producing Person that all such materials have been destroyed; except that each party may maintain one copy of any work product derived from such Confidential Discovery Material or Highly Confidential Discovery Material in its master file for the case.

19.    Nothing in this Stipulation and Order shall be construed as prejudicing any Producing Person's right to seek an agreement or court order providing additional confidentiality or other protections to any Discovery Material produced in this action. However, until such agreement or order is obtained, this Stipulation and Order shall constitute the entire agreement of the parties with respect to the matters covered herein. The parties agree to notify other parties to the Stipulation and Order of any such additional confidentiality agreements.

20.    In the event additional parties join or are joined in this action, they shall not have access to Confidential Discovery Material or Highly Confidential Discovery Material until the newly-joined party or its counsel has executed and, at the request of any party, filed with the Court its agreement to be fully bound by this Stipulation or an alternative protective order which is satisfactory to all parties and the Court. Third parties who produce information in this action may avail themselves of the provisions of this Stipulation and Order, and Discovery Material produced by third parties shall then be treated by the parties in conformance with this Stipulation.

21.    If a Receiving Party (a) is subpoenaed in another action, (b) is served with a demand in another action in which it is a party, or (c) is served with any legal process by one not a party to this action, seeking Discovery Material which was produced or designated as "Confidential" or "Highly Confidential" by someone other than the

16

Receiving Party, the Receiving Party shall object to its production to the extent permitted by law and shall use good faith to give prompt actual written notice, by hand or facsimile transmission, within five (5) business days of receipt of such subpoena, demand or legal process, to the Designating Party so that the Designating Party has an opportunity to seek relief from the subpoena, document, demand or legal process. Should the person seeking access to the Confidential Discovery Material or Highly Confidential Discovery Material take action against the Receiving Party or anyone else covered by this Stipulation and Order to enforce such a subpoena, demand or other legal process, the Receiving Party shall respond by setting forth the existence of the Stipulation and Order. Nothing herein shall be construed as requiring the Receiving Party or anyone else covered by this Stipulation and Order to challenge or appeal any order requiring production of Confidential Discovery Material or Highly Confidential Discovery Material covered by this Stipulation and Order, or to subject itself to any penalties for non-compliance with any legal process or order, or to seek any relief from this Court.

22.     This Stipulation and Order may be signed by the parties in counterparts.

17

APPROVED AS TO FORM AND AS TO SUBSTANCE:

MORRIS, NICHOLS, ARSHT &
TUNNELL

POTTER ANDERSON & CORROON LLP

_(signature)_

_(signature)_

Kenneth Nachbar (#2067)
David J. Teklits (#3221)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 575-7294 (telephone)
(302) 425-3013 (facsimile)

Richard L. Horwitz (#2246)
W. Harding Drane, Jr. (#1023)
Suzanne M. Hill (#34414)
1313 N. Market Street
Hercules Plaza, 6th Floor
P.O. Box 951
Wilmington, DE 19889-0951
(302) 984-6000 (telephone)
(302) 658-1192 (facsimile)

OF COUNSEL:

OF COUNSEL:

Donald R. Cassling
Christopher Tompkins
Zachary V. Moen
JENNER & BLOCK LLP
One IBM Plaza
Chicago, IL 60611
(312) 923-2951 (telephone)
(312) 840-7351 (facsimile)

William C. Ferebee
O'DONNELL FEREBEE MEDLEY &
KEISER, PC
450 Gears, Eighth Floor
Houston, TX 77067-4512
(281) 875-8200 (telephone)
(281) 875-4962 (facsimile)

_Attorneys for Dow Chemical Canada Inc.
and The Dow Chemical Company_

_Attorneys for Defendant HRD Corporation
d/b/a Marcus Oil & Chemical, Inc._

DATED: January 19, 2006

713506

SO ORDERED, this _____ day of _____, 2006.

_____
UNITED STATES DISTRICT JUDGE

18

## EXHIBIT A

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| DOW CHEMICAL CANADA INC. on its own behalf and as assignee of THE DOW CHEMICAL COMPANY,<br><br>      Plaintiff,<br><br>      v.<br><br>HRD CORPORATION (d/b/a Marcus Oil & Chemical)<br><br>      Defendant, Counterclaim Plaintiff,<br><br>      v.<br><br>DOW CHEMICAL CANADA INC., on its own behalf and as assignee of THE DOW CHEMICAL COMPANY, and THE DOW CHEMICAL COMPANY,<br><br>      Counterclaim Defendants | C.A. No. 05-023 (JJF) |

## AGREEMENT TO BE BOUND BY STIPULATION AND ORDER
## GOVERNING DISCOVERY MATERIALS

I have read the Stipulation and Order Governing Discovery Materials (the "Stipulation and Order") in the above-captioned matter. I understand the terms and agree to be fully bound by them and hereby submit to the jurisdiction of the United States District Court for the District of Delaware for purpose of enforcement of this Stipulation and Order.

I understand that any violation of the terms of the Stipulation may be punishable by money damages, sanctions, contempt of court citation, or such other or additional relief as deemed appropriate by the Court.

I will hold in confidence and will not disclose to anyone not qualified under the Stipulation and Order, any Confidential Discovery Material, Highly Confidential Discovery Material, or any words, substances, summaries, abstracts or indices of Confidential Discovery Material or Highly Confidential Discovery Material disclosed to me, and I shall use Confidential Discovery Material or Highly Confidential Discovery Material only for purposes of this action and not for any other purpose, including without limitation, any business, proprietary, commercial, governmental or litigation purpose.

At the conclusion of this matter, I will return all Confidential Discovery Material, Highly Confidential Discovery Material, or any words, substances, summaries, abstracts or indices thereof, and all copies thereof, which come into my possession, and documents or things which I have prepared relating thereto, to counsel for the party by whom I am employed or retained.

I declare under penalty of perjury that the foregoing is true and correct.

_____                    _____
        Date

2

# EXHIBIT B

LEXSEE 1982 U.S. DIST. LEXIS 10258



Cited
As of: Jan 23, 2007

**E. I. duPont de Nemours & Company v. Phillips Petroleum Company et al.**

**No. 81-508**

**UNITED States District Court for the District Delaware**

*1982 U.S. Dist. LEXIS 10258; 219 U.S.P.Q. (BNA) 37*

**May 17, 1982**

**COUNSEL:** [*1]

Roger A. Hines, Wilmington, Del., (John O. Tramontine, James F. Haley, Jr., Glenn A. Ousterhour, and Fish & Neave, all of New York, N.Y.), for plaintiff.

C. Waggaman Berl, Jr., Wilmington, Del., (Harry J. Roper, Sidney Neuman, Kenneth R. Adamo, George S. Bosy, Nicholas A. Poulos, and Neuman, Williams, Anderson & Olson, all of Chicago, Ill.), for defendants.

**OPINION BY:**

LATCHUM

**OPINION:**

Latchum, Chief Judge.

E.I. duPont de Nemours & Company ("DuPont") has brought this civil action against Phillips Petroleum Company and Phillips Chemical Company (collectively "Phillips") alleging that Phillips was, and is, infringing DuPont's U.S. Patent No. *4,076,698*, entitled "Hydrocarbon Interpolymer Compositions," which is directed generally to copolymers of ethylene and an alpha-olefin containing from 5 to 18 carbon atoms. (Docket Item ["D.I."] 1 & 22.) The case is at issue and some discovery has been undertaken. However, Phillips objects to much of Du-Pont's document requests on the ground that they will require the production of highly confidential proprietary and technical information connected with the research, development, production and constitution of Phillips' ethylene copolymers. (D.I. [*2] 28.)

There appears to be no dispute that some of the information sought by DuPont, a business competitor of Phillips, is of a confidential nature. (Id.) Thus, on March 18, 1982, Phillips moved for a protective order, pursuant to *Rule 26(c)(7), F.R.Civ.P.*, and submitted a proposed order for that purpose. (D.I. 26 & 27.) DuPont responded by submitting a counter-form of the proposed protective order. (D.I. 37.) During the course of briefing Phillips' motion, counsel for the parties, acting as reasonable and responsible attorneys, were able to narrow the dispute concerning the terms of the proposed protective order to three remaining issues as follows:

DuPont contends that the protective order should permit disclosure of all confidential documents produced by the respective parties: (1) to "inside experts and consultants," i.e., those who are employees of the parties; (2) to a corporate representative designated by each party, provided that those so designated under (1) and (2) execute a sworn undertaking to abide by the protective order and submit to the jurisdiction of the Court for the purposes of enforcement thereof; and (3) to the U.S. Patent and Trademark Office (the "Patent [*3] Office") in connection with the reissue-protest proceedings involving the same parties on the patent in suit, provided that such disclosures are made in accordance with the procedures for submission of "Protective Order Materials" provided for by the Patent Office in the Manual of Patent Examining Procedure, § 724 et seq. Phillips strenuously objects to incorporating these disclosure provisions in the protecive order.

1982 U.S. Dist. LEXIS 10258, *; 219 U.S.P.Q. (BNA) 37

The provisions of the protective order agreed upon by the parties will permit disclosure of confidential materials to all counsel of record, to named in-house counsel for each of the parties, to their staffs and clerical employees, and to outside experts and consultants retained by the parties. Thus, the Court is called upon to determine whether ocnfidential information should be permitted to be disclosed also to the three additional groups of persons described above, as urged by DuPont. In making this determination the Court is required to exercise its sound discretion to implement the philosophy of full disclosure of relevant information during discovery, while at the same time affording the parties reasonable protection against harmful side effects. These goals [*4] are in tension and each must be fairly balanced against the other. Undoubtedly confidential information will be sought in this action by both sides and each should be afforded as much protection as the Court may reasonably provide consistent with the ultimate goal of seeking the truth. Here the question is not whether the disclosure of all confidential material shall be prohibited but how far such disclosures, which have already been agreed upon, should be extended.

The parties agree that expert and technical assistance will be necessary in the development of the issues in this case and in the related reissue-protest proceedings in the Patent Office. The Court is unable to perceive that there would be any greater possibility of abuse of the confidential information if disclosed to inside experts and consultants than might exist with outside experts and consultants, provided that those in both groups are required to execute a sworn statement to abide by the terms of the protective order and submit for enforcement purposes to the jurisdiction of the Court. Indeed, it appears to the Court that the parties' incentive to supervise, and their ability to control compliance with, the [*5] protective order by its inside experts and consultants would be greater than that which might be exercised over outside experts and consultants. The Court believes that each party would exercise greater care not only to prevent their own employees from directly abusing the confidential disclosures but would be even more sensitive to possible unintentional and unconscious abuse of the confidential information and thus would undoubtedly arrange their work and project assignments in such a way as to avoid the possibility of such abuses.

The same reasoning applies equally to each party's corporate representative, the nontechnical, nonlawyer, corporate officer, who is delegated the responsibility for making business judgments with respect to this litigation and the related proceedings in the Patent Office. Undoubtedly, the need often arises for a responsible officer to decide from a business standpoint whether litigation should continue or whether settlement overtures should

be made. Such nonlegal and nontechnical decisions can only be made by an officer delegated this responsibility by the respective corporations. While attorneys undoubtedly have some input into these decisions, [*6] they usually do not have either the authority or the expertise to make these business evaluations. In order to make such decisions it may very well be essential that some confidential disclosures be made to the designated corporate representative to allow him to make an informed judgment from all the relevant facts. This can also have a salutary effect upon the administration of justice in terminating costly and protracted litigation when the costs outweigh the possible results that might be obtained.

As noted earlier, DuPont has filed a reissue application in the Patent Office on the patent in suit and Phillips has filed a protest in that ongoing proceeding. DuPont desires permission to disclose to the Patent Office in the reissue-protest proceedings confidential documents which may be produced in this litigation, subject to the Patent office procedure for handling trade secrets and confidential materials as set forth in the Manual of Patent Examining Procedure ("MPEP"), § 724 et seq. Under this procedure the information remains under seal and not revealed to the public unless the "information is found to be material to the examination" and then "it would be cited in the next [*7] Office action * * * and will thereafter become a permanent part of the reissue application file and open to the public." MPEP § 724(b)(3). On the other hand, if any portion of the confidential information "if found not to be "material to the examination" * * * the next Office action * * * will so indicate without including in the communication of the details of the submitted information." MPEP § 724(b)(4). Consequently, the nonmaterial information will not be available to the public. MPEP § 724(b)(5). The Court considers this to be a reasonable protection afforded to confidential materials submitted in a reissue-protest proceeding.

