IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DOW CHEMICAL CANADA, INC. on its own behalf and as assignee of THE DOW CHEMICAL COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>HRD CORPORATION (d/b/a Marcus Oil & Chemical),<br><br>Defendant, Counterclaim Plaintiff,<br><br>DOW CHEMICAL CANADA, INC. on its own behalf and as assignee of THE DOW CHEMICAL COMPANY and THE DOW CHEMICAL COMPANY,<br><br>Counterclaim Defendants. | C.A. No. 05-23 (JJF) |

## AFFIDAVIT OF ABBAS HASSAN

STATE OF TEXAS           §
                                    §
COUNTY OF HARRIS    §

BEFORE ME, THE UNDERSIGNED AUTHORITY, on this day personally appeared Abbas Hassan, who after being by me first duly sworn, did upon his oath depose and state:

1. My name is Abbas Hassan. I am one of the two owners, the other being my brother Aziz Hassan, of HRD, Inc. ("HRD"), the Defendant and Counter-Plaintiff in the above litigation. Aziz Hassan and I are citizens of the United States and reside in Sugarland, Texas.

2. To my knowledge, neither HRD, nor any of its affiliates or employees (including myself and my brother), is violating any US laws with regard to sanctions against Iran. There has never been any discussion with anyone in Iran concerning the manufacture of metallocene wax for use in the adhesive industry, which is the subject of this lawsuit.

3. The manufacture of polyethylene wax using metallocene catalyst, which is the subject of this litigation, is totally separate from the methane to ethylene manufacturing process, which Dow has discussed with HRD in connection with an Evaluation Agreement that HRD and Dow entered into in November 2004. Ethylene is the chemical compound with the formula, CH2CH2. It is used primarily as an intermediate in the manufacture of many other chemicals. Ethylene is currently produced by steam cracking large hydrocarbon molecules. The HRD-Dow Evaluation Agreement involved a new method of creating ethylene. Rather than cracking large molecular weight hydrocarbons, the HRD method would combine small natural gas molecules to create ethylene.

4. Polyethylene wax is a component used to make hot melt adhesives. Hot melt adhesives are used to rapidly glue items such as cardboard boxes together. In the Supply Agreement, which Dow and HRD executed in July 2002, and a related Joint Development Agreement, Dow and HRD had agreed to work together to produce a superior product in the hot melt industry. The current lawsuit involves whether Dow added impermissible "light ends" to the HRD product, which Dow knew would make it unusable in the hot melt industry. In addition HRD asserts in its counterclaims that Dow is now testing a 2-pack product for use in the hot melt industry, and that the concept for

that product originated with HRD. The 2-pack product consists of wax and resin in a single product, and represents an improvement, because previously in this application the wax and resin were not combined into a single product.

5. My interest in possibly dealing with Iran only involved the conversion of natural gas to ethylene. As we told Dow from the beginning and prior to entering into the Evaluation Agreement, some of that technology could have originated in Iran. Contrary to the recent assertions of Dow, we have been consulting with the Secretary of State's office, the Office of Foreign Assets Control and Baker Botts, LLP, as well as Dow, to assure that HRD's actions are legal.

6. The US sanctions against Iran deal mostly with <u>exporting</u> to Iran. Because of the complex nature of the sanctions and the lack of specificity with regards to importing technology, in 2003, HRD, Inc. hired and consulted with former Secretary of State, James A. Baker, III, James A. Baker, IV and a team of other attorneys of the law firm Baker Botts, LLP to advise us in matters dealing with Iran. Baker Botts continues to represent us in that regard. We continue to heed the advice of Baker Botts with regards to any interaction with Iran. Baker Botts is recognized as a reputable firm with expertise in international trade, including issues related to trade sanctions against Iran.

7. In order to resolve the dispute over the production of documents, HRD offered to enter into a mutual Order with Dow where both parties agreed not to violate any laws dealing with Iran. Dow refused our offer.

