# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DOW CHEMICAL CANADA INC. on its own behalf and as assignee of THE DOW CHEMICAL COMPANY, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HRD CORPORATION (d/b/a Marcus Oil & Chemical) | ) ) | Case No. 05-023 (JJF) |
| | ) | |
| Defendant, Counterclaim Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DOW CHEMICAL CANADA INC., on its own behalf and as assignee of THE DOW CHEMICAL COMPANY, and THE DOW CHEMICAL COMPANY, | ) ) ) ) | |
| | ) | |
| Counterclaim Defendants. | ) | |

## DOW'S REPLY BRIEF IN SUPPORT OF ITS MOTION
## FOR A PROTECTIVE ORDER REGARDING HRD'S EXPORTING TO IRAN

Harry J. Roper
Raymond N. Nimrod
Aaron A. Barlow
JENNER & BLOCK LLP
330 N. Wabash Ave.
Chicago, IL 60611
Telephone: 312 222-9350

MORRIS, NICHOLS, ARSHT
    & TUNNELL LLP
Kenneth Nachbar (#2067)
Samuel T. Hirzel (#4415)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
Attorneys for Plaintiff
    Dow Chemical Canada Inc.
and Counterclaim Defendant
    The Dow Chemical Company

February 6, 2007

# TABLE OF CONTENTS

I.    SUMMARY OF ARGUMENT ..................................................................................1

II.   ARGUMENT ....................................................................................................4

   A.   HRD fails to justify or explain the red flags pointing to Iranian export activity................................................................................................5

      1.   HRD's argument that Dow seeks to delay discovery and long ago knew of the grounds for this motion is false.................................................5

      2.   HRD either confirms or fails to explain all red flags identified by Dow..........................................................................................9

      3.   Abbas Hassan's affidavit is at best unreliable ..........................................13

   B.   The current protective order will not provide the level of protection Dow needs to comply with the law.................................................................15

CONCLUSION.....................................................................................................17

i

## TABLE OF AUTHORITIES

**Cases**

*Max's Seafood Cafe v. Quinteros*,
　176 F.3d 669 (3rd Cir. 1999) ................................................................................................. 16

Plaintiffs/Counterclaim Defendants Dow Chemical Canada and The Dow Chemical Company ("Dow") submit this reply in support of their motion for a protective order precluding HRD from having access to Dow's confidential information so Dow can comply with its obligations under export control and economic sanctions laws regarding exporting technology to Iran.

## I.        SUMMARY OF ARGUMENT

HRD's responses to Dow's motion are meritless.  Dow's motion raised two issues: (1) that certain facts put Dow on notice that HRD and/or the Hassans may export technology to Iran and (2) the current protective order, allowing HRD and the Hassans to view all of Dow's confidential information, does not satisfy Dow's obligations under the U.S. export control and economic sanctions laws.

1.        With respect to Dow being on notice regarding exports to Iran, HRD's response can be divided into two categories:

a.        First, HRD argues that Dow knew all about HRD's Iranian activities relating to the methane conversion technology a long time ago.  Therefore, HRD argues, Dow has filed this motion solely to delay production of documents.

However, Dow offered to produce its documents to HRD's counsel and independent experts, but HRD refused this offer.  Now HRD argues, with no basis, that it expected Dow to object to Dr. John Ewen having access to Dow's confidential documents.  Dow never made that objection, and hereby expressly states that it has no objection to Dr. Ewen reviewing Dow's confidential and highly confidential documents.

Furthermore, up to October 2006, HRD's Iranian activities did not relate to the metallocene wax manufacturing process at issue in this case.  In October 2006, HRD indicated *for the first time* that it "expect[ed] Dow to actively cooperate and

teach [HRD's] manufacturer how ***to construct a plant to manufacture products with Dow metallocene catalysts***."  (Exh. 1 at ¶ 3) (emphasis added).  That fact, coupled with HRD's known ties to Iran raised a red flag that HRD may export technology to Iran.  Furthermore, what Dow knew regarding HRD's activities was almost entirely based on HRD's representations regarding the nature of the methane conversion technology, now known to be false.

