# Exhibit 1

# Redaction Key

| Code | Description |
|------|-------------|
| A | Proprietary business information unrelated to wax, adhesives or the issues identified in this case (e.g. Dow's cost for ethylene). |
| B | Dow's internal code names for each piece of equipment for the portions of the Sarnia plant consisting of the reactor, post reactor heaters and solvent recycle systems. |
| C | Information on Dow commercial and experimental catalysts not used at either Sarnia or Freeport for purposes of work for HRD (e.g. ESI catalysts). |
| D | Information on Dow commercial and experimental process conditions and equipment not used for the purposes of the work done for HRD (e.g. ESI, Dowlex, plants in Plaquemine, LA). |
| E | Information on actual catalyst efficiency data and costs for catalysts for the work done for HRD at Sarnia. |
| F | Diagrams and flow charts of sections of the plant or specific equipment that relates to the proprietary aspects of the Dow solution process, except for portions of flow charts showing the final stage of product isolation from ████████████████████ |
| G | Methods/equipment used for on-line analysis for process control in Dow plants. |
| H | Manufacturer names for equipment where identity of the manufacturer would reveal key aspects of the Dow solution manufacturing system that are not related to the production or removal of light ends. |
| I | Information related to the operating conditions of the reactor, such as ████████ ███████████████████████████████████ |
| J | Information relating to details of the construction of the reactor equipment or piping such as reactor type or reactor feed systems. |
| K | Information relating to the operating conditions of the devolatizer system with the exception of ████████████ |
| L | Information relating to details of the construction of the process equipment or piping in the devolatizer system. |
| M | Information relating to the operating conditions of the ██████████████████ ████████████ |
| N | Information relating to the details of the construction of the process equipment or piping in the ████████████████████ |
| O | Information on business plans or research projects that are not related to wax or adhesives. |
| P | Potential third party confidential information where we have been unable to obtain consent to disclose their information pursuant to the protective order. |
| Q | Information subject to the attorney/client privilege or the work-product immunity. |

# Exhibit 2

No. 05-023                                  Abbas A. Hassan
Dow Chem vs. HRD vs. Dow Chem               February 18, 2008

Page 111

1    something that you have to really find out, how the

2    market is receptive to the product and -- and

3    understand.

4         Q.    So when did Tom Quinn test the Sarnia product?

5         A.    Dow was sending it direct to Tom Quinn.

6         Q.    Okay.  And now, if you could answer my

7    question:  When did Tom Quinn test the Sarnia product?

8         A.    I don't recall the date off the top of my

9    head.

10        Q.    Do you know what year?

11        A.    It was right after the Sarnia plant was

12   started.

13        Q.    Okay.  And do you know what Tom Quinn

14   concluded?

15        A.    I don't have the document in front of me.

16        Q.    Do you have any idea?

17        A.    Not off the top of my head, no.

18        Q.    So sitting here today, you have no idea

19   whether Adherent found it good, bad or indifferent?

20        A.    We knew, you know, the test failed.  And

21   that's all I understand, the test failed and that it was

22   failing by 5 to 7 degrees.

23        Q.    And so that you do know with that document?

24        A.    Yes.

25        Q.    Okay.  And what was wrong with it, according

Edmondson Reporting Service
281-376-3532

No. 05-023                                    Abbas A. Hassan
Dow Chem vs. HRD vs. Dow Chem              February 18, 2008

Page 112

1    to Tom Quinn?

2        A.    Tom Quinn was looking at it, you know, as a --

3    as the product testing, you know.  He never, you know,

4    concluded as to what is the issue.

5            We came up, you know, with the answer

6    after, you know, Dave Edwardes said that they were

7    adding the product in.  That's when we realized there

8    what was the other issue.  You know, we did not know

9    before with 100 percent accuracy that the product had

10   the light-ends until Dave Edwardes said we were putting

11   it back in.

12       Q.    Was that before or after it was tested by

13   Tom Quinn?

14       A.    I believe it was after.

15       Q.    So Dave Edwardes told you this after the

16   testing by Tom Quinn?

17       A.    I think, you know, it was in -- we had over 30

18   or 50 railcars of the product made different kinds.  And

19   in one of the conversations one evening, you know, he

20   told Craig, he said:  We're adding it back in, because

21   we don't have no way of disposing of it all.

22            You know, so I don't recall exactly what

23   date, you know, that thing happened.  You know, but

24   subsequently I had meeting with Kurt Swogger and I had

25   an exchange of e-mails with him.  Maybe one railcar out

# Exhibit 3

No. 05-023                              Aziz A. Hassan
Dow Chem vs. HRD vs. Dow Chem           February 18, 2008

Page 50

1  polyethylene, it is a broad molecular weight.  In the

2  manufacturing process, they were making a low molecular

3  weight product which, in some instances, is liquid at

4  room temperature.  And it may be liquid at a little bit

5  higher temperature than the melting point of the

6  product.

7            When they were taking that Isopar G

8  solvent material out, this was coming over with it.  And

9  they would take the Isopar G out of whatever they took

10 off and put the rest of it back in the product.

11       Q.   (By Mr. Weissmann)  When you say the rest of

12 it, what are you referring to?

13       A.   That low molecular weight product.

14       Q.   Is that a -- what you referred to as the

15 solvent?

16       A.   Yes.

17       Q.   When you say solvent, are you -- is that

18 interchangeable in your mind with the term light-ends?

19       A.   Light-ends are a solvent, yes.

20       Q.   Okay.  And from your perspective, are those

21 one in the same thing?

22       A.   It is.

23       Q.   So you use those interchangeably?

24       A.   That's correct.

25       Q.   And I think you mentioned that there were

Edmondson Reporting Service
281-376-3532

No. 05-023                           Aziz A. Hassan
Dow Chem vs. HRD vs. Dow Chem        February 18, 2008

Page 51

1    three people who told you from Dow that Dow was adding
2    in the low-ends?
3        A.   Dave Edwardes is the one that told us that
4    they were adding in the low-ends or light-ends back in
5    the product.
6        Q.   Light-ends?
7        A.   We approached Tony Frencham and he said:  I
8    don't know anything I can do about it.  We, meaning me
9    and my twin brother, went, the same week we went to
10   Freeport and had a meeting with Kurt Swogger.  And
11   Kurt Swogger said:  Let me see what I can do about it.
12   We make about a railcar of this product a month in the
13   Sarnia plant.  Maybe we can just give it to you in a
14   separate railcar.
15       Q.   Okay.  When did Mr. Edwardes tell you that Dow
16   was adding back in the light-ends?
17       A.   Right when the plant was started.
18       Q.   So when was that?
19       A.   I would say in the mid-2004 time frame.
20       Q.   And was that on the phone or was it in person?
21       A.   On the phone.
22       Q.   Okay.  And it was just him and you?
23       A.   No, it was my -- Dave Edwardes and
24   Craig Cawley.
25       Q.   Were you on the phone?

