UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DOW CHEMICAL CANADA INC. on its own behalf and as assignee of THE DOW CHEMICAL COMPANY,<br><br>    Plaintiff,<br><br>    v.<br><br>HRD CORPORATION (d/b/a Marcus Oil & Chemical)<br><br>    Defendant, Counterclaim Plaintiff,<br><br>    v.<br><br>DOW CHEMICAL CANADA INC., on its own behalf and as assignee of THE DOW CHEMICAL COMPANY, and THE DOW CHEMICAL COMPANY,<br><br>    Counterclaim Defendants. | Case No. 05-023 (JJF)<br><br>**PUBLIC VERSION**<br><br>Original Filing Date: May 28, 2008<br>Public Version Date: Sept. 12, 2008 |

## **DECLARATION OF BRIAN W.S. KOLTHAMMER, Ph.D.**

I, Briwn W.S. Kolthammer, do declare and state as follows:

1. I earned a B.S. in Chemistry in 1975 and a Ph.D. in Chemistry in 1979 from the University of British Columbia-Vancouver. In 1979, I became a Research Associate at the University of British Columbia-Vancouver and a NATO Science Fellow at Texas A&M University.

2. I am presently a Research Fellow in the Basic Plastics & Chemicals, Hydrocarbons & Energy R&D Group at The Dow Chemical Company ("Dow"). For over 20 years, I have been responsible for the development and commercialization of a variety of polymers that Dow makes using its proprietary Solution Process Technology,

including polymers made with metallocene catalysts. For more than 15 years, I have also been responsible for the scale-up and implementation of INSITE* Technology, and for the operation of market development plants for Dow's first polyethylene polymers made with a metallocene catalyst, which were called AFFINITY* and ENGAGE*. I am an inventor or co-inventor on 30 U.S. patents and numerous foreign patents and have published over 40 papers on a variety of topics including polymer production and development.

3. Dow manufactures approximately seven billion pounds (7,000,000,000 lbs.) of polyethylene a year using its proprietary Solution Process Technology, many of the elements of which are held as trade secrets. Globally, there are only three companies that produce polyethylene using their own proprietary solution process technologies with any significant capacity. Of those three, Dow is the predominant producer. Dow has invested tens of millions of dollars to develop its Solution Process Technology, including developing and optimizing the configuration and operating conditions for the devolatilizers and the reactors. Through years of engineering, this unique Solution Process Technology allows Dow to control product composition and productivity to unparalleled proportions.

4. I have carefully reviewed the discovery produced by Dow in this matter, including the material that Dow has redacted. Additionally, I have reviewed HRD Corporation (d/b/a Marcus Oil & Chemical) (HRD)'s Motion to Compel Dow to Remove all Redactions From the Documents It Has Produced. As set forth in more detail below, the material sought by HRD consists of Dow's proprietary trade secrets pertaining to its extremely valuable and unique Solution Process Technology.

5. Dow takes aggressive measures to limit who has access to its Solution Process Technology in order to ensure that it remains a confidential trade secret.



6. Furthermore, while from time-to-time Dow has worked with outside consultants regarding its Solution Process Technology,



7.  For example, in the late 1990's, Dow engaged in a joint development program with an outside company to assist in the development of catalysts for use in its Solution Process Technology. Rather than provide the outside company with actual commercial reactor conditions, such as the very information subject to the redactions here, Dow provided the company with generic experimental targets containing a series of performance criteria which were used in a laboratory testing environment. The results of the outside company's experiments were then returned to Dow, and any potentially relevant discoveries were evaluated within Dow employing its actual proprietary reactor conditions. ████████████████████████████████████████ Although, in many cases, it would be helpful to provide outside companies involved in a joint development project with the actual reactor conditions, Dow elects not to share its trade secret information with outside parties because the risks inherent in such disclosure far outweigh the benefits. The magnitude of commercial harm to Dow if its proprietary information were to be revealed to an outside party is immeasurable.

