# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| DOW CHEMICAL CANADA INC. on its own behalf and as assignee of THE DOW CHEMICAL COMPANY, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| HRD CORPORATION (d/b/a Marcus Oil & Chemical) | ) ) ) | Case No. 05-023 (JJF) |
| Defendant, Counterclaim Plaintiff, | ) ) | **PUBLIC VERSION** |
| v. | ) ) | Original Filing Date:  April 16, 2008 |
| DOW CHEMICAL CANADA INC., on its own behalf and as assignee of THE DOW CHEMICAL COMPANY, and THE DOW CHEMICAL COMPANY, | ) ) ) ) ) | Public Version Date:  Sept. 12, 2008 |
| Counterclaim Defendants. | ) ) | |

**DOW'S OPPOSITION TO HRD CORPORATION'S EMERGENCY MOTION TO TAKE PHOTOGRAPHS AT ITS PLANT INSPECTION, MOTION TO COMPEL PRODUCTION OF DOCUMENTS, MOTION TO RE-INSPECT PLANT AND FOR <u>SANCTIONS</u>**

1644876

**TABLE OF CONTENTS**

I.      The Current Physical State Of The Plant Is Irrelevant And Has Been Seen By HRD on Four Separate Occasions.  Therefore, Dow Should Be Allowed To Proceed With Its Long-Planned Demolition...................................................................................................7

II.     HRD's Photograph And Video Claims Are Without Merit..............................................10

III.    HRD Requested Inspection *In Lieu* Of Having "Unredacted" Documents .......................11

IV.     A Trial Date Is Necessary To Avoid Further Delay ........................................................12

1644876

## TABLE OF AUTHORITIES

**Cases**

*Dyson Tech. Ltd. v. Maytag Corp.,*
241 F.R.D. 247 (D. Del. 2007) .............................................................. 11

*Elm Grove Coal Co. v. Director, O.W.C.P.,*
480 F.3d 278 (4th Cir. 2007) ............................................................... 11

*Long v. United States Brass Corp.,*
No. Civ.A. 03-B-968BNB, 2004 WL 1725766 (D. Colo. June 29, 2004) ................................. 3

*Martin v. Intex Recreational Corp.,*
Civ. A. No. 91-2200-JWL, 1994 WL 593987 (D.Kan. 1994)................................................. 11

1644876

Plaintiff/Counterclaim Defendants Dow Chemical Canada and The Dow Chemical Company (collectively "Dow") oppose Defendant/Counterclaim Plaintiff HRD Corporation's ("HRD") Emergency Motion to Take Photographs at its Plant Inspection, Motion to Compel Production of Documents, Motion to Re-Inspect Plant and for Sanctions. HRD's motion and requests for relief are meritless, intended to harass Dow, and merely the latest attempt by HRD to further delay the trial of this case—a case HRD should want to advance, not stall, since HRD has alleged it has been damaged by close to █████████

HRD filed its motion in spite of the following facts:

- HRD never raised these issues with Dow counsel before filing its motion;
- Dow sought to clarify the scope and reasons for the latest Sarnia site visit, precisely to avoid this type of litigation (Affirmation of Thomas Pulham, dated April 16, 2008 ("Pulham Aff."), ¶ 7);
- HRD never advised Dow that it wanted to take a video or photographs of the site prior to arrival, but was nevertheless afforded the opportunity to do both (Pulham Aff. ¶¶ 8, 16, 18);
- HRD has now inspected the Sarnia site on four (4) separate occasions (Pulham Aff. ¶¶ 2, 12-13);
- HRD, during its latest visit, took 144 photographs (Pulham Aff. ¶ 16);
- HRD never even looked at those photographs before it claimed they were inadequate and of poor quality, even though HRD was offered opportunities by Dow to see all of the photographs displayed on a laptop or projected on a screen on the very day of the inspection, April 8, 2008 (Pulham Aff. ¶¶ 21-22);
- As promised, Dow promptly sent HRD digital copies of all of the photographs taken by HRD at Sarnia; a compact disc containing the photographs was sent to HRD via overnight delivery on April 14, 2008, within a week of the inspection (Pulham Aff. ¶ 23);
- Although HRD did not wait to see them, the 144 photographs already taken by HRD of the Sarnia site are clear and of high quality (Pulham Aff. Ex. L) (attaching all the photographs);
- HRD advised Dow prior to the visit that it wanted to see the site so its two potential experts could see it to support their opinions, but one of these experts did not even show up and now HRD concocts a sham reason to visit Sarnia a fifth time, at considerable expense to Dow (Pulham Aff. ¶ 10);
- HRD stayed a mere 4.5 hours at the site, although the HRD representatives could have stayed all day (Pulham Aff. ¶ 20);
- HRD waited literally *years* to request to see the Sarnia site again, although it was on clear notice that it was going to be dismantled (Pulham Aff. ¶¶ 3-4); and

