**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| DOW CHEMICAL CANADA INC. on its own behalf and as assignee of THE DOW CHEMICAL COMPANY,<br><br>       Plaintiff,<br><br>       v.<br><br>HRD CORPORATION (d/b/a Marcus Oil & Chemical)<br><br>       Defendant, Counterclaim Plaintiff,<br><br>       v.<br><br>DOW CHEMICAL CANADA INC., on its own behalf and as assignee of THE DOW CHEMICAL COMPANY, and THE DOW CHEMICAL COMPANY,<br><br>       Counterclaim Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 05-023 (JJF)<br><br>**PUBLIC VERSION**<br><br>Original Filing Date:  April 16, 2008<br>Public Version Dated:  September 12, 2008 |

**AFFIRMATION OF THOMAS PULHAM**

I, Thomas Pulham, affirm as follows pursuant to Title 28, United States Code, section 1746:

1.      I am an attorney in the Washington, D.C., office of Jenner & Block LLP, which represents Dow Chemical Canada, Inc. and The Dow Chemical Company (collectively, "Dow") in the above-captioned matter.

<u>HRD'S PREVIOUS VISITS TO SARNIA AND NOTICE OF ITS DEMOLITION</u>

2.      On information and belief, prior to the onset of this litigation, representatives of the HRD Corporation ("HRD") had visited Dow's Product Development Plant ("PDP") in

Sarnia, Ontario, Canada, on multiple occasions, including May 2002, December 2002, and April 2004. HRD employee Craig Cawley was present for at least two of these visits and HRD consultant Greg Borsinger was present for at least one.

      3.     Dow ceased operations at the PDP at HRD's request in July 2004. On January 18, 2005, Dow publicly announced that the PDP would be "mothballed" or idled. A copy of that announcement is attached hereto as Exhibit A. And on August 31, 2006, Dow publicly announced its intent to cease all operations at the Sarnia facility by the end of 2008. The announcement explained that the PDP would be "moved from a mothballed state to permanent shut down." A copy of that announcement is attached hereto as Exhibit B.

HRD'S BELATED REQUESTS TO VISIT THE SARNIA SITE AGAIN

      4.     HRD first raised the possibility of another inspection of the Sarnia plant for the purposes of this litigation in a letter dated December 12, 2007, attached hereto as Exhibit C. The inspection was presented as a possible means of resolving a dispute between the parties over the redaction of certain documents. Thus, after arguing that its experts needed to see unredacted versions of these documents, HRD's counsel asked, "[m]aybe my plant/processing expert would change his mind after he has a chance to see the actual facility at Sarnia were [sic] the product was made. Can you arrange for that inspection?"

      5.     Dow addressed this issue in a letter dated December 18, 2007, attached hereto as Exhibit D. Dow observed that the request for an inspection appeared to be disingenuous, as the discovery dispute centered on the relevance of the redacted material and HRD's experts should not need to inspect the plant in order to explain why the redacted information was reasonably necessary for the formation of their expert opinions on the matters at issue in this litigation.

6.      Dow's December 18 letter notwithstanding, HRD claimed in letters dated January 25, 2008, and February 6, 2008, that it had not received any response to its request to inspect the Sarnia facility.  These letters are attached hereto as Exhibits E and F, respectively.

7.      In a conference call on February 22, and in a letter dated February 29, 2008, attached hereto as Exhibit G, Dow informed HRD that it would consider its request for an inspection of the Sarnia plant provided that HRD explained the reason(s) for its request, a description of the scope of the proposed inspection, and a list of the proposed attendees.  Dow reminded HRD that it had been previously informed that the facility was scheduled to be dismantled as early as April 2008 and that it would not be kept in its current state pending HRD's request.  Finally, Dow expressed its skepticism as to what benefit could be derived from a physical inspection of the site four years after the events at issue in this lawsuit, especially given that representatives of HRD had visited the site on at least three prior occasions.

8.      HRD provided the following response on March 6, 2008: "As to the scope of the inspection, HRD simply wants to see the physical site so they can understand how the plant was operated.  Because of the extensive redaction of documents, this inspection is very important.  In addition, as a matter of due diligence, [HRD's] experts want to be able to tell a jury that they physically saw the plant."  HRD's March 6 letter is attached hereto as Exhibit H.  No mention was made of a need to photograph or otherwise record the inspection.

