# Exhibit 1

This Exhibit Was
Redacted In Its Entirety

# **Exhibit 2**

DATE      July 1, 2002

## THE DOW CHEMICAL COMPANY

## AND

## HRD CORPORATION

SARNIA PE WAX SUPPLY AGREEMENT

Table of Contents

| *Clause* | | *Page* |
|---|---|---|
| 1. | Definitions | 3 |
| 2. | Duration | 7 |
| 3. | Conversion of the Facility | 7 |
| 4. | Products, Product Mix and Performance Criteria | 8 |
| 5. | Supply Chain Team | 9 |
| 6. | Forecasting, Ordering, and Supply | 9 |
| 7. | Delivery | 10 |
| 8. | Price, Price Adjustment and Payment Terms | 11 |
| 9. | Product Warranty | 13 |
| 10. | Acceptance | 13 |
| 11. | Liability, Indemnification and Limitation of Remedies | 14 |
| 12. | Changes to Production | 16 |
| 13. | Hardship | 16 |
| 14. | Performance Warranties | 17 |
| 15. | Force Majeure and Government Controls | 17 |
| 16. | Intellectual Property | 18 |
| 17. | Notices | 20 |
| 18. | Variation | 22 |
| 19. | Confidentiality | 22 |
| 20. | Assignment | 23 |
| 21. | Termination | 23 |
| 22. | Severability | 25 |
| 23. | Law | 26 |
| 24. | Alternative Dispute Resolution | 26 |
| 25. | Parties in Interest | 26 |

THIS SUPPLY AGREEMENT ("Agreement") is made and entered into the 1st day of July, 2002 ("Effective Date") between **THE DOW CHEMICAL COMPANY,** a Delaware corporation located in Midland, Michigan ("TDCC") and **HRD CORPORATION,** trading as Marcus Oil & Chemicals, a Texas corporation located in Houston, Texas ("HRD") (together the "Parties" or individually a "Party").

## WHEREAS:

(A)     TDCC has the manufacturing expertise and "know how" to make PE Wax.

(B)     HRD & TDCC have separately entered into a Joint Development Agreement ("JDA") to collaborate on the development of PE Wax.

(C)     HRD wishes to purchase PE Wax manufactured consistent with certain mutually agreed upon specifications ("Product") from TDCC, and TDCC is willing to supply HRD with Product under the terms and conditions as are more particularly described below.

(D)     TDCC is willing to convert an existing manufacturing plant ("Facility") at its Sarnia Site to manufacture sixty (60) million pounds a year of PE Wax for a period not to exceed forty eight (48) months while HRD determines if further expansion is commercially reasonable. HRD is willing to repay TDCC its investment costs in converting the facility under the terms and conditions as are more particularly described below.

## NOW IT IS HEREBY AGREED as follows:

1.      **DEFINITIONS**

        In this Agreement the following terms shall, unless the context requires otherwise, have the meanings respectively assigned thereto below:

| | |
|---|---|
| "Affiliate(s)" or "Affiliated Companies" | Any entity that directly or indirectly owns, is owned by, or is under the common ownership with a Party, at any time during the term of this Agreement. "Owns", "owned", or "ownership" means direct or indirect possession of more than 50 percent of the votes of holders of a corporation's voting securities, or a comparable equity or other ownership interest in any other type of entity. |
| "Agreement" | This Supply Agreement between TDCC and HRD including the Schedules hereto. |
| "Annual Capacity" | Sixty (60) million pounds of Product. |
| "Annual Operating Payment" or "AOP" | The payment due from HRD for operation of the |

3

Facility as set forth in Clause 8.1.2.

"Background Information"  Background Information is any Information owned or controlled by a Party or its Affiliates prior to the Effective Date, as well as any Information developed by or for a Party or its Affiliates independent of this Agreement.

"Background Patent Rights"  Background Patent Rights are those claims of any patents or patent applications, owned or controlled by a Party or its Affiliates at anytime during the term of this Agreement, that define any invention other than a Development.

"Beneficial Manufacture"  TDCC' first Delivery of Product to HRD.

"Business Day"  Business Day shall mean any day other than a Saturday, Sunday, bank holiday or national holiday in the United States.

"Capacity Rights Payment" or "CRP"  The payment due from HRD to TDCC for the exclusive right to the Annual Capacity as set out in Clause 8.1.1.

"Conversion Period"  Conversion Period has the meaning ascribed to it in Clause 3.1 of this Agreement.

"Delivery"  Delivery has the meaning ascribed to it in Clause 7.3 of this Agreement.

"Development"  Development has the meaning ascribed in Clause 16.2.

"Effective Date"  Effective Date has the meaning ascribed to it in the Preamble.

"Estimated CRP Payment"  The initial payment due from HRD to TDCC as described in Clause 8.1.1

"Facility"  The plant(s), items of equipment, warehouses, and other manufacturing and storage facilities that are located on the Sarnia Site, owned by TDCC or an Affiliate of TDCC, used solely in connection with the manufacture of the Product that is (i) capable of producing at least two (2) different grades of Prime Product and (ii) capable of producing the Annual Capacity

4

| | |
|---|---|
| "Final CRP Payment" | The payment made by either HRD or TDCC to reflect the difference between the Estimated CRP Payment and the actual costs incurred by TDCC in converting the Facility as set out in Clause 8.1.1. |
| "Force Majeure" | Force Majeure has the meaning ascribed to it in Clause 15.2 of this Agreement. |
| "Implementation Date" | The date upon which the Parties agree in writing that the (i) JDA has produced the necessary Development outcomes to warrant the commencement of the Conversion Period, (ii) Schedules 1-3 have been completed and (iii) the estimates of the conversion costs supplied by TDCC are acceptable to HRD. |
| "Indemnified Party" | Indemnified Party has the meaning ascribed to it in Clause 11.3.3 of this Agreement. |
| "Indemnifying Party" | Indemnifying Party has the meaning ascribed to it in Clause 11.3.3 of this Agreement. |
| "Information" | Information has the meaning ascribed to it in Clause 16.3 of this Agreement. |
| "Joint Development Agreement" or "JDA" | That Joint Development Agreement for PE Wax between the Parties with an effective date of July 1, 2002. |
| "Off Spec Product" | Product that does not meet one or more of the specifications in Schedule 1. |
| "Patent Rights" | Patent Rights means any claim of any patent or patent application, owned or controlled by either Party or its Affiliates, that defines a Development. |
| "PE Wax" | Metallocene ethylene homopolymers and copolymers having a Mn within the range of 600-9,000, a density > 0.900g/cc, and $T_m$ above 50°C. |
| "Price" | Price is the amount of money in United States dollars that HRD will pay TDCC to manufacture Product, the components of which are set out in Clauses 8.1 of this Agreement. |

5

"Prime Product"

PE Wax that meets the specifications set out in Schedule 1 as determined in accordance with the analytical methods also set out in Schedule 1 or such alternative analytical methods as shall from time to time be agreed in writing between the parties.

"Product"

All PE Wax manufactured with the intent to (i) be delivered to HRD and (ii) to meet the specifications set out in Schedule 1 as determined in accordance with the analytical methods also set out in Schedule 1 or such alternative analytical methods as shall from time to time be agreed in writing between the parties. Product includes Off Spec Product. Transition material produced when changing between PE Wax manufactured for HRD and that output to be consumed by TDCC is not Product.

"Product Mix"

The specific PE Waxes produced at the Facility.

"Project Threatening Event"

Project Threatening Event has the meaning ascribed in Clause 3.2.1 of this Agreement.

"Sarnia Site"

The Sarnia, Ontario, Canada manufacturing site owned and operated by TDCC or an Affiliate of TDCC and on which the Facility is to be located.

"Supply Chain Team" or "SCT"

SCT has the meaning ascribed to it in Clause 5.1 of this Agreement.

"Supply Period"

Supply Period has the meaning ascribed to it in Clause 2 of this Agreement.

"Variable Costs Payments" or "VCP"

Variable Costs has the meaning ascribed to it in Clause 8.1.3 of this Agreement.

"Vendor Schedule"

Vendor Schedule has the meaning ascribed to it in Clause 6.4 of this Agreement.

"Year"

The successive periods of twelve months commencing on each 1st January.

"Yearly Forecast"

Yearly Forecast has the meaning ascribed to it in Clause 6.3 of this Agreement.

6

2.     **DURATION**

2.1    This Agreement shall commence on the Effective Date and shall continue in force for forty eight (48) months from the date of Beneficial Manufacture at the Facility (the "Supply Period") unless terminated earlier pursuant to the terms of the Agreement. If not terminated earlier, the Parties agree to meet at least twelve (12) months prior to the expiration of the Supply Period and discuss whether they want to extend the Agreement and, if so, upon what terms.

2.2    If the Implementation Date is not reached six (6) months after the Effective Date then this Agreement shall terminate unless the Parties mutually agree to extend.

3.     **CONVERSION OF THE FACILITY**

3.1    Subject to the Parties agreeing in writing that the JDA has produced the necessary Development outcomes ("Implementation Date"), TDCC shall immediately commence and, with all reasonable commercial diligence, proceed with preparing plans and engineering studies and obtaining all engineering, planning, regulatory and all other approvals, and doing all such other things, advisable or necessary, for the conversion and operation of the Facility for the commercial manufacture of the Product, and shall, subject to Clauses 3.2 and 15, use its best efforts to complete conversion of the said Facility within twelve (12) months of the Implementation Date ("Conversion Period"). For purposes of this Clause 3, the phrase "best efforts" shall mean TDCC's timely pursuit and exhaustion of all commercially prudent and reasonable activities ordinarily available for the conversion of a manufacturing facility. TDCC shall have the sole responsibility and discretion for all decisions related to the conversion of the Facility including but not limited to those decisions related to equipment specifications, manufacturing quality and contractors.

3.2    Termination due to Project Threatening Event

       3.2.1. At any time prior to the date of Beneficial Manufacture for the Facility, TDCC shall, following a determination by TDCC, acting reasonably and properly and taking into account all relevant circumstances, that (i) there has occurred one or more events during the conversion of the Facility beyond the reasonable control of TDCC and which TDCC reasonably believes, either singly or as a whole, are reasonably likely to threaten or imperil TDCC's ability to achieve Beneficial Manufacture within the Conversion Period or (ii) subject always to TDCC having complied with the provisions of Clause 3.1, it would not be possible for TDCC, despite using its best efforts, to operate the Facility in a safe and proper manner (each a "Project Threatening Event"), notify HRD in writing of such Project Threatening Event, specifying in summary fashion the nature of the Project Threatening Event and the expected period of delay beyond the Conversion Period in achieving Beneficial Manufacture from the Facility that is due to such Project Threatening Event. Provided, however, that a TDCC decision to not notify HRD of a potential Project Threatening Event will not be considered a material breach of this Agreement unless it is objectively certain that the circumstances potentially constituting a Project Threatening Event would in fact be reasonably likely to

7

threaten or imperil TDCC's ability to Beneficial Manufacture from Facility within the Conversion Period.

3.2.2   Upon receipt of such notice by HRD of a Project Threatening Event, unless HRD disputes that a Project Threatening Event has occurred, in which case such dispute may be resolved pursuant to Clause 24, the parties will promptly meet, through each Party's respective SCT representatives or through such other representatives as each Party may designate, and discuss in good faith to further identify and outline: (i) the nature of the Project Threatening Event, (ii) the potential time period of delay, if any, to TDCC's achieving Beneficial Manufacture within the Conversion Period due to the Project Threatening Event, (iii) the potential solutions to such Project Threatening Event,  and (iv) the time frame for implementing a solution to such Project Threatening Event, if any.  Following the conclusion of such discussions to the reasonable satisfaction of both parties, HRD shall, subject to Clause 15, have the right to (i) accept the risk, if any, such Project Threatening Event (and the corresponding delay to the achievement of Beneficial Manufacture within the Conversion Period due to such Project Threatening Event) presents, in which case TDCC shall have no liability to HRD for the impact of the Project Threatening Event provided that TDCC uses its best efforts to complete conversion or (ii) to terminate this Agreement pursuant to the provisions of Clause 21.4.

3.2.3   If both parties acting reasonably cannot reach a mutually agreeable plan of action to overcome such a Project Threatening Event pursuant to 3.2.2 above or TDCC, despite using its best efforts, cannot implement the said plan so as to address and/or overcome the said Event to HRD's satisfaction TDCC may terminate this Agreement in accordance with the provisions of Clause 21.4.

3.3   It is understood between the Parties that any changes to the Product Mix, the specifications in Schedule 1 or HRD's requirement's set out in Schedule 2 during the Conversion Period may result in an extension of the Conversion Period, a change in the CRP, the AOP or the VCP or any combination of the above.

## 4.   PRODUCTS, PRODUCT MIX AND PERFORMANCE CRITERIA

4.1   The specifications for the Prime Products to be produced at the Facility are as set out in Schedule 1.  The specific Prime Products to be produced at the Facility shall be known as the "Product Mix".  The specification of any Prime Product and the resultant Product Mix for the Facility shall be subject to approval of the Supply Chain Team.

4.2   HRD's currently estimated annual need for Product from TDCC is as set out in Schedule 2.  Conversion of the Facility as outlined in Clause 3 will use Schedule 1 and Schedule 2 as the basis for designing the necessary changes to, and estimating the capabilities of, the Facility.  For the avoidance of doubt, such estimate in Schedule 2 is indicative only and shall not constitute an obligation on the part of HRD to purchase or take delivery of the estimated quantities.

8

5.    **SUPPLY CHAIN TEAM**

5.1    <u>Creation and Responsibilities of SCT.</u>  The parties have formed a Supply Chain Team ("SCT") for the purpose of facilitating communication between the parties concerning the conversion and operation the Facility and the production of the Product. Specifically, it is the intention of the parties that such SCT shall, among other things, (1) review the progress of the conversion of the Facility against TDCC-established milestones, (2) review TDCC' costs relative to the conversion and operation of the Facility, (3) provide recommendations to TDCC concerning the conversion of the Facility, (4) approve changes to Product specifications and the Product Mix, (5) approve changes to the VCP, (6) review TDCC' costs relative to maintaining or repairing the Facility and/or proposed capital expenditures required attributable to regulatory concerns, (7) provide recommendations to TDCC concerning the quality of Product supplied to HRD, (8) develop and oversee the forecasting, order call-off, and delivery procedures, (9) work together to manage Product inventory, and (10) work together to co-ordinate HRD's production forecasting with TDCC' periodic need for shutdown at the Sarnia Site or Facility.

