# Exhibit 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DOW CHEMICAL CANADA INC. on its own)
behalf and as assignee of THE DOW CHEMICAL)
COMPANY,                                )
                                        )
                Plaintiff,              )
                                        )
        v.                              )
                                        )
HRD CORPORATION (d/b/a Marcus Oil &)
Chemical)                               )    Case No. 05-023 (JJF)
                                        )
        Defendant, Counterclaim Plaintiff, )
                                        )
        v.                              )
                                        )
DOW CHEMICAL CANADA INC., on its own)
behalf and as assignee of THE DOW CHEMICAL)
COMPANY, and THE DOW CHEMICAL)
COMPANY,                                )
                                        )
                Counterclaim Defendants. )

## DCCI's AND TDCC'S FIRST SET OF INTERROGATORIES
(Interrogatories No. 1 to 13)

Plaintiff and Counterclaim-Defendant Dow Chemical Canada Inc. ("DCCI") and

Counterclaim-Defendant The Dow Chemical Company ("TDCC"), by and through their

attorneys, hereby propound the following interrogatories upon Defendant and Counterclaim

Plaintiff HRD Corporation ("HRD") pursuant to Fed.R.Civ.P. 26 and 33, and request that

responses be made within 30 days.

<u>DEFINITIONS AND INSTRUCTIONS</u>

**A.    <u>Definitions</u>**

1.    "Archive" means a long-term storage area, often on magnetic tape, for backup copies of files or for files no longer in active use; or the act of copying files to a long-term storage medium for backup. An archive copy is typically maintained for historical reference.

2.    "Backup" means a snapshot of a data store taken at a specific point in time, typically stored on a second medium such as tape or a disk, and typically made to have another copy of data in case the original copy is unreadable, but includes any copy of data on any medium in any format.

3.    "Communication" means all interchanges of thoughts, facts, information, and/or opinions between two or more persons or entities, whether written or oral, through any medium whatsoever, including the mails, memoranda, reports, telephones, telegraph, voicemail, facsimile, electronic mail, face-to-face, audiotape, contracts, agreements, solicitations, offers, proposals, financial statements and transcripts.

4.    "Complaint" means the complaint filed by DCCI in the above captioned case on January 18, 2005, or any amendment thereto.

5.    "Computer" means any programmable machine, including, but not limited to, network servers, desktops, laptops, notebook computers, employees' home computers, mainframes, the PDAs (personal digital assistants, such as Palm Pilot, Cassiopeia, HP Jornada, BlackBerry and other such handheld computing devices) of HRD and its employees, digital cell phones, and pagers.

6.    "Correspondence" means any document that either constitutes a communication between two or more entities or persons, or that records, memorializes, reflects, or otherwise summarizes the substance of such a communication whether made directly to the author of the document or otherwise.

7.    "Confidentiality Agreement" means the confidentiality agreement between TDCC and HRD effective January 8, 2001, and any and all amendments thereto.

8.    "Counterclaims" means HRD's First Amended Counterclaims filed in the above captioned matter on June 5, 2005, or any subsequent Amended Counterclaims.

9.    "Counterclaim Defendants" means both DCCI and TDCC, collectively.

10.    "Defenses" means HRD's affirmative defenses filed in the above captioned matter on June 5, 2005, or any subsequent Amended Defenses.

11.    "Defendant," "Counterclaim-Plaintiff," "HRD," "Marcus," "you," "your," and "yourself" means the defendant, HRD Corporation and all of its affiliates, agents, employees, or representatives acting or purporting to act on behalf of HRD for any purpose whatsoever, including without limitation Marcus Oil and Chemical.

12.    "Dow" means either DCC1 or TDCC, or both, as appropriate in the context of the interrogatory.

13.    "Document" or "documents" shall be construed in the broadest sense possible under Fed.R.Civ.P. 34 and shall include all writings as that term is defined in Fed.R.Evid. 1001, and all written, typed, printed, recorded, graphic, computer-generated, or other matter of any kind from which information can be derived, whether produced, reproduced, or stored, on paper, cards, tape, film, electronic facsimile, computer storage devices, or any other medium in your possession, custody or control, or whose existence is or was ever known to you, including but not limited to: correspondence, letters, notes, memoranda, appointment calendars, schedules, telegrams, telexes, facsimiles, electronic mail, voicemail, press releases, notices, brochures, pamphlets, guidelines, manuals, instructions, summaries or abstracts, diaries, notebooks, minutes, computer printouts or information stored in computer-readable form, tests, reports, files, file jackets, analyses, studies, testimony, speeches, worksheets, invoices, bills, written estimates, contracts, agreements of any kind, purchase orders, change orders, plans, charts, diagrams, drawings, graphs, designs, blueprints, tables, photographs, books, articles, or extracts from any of the foregoing, and any other writings or documentary materials of any nature whatsoever, whether or not divulged to other parties, together with any attachments thereto and enclosures therewith.

These interrogatories encompass all forms and manifestations of electronically or optically coded, stored, and/or retrievable information, included but not limited to "e-mail," digital images and graphics, digital or analog audio tapes and files, and digital or analog video tapes and files. The term "document" or "documents" shall also include any preliminary drafts of any documents or any working papers related thereto, and specifically includes internal memoranda. If a document responsive to any interrogatory was, but no longer is, in your possession and control, describe in detail the contents of the document, its date of creation and disposition, and its present location and custodian.

14.    "Gregory Borsinger" refers to the consultant identified on page 1 of the HRD Initial Disclosures, including without limitation all affiliates, agents, employees, employers of Gregory Borsinger, or representatives acting or purporting to act on behalf of Gregory Borsinger for any purpose whatsoever, including without limitation New Millennium Associates and New Millennium Development Corp.

15.    "Hard Drive" means the mechanism that reads and writes data on a hard disk. A hard drive is the primary hardware that a computer uses to store information, typically magnetized media on rotating disks.

16.    "HRD Initial Disclosures" means the disclosures served by HRD on November 9, 2005 pursuant to Fed.R.Civ.P. 26(a)(1).

17.    "Individual" or "person" or "affiliate" means any natural person, corporation (private or governmental), subsidiaries, syndicate, trust, partnership, proprietorship, firm, group, association, joint venture, or any other form of organization or legal entity, including all respective officials, directors, officers, employees, representatives, independent contractors, investigators, consultants, agencies, or agents, whether or not still alive or in existence.

3

18.     "JDA" means the Joint Development Agreement between HRD and TDCC effective July 1, 2002, which was attached to DCCI's complaint as Exhibit A, and any and all amendments thereto.

19.     "Official," "officer," "director," "employee," "representative," "agency," or "agent" shall include any person, natural, corporate, or otherwise, including any attorney, serving or acting in such capacity (by contract or otherwise) at any relevant time even though such person no longer serves or acts in such capacity.

20.     "Plaintiff" and "DCCI" means the plaintiff, Dow Chemical Canada Inc. and all of its affiliates, agents, employees, or representatives acting or purporting to act on behalf of DCCI for any purpose whatsoever.

21.     "Product," "Polyethylene Wax," or "PE Wax" means wax(es) supplied to HRD by Dow pursuant to the JDA and/or the Supply Agreement and any experimental products HRD requested DCCI produce at the Sarnia PDP.

22.     "Product Samples" means any sample of any wax(es) provided to HRD by Dow whether pursuant to the JDA or another agreement.

23.     "Relating to" or "relates to" or "related to" means containing, constituting, discussing, describing, identifying, referring to, supporting, explaining, contradicting, reflecting and/or in any way pertaining to the subject specified.

24.     "TDCC" means The Dow Chemical Company and all of its affiliates, agents, employees, or representatives acting or purporting to act on behalf of TDCC for any purpose whatsoever.

25.     "Supply Agreement" means the Sarnia PE Wax Supply Agreement between TDCC and HRD effective July 1, 2002, which was attached to DCCI's complaint as Exhibit B, and any and all amendments thereto.

26.     "Sarnia PDP" means DCCI's Sarnia Product Development Plant in Ontario, Canada.

**B.**    <u>Instructions</u>

1.     These interrogatories are continuing and must be supplemented in accordance with Fed.R.Civ.P. 26(e).

2.     When an interrogatory calls for an answer in more than one part, separate the parts in the response accordingly so that the response to each separate part of the interrogatory or is apparent; do not join together and provide a common response or answer to two or more interrogatories or to subparts of an interrogatory.

3.     When asked to identify a document, state or identify: (a) its location; (b) the location of all non-identical copies of the document; (c) the name and title of each person presently in charge of the custody and maintenance of the original and any non-identical copies;

4

(d) the date that the original and all non-identical copies of the document bear; (e) the author and signatories of the original and all non-identical copies; (f) its length; (g) the original document's content and how each non-identical copy of the document differs from the original; (h) each person who received the original or a copy of the document. If the document is available only in machine-readable form, state the form in which the document is available and describe the type of machine required to read the document. If the document was, but no longer is, in your possession, custody, or control, state or identify: (i) what disposition was made of the document; (ii) the date of any such disposition; and (iii) each person that either authorized or has knowledge of such disposition.

4.    When asked to identify a natural person, state his or her: (a) name; (b) title or position; (c) present or last known business address; (d) present or last known home address; (e) present or last known business telephone number; and (f) present or last known home telephone number. If such person is no longer employed by the person for which he/she engaged in the activity that is the subject of the interrogatory, state that date on which he/she left the employ of the person and his/her title or position when he/she engaged in the activity that is the subject of this interrogatory.

5.    When asked to identify a non-natural person, state: (a) the full name of the entity; (b) the address of its principal place of business; (c) the telephone number of its principal place of business; (d) the name and title of each person who (1) is or was an officer, general partner, limited partner, member, or beneficiary of the organization, or (2) represented the organization with respect to the subject matter of the interrogatory; and (e) the relationship of the entity to the parties to this proceeding.

6.    When asked to identify a communication, state: (a) the date, time, and place of the communication; (b) the form of the communication (such as memorandum, letter, or conversation); (c) the speaker(s) or author(s) making the communication; (d) the recipient(s) of the communication; (e) each person who has or believed to have first-hand knowledge of the communication; (f) the substance of the communication; and (g) each document relating to the communication.

7.    To the extent you consider any of the following interrogatories, or their subparts, to be objectionable, answer the portion of the interrogatory or subpart to which you have no objection and separately state the portion of the interrogatory or subpart to which you object and state with specificity all grounds for your objection. If you object to an interrogatory on the basis that it is too broad, provide the response that you believe is within a reasonable scope of the interrogatory. If you object to an interrogatory on the basis that to provide a response would constitute an undue burden, provide all information that can be supplied without undertaking an undue burden. For those interrogatories or portions thereof that you decline to answer, state the reason for the objection or declination in sufficient detail to permit the Court to adjudicate the merits of the claim.

8.    If you believe that any of the following interrogatories call for the production of documents that you claim contained privileged material, produce so much of the document(s) as is not objected to, and set forth in a privilege log, with respect to each such document as to which a claim of privilege is asserted, the nature of the privilege claimed (e.g. attorney-client and/or

5

work product privileges) and all the reasons upon which you base the claim of privilege. For each document or part of a document as to which you claim privilege, the privilege log should state: (a) the date thereof; (b) the type, title, and subject matter of the document, sufficient to assess whether the assertion of privilege is valid; (c) the name of the person or persons who prepared or signed the document; (d) the name and positions of all intended and actual recipients of the document; and (e) if not previously identified, the nature of the privilege being claimed and all facts relevant to the claim.

9.     Notwithstanding a claim that a document is privileged, any document so withheld must be produced with the portion claimed to be protected excised.

10.     Each interrogatory calls for the knowledge of the answering party, as well as knowledge that is available by reasonable inquiry, including inquiry of the answering party's representatives, agents, and investigators. If, after exercising due diligence to secure information, any interrogatory cannot be answered in full and complete detail, please state so and answer to the extent possible, specifying in each instance the inability to answer the remainder and stating whatever information or knowledge that you have concerning the unanswered portions.

11.     To bring within the scope of these interrogatories all information or documents that might otherwise be construed to be outside of their scope:

a.     the singular of each word shall include its plural and vice versa, and the root word and other forms thereof shall be construed to include each other;

b.     "and" as well as "or" shall be used conjunctively as well as disjunctively;

c.     "any" shall be construed as "all" and vice versa;

d.     the present tense shall be construed to include the past tense and vice versa;

e.     the masculine shall be construed to include the feminine and vice versa;

f.     "include" and "including" shall have their ordinary meaning and shall mean "including but not limited to;"

g.     "Knowledge," "information," "possession," "custody," and "control" possessed or exercised by a person shall be construed to include "knowledge," "information," "possession," "custody," and "control" possessed by such person's agents, representatives, and attorneys.