Phillips contends that if its confidential material is submitted to the Patent Office by DuPont and deemed "material" to the reissue application this information will be placed in the public domain and Phillips will have irrevocably lost its proprietary advantage of that information. This is true but Phillips cannot have it both ways. Phillips is a protesting party to DuPont's reissue application and is the defendant in this litigation. When a party becomes an applicant or protester in a reissue proceeding, or becomes involved in patent infringement [*8] litigation, it is always confronted with the possibility that some confidential information may become public information. This is the price to be paid under our patenting system. Furthermore, the Court concludes that it gives the reissue-protest procedure greater validity if the

1982 U.S. Dist. LEXIS 10258, *; 219 U.S.P.Q. (BNA) 37

Patent Office receives the fullest disclosure of pertinent information available.

Accordingly, the Court concludes that the protective order should permit disclosure of confidential information to inside experts and consultants, to corporate representatives, and to the Patent Office. The limitations to be placed on those disclosures will afford the parties the maximum protection consistent with the philosophy of full disclosure of relevant information under the Federal Rules of Civil Procedure.

A protective order will be entered embodying the provisions that the parties have agreed upon as well as the three additional provisions discussed in this Memorandum Opinion.

# EXHIBIT C

LEXSEE 1994 U.S. DIST. LEXIS 21273



Analysis
As of: Jan 23, 2007

**LANCE FISHER, et al., Plaintiffs, v. BORDEN, INC., Defendant.**

**Civ. No. 92-4306**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

*1994 U.S. Dist. LEXIS 21273*

**October 25, 1994, Decided
October 26, 1994, Filed**

**DISPOSITION:** [*1] Defendant's motion to bar disclosure of documents to Plaintiff's expert DENIED.

**COUNSEL:** For LANCE FISHER, L.G. FISHER INC., F/V BRANDYWINE INC., F/V INDIAN RIVER INC, plaintiffs: RICHARD L. BAZELON, ESQ., BAZELON & LESS, ESQUIRES, VOORHEES, NJ.

For BORDEN INC., defendant: ADRIAN M FOLEY JR, PETER JOSEPH PIZZI, CONNELL, FOLEY AND GEISER, ROSELAND, NJ.

For BORDEN INC., counter-claimant: PETER JOSEPH PIZZI, CONNELL, FOLEY & GEISER, ROSELAND, NJ.

**JUDGES:** ROBERT B. KUGLER, UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** ROBERT B. KUGLER

**OPINION:**

Defendant Borden's Motion to Bar Disclosure of Documents to Plaintiff's Expert

**LETTER OPINION**

Dear Litigants:

Defendant Borden moves pursuant to *Fed. R. Civ. P. 26(c)* and the Stipulated Protective Orders filed in this action to bar disclosure of certain documents to Plaintiff Fisher's proposed expert, Robert O. Bredimus. Defendant claims that Mr. Bredimus is an employee of a competitor of Castleberry's Foods, the company which purchased part of Borden's clam business. Defendant submits affidavits of Peter J. Pizzi, counsel for Defendant Borden, and Robert P. Kirby, president of Castleberry's Foods, in support of its motion. Snow's/Doxsee, Inc., a [*2] subsidiary of Castleberry's Foods which operates Borden's former Seafood Products Division and a non-party to this action, also filed a motion to limit disclosure of documents to Mr. Bredimus.

The Protective Order filed April 3, 1993 limits disclosure of confidential material to "independent experts who are requested by counsel to the receiving party to furnish technical or expert services in connection with this action or to give testimony with respect to the subject matter thereof for the trial of this action", as well as to appropriate counsel and court officials. (Protective Order, P 2). "Confidential material" is defined as "business or technical documents or information which is actually treated and maintained by the producing party as confidential or proprietary information". (Protective Order, P 1(a)). The Order further provides that before any disclosure of confidential material is made to an independent expert, outside counsel for the receiving party shall provide the expert with a copy of the Order, explain its terms, obtain the expert's written agreement to comply with and be bound by its terms, and give notice of the proposed disclosure to the producing party. (Protective [*3] Order, P 3). Disclosure can take place unless "the party claiming the privilege serves notice of a motion to bar such disclosure", in which event "such disclosure shall not take place until resolution of the motion, which shall be promptly prosecuted." (Protective Order, P 3).

The Order Amending the Stipulated Protective Order filed July 23, 1993 allows disclosure of certain confidential materials to Plaintiff Lance Fisher, upon notice to and consent by Defendant Borden. Fisher may only review the materials in the offices of Plaintiffs' counsel and may not remove or copy any documents; nor may he discuss what he reviewed with any person other than counsel or use any of the information obtained for any purpose other than for the instant litigation. (Amended Protective Order, P 1).

According to Defendant Borden, n1 Plaintiff Fisher proposes to furnish the following documents to its expert:

(1) memoranda reflecting detailed discussions involving Borden personnel and Borden's outside engineering firm during several months in 1992 about how to re-design and renovate Borden's shucking lines;

(2) internal Borden documents describing the plans for the design and layout of the shucking [*4] lines;

(3) documents detailing the costs associated with discrete pieces of equipment in the shucking lines;

(4) schematic diagrams of numerous component parts of the shucking lines and the layout of each piece of equipment in the lines (these diagrams were actually used by vendors to manufacture the equipment depicted); and

(5) schedules showing the actual shucking figures for the Cape May plant in 1992.

(Pizzi Aff., P 5).

n1 Plaintiffs refer to their letter of August 3, 1994 which requested the documents at issue but which does not explain the nature of each document; neither do Plaintiffs provide anywhere in their briefs or affidavits a complete breakdown of the requested documents. Therefore, the Court must rely upon Defendant Borden's characterization of the requested information.

## I. OBJECTIONS TO DISCLOSURE OF DOCUMENTS

Defendant Borden and Snow's/Doxsee object to the disclosure of documents which reveal the technology involved in the shucking process at the Cape May plant; [*5] such technology was sold to Snow's/Doxsee allegedly as part of confidential business methods, technologies and trade secrets. (Kirby Aff., P 3). Borden and Snow's/Doxsee claim that Mr. Bredimus's employer, Mid-Atlantic Foods, is one of Snow's/Doxsee's foremost competitors in the canning and marketing of clam food products, and disclosure to Bredimus of "confidential documents concerning the business methods and technologies of Snow's would be no different from opening the doors of Snow's for inspection by a competitor" and would "cause irreparable injury to Snow's competitive position in the clam food products business." (Kirby Aff., P 10).

Snow's "open design" is vulnerable to easy memorization by a "reasonably seasoned individual" performing a walk-through or reviewing documents describing Snow's system. (Kirby Aff., P 12). Further, Mid-Atlantic is in the process of constructing a new shucking plant in Massachusetts, making disclosure of state-of-the-art shucking technology particularly sensitive at this time. (Kirby Aff., P 13). Snow's asserts that it has incorporated advanced, state-of-the-art controls and designs into its system which are not part of the equipment and designs [*6] at issue between Plaintiff and Defendant, and knowledge of these, which gives Snow's a competitive edge, would severely damage its business should they become known by a competitor. (Kirby Aff., P 13; See Supporting Memorandum, Motion of Snow's/Doxsee, Inc. to Limit Disclosure of Discovery Documents, at 1-3 ("Snow's/Doxsee Motion").

Borden and Snow's/Doxsee contend that they have established, through Mr. Kirby's affidavit, that Snow's clam shucking operation is a confidential trade secret, the disclosure of which to a competitor would be helpful to the competitor and harmful to Snow's/Doxsee. Therefore, the burden should shift to the plaintiff to show both relevance and need. Snow's/Doxsee Motion, at 4.

## II. STANDARDS FOR PROTECTION OF TRADE SECRETS

Under *Fed. R. Civ. P. 26(b)(1)* there exists a presumption that all matters relevant to a pending case are freely discoverable. However, where a party seeks discovery of trade secret or other confidential material, the Court may limit or prohibit discovery of such material. *Fed. R. Civ. P. 26(c)(7)*. Rule 26(c) places the burden of persuasion on the party seeking protection. *Cipollone v. Liggett Group, Inc., 785 F.2d 1108,* [*7] *1121 (3d Cir. 1986)*, cert. denied, *484 U.S. 976, 98 L. Ed. 2d 485, 108 S. Ct. 487 (1987)*. A party seeking a protective order must show good cause by demonstrating a particular need for protection and must justify the confidentiality of each and every document sought to be covered by the order. Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test. Moreover, the harm must be significant, not a mere trifle. Id. See *Littlejohn v. BIC Corp.,*

*851 F.2d 673, 685 (3d Cir. 1988)* (protective order denied where affidavit upon which moving party relied did not specifically explain why the two contested exhibits contained trade secret information).

The courts "have not given trade secrets automatic and complete immunity against disclosure, but have in each case weighed their claim to privacy against the need for disclosure." *Smith v. BIC Corp., 869 F.2d 194, 199 (3d Cir. 1989)* (quoting the Notes of Advisory Committee on Rule, *Fed. R. Civ. P. 26(c)*). In Smith, the Court of Appeals for the Third Circuit listed six factors to be considered in determining whether certain information is a trade secret:

(1) the extent [*8] to which the information is known outside of the owner's business;

(2) the extent to which it is known by employees and other involved in the owner's business;

(3) the extent of measures taken by the owner to guard the secrecy of the information;

(4) the value of the information to the owner and to his competitors;

(5) the amount of effort or money expended by the owner in developing the information; and

(6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Smith v. BIC Corp., 869 F.2d at 200* (citing *SI Handling Systems, Inc. v. Heisley, 753 F.2d 1244, 1256 (3d Cir. 1985)*).

The documents which Defendant and Snow's/Doxsee claim should be protected fall into three categories: (1) memoranda, internal documents, and schematic diagrams pertaining to the design and layout of the shucking lines and their component parts; (2) documents detailing the costs associated with pieces of equipment in the shucking lines; and (3) schedules of actual shucking figures at the Cape May plant for 1992. As the party seeking disclosure, Defendant bears the burden of proving that the materials should be protected from disclosure. [*9] The Court finds that the burden has not been met for any of the requested documents.

With respect to design and layout information, Defendant has not explained why such information constitutes trade secrets. Defendant's generalized concerns about business harm are significantly diminished by the facts presented by Plaintiffs. Specifically, Plaintiffs submit that much of the design information was information which Borden admitted it took from Fisher (e.g., designs of whammers, swirltanks, and impact evisceration including flows, pressure, and size of pumps). Plaintiffs'

Memorandum in Opposition to Motion to Bar Disclosure of Documents to Proposed Expert Witness, at 9 ("Plaintiffs' Opposition Brief"). Also, meeting minutes that are proposed to be disclosed reflect information about water separation processes and equipment, all of which was originally obtained from Fisher. Id. at 11.

Plaintiffs also point out that layout of the shucking lines is not confidential considering the fact that Carl Golinski, Borden's Engineering Manager, provided detailed information about the layout of the shucking lines in his deposition, and Defendant Borden never designated this portion of the deposition [*10] as confidential. Id. at 10. Further, a newspaper article published after installation of the new lines in the Cape May plant exhibits the layout of the shucking lines and reveals that Borden gave a tour of the plant to the press. Id. Under the Smith criteria, the information regarding the design and layout of the shucking lines cannot be considered trade secrets entitled to protection.

With respect to information about costs associated with the new shucking lines, Defendant does not demonstrate why this information is confidential. Plaintiffs, on the other hand, note that one piece of cost information, the cost of altering the Cape May plant to accommodate Fisher's water separation system, was disclosed in Judge Gerry's June 17, 1994 opinion granting in part and denying in part Defendant Borden's motion for summary judgment. Id. at 12. Defendant also does not address the confidential nature of other cost information or the schedules showing the actual shucking figures for the Cape May plant in 1992.

Plaintiffs argue that expert testimony is necessary to Plaintiffs' case in attempting to prove the misappropriation of trade secrets, fraud, and malice, and Bredimus' [*11] specialized and extensive experience in the clam shucking business makes him the most appropriate and effective expert Plaintiffs can find. Id. at 1-9. While Plaintiffs have submitted that Bredimus' expert testimony is relevant and necessary, Defendant has not demonstrated with particularity why each requested document constitutes confidential information and should be protected. n2 Accordingly, Defendant's motion to bar disclosure of documents to Plaintiff's expert is hereby DENIED.

n2 Because the Court finds that Defendant did not meet its burden of demonstrating why the requested information constitutes a trade secret, it finds it unnecessary to address the host of "supplemental" reply briefs, letters and affidavits submitted by the parties which dispute the extent of market competition between Snow's and Mid-Atlantic.

1994 U.S. Dist. LEXIS 21273, *

The accompanying Order shall enter today.