8. Neither I, nor HRD, Inc. has any intention of exporting any metallocene or polyethylene wax technology to Iran.

9. I do not know Dow's intentions in this regard. I am aware of at least one meeting between Dow representatives, Tony Frencham, Richard Savage and a man from Dow in Brussels and representatives of Iran. This meeting occurred in Dubai in 2003. I do not know if metallocene or wax was discussed. I only know that my dealings with Mr. Frencham have been regarding metallocene and/or polyethylene waxes.

10. I am also aware that Dow has sent a representative to Iran regarding the conversion of methane to ethylene and other projects. His name was Page Shirtum. He traveled to Tehran, Iran and other sites owned and operated by NPC, an Iranian owned petrochemical company, in 2004.

11. Dow's Motions make numerous unfounded and untrue allegations.

12. On page 2 of its Brief in Support of its Motion for a Protective Order Regarding HRD's Exporting to Iran, Dow incorrectly asserts that HRD has intentions of becoming a manufacturer of metallocene polymer waxes. Neither I nor HRD has ever stated to Dow or anyone else that it intends to become a manufacturer of metallocene polymer waxes and we have no such intent. The idea is totally impossible because Dow and Exxon hold almost all of the patents regarding metallocene and the cost to design, construct and build a facility is cost prohibitive for a company such as HRD.

13. As Dow well knows from its six year long association with HRD, HRD does not "manufacture" wax of any kind; rather, HRD has been in the business of refining polyethylene wax. The distinction is this: HRD's plant in Houston refines polyethylene wax feedstock through what is essentially a distillation process that removes impurities from the feedstock, and then HRD blends various different waxes to get an end product tailored to the needs of our customers. Marcus Oil India does the same thing. In

contrast, the manufacture of wax through the process developed jointly with Dow makes wax from ethylene through a catalytic process that actually constructs hydrocarbon molecules of a specific configuration. The manufacture of wax can only be accomplished at chemical facilities that cost hundreds of millions of dollars to construct. In contrast, distillation and blending facilities such as those at HRD's plant in Houston and at Marcus Oil India cost less than ten million dollars.

14. Dow apparently has misrepresented HRD's intentions because of the requirements HRD set forth in the confidential settlement documents that Dow has now made non-confidential. Dow's speculation that HRD intends to manufacture wax is wrong. The statements to which Dow alludes were made in the course of attempting to negotiate a settlement of this lawsuit. In those confidential settlement discussions, HRD made a demand that Dow assign all rights to manufacture the "2 Pack" product to HRD, in consideration for HRD's payment of a substantial sum of money. Dow represented that it had the authority to do so, when in fact it was bound by an agreement concerning a "2 Pack" product with another company, HB Fuller. HRD suspected in advance Dow's relationship with Fuller, and Dow's later demand for the payment of a royalty to Fuller proves Dow's deceptive intent. HRD has never had any plans to produce metallocene wax, either by constructing its own plant or through any joint venture with another. The value to HRD in obtaining the exclusive control over the technology was to preclude Dow's entry into the market, either alone or with another, in competition with HRD's existing wax products.

15. Dow next incorrectly states that HRD's manufacturing facilities are closed indefinitely. HRD's wax refining facilities in Houston, Texas have been open and

running for several months. I noted with interest that Dow's "evidence" that our Houston plant was closed was based only upon a newspaper article written 22 months ago. Since the time the article cited by Dow was published, HRD has worked diligently with the appropriate authorities and has now received all necessary permits to operate. As of this date, the only construction needed to fully restore the Houston facility to its prior condition is the completion of office and warehouse space, and that construction is now nearing completion.