        b.      Second, HRD purports to explain the red flags noted by Dow.  However, HRD fails to do so, and in fact, raises new ones.

        i.      For example, HRD's statements regarding the agreement with Iran's state owned oil company, National Petrochemical Company ("NPC"), and the ownership of Marcus India unequivocally show that HRD misrepresented key facts to the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC").  HRD told OFAC that Abbas Hassan "assisted in arranging an agreement between Marcus Oil India and NPC."  (D.I. 75 at 2).  HRD also told OFAC that Marcus India was not controlled by any U.S. individuals or corporations, thereby exempting Marcus India from the Iranian Transactions Regulations on the ground that Marcus India is not a "U.S. person."  (*Id.*).  However, HRD now acknowledges that Abbas Hassan "entered into an agreement with an affiliate of NPC" and that he and his brother, U.S. citizens, are owners of Marcus India.  (D.I. 84 at ¶19); (D.I. 82 at 3).  Thus, HRD's representation to OFAC that Mr. Hassan only "assisted in arranging an agreement between Marcus Oil India and NPC" is patently false.  (D.I. 75 at 2).  The Hassans' ownership and authority to enter into agreements on Marcus India's behalf show a level of control inconsistent with HRD's statements to OFAC that, other than an "investment"

by HRD, Marcus India "was established and is operated by Indian citizens."  (D.I. 75 at 2).

ii.    HRD's attempt to address its blatant misrepresentation to this Court that the businesses of Marcus Iran and Marcus India have nothing to do with wax makes no sense at all.  HRD's only statement on this issue is:

> If Dow has construed any previous statement made by Mr. Hassan or HRD to mean that the plant in India "has nothing to do with wax," as opposed to "nothing to do with the manufacture of wax," that is mistaken.

(D.I. 82 at 7).  However, it is not a question of Dow construing anything.  HRD stated unequivocally to this Court:

> With respect to Dow's irrelevant objections based upon HRD having business operations in **_Iran and India (businesses that have nothing to do with wax),_** any documents produced by Dow that are marked "highly confidential" cannot be shared with HRD pursuant to an existing protective order of this Court.

(D.I. 71 at 4) (emphasis added).  There is simply no other way to construe this statement. At best, this statement and HRD's inability to explain it show that HRD is willing to make completely unreliable statements of fact to this Court in order to obtain the relief it requests.

iii.    Rather than address the red flags showing Marcus Iran is involved in the wax business, HRD, still refusing to produce any documents on Marcus Iran, simply asserts that its Indian and Iranian affiliates are not involved in any business in Iran and have no agreements, "whether written or verbal, that relate in any fashion to any Iranian entity."  However, Indian export records Dow recently obtained show that in December 2006, five shipments of "Polyethylene Wax" grades M300 and M500 were exported to Iran from the port of Haldia and Calcutta, India.  Haldia is where

3

Marcus India's plant is located, and M300 and M500 are two grades of Marcus wax. Thus, HRD's affiliates are actually exporting wax products, directly or indirectly, to Iran and therefore must have agreements related to Iranian entities. HRD's blatant misrepresentations of the facts regarding its business with Iran simply raise more red flags.

> 2.   With respect to the second issue raised by Dow's motion, namely whether the current protective order is adequate, HRD contends no changes need be made in the protective order. Specifically, HRD argues that, even if there are red flags showing HRD will export to Iran, Dow is protected by the Hassans' promise to abide by the protective order in this case. However, given the Hassans' repeated misrepresentations regarding their relations with Iran, Dow cannot satisfy its obligations under U.S. export control and economic sanctions laws by burying its head in the sand and assuming that, even though the Hassans appear to have misrepresented key facts to this Court and the federal government on multiple occasions, they will abide by a protective order.

## II.    ARGUMENT

> There are two issues relevant to this motion. The first issue is whether Dow has an obligation, under U.S. export control laws, to withhold confidential information from HRD and the Hassan brothers. The second is what form of protective order is necessary if that is the case. HRD's responses on each of these issues are meritless, as discussed in the sections below.