# Exhibit 4

# This Exhibit Was Redacted In Its Entirety

# Exhibit 5

# This Exhibit Was Redacted In Its Entirety

# Exhibit 6

# This Exhibit Was Redacted In Its Entirety

# Exhibit 7

# This Exhibit Was Redacted In Its Entirety

# Exhibit 8

# This Exhibit Was Redacted In Its Entirety

# Exhibit 9

# This Exhibit Was Redacted In Its Entirety

# Exhibit 10

# This Exhibit Was Redacted In Its Entirety

# Exhibit 11

*Confidential*

# JOINT DEVELOPMENT AGREEMENT
Table of Contents

| Headings | Page |
|---|---|
| ARTICLE 1. - BACKGROUND | 1 |
| ARTICLE 2. - ADMINISTRATION | 1 |
| ARTICLE 3. - EXCLUSIVITY OF DEVELOPMENT EFFORTS | 2 |
| ARTICLE 4. - INTELLECTUAL PROPERTY ALLOCATION AND PROTOCOL | 3 |
| ARTICLE 5. - COMMERCIALIZATION | 5 |
| ARTICLE 6. - CONFIDENTIALITY | 5 |
| ARTICLE 7. - RESPONSIBILITIES | 6 |
| ARTICLE 8. - TERM AND TERMINATION | 7 |
| ARTICLE 9. - GENERAL PROVISIONS | 8 |
| ARTICLE 10. - DEFINITIONS | 10 |

This Joint Development Agreement ("**JDA**") is between HRD Corporation, trading as Marcus Oil & Chemical, (hereinafter referred to as "**HRD**"), a corporation of Texas, having a principal place of business at 14549 Minetta St., Houston, Texas 77035, and The Dow Chemical Company, a Delaware corporation (hereinafter referred to as "**Dow**"), having an office at 2301 N. Brazosport Blvd., Building B-1211, Freeport, Texas 77541-3257. Certain terms used in this JDA are defined in Article 10.

## ARTICLE 1. - BACKGROUND

**1.1.**     HRD sells certain wax products into a variety of end-use applications.

**1.2.**     Dow develops, manufactures, and sells polyolefin-based products, including metallocene polyethylene products.

**1.3.**     The Parties desire to (a) assess an opportunity to collaborate on the development of Polyethylene Waxes and (b) develop jointly Polyethylene Waxes. In particular, the Parties desire that this JDA outline the Parties' respective rights and obligations and the goals to be achieved with respect to the development of Polyethylene Waxes.

Now, therefore, the Parties agree as follows:

## ARTICLE 2. - ADMINISTRATION

**2.1.     Administration**

The Parties will endeavor to perform their respective duties and to meet the Success Criteria of this JDA. Each Party will appoint an Administrator who is responsible to have that Party meet its obligations.

**2.2.     Research and Development ("R&D") Expenses**

Unless otherwise mutually agreed in writing or specifically stated herein, Dow and HRD will jointly (50:50) fund the Research and Development activities under this JDA, which are both (a) performed during the Activity Period of this JDA and (b) relate to process chemistry and design, product/structure characterization, and scale up risk assessment. The expected direct cost of those R&D activities through June 2003 is $2MillionUS, not including general, administrative, overhead, and profit.

Within 14 days of signing this JDA, HRD will pay $600,000US to Dow as partial payment for HRD's share of the expected direct R&D costs. On or before October 1, 2002, HRD will pay $400,000US to Dow as the remainder of HRD's share of the expected direct R&D costs.

---

CONFIDENTIAL DISCOVERY MATERIAL  Subject to Protective Order in C.A. . 05-023 (JJF)

DOW00005562

*Confidential*

When the direct R&D costs reach $1MillionUS, the Parties will meet to discuss the expenditures to date, the projected costs, and the progress of the JDA toward achieving the Success Criteria. The Project Administrators will agree upon the time, location, and format of the meeting. If the total projected costs are expected to exceed $2MillionUS and the total projected costs do not cause the Parties to terminate the JDA, HRD will pay 50% of the additional costs to Dow on or before June 30, 2003.

On or before the anniversary of the Effective Date and until the Activity Period expires, Dow will provide an updated report on the direct R&D costs. If the costs have exceeded the expected direct R&D Costs, HRD will pay 50% of the excess to Dow within 30 days.

If this JDA is terminated before the activities hereunder consume the initial payment of $600,000US, Dow will prepare a final report on direct R&D Costs and repay the unused portion to HRD within 14 days of the date on which this JDA is terminated and the remaining $400,000 USD will not come due on October 1, 2002. If the Activity Period expires and the total R&D costs were below the expected R&D costs, Dow will prepare a final report and refund any HRD overpayment within 14 days.

### 2.3.    Records of Direct R&D Costs and Audits

Dow will maintain detailed and accurate records, in accordance with generally accepted accounting principles, consistently applied, sufficient to confirm the basis for the payments to be made for direct R&D Costs under this JDA. Those records will be maintained for the Activity Period, plus the subsequent calendar year. However, if the Parties agree to extend the Activity Period, Dow shall not be required to maintain records for any time period prior to the immediately preceding calendar year of the Activity Period.

HRD has the right to audit (by an independent auditor acceptable to Dow) such records during normal business hours at intervals not more frequently than twice per year to verify their accuracy at any time after giving reasonable notice to Dow. Dow will cooperate with the auditor and will not withhold approval of the independent auditor unreasonably. Dow may impose reasonable conditions on the auditor to protect Dow's Confidential Information. The auditor will report to HRD only the accuracy of the direct R&D Costs reports. HRD will pay the cost of the audit. The obligations of this Paragraph 2.3. end on the first anniversary of the termination of this JDA.