8.  Similarly, when Dow constructs a new plant or modifies its existing development plants, it goes to great lengths to ensure that contractors and vendors only receive the mechanical and design requirements necessary to build that particular equipment. Dow employees are solely responsible for the overall design of Dow's

solution polyethylene plants and associated proprietary equipment. For example, a contractor may see the location of a piece of equipment within the plant, but he or she would never be informed as to what the equipment was used for or any of its operating conditions.

9. As illustrated in the examples above, in order to maintain the secrecy of this proprietary information, Dow takes expansive measures to limit access to its Solution Process Technology. In recognition of the sensitive nature of this information relating to Dow's Solution Process Technology, when Dow enters into an agreement with an outside company (like Dow and HRD's Joint Development Agreement), such agreements are intentionally drafted to limit the outside company's access to this information. If Dow's competitors or prospective manufacturers were to obtain information concerning the proprietary aspects of Dow's unique and superior Solution Process Technology, those competitors or prospective manufacturers would be able to improve their own processes and products to the irreparable detriment of Dow. Through its process technology, Dow can produce higher volumes of product with superior qualities and at lower production costs, which means a higher economic return. If Dow's trade secrets were to become known outside of Dow, the value of its trade secrets would be compromised, resulting in substantial economic harm to Dow.

10. Previously, HRD identified Dr. Rayford G. Anthony as one of the consultants it plans to use in this litigation. I am familiar with Dr. Anthony. Dr. Anthony has been a consultant to the industry since 1966, and a Professor of Chemical Engineering at Texas A&M University since 1974. In my opinion, if Dr. Anthony is allowed to review Dow's trade secrets, Dow runs the risk that Dr. Anthony will retain the

unique engineering and operational aspects of Dow's proprietary polymerization process, or Solution Process Technology, in his mind forever. Even without the intent to do so, Dr. Anthony may inadvertently make use of this confidential information in his continuing role as a consultant in the industry, to the severe detriment of Dow. Consequently, Dow runs the risk of irreparable economic harm if this technology is disclosed to its competitors. Therefore, it is imperative that Dow's Solution Process Technology trade secrets are not disclosed.

11. In its motion to compel, HRD asserts that "the design of the plant [Sarnia] is typical for a polyethylene plant, and extraordinary measures over and above the confidentiality order are unnecessary." (D.I. 152 at ¶ 6). HRD cites the Declaration of Dale Joy to support this point. I disagree with Mr. Joy.

12. Frankly, neither HRD nor Mr. Joy know what is typical for a solution process polyethylene plant. According to Mr. Joy's declaration, he is a former Exxon employee. Exxon does not use anything similar to Dow's Solution Process Technology for its polyethylene production. Although Mr. Joy has worked in polyethylene manufacturing, not all polyethylene processes are the same. Exxon's polyethylene processes are very different from Dow's solution process. Indeed, the solution process method of production accounts for a small percentage of the global production of polyethylene. ███████████████████████████████████ ███████████████████████ (Ex. A at p. 20). In addition, there are only a few producers in the world that use solution process technology, and no one produces polyethylene with the success and profitability of Dow. ███████████

███████████████████████████████████
███████████████ (Ex. A at pp. 31, 37, 39, 41, 46-48).

13.  Mr. Joy additionally surmises that Dow's Solution Process Technology is not a trade secret because it has existed for years. (D.I. 140 at Ex. A ¶ 8). This is irrelevant. In fact, Dow's ability to protect its trade secrets, including the properties of its Solution Process Technology (the very information HRD seeks in discovery) over the years is exactly what has ensured Dow's economic success.