1

- HRD's request for additional documents was made orally just days ago, during the site visit, and Dow did not deny the request; Dow told HRD that any questions raised at the inspection would be formally answered through appropriate channels (Pulham Aff. ¶ 15, 19).

HRD's stratagem is transparent. Because it knows Dow is scheduled to dismantle the plant, it wants to delay that long-scheduled plan to put pressure on Dow by imposing substantial costs and disruption on Dow's business operations. HRD's bad faith in filing this motion is a continuation of the bad faith shown in █████████████████████████████████████████

Notably, HRD has never explained how the physical nature of the Sarnia plant as it exists in 2008 is relevant to any issue in this lawsuit. Nevertheless, Dow arranged for this latest HRD visit, to remove any discovery issues in an effort to focus on the underlying merits and avoid further delay. There is no reason to require Dow to delay demolition, at considerable expense set forth herein, based on HRD's manufactured claim to need a fifth site visit.

The Court has set a pre-trial conference in this case for June 2008. (D.I. 124). Dow seeks to keep that date and to proceed expeditiously with discovery and a prompt trial thereafter. HRD will only continue to play these games until trial. Indeed, during the limited depositions which were taken in February 2008, Mr. Abbas Hassan, one of the two owners of HRD, testified under oath that HRD has made no efforts to find the evidence it contends will support its claims and will not do so until the Court enters a trial date:

> Q. .... So I would think that if you were bringing a claim for ████████ ███████ you might actually try and get some documents when you have represented to the Court that you were doing that.
>
> A.   Whenever the trial date comes, we will definitely work on that.

*          *          *          *          *

2

Q.    Even though there might be ███████ at stake, you will
have a wait-and-see attitude?

A.    No, we will definitely start when -- if you have a court date
and then we will start working very hard on, you know, on getting
the documents from all around.  And if the date is, let's say,
tomorrow and the judge decides we'll have a trial this summer, so
we will start working on it.

(Abbas Hassan Dep., Feb. 18, 2008 at 51, 68-69, Pulham Aff. Ex. N).

Consequently, Dow hereby requests that the Court grant Dow's fully briefed motion (D.I.

133) for entry of one of the scheduling orders attached as Exhibits A and B in order to advance

the case consistent with the Court's ruling setting the pre-trial conference for June 2008 and to

diminish HRD's game-playing.[1]  We also seek an order denying HRD's latest motion in full.

*See Long v. United States Brass Corp.*, No. Civ.A. 03-B-968BNB, 2004 WL 1725766 (D. Colo.

June 29, 2004) (denying plaintiff's request to inspect plant where expense to the defendants was

more than $100,000, the plant had been changed to produce different products and potential trade

secrets would be disclosed).

## Factual Background

On April 8, 2008, representatives of HRD—including a potential expert, an HRD

consultant, an HRD attorney, and HRD employee Craig Cawley—met with representatives of

Dow, including Dow's attorneys and two Dow employees, for an inspection of the Sarnia

manufacturing facility in Canada.  (Pulham Aff. ¶¶ 12-13).  In addition to the inspection that

occurred on April 8, 2008, representatives of HRD had already visited the Sarnia facility on

multiple occasions, including May 2002, December 2002, and April 2004.  (Pulham Aff. ¶ 2).

In anticipation of this latest visit, Dow sought to determine from HRD precisely the scope and

purpose of the visit.  Before filing its motion, HRD never once indicated that the current physical

---

[1] This motion was fully briefed and noticed to be heard on March 7, 2008, but was taken
off the calendar.