9.      On March 10, 2008, Dow informed HRD in a conference call and a letter, attached hereto as Exhibit I, that the plant would be available for inspection any day between March 10 and March 31.

10.     On March 17, 2008, counsel for HRD informed Dow that he would be in trial through the end of the month and would not be able to conduct the inspection until after that

time. HRD suggested that the inspection take place over two days, on April 8 and 9. HRD also provided Dow with a list of nine attendees for the inspection, which list included two potential experts who had not previously been identified to Dow. HRD's March 17 letter is attached hereto as Exhibit J. As it turned out, only four of the nine identified attendees, and only one of the new potential experts, actually showed up for the inspection. And HRD conducted the inspection in just 4.5 hours.

11.     Although demolition had been scheduled to begin as early as the beginning of April, Dow agreed, in a letter dated March 24, 2008, to postpone demolition in an attempt to accommodate HRD's counsel's schedule. Dow further agreed to the April 8 date, but disagreed that more than a full day would be required (which proved to be accurate). Accordingly, Dow limited its agreement to a single full day of inspection. Dow's March 24 letter is attached hereto as Exhibit K.

THE HRD APRIL 8, 2008 SARNIA PLANT SITE VISIT

12.     I was present for HRD's inspection of the Sarnia PDP plant. Also present on behalf of Dow were James Sherer, an in-house attorney at Dow, Joe O'Donnell, Activity Coordinator/Gatekeeper for the PDP, and Livio Nannini, Quality Coordinator for the PDP.

13.     Representatives for HRD arrived at Sarnia at approximately 9:00 am. These representatives were William C. Ferebee (HRD's counsel), Craig Cawley (HRD's marketing manager), Greg Borsinger (an HRD consultant), and Dale Joy (a potential expert witness).

14.     Shortly after the arrival of HRD's representatives, Mr. Sherer and I met with the HRD representatives and described the procedures that would be followed during the inspection of the facility. We explained that, in keeping with normal practice, outside visitors would not be allowed to take any photographs of equipment at Dow facilities. In spite of this routine practice,

4

we offered to take any pictures that HRD wished and to provide HRD with digital copies of those photographs shortly after the inspection. HRD objected, and stated for the first time that it had intended to take its own pictures and had also intended to take a video recording of the inspection that would include its commentary. We explained that HRD was welcome to take any notes it wanted, either by hand or by audio recorder, and to keep those confidential, but that any photography would need to follow the procedures already described.

15.    We also explained that this inspection would not be an opportunity for HRD to obtain informal discovery by asking questions of Dow employees who guided the tour. We requested that any questions be submitted to Dow's counsel so that they could be answered through appropriate channels. It was agreed by the parties that HRD would collect its questions and provide them to Dow's counsel at the end of the inspection.

16.    To facilitate the taking of photographs, Dow provided a digital camera. At the beginning of the inspection, the camera was operated by a Dow representative who took a picture when requested to do so by someone from HRD. After a couple of photographs, however, to facilitate HRD's ability to photographically capture any images it wanted, we gave the camera to HRD to operate and take pictures when and where it chose. HRD took 144 photographs of the site. At no point during the inspection did Dow interfere with HRD's ability to take a photograph with the Dow camera. And at no point did HRD complain that it could not photograph anything it wanted or complain about the quality of the photographs.

17.    Notwithstanding both Dow's request that HRD not attempt to elicit information from Dow employees during the inspection and the parties' agreement that questions would be collected and transmitted to Dow at the end of the inspection, HRD's representatives regularly asked questions. We reminded HRD to collect and present these questions later, but nonetheless

provided HRD with answers to a number of its questions when they were asked during the inspection. For instance, Mr. O'Donnell answered a number of HRD's questions, and even unilaterally corrected misimpressions of HRD's consultant Dale Joy with respect to the functionality of certain pieces of equipment and the order of processes.

18.    Later that morning, we advised HRD's counsel that Dow would be willing to allow HRD to record its inspection on its video recorder, in addition to Dow's digital camera, provided that it promptly furnish a copy of the recorded video to Dow. We explained that this approach would allow each side to have the same evidentiary record of the inspection. We also explained that HRD would have the unfettered ability to make notes on its videotaping, and that we would not seek copies of those notes. We felt this would allow HRD to accomplish its goal of establishing a record, and explained this reasoning to HRD. HRD refused this offer and continued to take photographs with Dow's digital camera.