5.2    <u>Relationship Created.</u>  Notwithstanding anything to the contrary in this Agreement: (i) TDCC shall retain complete discretion and authority over the conversion and operation of the Facility and HRD shall have no authority over the conversion or operation of the Facility; (ii) HRD shall bear no liability or risk of loss (other than payment of the CRP) in the event the Facility or Sarnia Site is damaged or demolished during such conversion or operation; and (iii) the establishment of any such SCT shall not limit or prejudice either Party's respective obligations and responsibilities under this Agreement at law or in equity.

5.3    <u>HRD Right to Inspect Facility.</u>  HRD shall have the right, upon ten (10) business days prior notice and during normal business hours, for up to three (3) HRD personnel to inspect the Facility once per calendar quarter prior to the date of Beneficial Manufacture and twice per year following the date of Beneficial Manufacture.  All such HRD personnel who visit the Facility shall adhere to the confidentiality obligations contained in Clause 19 of this Agreement and shall comply with all safety and operational policies and/or procedures established by TDCC with regard to the Facility and/or the Sarnia Site where located.  TDCC reserves the right however, to deny access to any HRD personnel whom TDCC reasonably believes imposes an information security risk to the TDCC technology.

6.    **FORECASTING, ORDERING, AND SUPPLY**

6.1    During the period of this Agreement and subject to the terms and conditions of this Agreement, HRD shall annually accept and purchase from TDCC the output of the Facility up to the Annual Capacity, and shall have the optional and exclusive right to purchase any additional annual output available beyond the Annual Capacity at a price set out in Schedule 3.

6.2    During the period of this Agreement and subject to the terms and conditions of this Agreement TDCC shall sell and deliver to HRD the output of the Facility up to the

Annual Capacity in such quantities of the Product as shall be ordered by HRD from time to time in accordance with the provisions of this Clause 6. Subject to Clause 15, TDCC will use its best efforts to prevent, curtail and/or rectify any failure of supply of Product as soon as possible. For purposes of this Clause 6.2, the phrase "best efforts" shall mean TDCC's timely pursuit and exhaustion of all commercially prudent and reasonable measures ordinarily available for the operation of a manufacturing facility.

6.3　　Not later than each 31 October following Beneficial Manufacture, HRD shall provide TDCC with a non-binding forecast of HRD's aggregate monthly requirements for Products from TDCC during the following calendar year (the "Yearly Forecast"). Before submitting the Yearly Forecast HRD undertakes to discuss in good faith and as far as practicable to take account of TDCC's production needs (including plant shutdown, and/or maintenance) or other legitimate non-production needs of the Facility or Site including its effect on annual operating costs. The SCT will then meet and discuss in good faith any changes which would be appropriate to the Yearly Forecast for the following Year.

6.4　　HRD shall by the fifteenth (15th) day of each month provide TDCC with a schedule comprising a non-binding rolling forecast of HRD's requirements for the Product from TDCC during each of the six (6) months commencing with the month immediately following the month in which such schedule is provided (hereinafter referred to as the "Vendor Schedule"). TDCC will plan to manufacture Product within +/- 10% of the Vendor Schedule in any given month.

6.5　　HRD shall provide TDCC with firm call off order(s) for Product in accordance with the then current requirements of the SCT. Such firm call off order(s) for Product will be consistent with the Yearly Forecast agreed upon by TDCC and HRD pursuant to Clause 6.3 or otherwise mutually agreeable to TDCC and HRD.

6.6　　Notwithstanding anything to the contrary in this Agreement, TDCC shall not be obliged to supply more than (i) 5,000,000 pounds of Product during each calendar month following Beneficial Manufacture and (ii) 60,000,000 total pounds of Product during each calendar year following Beneficial Manufacture. TDCC will, subject to the shutdown, maintenance, or other legitimate non-production needs at the Facility or Sarnia Site, use commercially reasonable efforts to supply to HRD such quantities of the Product from time to time ordered by HRD from TDCC in excess of the said monthly and total annual maximum quantities referred to in this Clause 6.6, but in no event shall TDCC be liable to HRD for its failure to deliver quantities of the Product in excess of such maximum amounts.

6.7　　If and to the extent that HRD's forecast offtake of Product will be less than 50% of the Annual Capacity in any year then HRD and TDCC shall discuss in good faith TDCC's utilization of any resulting excess Product capacity for other uses.

## 7.　　DELIVERY

7.1　　The Product manufactured at the Facility shall be transferred immediately in molten form to railcars at the Facility. HRD is responsible for supplying railcars that are

certified clean or are dedicated to the same grade of PE Wax. Additionally HRD shall be responsible for managing the railcars as well as the timely transportation of the Product from the Facility according to the then current requirements of the SCT.

7.2    Title to and risk of loss for the Product shall pass to HRD upon Delivery of the Product.

7.3    "Delivery" shall be deemed to occur when (i) the Product is declared by TDCC to be Prime Product or Off-Spec Product and (ii) when the Railcar is full or otherwise declared by TDCC to be ready to be transported.

## 8.    PRICE, PRICE ADJUSTMENT AND PAYMENT TERMS

8.1    The Price which HRD shall pay to TDCC for the Product taken from the Facility is equal to (a) the initial Capacity Rights Payment (CRP), plus (b) the Annual Operating Payment (AOP), plus (c) the Variable Costs Payment (VCP).

8.1.1    Subject to Clauses 21 and 15.3, the CRP is a non-refundable payment for the right to purchase up to the Annual Capacity of Product from the Facility for the Supply Period. It is comprised of an Estimated CRP Payment of $4,000,000 and a Final CRP Payment. The CRP is intended to equal the actual costs to engineer and build the Facility including but not limited to those costs incurred for procurement, materials, equipment, expendable supplies, construction and conversion, commissioning, start up and a 10% project management fee but excluding (i) those costs charged in the JDA and (ii) the capital associated with activities outside boundary limits (OSBL) of the Facility as defined in TDCC's drawings and nomenclature. TDCC will collect all of the actual costs incurred in converting the Facility according to TDCC standard procedures for capital projects. Within ninety (90) days after the date of Beneficial Manufacture TDCC will "true up" the actual costs incurred with the CRP and issue either an invoice to HRD or advise HRD that payment from TDCC will be forthcoming pursuant to 8.2.4 for the difference between the Estimated CRP Payment and the actual costs incurred by TDCC as defined by TDCC's standard processes for capital projects ("Final CRP Payment").

8.1.1.1    Right to Audit – HRD shall have the right to have an independent certified public accounting firm ("CPA firm"), mutually acceptable to the Parties, audit TDCC's books of account and other records pertaining to the conversion of the Facility pursuant to this Agreement. Prior to commencing its audit, the CPA firm shall execute a confidentiality agreement reasonably acceptable to TDCC. Upon completing its audit, the CPA firm shall report only whether or not the charges resulting from the "true up" by TDCC hereunder were correct or, if not, the amount of any overcharge or undercharge. The Parties agree to accept the determination of the CPA firm as binding and final. The cost of such audit shall be borne by HRD.

8.1.1.2    Any subsequent capital expenditure for enhancing production capability (such as expanded capacity, improved quality, changed product mix, etc.) shall require the agreement of the Parties and be subject to payment from

HRD to TDCC in a manner similar to that for the original CRP. Any such additional payment is due to TDCC prior to the commencement of any additional conversion activity on the Facility.

8.1.2 The AOP is an annual fee of C$16,500,000 (only the AOP shall be paid in Canadian currency) payable regardless of the amount of Product taken by HRD in the year. The AOP is a fee paid by HRD to TDCC to operate the Facility each year, and is represents those costs incurred by TDCC for labor, maintenance, overhead and includes a profit margin for TDCC. The AOP shall include provision for capital expenditures associated with plant health (such as general maintenance, and achieving TDCC or regulatory environment, health and safety requirements). Should the Canadian Consumer Price Index experience an annual increase of five percent (5%) or more in any Year then the AOP shall increase by ½ of the increase. In the event of any such increase HRD shall have the exclusive right to terminate the Agreement.

8.1.3 The VCP represents the actual full variable market cost of raw materials for the Product, based on a formula that references pre-agreed market cost sources. The formula will differ for each grade based on the raw materials (ethylene, co-monomer, catalyst, additives) consumed. Schedule 3 will set out the Product formulae and market cost sources, as well as the maximum allowable Off-Spec Product volume and discount on the VCP for volumes of Off-Spec Product beyond the maximum allowable. The VCP invoiced will be according to Schedule 3 or any updates thereto agreed by the Parties.

8.2 Payment.

8.2.1 The Estimated CRP Payment is due within fifteen (15) days of the Implementation Date.

8.2.2 1/12 of the AOP shall be invoiced on a monthly basis commencing on the first month after the date when TDCC first produces two (2) railcars of Prime Product meeting the specifications for one of the Products in Schedule 1.

8.2.3 The VCP shall be invoiced on a weekly basis commencing on the first week after Beneficial Manufacture for the Facility.

8.2.4 All payments are due thirty (30) days from the invoice date. Payment hereunder shall be made by the Parties by transfer to such account with such bank as shall have been notified by the receiving Party in writing.

8.2.5 TDCC may charge HRD interest at the rate of one and one half percent (1-1/2%) per month, or the maximum amount of interest allowed by law, whichever is less, on all undisputed overdue amounts. HRD agrees to pay all costs and expenses (including court costs and reasonable attorneys' fees) incurred by TDCC in the collection of any amounts due this Agreement or in the protection of TDCC's interest during any bankruptcy proceeding involving HRD.

**9.    PRODUCT WARRANTY**

9.1    TDCC hereby warrants that on Delivery, all Products sold pursuant to this Agreement:

9.1.1    Prime Product shall conform in all material respects to the specification set out in Schedule 1 as determined in accordance with the analytical methods also set out in Schedule 1, and Off-Specification Product shall be so designated and the relevant characteristics identified according to the then current requirements of the SCT; and

9.1.2    will be conveyed with good title, free from any lawful lien or encumbrance (including the license to practice under any claim of a Dow-owned Background Patent Right, wherein the claim is directed to a PE Wax);

9.1.3    will be manufactured in accordance with Dow good manufacturing practices and TDCC will, where appropriate, provide production information to HRD relating to FDA food contact requirements;

9.1.4    will be appropriately placarded for flammability;

**EXCEPT AS PROVIDED HEREIN, TDCC GIVES NO OTHER WARRANTY WITH REGARD TO THE QUALITY, MERCHANTABILITY, OR FITNESS FOR THE PURPOSE OF THE PRODUCT, AND ALL SUCH OTHER REPRESENTATIONS AND WARRANTIES WHETHER EXPRESS OR IMPLIED ARE HEREBY EXCLUDED. IT IS EXPRESSLY UNDERSTOOD THAT HRD HAS THE SOLE RESPONSIBILITY FOR DETERMINING THE APPLICABILITY OF PRODUCT FOR A PARTICULAR APPLICATION AND THAT HRD WILL OBTAIN ANY AND ALL APPROVALS REQUIRED FOR ANY PARTICULAR USE OF THE PRODUCT.**

9.2    Each railcar of Prime Product Delivered hereunder shall be accompanied by a Certificate of Analysis, signed and dated on behalf of TDCC, which indicates the relevant order number and details all matters described in the specification set out in Schedule 1. TDCC shall retain a sample from each shipment of Product supplied to HRD for at least one (1) year after shipment, and if HRD shall contest the quality of any such shipment, until any dispute with regard thereto has been finally determined.

9.3    HRD warrants that it will not use Product in an application that violates the then current TDCC Medical Application Policy.

**10.    ACCEPTANCE**

10.1    Promptly following each Delivery of the Product, HRD shall examine the Product.

10.2    If HRD, upon examination in accordance with Clause 10.1, becomes aware of any defect in the Product, it shall notify TDCC within sixty (60) days of Delivery of such Product.

10.3  If and to the extent that HRD has failed to timely examine the Product upon Delivery in accordance with Clause 10.1, or if it has failed to notify TDCC in accordance with Clause 10.2, such failure shall be deemed an irrevocable acceptance by HRD of the Product in satisfactory condition in respect of all defects which would have reasonably been discovered upon such examination and a waiver of all claims with respect thereto.

## 11.    LIABILITY, INDEMNIFICATION AND LIMITATION OF REMEDIES

11.1  In the event of a breach of warranty contained in Clause 9.1, HRD shall be entitled to, at TDCC's option, either (i) the costs of disposal by HRD, (ii) to sell the material and retain the proceeds or (iii) to a refund of the VCP associated with the production of the Product that breaches the warranty.

11.2  TDCC's and its Affiliates' total liability for claims related to Product supplied to HRD or its Affiliates shall be exclusively limited to the remedies specified in Clause 11.1 of this Agreement.

11.3  Indemnification.

11.3.1  By HRD. Subject to the provisions of Clause 11.3.3 below, HRD agrees to indemnify and defend TDCC, its Affiliated Companies, officers, directors, employees and agents, from and against any and all third party claims, demands, suits, causes of action at law or in equity, expenses (including reasonable attorney's and expert's fees), and liability of any nature on account of any damage or destruction of property, injury or death of persons, or action of any foreign, federal, state or local governmental agency arising out of HRD's or its Affiliates' failure to (i) familiarize itself with any Product literature or information TDCC provides under TDCC's product stewardship program, including the MSDS for each Product, (ii) follow safe handling, use, selling, storage , transportation and disposal practices including any special practices as HRD's use of each Product requires and instruct its employee, contractors, agents and customers in these practices, and (iii) take appropriate action to avoid spills or other dangers to persons, property or the environment.