12.     In general, all terms used herein shall be construed in an ordinary common-sense manner, and not in a technical, strained, overly literal, or otherwise restrictive manner.

## INTERROGATORIES

**Interrogatory No. 1.**

Identify each person having knowledge of facts relevant to the allegations of the Complaint, and any Answer, Affirmative Defenses. or Counterclaim in this litigation, and summarize the topics about which each person has knowledge.

**Interrogatory No. 2.**

Excluding counsel, identify each person who was interviewed about, consulted about, or participated in the preparation or formulation of HRD's  (1) answer and Counterclaims, (2) responses to each of these Interrogatories, (3) responses to DCCI's and TDCC's First Set of Document Requests.

**Interrogatory No. 3.**

With respect to Counts II and III of your Counterclaims, identify each trade secret that DCCI or TDCC allegedly misappropriated, and, with respect to each trade secret, identify:

    (a)    whether the trade secret consists of information HRD communicated to DCCI or TDCC;

    (b)    whether the trade secret consists of information developed by TDCC or DCCI;

    (c)    the date on which the trade secret was communicated to HRD or DCCI;

    (d)    each person making the communication;

    (e)    each recipient of the communication; and

    (f)    each document reflecting or memorializing the communication.

**Interrogatory No. 4.**

For each trade secret you listed in response to Interrogatory 3, identify:

    (a)    the manner in which you allege the trade secret was misappropriated;

    (b)    any third party to whom you allege DCCI or TDCC communicated or disclosed the trade secret;

    (c)    the date on which you allege the trade secret was communicated;

    (d)    each person making the alleged communication;

    (e)    each recipient of the alleged communication; and

7

    (f)    each document reflecting or memorializing the alleged communication.

**Interrogatory No. 5.**

Identify all testing procedures or processes that you used to test the Product Samples. For each testing procedure or process, identify the tests conducted, the testing methods used, the results of such tests, and each person with knowledge of such tests.

**Interrogatory No. 6.**

State whether Product delivered to HRD complied with the specifications in Schedule 1 to the Supply Agreement or any other specification you claim applies to such Product. If your answer is anything other than an unqualified "yes," identify each shipment of Product from Dow that was received by HRD and did not meet the specifications, the specific specification that was not met by each shipment, and each communication between you, Dow, and/or anyone else regarding the failure of the Product in that shipment to meet that specification.

**Interrogatory No. 7.**

With respect to the allegation in Paragraph 103 of your Defenses, identify each physical characteristic or property of the Product produced under the Supply Agreement that differed from the Product Samples that HRD approved under the JDA, making sure to identify each person with knowledge of the facts in this allegation, identify any tests or analyses performed by HRD or any third parties that support the allegation, and identify any documents relating to the allegation.

**Interrogatory No. 8.**

Define the term "solvents" as used in your Counterclaims and Defenses, such as in Paragraph 103 of your Defenses. If you use more than one definition of the term "solvents" in your Counterclaims and Defenses, please provide each definition of that term and identify the allegations in which you use each definition.

**Interrogatory No. 9.**

Define the term "light ends" as used in your Counterclaims and Defenses, such as in Paragraph 103 of your Defenses. If you use more than one definition of the term "light ends" in your Counterclaims and Defenses, please provide each definition of that term and identify the allegations in which you use each definition.

**Interrogatory No. 10.**

Identify each person with knowledge of the allegation in Paragraph 104 of your Counterclaims that "[m]anufacturers of these waxes typically remove these volatile light ends from the finished wax," identify each manufacturer of wax that you are aware of that removes such light ends, and identify each document related to your allegation that manufacturers of wax remove such light ends.

**Interrogatory No. 11.**

With respect to the allegations in Paragraph 105 of your Counterclaims, describe how the "manufacturing process was designed to remove" light ends or solvents from the Product and identify each piece of equipment at the Sarnia PDP that HRD paid for in order to remove light ends or solvents from the Product, including the date and amount of each payment made for such equipment.

**Interrogatory No. 12.**

With respect to Count IV of your Counterclaims, identify each communication between HRD and Dow that you allege was a demand by HRD for adequate assurance of future performance under the Joint Development Agreement and/or the Supply Agreement making sure to identify (a) the date of each communication, (b) the identity of each person making the communication; (c) the identity of each recipient of the communication; and (e) each document reflecting or memorializing the communication.

**Interrogatory No. 13.**

Identify the person(s) most knowledgeable regarding the document reconstruction effort described on page 2 of the HRD Initial Disclosures, including without limitation the persons most knowledgeable about:

    (a)    the damage sustained to HRD's main offices, warehouse, and plant in Houston, Texas as the result of a fire at those facilities on December 3, 2004;

    (b)    the property, items, electronic information, or documents that HRD salvaged or attempted to salvage from those facilities after the December 3, 2004 fire;

    (c)    any disaster recovery plan, business continuity plan, or other similar plan, procedure or document in place at HRD as of December 3, 2004;

    (d)    HRD's document retention policies;

    (e)    HRD's computer network including the location of all data storage devices, servers, and backup systems employed by HRD attempts to recover any electronic data as a result of the December 3, 2004 fire; and

    (f)    HRD's e-mail system including the identity of any network connectivity vendor utilized by HRD, any backup systems for e-mail, and HRD's attempts to recover e-mail as a result of the December 3, 2004 fire.

9

MORRIS, NICHOLS, ARSHT & TUNNELL

Kenneth Nachbar (#2067)
David J. Teklits (#3221)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
knachbar@mnat.com
dteklits@mnat.com
*Attorneys for Dow Chemical Canada Inc. and The Dow Chemical Company*

OF COUNSEL:

Donald R. Cassling
Christopher Tompkins
Zachary V. Moen
JENNER & BLOCK LLP
One IBM Plaza
Chicago, IL 60611
(312) 923-2951 (telephone)
(312) 840-7351 (facsimile)

November 23, 2005

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that on November 23 2005, a copy of the foregoing DCCI'S AND TDCC'S FIRST SET OF INTERROGATORIES was served upon the following in the manner indicated:

**BY HAND**

Richard L. Horwitz
Suzanne M. Hill
Potter Anderson & Corroon LLP
Hercules Plaza, 6th Floor
1313 North Market Street
Wilmington, DE 19899-0951

I also certify that a copy was delivered by facsimile to the following persons:

John O'Neill
Sheryl A. Falk
Eleanor Vernon
Howrey, Simon, Arnold & White, LLP
1000 Louisiana, Suite 1800
Houston, TX 77002

Kenneth J. Nachbar (#2067)
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
knachar@mnat.com

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DOW CHEMICAL CANADA INC. on its own behalf and as assignee of THE DOW CHEMICAL COMPANY, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| HRD CORPORATION (d/b/a Marcus Oil & Chemical) | ) ) ) | Case No. 05-023 (JJF) |
| Defendant, Counterclaim Plaintiff, | ) ) | |
| v. | ) ) | |
| DOW CHEMICAL CANADA INC., on its own behalf and as assignee of THE DOW CHEMICAL COMPANY, and THE DOW CHEMICAL COMPANY, | ) ) ) ) ) | |
| Counterclaim Defendants | ) ) | |

### NOTICE OF SERVICE

The undersigned, counsel for Dow Chemical Canada, Inc. and the Dow Chemical Company hereby certifies that true and correct copies of DCCI'S AND TDCC'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS and DCCI'S AND TDCC'S FIRST SET OF INTERROGATORIES were served on November 23, 2005 on the following attorneys of record by hand:

> Richard I. Horwitz
> Suzanne M. Hill
> Potter Anderson & Corroon LLP
> Hercules Plaza, 6th Floor
> 1313 North Market Street
> Wilmington, DE 19899-0951

Copies were also sent by facsimile to the following:

John O'Neill
Sheryl A. Falk
Eleanor Vernon
Howrey, Simon, Arnold & White, LLP
1000 Louisiana, Suite 1800
Houston, TX 77002

MORRIS NICHOLS ARSHT & TUNNELL

_____
Kenneth Nachbar (#2067)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 575-7294
knachbar@mnat.com
 *Attorneys for Dow Chemical Canada, Inc. and
 The Dow Chemical Company*

OF COUNSEL:

Donald R. Cassling
Christopher Tompkins
Zachary V. Moen
JENNER & BLOCK LLP
One IBM Plaza
Chicago, IL 60611
(312) 923-2951

November 23, 2005

2

# Exhibit 2 – Part 1a

# This Exhibit Was Redacted In Its Entirety

# Exhibit 2 – Part 1b

# This Exhibit Was Redacted In Its Entirety

# Exhibit 2 – Part 2











# High Flow *Affinity*-Based Hot Melt Adhesives

This paper was presented at the ASC Fall Conference
in Pittsburgh, PA on September 21, 2004

High Flow *Affinity*-Based Hot Melt Adhesives
S. Yalvac, T.P. Karjala
The Dow Chemical Company

L. Martin
Eastman Chemical Company

The introduction of high flow *Affinity*-based hot melt adhesives (HMAs) has been one of the most important events in the HMA market in the last 30 years. These novel polymers present an exceptional opportunity to formulate HMAs, which can deliver excellent adhesion at both low and high use temperatures, with unsurpassed processability, and excellent value for the end user.

This paper summarizes some of the important attributes of these polymers and HMAs made from these polymers and *Eastotac* tackifier resins.

*Eastotac* resins are Dow's tackifier of choice for their new *Affinity* packaging applications.

**EASTMAN**

# Contents

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2
Test Methods . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3
   Polymer Test Methods . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3
   HMA Methods . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3
Polymers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4
HMA Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5
   Cost Savings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5
   Gardner Color and Color Change . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5
   Percent Fiber Tear . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7
   Service Temperature Range . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7
   PAFT, SAFT, and Heat Stress . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7
   Viscosity and Thermal Stability . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9
   Tackifier Selection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

# Introduction

High flow *Affinity*[1]-based HMAs combine impressive performance with customer demonstrated cost savings. These new products surpass their competition in processability, performance, cosmetic appearance, and most importantly they save money for end users. These HMAs offer high mileage due to aggressive bonding as well as lower density. They run clean and char-free resulting in savings in maintenance expenses such as filters and nozzles. As a result, end users experience much lower rates of line shut down and thus lost production. Additionally, the ease of cleaning the spilled or misfired beads from machinery and the lack of angel hairing or spider webs results in more savings in terms of reduced labor costs. Reduced wear and tear on the equipment, primarily due to the low acid content of the base polymer, have been documented. HMAs made from these polymers offer a wider service temperature than those of traditional ethylene vinyl acetate (EVA)-based hot melt adhesives. The clarity of the product in molten form and the much improved heat stability of the product as compared to competitive polymers results in better color and increased intervals between product changes in the melt tank. Finally, the lack of odor and smoke from the product improves workplace conditions. These attributes are summarized in Table 1. Use of these polymers in a wider variety of applications has been discussed in [1–2], and specifically as a flow modifier for thermoplastic polyolefins or TPO's in [3–4].

*Affinity* polymers are novel polyolefins manufactured using INSITE* Technology. The newly introduced polymers have unprecedented low density and low molecular weight combinations for a polyolefin. They are designed to be used in hot melt and hot melt pressure sensitive formulations in a variety of applications. These include:

1. Case and Carton Sealing
   a. Folding Carton Sealing
   b. Corrugated Container Closure
   c. Tray Forming
   d. Pallet Stabilization

2. General Packaging

3. Bottle Labeling
   a. Roll Feed
   b. Magazine Feed

4. Graphic Arts
   a. Lay-flat
   b. Hard Cover
   c. Soft Cover

5. Multi-wall and Specialty Bag
   a. Film Laminating
   b. Pinch Bottom
   c. Spot Paste
   d. Valve Assembly
   e. Longitudinal Seam and Bottom Paste
   f. Plastic Bags
   g. Vacuum Bags
   h. Security Bags
   i. Wax Bags

6. Nonwoven Hygienics
   a. Diaper Construction
   b. Core Stabilization

[1] Trademark of Dow Chemical Company.

Table 1

**Performance Attributes of High Flow Affinity Polymers**

| Performance Attribute | Observations |
|---|---|
| Increased mileage | Reduced adhesive usage, lowers cost as much as 15-30%, depending on application. |
| Reduced gel and char formation | No plugged filters and nozzles, reduced downtime and lost production. |
| No stringing and spider webbing | Enhanced package appearance, reduced labor cost, reduced downtime. |
| Improved thermal stability | Excellent control of viscosity resulting in precise control of bead size and bead placement. |
| Wide service temperature range | Final bonds resist extreme heat and cold, reducing waste, product returns, and replacement costs. |
| Color/clarity | Enhances package appearance. |
| Clean machining | Reduced wear and tear on the equipment, reduced downtime. |
| Odor free | Offers environmentally friendly workplace. |

# Test Methods

## Polymer Test Methods

The differential scanning calorimetry (DSC) data were gathered on a TA Q1000 using 5–8 mg of sample pressed into a thin film. The sample was heated to 180°C and kept isothermal for 3 minutes to ensure complete melting (first heat). The sample was then cooled at 10°C/min to –90°C and kept isothermal for 3 minutes. The sample was then heated to 150°C (second heat) at 10°C/min. The second heat curve and data are reported in this work. Additionally, from the cooling curve the crystallization temperature is reported.