Very truly yours,

ROBERT B. KUGLER

United States Magistrate Judge

**ORDER** - ENTERED on THE DOCKET 10-31-1994

THIS MATTER having been [*12] brought by motion before the Court by Peter J. Pizzi, Esquire, attorney for Defendant, for an order to bar disclosure of documents to the plaintiff's expert; and the Court having con-

sidered the moving papers and the opposition thereto; and for good cause shown herein;

IT IS this 26th day of October, 1994 hereby

**ORDERED** that the defendant's motion is **DENIED;** and.

**IT IS FURTHER ORDERED** that Plaintiff's expert shall execute a consent to be bound by the terms and conditions of the existing protective orders.

ROBERT B. KUGLER

United States Magistrate Judge

# EXHIBIT D

LEXSEE 1994 DEL. CH. LEXIS 105



Caution
As of: Jan 23, 2007

**Cincinnati Bell Cellular Systems Co. v. Ameritech Mobile Phone Service, et al.**

**Civil Action No. 13389**

**COURT OF CHANCERY OF DELAWARE, SUSSEX**

*1994 Del. Ch. LEXIS 105*

**June 1, 1994, Submitted**
**June 30, 1994, Decided**

**COUNSEL:** [*1]

Vernon R. Proctor, Esquire, John H. Newcomer, Jr., Esquire, Bayard, Handelman & Murdoch, P.A. P.O. Box 25130, Wilmington, DE 19899.

Richard L. Sutton, Esquire, Thomas C. Grimm, Esquire, Matthew B. Lehr, Esquire, Elaine C. Reilly, Esquire, Maryellen Noreika, Esquire, Morris, Nichols, Arsht & Tunnell, P.O. Box 1347, Wilmington, DE 19899.

**JUDGES:** Chandler III

**OPINION BY:** WILLIAM B. CHANDLER III

**OPINION:**

Before me is a motion for a protective order by defendants, Ameritech Mobile Phone Service of Cincinnati, Inc. ("Ameritech") regarding certain financial, marketing, strategic, technological and acquisition information relating to businesses affiliated with Ameritech. Plaintiff, Cincinnati Bell Cellular Systems Company ("CBCS") seeks this information as part of its action against Ameritech, seeking dissolution of the Cincinnati SMSA Limited partnership (the "Partnership") pursuant to *6 Del. C. § 17-802*. CBCS owns a limited partnership interest in the Partnership and Ameritech owns both a general and limited interest as well. This is my decision on Ameritech's motion for a protective order.

I.

The Partnership is involved in cellular communications and sales of cellular telephone services and equip-

ment in the Ohio [*2] area. In addition to CBCS, defendants Sprint Cellular Company ("Sprint"), Champaign Telephone Company ("Champaign") and Germantown Independent Telephone Company ("Germantown") are also limited Partners in the Partnership. Ameritech, a wholly owned subsidiary of Ameritech Mobile Communications, Inc., which is an operating division of Ameritech Corporation, has been the managing partner since the Partnership's inception in 1982.

According to CBCS, it has incurred cumulative losses in excess of $ 13 million during the first ten years of the Partnership, notwithstanding its capital contributions of approximately $ 47 million. As a result, it seeks dissolution and liquidation of the Partnership pursuant to *6 Del. C. § 17-802*. In order to establish its case for dissolution and liquidation of the Partnership, and as part of the usual discovery process, CBCS seeks certain financial, technological and acquisition information from Ameritech relating to businesses affiliated with Ameritech. Ameritech, in turn, seeks a protective order regarding this information, asking that it be designated "Attorneys Eyes Only" and that it not be disseminated to any employee of Ameritech. The parties agree, [*3] for the purposes of the motion currently before the Court, that the documents sought by CBCS are properly characterized as trade secrets.

II.

Under Delaware law, trade secrets do not enjoy absolute protection from the discovery process. Rather, once the information sought is properly characterized as a trade secret, a court must determine whether disclosure of the information will be harmful to the objecting party. If so, the party seeking discovery must then show that the

documents in question are relevant to the issue, not otherwise available, and needed in order for the discovering party to prove its case. See, e.g., Philadelphia Gear Corporation v. Power Transmission Services, Inc., Del. Ch., C.A. No. 11364, Allen, C. (Mar. 5, 1991); MacLane Gas Co. v. Enserch Corp., Del. Ch., CA. No. 10760, Chandler, V.C. (Sept. 11, 1989). The court, in its discretion, must then determine whether the principles of fair adjudication require production or protection of the information.

Keeping in mind the above principles of Delaware law and the fact that restricting information only to the eyes of attorneys may "create severe obstacles to a litigating party," I am of the opinion that the [*4] circumstances of this case do not warrant the protection of an "Attorneys Eyes Only" designation on the documents currently at issue in this motion. See Philadelphia Gear, Mem. Op. at 11.

Ameritech argues that our Courts have recognized the need to protect confidential business information from competitors. Accordingly, it argues, the information sought by CBCS should be restricted to CBCS' attorneys eyes because CBCS is a potential competitor of Ameritech. Moreover, Ameritech asserts that each of the parties involved in the litigation currently before the Court is a potential competitor in the cellular market, thus creating the possibility of misuse or abuse of the information sought from Ameritech. Finally, Ameritech contends that limiting disclosure of the information sought by CBCS to its counsel will not harm CBCS because CBCS may retain outside financial experts and consultants to help it review the information.

CBCS, on the other hand, argues that "attorneys eyes" designations should be made only in compelling circumstances, which are not present here. CBCS contends that the information it seeks is primarily financial information that is central to its action against Ameritech. [*5] As such, CBCS asserts that the information it seeks should be produced, especially in light of the fact that CBCS is not a competitor in the areas to which the information sought pertains. Moreover, CBCS contends that the information will be disseminated to only one employee of CBCS and her staff, thereby severely limiting the possibility of misuse or abuse of the information by CBCS. Finally, CBCS asserts that limiting disclosure of the information to its attorneys will hinder its prosecution of this litigation because the information sought is critically relevant to the operation of the Partnership.

Both parties concede that the information at issue here is properly characterized as a trade secret. The issue for the Court to determine, then, is whether disclosure of the information will be harmful to Ameritech. CBCS has represented that only one of its employees, Mary Beth Meyer, and her staff, will be viewing the information. In addition, CBCS has also represented that Ms. Meyer has no authority at CBCS to use the information sought from Ameritech (i.e.; she cannot make investment or acquisition decisions). From these representations, I am convinced that CBCS has greatly limited [*6] the potential for abuse or misuse of the information by its employees.

Moreover, CBCS asserts, and Ameritech concedes, that CBCS, a local cellular company, is not currently, nor does it have concrete plans to become, a competitor of Ameritech. Indeed, it appears that Ameritech's concern that CBCS will compete against Ameritech in the nationwide cellular market is merely speculation. Speculation such as this does not provide a proper basis for the institution of a protective order.

Consequently, Ameritech has failed to demonstrate that disclosure of the information to CBCS will be harmful to Ameritech. This, coupled with the fact that any outside experts retained by CBCS might not be as valuable to CBCS as Ms. Meyer and her staff, in light of their prior involvement in this litigation, convinces me that an "Attorneys Eyes" designation for this information would be inappropriate.

Moreover, I am of the opinion that CBCS has demonstrated the relevancy of the documents at issue and their importance in establishing its case against Ameritech. The documents may help CBCS to establish performance levels of successful partnerships involved in the cellular business which can be compared against [*7] performance levels of the Partnership, thereby facilitating a determination of whether Ameritech mismanaged the Partnership.

Accordingly, Delaware's liberal discovery policy, as well as principles of Delaware law regarding trade secrets, lead me to the conclusion that fair adjudication of this matter can be achieved only if Ameritech discloses, without the aid of a protective order, the information at issue here to CBCS. Such a result is also consistent with Delaware's policy of permitting full disclosure of information except in situations where compelling circumstances warrant protection of the information. Ameritech's motion for a protective order is therefore denied. CBCS shall refrain from disseminating any of the information at issue here to CBCS employees other than Mary Beth Meyer and her staff. In addition, CBCS shall take the necessary steps to ensure that Ms. Meyer and her staff do not discuss or disclose this information to other CBCS employees.

IT IS SO ORDERED.

William B. Chandler III

# EXHIBIT E

LEXSEE 1995 U.S. DIST. LEXIS 16328



Analysis
As of: Jan 23, 2007

### HEINTZ CORPORATION v. DONALD JUDSON, PAUL KUMITIS, MICHELLE DUBREVIL, and AL STANGER

### CIVIL ACTION NO. 94-6916

### UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### *1995 U.S. Dist. LEXIS 16328*

### November 3, 1995, Decided
### November 3, 1995, Filed

**COUNSEL:** [*1] For HEINTZ CORP., DEBTOR: J. PHILIP KIRCHNER, FLASTER, GREENBERG, MANN & WALLENSTEIN, P.C., MARLTON, NJ.

For HEINTZ CORP., PLAINTIFF: J. PHILIP KIRCHNER, ELIZABETH J. HAMPTON, FLASTER, GREENBERG, MANN & WALLENSTEIN, P.C., MARLTON, NJ. PAUL J. RUSSONIELLO, PAUL RUSSONIELLO, ESQ., MARLTON, NJ.

For ELECTRO METHODS, INC., DEFENDANT: PATRICK T. RYAN, RICHARD L. SCHEFF, MONTGOMERY, MC CRACKEN, WALKER & RHOADS, PHILA, PA. For DONALD JUDSON, PAUL KUMITIS, AL JARVIS, DEFENDANTS: ROBERT E. WELSH, JR., PHILA, PA. For MICHELE DUBREVIL, AL STANGER, PAUL R. KELLER, PETER BURHANS, MORRIS AVERY, FRANK SELICK, DANI STEPHENS, DEFENDANTS: RUTH E. GANISTER, WEST CHESTER, PA.

FREDERICK BAKER, ESQ., ASSISTANT U.S. TRUSTEE, PRO SE, PHILADELPHIA, PA.

**JUDGES:** JUDGE JOHN R. PADOVA. MAGISTRATE JUDGE CHARLES B. SMITH

**OPINION BY:** JOHN R. PADOVA

**OPINION:**

**MEMORANDUM**

Padova, J.

November 3, 1995

Defendants, Donald Judson, Paul Kumitis, Michelle Dubrevil, and Al Stanger, join non-party Electro-Methods, Inc. ("EMI") in raising objections to that portion of an Order issued by Magistrate Judge Charles B. Smith allowing Plaintiff's expert to review documents designated as "Specially Confidential" in a [*2] confidentiality agreement voluntarily negotiated among the parties. Because I find Magistrate Judge Smith's Order neither clearly erroneous nor contrary to law, I will overrule Defendants' objections and confirm the Order.

### I. FACTS

### A. PROCEDURAL HISTORY

Plaintiff, Heintz Corporation ("Heintz"), formerly manufactured and supplied aircraft engine parts to the aerospace industry. n1 Heintz initiated this suit asserting that both EMI, an aircraft parts manufacturer, and several of EMI's current and former employees, officers, and directors n2 misappropriated sensitive technology developed by Heintz relating to "flameholder assemblies" for the "F-100 Engine." According to Heintz, EMI and its employees embezzled Heintz' proprietary technology, enabling EMI to underbid Heintz and other competitors for lucrative government contracts.

n1 On or about June 23, 1993, Heintz ceased its business operations, and on or about August 4,

Case 1:05-cv-00023-JJF    Document 82-2    Filed 01/23/2007    Page 36 of 56

Page 2
1995 U.S. Dist. LEXIS 16328, *

1993, Heintz filed a bankruptcy petition in the United States Bankruptcy Court for the Eastern District of Pennsylvania. Heintz is presently involved in liquidation proceedings. Brown Aff. P 2.

[*3]

n2 In addition to EMI, the original Defendants were Donald Judson, Paul Kumitis, Michelle Dubrevil, Al Stanger, Paul Keller, Peter Burhans, Morris Avery, Al Jarvis, Frank Selick, and Dani Stephens ("Individual Defendants").

Specifically, Heintz filed a RICO Case Statement on December 12, 1994 pursuant to the Racketeer Influenced and Corrupt Organization Act ("RICO"), *18 U.S.C.A. § § 1961-1968* (West 1984 & Supp. 1995), asserting a RICO claim (Count I) and several state common law claims (Counts II-VI). n3 By Memorandum and Order dated June 20, 1995 (Doc. No. 28), I granted Defendants' Motion for Summary Judgment on Heintz' state common law claims and denied Defendants' Motion to Dismiss the RICO claim with respect to Defendants Judson, Kumitis, Dubrevil, and Stanger. These four remain as the only Defendants in this litigation.

n3 Heintz only alleged Count I against the Individual Defendants, and it asserted the state common law claims against all Defendants, including EMI.