16. Dow next wrongfully asserts that it is aware of "red flags" regarding the possibility of illegal dealings with Iran on unrelated technology (conversion of natural gas to ethylene). Dow has had full knowledge of HRD's activities in the conversion of natural gas to ethylene for years and has actual knowledge that the activities are not illegal. To the contrary, Dow supported HRD's efforts to obtain approval of this technology from the Office of Foreign Assets Control as far back as July 23, 2003 (Exhibit 1). As noted above, HRD and Dow entered into the Evaluation Agreement in November 2004 with regard to this technology. That agreement is attached as Exhibit 13 to Dow's Brief. During the negotiations that preceded execution of the Evaluation Agreement, HRD's activities with Iran were disclosed to Dow, including the 2003 proposal with NPC mentioned by Mr. Frencham. Indeed after Mr. Frencham saw the agreement he was the person that told us we needed clearance from the Office of Foreign Assets Control to proceed any further. Dow was well aware that some of that technology could have originated in Iran. Prior to signing the Evaluation Agreement, Dow requested and HRD obtained an opinion letter from Baker Botts, LLP regarding the legality of HRD's activities. That opinion letter is dated September 10, 2004 and is attached to

Dow's Brief as Exhibit 14. The Evaluation Agreement continued in effect until the summer of 2006, when it was cancelled by HRD. At no time during the pendency of that agreement did Dow ever advise HRD that it was aware of any red flags, or suggest that either HRD or Dow was involved in any wrongful conduct. To the contrary, throughout the 20 or so months the agreement was in effect, HRD and Dow had countless meetings and Dow never expressed any concerns about HRD's or its own conduct with regard to Iran.

17. Almost every piece of evidence produced by Dow regarding so-called "red flags" related to Iran is associated with the natural gas to ethylene Evaluation Agreement and predates the execution of the agreement in November 2004 and the Baker Botts opinion letter. As of November 2, 2004, Dow was aware of HRD's activities with Iran, investigated them, supported them with the Office of Foreign Assets Control, and determined that there were no red flags. For example, Dow's Exhibit 1, is a letter dated July 10, 2003. It is a letter HRD supplied to Dow before it signed the Evaluation Agreement. Exhibit 2 is a letter dated October 21, 2003, and was in Dow's possession before it signed the Evaluation Agreement. Exhibit 3 is an Assignment that Dow had in its possession before it signed the Evaluation Agreement. Exhibit 5 is a document dated June 3, 2005, and sets forth the history of our dealings with this issue. Dow had that in its possession for well over a year before filing the present motions. Exhibit 9 is a Revocation of Assignment dated August 4, 2004. This predates the Evaluation Agreement and Dow had this document in its possession when it entered into the Evaluation Agreement. Exhibit 10 is an Australian Patent Application dated April 28, 2004 and predates the Evaluation Agreement and the Baker Botts opinion letter. Exhibits

11 and 12 are the same Chinese Patent application and are dated April 28, 2004 and predate the Evaluation Agreement. Exhibits 15 and 16 are the Canadian Patent Application, which is dated April 29, 2003 and predates the Evaluation Agreement. Exhibit 18 is a Combined Declaration, Priority Claim and Power of Attorney for Patent Application dated April 28, 2004 and predates the Evaluation Agreement. Dow met with Dr. Bagherzadeh on several during the pendency of the Evaluation Agreement and was well aware that he was residing in the United States. The bottom line is that Dow had no complaints about HRD's or its own activities *vis a vis* Iran while the Evaluation Agreement was in effect. The documents it now attaches as "red flags" are the very documents which did not constitute a red flag while the agreement was active, and none of them relate to metallocene wax, the subject of this lawsuit.

18.  To the best of my knowledge, none of the activities in which HRD has engaged regarding Iran, including many contacts involving Dow, have been in violation of any U.S. statute or regulation. All of those activities have been undertaken with the advice of counsel. The entity known as Marcus Oil & Chemical (Iran) is merely a rented office established for the purpose of maintaining a minimal presence in Iran against the possibility that relations between the U.S. and Iran might change in the future. That office conducts no business. Marcus Oil & Chemical (Iran) has no contracts with any Iranian entity, it does not conduct any business and it generates no income. Marcus Oil & Chemical (Iran) is owned by Marcus Oil & Chemical India, Ltd.