A.    **HRD fails to justify or explain the red flags pointing to Iranian export activity**

The first issue is whether the facts identified by Dow constitute red flags sufficient to trigger an obligation by Dow to withhold technology from the Hassan brothers and HRD.

1.    **HRD's argument that Dow seeks to delay discovery and long ago knew of the grounds for this motion is false**

HRD's principal response to the red flags Dow has identified is to argue that "Dow's allegations on Iran are nothing more than an attempt to sidestep the real issue precipitating its motion - Dow's continuing, unreasonable delay in complying with HRD's discovery requests." (D.I. 82 at 27-28). As alleged proof of this contention, HRD argues that many of the documents that Dow cites were known to Dow before Dow entered the Evaluation Agreement in November 2004.

However, with respect to HRD's contention that Dow is attempting to delay production of its documents, Dow offered to produce its documents to HRD's counsel and independent experts, but HRD's counsel refused to accept Dow's documents on that basis. (D.I. 73 [Exhs. 21, 22]). In fact, the very relief that Dow is seeking in this motion is that Dow be allowed to produce confidential documents to HRD's counsel and independent experts. (D.I. 72). Consequently, HRD's contention that Dow's motion is motivated by attempts to delay is completely false.

Turning to Dow's alleged prior knowledge of the red flags, HRD argues that Dow entered an Evaluation Agreement in November 2004 and "had full knowledge" of HRD's Iranian activities with respect to methane conversion technology. (D.I. 82 at 28). However, that argument is both irrelevant and false.

First, this argument is irrelevant because before October 2006, Dow was not aware that HRD's Iranian activity had anything to do with exporting metallocene waxes or technology to Iran.  However, in October 2006, HRD indicated it intended to work with another manufacturer to make metallocene waxes.  That changed the significance of HRD's Iranian ties.  Specifically, in October 2006, HRD stated that "we expect Dow to actively cooperate and teach our manufacturer how to construct a plant to manufacture products with Dow metallocene catalysts."  (Exh. 1 at ¶ 3).  HRD also demanded "the use of Dow plant designs, plant specifications, plant operating manuals and manufacturing procedures as well as the right to interview Dow employees concerning *how to manufacture* Two Pack products using metallocene technology." (D.I. 73 [Exh. 6]) (emphasis added).

As Dow explained in its opening brief, Dow's attempts to investigate whether HRD had any Iranian ties related to waxes were rebuffed by HRD, further heightening suspicions that HRD may export wax technology to Iran.  (D.I. 73 at 12-13). Given Dow's existing understanding of HRD's Iranian contacts, Dow could not simply bury its head in the sand.  Dow is required, based on federal agencies' published interpretations of the export control and economic sanctions laws, to investigate and explain the red flags or else withhold confidential information from HRD.  (D.I. 73 [Exhs. 23, 24]).

Second, HRD's contention that Dow had full knowledge of HRD's Iranian activities is simply incorrect.  It is now clear that Dow did not have either full or accurate knowledge of those activities.  Dow's understanding of HRD's Iranian business was

based almost entirely on what HRD told Dow.  As Dow showed in its opening brief, much of what HRD told Dow is false.  (D.I. 73 at 10-12).

Specifically, as Dow pointed out in its opening brief, the November 2004 Evaluation Agreement contains an entire section called "REPRESENTATIONS" in which "HRD represents and warrants" a number of facts.  (D.I. 73 at 10); (D.I. 73 [Exh. 13]).  In this section of the Evaluation Agreement, HRD represented that the technology at issue ***did not*** originate in Iran, but instead was "entirely of United States origin."  (D.I. 73 [Exh. 13]).  In preparing this motion, Dow discovered that this statement appears to be false.  (*Id.* at 10-12).  Dow pointed this out in its opening brief, and HRD does not dispute that its statement on the origin of the technology in the Evaluation Agreement is anything but false.  (*Id.* at 10).