### 2.4.    Other Expenses

Unless otherwise mutually agreed in writing, each Party will bear all of its other expenses to develop Polyethylene Waxes under this JDA.

### 2.5.    Interim Project Review

As previously mentioned in Paragraph 2.2., the Parties will conduct an interim Project Review when the R&D costs reach $1MillionUS to evaluate their progress toward achieving the Success Criteria. Either Party may request additional project reviews, which the parties will conduct no later than 30 days after receipt of the request. The Project Administrators will agree upon the time, location, and format of the Project Review(s).

### 2.6.    Participation by Affiliates and Third Persons

Any Party's Affiliate may participate in this JDA. Any participation by a Third Person must be mutually agreed in writing. Each Affiliate or Third Person participating in this JDA must be bound by terms substantially the same as this JDA (i.e., ensuring that each of the Parties obtains substantially the same benefits as set forth in this JDA), unless the Parties otherwise agree in writing.

## ARTICLE 3. - EXCLUSIVITY OF DEVELOPMENT EFFORTS

### 3.1.    Exclusive Development

The Parties' relationship to develop jointly Polyethylene Waxes that meet the Success Criteria is to be exclusive, during the Activity Period.

---

CONFIDENTIAL DISCOVERY MATERIAL  Subject to Protective Order in C.A. . 05-023 (JJF)

DOW00005563

*Confidential*

### 3.2.    Confidential Information

To avoid any doubt, nothing in this Article 3. authorizes either Party to disclose the other Party's Confidential Information contrary to the provisions of Article 6.

## ARTICLE 4. - INTELLECTUAL PROPERTY ALLOCATION AND PROTOCOL

### 4.1.    Background Information and Background Patent Rights

This JDA does not (a) change the ownership of any Party's Background Information or Background Patent Rights and/or (b) grant to either Party or its Affiliates (or to anyone else) any license (express, implied or otherwise) under any of the Background Information, Background Patent Rights or trademarks of the other Party or its Affiliates. If the Parties agree to any such license, that license will be appropriately defined in a separate written agreement.

### 4.2.    Ownership of Developments

Without regard to which Party's employees are inventor(s) of a particular Development, ownership of Developments will be determined as follows:

(a)    HRD will own Developments that are (1) products made from or containing Polyethylene Waxes, (2) process for making products made from or containing Polyethylene Waxes, and/or (3) methods of use of Polyethylene Waxes; and

(b)    Dow will own all other Developments, including Polyethylene Waxes, processes for making Polyethylene Waxes, and catalysts used for making Polyethylene Waxes.

### 4.3.    Ownership of and Access to JDA Information

Each Party will own all JDA Information that the Party generates. Both Parties (and their Affiliates) may use and/or disclose that JDA Information, subject to the obligations of confidentiality the Parties have undertaken with respect to the other Party's Information under Article 6. Each Party will keep complete and accurate written records of all Information developed by or for it. Each Party will make those records available for review by the other Party at any reasonable time during regular working hours. Each Party will furnish copies of all or any part of those records to the other Party upon request for appropriate patent filing, prosecution, and enforcement efforts on Developments owned by that other Party, consistent with the other Party's obligations of confidentiality under Article 6.

### 4.4.    Disclosure of Developments and Inventorship

After a Party becomes aware that an invention has been conceived or first reduced to practice that may be a Development, the Party must promptly deliver a written description of the invention to the other Party's corresponding Administrator. The written description must include sufficient information to enable the Parties, together with their patent counsels, to evaluate the inventorship of the invention. The Parties will attempt to reach a consensus on whether the invention is a Development and who is(are) the inventor(s). The statutory and common law of the United States of America shall govern all determinations of inventorship and reduction to practice of Developments. Each Party is solely responsible for any and all compensation legally due to its employees (who are inventors of any Development), irrespective of which Party owns that Development.

### 4.5.    Filing and Prosecution of Patent Applications

In its sole discretion, the owner of the Development in question may make all decisions on filing, prosecuting, and maintaining patent applications (both domestic and foreign) that claim the Development, with three limitations. The owner must (i) obtain the other Party's approval before using or disclosing the other Party's Confidential Information in the filing or prosecuting of the patent application, (ii) provide the other Party with 30 days to review and comment on the patent application prior to its filing, and (iii) cooperate with the other Party to make related patent application filings concurrently (i.e., on the same day). The other Party will not unreasonably withhold its approval when the owner's use or disclosure of the other Party's Confidential Information is only to the extent necessary to satisfy the statutory requirements of the relevant patent office. The other Party's approval will be deemed granted if the other Party does not object in writing within 30 days of receipt of the owner's request for approval. If the other Party's objects. It will recommend reasonable alternative information for use instead of the objectionable

CONFIDENTIAL DISCOVERY MATERIAL   Subject to Protective Order in C.A. . 05-023 (JJF)

DOW00005564

*Confidential*

Information. The owner is solely responsible for paying the expenses for the patent applications. Each Party agrees to cooperate with the other Party, as requested, to establish, acquire, and maintain intellectual-property protection for Developments, JDA Information, and Polyethylene-Wax-Samples. This includes signing assignments and other appropriate documents, as requested.

### 4.6.    Abandonment of JDA Patent Rights

If the owner chooses not to file a patent application directed to its Development or no longer desires to continue prosecution or maintenance of particular JDA Patent Rights in any country, that owner must notify the other Party in writing and offer to assign such Development and/or JDA Patent Rights to the other Party. The other Party may accept such offer anytime within 30 days after receipt of the notification; otherwise, the owner may abandon the Development and/or JDA Patent Rights in question. If the other Party accepts, the owner will promptly assign the Development and/or JDA Patent Rights to the other Party and the other Party may file or continue the prosecution or maintenance at its sole expense. The assignment shall not affect the Parties' fundamental rights (i.e., the rights that each Party would have had the assignment not occurred) with respect to the practice or licensing of the Development and/or the JDA Patent Rights. The Parties may agree in writing to change those fundamental rights.