14.  HRD claims that disclosure of the redacted material will not harm Dow's business as a whole because the Sarnia process designed for HRD was different from the production process employed at Dow's other facilities. (D.I. 152 at ¶ 4). However, HRD's claim is only partially factually accurate since prior to being converted to produce HRD's products, Sarnia was originally designed to produce ethylene styrene interpolymers using Dow's Solution Process Technology. Pursuant to the Supply Agreement, certain aspects of the plant were modified to produce HRD's products. Although some aspects of the Sarnia plant were unique for HRD, ███████████
█████████████████████████████████████
█████████████████████████████████████
█████████████████████████████████████ Contrary to HRD's assertions, the redacted information is *not* specific to HRD and reflects details from years of Dow's research that is generally applicable to all of Dow's solution process plants. Information specific to the isolation of waxes produced for HRD and the back-end handling of these waxes was not redacted by Dow, and HRD was provided with this information. Instead,

much of the redacted information relates to Dow's unique operating methods. If HRD were to obtain this information, it would reveal to HRD details of the process that create the economic advantages of the Dow designed solution manufacturing technology, including processes that result in improvements in throughput, production per hour, and conversion percentages, all of which are unknown to the industry.

15. Mr. Joy further states that Dow's Sarnia plant has "existed for years" and "has not been in operation for several years." (D.I. 140 at Ex. A ¶ 8). Although factually accurate, these statements have no bearing on whether Dow maintains economic advantage by keeping details of the plant secret. In the context of commercial polyethylene processes, technology that is less than ten years old is considered to be fairly new technology.

16. In the following paragraphs, I address HRD's contentions that certain categories of information relating to Dow's proprietary solution process technology are relevant to determine whether Dow intentionally "either dumped . . . waste material [*i.e.*, the light ends] back into the product, failed to remove it, or both." (D.I. 25 at ¶ 105).

17. In its motion, at Exhibit B, HRD contends that certain categories of information redacted in Dow's documents are relevant to this case. Exhibit B contains Dow's Redaction Key, which was created pursuant this Court's Order dated January 17, 2008, requiring Dow to explain what information was redacted on each page of every document produced by Dow. HRD disputes Dow's categories on a code by code basis. HRD does not dispute all of the categories of documents listed on Dow's Redaction Key; therefore, I will specifically address HRD's claims of relevance relating to Codes B and E-N on pages 1 and 2 of Exhibit B attached to HRD's motion.

18. As a preliminary matter, I will address what constitutes "light ends." It is my understanding that HRD defines "light ends" as any substance having a carbon number of 20 or under. Based on this definition, there are light ends that are volatiles and there are light ends that are heavier than volatiles, such as the low molecular weight portion of the product. Therefore, the light ends that HRD contends that Dow added back into the product or failed to remove from the product must be light ends that are heavier than volatiles.

19. Redaction Code B covers "Dow's internal code names for each piece of equipment for the portions of the Sarnia plant consisting of the reactor, post reactor heaters and solvent recycle systems." (Ex. B). HRD contends that "[w]ithout this information HRD is unable to determine the manufacturer, size, capacity or any other information about the equipment used at the Sarnia Plant to manufacture HRD products or remove light ends." (D.I. 152 at Ex. B). HRD's contention is misplaced. For  These code names are simply flowsheet names that Dow uses as an internal reference for its equipment. These codes are not relevant to any of the information indicated by HRD. In addition, Dow's internal

9

code names reveal information about the design and process flow of the plant, and Dow employs the same naming convention for all of its solution polyethylene plants.

20.  Redaction Code E covers "[i]nformation on actual catalyst efficiency data and costs for catalysts for the work done for HRD at Sarnia." (Ex. B). This is the very type of information that is a critical trade secret for Dow. HRD contends that it should nonetheless receive this information because "information regarding catalyst efficiency is important because some of the excessive 'lights ends' were being produced in Dow's reactor because of poor operating techniques." (D.I. 152 at Ex. B). HRD's contentions are misplaced. As mentioned above, it is my understanding is that HRD defines "light ends" as any substance having a carbon number of 20 or under. "Excessive 'light ends'" are not produced because of low catalyst efficiency. ██████████████████████████████████████████████████████████████████████████████████████████ Although I disagree with HRD's contention that Dow's reactor was run under poor operating techniques, even if a reactor was run under extremely poor operating conditions, this fact will not change. The characterization of the products confirms the anticipated behavior of the catalyst, and Dow has produced all documents relevant to the molecular weight distributions and composition data for the products produced at Sarnia.