1644876

nature of the plant was relevant to the issues in this case or was anything more than cumulative to what is found in Dow's documents. On the contrary, HRD provided only two reasons for its requested inspection:

1.    HRD first requested the inspection as a way to resolve the parties' dispute over the document redactions. Specifically, HRD stated, "Maybe my plant/processing expert would change his mind [on needing to see unredacted documents] after he has a chance to see the actual facility at Sarnia were [sic] the product was made. Can you arrange for that inspection?" (Pulham Aff. Ex. C). Thus, HRD did not indicate that the physical state of the plant had any relevance beyond what was already in the documents.

2.    When asked to specify the scope of its inspection, HRD simply stated, "HRD simply wants to see the physical site so they can understand how the plant was operated. Because of the extensive redaction of documents, this inspection is very important. In addition, as a matter of due diligence, [HRD's] experts want to be able to tell a jury that they physically saw the plant." (Pulham Aff. Ex. H). Nowhere in this letter did HRD indicate what issues in the case had anything to do with the current physical state of the plant or provide any notice to Dow as to what that relevance might be.

--    The Taking of Photographs and Video

At the beginning of the inspection, HRD stated, for the first time, that it wished to take photographs of the Sarnia plant. Dow explained that, in keeping with normal practice, outside visitors would not be allowed to take any photographs of equipment at Dow facilities. In spite of this routine practice, Dow offered to take any pictures that HRD wished and to provide HRD

4

with digital copies of those photographs shortly after the inspection. HRD objected, and stated for the first time that it had intended to take its own pictures and had also intended to take a video recording of the inspection that would include its commentary. Dow explained that HRD was welcome to take any notes it wanted, either by hand or by audio recorder, and to keep those confidential, but that any photography would need to follow the procedures already described. (Pulham Aff. ¶ 14).

To facilitate the taking of photographs, Dow provided a digital camera. At the beginning of the inspection, the camera was operated by a Dow representative who took a picture when requested to do so by someone from HRD. After a couple of photographs, however, to facilitate HRD's ability to photographically capture any images it wanted, Dow gave the camera to HRD to operate and take pictures when and where it chose. HRD took approximately 140 photographs of the site. At no point during the inspection did Dow interfere with HRD's ability to take a photograph with the Dow camera. And at no point did HRD complain that it could not photograph anything it wanted. (Pulham Aff. ¶ 16).

Later that morning, Dow's attorneys advised HRD's counsel that Dow would be willing to allow HRD to record its inspection on its video recorder, in addition to Dow's digital camera, provided that it promptly furnish a copy of the recorded video to Dow. Dow explained that this approach would allow each side to have the same evidentiary record of the inspection. Dow also explained that HRD would have the unfettered ability to make notes about its videotaping, and that Dow would not seek copies of those notes. Dow felt this would allow HRD to accomplish its goal of establishing a record, and explained this reasoning to HRD. HRD refused this offer and continued to take photographs with Dow's digital camera. (Pulham Aff. ¶ 18).

5

At the end of the inspection, HRD asked if Dow would display the photographs taken on the digital camera so that HRD could ensure that its notes corresponded to the ordering of the photographs. Although Dow initially did not believe that such display was possible at that moment, a Dow employee soon thereafter brought equipment into the conference room that would enable the photographs to be downloaded and displayed. Dow attorney James Sherer promptly notified HRD of this development, and twice asked HRD's representatives if they would like to return to the conference room to view the photographs. HRD declined the offer and departed. (Pulham Aff. ¶ 21).

Although HRD in its motion complains about the quality of the digital camera Dow provided, HRD had not seen either hard copies or large projection views of the photographs that it took with this camera before the motion was filed. Indeed, HRD declined Dow's offers to view the photographs at Sarnia after a Dow employee obtained equipment that would enable display in the conference room. (Pulham Aff. ¶ 22).

-- <u>Conducting an Informal Deposition</u>

Dow's attorneys also explained that this inspection would not be an opportunity for HRD to obtain informal discovery by asking questions of Dow employees who guided the tour. Dow requested that any questions be submitted to Dow's counsel so that they could be answered through appropriate channels. It was agreed by the parties that HRD would collect its questions and provide them to Dow's counsel at the end of the inspection. (Pulham Aff. ¶ 15).

Notwithstanding both Dow's request that HRD not attempt to elicit information from Dow employees during the inspection and the parties' agreement that questions would be collected and transmitted to Dow at the end of the inspection, HRD's representatives regularly asked questions. Dow's attorneys reminded HRD that the parties' agreement was to direct

6

questions to counsel after completion of the inspection, but Dow nonetheless provided HRD with answers to a number of its questions when they were asked during the inspection. For instance, Mr. O'Donnell answered a number of HRD's questions, and even unilaterally corrected misimpressions of HRD's consultant Dale Joy with respect to the functionality of certain pieces of equipment and the order of processes. (Pulham Aff. ¶ 17).