19.    HRD asked to take a break at approximately 12:00 p.m. During that break, HRD requested that Dow produce a number of categories of documents, namely (1) a "full set of schematics," defined as process and instrumentation diagrams ("P&ID") and process flow diagrams, (2) minutes from daily operating meetings and any special meetings where problems with the devolatizers were discussed, (3) a daily operating log, and (4) operating conditions for typical runs for each of three products made at Sarnia. At the end of the inspection, HRD also requested (5) mechanical flow diagrams for ███████████ at the plant, and asked a single question: (1) was the ██████████████████████████████ ████████ and, if not, then on which portions?

20.    HRD concluded its inspection before 1:30 p.m. At no time did any representative of Dow attempt to terminate prematurely the inspection or exert any pressure to bring the

inspection to a close.  Although HRD had initially sought to inspect Sarnia for two days, it in fact chose to use only 4.5 hours for the inspection.  Similarly, although HRD had expressed a need for two of its outside experts to inspect the plant, only one of these potential expert witnesses in fact showed up at the plant.

21.     At the end of the inspection, HRD asked if Dow would display the photographs taken on the digital camera so that HRD could ensure that its notes corresponded to the ordering of the photographs.  Although we initially did not believe that such display was possible at that moment, a Dow employee soon thereafter brought equipment into the conference room that would enable the photographs to be downloaded and displayed.  Mr. Sherer promptly notified HRD of this development, and twice asked HRD's representatives if they would like to return to the conference room to view the photographs.  HRD declined the offer and departed.

22.     In its motion, HRD complains about the quality of the digital camera Dow provided, yet HRD had not seen the photographs at the time it filed its motion.  Indeed, HRD declined Dow's offers to view the photographs at Sarnia after a Dow employee obtained equipment that would enable display in the conference room.  All of the photographs taken by HRD at Sarnia with Dow's digital camera are attached hereto as Exhibit L.

23.     A compact disc containing digital copies of all 144 photographs taken by HRD at Sarnia was sent to HRD via overnight delivery on April 14, 2008.  The transmittal letter that accompanied the disc is attached hereto as Exhibit M.

THE PREJUDICE TO DOW OF FURTHER DELAY FOR A FIFTH HRD SITE VISIT

24.     According to the Sarnia Site Manager, Dow had to prevail upon the demolition contractor to rearrange his schedule in order to permit the April 8, 2008, HRD Sarnia inspection. However, further delays to the demolition process may not be accommodated by Dow's

contractor without considerable expense. Dow estimates that beginning April 21, the delay would cost $20,000 per day or $100,000 per five-day work week. If the demolition is delayed to May 19, the demolition of the PDP will have to be removed from the current demolition contract. The cost impact for Dow is estimated to be ███████████ to renegotiate the demolition contract.

THE DEPOSITION OF ABBAS HASSAN

25.    Abbas Hassan, the president and chairman of Marcus Oil & Chemical and a principal of HRD, was deposed in connection with the above-captioned matter on February 18, 2008. In his deposition, Mr. Hassan testified under oath that HRD would not make efforts to locate evidence to support its counterclaims until a trial date has been set by this Court. Pages from Mr. Hassan's February 18 deposition containing these statements are attached hereto as Exhibit N.

I state under penalty of perjury that the foregoing is true and correct.

Executed on April 16, 2008

By: _____

Thomas Pulham

8

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on September 12, 2008 I served via

Electronic Mail and by Hand the attached document on the following:

W. Harding Drane, Jr.
Richard L. Horwitz
Potter Anderson & Corroon LLP
Hercules Plaza, 6th Floor
1313 North Market Street
Wilmington, DE  19899-0951

Copies were also sent via Electronic Mail to the following:

William C. Ferebee, Esquire
Michael Landrum, Esquire
O'DONELL, FEREBEE, MEDLEY & KEISER, P.C.
450 Gears, Eighth Floor
Houston, TX  77067-4512

*/s/ Kenneth J. Nachbar*
Kenneth J. Nachbar (#2067)
Samuel T. Hirzel (#4415)
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200