11.3.1.1    At all times while the Agreement is in effect, HRD will insure the risk imposed by this Clause 11.3.1 by procuring and maintaining, at its own expense and for its own benefit, Comprehensive/Commercial General Liability Insurance (including contractual liability, products liability, and completed operations coverage) with a bodily injury, death, and property damage combined single limit of $5,000,000 per occurrence.  The scope of this coverage is to be equivalent to standard ISO forms (e.g., 1996 Commercial General Liability ISO form # CG 00 01 01 96, etc. or CG 00 02 01 96). If the insurance to be provided is in the form of ISO Form CG 00 02 01 96 (claims made), the policy shall contain an extended reporting period of at least five (5) years; any Retroactive Date under said policy shall be no later than the Effective Date of the Agreement

11.3.1.2    HRD will furnish TDCC a certificate(s) from an insurance carrier (having a minimum AM Best rating of A) showing all insurance set forth above. The certificate(s) will include the following statement: "The insurance certified

14

hereunder is applicable to all contracts between The Dow Chemical Company and the Insured. This insurance may be canceled or altered only after thirty (30) days written notice to DOW." The insurance, and the certificate(s), will (1) name TDCC (including TDCC's officers, directors, employees, affiliates, agents, subsidiaries, successors, and assigns) as additional insureds with respect to matters arising from this Agreement, (2) provide that such insurance is primary and non contributing to any liability insurance carried byTDCC, and (3) provide that underwriters and insurance companies of HRD may not have any right of subrogation against TDCC (including TDCC's officers, directors, employees, affiliates, agents, subsidiaries, successors, and assigns). The insurance will contain no more than an ordinary deductible. HRD agrees to waive any right of recovery against TDCC (including TDCC's officers, directors, employees, affiliates, agents, successors, and assigns) for any loss or damage of the type covered by the insurance to be procured and maintained under this Clause, regardless of whether or not such insurance is so maintained. Failure of any of the terms and conditions of this Clause will be considered a material breach under this Agreement.

11.3.2 Patent Indemnity. Subject to the provisions of Clause 11.3.3 below, TDCC agrees to indemnify and defend HRD, its Affiliated Companies, officers, directors, employees and agents from all liability, damages, costs, and expenses incurred by HRD, its Affiliated Companies, officers, directors, employees, and agents arising from any cause of action based on a claim that the Product in the form delivered to HRD infringes any United States or Canadian patent. If the use or sale of the Product furnished hereunder becomes, or in the opinion of TDCC is likely to become, the subject of any claim of infringement of any United States or Canadian patent or in the event an injunction or order is obtained against HRD's use of the Product by reason of a judicial determination of infringement of a valid United States or Canadian patent by use of the Product, TDCC may at its option and expense either (i) obtain a license on commercially reasonable terms to permit sales of the Product to HRD or (ii) modify such Product so as to make it non-infringing or replace such Product with non-infringing substitutes provided that such modified Product or replacement shall be at least of equivalent efficacy as the Product in the manufacture, formulation and use. If TDCC is unable to exercise either of such options, after employing reasonable efforts to do so, TDCC shall be entitled to terminate the Agreement and cease supplying the Product without obligation or liability to HRD other than that contained in Clause 21.4 or 21.5.

11.3.3 Tender of Defense. Each Party's indemnification obligations under Clauses 11.3.1 and 11.3.2 of this Agreement are subject to the following conditions: (I) the Party seeking indemnification (the "Indemnified Party") notifies the Party to provide the indemnification (the "Indemnifying Party") of such claim in writing promptly after the Indemnified Party becomes aware of such claim; (ii) the Indemnifying Party is permitted to defend, control, conduct, and prosecute, in its sole discretion and by counsel of its own choosing, the defense of any such claim brought against the Indemnified Party provided that the Indemnified Party may participate in such defense through separate counsel at its own expense; (iii) the Indemnifying Party shall not settle, compromise or otherwise terminate the cause of action without the written approval of the Indemnified Party (which approval

15

shall not be unreasonably withheld); provided, however, that if the Indemnified Party refuses to approve the Indemnifying Party's proposed settlement, the Indemnified Party shall be liable to the Indemnifying Party for any and all liability, cost or expense which is incurred by the Indemnifying Party after the Indemnified Party's refusal, is associated with such claim, and is in excess of the settlement amount; (iv) the Indemnified Party shall refrain from settling any actions based on such claim without the Indemnifying Party's consent; (v) the Indemnified Party shall not intentionally and materially compromise the position of the Indemnifying Party by admissions, statements, or conduct in a way that could prejudice the defense, control, conduct or prosecution of such action; and (vi) the Indemnified Party cooperates with the Indemnifying Party in the defense, conduct, prosecution, or termination of such actions, including the furnishing of information and assistance of employees of the Indemnified Party at the Indemnifying Party's request and at no charge to the Indemnifying Party.

11.4    <u>Limitation of Remedies and Liabilities.</u>  Neither Party shall be liable to pay consequential, special, punitive, exemplary or incidental damages to the other Party arising out of the performance or nonperformance of this Agreement.  TDCC' and its Affiliates' total liability for claims related to Product supplied to HRD or its Affiliates is limited to the remedies specified in Clause 11.1 of this Agreement.

## 12.    CHANGES TO PRODUCTION

12.1    TDCC shall not, without the prior written consent of HRD, which consent shall not be unreasonably withheld, make any change in the production facilities or raw materials used by TDCC to manufacture the Product.  TDCC acknowledges that HRD may require TDCC to produce samples of the Product manufactured using the changed production facilities or raw materials in sufficient quantities to enable HRD to establish the effect of the change on the manufacturing process in which HRD employs the Product.  Without prejudice to TDCC's ongoing obligations under this Agreement, in particular those under Clause 9.1 above, if HRD's consent to such change is forthcoming, the specification set out in Schedule 1 shall be amended to the extent required by the change.

12.2    Should HRD desire that Product be certified according to an external organization, i.e. ISO, then the Parties agree to meet and discuss the request, the financial impact of the request and the allocation of costs for such a certification.

## 13.    HARDSHIP

If at any time by reason of any changed circumstances the performance of this Agreement results in undue hardship to either Party, such Party may notify the other Party in writing specifying the reasons considered to result in undue hardship and require the other Party to confer and to decide what, if any, amendment of the provisions of this Agreement (whether on a temporary or permanent basis) would be appropriate, equitable and mutually acceptable to remedy such undue hardship.  The other Party shall in good faith consider such a request and any proposals but shall be under no obligation to accept or implement any such request or proposal.

## 14.    PERFORMANCE WARRANTIES

14.1    TDCC and HRD each hereby warrants and undertakes to the other that:

      14.1.1  it is the lawful owner, lessee or licensee of all plant, equipment, machinery, technology, intellectual property and know-how and all other assets required to enable it to perform its obligations under this Agreement;

      14.1.2  the performance by it of its obligations to the other Party hereunder will not breach any covenant or obligation of it to any third party, or infringe any rights of any third party;

and that the above warranty and undertaking will be correct and complied with in all respects so long as any obligation of either Party hereunder remains to be performed. TDCC and HRD each hereby undertakes that if it should at any time become aware that any of the above warranties and undertakings is not correct or complied with, it shall promptly make a full disclosure to the other Party of all relevant facts or circumstances.

## 15.    FORCE MAJEURE AND GOVERNMENT CONTROLS

15.1.   If one or more events of Force Majeure as defined in Clause 15.2 affect the conversion or operation of any of TDCC's facilities at which the Product and/or raw materials are manufactured, TDCC shall nonetheless use best efforts to re-establish as soon as possible and to continue to supply Product sufficient to enable TDCC to meet its obligations to sell and deliver Product to HRD under this Agreement. Provided, however, that TDCC shall not, as a part of its best efforts under this Clause 15.1, be required to settle or resolve any labor dispute that affects the conversion or operation of any of the TDCC facilities at which the Product and/or raw materials are or will be manufactured. For purposes of this Clause 15, the phrase "best efforts" shall mean TDCC's timely pursuit and exhaustion of all commercially prudent and reasonable measures ordinarily available for the operation of a manufacturing facility.

15.2    Except as provided for in Clause 15.3, if either Party to this Agreement is prevented or delayed in the performance of any of its obligations hereunder by Force Majeure and if such Party gives written notice thereof to the other Party within fifteen (15) business days of the first day of such event specifying the matters constituting Force Majeure, together with such evidence thereof as it reasonably can give, then the Party so prevented or delayed will be excused from the performance or punctual performance, as the case may be, of such obligations, as from the date of such event for so long as such cause of prevention or delay continues.

For the purpose of this Agreement, the term "Force Majeure" shall be deemed to be any cause which affects the performance of this Agreement, arising or attributable to acts, events, non happenings, omissions or accidents beyond the reasonable control of the Party affected and shall include, but not be limited to, acts of God, war, hostilities, riot, fire, explosion, accident, flood, sabotage, lack of adequate fuel, power, raw materials,

17

labor, strike, lock-out or injunction, compliance or non-compliance with new governmental laws, regulations, permits or orders.

15.3    HRD Payment Obligations During Force Majeure Period

15.3.1    Notwithstanding the provisions of Clauses 15.2 and 15.4, if HRD is the Party claiming Force Majeure, HRD shall be required to continue to pay as required under Clause 8.1 of this Agreement throughout such period of Force Majeure.

15.3.2    Notwithstanding the provisions of Clauses 15.2 and 15.4, if TDCC is the Party claiming Force Majeure, HRD's payment obligations shall be as follows:

15.3.2.1    All of the CRP, if any, not yet paid;

15.3.2.2    The AOP scheduled except that 1/12 of the AOP is excused for every 30 days that Force Majeure continues; and

15.3.2.3    All of the VCP, if any.

15.4    Except as provided in Clause 15.3, if any Force Majeure prevails for a continuous period in excess of six (6) months the parties shall (a) enter into bona fide discussions with a view to alleviating its effects, and (b) at the request of the Party not affected by the Force Majeure terminate this Agreement forthwith should such discussions not provide a readily satisfactory solution to the Force Majeure event.  Provided, however, that the Party not affected by the Force Majeure may not terminate this Agreement where the Party claiming Force Majeure has identified a readily achievable solution to the Force Majeure event and is taking the necessary steps to implement such solution.

15.5    If TDCC is the Party that declares the Force Majeure, then the Agreement shall, at HRD's option, be extended one month for every month that the Force Majeure continues

15.6    The Annual Capacity shall be reduced by 1/12 for every 30 days that a Force Majeure continues.

16.    **INTELLECTUAL PROPERTY**

16.1    Except as specifically stated in Clause 9.1.2. and with regard to PE Wax purchased from Dow, this Agreement does not (a) change the ownership of any Party's Background Information or Background Patent Rights and/or (b) grant to either Party or its Affiliates (or to anyone else) any license (express, implied or otherwise) under any of the Background Information, Background Patent Rights or trademarks of the other Party or its Affiliates.  If the Parties agree to any such license, that license will be appropriately defined in a separate written agreement.

16.2    Without regard to which Party's employees are inventor(s) of a particular Development, ownership of Developments will be determined as follows:

18

(a)     HRD will own Developments that are (1) products made from or containing PE Wax, (2) process for making products made from or containing PE Wax, and/or (3) methods of use of PE Wax; and

(b)     Dow will own all other Developments, including PE Waxes, processes for making PE Waxes, and catalysts used for making PE Waxes.

For the purpose if this Agreement "Development" means any invention, whether patentable or unpatentable, that is: (a) a PE Wax, and/or (b) any method of use for a PE Wax, and/or (c) a product made from or containing a PE Wax; and/or (d) a process for making a product made from or containing a PE Wax, (e) a process for making a PE Wax; and/or (f) a catalyst for making a PE Wax, which invention is first actually reduced to practice by a Party (and/or by its participating Affiliates or subcontractors), alone or with others, and which reduction to practice occurs after the Effective Date and as a result of work performed in connection with this Agreement.

16.3     Each Party will own all Information that the Party generates.  Both Parties (and their Affiliates) may use and/or disclose that Information, subject to the obligations of confidentiality the Parties have undertaken with respect to the other Party's Information under Clause 19. Each Party will keep complete and accurate written records of all Information developed by or for it. Each Party will make those records available for review by the other Party at any reasonable time during regular working hours.  Each Party will furnish copies of all or any part of those records to the other Party upon request for appropriate patent filing, prosecution, and enforcement efforts on Developments owned by that other Party, consistent with the other Party's obligations of confidentiality under Clause 19.

For the purpose of this Agreement "Information" means technical or business information pertaining to (a) the composition, structure and/or properties of any PE Wax (including but not limited to the Product Specifications) (b) the use of a PE Wax in any end-use application, (c) any product made from or containing a PE Wax, (d) any process for making a product made from or containing a PE Wax, (e) any process for making any PE Wax, and/or (f) any catalyst for making any PE Wax as well as Information as defined in the separate Confidentiality Agreement between the Parties, having an effective date of January 8, 2001 (Dow Agreement 202541).

16.4     After a Party becomes aware that an invention has been conceived or first reduced to practice that may be a Development, the Party must promptly deliver a written description of the invention to the other Party's contact as detailed in Clause 17.2.1.  The written description must include sufficient information to enable the Parties, together with their patent counsels, to evaluate the inventorship of the invention.  The Parties will attempt to reach a consensus on whether the invention is a Development and who is(are) the inventor(s). The statutory and common law of the United States of America shall govern all determinations of inventorship and reduction to practice of Developments.  Each Party is solely responsible for any and all compensation legally due to its employees (who are inventors of any Development), irrespective of which Party owns that Development.

16.5     In its sole discretion, the owner of the Development in question may make all decisions on filing, prosecuting, and maintaining patent applications (both domestic and foreign)

19

that claim the Development, with three limitations. The owner must (i) obtain the other Party's approval before using or disclosing the other Party's Confidential Information in the filing or prosecuting of the patent application, (ii) provide the other Party with 30 days to review and comment on the patent application prior to its filing, and (iii) cooperate with the other Party to make related patent application filings concurrently (i.e., on the same day). The other Party will not unreasonably withhold its approval when the owner's use or disclosure of the other Party's Confidential Information is only to the extent necessary to satisfy the statutory requirements of the relevant patent office. The other Party's approval will be deemed granted if the other Party does not object in writing within 30 days of receipt of the owner's request for approval. If the other Party's objects, it will recommend reasonable alternative information for use instead of the objectionable Information. The owner is solely responsible for paying the expenses for the patent applications. Each Party agrees to cooperate with the other Party, as requested, to establish, acquire, and maintain intellectual-property protection for Developments and Information. This includes signing assignments and other appropriate documents, as requested.