The viscosity data were measured both by dynamical mechanical spectroscopy (DMS) and by capillary rheometry. The DMS data were gathered on a Rheometrics ARES with 50 mm parallel plates in a nitrogen purge at 150% strain. A separate sample was used at each temperature of 110, 150, and 190°C, with each frequency sweep being conducted from 0.1–100 rad/s. The capillary data were gathered on a Goettfert Rheograph 2003 with a 0.5 mm diameter die and 30 length-to-diameter die ratio from 100–10,000 s⁻¹. An overlay of the DMS and capillary data is presented in this work.

Density was measured according to ASTM D792 [5]. Brookfield viscosity was measured according to ASTM D3236 [6] on a Brookfield LVDVII+ with Thermosel. Data are reported at either 350°F (177°C), the conventional HMA testing temperature, or 250°F (121°C), the temperature commonly used for a low application temperature hot melt adhesives. The melt indexes [7] at 190°C with a 2.16 kg weight were estimated based upon the Brookfield viscosity.

## HMA Methods

Gardner color was determined as a function of time at the application temperature for the HMA [8]. Approximately 25 grams of adhesive was placed in a 4-oz glass jar and loosely wrapped with aluminum foil. Several samples were prepared for each HMA and placed in a forced air oven. The HMA was removed from the oven at the desired time and immediately decanted into a Gardner color tube. The Gardner color was determined as described in [9] using a Gardner Delta Illuminator.

The peel adhesion fail temperature (PAFT) and shear adhesion fail temperatures (SAFT) were determined on 40 lb virgin Kraft paper coated at 350°F (177°C) for *Affinity* GA 1950 and 250°F (121°C) for *Affinity* GA 1900. The adhesive thickness was 25 + 5 mil and the bond configuration for the Kraft coupons was 1" × 3" with a 1" × 1" bond overlap. The samples were conditioned overnight at 73°F (23°C) and 50% relative humidity. The PAFT weight used was 100 grams and the SAFT weight was 500 grams as described in [10]. The starting temperature was 30°C with a ramp rate of 0.5°C/min.

Heat stress data were based on Jefferson Smurfit virgin and recycled corrugated cardboard with conditions similar to that for PAFT and SAFT; a weight of 500 grams was used. For fiber tear, a ½–¼" bead was used on cardboard coupons of 2" × 2.5" overlapped crosswise with the bond formed by light finger pressure. The samples were conditioned overnight at 73°F (23°C) and 50% relative humidity, with those at freezer conditions being kept for 30 minutes at the desired temperature. The fiber tear assessment was based on samples which were pulled apart by hand.

For the PAFT, SAFT, and heat stress studies, ten samples were measured in order to report the standard deviations; for fiber tear, three samples were used. Error bars are reported as the product of the standard deviation and the *t* distribution or Student's *t* at the 95% confidence level or at an α = 0.025 [11]. For the PAFT, SAFT, and heat stress studies where error bars are reported, the Student's *t* is 2.262.

# Polymers

Dow Chemical has recently introduced two high flow *Affinity* polymers, namely *Affinity* GA 1950 and *Affinity* GA 1900. These two polymers are intended for use in hot melt adhesives for case and carton sealing and graphic arts and a third one, *Affinity* EG 8200, is a low melt index polymer suitable for use in diaper construction and graphic arts applications. The physical characteristics of these polymers are shown in Table 2.

DSC heating curves of *Affinity* GA 1950 and GA 1900 are shown in Figure 1. It should be noted that the low crystallinity of these polymers coupled with low molecular weight (low viscosity) are primarily responsible for their excellent performance in HMAs. Figure 2 shows the viscosity of these two polymers as a function of shear rate and temperature. It should be noted that these polymers exhibit Newtonian behavior up to about 1,000 sec⁻¹. Much more detailed structure/property relationships of this general class of polymers are discussed elsewhere [12].

Table 2

### Physical Properties of Adhesive Grade *Affinity* Polymers

| Polymer | Density (g/cc) | Melt Index, g/10 min (190°C, 2.16 kg weight) | Viscosity, cP @ 177°C (350°F) | $T_m$ (°C)[1] | $T_c$ (°C)[2] | % Crystallinity[3] | $T_g$[4] (°C) |
|---|---|---|---|---|---|---|---|
| Affinity GA 1900 | 0.87 | 1,000[5] | 8,200 | 69.4 | 54.3 | 15.8 | –58 |
| Affinity GA 1950 | 0.874 | 500[5] | 17,000 | 71.4 | 53.1 | 18.3 | –57 |
| Affinity EG 8200 | 0.87 | 5 | — | 63.0 | 46.0 | 15.9 | –53 |

[1]$T_m$: Melting Temperature   [2]$T_c$: Crystalization Temperature   [3]Heat of Fusion in J/g(/292 J/g) × 100   [4]Glass Transition Temperature   [5]Apparent Melt Index

Figure 1

**DSC Heating Curves of High Flow *Affinity* Polymers**



Figure 2

**Viscosity of High Flow *Affinity* Polymers**





4

# HMA Performance

Table 3 shows HMA formulations prepared using *Affinity* GA 1950 and GA 1900 with different tackifying resins. The attributes and properties of these formulations will be discussed in this section.

## Cost Savings

High flow *Affinity*-based HMAs offer lower overall cost as compared with EVA or ethylene-n-buryl acrylate (EnBA)-based HMAs. In one case study a pound of *Affinity*-based HMA sealed significantly more cases than a pound of incumbent HMA. Mileage advantage in this case study resulted in savings of 15 to 30%. These savings resulted from aggressive bonding, improved thermal stability, and lower density. Additional savings were achieved due to the ability to bond to a wide range of substrates, reduction in waste, reduction in maintenance, and lower inventory due to a wide service temperature.

In another case study, a Dow plant, which used to change filters and nozzles on a monthly basis and, therefore, experienced significant downtime,

switched from an EVA based HMA to an *Affinity* GA 1950-based HMA, and operated with no downtime and no need to change nozzles and filters for a period of 18 straight months.

## Gardner Color and Color Change

High flow *Affinity*-based formulations produce exceptionally clear and odor-free hot melt adhesives. This is attributed partly to the polymer component and partly to the hydrocarbon tackifiers used in the formulations. Figure 3 shows color change for two high flow *Affinity*- and EVA-based HMAs at 350°F (177°C) for up to 7 days. Table 4 shows the Gardner color as a function of temperature for the HMA formulations of Table 3, including one EVA-based HMA. As can be seen, both the initial and aged color is substantially improved for the *Affinity*-based HMA. These properties make high flow *Affinity*-based HMAs a preferred product when improvement in cosmetic aspects of the packaged goods and the work environment conditions are needed.

Table 3

Hot Melt Adhesive Formulations of *Affinity* GA 150 and GA 1900 and
Three Different Tackifying Resins From Eastman Chemical Company
(The experimental tackifier resin is intended to be available in Europe.)

| Component, wt % | Affinity[1] GA 1950 | | | Component, wt % | Affinity GA 1900 | | |
| | Eastotac[2] H-130R | Eastotac H-142R | Experimental Tackifier | | Eastotac H-130R | Eastotac H-142R | Experimental Tackifier |
|---|---|---|---|---|---|---|---|
| Affinity GA 1950 | 34.5 | 34.5 | 34.5 | Affinity GA 1900 | 29.5 | 29.5 | 29.5 |
| Eastotac H-130R | 35.0 | — | — | Eastotac H-130R | 35.0 | — | — |
| Eastotac H-142W | — | 35.0 | — | Eastotac H-142W | — | 35.0 | — |
| Experimental Tackifier | — | — | 40.0 | Experimental Tackifier | — | — | 35.0 |
| Paraflint[3] H2 | 30.0 | 30.0 | 25.0 | Paraflint H2 | 35.0 | 35.0 | 35.0 |
| Irganox[4] 1010 | 0.5 | 0.5 | 0.5 | Irganox 1010 | 0.5 | 0.5 | 0.5 |
| Total | 100.0 | 100.0 | 100.0 | Total | 100.0 | 100.0 | 100.0 |

[1] Trademark of Dow Chemical Company
[2] Trademark of Eastman Chemical Company
[3] Trademark of Sasol (now under Sasolwax trademark)
[4] Trademark of Ciba Specialty Chemicals Inc.

Figure 3

Color Change at 350°F (177°C) Over 168 Hours (7 Days) for HMAs
Based on (A) *Affinity* GA 1950 and on (B) EVA

## HOT MELT ADHESIVE A



|   0   |   24   |   48   |   72   |   96   |   148   |

### HOURS AT 177°C

## HOT MELT ADHESIVE B

Table 4

Gardner Color as a Function of Time at the Application Temperature for the HMAs
of Table 3 Along With an EVA-Based Low Application Temperature HMA

|  | *Affinity*[1] GA 1950 Conventional (350°F) HMA | | | *Affinity* GA 1900 Low Application Temp. (250°F) HMA | | | EVA-Based LATHMA |
|---|---|---|---|---|---|---|---|
|  | Eastotac[2] H-130R | Eastotac H-142R | Experimental Tackifier | Eastotac H-130R | Eastotac H-142R | Experimental Tackifier |  |
| Gardner Color, Initial | | | 2 | | | 2 | 5 |
| Gardner Color @ 12 hrs | | | 5 | | | 5 | 8 |
| Gardner Color @ 24 hrs | | | 5 | | | 5 | 11 |
| Gardner Color @ 36 hrs | | | 6 | | | 5 | 11 |
| Gardner Color @ 48 hrs | | | 6 | | | 5 | 12 |
| Gardner Color @ 96 hrs | 11 | 8 | 11 | 6 | | 6 | 13 |
| Gardner Color @ 200 hrs | 13 | 13 | 11 | 9 | 4 | 7 | 14 |

[1]Trademark of Dow Chemical Company
[2]Trademark of Eastman Chemical Company

High Flow *Affinity*-Based Hot Melt Adhesives

## Percent Fiber Tear

Hot melt adhesives formulated with high flow *Affinity* polymers provide excellent adhesion to a wide variety of substrates due to the low crystallinity and the very low molecular weight of these polymers. These include the many difficult-to-bond coatings used in the production of folding cartons. This aggressive bonding is maintained over a wide temperature range. HMAs based on EVA polymers and other competitive HMAs are not comparable to the performance of high flow *Affinity*-based HMAs. Typical percent fiber tear results for three different HMAs are shown in Figure 4.

### Figure 4

Percent Fiber Tear at Five Different Temperatures of HMAs Formulated With Different Base Polymers, With Two EVA Formulations Designed to Perform at Low and High Temperatures



## Service Temperature Range

Hot melt adhesives formulated with high flow *Affinity* polymers exhibit exceptional performance at both ends of the temperature scale, due to the very low glass transition temperature of the polymer and the heat resistance offered by the optimum tackifier. These polymers are the ideal choice when the packaging needs call for freezer-to-microwave exposure. Formulations prepared with high flow *Affinity* polymers save money for both the formulator and the end-user as the number of HMAs kept in the inventory and the plant floor

will be reduced. One HMA can solve both the low temperature and the high temperature needs of the line operator. Frequent changes from one HMA grade to another will no longer be necessary. The service temperature range for *Affinity*- and EVA-based HMAs is shown in Figure 5.

### Figure 5

Service Temperature Range for an *Affinity*-Based HMA and an EVA-Based HMA



## PAFT, SAFT, and Heat Stress

High upper service temperature, as measured by PAFT, is very important for warehouse storage purposes, especially in warm climates. *Affinity*-based HMAs offer superior PAFT performance when compared with competitive samples. Formulations that offer PAFT values in excess of 160°F have been prepared. Use of high performance HMAs based on *Affinity* polymers will reduce the failure rate in cases sealed with these HMAs, thus reducing returned boxes and associated expenses.