[*4]

During discovery, the parties voluntarily negotiated and executed a Confidentiality Agreement ("Agreement") which permitted the parties to designate certain commercially sensitive documents and other proprietary information as either "Confidential" or "Specially Confidential." "Confidential" documents may only be disclosed "to the parties, their counsel, and any experts who agreed to be bound by the confidentiality provisions." Objections of Defendants and Non-Party Electro-Methods, Inc. to P 3 of the September 14, 1995 Order of the Magistrate Judge, at 4 (hereinafter "Def.'s Mem."). "Specially Confidential" documents may only be revealed to the "non-producing parties and the Court." Id. The Agreement did not articulate a standard to determine into which of the two categories the documents would fall, stating only that the parties were to act in "good faith" classifying the documents. Pl.'s Mem. at 4-5.

On July 17, 1995, Plaintiff asked Defendants and EMI to modify the Agreement so an expert consultant

could review "Specially Confidential" documents. Hampton Aff. P 5. In mid-June, 1995, Plaintiff hired Donald Bandurick, a former Chief of Engineering for Heintz now self-employed [*5] as a consultant to serve as Plaintiff's expert consultant on this case. After signing an agreement to be bound by the Agreement and an engagement letter relating to his work for Heintz, Bandurick began reviewing "Specially Confidential" documents on or about July 24, 1995. Bandurick Aff. of 8/18/95 PP 7,9. Defendants and EMI, however, refused to modify the agreement.

On August 21, 1995, this Court referred the case to Magistrate Judge Smith to conduct all further pretrial proceedings, including all settlement conferences and dispositive motions. On August 23, 1995, Plaintiff moved to vacate and/or modify the Agreement, and on September 14, 1995, after hearing oral argument, Magistrate Judge Smith issued an Order denying Plaintiff's motion. Magistrate Judge Smith interpreted the motion as a request to permit Plaintiff's expert, Bandurick, to review "Specially Confidential" documents. Accordingly, P 3 of the Order authorized the disclosure of "Specially Confidential" documents to Bandurick.

**B. EVIDENTIARY HEARING**

On September 22, 1995, Defendants and EMI filed objections to P 3. n4 On October 26, 1995, this Court held an evidentiary hearing lasting several hours on whether [*6] Magistrate Judge Smith abused his discretion by allowing Bandurick to review the "Specially Confidential" documents. I provided the parties with an opportunity to present and cross examine witnesses as well as submit other evidence.

n4 Although the June 20, 1995 Order dismissed Plaintiff's claims against EMI, EMI requested that Heintz be bound by the terms of the Agreement with respect to documents produced by EMI even though EMI is no longer a party in this litigation. Hereinafter, reference to "Defendants" includes non-party EMI.

First, Defendants called Suzanne Olita, Director of Operations for Technical Advisory Service for Attorneys ("TASA"), a company that refers expert consultants to insurance companies and attorneys. Tr., Oral Argument, 10/26/95, at 36. Defendants then called Bandurick to the stand, who testified that he that he worked in the aerospace and jet engine industry for a number of years for both United Technologies Pratt & Whitney Aircraft and Heintz. Id. at 62. Defendants' third witness [*7] was an associate with the law firm representing EMI, Arline L. Bayo Santiago. Defendants' final witness was Dani

Stephens, Vice President of Operations Support for EMI in charge of quality control, data processing, government contracting, and purchasing. Id. at 75. Stephens testified about the security procedures at EMI and described some of the documents listed as "Specially Confidential." Id. at 78-99.

After Defendants finished presenting their witnesses, Plaintiff called Bandurick back to the stand. Following Bandurick's testimony, both parties stipulated to the testimony of Ralph Brown, Secretary at Heintz, and Elizabeth Hampton, Plaintiff's counsel. Id. at 167-170.

## II. STANDARD OF REVIEW

"Within 10 days after being served with a copy of the magistrate judge's order, a party may serve and file objections to the order . . . . The district judge to whom the case is assigned shall consider such objections and shall modify or set aside any portion of the magistrate judge's order found to be clearly erroneous or contrary to law." *Fed. R. Civ. P. 72(a)*. The district court may reconsider any pretrial matter under subparagraph (A) of *28 U.S.C.A. § 636* n5 where [*8] it has been shown that the magistrate judge's order is clearly erroneous or contrary to law." *Haines v. Liggett Group, Inc., 975 F.2d 81, 91 (3d Cir. 1992)*. "The matters handled by magistrate judges under subparagraph (A) are generally described as 'non-dispositive.'" Id. (citation omitted). Section 636 provides for different standards of review when the district court reconsiders rulings of the magistrate judges in non-dispositive matters under (b)(1)(A) and dispositive matters under (b)(1)(B) and (b)(1)(C). n6 Id. "Under (b)(1)(A), the standard of review is circumscribed: 'the district court is bound by the clearly erroneous rule in findings of facts; the phrase contrary to law indicates plenary review as to matters of law.'" Id. (citations omitted).

n5 *28 U.S.C.A. § 636(b)(1)(A)* provides:

(A) a judge may designate a magistrate to hear and determine any pretrial matter pending before the court, except a motion for injunctive relief, for judgment on the pleadings, for summary judgment, to dismiss or quash an indictment or information made by the defendant, to suppress evidence in a criminal case, to dismiss for failure to state a claim upon which relief can be granted, and to involuntarily dismiss an action. A judge of the court may reconsider any pre-

trial matter under this subparagraph (A) where it has been shown that the magistrate's order is clearly erroneous or contrary to law.

*28 U.S.C.A. § 636(b)(1)(A) (West 1993).*

[*9]

n6 *28 U.S.C.A. § 636(b)(1)(B) and (b)(1)(C)* provide:

(B) a judge may also designate a magistrate to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations for the disposition, by a judge of the court, of any motion excepted in subparagraph (A), of applications for post-trial relief made by individuals convicted of criminal offenses and of prisoner petitions challenging conditions of confinement.

(C) the magistrate shall file his proposed findings and recommendations under subparagraph (B) with the court and a copy shall forthwith be mailed to all parties.

*28 U.S.C.A. § 636(b)(1)(B), (b)(1)(C).* Section 636(b) permits the district judge to make "a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings made by the magistrate . . . . and receive further evidence." *28 U.S.C.A. § 636(b).*

## III. DISCUSSION

### A. CLEARLY ERRONEOUS   [*10]   FINDINGS

Defendants argue that Magistrate Judge Smith's conclusion that EMI would not be harmed if Bandurick reviewed "Specially Confidential" documents was clearly erroneous, and they contend Magistrate Judge Smith

should have found "good cause" to deny access to Bandurick. In reviewing whether clear error has been committed, I will examine whether "good cause" exists for the issuance of a protective order under *Fed. R. Civ. P. 26(c)(7)* to prevent Bandurick from reviewing those materials. n7 If I conclude that Defendants cannot show good cause to warrant the issuance of a protective order preventing Bandurick from reviewing the documents, then it follows that Magistrate Judge Smith's conclusion is not clearly erroneous .

n7 *Fed. R. Civ. P. 26(c)(7)* provides, in part:

For good cause shown, the court in which the action is pending . . . may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including

* * * *

(7) that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a designated way.

*Fed. R. Civ. P. 26(c)(7).*

"In order to demonstrate good cause under this provision, the party seeking the order must show that the information sought is a trade secret or other confidential information protected by Rule 26(c)(7)." *Miles v. Boeing Co., 154 F.R.D. 112, 115 (E.D. Pa. 1994)* (citation omitted). I will assume, for the purposes of this decision, that the "Specially Confidential" documents do contain trade secrets. This will not alter my conclusion, however, that Defendants have not shown good cause to justify the issuance of a protective order.

[*11]

"In the context of discovery, it is well established that a party wishing to obtain an order of protection over discovery material must demonstrate that 'good cause' exists for the order of protection." *Pansy v. Borough of Stroudsburg, 23 F.3d 772, 786 (3d Cir. 1994)* (citation omitted). n8 "Good cause is established on a showing that disclosure will work a clearly defined and serious injury to the party seeking closure. The injury must be shown with specificity." Id. (citation omitted). "Broad

allegations of harm, unsubstantiated by specific examples of articulated reasoning, do not support a good cause showing. The burden of justifying the confidentiality of each and every document sought to be covered by a protective order remains on the party seeking the order." *Id. at 786-787*. The courts must balance "the requesting parties need for information against the injury that might result if uncontrolled disclosure is compelled. When the risk of harm to the owner of a trade secret or confidential information outweighs the need for discovery, disclosure through discovery cannot be compelled, but this is an infrequent result." *Id. at 787* (citation omitted) (emphasis [*12] supplied).

n8 Although Pansy involved a settlement agreement (as opposed to discovery materials), the Court noted, "protective orders over discovery materials and orders of confidentiality over matters relating to other stages of litigation have comparable features and raise similar policy concerns . . . . whether an order of confidentiality is granted at the discovery stage or any other stage of litigation, including settlement, good cause must be demonstrated." *Pansy, 23 F.3d at 786.* Therefore, the reasoning in Pansy is applicable to this case.

**1. THE THREAT OF FUTURE COMPETITION**

Defendants contend that disclosure of the "Specially Confidential" documents to Bandurick, a past and future competitor of EMI, will cause EMI to suffer specific and particular injury. I find that Defendants have neither shown Bandurick is a likely future competitor nor demonstrated that disclosure of this information will place them at a competitive disadvantage.

First, EMI regularly discloses the information [*13] in "Specially Confidential" documents to vendors and customers. At the hearing, Dani Stephens, Vice President of Operations Support for EMI, testified that certain documents which she labeled "Specially Confidential" could be viewed by vendors, customers, and, on certain occasions, the public. n9 Specifically, Stephens testified that EMI locks process sheets in a room in the engineering department for security purposes and restricts access to fifteen out of 160 persons. EMI then distributes these process sheets to subcontracting machining vendors with a statement limiting their use to completing a particular purchase order. These vendors service EMI's competitors, and EMI relies on the vendor's bona fides and the statements listing the processing sheets proprietary to EMI to insure that the vendors will not misappropriate EMI's technology. Id. at 77-79. Stephens also revealed that: (1) outsiders can occasionally review EMI's "cost

1995 U.S. Dist. LEXIS 16328, *

estimates" and financial data pertaining to the development and manufacture of its products; (2) EMI's "quality control manual" describing internal inspection and testing procedures is given to customers upon request with instruction prohibiting further [*14] dissemination of the information it contains; (3) EMI discloses "purchase orders" containing pricing information to vendors; (4) EMI provides customers with "gauge calibration records" which illustrate the calibration of the gauges used by EMI to inspect its parts; (5) "value engineering change proposals" ("VECP") are available to the public under the Freedom of Information Act; and (6) "purchase agreements" with vendors do not contain any language designating them as confidential in order to prevent the vendor from disseminating price information. Id. at 79-99, 122.

n9 Stephens stated documents receiving the "Specially Confidential" designation included, but were not limited to: process sheets, operations sheets, travelers, tooling drawings, purchase orders, cost estimates, job summary analyses, routing sheets, engineering folders, engineering notes, requirements control cards, inspection method sheets, quality control manuals, details, and value engineering change proposals. Tr., Oral Argument, 10/26/95, at 78-99.

[*15]

Thus, EMI cannot successfully argue that good cause exists to prevent Bandurick from reviewing the same "Specially Confidential" documents which EMI regularly disseminates to its vendors and subcontractors. I find it ironic that EMI relies on the good faith of its vendors to prevent against the abduction of EMI's proprietary information and, at the same time, argues that the sanctioning power of a federal court is insufficient to protect EMI's interests. Id. at 189. Subcontractors and vendors pose as great a threat as competitors. They often have sufficient capital, market presence, access to channels of distribution, name recognition, and supply contacts to move into the industry they service. EMI, however, readily provides them with commercial information it considers "Specially Confidential."

Second, Bandurick testified that Heintz, because of the bankruptcy proceedings, would never again become a competitor in the flameholder assembly field. According to Bandurick, Heintz has liquidated most of its assets, leaving the company with insufficient resources to enter the flameholder assembly industry. Id. at 129. Bandurick also commented that flameholder technology is being [*16] phased out because of military cutbacks and because new engine models in the F-15 and F-16 aircraft

will not utilize the flameholder at issue in this case. Given the capital intensive nature of manufacturing and supplying flameholders, Bandurick does not believe it would be worthwhile for any company to enter the market this late in the flameholder's product life-cycle. Tr., Oral Argument, 10/26/95, at 128. After observing Bandurick's demeanor and testimony at the hearing, I accept his testimony as truthful, and I note that "an attempt to show that disclosure will indeed work a competitive disadvantage might be undermined if the information sought to be protected were stale." Zenith Radio Corp. v. Matsushita Elec. Indus. Co., 529 F. Supp. 866, 891 (E.D. Pa. 1981). n10

n10 The Zenith decision acknowledges that even old information could be "extrapolated to reveal a business' current strategy, strengths, and weaknesses. In the hands of an able and shrewd competitor, old data could indeed be used for competitive purposes." Id. at 891-892. Defendants have failed, however, to show that Bandurick is such a competitor.