19.  I am aware of the declaration furnished by Tony Frencham in this matter, and his statement to the effect that I had entered into an agreement with an affiliate of NPC. There was at one time in about 2003 an agreement in principal with NPC which

was shown to Mr Frencham. When I learned that there might be regulations prohibiting trade with Iran, I sought qualified legal counsel and immediately took the corrective action prescribed. The agreement mentioned by Mr. Frencham in his affidavit was void as a matter of law and is of no effect. There are no other agreements, written or verbal that relates in any fashion to any Iranian entity, and Mr. Frencham and Dow were aware of those facts at the time Dow signed the Evaluation Agreement in 2004.

20.    Dow also complains that I am an owner in Marcus Oil & Chemical India, Ltd. My ownership in that organization and its operation has been disclosed to the United States government and to Baker Botts, LLP. Dow is also fully aware of the nature of the operations of Marcus Oil & Chemical India, Ltd. Dow knows that the plant in India is incapable of manufacturing wax using any Dow technology, and that it, like the Houston plant, merely refines and packages wax products using universally known and commonly used techniques. If Dow has construed any previous statement made by me or HRD to mean that the plant in India "has nothing to do with wax", as opposed to "nothing to do with the manufacture of wax" that is mistaken. To my knowledge, Marcus Oil & Chemical India, Ltd. is not violating any laws concerning doing business in or with Iran.

Further Affiant sayeth not.

_____
Abbas Hassan

SUBSCRIBED and SWORN to before me on this 23rd day of January, 2007.


CINDY S. MEDCHILL
MY COMMISSION EXPIRES
MARCH 2, 2008

_____
Notary Public - State of Texas
My commission expires: 3-2-08

# EXHIBIT 1



*Did Bill get This?*

The Dow Chemical Company
400 West Sam Houston Pkwy, S
Houston, Texas 77042-1299

July 23, 2003

R. Richard Newcomb
Director
Office of Foreign Assets Control
U.S. Department of the Treasury
Washington, D.C. 20220

    Re: Request for Interpretation of Iranian Transaction Regulations of Marcus Oil and Chemical

Dear Mr. Newcomb:

By letter addressed to you dated July 10, 2003, Marcus Oil and Chemical ("Marcus") requested that OFAC grant Marcus a license to import from Iran technology related to an experimental process for converting methane to ethylene. Marcus has contacted The Dow Chemical Company ("TDCC") to ask whether, in the future, Dow would be interested in learning more about and possibly developing or using this technology if it can be imported.

TDCC believes that discovery and development of a viable process for converting methane to ethylene would be of great value to the U.S. petrochemical industry directly and the U.S. economy as a whole. TDCC continues to be interested in any developing technology that might make this conversion both technically and commercially possible, and that can be reviewed and obtained consistently with U.S. law. Consequently, TDCC supports OFAC's granting of any appropriate license for the import of this methane to ethylene technology.

Sincerely,

Richard Savage
Director, Business Development
Olefins & Feedstocks

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

**CERTIFICATE OF SERVICE**

I, W. Harding Drane, hereby certify that on January 23, 2007, the attached document was electronically filed with the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the following and the document is available for viewing and downloading from CM/ECF:

Kenneth Nachbar
David J. Teklits
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347

I hereby certify that on January 23, 2007, I have Federal Expressed the documents to the following non-registered participants:

Aaron Barlow
Jenner & Block LLP
One IBM Plaza
Chicago, IL 60611

By: /s/ W. Harding Drane, Jr.
Richard L. Horwitz (#2246)
W. Harding Drane, Jr. (#1023)
Suzanne M. Hill (#4414)
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
wdrane@potteranderson.com
shill@potteranderson.com

676294