HRD also argues that Dow's own letter to OFAC expressing support for allowing the Iranian technology to be imported into the United States shows that "the Hassans were working jointly with Dow in connection with the methane-to-ethylene technology."  (D.I. 82 at 30).  HRD argues that this fact is "clear and convincing evidence that HRD and the Hassans are abiding by the law."  (*Id.*).  However, the Dow letter expresses support for a license to import the technology of ***Iranian origin***, not the technology that HRD represented was "entirely of ***United States origin***."  (D.I. 84 [Exh. 1]); (D.I. 73 [Exh. 13]) (emphasis added).  To Dow's knowledge OFAC has never granted HRD a license to import the Iranian technology.  Consequently, Dow has refused to evaluate technology of Iranian origin.  (Exh. 2).

Subsequent to Dow's refusal to evaluate the Iranian technology, HRD induced Dow to enter into the November 2004 Evaluation Agreement by representing

7

that it had *new* technology, related to the Iranian technology, but "entirely of United

States origin."  (D.I. 73 [Exh. 13]).   HRD also represented that the technology was

developed *after* Dr. Ebrahin Bagherzadeh became a United States resident.  (*Id.*).

However, the patent application covering this technology was filed at a time when Dr.

Bagherzadeh stated under oath he was a citizen of Iran.  (D.I. 73 [Exh. 18]).  Obviously,

the technology could not have been invented *after* the patent application covering it was

filed.  These documents were not publicly available until after Dow executed the

Evaluation Agreement.

 HRD's only attempt to explain this misrepresentation is to state that Dr.

Bagherzadeh resided in the United States during the time "the Evaluation Agreement was

in effect."  (D.I. 82 at 32).  The question is whether Dr. Bagherzadeh resided in the

United States when he began developing the technology, not whether he resided in the

United States months later when Dow agreed to evaluate the technology.

 HRD also completely ignores the facts that the United States patent that

HRD owns contains claims that are identical in scope to claims in a Canadian patent

application owned by NPC and that HRD and NPC are the current co-owners of Chinese

and Australian patent applications.  (D.I. 73 at 9, 11); (D.I. 73 [Exhs. 10-12, 15-17]).

HRD also completely ignores the obvious inference that NPC would not have given this

technology to HRD for free; therefore, there must be some contingent obligation

requiring future payments from HRD, Marcus India, Marcus Iran and/or the Hassan

brothers themselves.

8

Thus, these facts merely show that Dow was working with HRD only because HRD concealed the Iranian origin of this technology from Dow and represented that the technology at issue was "entirely of United States origin."  (D.I. 73 [Exh. 13])

> **2.    HRD either confirms or fails to explain all red flags identified by Dow**

As Dow explained in its opening brief, guidance from the federal agencies that enforce the export control laws and economic sanctions laws indicates that unless Dow can "explain or justify" these red flags, Dow "run[s] the risk of having had 'knowledge' that would make [Dow's] actions a violation."  (D.I. 73 [Exh. 24]).

In its brief, Dow identified several key red flags.  (D.I. 73 at 15).  HRD simply fails to explain these red flags.  Most of HRD's arguments are primarily focused on misrepresenting the issues as whether certain *documents* are red flags, not, as required by the law, whether certain *facts* known to Dow are red flags.  HRD's specific responses to the key red flags identified by Dow show that HRD is unable to satisfactorily explain any of them.

In the paragraphs below, we discuss each of the key red flags listed on page 15 of Dow's opening brief and HRD's attempts to explain it:

**HRD intends to manufacture metallocene waxes**.  HRD states, "HRD has never had any plans to manufacture metallocene wax, either by constructing its own plant or through any joint venture with another."  (D.I. 82 at 32).  However, as pointed out above,  HRD's statements last fall show HRD does intend to do just that.  Specifically, in October, HRD made clear that "we expect Dow to actively cooperate and *teach our manufacturer* how to construct a plant to manufacture products with Dow metallocene catalysts."  (Exh. 1 at ¶ 3) (emphasis added).  HRD also demanded "the use

of Dow plant designs, plant specifications, plant operating manuals and manufacturing procedures as well as the right to interview Dow employees concerning ***how to manufacture*** Two Pack products using metallocene technology." (D.I. 73 [Exh. 6]) (emphasis added).