### 4.7.    Status Reports on JDA Patent Rights

If a Party has JDA Patent Rights, its Administrator will provide semi-annually a status report (in a mutually agreed format and medium) on all of that Party's JDA Patent Rights to the other Party's Administrator. That reporting is required both during the term of this JDA, and for so long thereafter as there are pending patent applications or maintained patents claiming any Development. Unintentional failure to provide this report shall not be deemed a material default under Paragraph 8.3.

### 4.8.    Right to Practice

#### 4.8.1.    Costs/Responsibility

Each Party will bear its own costs and will be solely responsible for determining its freedom to practice. Dow will be responsible for determining its freedom to practice with regard to processes for making and selling Polyethylene Waxes and using catalysts for making Polyethylene Waxes. HRD will be responsible for determining its freedom to practice with regard to selling products made from or containing Polyethylene Waxes and methods of using Polyethylene Waxes.

#### 4.8.2.    No Warranties/Representations during Activity Period

As specifically stated in Paragraph 7.3., neither Party makes any warranties or representations with respect to the freedom from infringement of the activities of either Party or their Related Persons under this JDA with respect to any intellectual property rights of any Third Person. Each Party agrees to assume the risk of any actual or alleged intellectual property infringement by the activities of that Party or its Related Persons under this JDA.

#### 4.8.3.    Outside Counsel

Each Party may disclose the other Party's Confidential Information and/or JDA Information to outside counsel for the purpose of obtaining legal advice or opinion regarding the Party's freedom to practice. The Parties may seek advice and opinions from the same outside counsel (shared counsel). However, each Party shall separately instruct shared counsel on the Party's request for legal assistance and shall bear its own expense. Each Party shall also instruct its outside counsel to provide any advice or opinion solely to the Party requesting such advice or opinion. The shared outside counsel may use technical information provided by any Party in the shared outside counsel's work for either Party, but the shared outside counsel must take care not to share the technical information with the Party that did not provide the information without the approval of the Party providing the information. The Parties shall not share legal advice or opinions with each other so as to protect the attorney-client and work product privileges and opinions of each Party.

CONFIDENTIAL DISCOVERY MATERIAL  Subject to Protective Order in C.A. . 05-023 (JJF)                DOW00005565

*Confidential*

# ARTICLE 5. - COMMERCIALIZATION

### 5.1.    Statement of Intent

The Parties desire to have each Party profit from this collaboration by fostering the development and commercialization of Polyethylene Waxes. The Parties also desire to balance (a) Dow's desire to supply large volumes of Polyethylene Waxes at a reasonable price by the sale to HRD and its Affiliates with (b) HRD's desire for exclusive access to Polyethylene Waxes.

### 5.2.    Commercial Arrangement

The Parties (1) anticipate that the Parties will achieve the Success Criteria and (2) are contemporaneously herewith entering into a commercial arrangement (the "Sarnia PE Wax Supply Agreement"), whereby (a) Dow and its Affiliates will have the exclusive, worldwide obligation to sell Polyethylene Waxes to the order of HRD and HRD's Affiliates and (b) HRD and its Affiliates will have the exclusive, worldwide right (under all JDA Patent Rights) to sell all Polyethylene Waxes to Third Persons and to grant licenses to Third Parties for the use of any and all Polyethylene Waxes. The terms and conditions of the commercial arrangement between Dow and HRD are separately defined in the Sarnia PE Wax Supply Agreement.

# ARTICLE 6. - CONFIDENTIALITY

### 6.1.    Supersede Confidentiality Agreement for Initial Evaluations

The Parties have a separate Confidentiality Agreement, having an effective date of January 8, 2001 (Dow Agreement 202541). The Confidentiality Agreement covered the Parties' initial evaluation of Samples and Information. The Parties expressly make those Samples and Information subject to this JDA. The provisions of this JDA supersede the Confidentiality Agreement with respect to those Samples and Information.

### 6.2.    Disclosure and Use of Confidential Information

For a period of 5 years from the end (either completion or earlier termination) of this JDA, the Party ("**Recipient**") who receives the other Party's ("**Discloser's**") Confidential Information agrees that (a) the Recipient will maintain that Confidential Information in confidence and prevent the disclosure of the same to others, and (b) the Recipient will use that Confidential Information exclusively for the JDA, or to carry out the Recipient's obligations under this JDA, or to exercise the rights or licenses expressly granted under this JDA.

### 6.3.    Duty of Care

In fulfilling the Recipient's obligations under this Article, the Recipient shall use the same degree of care as that Recipient uses to protect its own confidential information of a like nature. In no event shall the Recipient take less than reasonable precautions to protect the Discloser's Confidential Information.

### 6.4.    Permitted Disclosures

Notwithstanding anything to the contrary in this Article, either Recipient may disclose the other Party's Confidential Information:

(a)    as may be required to comply with a court order or subpoena so long as the Recipient secures whatever confidentiality protections are available under that law, and gives to the Discloser both reasonably prompt notice and an opportunity to intervene. and/or

(b)    to the Recipient's Affiliates, and/or to Third Persons, as may reasonably be required to carry out the Recipient's obligations and/or to exercise the rights or licenses expressly granted under this JDA, provided that each such Affiliate or Third Person undertakes obligations of confidentiality which are at least as stringent as those undertaken by the Parties hereunder, and obligations of limited use which are reasonably appropriate for the situation, and/or

(c)    in a patent application for which the filing is authorized by Paragraph 4.5., but only to the extent that such Confidential Information is reasonably necessary to provide enabling support for any patent claim covering a Development owned by the Recipient, and/or

(d)    to the Recipient's legal counsel in confidence, and/or

CONFIDENTIAL DISCOVERY MATERIAL  Subject to Protective Order in C.A. . 05-023 (JJF)                DOW00005566

*Confidential*

(e) to appropriate governmental agencies (and to Recipient's relevant governmental-approval consultants) as, and when, reasonably required for regulatory review or approval of the Polyethylene Wax, so long as Discloser is first consulted and has been provided a reasonable time to perform any associated patent filings on Discloser-owned Developments or related background technologies. Where appropriate, a claim of confidentiality will be made by Recipient.