21.  Redaction Code F covers "[d]iagrams and flow charts of sections of the plant or specific equipment that relates to the proprietary aspects of the Dow solution process, except for portions of the flow charts showing the final stage of product isolation from ██████████████████████████████████████ (Ex. B).

10

Again, this is critical trade secret information. HRD contends that "[t]his information is ext[r]emely relevant because the source(s) of the light ends cannot be determined without a full understanding of the manufacturing process and the capability of the equipment. In addition, this information would disclose if the light ends could easily be removed from the product." (D.I. 152 at Ex. B).



22.     Redaction Code G covers Dow's trade secrets concerning "[m]ethods/equipment used for on-line analysis for process control in Dow plants." (Ex. B). HRD contends that "[t]his information is extremely relevant because the operating conditions and on-line analysis is critically important in identifying the source of the light ends and whether they could have easily been removed." (D.I. 152 at Ex. B). HRD's claim of relevance is misplaced. ▌ Methods and equipment have nothing to do with defining operating conditions. Dow's on-line analysis equipment is proprietary and is not used anywhere else in the world by companies that operate solution polyethylene processes.

Dow's equipment and methods used for on-line analysis have nothing to with HRD's claimed need for the operating conditions and on-line analysis.

23.     Redaction Code H covers "[m]anufacturer names for equipment where identity of the manufacturer would reveal key aspects of the Dow solution manufacturing system that are not related to the production or removal of light ends." (Ex. B). HRD contends that "[t]his information will enable HRD to identify the capability of the processing equipment." (D.I. 152 at Ex. B). HRD's statement is factually incorrect. The capability of equipment is based on its design, *i.e.*, the ability to work under required temperatures and pressures or being able to move product from point A to point B. In many cases, Dow uses equipment specially designed by Dow, so the manufacturer name itself would reveal nothing to do with the size or capability of the equipment. Dow has not redacted any manufacturer names related to ▮▮▮▮▮▮▮▮ Revealing Dow's selection of manufacturers speaks to its engineering and procurement practices. It also indicates who Dow considers to be the best in the industry from a cost and integrity standpoint. Identification of the manufacturers that Dow chooses to work with on equipment and materials is propriety business information and has nothing to do with HRD's claim regarding the capability of equipment at Sarnia.

24.     Redaction Code I covers trade secrets concerning "[i]nformation related to the operating conditions of the reactor, such as ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ (Ex. B). HRD contends that "[t]his information is extremely relevant because the operating conditions are critically important in identifying the source of the light ends and whether they could have easily been removed." (D.I. 152 at Ex. B). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████████████████████████████████████
███████████████████████████ The characterization data that shows that the products produced at Sarnia had an ██████████████ No practical changes to the operating conditions in the reactor would change this fact. The operating conditions of Dow's reactor are proprietary and ████████████ ███████████████████████████████████████ ███████████████████████████ Disclosing reactor operating conditions such as ███████████████████████ ███████████████████████████████████████

25.  Redaction Code J covers "[i]nformation relating to details of the construction of the reactor equipment or piping such as reactor type or reactor feed systems." (Ex. B). HRD contends that "[t]his information is extremely relevant because the size and type of equipment will tell HRD's expert whether the equipment was capable of making HRD's products without excessive light ends." (D.I. 152 at Ex. B). HRD's reasoning is flawed. The construction of the reactor equipment has nothing to do with the fact that ███████████████████████████████████ ███████████████████████████████████████ ██████████ These facts will not change regardless of the size, shape or pressure rating or other details of the reactor. Information relating to the construction of the reactor has nothing to do with HRD's claim of relevance.

26.  Redaction Code K covers "[i]nformation relating to the operating conditions of the devolatizer system with the exception ████████████████ (Ex. B).