--    The End of the Sarnia Visit

HRD concluded its inspection before 1:30 p.m. At no time did any representative of Dow attempt to terminate prematurely the inspection or exert any pressure to bring the inspection to a close. Although HRD had initially sought to inspect the facility for two days, it in fact chose to use only 4.5 hours for the inspection. Similarly, although HRD had expressed a need for two of its outside experts to inspect the plant, only one of these potential expert witnesses in fact showed up at the plant. (Pulham Aff. ¶ 20).

I.    **The Current Physical State Of The Plant Is Irrelevant And Has Been Seen By HRD on Four Separate Occasions. Therefore, Dow Should Be Allowed To Proceed With Its Long-Planned Demolition**

The present dispute about a fifth plant inspection has nothing to do with any issue in this case, as HRD's own conduct evidences. This lawsuit was filed in January 2005. (D.I. 1). Even though HRD knew at least by August 2006 that the plant would be demolished (Pulham Aff. ¶ 3), it never mentioned inspecting the plant until December 2007—almost *three years* after the lawsuit was filed, more than *a year* after it knew Dow was going to demolish the plant, and almost *three and a half years* after HRD itself requested that the plant be shut down. Moreover, the current state of the plant has nothing to do with any of the issues in this lawsuit. HRD has never identified a single issue that could be resolved by reference to the current state of the plant.

Further, HRD is well aware that the Sarnia plant has been idle since HRD instructed Dow to stop manufacturing all products in July of 2004. It would have been absurd for HRD to

7

assume that Dow would let an asset indefinitely sit idle; if the state of the plant were genuinely relevant to HRD's claims, HRD would have requested another site visit long ago. Nonetheless, when HRD made its recent, belated request for a plant inspection, Dow agreed, simply to remove an issue from the case, in spite of the request being irrelevant, late, and inconvenient due to the imminent demolition.

HRD's current demand is particularly misguided given the irrelevance of the current state of the site to the lawsuit. This lawsuit concerns operations at the Sarnia plant that were conducted pursuant to a supply contract between Dow and HRD for wax products. Dow contends the products it supplied were within the specifications agreed to by the parties and therefore HRD owes Dow the payments HRD promised to make. HRD disputes that the products were within the specifications and also contends that Dow broke a promise to remove impurities HRD calls "light ends" or, in the alternative, HRD now contends that Dow deliberately added light ends to the products. Whether Dow ever promised to remove these light ends and whether the products were within the agreed specifications obviously have nothing to do with the state of the plant at any time. These issues will be resolved by witness testimony, documents, and testing of the products themselves.

In its motion, HRD makes vague, conclusory accusations that "key portions of the Plant already had been demolished or removed," referring to "all instruments in the control room, strategic temperature gauges and pressure gauges in the plant, and significant portions of the devolatilization units." (D.I. 140 at 1). Even if true, HRD's contention about portions of the plant that have allegedly *already* been demolished does not support yet another visit to the site.

1644876

Moreover, none of this physical equipment is "key" to any issue in this case and HRD fails to explain how any of these portions of the plant have any bearing on any issue in this case.[2]

Dow has already delayed demolition in order to accommodate HRD's schedule. Ordering Dow to further delay demolition of the plant will impose a significant burden on Dow. Dow estimates that beginning April 21, the delay would cost $20,000 per day or $100,000 per five-day work week. Moreover, Dow has already contracted for the demolition of the plant as well as the rest of the Sarnia facility. Requiring Dow to renegotiate its contract will impose further costs and other burdens on Dow. If the demolition is delayed to May 19, the demolition of the plant will have to be removed from the current demolition contract. The cost impact for Dow is estimated to be ████████████████ to renegotiate the demolition contract. (Pulham Aff. ¶ 24).