16.6    If the owner chooses not to file a patent application directed to its Development or no longer desires to continue prosecution or maintenance of particular Patent Rights in any country, that owner must notify the other Party in writing and offer to assign such Development and/or Patent Rights to the other Party. The other Party may accept such offer anytime within 30 days after receipt of the notification; otherwise, the owner may abandon the Development and/or Patent Rights in question. If the other Party accepts, the owner will promptly assign the Development and/or Patent Rights to the other Party and the other Party may file or continue the prosecution or maintenance at its sole expense. The assignment shall not affect the Parties' fundamental rights (i.e., the rights that each Party would have had the assignment not occurred) with respect to the practice or licensing of the Development and/or the Patent Rights. The Parties may agree in writing to change those fundamental rights.

## 17.    NOTICES

17.1    All notices and other communications given or made in relation to this Agreement

    17.1.1    shall be in English and in writing;

    17.1.2    shall be delivered by hand or sent by first class registered post, facsimile or e-mail;

    17.1.3    shall be delivered or sent to the Party concerned at the relevant address or facsimile or telex number, shown in Clause 17.2 subject to such amendments as may be notified in writing from time to time in accordance with this Clause by the relevant Party to the other Party by no less than five (5) Business Days' notice; and

    17.1.4    shall be deemed to have been duly given or made if addressed in the aforesaid manner:

(i)    if delivered by hand, upon delivery;

(ii)   if posted by first class registered post, at the earlier of the time of delivery or 10:00 a.m. on the tenth (10th) Business Day after posting;

(iii)  if sent by facsimile, when a complete and legible copy of the communication has been received at the appropriate address; and

(iv)  if sent by e-mail, when sent;

provided that if any notice or other communication would otherwise become effective on a non-Business Day or after 5:00 p.m. on a Business Day, it shall instead be deemed to be given or made at 10:00 a.m. on the next Business Day.

17.2   The initial details for all notices are:

17.2.1  <u>Legal Notices</u>.  Any legal notices, demands or requests required or which may be given hereunder to the respective parties including, without limitation, notices of Force Majeure or material breach, termination, or amendment of this Agreement shall be delivered as follows:

For TDCC   Michael J. Levinson
Global Business Development Manager – Polyethylene
The Dow Chemical Company
400 W. Sam Houston Pkwy. S.
Houston, TX  77042
(713) 978-2291
E-mail: mjlevinson@dow.com

Copy to:

Lynn Schefsky
The Dow Chemical Company
2040 Dow Center
Midland, MI  48674
(989) 636-0523
laschefsky@dow.com

For HRD   Aziz Hassan
Vice President
Marcus Oil & Chemical
14549 Minetta
P. O. Drawer 450267
Houston, TX 77245
(713) 721-9131 Ext. 102
E-Mail : Marcusoil@aol.com

Copy to:

Michael L. Landrum
O'Donnell Ferebee & McGonigal
450 Gears

21

Houston, TX 77067-4584
(281) 875-8200
E-Mail : Mlandrum@ofmslaw.com

17.2.2 <u>Day to Day Communications and Notices</u>. All other non-legal notices and day-to-day communications shall be delivered as follows:

For TDCC     Michael J Levinson
Global Business Development Manager – Polyethylene
The Dow Chemical Company
400 W. Sam Houston Pkwy. S.
Houston, TX  77042
(713) 978-2291
E-mail: mjlevinson@dow.com

For HRD     Aziz Hassan
Vice President
Marcus Oil & Chemical
14549 Minetta
P. O. Drawer 450267
Houston, TX 77245
(713) 721-9131 Ext. 102
E-Mail : Marcusoil@aol.com

## 18.    VARIATION

The terms of this Agreement shall govern all HRD's purchases of the Product from TDCC under this Agreement and shall not be varied by any printed conditions submitted or referred to by either Party in any acceptance of order, delivery note, acceptance of delivery, invoice or otherwise howsoever unless the parties so agree in writing.

## 19.    CONFIDENTIALITY

19.1    Any process know-how or other valuable information proprietary to either Party to this Agreement which is disclosed by that Party to the other Party in connection with this Agreement shall remain the property of the Party making the disclosure and shall not, without the prior written consent of that disclosing Party, be disclosed to any third party or used by the other Party except for the performance of that other Party's obligations under this Agreement.  The obligations of non-use and confidentiality contained in this Clause shall not apply to any information which (i) was already in the possession of the recipient or in the public domain prior to its disclosure by the other Party, or (ii) is purchased or otherwise legally acquired by the recipient at any time from a third party having good title thereto, or (iii) comes into the public domain otherwise than through the fault of the recipient, or (iv) is disclosed under compulsion of law to any court or government or regulatory authority.  All documents supplied by either Party to this Agreement to the other Party which contain information within the scope of this Clause shall be promptly returned by the recipient to the Party which supplied them upon the expiry or earlier termination of this Agreement and the obligations of each Party under

22

this Clause shall survive such expiry or termination for a period of five (5) years thereafter. The Parties will continue to adhere to their respective obligations under the confidentiality provisions of the JDA between the Parties which will remain in full force and effect and governed by their own terms following the execution of this Agreement.

19.2    The Parties will not use the other Party's name(s) or trademark(s) or issue any press release or public announcement of the Parties' relationship under this Agreement except with the other Party's prior written consent, such consent not to be unreasonably withheld.

## 20.    ASSIGNMENT

The rights and obligations of each of the Parties to this Agreement hereunder are personal to that Party and shall not be assigned, licensed, charged, delegated or transferred in any way whatsoever by that Party without the prior written consent of the other Party. HRD does agree to the assignment of some of the obligations contained in the Agreement to TDCC's wholly owned Canadian subsidiary.

## 21.    TERMINATION

21.1    Either Party shall be entitled to terminate this Agreement immediately by written notice to the other if:

21.1.1    that other Party or a domestic Affiliate goes into voluntary liquidation or bankruptcy proceeding (except for the purpose of an amalgamation or reconstruction and in such a manner that the company resulting therefrom effectively agrees to be bound by or assume the obligations of that other Party under this Agreement) or has a receiver or administrator appointed in respect of the whole or any part of its assets or a court shall make an order to that effect or if that other Party shall pass a resolution for winding-up (other than a winding-up for the purposes of or in connection with any amalgamation or reconstruction and in such manner that the company resulting therefrom effectively agrees to be bound by or to assume the obligations imposed on that other Party under this Agreement) or a Court shall make an order to that effect, or if that other Party shall cease to carry on business; except that in the event that an involuntary case or other proceeding shall be commenced against a Party or any domestic Affiliate seeking liquidation, reorganization or other relief with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, the affected Party shall have sixty (60) days to obtain a dismissal or stay of proceeding or an order for relief under the Federal bankruptcy laws as now or hereafter in effect; or

21.1.2    that other Party commits any material breach of this Agreement and fails to remedy such breach within sixty (60) days after the date of service of a written notice giving full particulars of such material breach and requesting it to be remedied; provided, however, that the Party not causing such material breach of this Agreement may not terminate this Agreement where the Party materially

breaching this Agreement has identified a readily achievable solution to the event giving rise to the material breach and is taking the necessary steps to implement such solution.

21.1.3  Terminations that occur pursuant to Clause 21.1 shall, for the purposes of computations under Clauses 21.4 and 21.5, be treated as though the Party who commits the act that provides the basis for the termination has terminated the Agreement. That is for example, if a Party commits a material breach that leads to a termination pursuant to the provisions of 21.1.2, the Party that has committed the material breach shall be deemed to have terminated the Agreement for the purposes of computing compensation pursuant to Clauses 21.4 and 21.5.

21.2  In addition, either Party may terminate this Agreement as provided for under Clause 15.4 or upon 180 days notice for any reason;; HRD may terminate this Agreement as provided for under Clauses 3.2.2, 8.1.2 and 11.3.2. TDCC may terminate this Agreement as provided for under Clause 3.2.3.

21.3  If the Agreement is terminated prior to the Implementation Date, then neither Party has any obligations hereunder.

21.4  The following shall apply if the Agreement is terminated after the Implementation Date but prior to the date of Beneficial Manufacture for the Facility:

21.4.1  Termination by HRD:

21.4.1.1    HRD shall pay to TDCC:

21.4.1.1.1    the CRP, if any; and

21.4.1.1.2    $0.05 per pound times twice the Annual Capacity.

21.4.1.2    Provided that HRD has paid all amounts due TDCC, TDCC will not sell PE Wax to anyone for a period of two (2) years.

21.4.2  Termination by TDCC:

21.4.2.1    TDCC will refund the CRP paid by HRD;

21.4.2.2    TDCC will not sell PE Wax to anyone for a period of two (2) years.

21.4.3  All amounts under this Clause 21.4 are due within forty-five (45) days of such notice of termination.

21.5  The following shall apply if the Agreement is terminated after the date of Beneficial Manufacture for the Facility:

24

21.5.1  Termination by HRD:

    21.5.1.1     HRD shall pay to TDCC:

        21.5.1.1.1    the CRP, if any;

        21.5.1.1.2    the remainder of the AOP for the Year; and

        21.5.1.1.3    $0.05 per pound times three (3) times the Annual Capacity.

    21.5.1.2     Provided that HRD has paid all amounts due TDCC, TDCC will not sell PE Wax to anyone for a period of three (3) years.

21.5.2  Termination by TDCC:

    21.5.2.1     TDCC will refund the CRP paid by HRD;

    21.5.2.2     TDCC will not sell PE Wax to anyone for a period of three (3) years.

21.5.3  All amounts under this Clause 21.5 are due within forty-five (45) days of such notice of termination.

21.6　Any waiver by either Party of a breach of any provision of this Agreement shall not be construed to be a waiver of any other breach of the same or any other provision.

21.7　Upon the termination of this Agreement pursuant to this Clause 21 no Party shall have any further rights, claims or remedies against any other Party as a result of this Agreement.

21.8　Except as provided herein and in Clause 26, upon termination of this Agreement for any reason, save as otherwise provided by this Agreement and subject to any rights or obligations which have accrued prior to termination, neither Party shall have any further obligation to the other under this Agreement. Notwithstanding the foregoing, HRD shall take delivery of and pay TDCC the VCP for all inventory of the Product ordered by HRD or produced by TDCC in good faith for HRD under this Agreement as of the date of such termination of this Agreement

## 22.  SEVERABILITY

22.1　Should any provision of this Agreement be held to be illegal, invalid or unenforceable in any respect by any judicial or other competent authority under the law of any jurisdiction:

    22.1.1　such provision shall, so far as it is illegal, invalid or unenforceable in any jurisdiction, be given no effect by the parties and shall be deemed not to be included in this Agreement in that jurisdiction;

22.1.2   the other provisions of this Agreement shall be binding on the parties in that jurisdiction as if such provision were not included herein;

22.1.3   the legality, validity and enforceability of the provision in any other jurisdiction shall not be affected or impaired; and

22.1.4   the parties agree to negotiate in good faith to amend such provision for incorporation herein in such reasonable manner as most closely achieves the intention of the parties and without rendering such provision invalid or unenforceable.

23.    **LAW**

This Agreement shall be governed by and construed in accordance with the laws of the state of Delaware without regard to its provisions concerning the conflicts of law, and the parties hereby submit to the exclusive jurisdiction of either the courts of Michigan or Delaware. The United Nations Conventions on Contracts for the International Sale of Goods shall not apply to this Agreement.

24.    **ALTERNATIVE DISPUTE RESOLUTION**

24.1   The parties shall negotiate in good faith to resolve any dispute arising out of or relating to this Agreement. In the event that the parties fail to resolve a dispute by good faith negotiations or if either Party deems a resolution by such means to be improbable, either Party may initiate litigation of the dispute. Alternatively, but only upon the written agreement of both parties, the parties may submit any such dispute to mediation or arbitration before an appropriate dispute resolution firm or body.

24.2   Unless this Agreement has been properly terminated, each Party shall continue to perform its obligations under this Agreement pending final resolution of any dispute.

25.    **PARTIES IN INTEREST**

This Agreement shall be binding upon and shall inure solely to the benefit of the Parties and their successors and permitted assigns. Nothing in this Agreement, express or implied, is intended to or will confer upon any other person or company any rights, benefits, or remedies of any nature whatsoever under or by reason of this Agreement.

26.    **SURVIVAL OF CERTAIN TERMS**

The rights and obligations of the parties described in Clauses 11,16 and 19 above shall survive the expiration or termination of this Agreement in accordance with their respective terms and conditions. Other provisions of this Agreement which by their nature would reasonably be expected to survive expiration or termination shall so survive.

27.    **CONSTRUCTION**

This Agreement shall not be construed more strictly against one Party than against the other Party merely by virtue of the fact that the Agreement may have been prepared primarily by counsel for one of the Parties. It is understood and agreed that both Parties have contributed substantially and materially to the preparation and execution of the Agreement.

28.    **HEADINGS**

The descriptive headings and titles contained in this Agreement are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

29.    **ENTIRE AGREEMENT**

This document, together with its Schedules, and the JDA constitutes the complete and exclusive understanding between the Parties concerning the subject matter expressed herein. Except to the extent provided for in this Agreement and the JDA, any additional or different terms contained in subsequent purchase orders, invoices, or other documents shall not be binding. This Agreement may only be modified by an amendment, expressly stated as such, signed by both Parties.

30.    **NON WAIVER**

Subject to Clauses 9.1, 10.3, and 11.3, failure of either Party to exercise any of its rights under this Agreement on one occasion shall not waive, or be deemed a waiver of, its right to exercise the same on another occasion.

31.    **EXCLUSIVITY**

31.1    TDCC promises that it will sell PE Wax only to HRD for as long as the Agreement is in effect. Should the Agreement be terminated for any reason other than a reason set out in Clause 21.1 after the Implementation Date but prior to the date of Beneficial Manufacture, this promise shall continue for an additional two (2) years from the date of the termination. Should the Agreement be terminated for any reason other than a reason set out in Clause 21.1 after the date of Beneficial Manufacture this promise shall continue for an additional three (3) years from the date of the termination. At the expiry of the Agreement, TDCC will not sell PE Wax for an additional three (3) years.

31.2    TDCC will provide HRD an exclusive right to negotiate for the construction of a new PE Wax production plant during the first twelve (12) months after Beneficial Manufacture.

31.3    Should the Parties proceed with the construction of a new PE Wax production facility, TDCC will promise exclusivity on the same basis as Clause 31.1 except that the exclusivity period prior to plant start-up would be three (3) years and after plant start-up would be five (5) years.

31.4    All of the promises by TDCC contained in this Clause 31 are contingent upon HRD having fully paid all amounts due to TDCC under this Agreement.