Table 5 shows the PAFT, shear adhesion fail temperature (SAFT), heat stress, and onset and full fiber tear temperatures for both conventional and low application temperature hot melt adhesives (LATHMAs) measured on the samples of Table 3. The last column in Table 5 summarizes the results of a commercially available EVA-based low application temperature HMA. These results for PAFT, SAFT, heat stress, and fiber tear are shown pictorially in Figures 6–9 along with the error bars of the measurements. The average PAFTs of the *Affinity*-based HMAs were 150°–169°F as compared to 132°F for the EVA-based HMA. Similarly, the SAFTs were much improved for the *Affinity*-based HMAs at 188°–208°F as compared to 165°F for the EVA-based HMA. Onset of and

7

full fiber tear was impressive for the conventional application temperature *Affinity*-based HMAs at −40° to −50°F and 0°F, respectively, and at 10° to −20°F and 10° to 20°F, respectively for the *Affinity*-based LATHMA. In comparison, the fiber tears for the EVA-based HMA were all poor at >35°F. Heat

stress results were comparable for the LATHMAs at 177°–187°F for *Affinity*-based HMAs and 187°F for the EVA. The conventional HMA heat stress results were substantially higher for those based on *Affinity* at 196°–202°F.

Table 5

PAFT, SAFT, Heat Stress, and Onset and Full Fiber Tear of the Formulations Shown in Table 3 Along With an EVA-Based Low Application Temperature HMA

| | *Affinity*[1] GA 1950 Conventional (350°F) HMA | | | *Affinity* GA 1900 Low Application Temp. (250°F) HMA | | | EVA-Based LATHMA |
|---|---|---|---|---|---|---|---|
| | Eastotac H-130R[2] | Eastotac H-142R[2] | Experimental Tackifier | Eastotac H-130R[2] | Eastotac H-142R[2] | Experimental Tackifier | |
| Avg. PAFT, °F | 158 | 169 | 150 | 161 | 158 | 151 | 132 |
| St. Dev., °F | 8.8 | 9.9 | 6.3 | 7.3 | 7.5 | 4.4 | 7.5 |
| Avg. SAFT, °F | 208 | 204 | 210 | 188 | 205 | 198 | 165 |
| St. Dev., °F | 5.0 | 4.5 | 2.6 | 7.2 | 5.2 | 3.1 | 3.7 |
| Avg. Heat Stress, °F | 200 | 196 | 202 | 177 | 183 | 188 | 187 |
| St. Dev., °F | 23.8 | 2.2 | 16.2 | 11.7 | 9.3 | 8.9 | 6.7 |
| Onset of Fiber Tear, °F Virgin Corrugated | −50 | −40 | −50 | −20 | 10−15 | 10−15 | >35 |
| Full Fiber Tear, °F Virgin Corrugated | 0 | 0 | 0 | 10−15 | 20 | 20 | >35 |
| Onset of Fiber Tear, °F Fiber Tear Recycled | −50 | −40 | −50 | −20 | 10−15 | 10−15 | >35 |
| Full Fiber, °F Fiber Tear Recycled | 0 | 0 | 0 | 10−15 | 20 | 20 | >35 |

[1] Trademark of Dow Chemical Company
[2] Trademark of Eastman Chemical Company

Figure 6

Peel Adhesion Fail Temperature (PAFT) for High and Low Application Temperature *Affinity*-Based HMAs and an EVA-Based HMA



Figure 7

Shear Adhesion Fail Temperature (SAFT) for High and Low Application Temperature *Affinity*-Based HMAs and an EVA-Based HMA



High Flow *Affinity*-Based Hot Melt Adhesives

Figure 8

Heat Stress Data for High and Low Application
Temperature Affinity-Based HMAs and
an EVA-Based HMA



Figure 9

Fiber Tear Data for High and Low Application
Temperature Affinity-Based HMAs and
an EVA-Based HMA



## Viscosity and Thermal Stability

Viscosity values of the HMAs of Table 3 measured at application temperature as a function of time are shown in Table 6. The thermal stability of *Affinity* GA 1950- and GA 1900-based HMAs is clearly outstanding. These formulations owe their stability to both the pure hydrocarbon nature of the backbone (no double bonds or oxygen atoms as in the case of styrenic block copolymers or EVA) and the type of tackifying resins used in the preparation. As shown in Table 7, most of these formulations were comparable in terms of the percent change in viscosity, with a maximum of a 3%–9% at 350°F and 0%–4% at 250°F. Note in most of these cases that the viscosity at over 8 days was less than these maximum values, indicating that much of this change was due to the experimental error of the test. In this study, one EVA was tested at only the low application temperature of 250°F and showed comparable results with a maximum viscosity change of 3%.

In another study, the viscosity change as a function of time was measured at the 350°F application temperature for both an EVA-based and an

*Affinity* GA 1950-based HMA. These results are shown in Figure 10. The outstanding performance of the *Affinity*-based HMA over that of the EVA is clearly evident at this conventional application temperature. The *Affinity*-based HMA showed essentially no change in viscosity over 7 days, while the EVA-based system showed substantial changes after 1 day and a change of 65% over 7 days.

Figure 10

Viscosity Change as a Function of Time for an
Affinity GA and an EVA-Based HMA



9

Table 6

Viscosity Change in cP as a Function of Time at the Application Temperature of 350°F for Conventional HMAs and 250°F for Low Application Temperature HMAs

| | Affinity[2] GA 1950 Conventional (350°F) HMA | | | Affinity GA 1900 Low Application Temp. (250°F) HMA | | | |
|---|---|---|---|---|---|---|---|
| | Eastotac[2] H-130R | Eastotac H-142R | Experimental Tackifier | Eastotac H-130R | Eastotac H-142R | Experimental Tackifier | EVA-Based LATHMA |
| Viscosity (cP), Initial | 597 | 772 | 538 | 1,092 | 1,127 | 1,037 | 1,055 |
| Viscosity (cP), 12 hrs | 610 | 755 | 587 | 1,102 | 1,152 | 1,030 | 1,050 |
| Viscosity (cP), 24 hrs | 620 | 740 | 577 | 1,102 | 1,147 | 1,025 | 1,055 |
| Viscosity (cP), 36 hrs | 607 | 750 | 570 | 1,105 | 1,150 | 1,035 | 1,065 |
| Viscosity (cP), 48 hrs | 607 | 763 | 567 | 1,025 | 1,125 | 1,025 | 1,052 |
| Viscosity (cP), 96 hrs | 597 | 795 | 580 | 1,117 | 1,175 | 1,025 | 1,055 |
| Viscosity (cP), 200 hrs | 602 | 790 | 570 | 1,110 | 1,135 | 1,035 | 1,085 |

[1] Trademark of Dow Chemical Company
[2] Trademark of Eastman Chemical Company

Table 7

Percent Change in Viscosity as a Function of Time at the Application Temperature of 350°F for Conventional HMAs and 250°F for Low Application Temperature HMAs

| | Affinity[1] GA 1950 Conventional (350°F) HMA | | | Affinity GA 1900 Low Application Temp. (250°F) HMA | | | |
|---|---|---|---|---|---|---|---|
| | Eastotac[2] H-130R | Eastotac H-142R | Experimental Tackifier | Eastotac H-130R | Eastotac H-142R | Experimental Tackifier | EVA-Based LATHMA |
| Viscosity (cP), Initial | 0 | 0 | 0 | | | 0 | 0 |
| Viscosity (cP), 12 hrs | 2 | | 9 | | | −1 | 0 |
| Viscosity (cP), 24 hrs | 4 | | 7 | | | −1 | 0 |
| Viscosity (cP), 36 hrs | 2 | 3 | 6 | | | 0 | 1 |
| Viscosity (cP), 48 hrs | 2 | | 5 | | | −1 | 0 |
| Viscosity (cP), 96 hrs | 0 | 3 | 8 | | | −1 | 0 |
| Viscosity (cP), 200 hrs | 1 | | 6 | | | 0 | 3 |
| Minimum | 0 | | 0 | | | −1 | 0 |
| Maximum | 4 | 3 | 9 | | | 0 | 3 |

[1] Trademark of Dow Chemical Company
[2] Trademark of Eastman Chemical Company

## Tackifier Selection

The performance of a hot melt adhesive is highly related to the compatibility of its components. As the tackifier is one of these critical components, studies were undertaken to assess the compatibility of *Affinity* polymers with several types of tackifiers. The compatibility of a resin with a given polymer depends mainly on its polarity and to a lesser extent on its molecular weight. The high molecular weight fraction of the resin, measured by its $M_z$ value, may lead to symptoms of incompatibility such as turbid melts or migration upon aging. Therefore, it is customary to measure the compatibility of a hot melt adhesive by determining its cloudpoint. There are, however, several problems with this method among these being that it is time consuming and that the wax component can often obscure the cloudpoint.

To avoid these issues, the dual polymer/resin (1:1) cloudpoint measurements or the Hercules modified diacetone (MDA) alcohol method was used [13–14]. An isothermal compatibility contour for the *Affinity* GA polymers is shown in Figure 11. In this plot, the logarithm of the molecular weight $(M_z)$ is plotted as a function of the resin polarity (lower DACP or diacetone alcohol cloudpoint value corresponds to increasing polarity) for several types of tackifiers.

Fully or partially hydrogenated C5 and C9 tackifiers are shown to be compatible with *Affinity* polymers. In particular, *Eastone* tackifier resins show excellent compatibility with *Affinity* GA polymers.

Figure 11

### Isothermal Compatibility Contour for *Affinity* GA Polymers



# Summary

Novel high flow *Affinity* polymers offer unique properties which deliver outstanding performance in hot melt adhesives (HMAs). Designed to be used in both conventional and low application temperature HMAs, these polymers save money for both the HMA manufacturer as well as the end user.

# References

[1] S. Yalvac and T. P. Karjala, "Novel High Flow Polymers and Their Applications," *SPE ANTEC Proceedings,* Chicago, p. 3453 (2004).

[2] B. W. Walther, S. Yalvac, and T. P. Karjala, "Novel Low Viscosity Additives Impact the Property Balance in Compounds," *The Thirteenth International Conference ADDITIVES 2004 Bringing New Value to Plastics,* Clearwater, Florida (2004).

[3] B. W. Walther, T. P. Karjala, and M. J. Levinson, "Novel Elastomer Blends Impact the Property Balance in TPO Compounds," *SPE Automotive Global Conference,* Dearborn, Michigan, p. 121 (2003).

[4] B. W. Walther and T. P. Karjala, "Novel Polymer Modifier Improves the Flow Characteristics of TPO Compounds," *SPE ANTEC Proceedings,* Chicago, p. 3480 (2004).

[5] "Standard Test Methods for Density and Specific Gravity (Relative Density) of Plastics by Displacement," ASTM D792, p. 159 (1988).

[6] "Standard Test Method for Apparent Viscosity of Hot Melt Adhesives and Coating Materials," ASTM D3236, p. 617 (1988).

[7] "Standard Test Method for Flow Rates of Thermoplastics by Extrusion Plastomer," ASTM D1238, p. 393 (1990).

[8] "Standard Test Method for Heat Stability of Hot-Melt Adhesives," ASTM D4499, p. 358 (1995).

[9] "Standard Test Method for Color of Transparent Liquids (Gardner Color Scale)," ASTM D1544, p. 207 (1998).

[10] "Standard Test Method for Heat-Fail Temperature in Shear of Hot Melt Adhesives," ASTM D4498, p. 351 (1985).

[11] I. Miller and J. E. Freund, *Probability and Statistics for Engineers,* 3rd Edition, Prentice-Hall, Englewood Cliffs, New Jersey, p. 178 (1985).

[12] J. Minick, D. Parikh, M. Finlayson, N. Bautista, R. Patel, T. Karjala, and K. Sehanobish, "Structure-Property Relationships of Low Molecular Weight INSITE Technology Polymers," *SPE ANTEC Proceedings,* p. 1962 (1997).

[13] J. Simons, "The HMDA Concept: A New Method for Selection of Resins," *Adhesives Age,* 28, November (1996).

[14] J. Simons, "The HMDA Concept: A Quick and Practical Method for Classifying and Selecting Resins in EVA and APAO-Based Hot Melts," *European Adhesives and Sealants,* September (1994).

# EASTMAN

**Eastman Chemical Company**
**Corporate Headquarters**
P.O. Box 431
Kingsport, TN 37662-5280 U.S.A.

Telephone:
U.S.A. and Canada, 800.EASTMAN
(800.327.8626)
Other Locations, (1) 423.229.2000
Fax: (1) 423.229.1193

www.eastman.com

**Eastman Chemical Latin America**
9155 South Dadeland Blvd.
Suite 1116
Miami, FL 33156 U.S.A.

Telephone: (1) 305.671.2800
Fax: (1) 305.671.2806

**Eastman Chemical B.V.**
Fascinatio Boulevard 602-614
2509 VA Capelle aan den IJssel
The Netherlands

Telephone: (31) 10 2402 111
Fax: (31) 10 2402 100

**Eastman Chemical Japan Ltd.**
AIG Aoyama Building 5F
2-11-16 Minami Aoyama
Minato-ku, Tokyo 107-0062 Japan

Telephone: (81) 3.3475.9510
Fax: (81) 3.3475.9515

**Eastman Chemical Asia Pacific Pte. Ltd.**
#05-04 Winsland House
3 Killiney Road
Singapore 239519

Telephone: (65) 6831.3100
Fax: (65) 6732.4930

Material Safety Data Sheets providing safety precautions that should be observed in handling and storing Eastman products are available online or on request. You should obtain and review the available material safety information before handling any of these products. If any materials mentioned are not Eastman products, appropriate industrial hygiene and other safety precautions recommended by their manufacturers should be observed.