[*17]

Defendants claim that the future is unpredictable and changing defense circumstances may increase demand for the F-100 engine and make the flameholder assembly in this case valuable. Tr., Oral Argument, 10/26/95, at 158. This assertion, however, does not articulate potential injury to EMI with sufficient specificity or certainty. Bandurick refuted this argument by noting that demand for this type of flameholder will definitely decrease because it is being replaced with a different flameholder in a new engine. Defendants have not produced any concrete evidence to the contrary except a broad, unsubstantiated allegation that "things may change."

Fourth, EMI has not convinced this Court that Bandurick poses a competitive threat. Defendants argue Bandurick threatens EMI because Bandurick (1) is only forty-three years old, (2) will be employed in the aerospace industry for twenty to twenty-five more years, and (3) has a wide range of expertise in mechanical engineering, aerospace technology, and jet engines. I disagree with this conclusion. Bandurick, as an individual, does not pose the same danger to EMI as an active company competing in the same industry. He does not possess the extensive [*18] financial resources necessary to design a product, develop the appropriate tooling, establish a system of manufacturing, market the product, and distribute it to customers. See Bayer AG and Miles, Inc. v. Barr Laboratories, Inc., 162 F.R.D. 456, 464 (S.D.N.Y. 1995) (finding good cause for protective order where patent dispute "involves two direct competitors"); Miles, 154

*F.R.D. at 114* (citing with approval a case declaring certain data used by insurance companies confidential "for fear that hospitals could use the comparative price information to raise their prices or collude in future years") (citation omitted); *Staff Builders of Philadelphia, Inc. v. Koschitzki, 1989 U.S. Dist. LEXIS 4413, No. 88-6103, 1989 WL 46284,* at * 1 (E.D. Pa. April 26, 1989) (granting a protective order over confidential information the "disclosure of which to plaintiffs or other active competitors of [the non-party] in the temporary personnel service industry would cause clearly defined and serious economic harm"); *Cipollone v. Liggett Group, Inc., 785 F.2d 1108, 1121 (3d Cir. 1986)* (citing with approval a case refusing a protective order based only on a "broad allegation that disclosure of certain information would [*19] injure the bank in the industry and local community") (citation omitted), cert. denied, *484 U.S. 976, 108 S. Ct. 487, 98 L. Ed. 2d 485 (1987).*

Moreover, I note that Bandurick has already read the documents and had sufficient opportunity to extract commercially sensitive information. Denying him access at this point would not prevent him from becoming a future competitor. On the other hand, replacing him with yet another expert who will gain access to the "Specially Confidential" documents merely increases the probability that the information will be misappropriated to EMI's competitive disadvantage.

I find that Defendants have not shown that (1) either Heintz or Bandurick pose a competitive threat to EMI; and (2) releasing the information to Bandurick will place EMI at a competitive disadvantage. Defendants have failed to provide a "concrete example of the type of harm they would suffer . . . . and how preventing the release of [these materials] is needed to prevent particularized, significant injury to their financial and competitive position." *Cipollone v. Liggett Group, Inc., 822 F.2d 335, 346 (3d Cir.)* (citation omitted), cert. denied, *484 U.S. 976, 108 S. Ct. 487, 98 L. Ed. 2d 485.*

## 2. INABILITY [*20] TO DISTINGUISH

Defendants also assert that Bandurick will not refrain from disclosing on future consulting assignments the information provided to him in this case. I disagree. "Broad allegations of harm, unsubstantiated by specific examples of articulated reasoning, do not satisfy the Rule 26(c) test, and there must be a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements." *Cipollone, 785 F.2d at 1121* (citation omitted). Defendants assertions are nothing more than bare allegations. Bandurick testified that he would not accept a job in the aerospace industry having to do with the flameholder assembly. Bandurick referred to a signed agreement signed requiring him to keep confidential all information acquired in this litigation and

stated that another confidentiality agreement binds him with Heintz and precludes him from working for another entity on the flameholder. Tr., Oral Argument, 10/26/95, at 127. Furthermore, Bandurick stated the technology involved in this case is unique to the F-100 engine, and the specific characteristics and configuration of the F-100 flameholder preclude him from applying any EMI technology [*21] disclosed to him through this litigation in the future. Id. at 154-156. n11

n11 Questioned as to of why he had not told TASA that conflicts of interest might render him unavailable for certain assignments, Bandurick responded that such information is not normally disclosed until after TASA refers a specific consulting assignment. TASA has not yet referred any more work to Bandurick. Id. at 153. Also, Bandurick read "Specially Confidential" documents prior to the September 14, 1995 Order with the understanding that the lawyers could seek consultation in deciphering these complex documents. Upon learning that he was not allowed access to the documents, Bandurick refrained from examining them until Magistrate Judge Smith again allowed him to view them. Bandurick also stated that he did not discuss the details of these documents with anyone. Id. at 141-144.

After observing Bandurick's testimony and demeanor, I accept his testimony as truthful. He recognizes the gravity of the confidentiality agreements [*22] he has signed, and I have no reason to believe that he will violate those agreements.

## 3. AVAILABILITY OF OTHER EXPERTS

Defendants attempt to show good cause by arguing that other experts can serve as consultants in this case, and they argue Plaintiff has failed to conduct a diligent search for them. Specifically, they point to (1) Bayo Santiago's testimony that a three hour telephone survey of the academic community searching for experts in fabrication and jet engines in the aerospace industry produced three viable alternatives to Bandurick; and (2) Bandurick's admission that someone else might have the qualifications to assist Heintz. I disagree with this conclusion.

First, Bandurick testified that the academic consultants produced by Defendants were ill equipped and improperly trained to assist Plaintiff in this case. Bandurick stated that while the academicians identified by Defendants may have an extensive understanding of metallurgy, they lacked hands on experience in industry to understand how a design becomes a product which is

then, within the constraints of a budget, manufactured, produced, and marketed to the government for sale. Id. at 131-137. Bayo Santiago's [*23] testimony corroborated that the experts contacted by Defendants did not have direct experience in government contracting, production, production management, or manufacturing. Tr., Oral Argument, 10/26/95, at 72-73.

Bandurick explained that his experience in manufacturing and business enabled him to sort through the thousands of documents produced in this case and determine which were critical, i.e. the "tool prints for the inner, outer, and center chambers of the flameholder." Id. at 131. Stephens conceded during her testimony that "the routing sheets relating to the inner, middle, center, and outer flameholder assembly" could be relevant to "whether EMI utilized Heintz' technology" Id. at 118-19. I find that Bandurick's experience in aerospace engineering, manufacturing, production, assembly, and government contracting provides Plaintiff with an expert who understands the specifics of jet engine manufacture and can decipher the complex documents in this case.

I also find that Defendants have not supplied a specific and viable alternative expert to replace Bandurick. Their bare assertion that somewhere another expert exists who can assist Plaintiff, without the submission [*24] of another person with Bandurick's qualifications, provides no support for a finding of good cause. Moreover, I am not convinced that the availability of another expert is relevant to the question of whether good cause exists. The burden is not on Plaintiff to show the Court they have exhausted their search for a replacement expert. Rather, the burden lies on Defendants to show good cause exists to withhold the "Specially Confidential" documents from Bandurick and that failure to do so will result in specific and definite injury.

## 4. RELIANCE

Defendants contend good cause exists because they relied on the protections of the Agreement in producing the "Specially Confidential" documents. I disagree. First, reliance is not a factor to consider when making an initial finding of good cause. Pansy states "in determining whether to modify an already existing confidentiality order, the parties reliance on the order is a relevant factor." Pansy, 23 F.3d at 789-790 (emphasis in original). My inquiry, however, focuses on whether good cause exists to issue ab initio a protective order over the "Specially Confidential" documents, and I am not deciding whether to modify [*25] an existing order. Second, as noted above, I adopt as truthful Bandurick's testimony that he will abide by the two agreements requiring him to keep this information confidential. I also find Bandurick testified truthfully to the fact that he never discussed the details of any "Specially Confidential" documents with

anyone other than counsel. Tr., Oral Argument, 10/26/95, at 144.

## 5. HEINTZ' FINANCIAL POSITION

Defendant's argue that Heintz has the financial ability to retain and compensate another expert. During the hearing, the parties stipulated that Ralph Brown, Secretary of Heintz, would testify that based upon the relationship between Brown, the creditors committee, and bankruptcy counsel, Heintz will not be afforded funds to engage another expert, and removal of Bandurick from the case will end this lawsuit. Id. at 167-168. Defendants point to Heintz' monthly operating report from July, 1995 which shows assets and cash on hand.

First, Defendants fail to cite to any authority to support the proposition that good cause may be demonstrated by the financial ability of one party to react to the protective order. Second, I have already accepted as truthful Bandurick's [*26] testimony that Heintz is liquidating its assets. Third, Defendants have not produced any evidence that would cause me to disbelieve and reject Brown's stipulated testimony that Bandurick's removal from this case would end the litigation. Finally, Bandurick has spent a total of 400 hours on this case already reviewing all the documents. Id. at 163. His involvement has already cost Heintz $ 50,000 and replacing him with a new expert who would start afresh would cost at least that amount. This leads me to believe that the appointment of a new expert could unnecessarily result in the end of this lawsuit. See Pansy, 23 F.3d at 787 (noting "circumstances weighing against confidentiality exist when . . . the sharing of information among litigants would promote fairness and efficiency") (citation omitted). n12

---

n12 Defendants present four additional arguments in an attempt to deprive Bandurick of access to the documents. First, Defendants rely on Pansy for the proposition that "if a case involves private litigants, and concerns matters of little legitimate public interest, that should be a factor weighing in favor of granting or maintaining an order of confidentiality." Pansy, 23 F.3d at 788. While I agree that this language does support Defendants position, it is only one of at least six factors articulated in Pansy that the court should consider; alone, it is insufficient to illustrate good cause. See Farley v. Cessna Aircraft, 1994 U.S. Dist. LEXIS 10205, No. 93-6948, 1994 WL 396479c, at * 1 (E.D. Pa. July 22, 1994) (articulating six factors identified in Pansy).

Second, Defendants rely on Bayer AG and Miles Inc. to support their position that the initial

Agreement's provision preventing expert witnesses from viewing "Specially Confidential" documents should preclude Bandurick from access to them. This reliance is misplaced, however, because (1) Bayer involved the disclosure to a direct competitor of "nearly all proprietary aspects of an entire research program" which Bayer kept "under strict confidence;" *Bayer AG and Miles, Inc., 162 F.R.D. at 464;* and (2) the Bayer Court limited its holding to cases where a party seeks to modify a previously stipulated protective order for non-public interest reasons. *Id. at 458* (emphasis supplied). Defendants also note that one factor the Bayer Court applied in declining to modify the protective order was whether the "need for modification was foreseeable at the time the parties negotiated the original order." *Id. at 466.* This foreseeability factor, however, is not applicable here because my inquiry concentrates on whether good cause exists to issue a protective order in the first instance.

Third, Defendants argue that Bandurick's financial interest in this litigation -- his $ 125 per hour fee -- shaped his testimony at the evidentiary hearing. I disagree. After observing Bandurick's testimony and demeanor, I find that his testimony was unbiased and not guided by a financial interest in this litigation.

Finally, I will deny Defendants' request that I find the "Specially Confidential" documents actually warranted such a classification. The Agreement is not an order from this Court or Magistrate Judge Smith. Rather, it is a contract voluntarily negotiated among the parties to this litigation. I will not allow the parties to impose on this Court any of the classifications in the Agreement unless the Agreement articulates specific standards for each category and the parties request this Court to engage in contractual interpretation. I limit my review to determining whether good cause exists.

[*27]

## 6. BALANCING

Balancing these interests, I find that Plaintiff's needs and interests clearly outweigh those of Defendants. Plaintiff needs Bandurick's expertise, which is appropriately tailored to this litigation. The academic experts available maybe inadequate to assist Plaintiff, and the effect on Plaintiff's position if Bandurick is removed from this case is likely to cause undue hardship. Defendants' allegations are completely unsubstantiated. Defendants have not demonstrated that Bandurick is a competi-

tor or that revealing the "Specially Confidential" documents will place them at a competitive disadvantage. This is especially true considering EMI disseminates that information to vendors, subcontractors, and customers. Because Defendants cannot establish good cause, I find that Magistrate Smith's conclusion to provide Bandurick with access to the "Specially Confidential" documents will not harm EMI and was not clearly erroneous.