HRD argues that it only sought rights to the technology in order to "preclude Dow's entry into the market, either alone or with another, in competition with HRD's existing wax products." (D.I. 82 at 32). This explanation is totally inconsistent with HRD's demand for "Dow to actively cooperate and teach our manufacturer how to construct a plant." (Exh. 1 at ¶ 3).

This demand also defeats HRD's argument that it could not build a plant because a plant would cost hundreds of millions of dollars. Obviously, HRD expects to find a manufacturer to build the plant with HRD--whether in Iran, India or somewhere else in the world. And Dow's "countless patents in this area" would not protect Dow in Iran, where Dow is forbidden to obtain intellectual property rights by the very export control and economic sanctions laws at issue here.

**HRD has no facility in the U.S. to manufacture metallocene waxes**. While according to HRD's letterhead, HRD at one time (and allegedly now) manufactured waxes in its Houston plant, HRD agrees it cannot make ***metallocene*** waxes in the United States. (D.I. 75 at 2); (D.I. 82 at 4); (D.I. 84 ¶15).

**HRD has other facilities in India and Iran**. Now HRD admits it has a plant in India that produces wax, but denies that Marcus Iran is anything but a "rented office." (Exh. 3); (D.I. 82 at 6). However, HRD has wax-related business with Iran, either involving its Marcus Iran subsidiary or Marcus India or both. Specifically, India

export records for wax products show that in December 2006, approximately five tons of Marcus polyethylene wax was exported to Iran from the port serving Marcus India.  (Exh. 4 at pp. 3, 6 & 9, rows 118-122, highlighted in gray).  This wax was designated M300 and M500, both of which are Marcus Oil commercial wax grades.  (Exh. 5).  Furthermore, Marcus Iran's letterhead states "Superior Quality High Performance Waxes."  (D.I. 73 [Exh. 2]).  In any event, if Marcus Iran truly does no business and has no income, then corporate documents would reflect this.  However, despite repeated requests, HRD has refused to produce any.

**Dow requested information on Marcus Oil Iran's business and HRD's plans for the metallocene technology, but HRD refused to provide any information**.  HRD simply denies it has any "plans" in spite of the fact that it demanded that Dow teach HRD's manufacturer how to make metallocene waxes.  (D.I. 84 ¶ 8); (Exh. 1).

**HRD refused to accept Dow's confidential documents on an outside-counsel/independent-expert-only basis**.  HRD refused to accept Dow's documents on this basis and offers no explanation why.  (D.I. 73 [Exhs. 21-22]).  HRD suggests that Dow will object to HRD's independent expert, John Ewen, having access to Dow's documents.  (D.I. 82 at 18).  However, that suggestion has no basis.  Dow has never objected to Dr. Ewen seeing even the Highly Confidential documents, and hereby affirmatively states Dow will not object to HRD designating Dr. Ewen as an independent expert under the protective order proposed for this motion.

**HRD admitted that it violated the Iranian Transactions Regulations in the past by entering an agreement with Iran's state-owned oil company**.  HRD does not deny that this violation occurred, but instead attempts to explain this by stating

11

that "there are no other agreements by the Hassans, HRD, or any affiliates, whether written or verbal, that ***relate in any fashion to any Iranian entity.***"  (D.I. 82 at 7) (emphasis added).  However, there must be other agreements, for example, concerning the importation into Iran of Marcus wax grades M300 and M500, discussed above. Furthermore, Abbas and Aziz Hassan both signed assignment agreements with NPC that HRD filed in the U.S. Patent Office.  (D.I. 73 [Exh. 4]).  And HRD is currently the co-owner of Chinese and Australian patent applications with NPC.  (D.I. 73 [Exhs. 10-12]).

HRD also argues that the 2003 agreement between Marcus India/Abbas Hassan and NPC is "void as a matter of law and is of no effect."  (D.I. 82 at 7). However, it apparently is not void in China or Australia, and is probably not void in India or Iran.  If HRD has not formally revoked the agreement with NPC, it is still in effect somewhere.