### 6.5.    Limited Analysis and Return of Samples

During the JDA, it is anticipated that HRD may receive one or more of Dow's Samples for evaluation. Except with the Dow's prior written consent, HRD will:

(a) use Dow's Samples exclusively for this JDA; and

(b) promptly return to Dow, at its request, all of Dow's unconsumed Samples; and

(c) not analyze those Samples to determine their chemical composition or physical properties (other than those physical analyses reasonably necessary for the JDA); and

(d) not make Samples available (e.g., by sale or otherwise) to anyone (other than the Parties and any Affiliate or Third Person participating in the JDA as agreed in Paragraph 2.6.), except as authorized under Paragraph 6.6. or 6.7.

### 6.6.    Sampling of Polyethylene Waxes to HRD's Customers

HRD may distribute Polyethylene-Wax-Samples to its potential customers, provided (1) its potential customers have undertaken confidentiality obligations at least as stringent as the obligations undertaken by HRD in this JDA and (2) HRD warrants the compliance of its customers with the terms of this JDA.

### 6.7.    Sampling of Polyethylene Waxes –Without Obligations of Confidentiality

Before either Party distributes Polyethylene-Wax-Samples to anyone (other than an Affiliate or Third Person participating in the JDA as agreed in Paragraph 2.6.) without obligations of confidentiality, the Parties must first agree upon the timing and terms under which those Polyethylene-Wax-Samples are to be provided in order to achieve the goals of the JDA, while protecting the Parties' intellectual assets.

### 6.8.    Pre-approval Required For Publicity and Publications

Except with the other Party's prior written consent, each Party must not use the other Party's name(s) or trademark(s) or issue any press release or public announcement of the Parties' relationship under this JDA. Both Parties must approve technical publications disclosing results of the JDA before being presented or submitted for publication, whichever is earlier.

## ARTICLE 7. - RESPONSIBILITIES

### 7.1.    The Parties' Roles

This JDA is an experimental program that involves the manufacture and testing of chemical products and/or physical structures, some of which are experimental in nature. NEITHER PARTY MAKES ANY WARRANTIES OR REPRESENTATIONS OF ACCURACY, RELIABILITY, COMPLETENESS, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE WITH RESPECT TO ANY SAMPLES OR TECHNICAL INFORMATION, WHICH IT SUPPLIES TO THE OTHER PARTY HEREUNDER. ALL INFORMATION AND SAMPLES SUPPLIED HEREUNDER ARE PROVIDED ON AN "AS IS" BASIS AND EACH PARTY SUPPLYING THE SAME EXPRESSLY DISCLAIMS ANY AND ALL WARRANTIES WITH RESPECT TO THE SAME. Accordingly, each Party will be responsible for taking all reasonable precautions in using, handling, and/or evaluating the same. Each Party will take reasonable steps to ensure that its Related Persons observe the appropriate safety and operational rules of the host location at which that work is being done. Each Party agrees that it is in the best position to protect its property, its Related Persons, the property of its Related Persons against injury, illness, death, damage, or loss, and to insure against any of the same which may occur. Based upon the foregoing, the Parties agree that the following provisions are a reasonable allocation of the responsibilities, risks and liabilities with respect to their relationship under this JDA.

CONFIDENTIAL DISCOVERY MATERIAL  Subject to Protective Order in C.A. . 05-023 (JJF)

DOW00005567

*Confidential*

### 7.2.    Parties' Own People and Property

Except to the extent arising from the other Party's gross negligence or willful misconduct, each Party assumes the risk of personal injury (including illness) or death of its Related Persons and the risk of any damage to, or loss of, its property and the property of its Related Persons arising out of this JDA or the use of any Samples or Information received hereunder. Each Party agrees to release, defend, and indemnify the other Party and the other Party's Related Persons from and against any and all losses and/or liabilities (including but not limited to attorneys' fees and other litigation costs) arising out of any such injury, illness, death, damage, or loss for which that Party has assumed the risk. It is the express intent of the Parties that the foregoing release and indemnity shall apply notwithstanding any negligence, strict liability, or breach of warranty of that other Party or of that other Party's Related Persons.

### 7.3.    Intellectual Property Responsibility

Each Party agrees to advise the other Party of any potential intellectual property infringement problem of which it becomes aware which might adversely affect either Party's ability to perform its activities or exercise any of its rights or licenses under this JDA. However, neither Party makes any warranties or representations with respect to (a) the validity, scope or enforceability of any of its intellectual property rights, and/or (b) the freedom from infringement of the activities of either Party or their Related Persons under this JDA with respect to any intellectual property rights of any Third Person. Each Party agrees to assume the risk of any actual or alleged intellectual property infringement by the activities of that Party or its Related Persons under this JDA.

### 7.4.    Third Person Injury and Property Damage

With respect to any damage to or loss of the property of Third Persons, as well as any personal injury (including illness) or death of Third Persons, any of which damage, loss, injury or death arises out of this JDA or the use of any Samples or Information received hereunder from the other Party or its Affiliates, each Party will indemnify the other Party and the other Party's Related Persons (a) for the indemnifying Party's (or its Related Persons') share of any comparative negligence or breach of warranty, which negligence or breach was the proximate cause of that liability, as well as (b) for the indemnifying Party's (or its Related Persons') share of any strict liability.

### 7.5.    Indemnity Effectiveness

Any indemnity that is provided under this Article shall be effective to the maximum extent, scope, and amount permitted by the applicable law.

### 7.6.    Disclaimer of Consequential Damages

The Parties agree that neither Party nor its Related Persons will be liable to the other Party or its Related Persons for any indirect, incidental, special, exemplary, punitive, or consequential damages arising out of or in connection with the execution, performance, or nonperformance of this JDA, regardless of whether the other Party's or its Related Persons' cause of action resides in breach of contract or warranty, negligence, strict liability or other tort.

## ARTICLE 8. - TERM AND TERMINATION

### 8.1.    Agreement Term and Extensions

Unless earlier terminated under Paragraphs 8.2. or 8.3. or by mutual agreement, the term of this JDA will be for the Activity Period. The term of this JDA may be extended by mutual written agreement of the Parties.