HRD contends that "[t]his information is critical to determining whether the Dow equipment could remove the excessive light ends. ▮▮▮▮▮ were part of an integrated scheme to remove the light ends." (D.I. 152 at Ex. B). HRD's contentions are flawed. ▮▮▮▮▮

▮▮▮▮▮ Solvent used in the polymerization is considered a volatile. ▮▮▮▮▮

▮▮▮▮▮ Dow has also released ▮▮▮▮▮

27.    Redaction Code L covers "[i]nformation relating to details of the construction of the process equipment or piping in the devolatizer system." (Ex. B). HRD contends that "[t]his information is critical to determining whether the Dow equipment could remove the excessive light ends. The devolitizers were part of an integrated scheme to remove the light ends." (D.I. 152 at Ex. B). HRD's statement of relevance is misguided. Only the operating conditions of ▮▮▮ relevant to HRD's claim. As mentioned above, ▮▮▮ The construction of Dow's devolatilizers is proprietary and not relevant to whether "excessive light ends" could be removed from the product.

28.    Redaction Code M covers "[i]nformation relating to the operating conditions of the ▮▮▮" (Ex. B). HRD contends that "[t]his information is critical to determining whether the Dow equipment could remove the excessive light ends. ▮▮▮ were all part of the intergrated [sic] scheme to remove light ends." (D.I. 152 Ex. B). The



29. Redaction Code N covers "[i]nformation relating to the details of the construction of the process equipment or piping in the ███████████ ███████████ (Ex. B). HRD contends that "[t]his information is critical to determining whether the Dow equipment could remove the excessive light ends. The ███████████████████████████████ were all part of the intergrated [sic] scheme to remove light ends." (D.I. 152 at Ex. B). ███████████████████████

30. In addition, I have reviewed certain documents attached to HRD's motion. The following are brief explanations regarding the redacted information in each of those documents.

31. HRD complains that Dow redacted information on catalysts used for HRD's products in its Exhibit J.1. (D.I. 152 at ¶ 12). In fact, the redacted information in these documents solely concerns catalyst information in specifications from *other* products. What follows are two examples of redactions in this document: ███████ ███████████████████████████████ The deleted information identifies catalyst information for one of Dow's commercial polymers; it does not identify the catalysts used for HRD's products.

32.  Next, HRD complains that Dow used Redaction Code D for equipment used for HRD in the documents it attached at Exhibit K. (D.I. 152 at ¶ 13). One document (Ex. K 2) is a an email from April 2002, three months *before* the Dow/HRD Agreements were signed and long before the Sarnia plant was converted. The redacted information concerns a different Dow facility; the comparable equipment at Sarnia had not yet been purchased or even designed yet.

33.  HRD next asserts that Dow has redacted laboratory notebooks directly related to research on HRD's products. (D.I. 152 at ¶ 9). Contrary to HRD's assertion, these Databooks contain information on various research projects unrelated to HRD. For example, some of the redacted projects were: ███████████████████████
███████████████████

34.  Lastly, HRD claims that Dow redacted test results for samples referenced on page 8 of the lab notebook attached to its motion as exhibit I.1. (D.I. 152 at ¶ 9). However, that page simply references receipt of the samples. It does not indicate that the Databook contains any results for the samples. In fact, the redacted portion of page 8 contains results from a ██████████ unrelated to HRD's wax project. HRD also complains that pages 21 and 26 of the same notebook were redacted, but, again, these pages concern projects completely unrelated to HRD.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 28, 2008

Brian W.S. Kolthammer, Ph.D.

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on September 12, 2008 I served via Electronic Mail and by Hand the attached document on the following:

> W. Harding Drane, Jr.
> Richard L. Horwitz
> Potter Anderson & Corroon LLP
> Hercules Plaza, 6th Floor
> 1313 North Market Street
> Wilmington, DE  19899-0951

Copies were also sent via Electronic Mail to the following:

> William C. Ferebee, Esquire
> Michael Landrum, Esquire
> O'DONELL, FEREBEE, MEDLEY & KEISER, P.C.
> 450 Gears, Eighth Floor
> Houston, TX  77067-4512

> /s/ Kenneth J. Nachbar
> Kenneth J. Nachbar (#2067)
> Samuel T. Hirzel (#4415)
> Morris, Nichols, Arsht & Tunnell
> 1201 North Market Street
> P.O. Box 1347
> Wilmington, DE  19899-1347
> (302) 658-9200