Indeed, given the numerous visits by HRD to the plant already, the lack of relevance of another visit to any issue in the case, HRD's delay in even requesting the last site visit, and the expense of delaying the demolition, the Court is amply warranted in denying the requested relief. In fact, courts have declined to allow *any* physical inspections of manufacturing facilities where, as here, the burdens of the inspection outweigh the benefits. *See, e.g., Long v. United States Brass Corp.,* No. Civ.A. 03-B-968BNB, 2004 WL 1725766 (D. Colo. June 29, 2004) (denying

---

[2] HRD also tries to create an inference of devious behavior by Dow by contending that "vital information" regarding temperature and pressure was allegedly recently removed "by grinding or a wire-brush." The temperature and pressure conditions used to make the products at issue in this lawsuit are contained in the documents produced by Dow already. As part of its ordinary demolition procedures, Dow removed or defaced certain tags for equipment that was going to be scrapped. This routine safety procedure is required to ensure that scrap equipment leaving Dow's possession is not reused in an inappropriate manner. The information on the name plates is safety information that indicates under what temperatures and pressures the equipment may be safely used. After demolition, this equipment is no longer safe unless it is re-certified independently. Therefore, the safety information must be removed prior to demolition so the equipment is not used again improperly. HRD's statement that any information engraved onto the plant piping or vessels is "vital" is baseless and obviously not made in good faith.

9

plaintiff's request to inspect plant where expense to the defendants was more than $100,000, the plant had been changed to produce different products and potential trade secrets would be disclosed).

## II.    HRD's Photograph And Video Claims Are Without Merit

HRD also complains that its inspection was "largely meaningless" because it was unable to take its own photographs and videos. However, HRD took over 140 photographs and turned down the opportunity to take videos.  Indeed, HRD never even looked the photographs it took— although afforded an opportunity to do so—before filing this motion. Finally, HRD never even asked prior to arrival to be allowed to take photographs or a video, and in fact suggested quite the opposite to Dow.  Moreover, as explained above, HRD was permitted to take photographs and in fact *actually took* 144 photographs of the plant. As promised by Dow at the time of the inspection, digital copies of these photographs were promptly sent to HRD.  A disc containing all 144 photographs taken by HRD at Sarnia was sent to HRD via overnight delivery on April 14, 2008.  (Pulham Aff. ¶ 23).

HRD presents two arguments as to why these 144 photographs are inadequate.  First, HRD argues that the camera it wanted to use was "high-quality" but the camera used for the 144 photographs was inferior. (D.I. 140 at 1-2).  However, when the opportunity was presented, HRD refused to even look at the photographs from the supposedly inferior camera.  Therefore, HRD has no basis for contending that these photographs were not perfectly adequate for HRD's needs. In any event, HRD *was* allowed to use its video, but declined to do so.

Second, HRD argues that the photographs and videos would be work product. (D.I. 140 at 2).  But HRD indicated that the purpose of the inspection was so that its expert could "tell the jury" it physically inspected the plant.  Anything HRD's testifying expert views, including photographs and videos of the plant, could not be withheld as attorney work product, even if

10

1644876

taken by HRD's counsel. *See Elm Grove Coal Co. v. Director, O.W.C.P.*, 480 F.3d 278, 303 (4th Cir. 2007) ("[D]raft expert reports prepared by counsel and provided to testifying experts, and attorney-client communications that explain the lawyer's concept of the underlying facts...are not entitled to protection under the work-product doctrine."); *Dyson Tech. Ltd. v. Maytag Corp.*, 241 F.R.D. 247, 251 (D. Del. 2007) (requiring "disclosure of all materials considered by [a party's] experts, . . regardless of [any] claims of attorney-client or work-product privilege"); *Martin v. Intex Recreational Corp.*, Civ. A. No. 91-2200-JWL, 1994 WL 593987, *2 (D. Kan. Oct. 27, 1994) ("The work that retained experts do in anticipation of litigation is not work product . . . .").

Consequently, HRD had every opportunity to photograph and videotape the Sarnia plant. HRD's decision to forego that opportunity and its refusal to take the opportunity even to look at the over 140 photographs it took fails to justify a fifth inspection.

III.    **HRD Requested Inspection *In Lieu* Of Having "Unredacted" Documents**

HRD also argues that its inspection was "hampered" by not having unredacted documents. (D.I. 140 at 2-3). However, HRD proceeded to conduct the inspection knowing it did not have these documents and in fact, proposed the inspection in the first place as a substitute for having documents. Specifically, HRD first suggested the inspection as a way to resolve the parties' dispute over the document redactions. In December 2007, HRD wrote that its experts felt more comfortable having access to all documents in unredacted form. But, HRD wrote, they might change their mind if they could inspect the plant:

> Maybe my plant/processing expert would change his mind after he
> has a chance to see the actual facility at Sarnia were [sic] the
> product was made. Can you arrange for that inspection?