IN WITNESS whereof this Agreement has been entered into by the Parties hereto the day and year first above written.

SIGNED for and on behalf of:                 SIGNED for and on behalf of:

THE DOW CHEMICAL COMPANY            HRD CORPORATION

Len Azzaro
Business Vice President
Polyethylene

July 1, 2002

ABBAS A. HASSAN President

July 1st 2002.

28

<u>**SCHEDULE 1**</u>
<u>Specification and Analytical Methods</u>
<u>(Clause        )</u>

<u>**SCHEDULE 2**</u>
<u>HRD Estimated Requirements</u>

<u>(Clause        )</u>

| <u>Year</u> | <u>Volume pounds</u> |
|---|---|
| 2003 | |
| 2004 | |
| 2005 | |
| 2006 | |

**SCHEDULE 3**
**Variable Cost Formulas**

**Introduction**

Schedule 3 will be established as an outcome of the JDA, will then be subject to update from time to time by the SCT, and references in the Supply Agreement to Schedule 3 shall mean to apply to the most recent update approved by the SCT.

**Variable Cost Formulas** (to be established for each grade)

| Raw Materials | Grade Description |
|---|---|
| Ethylene | Benchmark cost * ethylene proportion/ethylene yield |
| Propylene | Benchmark cost * propylene proportion/propylene yield |
| Catalyst & Additives | $0.0xx/lb |
| Hydrogen | $0.0yy/lb |
| Utilities | $0.0zz/lb |
| Packaging | n/a |

Where:
(1) Ethylene Benchmark cost = US Gulf Delivered Contract Price CMAI ($/lb)
(2) Propylene Benchmark cost = Polymer Grade US Gulf Contract Price CMAI ($/lb)
(3) VCP = total unit cost of component Raw Materials ($/lb)

**Off-Spec Product**

The Parties agree to establish a mutually agreeable mechanism as an outcome of the JDA for specifying acceptable % range of Off-Spec Product, and a pricing mechanism that reflects a discount for volumes below the acceptable % range, and a bonus for volumes above the acceptable % range. The Parties acknowledge that the acceptable % range will be impacted by Product Mix and other HRD and Dow-related variables, and as such will be subject to update by the SCT.

**Cost of Volume additional to the Annual Capacity**

Unless otherwise amended by the SCT due to contributing factors such as slow run rates etc, any volume provided above the Annual Capacity shall be priced $0.10/lb above the applicable VCP.

# Exhibit 3

## AMENDMENT TO THE SUPPLY AGREEMENT BETWEEN THE DOW CHEMICAL COMPANY AND HRD CORPORATION

THIS AMENDMENT TO THE SARNIA PE WAX SUPPLY AGREEMENT effective this 28th day of March, 2003, by and between **THE DOW CHEMICAL COMPANY**, a Delaware corporation located in Midland, Michigan ("TDCC"), and **HRD CORPORATION**, trading as Marcus Oil & Chemicals, a Texas corporation located in Houston, Texas ("HRD") (together the "Parties" or individually a "Party").

### WHEREAS:

(A)    HRD and TDCC have previously entered into a JOINT DEVELOPMENT AGREEMENT ("JDA") and a SARNIA PE WAX SUPPLY AGREEMENT ("Supply Agreement") both having an effective date of July 1st, 2002.

(B)    The Implementation Date of the Supply Agreement had an effective date of February 28th, 2003, being mutually agreeable under the terms of Paragraph 2.2 of the Supply Agreement.

(C)    TDCC has advised HRD that as an outcome of the JDA it has revised the Estimated CRP (Capacity Rights Payment) up from $4,000,000 to $6,792,000.

(D)    HRD has advised TDCC that it has received new market information that requires it to conduct additional performance testing which may result in modifications to Schedules 1-3 of the JDA.

(E)    TDCC has ongoing costs at the Sarnia Site that it needs to recoup if the receipt of the Capacity Rights Payment is further delayed.

### NOW IT IS HEREBY AGREED as follows:

1.    Paragraph 8.2.1 of the Supply Agreement shall be replaced with the following:

    8.2.1    The Estimated CRP shall be remitted to TDCC as follows:

        8.2.1.1    HRD shall pay $4,000,000 to TDCC by April 15th, 2003 such sum being a part-payment of the revised Estimated CRP, with the remaining $2,792,000 of the revised Estimated CRP to be paid to TDCC by July 15th, 2003.

CONFIDENTIAL DISCOVERY MATERIAL Subject to Protective Order in C.A. . 05-023 (JJF)    03/31/03

8.2.1.2  If by April 15th, 2003 HRD has not advised TDCC in writing that it supports the existing Schedules 1-3 of the JDA or agreed modifications thereof, or HRD has not made the first part-payment as required under 8.2.1.1, then HRD will be required to make a non-refundable payment of $300,000 to TDCC as compensation for the ongoing Sarnia Site costs.  In such an event, HRD will be deemed to have not paid the Estimated CRP and the Parties' rights under the Supply Agreement will prevail under such a condition.

2.  All other terms and conditions of the Supply Agreement apply.

**Amendment Controlling.**   In the event there is a conflict between the terms and conditions of the Supply Agreement and this Amendment, this Amendment shall control.

IN WITNESS wherefore this Amendment has been entered into by the Parties hereto the day and year first above written.

SIGNED for and on behalf of:                      SIGNED for and on behalf of:

**THE DOW CHEMICAL COMPANY**          **HRD CORPORATION**


_____                          _____
John J. Yimoyines                                Abbas A. Hassan
Business Vice-President                           President
Date:  4|3|03                                    Date:  3|31|03

CONFIDENTIAL DISCOVERY MATERIAL Subject to Protective Order in C.A. . 05-023 (JJF)                    03/31/03

# **<u>Exhibit 4</u>**

# This Exhibit Was Redacted In Its Entirety

# **Exhibit 5**

# This Exhibit Was Redacted In Its Entirety

# **Exhibit 6**

## SARNIA PE WAX SUPPLY AGREEMENT – April 19, 2004

As an outcome of the Joint Development Agreement between the Parties, the Schedules to the Sarnia PE Wax Supply Agreement have been completed and are agreed as follows:

### SCHEDULE 1
### Specifications and Analytical Methods
### (Clauses 1, 3.3, 4.1, 4.2, 8.2.2, 9.1.1, 9.2, 12.1, and 29)

**Prime Product Specifications**

Grade 1 (XUS 62513.00):    3500 cP, 0.9040 Density – Ethylene/Octene Co-Polymer

Grade 2 (XUS 62513.01):    75 cP, 0.9050 Density – Ethylene/Propylene Co-Polymer

Grade 3 (XUS 62513.02):    75 cP, 0.967 Min. Density – Ethylene Homopolymer

Grade 4 (XUS 62513.05):    30 cP, 0.896 Density – Ethylene/Propylene Co-Polymer

Viscosity Specification:    +/- 15%  (+/- 35% on Grade 4)
Density Specification:      +/- 0.0025
Gardner Color              < 2

**Analytical Methods**
Viscosity Test Method – Brookfield Viscosity @ 300F (ASTM D3236)
        Spindle S18 would be used for the Grades 2 and 3 and 4
        Spindle S31 would be used for the Grade 1

Density Test Method – Density by displacement (ASTM D 792 modified). DCCI will mold plaques and finish density testing within one hour vs. 40hrs stated in the ASTM method.

Gardner Color Method – ASTM D1544. Color will be measured on the molten polymer.

### SCHEDULE 2
### HRD Estimated Requirements (Clauses 3.3, 4.2, and 29)

| **Supply Year** | **Volume lbs** |
|---|---|
| Supply Year 1 | 60MM (50% Grade 4, remainder to be advised by HRD) |
| Supply Year 2 | 60MM (Grade(s) to be advised by HRD) |
| Supply Year 3 | 60MM (Grade(s) to be advised by HRD) |
| Supply Year 4 | 60MM (Grade(s) to be advised by HRD) |

"Supply Year" means the successive periods of twelve months commencing on the date of Beneficial Manufacture.

DOW CONFIDENTIAL - Do not share without permission

## SCHEDULE 3
## Variable Cost Formulas (Clauses 6.1, 8.1.3, and 29)

### Introduction

Schedule 3 will be subject to update from time to time by the SCT, and references in the Supply Agreement to Schedule 3 shall mean to apply to the most recent update approved by the SCT.

### Variable Cost Price (VCP)

The VCP for each Grade has been calculated based on the estimated volume requirements listed in Schedule 2. VCP component costs (e.g. Utilities/lb) can be higher at substantially lower volumes and in such an event will be subject to review and update by the SCT.

| Raw Materials – Grade 1 | Cost Description |
|---|---|
| Ethylene | Benchmark cost * 0.795 (proportion) / 0.95 (yield) |
| 1-Octene | Benchmark cost * 0.205 (proportion) / 0.97 (yield) |
| Catalyst, Additives, and Chemicals | $0.0235/lb |
| Utilities | $0.0126 + Benchmark cost*0.00463MMbtu |
| Packaging | n/a |
| License Fee (if Grade 1 sold into HMA) | 5% * DCCI Net Selling Price |

| Raw Materials – Grade 2 | Cost Description |
|---|---|
| Ethylene | Benchmark cost * 0.88 (proportion) / 0.95 (yield) |
| Propylene | Benchmark cost * 0.12 (proportion) / 0.85 (yield) |
| Catalyst, Additives, and Chemicals | $0.0301/lb |
| Utilities | $0.0126 + Benchmark cost*0.00463MMbtu |
| Packaging | n/a |
| License Fee | n/a |

| Raw Materials – Grade 3 | Cost Description |
|---|---|
| Ethylene | Benchmark cost * 1.0 (proportion) / 0.95 (yield) |
| Propylene | Zero |
| Catalyst, Additives, and Chemicals | $0.0301/lb |
| Utilities | $0.0126 + Benchmark cost*0.00463MMbtu |
| Packaging | n/a |
| License Fee | n/a |

| Raw Materials – Grade 4 | Cost Description |
|---|---|
| Ethylene | Benchmark cost * 0.835 (proportion) / 0.95 (yield) |
| Propylene | Benchmark cost * 0.165 (proportion) / 0.85 (yield) |
| Catalyst, Additives, and Chemicals | $0.0301/lb |
| Utilities | $0.0126 + Benchmark cost*0.00463MMbtu |
| Packaging | n/a |
| License Fee | n/a |

DOW CONFIDENTIAL - Do not share without permission

**Where:**
Ethylene Benchmark cost = US Gulf Delivered Contract Price CMAI ($/lb)
1-Octene Benchmark cost = Ethylene Benchmark cost + $0.18/lb
Propylene Benchmark cost = Polymer Grade US Gulf Contract Price CMAI ($/lb)
Utility Benchmark cost = US Gulf Delivered Contract Burner Tip Natural Gas CMAI ($/MMbtu)
DCCI Net Selling Price = total cost of Raw Materials, Utilities, Packaging, and Unit AOP ($/lb)
Unit AOP = annual planned unit cost of Plant Operations ($/lb)
VCP = total unit cost of component Raw Materials, Utilities, and Packaging ($/lb)

## Off-Spec Product

The Parties acknowledge that their intent with respect to Off-Spec Product in Clause 8.1.3 was to ensure cooperation towards minimizing the production and financial impact of Off-Spec Product. The Parties now agree to replace the proposed % range and discount / bonus mechanism with an estimate of the expected % Off-Spec Product (see table below).

| Supply Year: | 1 - first 6 months | 1 – second 6 months | 2 | 3 | 4 |
|---|---|---|---|---|---|
| Expected Off-Spec Product | 20% | 12% | 7% | 7% | 7% |

The Off-Spec amounts recited are based on the original two Product grades. The amount of Off-Spec is expected to increase as the number of Products grades increases. When Schedule 2 is revised, the parties agree this section will be reviewed/revised accordingly.

DCCI will use all reasonable efforts to minimize % Off-Spec Product and, as part of Dow good manufacturing practices, constantly seek to improve Prime Product consistency and reduce % Off-Spec Product. Should the % Off-Spec Product remain above the expected level for a sustained period then the Parties agree to cooperate to determine a remedy. Such remedy may include, but is not restricted to, changes to the Prime Product specifications; changes to the expected % Off-Spec Product; and changes to the plant configuration. Should any of these changes, and any associated costs, not be contemplated by the Supply Agreement then the Parties will cooperate to agree on how to best implement and fund the changes.

The Parties also acknowledge that the % Off-Spec Product can be impacted by Product Mix, forecasting and order patterns, and other variables which are in the control of either DCCI or HRD, and as such will be subject to update and revision by the SCT.

## Cost of Volume additional to the Annual Capacity

Unless otherwise amended by the SCT due to contributing factors such as slow run rates etc, any volume provided above the Annual Capacity shall be priced $0.10/lb above the applicable VCP.

IN WITNESS whereof this Agreement update has been entered into by the Parties hereto the day and year first below written, in duplicate original exemplars.

DOW CONFIDENTIAL - Do not share without permission

SIGNED for and on behalf of:
**DOW CHEMICAL CANADA INC.**

Name: STEPHEN J. BOLT
Title: SITE LEADER
Date: 5/7/04

SIGNED for and on behalf of:
**HRD CORPORATION**

Name: 5. AZIZ HASSAN
Title: 1. Presedent
Date: 1/2/2004

DOW CONFIDENTIAL - Do not share without permission

# Exhibit 7



O'DONNELL
FEREBEE
MEDLEY &
KEISER, P.C.

William C. Ferebee                **ATTORNEYS AT LAW**                (281) 875-8200

November 8, 2007

Mr. Aaron Barlow                                    VIA FAX (312) 923-8408
Jenner & Block LLP
One IBM Plaza
Chicago, IL 60611-7603

RE:    Dow v. HRD Corporation; *Our File No. M313.00026.*

Dear Mr. Barlow:

This letter is in response to your letter of October 25, 2007, and Ray Nimrod's letter of November 6, 2007. First, I did not receive your letter until the end of October because I was out of the country for a week. As you might imagine, since my return I have been swamped with court hearings, depositions and general catch-up work.

With regard to your complaints on HRD's answers to Interrogatories 3 and 4, HRD will agree to supplement its previous answers. The supplemental answers should be in your hands within one week.