*Neither Eastman Chemical Company nor its marketing affiliates shall be responsible for the use of this information, or of any product, method, or apparatus mentioned, and you must make your own determination of its suitability and completeness for your own use, for the protection of the environment, and for the health and safety of your employees and purchasers of your products. No warranty is made of the merchantability or fitness of any product, and nothing herein waives any of the Seller's conditions of sale.*

Eastman and Eastotac are trademarks of Eastman Chemical Company.

© Eastman Chemical Company, 2004.

Publication WA-112
September 2004
Printed in U.S.A.



1



2





4



5



6



7







10





12



13





15









19

# Exhibit 3

Westlaw.

Not Reported in A.2d

Not Reported in A.2d, 2004 WL 1965869 (Del.Super.)

(Cite as: Not Reported in A.2d)

**H**Savor, Inc. v. FMR Corp.

Del.Super.,2004.

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT

RULES BEFORE CITING.

Superior Court of Delaware.

SAVOR, INC., a Michigan corporation, Plaintiff,

v.

FMR CORP., a Massachusetts corporation and

Upromise, Inc., a Delaware corporation, Defendants.

No. Civ.A. 00C-10-149JRS.

Submitted June 29, 2004.

Decided July 15, 2004.

Redacted Aug. 16, 2004.

Upon Defendants' Motions for Summary Judgment.

Granted.

William M. Aukamp, Harvey Pennington, Ltd,
Wilmington, Delaware, Howard M. Cyr, III, and Paul
M. Quinones, Harvey Pennington, Ltd, Philadelphia,
Pennsylvania, for Plaintiff, Savor, Inc.

Jeffrey L. Moyer, and Alyssa M. Schwartz, Richards,
Layton & Finger, P.A., Wilmington, Delaware, John
D. Donovan, Jr., and Emily C. Shanahan, Ropes &
Gray, LLP, Boston, Massachusetts, for Defendant,
FMR, Corp.

Anthony W. Clark, and James A. Whitney, Skadden,
Arps, Slate, Meagher & Flom, LLP, Wilmington,
Delaware, Irwin B. Schwartz, Petrie, Bauer,
Schwartz, LLP, Boston, Massachusetts, for
Defendant, Upromise, Inc.

MEMORANDUM OPINION

SLIGHTS, J.

I.

**\*1** In this misappropriation of trade secrets case, the
Court must determine whether a reasonable jury
could conclude: (1) that the plaintiff possessed a
trade secret and, if so, (2) that the defendants
misappropriated the secret. Although such
fundamental inquiries are standard fare in the realm
of motions for summary judgment, they are
complicated in this case by the nature of the alleged
trade secret-a purportedly "unique" compilation of
publically available or arguably commonsense ideas-

and also by the highly circumstantial nature of the
evidence regarding the alleged illegal transmission of
the trade secret-both the alleged transmitter and the
alleged recipient of the trade secret deny knowing
anything about it.

The plaintiff correctly observes that it may, as a
matter of law, seek trade secret protection for a
unique compilation of otherwise publicly known
ideas or information. And it also correctly observes
that it may, as a matter of law, prove
misappropriation of the trade secret through
circumstantial evidence, notwithstanding the
defendant's denials of wrongdoing. The plaintiff's
*allegation* of a "compilation" trade secret, and its
*allegation* of a misappropriation of that secret,
however, are not sufficient to overcome properly
supported motions for summary judgment. When
defendants support their motions for summary
judgment with competent evidence indicating that the
alleged trade secret was generally well known in the
relevant industry and couple that showing with
sworn, unrebutted denials of knowledge, much less
misappropriation of plaintiff's particular idea, the
plaintiff is obliged to answer with evidence in the
record that, at least, creates a material issue of fact as
to these fundamental elements of its claim. As
discussed below, plaintiff has failed to carry this
burden with respect to the misappropriation element
of its *prima facie* claim for misappropriation of trade
secrets. Consequently, the motions for summary
judgment must be GRANTED.

II.

The age of this case is a reflection of its rather
involved procedural history. Plaintiff, Savor, Inc.
("Savor"), initiated this action in October, 2000
against Fidelity Investment Corp. and defendant,
Upromise, Inc. ("Upromise"). After determining that
it had sued the wrong Fidelity entity, Savor amended
its complaint and then amended it again to name the
proper Fidelity entity, defendant, FMR Corp.
("FMR"), as the party to whom Savor initially
communicated its alleged trade secret. Both
defendants then moved to dismiss the second
amended complaint on the ground, *inter alia*, that
Savor had not adequately identified its alleged trade
secret in the pleading. Savor acknowledged that its

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                      Page 2
Not Reported in A.2d, 2004 WL 1965869 (Del.Super.)
(Cite as: Not Reported in A.2d)

complaint did not identify its trade secret and offered
to amend its complaint again, this time under seal, so
that the trade secret could properly be disclosed. The
Court dismissed the second amended complaint with
leave to amend .[FN1]

> FN1.*Savor, Inc. v. Upromise, Inc.,* 2001 WL
> 541484 (Del.Super.).

Savor's third amended complaint included an
additional description of the alleged trade secret and
attached a compilation of documents as "Exhibit A"
in which it alleged that the trade secret was described
in detail. The Court disagreed and dismissed the third
amended complaint with prejudice.[FN2]Savor appealed
and the Supreme Court of Delaware reversed this
Court's order dismissing the case by opinion and
order dated November 12, 2002.[FN3]

> FN2.*Savor, Inc. v. Upromise, Inc.,* 2002 WL
> 393056 (Del.Super.).

> FN3.*Savor, Inc. v. Upromise, Inc.,* 812 A.2d
> 894 (Del.2002).

*2 Approximately two months after the case was
remanded to this Court, Upromise moved for
dispositive relief again, this time recasting the
arguments raised in its motions to dismiss against the
backdrop of the more rigorous scrutiny contemplated
by Del.Super. Ct. Civ. R. 56. The Court denied the
motion for summary judgment as premature since the
discovery contemplated by the Supreme Court had
not yet been initiated in earnest.[FN4]Nevertheless, the
Court appreciated that the issues that continued to
surface in the defendants' dispositive motions-did
Savor have a trade secret and was it misappropriated-
would likely be raised again. Accordingly,
recognizing that these were threshold issues, the
Court bifurcated the litigation so that "phase 1"
discovery would encompass only the alleged
existence of the trade secret and the alleged
misappropriation.[FN5]

> FN4.*Savor, Inc. v. Upromise, Inc.,* 2003 WL
> 21054394 (Del. Super .).

> FN5.*Id.*

During the course of phase 1 discovery, Savor
propounded interrogatories and requests for
documents that sought information regarding

Upromise's trade secrets. Upromise sought protection
from the Court. In keeping with well-settled case law
that requires the plaintiff in a misappropriation of
trade secrets case to identify its own trade
secret before seeking discovery of the defendant's
trade secret,[FN6] the Court ordered Savor to prepare
and file with the Court an Identification of Trade
Secret ("ITS") in which it was to describe its trade
secret in detail. By order dated January 20, 2004, the
Court concluded that Savor's ITS identified its
alleged trade secret with sufficient detail to justify its
discovery of Upromise's trade secret
information.[FN7]Contrary to Savor's characterizations
in its brief on the motions *sub judice,* the Court did
not conclude as a matter of fact or law that Savor had
a trade secret worthy of legal protection. Indeed, the
Court expressly stated: "whether [the Savor] program
... is entitled to trade secret protection [is an] issue[ ]
for another day."[FN8]That day has come.

> FN6.*See Englehard Corp. v. Savin Corp.,*
> 505 A.2d 30, 33 (Del. Ch.1986).

> FN7.*See Savor, Inc. v. FMR Corp.,* C.A. No.
> 00C-10-249 JRS, Slights, J. (Del.Super.Jan.
> 20, 2004)(Letter Op.).

> FN8.*Id.* at 3.

### III.

#### A. The Development of the Savor Program

In 1994, Savor developed a program by which
consumers could purchase goods or services from
specified vendors and, in return, receive from the
vendors rebates in various amounts depending on the
nature of the goods or services acquired. The rebates,
in turn, would automatically be applied by Savor to
savings accounts for the benefit of the consumer and
ultimately deposited into tax-deferred, state-
sponsored college tuition savings accounts referred to
as "529 accounts," named after the applicable
provision of the Internal Revenue Code that
recognized the tax deferred status of these
funds.[FN9]Savor's program was the brainchild of its
founder, Dennis A. Doyle, an entrepreneur whose
experience was primarily in the development of
marketing initiatives within the automotive and
telecommunications industries.[FN10]Prior to Savor, he
had little to no experience in the financial services
industry.[FN11]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
Not Reported in A.2d, 2004 WL 1965869 (Del.Super.)
(Cite as: Not Reported in A.2d)

FN9. *See* 26 U.S.C.A. § 529 (2001).

FN10. D.I. 180, Ex. 19, at U00416.

FN11. *Id.*

*3 At its inception, the Savor program focused primarily on providing a means for consumers to initiate or enhance retirement savings.[FN12] Over time, Savor turned its [REDACTED]

FN12. D.I. 180, Ex. 2, at 24-25.

Although it is unclear in the record [REDACTED]

B. Savor Shares Its Idea With FMR

[REDACTED]

The State Treasurer of New Hampshire, a state targeted by Savor because of its successful state-sponsored college tuition savings program, suggested to Mr. Doyle that he contact a representative at FMR with whom the New Hampshire Treasurer's office had been working in the management of its program. Mr. Doyle made the initial contact with FMR's Abram Claude by telephone in early September, 1998. Mr. Claude was a Vice President for Business Development within FMR's college savings group.[FN13] There is no dispute that Mr. Doyle contacted Mr. Claude in the hopes that FMR would serve as the exclusive fund manager for the Savor 529 accounts. Mr. Claude expressed interest in the Savor program and encouraged Mr. Doyle to send him some materials so that he could better understand the idea.[FN14] Mr. Doyle requested a confidentiality agreement but Mr. Claude declined to give one. According to Mr. Doyle, Mr. Claude stated that a formal confidentiality agreement would simply delay the process. In its place, Mr. Claude allegedly made an oral commitment to Mr. Doyle to keep the information he received from Savor confidential.[FN15]

FN13. D.I. 180, Ex. 7, at 30.

FN14. D.I. 180, Ex. 2, at 181-84.

FN15. *Id.* at 194-95, 201-06. Mr. Claude does not recall that he made any such commitment to Mr. Doyle. D.I. 180, Ex. 7,

at 71, 88-89. The Court's recitation of the facts casts the record in the light most favorable to Savor; it is not intended to represent the Court's findings of fact.

By letters dated September 15 and September 30, 1998, Mr. Doyle forwarded to Mr. Claude information which Savor contends comprised its trade secret.[FN16] According to Mr. Doyle, he also had several telephone conversations with Mr. Claude during which he explained the Savor program to Mr. Claude in more detail.[FN17] Mr. Claude acknowledged that upon receipt of Savor's information he treated it as confidential by keeping it locked in a file cabinet and by showing it only to the supervisor within his group to whom he presented Savor's idea.[FN18]

FN16. D.I. 180, Ex. 48, Savor 014-15, Savor 044-46.

FN17. D.I. 180, Ex. 2, at 209-10.

FN18. D.I. 180, Ex. 7, at 74-75, 97.

Significantly, Mr. Claude claims that he did not discuss the Savor program with his immediate supervisor, James Fadule, or with any of the other subordinate members of the college savings group. Instead, he presented the idea directly to the head of the group, Steve Mitchell.[FN19] According to Mr. Claude, FMR's college savings group was in some turmoil at the time of the discussions with Savor because the group and its programs seemed to be attracting undesirable low balance accounts. Mr. Mitchell was assigned by FMR to the college savings group specifically to address this phenomenon. Accordingly, Mr. Claude thought it best to present the Savor idea directly to the man who would be most likely to have concerns about it.[FN20] As Mr. Claude expected, Mr. Mitchell was not interested in Savor and directed Mr. Claude to communicate as much to Mr. Doyle. Mr. Claude complied.[FN21] Despite Mr. Doyle's effort to address FMR's concerns, FMR held firm that it was not interested in pursuing a partnership with Savor.[FN22]

FN19. *Id.* at 97-104.