### B. ERROR OF LAW

Defendants argue Magistrate Judge Smith committed an error of law in failing to both conduct an evidentiary hearing and make specific findings prior to issuing the September 14, 1995 Order, thereby denying them fairness [*28] and due process. I disagree. First, Defendants concede their inability to provide this Court with any precedent that suggests a judge must hold an evidentiary hearing and articulate specific findings prior to expanding the scope of a confidentiality agreement voluntarily executed by both parties. Tr., Oral Argument, 10/26/95, at 7.

Second, I do not view Pansy as support for Defendants' position that a magistrate judge must provide a hearing and specific findings. That decision states "to facilitate effective appellate review of a district court decision of whether to grant or modify an order of protection or confidentiality, a district court should articulate on the record findings supporting its judgment . . . . we have, when appropriate, exercised our inherent supervisory power to require the district courts to provide an explanation for certain types of orders to assist our statutory function of appellate review." *Pansy, 23 F.3d at 789 & n.22* (citations omitted) (emphasis supplied). This language requests that a district court, not a magistrate judge, articulate factual findings to ease appellate review. To read Pansy as mandating a magistrate judge [*29] to provide a hearing and make specific findings when exercising a *28 U.S.C.A. § 636(b)(1)(A)* function, without being requested to do so in the referral order, is certainly an unwarranted extension of the Pansy Court's holding.

Finally, *28 U.S.C.A. § 636,* which governs the assignment of cases to magistrate judges by the district court, states that "a judge may designate a magistrate to hear and determine any pretrial matter pending before the court . . . . a judge may also designate a magistrate to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations." *28 U.S.C.A. § 636(b)(1)(A), (b)(1)(B)* (emphasis supplied). The use of "may" implies that the district court is not required to instruct the magistrate judge to conduct evidentiary hearings and make findings. Furthermore, in this case, I refrained from exercising my discretion and did not order the magistrate judge to hold an evidentiary hearing and make findings.

1995 U.S. Dist. LEXIS 16328, *

An appropriate Order follows.

**ORDER**

AND NOW, this 3rd day of November, upon consideration of (1) Defendants and Non-Party Electro-Methods, Inc.'s Objections to P 3 [*30] of the September 14, 1995 Order of Magistrate Judge Smith (Doc. No. 57); (2) Plaintiff's Memorandum In Opposition (Doc. No. 60); (3) an evidentiary hearing held on October 26, 1995; and (4) Supplemental Briefs submitted by (a) Plaintiff and (b) Defendants and Non-Party Electro-Methods, Inc. (Doc. Nos. 63 and 64 respectively), IT IS HEREBY ORDERED THAT:

1. The Objections of Defendants and Non-Party Electro-Methods, Inc. are OVERRULED.

2. Paragraph 3 of Magistrate Judge Smith's September 14, 1995 Order (Doc. No. 55) is CONFIRMED.

BY THE COURT:

John R. Padova, J.

# EXHIBIT F

LEXSEE 2004 U.S. DIST. LEXIS 670



Caution
As of: Jan 23, 2007

**MEDTRONIC AVE, INC., Plaintiff, v. ADVANCED CARDIOVASCULAR SYS-TEMS, INC., Defendant.**

**Civ. Nos. 98-0080-SLR; 98-0314-SLR; 98-0316-SLR (consolidated)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2004 U.S. Dist. LEXIS 670*

**January 13, 2004, Decided**

**SUBSEQUENT HISTORY:** Partial summary judgment denied by *Medtronic Vascular, Inc. v. Advanced Cardiovascular Sys., 2004 U.S. Dist. LEXIS 26756 (D. Del., Dec. 17, 2004)*

**DISPOSITION:** [*1] Medtronic's motion for protective order allowing redaction of limited information from manufacturing process documents denied.

**COUNSEL:** For MEDTRONIC AVE INC., Medtronic Vascular, Inc. aka Medtronic AVE, Inc., plaintiff: Philip Henry Bangle, Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

For ADVANCED CARDIOVASCULAR SYSTEMS, INC., defendant: Frederick L. Cottrell, III, Richards, Layton & Finger, Wilmington, DE.

For W.L. GORE & ASSOC. INC., movant: Stuart M. Grant, Grant & Eisenhofer, P.A., Wilmington, DE.

For ADVANCED CARDIOVASCULAR SYSTEMS, INC., counter-claimant: Frederick L. Cottrell, III, Richards, Layton & Finger, Wilmington, DE.

For ADVANCED CARDIOVASCULAR SYSTEMS, INC., counter-defendant: Frederick L. Cottrell, III, Richards, Layton & Finger, Wilmington, DE.

For MEDTRONIC USA, INC., plaintiff: Philip Henry Bangle, Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

For GUIDANT SALES COPORATION, defendant: Frederick L. Cottrell, III, Richards, Layton & Finger, Wilmington, DE.

For GUIDANT SALES COPORATION, counter-defendant: Frederick L. Cottrell, III, Richards, Layton & Finger, Wilmington, DE.

For MEDTRONIC AVE INC. aka Medtronic AVE, Inc., counter-defendant: [*2] Philip Henry Bangle, Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

For MEDTRONIC USA, INC., counter-defendant: Philip Henry Bangle, Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

**JUDGES:** Sue L. Robinson, United States District Judge.

**OPINION BY:** Sue L. Robinson

**OPINION:**

### MEMORANDUM ORDER

At Wilmington this 13th day of January, 2004,

IT IS ORDERED that Medtronic AVE's motion for a protective order allowing redaction of limited information from manufacturing process documents (D.I. 224) is denied.

1. Medtronic AVE ("Medtronic") filed suit against Advanced Cardiovascular Systems, Inc. ("ACS") on December 18, 1998 alleging patent infringement of U.S. Patent Nos. *5,292,331* and *5,674,278* (the "Boneau pat-

Case 1:05-cv-00023-JJF    Document 82-2    Filed 01/23/2007    Page 46 of 56

Page 2
2004 U.S. Dist. LEXIS 670, *

ents"), breach of contract, trade secret misappropriation, unfair competition, restoration of property wrongfully acquired, conversion, declaratory relief, and equitable claims. (See D.I. 1) Specifically, Medtronic alleges that ACS infringes the Boneau patents by manufacturing, using, selling, offering for sale, and importing its Multi-Link stents in the United States. (Id. at P2) Medtronic also contends that ACS wrongfully acquired and is misusing its stent technology to develop [*3] and to patent balloon expandable stents. n1 In this regard, Medtronic seeks a declaratory judgment that its Micro Stent II and GFX Stent Delivery Systems do not infringe ACS's patents relating to balloon expandable stents. On March 30, 1998, ACS answered the complaint denying Medtronic's allegation and asserting a variety of affirmative defenses including the "first-to-file" rule, noninfringement, estoppel, invalidity, statute of limitations, laches, and federal preemption. (See D.I. 8) ACS amended its answer on June 15, 1998 to add an additional affirmative defense of inequitable conduct (D.I. 24 at PP 113, 114) and to assert invalidity counterclaims as to the Boneau patents. (D.I. 24 at PP 5, 6) Medtronic denied ACS's invalidity allegations on July 6, 1998 (see D.I. 26) and, on this same day, moved to strike ACS's affirmative defenses and counterclaims. (See D.I. 27) The court denied Medtronic's motion on September 30, 1999. (See D.I. 63)

n1 AVE holds *U.S. Patent Nos. 5,421,955*; 5,514,154; and *5,603,721* relating to balloon expandable stents. (Id. at P3)

[*4]

2. On August 2, 2000, the court issued a protective order to prevent disclosure of confidential, proprietary, or trade secret information relating to the subject matter of the litigation. (D.I. 189) This order limits review of documents designated as "highly confidential" to legal counsel and independent experts only. (Id.) On July 28, 2000, pursuant to this order, ACS produced, without redaction, confidential information about its manufacturing process. (D.I. 228 at 3) Shortly thereafter in teleconference with the court on August 7, 2000, ACS requested Medtronic to provide all documents that Medtronic had previously redacted or withheld relating to: (1) Medtronic's process of manufacturing stent products accused of infringement and for stent products allegedly made in accordance with the Boneau patents; and (2) information that Medtronic redacted relating to "other" matters which Medtronic identified as privileged, or trade secret, or "possibly irrelevant." (See D.I. 194) The court indicated that redactions having to do with the manufacturing process should be disclosed. (Id. at 33, ll. 11-17) By September 2000, however, Medtronic had not provided the redacted information [*5] to ACS, thereby leading ACS

to schedule a second teleconference with the court on September 6, 2000. (See D.I. 219) The court ordered Medtronic to supply the documents in unredated form notating the portions to be redacted for the court's in camera review and to provide an explanation of the reasons for redaction to ACS. (Id. at 11, ll. 18-21) Medtronic responded by filing the instant motion with the court and providing a representation of the types of documents, as opposed to the actual documents as ordered.

3. *Federal Rule of Civil Procedure 26(c)* provides various means for the federal courts to protect parties and witnesses during the discovery process. The rule requires parties to confer in good faith to resolve any dispute; and if not successful, any party may apply to the court for relief concerning the dispute. *Rule 26 (c)(7)* provides, in pertinent part:

> For good cause shown, ... the court ... may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following . . .that a trade secret or other confidential [*6] research, development, or commercial information not be revealed or be revealed only in a designated way.

*Fed. R. Civ. P. 26(c)(7) (2003).*

Nevertheless, "it is well established that trade secrets are not absolutely privileged from discovery in litigation." *Coca Cola Bottling Co. of Shreveport, Inc. v. Coca Cola Co., 107 F.R.D. 288, 292 (D. Del. 1985)*. To avoid such discovery, a party must demonstrate by competent evidence that the information sought is a trade secret and that disclosure of the secret might be harmful. Id. (citing *Centurion Industries, Inc. v. Warren Steurer & Associates, 665 F.2d 323, 325 (10th Cir. 1981)*; 8 Wright & Miller, Federal Practice & Procedure: Civil § 2043 (1970)). In determining if disclosure would be harmful, the court must consider "not the injury that would be caused by public disclosure, but the injury that would result from disclosure under an appropriate protective order." *Id. at 293*. To this end, the party seeking the protective order must articulate the injury with specificity. *Pansy v. Borough of Stroudsburg, 23 F.3d 772, 786 (3d Cir. 1994)* [*7] (quoting *Publicker Indus., Inc. v. Cohen, 733 F.2d 1059, 1071 (3d Cir. 1984))*. "Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the *Rule 26(c)* test." Id. (quoting *Cipollone v. Liggett Group, Inc., 785 F.2d*

*1108, 1121 (3d Cir. 1986))*. Moreover, disclosure to a competitor is presumed more harmful than disclosure to a non-competitor. *Coca Cola Bottling Co., 107 F.R.D. at 293* (citing *United States v. United Fruit Co., 410 F.2d 553, 556 (5th Cir.)*; 2 R. Milgrim, Trade Secrets § 7.06[1][b] (1984)).

If it is established that the sought information constitutes trade secrets and that disclosure would be harmful, then the burden shifts to the party seeking discovery to establish that disclosure of the trade secret is relevant and necessary to the litigation. *Id. at 292*. Relevance is established when the sought information is relevant, in broad terms, to the subject matter of the litigation. Id. Disclosure of the evidence is considered necessary when the information is required "for the movant to prepare its case for trial, which includes proving its theories [*8] and rebutting its opponent's theories." *Id. at 293*. If relevancy and need are established, then the court must balance the need for the information with the harm that would be caused if disclosure is ordered. Id. This balance typically tilts in favor of disclosure. Id. The Supreme Court has recognized that "orders forbidding any disclosure of trade secrets or confidential information are rare." Id. (quoting *Fed. Open Mkt. Comm. v. Merrill, 443 U.S. 340, 362 n. 24, 61 L. Ed. 2d 587, 99 S. Ct. 2800 (1979)*. Indeed, "discovery is virtually always ordered once the movant has established that the secret information is relevant and necessary." Id. (citing a survey of relevant case law).

4. The court finds that Medtronic has not shown that it would suffer a particularized injury from disclosure of the manufacturing process information under the protective order currently in place between the parties. Med-

tronic instead alleges that it fears being placed at a competitive disadvantage by disclosure to its competitor ACS. While the court has previously recognized that disclosure to a competitor is likely more harmful than disclosure to a noncompetitor, disclosure to limited persons [*9] as in the instant case is not the same as disclosure to Medtronic personnel. The court, therefore, concludes that Medtronic's interests will not be in jeopardy by providing the redacted information to Medtronic's legal counsel and independent experts.