### HRD misrepresented to this Court that Marcus Oil Iran and Marcus Oil India have nothing to do with wax.  HRD only addresses this by stating:

> If Dow has construed any previous statement made by Mr. Hassan or HRD to mean that the plant in India "has nothing to do with wax," as opposed to "nothing to do with the manufacture of wax," that is mistaken.

(D.I. 82 at 7).  However, it is not a question of Dow construing anything.  HRD stated unequivocally to this Court:

> With respect to Dow's irrelevant objections based upon HRD having business operations in ***Iran and India (businesses that have nothing to do with wax),*** any documents produced by Dow that are marked "highly confidential" cannot be shared with HRD pursuant to an existing protective order of this Court.

(D.I. 71 at 4) (emphasis added).  There is simply no other way to construe this statement. At best, this statement and HRD's inability to explain it show that HRD is willing to

make completely unreliable statements of fact to this Court in order to obtain the relief it requests.

### 3.    Abbas Hassan's affidavit is at best unreliable

Even if any of the red flags could be explained, HRD's only basis for doing so is the affidavit of Abbas Hassan.  (D.I. 84 ¶¶ 2, 5, 8).  However, this affidavit is so filled with misrepresentations of material facts that, even if the Court does not find that Mr. Hassan is deliberately attempting to mislead the Court, the affidavit is at best unreliable.

Mr. Hassan states in his affidavit that "HRD does not 'manufacture' wax of any kind;" instead, Mr. Hassan says, HRD "refines" polyethylene wax.  (D.I. 84 ¶ 13).  HRD has repeatedly represented that it "produces" waxes, and whether this is the same as manufacturing them or not, Marcus Oil letterhead includes on the bottom of its letterhead the following statement: "**Manufacturers of Polyethylene Waxes."**  (D.I. 75 at 2).  Furthermore, in its pleadings, HRD contends that Dow has misappropriated information regarding HRD's "manufacturing processes."  (D.I. 25 ¶¶ 130, 132.)

Mr. Hassan also states in his affidavit that other than the 2003 agreement he signed with Iran's state-owned oil company, NPC, "[t]here are no other agreements…that relates in any fashion to any Iranian entity."  (D.I. 84 ¶19).  However, Mr. Hassan and his brother Aziz both signed an assignment agreement with NPC that HRD filed in the U.S. Patent Office.  (D.I. 73 [Exh. 9]).  And HRD and NPC are currently joint owners of related Chinese and Australian patent applications.  (D.I. 73 [Exhs. 10-12]).  This co-ownership obviously did not arise by chance; there must be an agreement that led to it.

13

Mr. Hassan states that he is an owner of Marcus India and he is a U.S. citizen. (D.I. 84 ¶¶1, 20). However, in Aziz Hassan's letter to OFAC, he represented that HRD's interest in Marcus India was only an "investment" which did not give HRD control of Marcus India. Other than this investment, Aziz Hassan stated, Marcus India "was established and is operated by Indian citizens." (D.I. 75 at 3). The Hassans made these statements to OFAC to support an argument that Marcus India is not subject to the Iranian Trade Regulations because it is not controlled by any U.S. persons. (*Id.*). Now they submit an affidavit to this Court contradicting those facts. Consequently, they either misrepresented facts to OFAC or this Court.

Mr. Hassan states that HRD's Houston plant has "been open and running for several months." (D.I. 84 ¶15). However, in discovery, when Dow requested documents relating to any ongoing business in the U.S., HRD responded--on December 5, about two months ago--that none exist. Specifically, Dow sought in discovery documents from 2004 up to the present relating to "HRD's plans, proposals, marketing activities…or business in the area of the manufacture, extraction and/or sale of waxes." (Exh. 6 at Request No. 108). HRD responded that all documents except a few emails were destroyed in the December 2004 fire and explosion. (Exh. 7 at Request 108 & Response). If HRD's plant has been open and running for several months, HRD would have documents relating to its waxes that were responsive to this document request.

Consequently, Mr. Hassan's statements are at best totally unreliable and should not be given any weight.