### 8.2.    Termination of Prior to Completion

If the Success Criteria are not met within 60 days of the mutually agreed time schedule or the reports of direct R&D Costs indicate the direct R&D Costs will exceed the expected costs by 25%, either Party may terminate JDA upon 10 business days written notice. Moreover, if this JDA is terminated before achieving all of its Success Criteria, then the Parties will negotiate a reasonable royalty bearing license under which Dow shall have the non-exclusive, worldwide right (under all JDA Patent Rights) to grant sublicenses to Third Parties for (a) making, selling, and using any and all products made from or containing Polyethylene Waxes and (b) using any and all Polyethylene Waxes. If (a) either Party terminates the agreement

CONFIDENTIAL DISCOVERY MATERIAL   Subject to Protective Order in C.A. . 05-023 (JJF)          DOW00005568

*Confidential*

because the Success Criteria are not met, (b), within two years of the JDA's termination, Dow achieves the Success Criteria, (c) Dow desires to make and sell the Polyethylene Waxes, and (d) Dow has a suitable manufacturing facility available for the production of Polyethylene Waxes, then Dow agrees to negotiate with HRD to supply the Polyethylene Wax(es) to HRD at terms and conditions consistent with the Sarnia PE Wax Supply Agreement.  If HRD and Dow do not execute a supply agreement within 30 days, Dow may offer the Polyethylene Wax(es) to Third Parties.

Additionally, the Parties may, by mutual written agreement, terminate this JDA early.

### 8.3.    Termination for a Material Default

If either Party defaults on any of its obligations hereunder, the other Party may give written notice to the defaulting Party specifying the particulars of that default.  If the defaulting Party does not remedy a material default within 30 days after the date of that notice (unless such remedy is not reasonably capable of being completed within 30 days, and, to the reasonable satisfaction of the non-defaulting party, the other Party is diligently pursuing such remedy), the other Party shall have the right to terminate this JDA, by giving to the defaulting Party 10 days' further written notice.  Minor, readily remediable defaults (such as failure to provide a report under Paragraph 4.7.) do not give rise to a right of termination of this JDA.

### 8.4.    Rights and Obligations Surviving Termination

Any termination of this JDA shall not:

(a)    release either Party or its Related Persons from any claim of the other Party accrued hereunder prior to the effective date of that termination; or

(b)    affect the respective rights or obligations of either Party or its Related Persons under Articles 4., 6. or 7., or under Paragraph 9.12.

## ARTICLE 9. - GENERAL PROVISIONS

### 9.1.    Assignment

Either Party may assign this JDA to any one or more of its Affiliates.  No Party shall otherwise assign this JDA or that Party's rights or obligations hereunder without the other Party's prior written approval, which approval will not be withheld unreasonably.  When properly assigned, this JDA shall be binding upon the assignor's respective successors and assigns.  However, where such an assignment might materially affect either Party's rights or obligations under this JDA, the non-assigning Party may elect to terminate this JDA.

### 9.2.    Extension to Affiliates

A Party's rights and obligations under this JDA may be extended by that Party to any one or more of its Affiliates, provided that each such Affiliate agrees in writing to abide and be bound by the terms of this JDA.  Each Party will be primarily responsible to ensure the compliance of its Affiliates who agree to be bound by this JDA.

### 9.3.    Subcontracting

Any subcontracting by either Party (to anyone other than that Party's Affiliates) must be pre-approved by the other Party, which approval will not be withheld unreasonably.  Subject to that limitation, each Party may designate one or more Third Persons (e.g., a contractor or an Affiliate) to fulfill one or more of that Party's obligations, or to exercise Party's rights, provided that the Third Person agrees in writing to abide and be bound by the corresponding terms of this JDA.  No Party shall otherwise subcontract its rights or obligations hereunder without the other Party's written approval.

### 9.4.    Effect of Assignment, Subcontract or other Transfers

Any assignment, subcontract, or other transfer shall not release the involved Party or its Affiliates from any claim of the other Party accrued hereunder prior to the effective date of that transaction, or their respective obligations under Articles 4., 6., or 7. or under Paragraph 9.12.

CONFIDENTIAL DISCOVERY MATERIAL  Subject to Protective Order in C.A. . 05-023 (JJF)

DOW00005569

*Confidential*

### 9.5.     Force Majeure

If the performance of a Party is delayed hereunder as a result of any event or circumstance beyond its reasonable control, that Party's performance may be postponed until such time as the cause of that delay has been removed, provided that if a Party's performance is delayed for more than 90 consecutive days the other Party may terminate this JDA without penalty by giving written notice to the other Party.

### 9.6.     Governing Law

Except as set forth in Paragraph 4.4., the Parties desire that any reviewing court or arbitrator(s) use the plain meaning of this JDA.  Only in the event that such meaning is not clear, should such court or arbitrator(s) refer to the laws of any jurisdiction to resolve any ambiguity, in which case the Parties select the laws of the State of Delaware, United States of America (exclusive of such State's laws relating to the choice of a different jurisdiction's laws) to resolve such ambiguity.

### 9.7.     Severability

In the event that any provision of this JDA is declared null and void, that provision will be struck from this JDA.  The remaining provisions of this JDA will remain in full effect.  The Parties will seek in good faith to negotiate terms to replace any provision so struck, so as to restore the balance of equities and the consideration present in the original Agreement terms.

### 9.8.     Disclaimer of Waivers

No omission or delay by either Party at any time to enforce any right or remedy, or to require performance of any obligations of this JDA, will constitute a waiver of the same.

### 9.9.     No Partnership, Joint Venture or Fiduciary Relationship

No partnership, joint venture or fiduciary relationship is created by this JDA.  Neither Party has, and neither Party will attempt to assert, the authority to act as an agent for the other Party.