(Pulham Aff. Ex. C). Thus, HRD suggested conducting the plant inspection *before* having unredacted documents as a way of potentially resolving that dispute. Now it seeks to turn its

11

1644876

representation on its head, claiming that it cannot have a meaningful site visit without unredacted documents.

More fundamentally, HRD's claim that it needs some amorphous "unredacted" documents is a make-weight to delay this case. Unredacted documents have been produced to HRD and the small number of remaining redacted documents is completely irrelevant to any issue in this case. HRD has literally only sheer speculation that any redactions are shielding relevant material. It is telling that in spite of HRD having been given thousands of documents, including documents that were previously redacted (which Dow unredacted simply to avoid more discovery disputes that would slow down the case getting to trial), HRD has not shown the relevance of any such document to another Sarnia site visit. Further, Dow has provided a page by page list of all redactions and the reasons for them. Dow is also happy to provide the Court *in camera* all unredacted documents and to explain any issues regarding them (i.e., what the technical documents are).[3]

Consequently, HRD's argument that it needs these documents before re-inspecting the plant is meritless.

## IV.    A Trial Date Is Necessary To Avoid Further Delay

HRD's latest motion is further evidence of HRD's strategy: to create discovery disputes in an effort to avoid trial and impose costs on Dow. Dow requests that, in addition to denying HRD's motion, the Court issue one of the scheduling orders attached hereto as Exhibits A and B. HRD has admitted that it is doing no work to prepare this case for eventual resolution, is avoiding any activity that will require expenditure of fees, and is waiting for this Court to enter a

---

[3] HRD also demands "full schematics" of the entire plant. These drawings would show every pipe and vessel in the plant and how they are connected together. HRD has never explained how the details of the piping are relevant to any issue in this case. Thus, HRD's unexplained demand for "full schematics" should be rejected as both irrelevant and unnecessarily revealing Dow's proprietary information.

12

trial date. For the reasons set forth herein, and in Dow's Motion for the Entry of a Scheduling

Order (D.I. 133), Dow respectfully seeks entry of a scheduling order that will force HRD to

focus on the merits of this case and will help bring these endless discovery disputes to a halt.

Finally, HRD has sought sanctions in connection with its discovery motion. That claim is

so devoid of merit as noted herein that the only party with a legitimate claim to such sanctions is

Dow. Dow is foregoing making such a "tit for tat" motion so that this matter can avoid endless

discovery disputes and proceed promptly to conclusion. For this reason, we implore the Court to

set a trial date herein.

| | |
|---|---|
| OF COUNSEL: | MORRIS, NICHOLS, ARSHT & TUNNELL LLP |
| | |
| Aaron A. Barlow | By: _Kenn J. Nachbar_ |
| JENNER & BLOCK LLP | Kenneth J. Nachbar (#2067) |
| 330 N. Wabash Ave. | Samuel T. Hirzel (#4415) |
| Chicago, IL 60611 | 1201 N. Market Street |
| (312) 222-9350 | Wilmington, DE 19899-1347 |
| | (302) 658-9200 |
| | *Attorneys for Dow Chemical Canada* |
| | *Inc. and The Dow Chemical Company* |
| Andrew Weissmann | |
| Katya Jestin | |
| JENNER & BLOCK LLP | |
| 919 Third Avenue | |
| 37th Floor | |
| New York, NY 10022-3908 | |
| (212) 891-1600 | |

Dated:    April 16, 2008

1644876

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on September 12, 2008 I served via Electronic Mail and by Hand the attached document on the following:

W. Harding Drane, Jr.
Richard L. Horwitz
Potter Anderson & Corroon LLP
Hercules Plaza, 6th Floor
1313 North Market Street
Wilmington, DE  19899-0951

Copies were also sent via Electronic Mail to the following:

William C. Ferebee, Esquire
Michael Landrum, Esquire
O'DONELL, FEREBEE, MEDLEY & KEISER, P.C.
450 Gears, Eighth Floor
Houston, TX  77067-4512

*/s/ Kenneth J. Nachbar*
Kenneth J. Nachbar (#2067)
Samuel T. Hirzel (#4415)
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200