With regard to your concern about damages, HRD will provide you with the information on how it calculated the ▮▮▮▮▮▮ However, that is not to say that HRD's expert will come to the same conclusion. HRD's expert needs information from Dow to either calculate or confirm HRD's damages. As a result, our expert will not prepare a report until the Court has ruled on our pending Motion to Compel and until the time for expert reports has arrived.

As to the corporate minute book, it was destroyed in the fire. However, attached to this letter are the corporate documents that have been recovered from the Secretary of State.

Ray Nimrod's letter of November 7, 2007, asks for additional information regarding Interrogatory 6. This appears to be the same information sought in your recent Interrogory 15. We should have this information before the end of November.

2

Very Truly Yours,

O'DONNELL, FEREBEE, MEDLEY & KEISER, P.C.

*William C. Ferebee*

WILLIAM C. FEREBEE

WCF/cm

cc:    CLIENT, *via fax*

Enclosures

# Exhibit 8

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DOW CHEMICAL CANADA, INC.          §
on its own behalf and as assignee of   §
THE DOW CHEMICAL COMPANY           §
                                   §
VS.                                §          C.A. No. 05-23 (JJF)
                                   §
HRD CORPORATION (d/b/a             §
Marcus Oil & Chemical)             §

## INITIAL DISCLOSURES

Defendant, HRD CORPORATION (d/b/a Marcus Oil & Chemical) ("HRD"), makes the following Initial Disclosures pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure to Plaintiffs, DOW CHEMICAL CANADA, INC. ("DCCI"), on its own behalf and as assignee of THE DOW CHEMICAL COMPANY ("TDCC") (collectively "Dow"), the following information:

(A)    The following individuals may have knowledge of discoverable information that the disclosing party may use to support its claims or defenses:

     1.    Greg Borsinger
       Consultant
       Marcus Oil & Chemical
       14549 Minetta
       Houston, Texas 77035
       713-721-9131

     2.    Craig Cawley
       Marketing Manager
       HRD Corporation
       D/B/A Marcus Oil & Chemical
       14549 Minetta
       Houston, Texas 77035
       713-721-9131

     3.    Abbas Hassan
       President/Chairman
       HRD Corporation

> D/B/A Marcus Oil & Chemical
> 14549 Minetta
> Houston, Texas 77035
> 713-721-9131

4.  Ariz Hassan
    HRD Corporation
    D/B/A Marcus Oil & Chemical
    14549 Minetta
    Houston, Texas 77035
    713-721-9131

5.  Richard Learn
    Intertek Caleb Brett
    Sarnia, Ontario

In addition, the individuals listed in Dow's Initial Disclosures may have discoverable information relating to HRD's defenses and counter-claims. HRD reserves the right to name additional fact witnesses as they become known to HRD through the course of discovery. Employees of HRD are represented by counsel and are considered within the scope of that named party and may not be contacted except through undersigned counsel.

——(B)   HRD provides the following description by category of all documents, data compilations, and tangible things in the possession, custody, or control of the party that are relevant to disputed facts.

> On December 3, 2004, HRD's main offices, warehouse and plant sustained extensive damage in a fire at the Marcus Oil complex in Houston, Texas. Due to the fire damage, the City of Houston declared the structure unsafe and refused to permit any officer or employee of HRD to reenter any of the buildings. On December 4, 2004, the City of Houston razed the entire warehouse and office to the ground destroying the bulk of HRD's business records.

> HRD has attempted to reconstruct the following records to the extent such reconstruction is possible.

1.  Contracts/Agreements between HRD and The Dow Chemical Company and between The Dow Chemical Company and Dow Chemical Canada, Inc.;

2

2.   Correspondence between HRD and The Dow Chemical Company and Dow
     Chemical Canada, Inc.;

3.   Internal memos and emails regarding Contracts;

4.   Documents pertaining to the purchase and sale of wax at issue;

5.   Documents related to the development of the wax;

6.   Documents pertaining to the quality and specifications of the wax at issue; and

7.   Financial Statements regarding the financial consequences of the Contracts

These documents are available for inspection and copying at the offices of Howrey, LLP,

1111 Louisiana, Suite 2500, Houston, Texas 77002-5242. HRD reserves the right to supplement

this section if additional documents are located.

(C)    Computations of damages sought by Defendant/Cross-Plaintiff.

HRD does not and cannot know at this time all of the damages suffered as a result of
Dow Chemical Company and The Dow Chemical Company's breach of the underlying
contracts and other acts and omissions. HRD states that at this time it has suffered the
following damages:

1.   HRD Corporation seeks monetary damages, arising out of Dow Chemical Canada
     and The Dow Chemical Company's breach of the supply contract and Joint
     Development Agreement;

2.   Dow's intentional misappropriation of trade secrets entitles HRD to recover
     punitive and exemplary damages;

3.   HRD is entitled to recover its attorneys' fees; and

4.   Pre-and Post Judgment.

The damages are not subject to exact computation at this time. At the appropriate time,
HRD Corporation will identify one or more experts with respect to damages and,
subsequently will provide a detailed report on the computation of damages.

(D)    Insurance Agreements:

HRD is currently unaware of any applicable insurance agreements relevant to this
litigation.

3

POTTER ANDERSON & CORROON LLP


By _____
Richard L. Horwitz (#2246)
Suzanne M. Hill (#4414)
1313 North Market Street
Hercules Plaza, 6th Floor
P.O. Box 951
Wilmington, DE 19889-0951
(302) 984-6000 (Telephone)
(302) 658-1192 (Facsimile)
rhorwitz@potteranderson.com
shill@potteranderson.com

*Attorneys for Defendant HRD Corporation d/b/a Marcus Oil & Chemical, Inc.*

OF COUNSEL:

JOHN E. O'NEILL
Texas Bar No. 15297500
SHERYL A. FALK
Texas Bar No. 06795350
HOWREY LLP
1111 Louisiana Street, Suite 2500
Houston, Texas 77002
(713) 787-1400 (Telephone)
(713) 787-1440 (Facsimile)

Dated: November 9, 2005
PA&C 706821

4

# **<u>Exhibit 9</u>**

05/15/2006 12:29 FAX                                                    ⬤002/002



# O'F M&K
## O'DONNELL FEREBEE MEDLEY & KEISER, P.C.

William C. Ferebee          **ATTORNEYS AT LAW**          (281) 875-8200

May 10, 2006

Ms. Lisa Spacapan                                    VIA FAX (312) 840-7312
Jenner & Block LLP
One IBM Plaza
Chicago, IL 60611-7603

  RE: Dow v. HRD Corporation; *Our File No. M313.00026.*

Dear Ms. Spacapan:

  Assuming the parties cannot reach a business solution, I thought it best that HRD make its monetary settlement demand prior to mediation. That demand is ▮▮▮▮

  The ▮▮▮▮▮ number is derived as follows: The total global market for all types of adhesives is ▮▮▮▮ per year. The target market for the venture was hot melt adhesives. That represents about 10-15% of the total adhesive market or ▮▮▮▮ annual global sales. HRD estimated that its product would enjoy a 50% market share. Its lost profits, reduced to present value, over the next ▮▮▮▮

  I realize that your client will immediately point to paragraph 11.4 of the Sarnia PE Wax Supply Agreement which appears to eliminate the recovery of consequential damages. However, Delaware law and numerous courts have held that a seller may not rely on a provision limiting damages if it acted in bad faith. We believe that Dow's intentional inclusion of harmful "light ends" in the product will be determined to be bad faith. This is especially true where HRD paid for three devolitalization units at the Sarnia plant.

  If you have any questions regarding this demand, please do not hesitate to contact me.

    Very Truly Yours,

    O'DONNELL, FEREBEE, MEDLEY & KEISER, P.C.

    *WC Ferebee*

    WILLIAM C. FEREBEE

cc: CLIENT
WCF/cm

450 Gears - Eighth Floor■Houston, Texas 77067-4512■Fax (281) 875-4962■Email: wferebee@ofmklaw.com

# Exhibit 10

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DOW CHEMICAL CANADA, INC.                     §
on its own behalf and as assignee of          §
THE DOW CHEMICAL COMPANY                       §
    Plaintiff,                             §
                                               §
VS.                                            §      C.A. No. 05-23 (JJF)
                                               §
HRD CORPORATION (d/b/a                         §
Marcus Oil & Chemical)                         §
    Defendant, Counterclaim Plaintiff      §
                                               §
VS.                                            §
                                               §
DOW CHEMICAL CANADA, INC.                      §
on its own behalf and as assignee of          §
THE DOW CHEMICAL COMPANY and                   §
THE DOW CHEMICAL COMPANY,                       §
    Counterclaim Defendants.               §


**HRD CORPORATION'S OBJECTIONS AND RESPONSES TO DCCI AND
TDCC'S FOURTH REQUEST FOR PRODUCTION OF DOCUMENTS
(Answers to Requests No. 99 to 115)**


TO::  Plaintiff/Counterclaim-Defendants, by and through its attorneys of record,
      David John Teklits and Kenneth J. Nachbar, MORRIS, NICHOLS, ARSHT &
      TUNNELL, 1201 North Market Street, P.O. Box 1347, Wilmington, DE 19899-
      1347.


      Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, on the basis

of information now known and without waiving any objections or admitting the relevance

or materiality of the information sought, Defendant/Counterclaim-Plaintiff HRD

Corporation (d/b/a Marcus Oil & Chemical) ("HRD") serves its responses to Plaintiffs'

Fourth Set of Requests for Production, as attached.

## GENERAL OBJECTIONS TO
## FOURTH REQUEST FOR PRODUCTION

1.  HRD objects to Dow's Definitions to the Extent they require any action or production that exceeds the scope provided by the Federal Rules of Civil Procedure.

2.  HRD objects to Definition 1 because it is overly broad. For example definition number 1 would require the production of "oral" statements.

3.  HRD objects to Definition 5 because it defines HRD to include an overbroad and undefined group of companies and persons.

4.  HRD objects to Definition 7 to the extent it exceeds the scope of discovery permitted by the Federal Rules of Civil Procedure.

5.  HRD objects to Definition 8 because it defines HRD to include an overbroad and undefined group of companies and persons.

6.  HRD objects to Definition 10 because it defines HRD to include an overbroad and undefined group of companies and persons, including its attorneys.

7.  HRD objects to Definition 14 because it is overly broad and makes responding to any request virtually impossible.

8.  HRD objects to all of the Instructions and will only answer these requests in accordance with the Federal Rules of Civil Procedure.

## OBJECTIONS AND RESPONSES TO
## FOURTH REQUEST FOR PRODUCTION

**REQUEST NO. 99:**

All documents identifying, referring to or relating to any Product Samples, Products, or other material received from DCCI or TDCC.

**RESPONSE:**

Almost all the responsive documents were destroyed as a result of the fire and explosion at Marcus Oil and Chemical. Generally the only remaining documents were emails which have been produced.

**REQUEST NO. 100:**

All documents identifying, referring to or relating to any testing performed by HRD, or any agent, employee, or consultant on any Product Samples, Products, or other material received from DCCI or TDCC.

**RESPONSE:**

Almost all the responsive documents were destroyed as a result of the fire and explosion at Marcus Oil and Chemical. Generally the only remaining documents were emails which have been produced.

**REQUEST NO. 101:**

All certificates of analysis, packing lists, or other notifications received by HRD and any of its agents, employees, or consultants for Product Samples or Products, or other materials received from DCCI or TDCC.

**RESPONSE:**

Almost all the responsive documents were destroyed as a result of the fire and explosion at Marcus Oil and Chemical. Generally the only remaining documents were emails which have been produced.

**REQUEST NO. 102:**

A 50 gram sample of any Product Sample, Product, or other material received from DCCI or TDCC.

**RESPONSE:**

The responsive samples have been produced.

**REQUEST NO. 103:**

All documents identifying, referring to or relating to any testing or feedback received from HRD from any customer on any Product Sample, Product, or other material received from DCCI or TDCC.

**RESPONSE:**

Almost all the responsive documents were destroyed as a result of the fire and explosion at Marcus Oil and Chemical. Generally the only remaining documents were emails which have been produced.

**REQUEST NO. 104:**

Any documents that support HRD's allegations in Par. 104 of Defendant's First Amended Answer and Counterclaims that "[l]ight ends are waste byproducts of the manufacturing process for polyethylene wax."

**RESPONSE:**

The responsive documents, if any, will be produced.

**REQUEST NO. 105:**

Any documents that support HRD's allegations in Par. 104 of Defendant's First Amended Answer and Counterclaims that "[m]anufacturers of these waxes typically remove these volatile light ends from the finished wax because the presence of this impurity results in a product that is far more likely to smoke and/or catch fire under the elevated temperatures used in transportation, storage, and end use of the product."

**RESPONSE:**

The responsive documents, if any, will be produced.

**REQUEST NO. 106:**

Any documents that support HRD's definition of "Light Ends" as "the waste byproducts of the manufacturing process for polyethylene wax" in HRD Corporation's Request for Production of Documents to Dow Chemical Canada Inc. and The Dow Chemical Company.

**RESPONSE:**

The responsive documents, if any, will be produced.

**REQUEST NO. 107:**

Any documents relating to any contacts or communications from January 1, 2005 to the present between HRD (or its principals, consultants or agents) and any third party regarding any possibility, plan, request, proposal or inquiry to develop, manufacture, design or sell any 2-pack product or any polyethylene wax.

**RESPONSE:**

Almost all the responsive documents were destroyed as a result of the fire and explosion at Marcus Oil and Chemical.  Generally the only remaining documents were emails which have been produced.

**REQUEST NO. 108:**

Any documents from the period January 2004 up to and including the present relating to HRD's plans, proposals, marketing activities, offers, agreements, or business in the area of the manufacture, extraction and/or sale of waxes, including but not limited to polyethylene waxes.

**RESPONSE:**

Almost all the responsive documents were destroyed as a result of the fire and explosion at Marcus Oil and Chemical.  Generally the only remaining documents were emails which have been produced.

**REQUEST NO. 109:**

Any documents from the period January 2004 up to and including the present relating to HRD's plans, proposals, marketing activities, offers, agreements, or business in the area of the manufacture and/or sale of products for use in hot melt adhesives.

**RESPONSE:**

HRD objects to this request because it is overly broad and as such cannot be answered. In addition, this request is objectiontionable because it inquires of confidential business information of HRD

**REQUEST NO. 110:**

Any documents relating from the period January 2004 up to and including the present relating to HRD's plans, proposals, marketing activities, offers, agreements, or business in the area of the design, manufacture and/or sale of 2-pack products.