FN20. *Id.* For his part, Mr. Mitchell did not recall discussing the Savor program with Mr. Claude and had only recently heard of Savor at the time of his deposition. D.I. 180,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Ex. 12, at 35-37. Each of Mr. Claude's colleagues within the college savings group, including Mr. Fadule, likewise denied knowing anything about the Savor program during the time Mr. Doyle and Mr. Claude were discussing the idea. D.I. 173, Ex. 6, at 98-99, 105-06; Ex. 7, at 47; Ex. 8, at 50; Ex. 9, at 26-27; Ex. 12, at 48.

FN21. D.I. 180, Ex. 7, at 102-103, 106-107.

FN22. *Id. See also* D.I. 180, Ex. 2, at 231-34.

C. The Development of the Upromise Program

*4 In 1999, Michael Bonner, an executive with a Boston-based marketing firm, developed a college savings program that would eventually become Upromise.[FN23] Like Mr. Doyle, Mr. Bonner had no experience with marketing or developing financial products prior to the creation of Upromise.[FN24]

FN23. D.I. 180, Ex.17, at 19-21, 40.

FN24. *Id.* at 20-21.

During 1999, Mr. Bonner began to assemble a management team and further refine his idea.[FN25] By February, 2000, Upromise had determined that it would focus its efforts on college savings through an affinity marketing program that would target vendors in designated industries to provide rebates to consumers for ultimate deposit into 529 accounts.[FN26] Upromise's July 13, 2000 Business Plan describes a web-based program whereby consumers would enroll in the Upromise plan, set up their Upromise account, and then purchase goods or services from Upromise's "commerce partners" by any means allowed by the vendor (not limited to credit card purchases) in exchange for cash rebates.[FN27] The rebate funds then would be deposited into a 529 account managed by any one of several "financial services partners" with whom Upromise had an arrangement.[FN28] Upromise would be paid a commission by commerce partners based on member spending, a sponsorship fee by commerce partners based on their level of participation in the Upromise program, an administrative service fee from financial service partners based on a predetermined percentage of assets under management, and a customer acquisition fee from selected commerce and financial service partners based on new customer

acquisitions.[FN29] The Upromise plan was introduced to the public in April, 2001.[FN30]

FN25. D.I. 180, Ex. 18, at 15-18.

FN26. D.I. 180, Ex. 40, 41, 43.

FN27. DI 180, Ex. 35. The form in which the rebate would appear in the member's Upromise account, along with other components of the Upromise program, evolved as the idea itself evolved. The Upromise rebate began as a points system that would eventually be converted into cash, then a hybrid rebate system was contemplated, and then (and finally) a straight cash rebate system was adopted. D.I. 180, Ex. 17, at 56, 58-59, 77-78.

FN28. D.I. 180, Ex. 35.

FN29. *Id.*

FN30. D.I. 180, Ex. 11, Resp. No. 20.

D. The Alleged Misappropriation of the Savor Trade Secret by FMR and Upromise

James Fadule worked at FMR until October, 1998. At the time Savor was in discussions with FMR, Mr. Fadule was an executive in FMR's college savings group and a direct supervisor of Abram Claude. From October, 1998 through April, 2000, Mr. Fadule worked with Merrill Lynch. In April, 2000, Mr. Fadule joined Upromise as Vice President of Financial Services.[FN31] Although Mr. Bonner had already begun to focus Upromise on 529 college savings plans, Mr. Fadule's initial mission with Upromise was to assist in linking these plans with customer loyalty initiatives.[FN32]

FN31. D.I. 180, Ex. 10, at 125, 178.

FN32. *Id.* at 179.

While employed with Merrill Lynch, Mr. Fadule arranged a meeting with Mr. Claude (FMR) and other competitors in the 529 market to discuss regulatory compliance and other process issues.[FN33] It is possible that he spoke with Mr. Claude on other occasions as well during this time frame, including to discuss

Westlaw.

Not Reported in A.2d                                                                                   Page 5
Not Reported in A.2d, 2004 WL 1965869 (Del.Super.)
(Cite as: Not Reported in A.2d)

possible employment opportunities for Mr. Claude in the financial services industry.[FN34] When Mr. Fadule joined Upromise, he spoke with Mr. Claude about his new role there and described what Upromise was trying to do.[FN35] It was Mr. Fadule's hope that he could plant the seed for a future business relationship between Upromise and FMR.[FN36] This relationship would later come to fruition in the form of a Marketing and Service Agreement, although the principal architects of the deal were not Claude or Fadule.[FN37] Mr. Claude joined Fleet Boston in 2002 and was instrumental in bringing about an unspecified "business relationship" between Fleet Boston and Upromise later that year.[FN38]

FN33. *Id.* at 114-15.

FN34. *Id.* at 117; D.I. 180, Ex. 7, at 120-23, 127, 156.

FN35. D.I. 180, Ex. 10, at 161-63.

FN36. *Id.*

FN37. *Id. See also* D.I. 180, Ex. 11, Resp. No. 76, 78.

FN38. *Id.* Resp. No. 70. *See also* D.I. 180, Ex. 7, at 41.

*5 According to Savor, the details of its program were transmitted by Mr. Claude to Mr. Fadule. Mr. Fadule, in turn, misappropriated the trade secret for Upromise's benefit.[FN39] As discussed below, the details surrounding the alleged transmission of the secret are murky at best.

FN39. D.I. 179, at 27-28.

IV.

When considering a motion for summary judgment, the Court's function is to examine the record to determine whether genuine issues of fact exist.[FN40] A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."[FN41] It has been said, then, that "the availability of summary judgment turn[s] on whether a proper jury question ... [has been] presented."[FN42]

FN40. *Oliver B. Cannon & Sons, Inc. v. Dorr-Oliver, Inc.,* 312 A.2d 322, 325 (Del.Super.Ct.1973).

FN41. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

FN42. *Id.* at 249.

In reviewing a motion for summary judgment, the Court's function "is not ... to weigh the evidence and [itself] determine the truth of the matter, but [rather] to determine whether there is a genuine issue for trial."[FN43] Since the grant of summary judgment will deny the non-moving party his day in court, the Court must view the record in a light most favorable to the party opposing the motion.[FN44] The moving party bears the initial burden of establishing the absence of any genuine issues of material fact.[FN45] If the moving party carries its initial burden, then the burden will shift to the non-moving party to demonstrate the existence of material issues of fact.[FN46] When the party opposing summary judgment is the party who will bear the burden of persuasion at trial, that party is obliged to point to facts in the record that will support its *prima facie* case at trial.[FN47]

FN43. *Id.*

FN44. *Id.*

FN45. *Moore v. Sizemore,* 405 A.2d 679, 680 (Del.1979).

FN46. *Id.* at 681.

FN47. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

"[A] complete failure of proof concerning an essential element ... necessarily renders all other facts immaterial."[FN48] Even a "scintilla of evidence in support of the nonmovant's position will not defeat a motion for summary judgment."[FN49] The record on summary judgment must contain "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[FN50]

FN48. *Id.* at 323.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
Not Reported in A.2d, 2004 WL 1965869 (Del.Super.)
(Cite as: Not Reported in A.2d)

FN49.*Detrick v. Panalpina, Inc.*, 108 F.3d 529, 536 (4th Cir.), *aff'd sub nom, Gold v. Panalpina, Inc.*, 522 U.S. 810 (1997).

FN50.*Anderson*, 477 U.S. at 249-50.

The Court does not expect, nor does it require, that a party opposing summary judgment shall present its entire case to the court in every detail. But the law does require and, therefore, the court does expect that the nonmoving party will do more than simply rest on the allegations in the pleadings or new-found allegations that it raises in its summary judgment papers with hopes that evidence may surface at trial to support them.[FN51]The time and place for coming forward with appropriately authenticated and admissible evidence to rebut a properly supported motion for summary judgment is in the papers and record submitted in opposition to the motion.[FN52]

FN51.*See Liboff v. Allen*, 1975 WL 1961, at *4 (Del. Ch.)("[I]t [is] incumbent on plaintiff to come forward with proof on which she relies to dispute the evidence on which defendants premise their motions. She is not entitled to await trial so as to see if she can find any.") (citation omitted); *Conaway v. Smith*, 853 F.2d 789, 793 (10th Cir.)1988)("In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial."); Adv. Comm. Note to Proposed Amendments to Rule 56(e)("The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine issue for trial.").

FN52.*See Monsanto Co. v. Aetna Casualty and Surety Co.*, 1993 WL 563246, at *1 (Del.Super.)(emphasizing that "a party cannot oppose a motion for summary judgment on the basis of unauthenticated and inadmissible documents.") (citations omitted).

## V.

The only claim still remaining in this case is misappropriation of trade secrets. The claim is governed by statute [FN53] and implicates the following inquiries: "(1) Does a trade secret exist, *i.e.*, have the statutory elements-commercial utility arising from secrecy and reasonable steps to maintain secrecy-been shown; (2) has the secret been communicated by plaintiff to the defendant; (3) was such communication pursuant to an express or implied understanding that the secrecy of the matter would be respected; and (4) has the secret information been improperly (*e.g.*, in breach of the understanding) used or disclosed by the defendant to the injury of the plaintiff?"[FN54]The Court will address the elements of the claim *seriatim.*

FN53.DEL.CODE ANN. tit. 6, § 2001 (1999) *et seq.* The parties have not specifically addressed the choice of law but appear to assume that Delaware's Uniform Trade Secret Act (the "Act") applies to this controversy. The only state with an arguably more significant relationship with this dispute is Massachusetts and it too has adopted the Uniform Trade Secrets Act. *See*MASS. GEN. LAWS ANN. ch. 93, § 1 (2004) *et seq. See also Travelers Indem. Co. v. Lake*, 594 A.2d 38, 47 (Del.1991)(adopting RESTATEMENT (SECOND) OF CONFLICTS OF LAWS, § 145's "most significant relationship" test); *Merck & Co. v. SmithKline Beecham Pharm. Co.*, 1999 WL 669354, *14-15 (Del. Ch.), *aff'd*,766 A.2d 442 (Del.2000)(noting that both Delaware and Maryland bore an equally significant relationship to the controversy and that both states applied the Uniform Trade Secrets Act, the Court adopted the Act as the governing law and considered all decisions interpreting the Act to be persuasive authority); *Rohm & Haas Co. v. Adco Chem. Co.*, 689 F.2d 424, 429 (3d Cir.1992)(noting that when a "false conflict" exists, the court need not resolve the choice of law issue). The Court will apply the Act and cases interpreting the Act.

FN54.*Wilimington Trust Co. v. Consistent Asset Mgt. Co.*, 1987 WL 8459, at *3-4 (Del. Ch.).

### A. Does a Trade Secret Exist?

*6 "Trade secret" is defined in the Act as:

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d, 2004 WL 1965869 (Del.Super.)
(Cite as: Not Reported in A.2d)

"Information, including a formula, pattern, *compilation*, program, device, method, technique or process that [d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use and [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy."[FN55] "A party alleging misappropriation of a trade secret has the burden of proving the existence of the trade secret."[FN56] And, at the summary judgment stage, the plaintiff must do more than allege it has a trade secret, it must describe its trade secret with a "reasonable degree of precision and specificity ... such that a reasonable jury could find that plaintiff established each statutory element of a trade secret."[FN57]

> FN55. DEL. CODE ANN. tit. 6, § 2001(4) (1999) (emphasis supplied).

> FN56. *Dionisi v. DeCampli,* 1995 WL 398536, at *11 (Del. Ch.). *See also ID Biomedical Corp. v. TM Technologies, Inc.,* 1995 WL 130743, at *14 (Del. Ch.) (same).

> FN57. *IDX Systems Corp. v. Epic Systems, Corp.,* 165 F.Supp.2d 812, 816-17 (W.D.Wisc.2001). *See also Glynn Interactive, Inc. v. Itelehealth, Inc.,* 2004 WL 439236, at *5 (D.Md.) (plaintiff must describe trade secret with particularity); *AMP Inc. v. Fleischhacker,* 823 F.2d 1199, 1203 (7th Cir.1987) ("courts have warned plaintiffs of the risks they run by failing to identify specific trade secrets and instead producing long lists of general areas of information which contain unidentified trade secrets.") (citation omitted); *Callaway Golf Co. v. Dunlop Slazenger Group Americas, Inc,* 2004 WL 1124758, at *4 (D.Del.) ("the plaintiff should describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons ... skilled in the trade.").

In this case, Savor has alleged that its trade secret is "a unique combination of unified characteristics, components, applications, compilations [sic] of business information, methods, techniques, processes, and operations of marketing, monitoring

and administration of a college savings program."[FN58] Savor acknowledges, albeit reluctantly,[FN59] that its so-called "compilation" trade secret is comprised in large part of publicly available information and ideas but points the Court to the legion of cases that hold that a unique combination of public information and ideas can be worthy of trade secret protection.[FN60] When the plaintiff claims a "compilation" trade secret, courts generally require that the trade secret be identified with even greater specificity.[FN61]

> FN58. D.I. 180, Ex. 29, Resp. No. 1.