Assuming, arguendo, that disclosure would be harmful, the court, nevertheless, finds that the manufacturing process documents are relevant and necessary to enable ACS to prepare for trial. ACS must be able to understand Medtronic's manufacturing details, especially the annealing, welding, and electropolishing steps, to access whether the products produced by these processes fall within the scope of its balloon expandable stent patents. In this regard, Medtronic's manufacturing processes directly bear upon the properties of its finished products. The court notes that Medtronic's experts, in fact, offered this very argument in litigation against Cordis to support discovery of the details around Cordis's manufacturing processes. (See D.I. 229, ex. K at P12) Medtronic cannot now ignore the protective order it agreed to abide by earlier in the litigation and from which it gleened discovery about ACS's manufacturing processes. Accordingly, [*10] the court denies Medtronic's motion for a protective order allowing redaction of limited information from manufacturing process documents.

Sue L. Robinson

United States District Court

# EXHIBIT G

LEXSEE 2005 U.S. DIST. LEXIS 23771



Analysis
As of: Jan 23, 2007

### IN RE PLASTICS ADDITIVES ANTITRUST LITIGATION

### CIVIL ACTION NO. 03-2038

### UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

*2005 U.S. Dist. LEXIS 23771*

**August 23, 2005, Decided**
**August 24, 2005, Filed**

**SUBSEQUENT HISTORY:** Class certification granted by, Motion denied by *In re Plastics Additives Antitrust Litig., 2006 U.S. Dist. LEXIS 69105 (E.D. Pa., Aug. 31, 2006)*

**PRIOR HISTORY:** *In re Plastics Additives Antitrust Litig., 2004 U.S. Dist. LEXIS 23989 (E.D. Pa., Nov. 29, 2004)*

**DISPOSITION:** [*1] Moving defendants' motion to modify protective order granted in part and denied in part.

**COUNSEL:** For GITTO/GLOBAL CORPORATION, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, Plaintiff: EUGENE A. SPECTOR, SPECTOR, ROSEMAN & KODROFF, PHILADELPHIA, PA; GREGORY P. HANSEL, RANDALL B. WEILL, PORTLAND, ME; HILARY COHEN, JOSEPH C. KOHN, WILLIAM E. HOESE, CRAIG W. HILLWIG, KOHN SWIFT & GRAF PC, PHILADELPHIA, PA; ROBERT N. KAPLAN, KAPLAN FOX & KILSHEIMER LLP, NEW YORK, NY; ROBERTA D. LIEBENBERG, FINE, KAPLAN AND BLACK, PHILADELPHIA, PA.

For CRANE GROUP CO., CRANE PLASTICS COMPANY LLC, CRANE PLASTICS SIDING LLC, CRANE PRODUCTS LTD., EX-TECH PLASTICS, INC., TIMBER TECH LIMITED, CRANE PLASTICS MANUFACTURING LTD., Plaintiffs: STEVEN O. SIDENER, CHARLES ANDREW DIRKSEN, JOSEPH

BARTON, GOLD BENNETT CERA & SIDENER LLP, SAN FRANCISCO, CA; JOSEPH C. KOHN, KOHN SWIFT & GRAF PC, PHILADELPHIA, PA.

For HERITAGE PLASTICS, INC., Plaintiff: CARL N. FRANKOVITCH, FRANKOVITCH ANETAKIS COLANTONIO & SIMON, WEIRTON, WV; DIANNE M. NAST, RODA & NAST, PC, LANCASTER, PA; STANLEY M. CHESLEY, WAITE, SCHNEIDER, BAYLESS AND CHESLEY CO., L.P.A., CINCINNATI, OH; JOSEPH C. KOHN, KOHN SWIFT & GRAF PC, PHILADELPHIA, [*2] PA.

For ISAAC INDUSTRIES, INC., Plaintiff: JOSEPH C. KOHN, KOHN SWIFT & GRAF PC, PHILADELPHIA, PA.

For NEW LINE COLOR INC., Plaintiff: CRAIG W. HILLWIG, JOSEPH C. KOHN, KOHN SWIFT & GRAF PC, PHILADELPHIA, PA.

For ROHM & HAAS COMPANY, Defendant: PETER BRESLAUER, LATHROP B. NELSON, III, STEPHEN W. ARMSTRONG, MONTGOMERY MCCRACKEN WALKER AND RHOADS, L.L.P., PHILADELPHIA, PA.

For FERRO CORPORATION, Defendant: AMY L. CADLE, J. PHILIP CALABRESE, SQUIRE SANDERS & DEMPSEY LLP, CLEVELAND, OH; BRIAN E. ROOF, GREGORY R. FARKAS, JAMES N. NIEHAUS, M. NEAL RAINS, FRANTZ WARD LLP, CLEVELAND, OH; DANIEL L. BROCKETT, PAUL

2005 U.S. Dist. LEXIS 23771, *

BRADFORD OCKENE, SQUIRE, SANDER AND DEMPSEY, CLEVELAND, OH; FRANCIS P. DEVINE, III, MARIA FEELEY, PEPPER HAMILTON LLP, PHILADELPHIA, PA.

For MITSUBISHI RAYON AMERICA, INC., Defendant: AMY C. GROSS, ANDREW BEHRMAN, DAVID G. KEYKO, FREDERICK A. BRODIE, PILLSBURY WINTHROP LLP, NEW YORK, NY; CATHERINE N. WALTO, RAWLE & HENDERSON LLP, PHILADELPHIA, PA.

For KREHA CORPORATION OF AMERICA, Defendant: J. MANLY PARKS, WAYNE A. MACK, DUANE MORRIS LLP, PHILADELPHIA, PA; JEREMY J. CALSYN, MARK LEDDY, CLEARY, GOTTLIEB, STEEN & HAMILTON, LLP, WASHINGTON, DC.

For [*3] AKZO NOBEL, INC., Defendant: JAMES R. EISZNER, SHOOK HARDY & BACON LLP, KANSAS CITY, MO; JOSEPH M. REBEIN, LAURIE A. NOVION, SHOOK HARDY & BACON, KANSAS CITY, MO; NANCY J. GELLMAN, CONRAD O'BRIEN GELLMAN & ROHN PC, PHILA, PA.

For AKCROS CHEMICALS AMERICA, Defendant: JAMES R. EISZNER, SHOOK HARDY & BACON LLP, KANSAS CITY, MO; NANCY J. GELLMAN, CONRAD O'BRIEN GELLMAN & ROHN PC, PHILA, PA.

For BAERLOCHER USA, L.L.C., Defendant: ALAN KANZER, TORSTEN M. KRACHT, ALSTON & BIRD LLP, NEW YORK, NY; ANDRE L. DENNIS, STRADLEY, RONON, STEVENS & YOUNG LLP, PHILADELPHIA, PA.

For ARKEMA INC., formerly known as ATOFINA CHEMICALS, INC. formerly known as ELF ATOCHEM NORTH AMERICA, INC., Defendant: HOWARD D. SCHER, STEVEN E. BIZAR, BUCHANAN INGERSOLL, P.C., PHILADELPHIA, PA.

For KANEKA TEXAS CORPORATION, Defendant: JAMES J. RODGERS, DILWORTH PAXSON L.L.P., PHILADELPHIA, PA; WILLIAM H. ROBERTS, BLANK ROME COMISKY & McCAULEY LLP, PHILADELPHIA, PA.

For THE DOW CHEMICAL COMPANY, Defendant: AMANDA C. BASTA, PATRICK M. BRYAN, WASHINGTON, DC; TEFFT W. SMITH, THOMAS J. LANG, KIRKLAND & ELLIS LLP, WASHINGTON, DC; JAMES J. RODGERS, DILWORTH PAXSON L.L.P., PHILADELPHIA, PA.

For UNION [*4] CARBIDE CORPORATION, Defendant: NATHAN P. EIMER, EIMER STAHL KLEVORN & SOLBERG LLP, CHICAGO, IL; JAMES J. RODGERS, DILWORTH PAXSON L.L.P., PHILADELPHIA, PA.

For UNITED STATES, Movant: NATHANAEL M. COUSINS, U.S. DEPARTMENT OF JUSTICE, SAN FRANCISCO, CA.

For CROMPTON CORPORATION, Movant: THOMAS J. MCGARRIGLE, PHILADELPHIA, PA.

**JUDGES:** Legrome D. Davis, J.

**OPINION BY:** Legrome D. Davis

**OPINION:**

### MEMORANDUM OPINION

J. Davis

Presently before the Court are the Motion to Amend the Stipulated Protective Order (Doc. No. 200), filed by Defendant The Dow Chemical Company ("TDDC"), Defendant Union Carbide Corporation ("UCC"), and Defendant Kaneka Texas Corporation ("KTC") (collectively "moving defendants"); Crompton Corporation's ("Crompton") Memorandum of Law in Opposition (Doc. No. 214); and moving defendants Reply Brief thereto (Doc. No. 218).

For the following reasons, it is hereby ORDERED that moving defendants' motion (Doc. No. 200) is GRANTED in part and DENIED in part.

### I. Background

On October 4, 2004, the Court approved a stipulated protective order (the "protective order") to govern the production of confidential business materials in this consolidated litigation. [*5] (See Stipulated Protective Order, Doc. No. 94). Crompton participated in the negotiation of the protective order and eventually signed the order, prior to settling with class plaintiffs. (See Stipulated Protective Order, at 18; see January 7, 2004 Rule 54(b) Final Judgment Order approving Crompton Settlement, Doc. No. 110). On April 18, 2005, plaintiffs filed a second consolidated amended complaint, adding moving defendants as parties. (See Second Consolidated Amended Complaint, Doc. No. 148).

Paragraph 5 of the protective order limits the dissemination of highly confidential business information to certain members of a party's litigation team. Paragraph 5(a) reads as follows:

5. Disclosure of Highly Confidential Information. Except as provided in Paragraph 5.1 below, access to information designed "HIGHLY CONFIDENTIAL" pursuant to this Order shall be limited to:

(a) Counsel of record (including members and associates of such counsel's firm) for the parties, as well as their paralegal, investigative, technical, secretarial and clerical personnel who are engaged in assisting them in this litigation. For purposes of this Paragraph 5(a), "counsel of record" [*6] shall not include in-house counsel for any party, except that any party may request permission from the designating party to disclose Highly Confidential Information to members of the in-house legal department engaged only in providing legal advice to their employer and who do not take part in decisions of a business or competitive nature relating to the pricing, marketing or other business strategies of their employer with regard to products covered by this litigation ("In-House Litigation Counsel"), which permission shall not be unreasonably withheld;

(See Stipulated Protective Order, at P5(a)). Within the meaning of the stipulated protective order, "Highly Confidential Information" consists of all documents and information that contain or are derived from trade secrets or other confidential research that a party believes to be of such a highly sensitive nature, such as documents containing product formulation and business plans, that disclosure of such information may result in substantial competitive harm to the producing party. (Id., at P1(b)).

Moving defendants' proposed modification to Paragraph 5(a) of the protective order will implement three major changes. [*7] n1 First, the proposed modification removes the "permission" requirement of the protective order, thereby eliminating the designating party's "veto power" over which members of a competitor's in-house legal department can see highly confidential materials. Second, the proposed modification dilutes the qualifications that in-house counsel must meet to access such materials, permitting all in-house counsel who do not participate in pricing or marketing decisions with regard to plastics additives to automatically view highly confidential materials; thus, the proposed modification permits disclosure to in-house counsel who, although not involved in pricing or marketing judgments, may direct a party's strategic business decisions associated with plastics additives (i.e., product design, production, and development, contract structuring, and other competitive decisions). Third, the proposed modification permits new entities, not previously covered, to view documents; automatic disclosure now applies to all "members of the legal department," including paralegal, investigative, technical, secretarial, and clerical personnel, and to the members of the legal department of a "party's parent or [*8] closely affiliated company" actively involved in providing legal advice to the named party.

n1 Defendants' proposed modification permits access to "Highly Confidential" information for:

Counsel (including members and associates of such counsel's firm) for a party, as well as counsel's paralegal, investigative, technical, secretarial and clerical personnel who are engaged in assisting counsel in this litigation; however, members of the legal department of a party or of a party's parent or closely-affiliated company actively involved in providing legal advice to the party with regard to the prosecution or defense of this action, and who do not participate in pricing or marketing decisions of the party or of the party's parent or closely-affiliated company with regard to products covered by the litigation ("Legal Department Members"), as well as the paralegal, investigative, technical, secretarial, and clerical personnel who are engaged in assisting the Legal Department Members in this litigation, shall have access so long as the Legal Department Members have executed the Confidentiality Agreement as provided in Paragraph 6.

(See Proposed Order, attached to Def. Mot.)