14

**B.**     **The current protective order will not provide the level of protection Dow needs to comply with the law**

HRD argues that even if there are red flags imposing an obligation on Dow with respect to the export control and economic sanctions laws, the current protective order need not be changed.  Under the current order, all Confidential information, but not Highly Confidential information, may be viewed by the Hassan brothers or any other employee of HRD.  HRD argues that Dow is protected because the Hassans will have to sign undertakings promising not to disclose Dow confidential information.

However, Dow cannot bury its head in the sand and ignore HRD's actions showing that HRD and the Hassans cannot be trusted to follow the terms of a protective order.  As the evidence supporting this motion shows, Dow is aware of evidence showing that (1) the Hassans have violated the export control laws in the past and are doing so still, (2) the Hassans have misrepresented facts to this Court and/or OFAC and (3) Abbas Hassan submitted a sworn affidavit with false statements.  (D.I. 73 at 8-12); (D.I. 84).

OFAC and the Bureau of Industry and Security ("BIS") would likely not excuse Dow if, in spite of Dow's knowledge of these facts, Dow blindly assumed the Hassans would not violate a protective order.

Similarly ineffective is the Hassans' "promise" not to export to Iran.  The Hassans have made representations to Dow in the past in connection with the Evaluation Agreement (D.I. 73 at 10-12) which Dow now knows to be false, and HRD refuses to even address them in its response.  Dow cannot reasonably assume that the Hassans will abide by a promise not to export to Iran.  Indeed, the guidance from OFAC indicates that red flags must be explained or justified.  (D.I. 73 [Exhs. 23, 24]).  They cannot simply be

15

ignored by obtaining a perfunctory "confirmation" that someone suspected of illegally trading with Iran will not do so in this instance. Under the law, such promises, if inconsistent with facts, are meaningless. (D.I. 73 [Exhs. 23, 24]).

HRD also cites caselaw to support the proposition that protective orders do not impose a duty on Dow to police others' compliance. *Max's Seafood Cafe v. Quinteros*, 176 F.3d 669, 673-74 (3rd Cir. 1999) (D.I. 82 at 33). However, the export control and economic sanctions laws do precisely that in the situation where red flags are present. (D.I. 73 [Exhs. 23-24]).

HRD also argues that Dow assumes that HRD's counsel and independent experts will violate this Court's orders. (D.I. 82 at 20-21). There is no basis for that argument. The very relief Dow proposes here is that HRD's counsel and independent experts, such as Dr. Ewen, have access to all documents produced by Dow.

**CONCLUSION**

For all of the foregoing reasons, Dow's motion for a protective order should be granted.  The Court should enter an order limiting access to Dow's Confidential information and Highly Confidential information to outside counsel and approved independent experts, such as Dr. Ewen.

MORRIS, NICHOLS, ARSHT &
TUNNELL LLP

/s/ Samuel T. Hirzel

Kenneth Nachbar (#2067)
Samuel T. Hirzel (#4415)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
Attorneys for Plaintiff
  Dow Chemical Canada Inc.
and Counterclaim Defendant
  The Dow Chemical Company

OF COUNSEL:

Harry J. Roper
Raymond N. Nimrod
Aaron A. Barlow
JENNER & BLOCK LLP
330 N. Wabash Ave.
Chicago, IL 60611
(312) 222-9350

Dated:  February 6, 2007

## CERTIFICATE OF SERVICE

I hereby certify that on February 6, 2007 I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

> Richard L. Horwitz
> W. Harding Drane, Jr.
> Susanne M. Hill
> POTTER ANDERSON & CORROON LLP
> Hercules Plaza, 6th Floor
> 1313 N. Market Street
> Wilmington, Delaware 19899-0951
> (302) 984-6000 (Tel)
> (302) 658-1192 (Fax)

I also certify that copies were caused to be served on February 6, 2007 upon the following by Federal Express and Facsimile:

> William Ferebee
> Michael Landrum
> O'DONNELL FEREBEE MEDLEY & KEISER, PC
> 450 Gears, Eighth Floor
> Houston, TX 77067-4512
> (281) 875-8200 (Tel)
> (281) 875-4962 (Fax)

*/s/ Samuel T. Hirzel*
Samuel T. Hirzel (#4415)