### 9.10.    Notice

Any notice or correspondence shall be given to the Parties at the following addresses, and will be effective when actually received:

|     |              |                                         |
|-----|--------------|-----------------------------------------|
| (a) | if to HRD:   | Marcus Oil & Chemical                   |
|     |              | 14549 Minetta Street                    |
|     |              | Houston, Texas 77035                    |
|     |              | Facsimile No.  (713) 726-9885           |
|     |              | Telephone No.  (713) 721-9131, Ext. 102 |
|     |              | Attention:  Mr. Aziz Hassan, Vice President |
|     |              | e-mail:  Marcusoil@aol.com              |
|     | With a copy to: | O'Donnell Ferebee & McGonigal        |
|     |              | 450 Gears, Sixth Floor                  |
|     |              | Houston, Texas 77067-4584               |
|     |              | Facsimile No.  (281) 875-4962           |
|     |              | Telephone No.  (281) 875-8200           |
|     |              | Attention:  Mr. Michael L. Landrum      |
|     |              | e-mail:  mlandrum@ofmslaw.com           |
| (b) | if to Dow:   | The Dow Chemical Company                |
|     |              | 2301 N. Brazosport Boulevard            |
|     |              | Building B-1470                         |
|     |              | Freeport, Texas  77541-3257             |
|     |              | Facsimile No. 979-238-0942              |
|     |              | Phone:  979-238-2897                    |
|     |              | Attention:  Mr. Kurt W. Swogger         |
|     |              | e-mail: kwswogger@dow.com               |

---

CONFIDENTIAL DISCOVERY MATERIAL  Subject to Protective Order in C.A. . 05-023 (JJF)

DOW00005570

*Confidential*

<table>
<tr><td>With a copy to:</td><td>The Dow Chemical Company<br>2301 N. Brazosport Boulevard<br>Building B-1211<br>Freeport, Texas  77541-3257<br>Facsimile No. 979-238-0878<br>Phone:  979-238-9041<br>e-mail:  krhansbro@dow.com<br>Attention: Kevin H. Hansbro, Intellectual Property Attorney</td></tr>
</table>

In addition, a copy of any such notice or correspondence will also be given to the other Party's Administrator.  Either Party may change its contacts and addresses by notice in writing under this Paragraph.

### 9.11.   Entire Agreement and Amendments

This JDA constitutes the entire understanding and agreement between the Parties relating to the subject matter of this JDA, and supersedes all other understandings and/or agreements relating to that subject matter.  Additionally, the provisions of this JDA shall supersede any standard form language which any Party or Related Person of that Party has signed, or in the future may be asked or required to sign, as a condition of admittance to the premises of the other Party or its Affiliates in connection with the Related Person's work relating to this JDA.  No waiver, modifications or amendments to this JDA will be valid unless made in writing specifying the particular waiver, modification or amendment and signed by an authorized representative of each Party.

### 9.12.   Export Control and Customs Regulations

Each Party agrees that it will not export or re-export any U.S.-source technology, software or products received from the other Party or the direct products of such technology or software or products to any country, person or entity, or for any use, prohibited by the export control regulations of the United States.

## ARTICLE 10. - DEFINITIONS

As used herein, the following terms will have the following meanings:

**10.1.   "Activity Period"** means the period of time for performing the JDA activities from the Effective Date of this JDA until the earlier of (a) June 30, 2003, or (b) the Success Criteria are achieved, unless earlier terminated or extended.

**10.2.   "Administrator"** means the person designated as such by each Party.  Dow hereby designates Michael J. Levinson as its Administrator.  He may be contacted at The Dow Chemical Company, 400 W. Sam Houston Pkwy. South, Houston, TX 77042, Phone: (713) 978-2291, Facsimile: (713) 978-3279, e-mail: mjlevinson@dow.com.   HRD hereby designates Mr. Aziz Hassan as its Administrator.  He may be contacted at Marcus Oil & Chemical, 14549 Minetta Street, Houston, TX 77035, Phone (713) 721-9131, ext. 102, Facsimile (713) 726-9885, e-mail: Marcusoil@aol.com.

**10.3.   "Affiliate"** means any entity that directly or indirectly owns, is owned by, or is under the common ownership with a Party, at any time during the term of this JDA.  "Owns", "owned", or "ownership" means direct or indirect possession of at least 50 percent of the votes of holders of a corporation's voting securities, or a comparable equity or other ownership interest in any other type of entity.

**10.4.   "Background Information,"** as used with respect to a designated Party, means any Information owned or controlled by that Party or its Affiliates prior to the Effective Date, as well as any Information developed by or for that Party or its Affiliates independently of this JDA.  By definition, JDA Information is not Background Information.

**10.5.   "Background Patent Rights,"** as used with respect to a designated Party, means those claims of any patents or patent applications, owned or controlled by that Party or its Affiliates at anytime during the term of this JDA, that define any invention other than a Development.

**10.6.   "Confidential Information,"** as used with respect to a designated Party, shall mean

CONFIDENTIAL DISCOVERY MATERIAL  Subject to Protective Order in C.A. . 05-023 (JJF)                    DOW00005571

*Confidential*

Background Information of the designated Party and/or its Affiliates (collectively the "**Discloser**"), as well as JDA Information first developed or discovered by the Discloser, which is disclosed or otherwise made available to the other Party and/or its Affiliates (collectively the "**Recipient**") pursuant to this JDA, provided that such Information is:

(1)    disclosed in writing or other tangible form and labeled "[Discloser's name] - confidential," or

(2)    disclosed orally or by observation and confirmed to the Recipient in writing as being "[Discloser's name] - confidential" within 30 days after the initial disclosure,

except with respect to any particular Information that Recipient can prove:

(a)    was available to the public through no fault of Recipient, or

(b)    Recipient already possessed prior to receipt from Discloser, or

(c)    Recipient acquired from a Third Person without obligation of confidence, or

(d)    was independently developed by or for Recipient by one who did not have access to Discloser's Confidential Information or Samples.

Specific Information is not within any of the above exclusions merely because it is within the scope of more general information within an exclusion. A combination of features is not within any of the above exclusions unless the combination itself, including its principles of operation, is within the above exclusions.

   10.7.    "**Development**" means any invention, whether patentable or unpatentable, that is:

(a)    a Polyethylene Wax (as defined in 10.13.), and/or

(b)    any method of use for a Polyethylene Wax, and/or

(c)    a product made from or containing a Polyethylene Wax; and/or

(d)    a process for making a product made from or containing a Polyethylene Wax; and/or

(e)    a process for making a Polyethylene Wax; and/or

(f)    a catalyst for making a Polyethylene Wax,

which invention is first actually reduced to practice by a Party (and/or by its participating Affiliates or subcontractors), alone or with others, and which reduction to practice occurs both during the Activity Period and as a result of work performed in connection with this JDA.

   10.8.    "**Effective Date**" shall mean July 1, 2002.