**RESPONSE:**

Since this litigation began there are not responsive documents.

**REQUEST NO. 111:**

Any documents relating to any damages claim HRD has in this case, including but not limited to the damages claims referred to in the May 10, 2006 letter from William C. Ferebee to Lise Spacapan.

**RESPONSE:**

Any responsive documents will be produced by HRD's damage expert.

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that on December 5, 2006, a copy of

the foregoing **HRD CORPORATION'S RESPONSES TO DCCI's and TDCC's**

**FOURTH SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND**

**THINGS** was served upon the following in the manner indicated:

**BY HAND**

Kenneth Nachbar
David J. Teklits
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
PO Box 1347
Wilmington, DE 19899-1347

I also certify that a copy was delivered by facsimile to the following persons:

Donald R. Cassling
Christopher Tompkins
Zachary V. Moen
Jenner & Block, LLP
One IBM Plaza
Chicago, IL 60611

POTTER ANDERSON & CORROON LLP

By _____

for Richard L. Horwitz (#2246)
Suzanne M. Hill (#4414)
1313 North Market Street
Hercules Plaza, 6th Floor
P.O. Box 951
Wilmington, DE 19889-0951
(302) 984-6000 (Tel)
(302) 658-1192 (Fax)
rhorwitz@potteranderson.com
shill@potteranderson.com
*Attorneys for Defendants HRD Corporation
d/b/a Marcus Oil & Chemical, Inc.*

Page 7 of 7

# Exhibit 11

# JENNER&BLOCK

October 25, 2007

Jenner & Block LLP          Chicago
330 N. Wabash Avenue     Dallas
Chicago, IL 60611        New York
Tel 312-222-9350         Washington, DC
www.jenner.com

**VIA FACSIMILE**

William Ferebee
O'Donnell, Ferebee, Medley & Keiser, P.C.
450 Gears, Eighth Floor
Houston, Texas 77067-4512

Aaron A. Barlow
Tel 312 923-8308
Fax 312 923-8408
abarlow@jenner.com

Re:    Dow Chemical Canada v. HRD Corp.,
       Case No. 05-023 (JJF)

Dr. Bill,

I am writing regarding several outstanding discovery matters. Specifically, Dow is concerned with: (1) HRD's failure to specifically identify the trade secrets that HRD claims were allegedly misappropriated, (2) HRD's failure to provide any information to support its ▮▮▮▮ claim for damages, and (3) HRD's failure to provide the documents you agreed to produce at our last meet and confer. (See my letter on September 28, 2007). We would like to discuss these concerns in a meet and confer before filing a motion to compel.

First, with regard to HRD's trade secret misappropriation counterclaim, we request that HRD further supplement its responses to Interrogatory Nos. 3 and 4. To date, HRD has failed to specifically identify the trade secrets allegedly at issue in this case. Nor has it explained how Dow misappropriated these trade secrets. Without this information Dow is unable to adequately prepare its defense to this counterclaim.

For example, Interrogatory No. 3 asks HRD to identify each trade secret that Dow allegedly misappropriated, and with respect to each trade secret, identify the date the trade secret was communicated, the person making the communication and the recipient of the communication. In response to this interrogatory, HRD asserts that it "introduced Dow to its customers and prospective customers, revealed marketing ideas and market information, and HRD's pricing, margin and other confidential business information." HRD also asserts that it revealed the "concept for the 'two-pack' product," results of prior research, and the special needs of certain customers. This answer is inadequate and fails to identify the trade secrets that Dow allegedly misappropriated.

To adequately support this claim and to give Dow sufficient information to prepare its defenses, HRD must: (1) identify the specific names of HRD's customers and prospective customers; (2) identify the dates Dow was introduced to these customers; (3) identify the persons who introduced Dow to these customers; (4) identify the alleged "special needs" relating to each customer that HRD revealed to Dow; (5) identify the specific "marketing ideas and market information" that were revealed to Dow and the products they relate to; (6) identify with specificity the confidential "pricing [and] margin" information HRD disclosed to Dow and the

William Ferebee
October 25, 2007
Page 2

products it relates to; (7) provide a detailed explanation of the "concept for the two-pack product" that you allege was a trade secret of HRD; (8) identify the person(s) at Dow to whom that the "two-pack" concept was disclosed and the date(s) of such disclosure(s); (9) identify with specificity the "prior research that HRD had funded" which was shared with Dow; and (10) identify what "other confidential business information" HRD refers to. Without this information, Dow is deprived of the opportunity to adequately prepare its defense to this counterclaim, particularly with respect to potential third party discovery Dow may need to pursue.

Interrogatory No. 4 asks HRD to identify the manner in which HRD alleges each trade secret was misappropriated. HRD failed to provide any information in response to this interrogatory. HRD must specifically identify which, if any, trade secrets were allegedly misappropriated by Dow and the manner of misappropriation. If HRD alleges that Dow misappropriated a particular trade secret by disclosing it to a third party, HRD must identify: (1) each specific trade secret that was allegedly misappropriated, (2) the third party recipient of the alleged communication, (3) the date that Dow allegedly communicated the trade secret to the third party, and (4) each person at Dow responsible for making the alleged communication. If HRD alleges that Dow has misappropriated a particular trade secret through some alleged internal use at Dow, HRD must identify: (1) each specific trade secret that was allegedly misappropriated in this manner, (2) the specific acts that allegedly comprise the misappropriation of such trade secrets, and (3) the date (or initial date) that Dow allegedly made the misappropriation.

For example, HRD alleged that its proposal for a "two-pack" product was a trade secret that was disclosed to Dow, but HRD never revealed how or when it has been misappropriated by Dow. We note that HRD has on a number of occasions publicly disclosed its proposal for a "two-pack" product to the adhesives industry. In order for Dow to prepare its defense to this counterclaim, please identify the dates and specific acts that HRD alleges constitute Dow's misappropriation of this trade secret.

Second, we also request that you agree to immediately produce information relating to HRD's damages claims. This case has been pending for over two years, and Dow has received no discovery relating to your client's damages claims. We need this information in order to determine what additional discovery is needed, including discovery from third parties, to prepare defenses to HRD's counterclaims.

As you know, as part of its initial disclosures, any party claiming damages is required to produce a computation of any category of damages claimed, and is under an ongoing obligation to update these disclosures as its investigation continues. Despite these obligations, HRD's initial disclosures did not include any computation of damages and stated that "HRD does not and cannot know . . . all of the damages suffered." Further, in response to Dow's Document Request No. 111, which sought any documents relating to HRD's damages, you stated that documents relating to HRD's damages will be produced by HRD's damages expert. These responses are wholly inadequate.

William Ferebee
October 25, 2007
Page 3

You have obviously performed some investigation into your client's damages, as you claimed in your May 10, 2006 letter to Lise Spacapan that your client has suffered ██████ in lost profits. You must have had some evidence to support your assertions regarding HRD's lost profits. Your client has failed to produce, however, any documents or evidence of any kind to support the figures included in that letter, which was sent more than six months before your response to Document Request No. 111 referenced above.

Your client has had over two years to investigate the damages it has purportedly suffered. In light of your ongoing duty to produce information relating to your client's damages, and the fact that you have already calculated a figure representing HRD's alleged lost profits, we request that you immediately produce the following:

- Separately identify each item of damages claimed for each of HRD's counterclaims of Breach of the Supply Agreement, Breach of the Joint Development Agreement, Misappropriation of Trade Secrets by Improper Means and Failure to Give Adequate Assurance of Future Performance.

- For each item of damages, disclose the amount of damages claimed, provide a computation or calculation for each such amount and disclose the method used to perform each such computation or calculation.

- For any claim of damages based on lost profits identify: (1) each potential customer from whom HRD's profits were lost; (2) which product grades were intended to generate the profits from each potential customer; (3) the percent of the hot melt adhesives market represented by each potential customer; (4) HRD's projected annual sales volume for each product to each potential customer for the next ten years; (5) the sales price and profit margin for each product that was intended to be sold to each potential customer; (6) each competitor and each competitive product for each product grade; and (7) any Dow commercial product that you allege is causing you damage or relates in any way to your damages claim (and describe how the Dow product has caused you damage or relates to your damages claim).

Additionally, please produce all of the data and other facts you used or relied upon in computing, calculating or estimating any of HRD's items of damages. These documents and facts should include evidence to support HRD's projected sales to each potential customer and should provide support for each figure included in your May 10, 2006 letter to Lise Spacapan.

Finally, you agreed to produce corporate minute documents, financial information and emails regarding polyethylene wax and two-packs and other documents requested in our document requests No.107-109. To date, we have not received this information. Please let us know when we can expect production of these documents. We also ask that you identify all of the firms that have provided professional services to HRD from 2000 to the present, such as accounting, consulting, insurance or other tax-related services. Please let us know if you are willing to provide this information.

William Ferebee
October 25, 2007
Page 4

     We request that the parties meet and confer to address these deficiencies in HRD's discovery responses.   We are available to meet and confer on Monday or Tuesday of next week.

Very truly yours,

Aaron A. Barlow

# **Exhibit 12**

# This Exhibit Was Redacted In Its Entirety

# Exhibit 13

# JENNER&BLOCK

January 06, 2008

Jenner & Block LLP
330 N. Wabash Avenue
Chicago, IL 60611-7603
Tel 312 222-9350
www.jenner.com

Chicago
Dallas
New York
Washington, DC

VIA FACSIMILE

Aaron A. Barlow
Tel  312 923-8308
Fax  312 923-8408
abarlow@jenner.com

William C. Ferebee
O'Donnell Ferebee Medley & Keiser, P.C.
450 Gears - 8th Floor
Houston, TX 77067-4512

Re:    Dow v. HRD Corporation

Dear Bill,

I am writing regarding a number of issues with HRD's answers and objections to Dow's
third set of interrogatories and HRD's objections and responses to Dow's fifth request for
production of documents. Several of HRD's objections are improper and many of its responses
do not provide complete answers to the discovery sought.

## Interrogatory Responses

HRD raised improper objections to Interrogatory Nos. 17 and 18 and has failed to
provide complete answers to Interrogatory Nos. 20, 22 and 23 (as well as Interrogatory No. 15
described in a separate letter that I sent you on December 11, 2007).

**Interrogatory Nos. 17 & 18.** HRD's objections to Interrogatory Nos. 17 and 18 are
improper. These interrogatories seek discovery relating to representations made by the Hassans
in connection with their attempts to interest Dow in their methane to olefin ("MTO") conversion
technology and related activities. HRD objected to answering these interrogatories, because the
MTO conversion technology is not relevant to "Dow's production of polyethylene waxes for
HRD." However, Interrogatory Nos. 17 and 18 properly seek information relating to the
credibility of Aziz Hassan and/or Abbas Hassan, in particular in connection with their
representations regarding the MTO technology, including representations to Dow.

Dow has reason to believe that Aziz Hassan and/or Abbas Hassan made
misrepresentations in connection with the MTO technology. If so, these misrepresentations
could be used to impeach the Hassans' credibility. We are entitled to discovery bearing on the
credibility of the Hassans, because they will be key witnesses in this case and "witness
impeachment is a time-honored basis for discovery." *Neuberger v. Shapiro*, 196 F.R.D. 286
(E.D.Pa. 2000) (citing *Hickman v. Taylor*, 329 U.S. 495 (1947)). Therefore, please provide
complete answers to Interrogatory Nos. 17 and 18.

**Interrogatory No. 20.** HRD's answer to Interrogatory No. 20 is incomplete. This
interrogatory asked HRD describe all of its efforts to comply with Dow's discovery requests,
including any efforts to obtain information or documents from HRD's e-mail provider. HRD

William C. Ferebee
January 06, 2008
Page 2

responded that its e-mail provider, AOL, only retains information for 90 days. HRD did not explain if and when it instructed AOL to preserve its information from the preceding 90 days.

In light of the fact that Dow's and HRD's attorneys had exchanged letters regarding HRD's overdue payments under the Supply Agreement by the time the fire occurred at HRD's Houston Facility, it would have been reasonable for HRD to have anticipated the possibility of litigation at that time, and HRD should have taken measures to preserve any information that would be relevant to the litigation. Had it done so, HRD could have preserved all of its AOL files dating back to September 2004. At a minimum, HRD should have taken reasonable measures to preserve its information when Dow filed its complaint, in which case HRD could have preserved all of its AOL files dating back to October 2004. In order to provide a complete answer to Interrogatory No. 20, please identify if and when HRD instructed AOL to preserve its records relating to the metallocene wax project. If HRD did not instruct AOL to preserve its records, please explain why.

**Interrogatory No. 21.** HRD's objection to Interrogatory No. 21 is improper. This interrogatory asked for information relating to the December 3, 2004 fire and explosion at its Houston facility, and HRD objected to answering the interrogatory because the "fire has nothing to do with the issues in this lawsuit." HRD's objection is improper for two reasons, either of which make this information discoverable.

First, the fire is relevant to HRD's ability of making the sales that form the basis of HRD's ▮▮▮▮▮▮▮ damages claim. Dow contends that because of, among other things, the fire, HRD had no ability to make even a fraction of those sales. Indeed, HRD admitted the fire is relevant to this lawsuit in its amended answer to Dow's complaint. Specifically, HRD pled that the fire was a Force Majeure event under the Supply Agreement which excused any obligation it had to Dow after December 3, 2004. (D.I. 25 at ¶ 109). Consequently, you cannot reasonably dispute that the fire is relevant for this reason alone.

Second, information relating to HRD's involvement in the fire and explosion bears on the potential spoliation of evidence by HRD, as most of the documents that would have contained support for HRD's defenses and counterclaims were purportedly lost in the fire. HRD's response to many of the document requests propounded by Dow in this case has been that "[a]lmost all the responsive documents were destroyed as a result of the fire and explosion at Marcus Oil and Chemical." As a result, HRD has produced almost no documents in support of its positions, which has forced Dow guess as to what basis HRD has for most, if not all, of the allegations in its counterclaims and defenses. Dow is entitled to discovery on any potential acts of spoliation by HRD.