> FN59. *See, e.g.,* D.I. 180, Ex. 2, at 27-29 (at first Mr. Doyle suggests that the idea for applying rebates to college savings was confidential and then, on further questioning, acknowledges that the idea was not confidential at the time it was communicated to FMR); *id.* at 99-100 (at first Mr. Doyle suggests that use of credit card to accomplish rebates for college savings was confidential, then he acknowledges that the idea was not confidential).

> FN60. *See Merck & Co., Inc.,* 1999 WL 669354, at *15 ("A commercial production process consisting of a 'combination of the principles and details used to make a product' can be a trade secret, as can elements of the process ... [t]he combination of steps into a process is a trade secret, even if all the component steps are known, so long as it is a 'unique process which is not known in the industry." ') (citations omitted); *Callaway Golf Co.,* 2004 WL 1124758, at *6 ("trade secret misappropriation can ... be based on a combination of otherwise public domain information."); *Harbor Software, Inc. v. Applied Systems, Inc.,* 887 F.Supp. 86, 90 (S.D.N.Y.1995) ("A trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which in unique combination affords a competitive advantage and is a protectable trade secret.") (citations omitted).

> FN61. *See, e.g., Struthers Scientific &*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



*International Corp. v. General Foods Corp.,* 51 F.R.D. 149, 153 (D.Del.1970)(requiring greater specificity in interrogatory answers regarding alleged trade secret comprised of a combination of elements.)

Defendants have contended throughout this litigation that the Savor program is nothing more than a business-school model for affinity marketing utilizing rebates to generate customer loyalty. They also contend that the idea of marrying affinity marketing with college savings and 529 plans cannot rise to the level of a trade secret because there was nothing secret about it as of the time Mr. Doyle disclosed the Savor program to Mr. Claude.[FN62] Indeed, among the information supplied by Mr. Doyle to Mr. Claude was an article published in *American Banker,* a daily financial newspaper, that described the Savor concept of college savings through consumer rebates in significant detail.[FN63] The article described the Savor credit card, the consumer rebates that would fund the state-sponsored college tuition savings plans, the marketing ideas promoting the plan (*e.g.,* "It's found money"), and the research supporting the need for the plan (*e.g.,* data on rising tuition costs) that make up a large part of Savor's alleged trade secret.[FN64] This information clearly was in the public domain by the time Mr. Doyle first approached FMR with his idea.[FN65]

> FN62.*See CVD, Inc. v. Raytheon Co.,* 769 F.2d 842, 850 (1st Cir.1985)("The cornerstone of a trade secret ... is secrecy.").

> FN63.*See* D.I. 180, Ex. 48, at Savor 016-19.

> FN64.*Compare id. with* D.I. 180, Ex. 29, Resp. No. 1 (Savor's description of its trade secret).

> FN65.*See CVD, Inc.,* 769 F.2d at 850 ("Once a trade secret enters the public domain, the possessor's exclusive rights to the secret are lost.").

But, according to Mr. Doyle, there was more to the Savor trade secret than was published in the *American Banker* article.

[REDACTED]

[REDACTED]

*7 Although the subject of some debate, it is generally recognized that "[t]he existence of a trade secret is a question of fact for determination by the jury."[FN66] And, in this regard, the Court must recognize that it will often "lack[ ] the technical expertise to evaluate · on its own whether the information plaintiff claims is secret is, in fact, not generally known in the industry."[FN67]

> FN66.CALLMAN, UNFAIR COMPETITION, TRADEMARKS & MONOPOLIES § 53.3 at 390 (3d ed. Supp.1973).*See also SmithKline Beecham Pharm. Co. v. Merck & Co.,* 766 A.2d 442, 448 (Del.2000)(same).*But see FMC Corp. v. Spurlin,* 596 F.Supp. 609, 613 (W.D.Pa.1984)("While the question of whether plaintiff possesses a trade secret is ultimately a question of law, there must be a factual predicate for resolving that question.") (citation omitted).

> FN67.*Harbor Software, Inc.,* 887 F.Supp. at 90.

In this case, Savor has managed through much of the litigation to skirt the question of whether it, in fact, possesses a trade secret by describing its alleged secret with elastic terms and phrases that track, in large part, the statutory definition of "trade secret" but do little meaningfully to explain how the Savor program works or how its combination of components is unique.[FN68] Savor correctly notes that its interrogatory response did attempt to describe the trade secret with more detail than the incantation of statutory language that had been a feature of its prior disclosures. But even there Savor made no attempt to articulate why or in what manner the compilation of "ideas, methods, processes, techniques, etc." was secret.[FN69]

> FN68.*See, e.g.,* D.I. 180, Ex. 30, at ¶ 6 (Savor's third amended complaint describes the trade secret as "marketing strategies, methods, techniques, and processes for extracting payments from program participants, aggregating the funds until they met minimum payment requirements under a State Qualified Tuition Plan, and then paying them over to the plan."); D.I. 180, Ex. 29, Resp. 1 (Savor's interrogatory

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
Not Reported in A.2d, 2004 WL 1965869 (Del.Super.)
(Cite as: Not Reported in A.2d)

response describes the trade secret as a "unique combination of unified characteristics, components, applications, compilations of business information, methods, techniques, processes, and operations of marketing, monitoring and administration of a college savings program."); D.I. 180, Ex. 26 (Savor's expert relies upon description of the trade secret set forth in Savor's interrogatory response and then continues to refer to the "unique marketing strategies, methods, techniques and processes" throughout the balance of the report).

FN69. D.I. 180, Ex. 29, Resp. 1. *See Struthers Scientific & Int'l Corp., 51 F.R.D. at 153* (to describe the trade secret adequately, plaintiff was ordered to disclose not only the "unique combination of components" it claimed constituted its trade secret, but also "how these components are combined, and how they operate in a unique combination.").

When read in a light most favorable to Savor, however, the Court is satisfied that the interrogatory response, coupled with Savor's ITS, verified by Mr. Doyle, and Mr. Doyle's deposition, provide enough information to allow a reasonable fact-finder to conclude that Savor's college savings program was a trade secret worthy of statutory protection. Clearly, neither the idea of linking college savings with an affinity marketing program nor the use of a credit card for doing so were secret. Nevertheless, a reasonable jury could conclude that the means by which the program would be implemented, [REDACTED] in the mind of a reasonable juror, be a trade secret, *i .e.,* the entire program could "[d]erive[ ] independent economic value, actual or potential, [for Savor] from not being generally known to, and not being readily ascertainable by proper means by, other persons who [might] obtain economic value from its disclosure or use."[FN70]

FN70. DEL. CODE ANN. tit. 6, § 2001(4) (1999). *See Nilssen v. Motorola, Inc., 963 F.Supp. 664 (N.D.Ill.1997).*

The "trade secret" inquiry does not end here. The defendants have argued that Savor did not take reasonable steps to maintain the secrecy of the Savor program as required by statute.[FN71] Specifically, they

contend that Savor's failure to secure a confidentiality agreement from Mr. Claude (who refused to give one) prior to supplying its alleged secret to FMR is fatal to Savor's trade secret argument. Clearly, a plaintiff claiming a misappropriation of its trade secrets must establish that it took reasonable steps to protect the secrecy of its idea.[FN72] The proof offered to satisfy this element of the claim, however, need not take the form of an express confidentiality agreement.[FN73] "Rather, a duty of confidentiality may be implied from the circumstances surrounding the parties' relationship."[FN74] And the duty of confidentiality is not destroyed merely because the holder "disclosed its trade secrets to 'a limited number of outsiders for a particular purpose....' "[FN75] "On the contrary, such disclosure, which is often necessary to the efficient exploitation of a trade secret, imposes a duty of confidentiality on the part of the person to whom the disclosure is made."[FN76] Whether the party in possession of the alleged trade secrets used reasonable efforts to maintain its secrecy is a question of fact.[FN77]

FN71. *Id.*

FN72. *See Merck & Co., Inc.,* 1999 WL 669354, at *19; *Rvpac Packaging Machinery Inc. v. Coakley,* 2000 WL 567895, at *9 (Del. Ch.).

FN73. *See Nilssen,* 963 F.Supp. at 679 ("While an express confidentiality agreement may certainly suffice to define the duty of confidentiality necessary for action under [the Act], the existence of such an agreement is not a prerequisite to such an action.") (citation omitted).

FN74. *Id.* (citation omitted). *See also Smith v. Dravo Corp.,* 203 F.2d 369, 376 (7th Cir.1953)(party may take reasonable efforts to maintain confidentiality of trade secret information without express confidentiality agreement.).

FN75. *Rockwell Graphic Systems, Inc. v. DEV Indus., Inc.,* 925 F.2d 174, 177 (7th Cir.1991).

FN76. *Id.*

FN77. *Id.* at 180.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 1965869 (Del.Super.)
(Cite as: Not Reported in A.2d)

**\*8** Here, defendants make much of the fact that Savor not only supplied its information to FMR with no written express agreement of confidentiality, it also supplied the same information to several other third parties, including vendors (such as Ford Motor Co.), and state treasurers' offices (such as New Hampshire's, Ohio's and Delaware's), also with no written commitment of confidentiality in hand. Mr. Doyle testified that he secured oral commitments from these third parties that the information would be kept confidential.[FN78] Such limited disclosures under these circumstances do not *ipso jure* destroy the trade secret status of the information.[FN79]

> FN78. D.I. 180, Ex. 2, at 27. He also testified that he did not supply all of the details of the Savor program to these third parties.*Id.* at 44-45.

> FN79.*See Rockwell Graphic Systems, Inc.,* 925 F.2d at 177.

Moreover, Mr. Doyle also testified that he extracted an oral commitment from Mr. Claude that FMR would keep the materials it received from Savor confidential.[FN80] Although Mr. Claude does not recall this discussion with Mr. Doyle[FN81] whether it occurred and, if so, whether the oral commitment of confidentiality obtained by Savor was a "reasonable" measure to maintain the secrecy of the Savor program, would both be questions of fact for the jury to decide.

> FN80. D.I. 180, Ex. 2, at 203-06.

> FN81. D.I. 180, Ex. 7, at 71.

B. Was the Trade Secret Misappropriated?

"Unauthorized use of trade secret information and unauthorized disclosure of trade secret information constitutes misappropriation."[FN82]Misappropriation includes not only the wholesale pirating of an idea, but also the unauthorized utilization of an idea "as a starting point or guide in developing a process," or as a means "to understand 'what pitfalls to avoid.'" '[FN83]

> FN82.*Merck & Co.,* 1999 WL 669354, at \*19 (citing DEL.CODE ANN. tit. 6, § 2001(2) (1999)).*See also Pulsecard, Inc. v. Discover Card Services, Inc.,* 1996 U.S.

Dist. LEXIS 3660, at \*30 (D.Kan.)("Under the Act, misappropriation may occur under either of two general sets of circumstances: (1) improper acquisition, or (2) improper disclosure or use.").

> FN83.*Merck & Co., supra,* at \*20 (citations omitted).*See also Mangren Research & Dev. Corp. v. Nat'l Chemical Co., Inc.,* 87 F.3d 937, 944 (7th Cir.1996)("the user of another's trade secret is liable even if he uses it with modifications or improvements upon it effected by his own efforts, so long as the substance of the process used by the actor is derived from the other's secret.") (citation omitted). In this case, the defendants argue that Savor has insisted that its trade secret is comprised of all of the elements of its Savor program, and that none of the elements can be separated from the whole, Savor must establish a misappropriation of the entire program to prevail. D.I. 183, at 12 (citing *Vital State Canada, Ltd. v. Dreampak, LLC,* 303 F.Supp.2d 516, 529 (D.N.J.2003)(an "assertion that the trade secret is the combination of the elements is crucial ... since it means that to prove use of the trade secret, [plaintiff] must prove use of each and every element in combination."). Given the Court's conclusion that the undisputed evidence does not support a claim that the defendants misappropriated *any* element of the Savor program, the Court need not address this potential inconsistency in the case law.