[*9]

II. Standard

It is well-established that a "district court retains the power to modify or lift confidentiality orders that it has entered." *Merit Industries, Inc. v. Feuer, 201 F.R.D. 382, 384 (E.D. Pa. 2001)*. This requires a two-part analysis. First, the party seeking to modify the order must present a reason for the proposed modification. See, e.g., *Pansy v. Borough of Stroudsburg, 23 F.3d 772, 790-791 (3d Cir. 1994)*. Second, a court must balance all relevant public and private interests to determine whether a moving party has demonstrated "good cause" to make the proposed changes. Id.; *Biovail Corp. Int'l v. Hoechst Aktiengesellschaft, 1999 U.S. Dist. LEXIS 21621, 1999 WL 33454801, at *6 (D.N.J. Nov. 12, 1999)* (party seeking modification of protective order has burden of showing "good cause"). The Third Circuit has identified a non-exhaustive list of factors that a court may consider in determining whether "good cause" exists: (1) whether disclosure will violate any privacy interests; (2) whether the information is being sought for a legitimate or improper purpose; (3) whether disclosure of the information will cause a party embarrassment; (4) whether [*10] confidentiality is being sought over information important to public health and safety; (5) whether the sharing of information among litigants will promote fairness and efficiency; (6) whether a party benefitting from the order or confidentiality is a public entity or official; (7) whether the case involves issues important to the public; and (8) reliance by the original parties on the confidentiality order. See *Glenmede Trust Co. v. Thompson, 56 F.3d 476, 483 (3d Cir. 1995)*; *Pansy, 23 F.3d at 788-89*.

### III. Application

Moving defendants base their motion on the need to streamline the accessibility of highly confidential information for members of a party's in-house legal department, so that moving defendants' legal team, consisting both of in-house and of outside counsel, will be able to fashion an effective, well-informed defense to plaintiffs' price-fixing allegations. (See Def. Br., at 3-5; Reply Br., at 2-5). Moving defendants further emphasize that a modification guaranteeing expedited access to such documents is particularly necessary because moving defendants were only recently added as defendants in this action on April 18, 2005, and [*11] because they never had an opportunity to participate in the negotiation of the original protective order (Id.).

Balancing all relevant factors, this Court finds that good cause exists to modify the protective order to permit the automatic dissemination of highly confidential business materials to in-house counsel, as well as their legal assistants, who: (i) are engaged only in provided legal advice to their employer; and (ii) do not take part in decisions of a business or competitive nature relating to the pricing, marketing, or other business strategies of their employer with regard to plastics additives ("qualifying in-house counsel"). First, this modification eliminates the requirement of seeking permission prior to disclosure of highly confidential materials to qualifying in-house counsel, thereby streamlining the document discovery process, avoiding prolonged negotiations and disputes over requests for certain members of a legal department to access certain documents, n2 and ensuring that key corporate legal advisers have a full understanding of relevant evidence to advise their clients. n3 See *Pansy, 23 F.3d at 787* (directing court to determine whether modification [*12] of protective order sought for improper or legitimate purpose); *United States v. Sungard Data Systems, Inc., 173 F. Supp. 2d 20, 21 (D.D.C. 2001)* (granting in-house counsel access to confidential business documents in anti-trust litigation because it "would be extremely difficult, if not impossible, for the defendants' outside counsel to prepare this case for trial without the assistance of in-house counsel"). Second, by maintaining the prerequisites for an in-house attorney to qualify for access to such documents and by requiring in-house counsel to sign the Confidentiality Agreement attached to the protective order, this modification allays Crompton's fears of a loss in marketplace power by ensuring that highly sensitive information, including trade secrets, will not be viewed and then used, however inadvertently, by in-house counsel who direct a competitor's strategic decision-making concerning plastics additives. n4 See, e.g., *Carpenter Tech. Corp. v. Armco, Inc., 132 F.R.D. 24, 27 (E.D. Pa. 1990)* (noting that denial of access to confidential and proprietary information should not hinge upon label of in-house or outside counsel, but upon individual [*13] counsel's involvement in party's competitive decision-making; permitting document access in contract dispute over intellectual property to in-house counsel with no involvement in litigant's pricing, marketing, design, or development decision-making). Third, because the protective order requires a designating party to reasonably grant permission for qualifying in-house counsel to see highly confidential information, and because Crompton admits that it has freely given permission to such persons, the Court fails to see the prejudice to Crompton in granting such a modification. (See Stipulated Protective Order, at P5(a); Cr. Br., at 3).

n2 Such disputes seem to have already taken place. For instance, moving defendants provide affidavit testimony from David Keyko, outside counsel for Defendant Mitsubishi Rayon America, Inc., averring that, on the only occasion that defendants requested permission from Crompton for qualifying in-house counsel to access highly confidential information, in the form of Plaintiffs' April 28, 2004 Supplemental Interrogatory Re-

sponses, Crompton withheld such permission in order to leverage defendants into an unrelated discovery disadvantage--agreeing not to depose Crompton's in-house or outside counsel concerning information provided on behalf of Crompton to the plaintiffs and the United States Department of Justice. (See Declaration of David Keyko, at PP2-3, attached as Ex. F to Def. Reply Br.). When all defendants were not willing to agree to such a condition, Crompton permanently withheld permission for defendants' qualifying in-house counsel to review Plaintiff's April 28, 2004 Supplemental Interrogatory Responses. (Id.).

[*14]

n3 Moving defendants provide affidavit testimony from Lynn Looby, an in-house attorney for TDCC, who is managing the litigation on behalf of TDCC and its wholly owned subsidiary, UCC, that she has been unable to make informed decisions regarding the defense of this case due to her inability to view documents, designated highly confidential, that contain facts allegedly supporting plaintiffs' allegations against TDCC and UCC. (See Looby Declaration, at PP3-4).

n4 The Court notes that moving defendants, in their reply brief, agree to maintain the prerequisites for in-house counsel to qualify for access to highly confidential information; specifically, moving defendants agree to extend "the prohibition on access to in-house counsel involved in 'business strategies' with regard to the products in this litigation." (See Reply Br., at 6 n.7).

However, this Court denies defendant's proposed modification in all other respects. This Court will not permit the disclosure of highly confidential information to the in-house legal department of a non-party to the litigation, potentially a competitor [*15] to the party designating and producing the information, even if that legal department provides legal advice to a party in this litigation. n5 Nor will this Court permit the disclosure of confidential information to in-house counsel who are actively involved in strategic business decisions involving plastics additives. These adjustments carry the potential for abuse through the unauthorized dissemination of sensitive business materials to competitors. See, e.g., *Pulsecard, Inc. v. Discover Card Servs., 1995 U.S. Dist. LEXIS 13111, 1995 WL 526533, at *9 (D. Kan. Aug. 31, 1995)* (finding restrictive protective order preferable to "risking the loss of confidentiality" of highly sensitive information to competitor). Furthermore, this Court

agrees that expanding the number of entities who may not just view, but automatically view, highly confidential information containing trade secrets would prejudice Crompton, which relied in part on protections inscribed within the protective order in deciding to settle with class plaintiffs. See, e.g., *Pansy, 23 F.3d at 790* (finding reliance by original parties major factor weighing against modification of protective order and noting reliance [*16] is greater when trade secret is involved and when protective order induces party to settle case); *Greene, Tweed of Del., Inc. v. DuPont Dow Elastomers, L.L.C., 2002 U.S. Dist. LEXIS 11389, 2002 WL 32349383, at *4 (E.D. Pa. Feb. 6, 2002)* (denying motion to modify protective order in part because interests of fairness and efficiency require deference to "parties' reliance on the protective order which has been in place since March of last year"). The protective order has been in place since October 4, 2004, and, although plaintiffs have not objected to the proposed change, to alter in a significant fashion the parties who can view highly confidential information would disrupt the settled expectations of Crompton, a signatory to the stipulated protective order, and would deter future litigants from utilizing such a pragmatic discovery tool. n6 See, e.g., *SRS Techs., Inc. v. Physitron, Inc., 216 F.R.D. 525, 530 (N.D. Ala. 2003)* (adopting Third Circuit test and denying motion to modify protective order because order provided "lubricating effect" on discovery proceedings and because modification would discourage parties from disclosing confidential documents for fear of forced disclosure later); [*17] 8 Wright, Miller, and Marcus, Federal Practice & Procedure § 2044.1, at 582-583 (2nd ed. 1994) (reasonable reliance constitutes paramount concern because "protective orders that cannot be relied upon will not foster cooperation through discovery").

n5 Although moving defendants make the argument that in-house counsel for a party's parent or affiliated company require access to highly confidential materials because several defendants do not have in-house counsel and must rely upon the legal department of a parent or closely-affiliated company to formulate legal strategy, moving defendants do not claim that they fall into such a category. (See Def. Reply Br., at 4). Nor do moving defendants identify those defendants who lack in-house counsel, let alone demonstrate, through affidavit testimony, why defendants who lack in-house counsel would be prejudiced by relying upon the management and legal advice of presumably competent outside counsel. Finally, defendants fail to provide an example of an in-house attorney for a parent corporation, not otherwise a party to the litigation, who is in charge

of directing the legal decision-making of a subsidiary/defendant and who would be prejudiced by the prohibition against access for in-house counsel of a non-party parent corporation or closely-affiliated company.

[*18]

n6 In contrast to moving defendants' suggestions otherwise, the existence of the modification clause in Paragraph 16 of the protective order does not undermine the reasonableness of Crompton's reliance upon the continued existence of the order's original protections; but, instead, merely codifies the parties' right to seek modification of the protective order from the Court, as moving defendants have done in this instance. Otherwise, the mere existence of a right to seek judicial modification a protective order would defeat reliance, thereby rendering nugatory the Third Circuit's command in Pansy to consider reliance by the original parties in the modification calculus.

## IV. Conclusion

For the preceding reasons, this Court grants in part and denies in part moving defendants' motion to modify the protective order. An appropriate Order follows.

### ORDER

AND NOW, this 23D day of August 2005, upon consideration of the Motion to Amend the Stipulated Protective Order (Doc. No. 200), filed by Defendant Dow Chemical Company, Defendant Union Carbide Corporation, and Defendant Kaneka [*19] Texas Corporation (collectively "moving defendants"), and Crompton Corporation's ("Crompton") Memorandum of Law in Opposition to Defendants' Motion (Doc. No. 214), it is hereby ORDERED as follows:

1. Moving defendants' Motion is GRANTED to the extent that moving defendants seek to streamline the process by which qualifying in-house counsel may view documents marked highly confidential.

2. Moving defendants' Motion is DENIED in all other respects.

3. Paragraph 5(a) of the Stipulated Protective Order is hereby amended as follows:

5. Disclosure of Highly Confidential Information. Except as provided in Paragraph 5.1 below, access to information designated "Highly Confidential" pursuant to this Order shall be limited to:

(a) Counsel of record (including members and associates of such counsel's firm) for the parties as well as their paralegal, investigative, technical, secretarial and clerical personnel who are engaged in assisting them in this litigation ("legal assistants"). For purposes of this Paragraph 5(a), "counsel of record" shall also include members of the in-house legal department of a party, including their legal assistants, who are engaged [*20] only in providing legal advice to their employer and who do not take part in decisions of a business or competitive nature relating to pricing, marketing or other business strategies of their employer with regard to products covered by this litigation ("Qualifying In-House Litigation Counsel"). Qualifying In-House Litigation Counsel shall execute the Confidentiality Agreement, attached as Exhibit A to this Protective Order, prior to receiving access to "Highly Confidential" information. All other members of the in-house legal department of a party do not qualify as "counsel of record" for purposes of this Paragraph 5(a).

BY THE COURT:

Legrome D. Davis, J.

### ORDER

2005 U.S. Dist. LEXIS 23771, *

AND NOW, this 23D day of August 2005, following consideration of Defendant Dow Chemical Company, Defendant Union Carbide Corporation, and Defendant Kaneka Texas Corporation's Motion for Leave to File a Reply Brief in Support of their Motion to Amend the Stipulated Protective Order (Doc. No. 218), it is hereby ORDERED that Defendants' Motion (Doc. No. 218) is GRANTED. The Clerk of Court is directed to file Defendants' Reply Brief, attached as Ex. 2 to Defendants' Motion, with the Court.

BY THE COURT:

Legrome [*21] D. Davis, J.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I, W. Harding Drane, hereby certify that on January 23, 2007, the attached

document was electronically filed with the Clerk of the Court using CM/ECF which will

send notification of such filing(s) to the following and the document is available for

viewing and downloading from CM/ECF:

Kenneth Nachbar
David J. Teklits
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347

I hereby certify that on January 23, 2007, I have Federal Expressed the documents

to the following non-registered participants:

Aaron Barlow
Jenner & Block LLP
One IBM Plaza
Chicago, IL 60611

By: /s/ W. Harding Drane, Jr.
Richard L. Horwitz (#2246)
W. Harding Drane, Jr. (#1023)
Suzanne M. Hill (#4414)
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
wdrane@potteranderson.com
shill@potteranderson.com

676294