   10.9.    "**Information**" means technical or business Information pertaining to (a) the composition, structure and/or properties of any Polyethylene Wax (including but not limited to the Success Criteria), (b) the use of a Polyethylene Wax in any end-use application, (c) any product made from or containing a Polyethylene Wax, (d) any process for making a product made from or containing a Polyethylene Wax, (e) any process for making any Polyethylene Wax, and/or (f) any catalyst for making any Polyethylene Wax as well as Information as defined in the separate Confidentiality Agreement, having an effective date of January 8, 2001 (Dow Agreement 202541). Under the separate Confidentiality Agreement, Dow's Information includes (a) information relating to and/or derived from the Samples (such as chemical or physical properties or processing information), (b) other information relating to Dow-proprietary polymers, blends, formulations, compounds, fabricated articles, polymer-design tools, test procedures, fabrication equipment or techniques, and/or other article designs or structures, and (c) any other information provided by Dow pertaining to the Purpose. Under the separate Confidentiality Agreement, HRD's Information includes (a) information relating to HRD-proprietary test procedures, fabrication equipment or techniques, end use applications, article designs and/or structures pertaining to the Purpose, and (b) information relating to HRD's business or research and development plans pertaining to the Purpose.

   10.10.    "**JDA Information**" means any new Information, owned or controlled by either Party or by its participating Affiliates, that is first developed or acquired both (a) during the Activity Period, and (b) in

---

CONFIDENTIAL DISCOVERY MATERIAL  Subject to Protective Order in C.A. . 05-023 (JJF)

DOW00005572

*Confidential*

connection with work performed on this JDA.

**10.11.  "JDA Patent Rights"** means any claim of any patent or patent application, owned or controlled by either Party or its Affiliates, that defines a Development.

**10.12.  "Party"** means HRD or Dow, and **"Parties"** means HRD and Dow.

**10.13.  "Polyethylene Wax(es)"** means metallocene ethylene homopolymers and copolymers having a number average molecular weight (**"Mn"**) within the range of 600-9,000, a density > 0.900g/cc, and Melting Temperature (**"T$_m$"**) above 50°C, and blends thereof.

Notwithstanding Paragraph 9.11., the Parties' Administrators may mutually agree to evaluate specific grades of ethylene homopolymers and copolymers having a broader Mn and/or a lower density than those polymers included in this definition of Polyethylene Wax, for substitution of micro-crystalline waxes. However, the Exclusive Development relationship described in Paragraph 3.1. shall not preclude Dow's development efforts with third parties with those mutually agreed upon polymers for other applications and HRD will not withhold unreasonably its consent with regard to the release of any those polymers which is of no further significant interest in the JDA.

**10.14.  "Polyethylene-Wax-Sample"** means a sample of any Polyethylene Wax that has not been sold commercially prior to the time when it is first sampled to the other Party hereunder.

**10.15.  "Product Mix"** means the grades of Polyethylene Wax satisfying the mutually agreed upon product specifications, including viscosity and melting point.  HRD will bear its costs for supporting Dow in Dow's requests on Product Mix specifications.

**10.16.  "Related Persons,"** as used with respect to a designated Party, shall mean (a) that Party's Affiliates, and (b) the officers, directors, and employees of that Party and/or that Party's Affiliates.

**10.17.  "Samples"** means Polyethylene-Wax-Samples and Samples as defined in the separate Confidentiality Agreement, having an effective date of January 8, 2001 (Dow Agreement 202541 – "Dow-proprietary experimental and/or developmental polyolefin-based polymers and/or blends, sampled under a Dow-proprietary alpha-numeric code designation, and/or any blends, formulations, compounds and/or fabricated articles that contain, or are made from, those polymers or blends").

**10.18.  "Sarnia PE Wax Supply Agreement"** means a separate, written agreement between the Parties for Dow to (1) supply one or more Polyethylene Waxes to HRD and (2) convert an existing manufacturing plant to the manufacture of Polyethylene Wax.

**10.19.  "Success Criteria"** means the technical and business parameters to be met for the JDA to be considered successfully completed.  The Project Administrators will agree upon a specific project plan for achieving the Success Criteria.

| | | |
|---|---|---|
| 10.19.1. | **Deliverables for the Sarnia PE Wax Supply Agreement:** | |
| | 10.19.1.1 | Complete specifications for "Product Mix," including, but not limited to, (a) physical property ranges for each "Prime Product," (b) analytical methods, (c) estimated production volume for each "Prime Product" for each 12-month period of the anticipated 48-month manufacturing period, (d) raw material requirements for each "Prime Product," and (e) acceptable proportion of "Off Spec Product" for each "Prime Product."  For this subparagraph, the terms "Product Mix," "Prime Product," and "Off Spec Product" have the same definition as provided in the Sarnia PE Wax Supply Agreement. |
| | 10.19.1.2 | Determine process/equipment modifications necessary for making the Product Mix (as defined in Paragraph 10.15. of this JDA) in the Sarnia plant. |

CONFIDENTIAL DISCOVERY MATERIAL  Subject to Protective Order in C.A. . 05-023 (JJF)

DOW00005573

*Confidential*

|       |       |       |
|-------|-------|-------|
|       | 10.19.1.3 | Complete Schedules 1-3 of Sarnia PE Wax Supply Agreement within 90 days of this JDA's Effective Date. |
| 10.19.2. | **Polyethylene Wax Performance Parameters:** | |
|       | 10.19.2.1 | Other evaluations and development efforts as mutually agreed by Project Administrators. |
| 10.19.3. | **Safety parameters:** | |
|       | 10.19.3.1. | Dow will conduct an internal process/product risk review. The process and product must comply with Dow's guidelines and policies, including Dow's safety and loss prevention policies and product stewardship policies. |

**10.20.** "**Third Person**" shall mean any natural person or legal entity, which is neither a Party nor a Party's Related Person.

Each Party has caused this JDA to be executed by its respective authorized representative.

**THE DOW CHEMICAL COMPANY**                    **HRD CORPORATION**

By _____              By _____

Name  Kurt W. Swogger                           Name   ABBAS  A.  HASSAN

Title:  Vice President,                          Title   President
        Polyolefins & Elastomer R&D

Date _____            Date _____

CONFIDENTIAL DISCOVERY MATERIAL  Subject to Protective Order in C.A. . 05-023 (JJF)                    DOW00005574