**Interrogatory No. 22.** HRD's response to Interrogatory No. 22 is inadequate. That interrogatory asked HRD to identify each potential customer for the 2-pack product and each potential customer for the wax product. It also asked HRD to identify why each potential customer did or did not find the product(s) acceptable. Instead of answering the question asked, HRD simply listed seven companies without identifying which product(s) were evaluated by each company. Also, instead of explaining why *each customer* accepted or rejected the product(s), HRD simply stated that "[t]he product was rejected" without identifying by whom it

William C. Ferebee
January 06, 2008
Page 3

was rejected and, with respect to each customer, the specific reasons that customer rejected the product. If no customers rejected HRD's products because of light ends, then Interrogatory No. 22 calls upon HRD to admit that and identify the real reason, if any, why any customer rejected these products.

A complete answer to this interrogatory could be as follows, for each customer who HRD contends rejected any product: "Company X evaluated the microcrystalline wax product. It did not find the product acceptable because _____." Please provide a similar statement for each potential customer listed in HRD's answer to Interrogatory No. 22.

**Interrogatory No. 23.** HRD's response to Interrogatory No. 23 is deficient in numerous regards. HRD was asked to provide a computation for each item of damages claimed for each counterclaim, and to provide various categories of supporting information for its claim for lost profits. In response, HRD simply restated its claim for ▮▮▮▮▮ in lost profits as first identified in your letter to Lise Spacapan on May 10, 2006. HRD's interrogatory response contains absolutely no support whatsoever for any of the numbers used in its ▮▮▮▮▮ estimate. HRD did not even identify which products were going to allow HRD to attain a 50% market share of the hot melt adhesive market, much less who its customers were going to be.

Dow is entitled to know HRD's basis or support for making a ▮▮▮▮▮ ost profit claim. Therefore, at a minimum, HRD must identify which product(s) HRD believes were going to account for the 50% market share (*e.g.* which grade of 2-pack, 3-pack, microcrystalline wax or some other HRD wax) and must describe its basis for asserting that such a market share was attainable for the product(s) identified. Additionally, if HRD has any claim for damages other than lost profits, please identify it immediately or we will seek to preclude HRD from making any such claim.

**Number of Interrogatories.** Finally, HRD's objection as to Dow's numbering of its interrogatories is improper. Each of the 23 interrogatories propounded by Dow asks HRD to answer one question about one topic. Dow's interrogatories do not contain discrete subparts. They simply contain enough information to provide guidance for HRD to give complete answers. Additionally, HRD waived any argument that Interrogatory Nos. 13 and 14 contain multiple questions by failing to raise this objection in its answers to those interrogatories.

## Requests for Production

HRD has raised improper objections to Request Nos. 112 - 125 and 130-131.

**Request Nos. 112 - 124.** HRD's objections to these requests for production are improper. These requests seek documents relating to representations made by the Hassans in connection with their MTO conversion technology, including representations to Dow. The documents sought by these requests are discoverable for the same reasons that HRD must answer Interrogatory Nos. 17 and 18. The requested documents relate to the credibility of two key witnesses, Aziz Hassan and Abbas Hassan, in particular in connection with their representations regarding the MTO conversion technology.

William C. Ferebee
January 06, 2008
Page 4

In addition, for two of the requests, HRD objects that the request "is an attempt to steal HRD's proprietary and patented technology on how to convert methane to olefins." We note that to the extent that its technology is disclosed in patents or published applications, HRD should have no concerns regarding confidentiality. Obviously, to the extent that HRD's documents contain confidential MTO information of HRD not relevant to the representations at issue, HRD could redact the documents.

**Request No. 125.** HRD's objection to producing documents in response to Request No. 125 is also unacceptable. This request asked for copies of HRD's tax returns for the years encompassing the Dow/HRD polyethylene wax project. HRD stated in response that these documents "are not relevant or calculated to lead to the discovery of admissible evidence." To the contrary, HRD's tax filings are both relevant to the litigation and will likely lead to the discovery of admissible evidence.

First, HRD's tax filings from 2000 to 2004 may contain documents or information that HRD claims was destroyed in the December 3, 2004 fire and explosion. HRD would have attached copies of documentation to its income tax filings to support the representations made in those filings. It is likely that the attached documents, or the returns themselves, contain information that is relevant to this lawsuit. In particular, HRD's income tax filings for 2004 would almost certainly contain relevant information, as all of the production under the Supply Agreement occurred in 2004.

Second, HRD has placed its finances at issue in this case by making a claim for lost profits. HRD is claiming it has suffered ▮▮▮▮▮▮ damages in lost profits, but has failed to provide any information to support that number. HRD has claimed that it has customers for its wax products in the hot melt adhesives industry. If HRD's claim for lost profits is based in any way on sales of its wax products, then Dow needs information about HRD's sales, income and profit for those products for the years before, during and after the Dow/HRD project to prepare a defense to that claim. As discussed above, HRD has failed to identify which products form the basis of its claim for lost profits. Regardless of which products form the basis of HRD's lost profits claim, however, HRD's tax returns will contain information relating to the extent of HRD's presence in the HMA industry. This information is relevant to HRD's claim that it would have attained a 50% market share in that industry.

**Request No. 130.** HRD's reason for not producing documents in response to Request No. 130 ignores the timeframe of the request. This request asks for documents relating to HRD's communications with third parties regarding hot melt adhesive products or components, 2-pack products or metallocene based polymers or waxes *from December 2004 to the present.* HRD responded that these documents were destroyed in the fire and explosion that occurred on December 3, 2004, which was before the timeframe specified in the request. HRD must produce all documents *since* the fire and explosion occurred in response to this request.

**Request No. 131.** HRD's objection to producing any documents relating to non-metallocene wax sales in response to Request No. 131 is also invalid for several reasons.

William C. Ferebee
January 06, 2008
Page 5

First, these documents will pertain to HRD's claim for lost profits. As noted above with respect to Request No. 125, HRD has claimed that it has lost sales to customers for its wax products in the hot melt adhesives industry. HRD's sales, pricing and properties of HRD's non-metallocene products obviously bears on HRD's damages claims, which extends out for several years past 2004. Dow needs information about HRD's business activities relating to those products to prepare a defense to HRD's lost profits claim.

Second, in response to Interrogatory No. 3, HRD included several items relating to non-metallocene wax products in its list of alleged trade secrets that were misappropriated by Dow. Therefore, information about HRD's business for these products is also relevant to its claim for misappropriation of trade secrets.

In its response to this request, HRD also claimed that it could not produce any documents relating to metallocene based products because these documents were destroyed in the December 3, 2004 fire and explosion. As in Request No. 130, however, the timeframe of this request was limited to after the fire occurred. Therefore, the responsive documents could not have been destroyed in the fire.

Finally, in our meet and confer on September 28 you agreed to provide us with certain financial information. I confirmed this agreement in my letter dated September 28, and I reminded you of the agreement in my letter dated October 25. We have yet to receive these documents. Please provide us with this information by next Friday.

We request a meet and confer to discuss the items addressed above on Tuesday, Wednesday or Thursday of this week. Please contact me to arrange a time.

Very truly yours,

Aaron A. Barlow

# FAX TRANSMITTAL        JENNER&BLOCK

Jenner & Block LLP          Chicago
330 N. Wabash Avenue        Dallas
Chicago, IL 60611           New York
Tel 312 222-9350            Washington, DC
www.jenner.com

Date:           January 6, 2008

To:             William Ferebee          Fax:    281-875-4962
                O'Donnell, Ferebee, Medley &    Voice:  281-875-8200
                Keiser, P.C.

From:           Aaron A. Barlow           Fax:    312 923-8408
                abarlow@jenner.com        Voice:  312 923-8308

**Important:** This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is attorney work product, privileged, confidential, and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone, and return the original message to us at the above address via postal service. Thank you.

Message:  Resent with corrected date

---

Total number of pages including this cover sheet:  6       Time Sent:

If you do not receive all pages, please call:  312 222-9350       Sent By:

Secretary:  Patty T. Sotiropoulos       Extension:  4791

```
*************** -COMM. JOURNAL- ******************* DATE JAN-06-2008 ***** TIME 17:11 *** P.01

    MODE = MEMORY TRANSMISSION           START=JAN-06 17:08      END=JAN-06 17:11

    FILE NO.= 027

 STN   COMM.     ONE-TOUCH/    STATION NAME/EMAIL ADDRESS/TELEPHONE NO.    PAGES    DURATION
 NO.              ABBR. NO.

 001    OK        ⅏            912818754962---3757111117                  006/006   00:03:05

                                              -JENNER BLOCK LLP           -

 ******************************* -          - **** -             - *********
```

# FAX TRANSMITTAL          JENNER&BLOCK.

Jenner & Block LLP          Chicago
330 N. Wabash Avenue        Dallas
Chicago, IL 60611           New York
Tel 312 222-9350            Washington, DC
www.jenner.com

Date:       January 6, 2008

To:         William Ferebee              Fax:    281-875-4962
            O'Donnell, Ferebee, Medley & Voice:  281-875-8200
            Keiser, P.C.

From:       Aaron A. Barlow              Fax:    312 923-8408
            abarlow@jenner.com           Voice:  312 923-8308

Important: This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is attorney work product, privileged, confidential, and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone, and return the original message to us at the above address via postal service. Thank you.

Message:  Resent with corrected date

Total number of pages including this cover sheet: 6          Time Sent:

If you do not receive all pages, please call: 312 222-9350          Sent By:

Secretary: Patty T. Sotiropoulos          Extension: 4791

# Exhibit 14



William C. Ferebee

**O'DONNELL FEREBEE MEDLEY & KEISER, P.C.**

**ATTORNEYS AT LAW**

(281) 875-8200

January 11, 2008

Mr. Aaron Barlow
Jenner & Block LLP
One IBM Plaza
Chicago, IL 60611-7603

VIA FAX (312) 923-8408

RE:    Dow v. HRD Corporation; *Our File No. M313.00026.*

Dear Mr. Barlow:

I am in receipt of your letter dated January 6, 2008. HRD's response to your letter is as follows:

**Interrogatories 17 and 18.** As we all know, these interrogatories are unrelated to the current litigation. HRD understands that Dow would like to learn more about HRD's methane to olefin conversion technology. However, the agreement between Dow and HRD regarding that technology has expired. In addition, the court has already ruled on this issue once.

You claim that Dow has some undisclosed reason to believe that Aziz or Abbas Hassan made some misrepresentation in connection with the MTO technology, and that possibly these could be used to impeach the Hassans' credibility. As I have stated in the past, HRD has reason to believe that Dow employees involved in this litigation, made misrepresentations in the Dow/Exxon metallocene litigation. If we are going to open the door for one party then it is only fair to open the door for both parties to find misrepresentations in unrelated litigation. Unfortunately if we are going to retry the Dow/Exxon case and reopen the MTO dispute, then we would probably have a trial that lasts several years, with only a few weeks spent on the real issues. The cases you cite do not stand for the proposition that a party may seek unlimited discovery in unrelated matters. As a result, HRD will stand on its objections to Interrogatories 17 and 18.

**Interrogatory 20.** HRD strongly rejects your assertion that it should have anticipated litigation by the time the fire occurred at its facilities. Indeed, Dow's employee, Tony Frencham was at the HRD facility the day of the fire working on a resolution of the issues. After that meeting there were numerous other conversations regarding a resolution. HRD assumed the matter would be resolved until Dow changed its position. Therefore HRD did not anticipate litigation until well after the fire. As a result, HRD believes that its answer to Interrogatory 20 is sufficient.

2

**Interrogatory 21.** You claim that your interrogatory 21 would lead to relevant evidence because 1) HRD had no ability to make sales, and 2) the information bears on spoliation of evidence. Your first contention is wrong. As Mr. Frencham can attest, HRD subcontracted its wax processing to other entities after the fire. Second, your contention of spoliation is unfounded and the documents you seek would not lead to the information you allege exists. You have been provided with television recordings of the fire and one can readily see the damage. In addition, it is public record that the City of Houston ordered everything bull dozed down the next morning.

If the information you seek is correctly stated in your letter, then the Interrogatory is patently over broad and unduly burdensome. If you would like a copy of the City of Houston order or the identity of HRD's subcontractors would took over processing wax please let me know.

**Interrogatory 22.** Dow's Interrogatory 22 exceeds the 25 Interrogatory limit imposed by the court. However, HRD graciously answered the question. It appears that your complaint is with the word "product" versus "products". Therefore HRD will amend the last sentence of its answer to Interrogatory 22 to read "The products were rejected because they contained light ends which caused the product to emit fumes and smoke when heated to useable temperatures."

**Interrogatory 23.** Dow's Interrogatory 23 exceeds the 25 Interrogatory limit imposed by the court. However HRD provided an answer. This was extremely generous given that Interrogatory 25 contains 6-10 separate inquires and a request for production of documents. In particular, Interrogatory 25 asks 1) HRD to provide a computation for its damages, 2) asks for information regarding HRD's customers, 3) asks HRD to identify the hot melt adhesive market with every customer and its market share, 4) asks HRD to identify each item of evidence it uses to calculate its damages, 5) asks HRD to identify every competitor and every competitor's products and 6) asks HRD to identify Dow products that are causing HRD damage.

In addition, this Interrogatory actually asks for expert information and the time to designate experts has not arrived.

**Number of Interrogatories.** HRD disagrees with your position that your interrogatories each ask one question about one topic. HRD believes that the court could easily find that your questions far exceed the 25 Interrogatory limit.

## Requests for Production

**Requests 112-124.** As your letter acknowledges, these requests all deal with the MTO conversion technology which has nothing to do with this lawsuit. HRD's position on these is described in the paragraph discussing Interrogatories 17 and 18. HRD will stand on its objections.

**Request 125.** HRD will stand on its objection to Request 125.

3

**Request 130.** HRD correctly answered this request that the existing documents were produced in the documents from Greg Borsinger.

**Request 131.** You claim that you need documents regarding HRD's plans, proposals, marketing activities and offers in the area of the manufacture, extraction and/or sale of waxes because they pertain to 1) HRD's claim for lost profits and 2) because there are items relating to non-metallocene wax products contained in HRD's list of alleged trade secrets. If those are the reasons for Request 131, then it is grossly overbroad.

Very Truly Yours,

O'DONNELL, FEREBEE, MEDLEY & KEISER, P.C.

*William C. Ferebee*

WILLIAM C. FEREBEE

cc:      CLIENT, *via fax*

WCF/cm

450 Gears - Eighth Floor■Houston, Texas 77067-4512■Fax (281) 875-4962■Email: wferebee@ofmklaw.com