Rarely will the plaintiff in a misappropriation of trade secrets case discover the "needle" in his opponent's "hay stack" of documents. Nor is it likely that plaintiff's counsel will enjoy the "Perry Mason moment" when the defendant's chief executive officer buckles under the weight of cross examination and admits that his company has misappropriated the plaintiff's trade secret. Consequently, it is now well-settled that the plaintiff may prove misappropriation of trade secrets with circumstantial evidence.[FN84]Nevertheless, "[a]gainst this often delicate construct of circumstantial evidence there frequently must be balanced defendants and defendants' witnesses who directly deny everything."[FN85]

> FN84.*See Merck & Co., supra,* at \*20 ("

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 1965869 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

'Misappropriation of trade secrets may be proven by circumstantial evidence,' and more often than not, 'plaintiff must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what plaintiffs allege happen did in fact take place.") (citations omitted); *SI Handling Systems, Inc. v. Heisley,* 753 F.2d 1244, 1261 (3d Cir.1985)(same) (citation omitted); *Computer Sciences Corp. v. Computer Assoc. International, Inc.,* 1999 U.S. Dist. LEXIS 21803, \*38 (C.D.Cal)("a number of cases have 'rejected the notion that only a smoking gun will suffice to defeat a motion for summary judgment' in a trade secret action.") (citations omitted).

FN85.*SI Handling Systems, Inc.,* 753 F.2d at 1261 (citation omitted).

Savor acknowledges that it has no direct evidence that the defendants misappropriated its trade secrets. It seeks, therefore, to prevail on its claim of misappropriation by attacking the credibility of the defendants' witnesses, all of whom have flatly denied in sworn testimony that any misappropriation of Savor's trade secret has occurred here.[FN86] Although Savor contends that there is ample fodder with which to attack the credibility of the defendants' sworn denials of misappropriation, this alone will not suffice to defeat a properly supported motion for summary judgment or to carry Savor's *prima facie* burden at trial.[FN87] In the face of this realization, Savor has contended that it will prove with circumstantial evidence that the defendants had "motive and opportunity" to misappropriate its trade secret and that the Upromise program is sufficiently similar to the Savor program to give rise to an inference of misappropriation.

FN86.*See, e.g.,* D.I. 180, Ex.7, 10, 12, 17, 20, 49.

FN87.*See Vantage Point, Inc. v. Parker Brothers, Inc.,* 529 F.Supp. 1204, 1213-14 (E.D.N.Y.1981)("If the most that can be hoped for is the discrediting of the defendants' denials at trial, no question of material fact is presented.") (citations omitted); *Harbor Software, Inc. v. Applied Systems, Inc.,* 887 F.Supp. 86, 89

(S.D.N.Y.1995)("An issue of credibility is insufficient to preclude the granting of a motion for summary judgment.")(citing *Matsushita Elec. Indus., Inc. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).

**\*9** As discussed below, Savor's theory of misappropriation, like its trade secret argument, is elastic; the theory expands and contracts with each defense argument indicating that dispositive relief is appropriate. This time, however, even the deference to which Savor is entitled as the non-moving party cannot save its ill-conceived and unsupported theory of misappropriation. The undisputed evidence of record simply does not provide a reasonable basis upon which a jury could find for Savor on this fundamental element of its *prima facie* case.

The link between Savor and Upromise, at least for purposes of Savor's misappropriation claim, is FMR. Savor alleges that Mr. Doyle disclosed the trade secret to Mr. Claude while Mr. Claude was employed with FMR. Mr. Claude, in turn, disclosed the trade secret to Mr. Fadule. Savor's various arguments regarding the timing of this latter disclosure-Claude to Fadule-are perhaps the best illustrations of the moving target that is its misappropriation theory.

In its interrogatory responses, Savor argued that FMR could have disclosed Savor's trade secret to Upromise during the negotiation of what would eventually become the Marketing and Services Agreement.[FN88] The participants in the misappropriation are not specifically identified under this theory. Alternatively, Savor alleged that the disclosure could have occurred when Upromise hired one of several former employees of FMR.[FN89] Once again, the participants are not specifically identified. In its briefing on this motion, Savor suggested that it would prove circumstantially that Mr. Claude transmitted the secret to Mr. Fadule while both worked at FMR and that Mr. Fadule shared the secret with Upromise upon his employment there in April 2000.[FN90] At oral argument, when confronted with FMR's argument that it could not be held responsible for Mr. Fadule's conduct after he left FMR, counsel for Savor contended that the transmission between Claude and Fadule could have occurred after Fadule had joined Upromise and while Claude was still employed with FMR.[FN91] Under this theory, Claude, not Fadule, transmitted the secret to Upromise (through Fadule).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
Not Reported in A.2d, 2004 WL 1965869 (Del.Super.)
(Cite as: Not Reported In A.2d)

FN88. See D.I. 180, Ex. 4, Resp. 23.

FN89. Id.

FN90. D.I. 179, at 27.

FN91. Transcript of oral argument unavailable as of this writing.

In the absence of *any* evidence of disclosure-from Claude to Fadule, from Fadule to Upromise, or from FMR to Upromise-Savor is left to argue that transmission *must have occurred* because the relevant players had access to each other and because the Savor and Upromise programs are so similar. Clearly, the opportunity to acquire information is not the same as actually acquiring it. Savor cannot withstand the defendants' motions for summary judgment with a mere showing that the defendants had the opportunity to misappropriate.[FN92] It must couple this showing with a showing that the Upromise program "bears a substantial identity" with its own program.[FN93] Accordingly, a comparison of the two college savings programs, as they existed before and after Mr. Fadule's arrival at Upromise, must be undertaken in order to evaluate the viability of Savor's misappropriation claim.[FN94]

FN92. See *SEC v. Truong*, 98 F.Supp.2d 1086, 1101 (N.D.Cal.2000)( "opportunity". to acquire knowledge insufficient to support inference of knowledge). See also *Greenberg v. Croydon Plastics Co.*, 378 F.Supp. 806, 812 (E.D.Pa.1974)(plaintiff does not prove misappropriation when evidence establishes that defendant could have developed similar method independently).

FN93. See *Callaway Golf Co.*, 2004 WL 1124758, at *8 ("In order to prove that a defendant's use of a trade secret or confidential material constitutes misappropriation, the ... plaintiff must show 'that defendant's product bears a substantial identity with [its] secrets.'").

FN94. According to Savor, Mr. Fadule either transmitted information to Upromise that he acquired from Mr. Claude while both were employed at FMR, or he received information from Mr. Claude after joining Upromise. Either way, Mr. Fadule is the

ultimate transmitter of the information to Upromise and his arrival there in April 2000 marks time when the "opportunity" for misappropriation would begin.

*10 The Court begins its analysis by identifying those elements of the Upromise program that could not, as a matter of pure timing, be the product of misappropriation of Savor's program, *i.e.,* elements that existed long before Mr. Fadule or any other FMR employee arrived on the Upromise scene. First and foremost, the core concept animating both programs-marrying college savings with affinity marketing (rebates)-was part of the Upromise program from the time it first graced a drawing board in 1999.[FN95] The research suggesting the need for the program was also in Upromise's hands as of 1999.[FN96] The use of computers to support the program, the use of scholarships to promote the program, and the use of research to target the program all were part of the Upromise program in 1999.[FN97] The program was designed as a web-based service; the use of a credit card to facilitate the purchases and rebates apparently was not considered.[FN98]

FN95. D.I. 180, Ex. 45.

FN96. Id.

FN97. Id.

FN98. Id. Indeed, the Court has found no reference in the entire record that would suggest that Upromise ever seriously considered using a credit card as the means to facilitate its program.

[REDACTED]

It had also developed a critical component of the program-its name, "Upromise." [FN99]

FN99. Id.

[REDACTED]

Significantly, Savor contends that all of these prominent features of the Upromise program were also features of its program and were misappropriated by FMR and Upromise.[FN100] Yet all of these components were developed by Upromise well

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                Page 13
Not Reported in A.2d, 2004 WL 1965869 (Del.Super.)
(Cite as: Not Reported in A.2d)

before the time frame in which the transmission of the trade secret could have occurred. While there may be some similarities, no reasonable juror could conclude that the similarities are anything but coincidental. The undisputed evidence, viewed in a light most favorable to Savor, demonstrates that Upromise came up with these ideas on its own.

FN100. See D.I. 179 at 18-27.

The Court next considers the impact of the article published in *American Banker* describing the Savor program. As discussed above, many of the details of the Savor program were disclosed in that article, including: paying cash (as opposed to other currency) as rebates for purchases, using state-run college tuition savings plans as investment vehicles for the rebates, identifying State treasurers as partners for the program, describing the restricted access to the funds until it is time to pay for college, identifying the need for the program, and even identifying a marketing slogan ("It's found money").[FN101] Although the Court already has determined that the combination of these published components with others not published could qualify as a trade secret, the comparison of these published components of the Savor program with similar components of the later-developed Upromise program cannot, without more, give rise to a reasonable inference of misappropriation.[FN102]

FN101. D.I. 180, Ex. 48, at Savor 016-18.

FN102. See *Callaway*, 2004 WL 1124758, at *8 (highlighting similarities between the allegedly offending product and the plaintiff's product based on information "well known in the public domain" or "commonly known in the industry" will not provide a basis to defeat summary judgment).See also *Destination Marketing, Inc. v. Kessler Financial Services, L.P.*, 00-CV-11775-MEL, Lasker, J. (D.Mass. Nov. 2, 2001)(Mem. Op. at 7, 12-13)(granting Upromise's motion for summary judgment as to a misappropriation of trade secrets claim brought by another competitor, the Court noted that the information in the *American Banker* article was well-known among the general public and within the credit card and financial services industries at the time the Upromise program was conceived).

Savor also seeks to compare basic features of the two programs-features that are so fundamental to any modern business organization that to be without them would be more remarkable. For instance, Savor points to the fact that Upromise offers a "toll-free 800" customer service line for customer support.[FN103]Not surprisingly, the Savor program would also provide similar customer support. Except perhaps for the corner lemonade stand, it is likely that every other customer-based business in this country offers direct-access customer support similar to Savor and Upromise. This is hardly a novel idea. Savor also identifies the fact that both its program and Upromise's program are supported by computer technology.[FN104]Again, the corner lemonade stand comes to mind. It would be more appropriate to compare the specific aspects of the computer technology used to support the two programs. This comparison yields nothing for Savor; the two systems are vastly different.

FN103. D.I. 179, at 26.

FN104. *Id.* at 25.

*11 Finally, the Court must return to the fundamental differences between the Savor program and the Upromise program. These undisputed differences cannot be ignored and they are fatal to Savor's effort to attempt to prove misappropriation with circumstantial evidence.[FN105]

FN105. See *Destination Marketing, Inc., supra,* at 13-14 ("Upromise's business plan is so significantly different from Destination Marketing's business plan that no reasonable jury could conclude that Upromise misappropriated the Destination Marketing plan.").

[REDACTED]

Indeed, in all of the voluminous information the Court has reviewed regarding the Savor program, there does not appear to be any direct explanation of how Savor is to be paid.[FN106]As best as the Court can discern from Savor's ITS (a document not supplied to Claude or FMR) [REDACTED]

FN106. At oral argument, Plaintiff's counsel was unable to direct the Court to any portion

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 1965869 (Del.Super.)
(Cite as: Not Reported in A.2d)

of the information supplied to FMR that describes this aspect of the Savor program.

While both programs share the goal of marrying college savings with affinity marketing, the manner in which they accomplish that goal is fundamentally different.[FN107] These fundamental differences do not allow an inference of misappropriation.[FN108]

> FN107. Interestingly, the program alleged to be unique and secret by the plaintiff in *Destination Marketing* as of December, 1998 (three months after the first disclosure of the Savor program to FMR) looks much more similar to the Savor program than the Upromise program has ever looked.

> FN108. *See, e.g., Calloway Golf Co., 2004 WL 1124758, at *8-9* (granting summary judgment on a misappropriation claim on the ground, *inter alia,* that plaintiff could not prove up a viable circumstantial claim for misappropriation); *First Federal Savings Bank v. CPM Energy Systems Corp., 1993 WL 138986, at *9 (Del.Super.)* (same); *Storage Technology Corp. v. Cisco Systems, Inc., 2003 WL 22231544, at *6, 9 (D.Minn.)* (same); *Computer Sciences Corp., supra,* at *39 (same).

### VI.

The Court has extended all due deference to Savor on summary judgment and has concluded, in this context, that it has a viable claim that its "Savor program" constitutes a "compilation" trade secret. The same cannot be said, however, for Savor's claim that defendants misappropriated this secret. Even when viewing the evidence in a light most favorable to Savor, it is clear that no reasonable jury could conclude that either FMR or Upromise misappropriated the Savor program. Indeed, no reasonable juror could conclude that Upromise was ever even made aware of the Savor program prior to the development of its own college savings program. Consequently, defendants' motions for summary judgment must be GRANTED.

IT IS SO ORDERED.

Del.Super.,2004.
Savor, Inc. v. FMR Corp.

Not Reported in A.2d, 2004 WL 1965869 (Del.Super.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit 4

# This Exhibit Was Redacted In Its Entirety

# Exhibit 5

# This Exhibit Was Redacted In Its Entirety