# Exhibit 6

# This Exhibit Was Redacted In Its Entirety

# Exhibit 7

US006890982B2

(12) **United States Patent**
Borsinger et al.

(10) Patent No.: **US 6,890,982 B2**
(45) Date of Patent: **May 10, 2005**

(54) **WAX FOR HOT MELT ADHESIVE APPLICATIONS**

(75) Inventors: **Gregory Borsinger**, Chatham, NJ (US); **Aziz Hassan**, Sugarland, TX (US)

(73) Assignee: **Marcus Oil and Chemical Corp.**, Houston, TX (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **10/166,959**

(22) Filed: **Jun. 11, 2002**

(65) **Prior Publication Data**

US 2003/0229168 A1 Dec. 11, 2003

(51) Int. Cl.[7] .................................................. C08L 91/06
(52) U.S. Cl. ........................ 524/277; 524/272; 524/274; 524/275
(58) Field of Search ................................ 524/272, 274, 524/275, 277, 177

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 3,474,055 A | * | 10/1969 | Dooley ............................ | 524/58 |
| 3,573,240 A | | 3/1971 | Flanagan ...................... | 524/273 |
| 4,081,415 A | * | 3/1978 | Matubara et al. ............ | 524/488 |
| 4,394,915 A | * | 7/1983 | Nelson ........................ | 215/12.2 |
| 4,792,495 A | * | 12/1988 | Taniguchi et al. ........ | 428/32.77 |
| 5,120,781 A | * | 6/1992 | Johnson, Jr. ................ | 524/274 |
| 5,177,133 A | * | 1/1993 | Peck et al. .................. | 524/139 |
| 5,326,413 A | | 7/1994 | Esemplare et al. .......... | 156/154 |
| 5,371,135 A | * | 12/1994 | Suzuki ........................ | 524/517 |
| 5,574,084 A | * | 11/1996 | Peacock ...................... | 524/270 |
| 6,022,947 A | * | 2/2000 | Frihart et al. .............. | 530/212 |
| 2003/0152707 A1 | * | 8/2003 | Hassan et al. .............. | 427/384 |

OTHER PUBLICATIONS

Notification of Transmittal of the International Search Report, mailed May 19, 2003.
International Search Report—PCT/US 03/00218.

* cited by examiner

*Primary Examiner*—Peter Szekely
(74) *Attorney, Agent, or Firm*—Thomas L. Adams

(57) **ABSTRACT**

Waxes prepared from hydrogenated plant oils, such as palm and soybean, are used as substitutes for petroleum derived waxes in hot-melt adhesive compositions. Unlike petroleum-derived or synthetic waxes, adhesive compositions comprising these waxes, which are obtained from naturally derived, renewable resources, achieve adhesion performance similar to conventional adhesives containing petroleum-derived waxes. The inventive waxes have a low iodine value (between 2–5), and melting points between approximately 120–165 degrees F. (Mettler Drop Point). These waxes comprise a triglyceride whose fatty acids are predominantly stearic acid ($C_{18}$). The naturally derived waxes are used as an alternative to petroleum and synthetically derived waxes in the manufacture of adhesives used to bond paper, wood, glass, plastic and metal in a variety of manufacturing operations.

**26 Claims, 4 Drawing Sheets**

**U.S. Patent**          May 10, 2005        Sheet 1 of 4              US 6,890,982 B2



Fig. 1 Process for the manufacture of Hydrogenated oils



Fig. 2 Open Time (sec)
ASTM D-4497

| | 28.0 | 18.0 |
|---|---|---|
| ■control | 10.0 | 5.0 |
| □soy | 12.5 | 15.0 |
| ■palm | 12.5 | 10.0 |

EVA Resin (%VA)

**U.S. Patent**    May 10, 2005    Sheet 3 of 4    US 6,890,982 B2



Fig. 3 Adhesive Viscosity
ASTM D3236

| | Viscosity @300F | | Viscosity @350F | |
|---|---|---|---|---|
| | 28.0 | 18.0 | 28.0 | 18.0 |
| control | 1175 | 3212 | 625 | 1587 |
| soy | 1700 | 4862 | 875 | 2312 |
| palm | 1687 | 4787 | 863 | 2287 |

EVA Resin %VA



Fig. 4 SAFT (F)
ASTM D-4498

| | 28.0 | 18.0 |
|---|---|---|
| control | 154.0 | 150.0 |
| soy | 147.0 | 140.0 |
| palm | 132.0 | 149.0 |

EVA Resin (%VA)



Fig. 5 DSC Peak

| | 28%VA EVA Adhesive | 18% EVA Adhesive |

US 6,890,982 B2

1

# WAX FOR HOT MELT ADHESIVE APPLICATIONS

## FIELD OF THE INVENTION

The present invention is a vegetable wax comprising triglycerides with a melting point of from about 50–70 degree C. Particularly, the present invention is used as an additive in hot met adhesive compositions, which are used in bonding articles such as those made from fibrous cellulosic materials, plastic, wood, metal and the like. The adhesive compositions comprise a high molecular weight, ethylene vinyl acetate copolymer with greater than about 18 weight percent vinyl acetate ("VA") and having a melt index greater than about 0.5. Because the waxes of the present invention have melting points that are lower than the melting points of many waxes traditionally used in hot melt adhesives, the compositions of the present invention have melting points which are towards the low end of the melting point spectrum of hot melt adhesives. This can be advantageous from a safety and handling perspective.

## BACKGROUND OF THE INVENTION

Hot melt adhesives are versatile in industrial applications such as bonding articles, for example, cardboard boxes, plastics parts, bookbinding and furniture manufacturing. Hot melt adhesives generally comprise 100% solids, and, in commercial applications, are typically used at temperatures at about 350 degrees F. These materials do not generate volatile compounds during the task of bonding, which is particularly advantageous in high-speed packaging operations where there is little time for drying an adhesive that contains solvent. The lack of volatile emissions is also an advantage over adhesives containing organic solvents, because the emission organic solvents, many of which are known to be toxic and may have an adverse effect when released into the environment, may pose environmental and health concerns.

Hot melt adhesive compositions are typically thermoplastic materials that are heated to a molten state for their application to cardboard or corrugated cartons, boxes, plastics and other items that need to be sealed or to be adhered to. For example, after application of the molten adhesive to a substrate such as paper (or similar cellulosic fibrous article), a second item that needs to be bonded to the substrate is placed in contact with the molten hot melt adhesive. As the molten adhesive cools and solidifies, a bond is formed between the substrate and the second item that has utility in many areas of commerce including consumer and industrial packaging.

The time a hot melt adhesive takes to solidify to a point where it can no longer bond with the intended article is called the 'open time'.

The time required for the adhesive to cool to the point where it has enough strength to form a bond is the 'set speed'. Set speed is an important parameter for applications such as high speed packaging lines, where bonding needs to occur rapidly to avoid poorly sealed or unsealed boxes from exiting the packaging line and having to be rejected, for example, in applications where items such as consumer packaged goods are being sealed.

Hot melt adhesives are generally composed of three components: (1) a polymer resin; (2) a tackifier; and (3) a wax. The polymer provides the formulation with its strength and adhesive characteristics. The polymer in the formulations generally range from 25 to 50% by weight of the formulation.

2

The tackifier allows the polymer to be more adhesive by improving wetting during the application. Tackifying agents are added to give tack to the adhesive and also to lower viscosity. Tack is required in most adhesive formulations to allow for proper joining of articles prior to the hot melt adhesive solidifying.

The wax reduces the overall viscosity of the adhesive, thereby allowing it to liquefy. The wax also controls the open time and set speed of the system. In the present invention, the use of a wax having a low but relatively sharp melting point leads to a hot melt adhesive composition which liquefies at a temperature lower than that of commercially available hot melt adhesives, but still retains good set speed characteristics.

The ratio of polymer to tackifier to wax is generally specific to a particular application's need. In general, the percent wax is minimized and added in sufficient quantities to achieve desired viscosity and set speeds. The level of wax is generally in the range of 15 to 35% by weight of the formulation. The waxes employed in most hot melt adhesive compositions are waxes which are derived from petroleum, such as the paraffins and microcrystalline waxes.

Depending upon the specific application desired, various other components, such as plasticizers, are used in the formulation of hot melt adhesives. Plasticizers reduce the overall viscosity of the adhesive and promote flexibility and wetting. Typical types of plasticizers used are phthalates, glycolates, polybutenes, and mineral oil. See "Adhesive Bonding", Chap. 8 Hot-melt Adhesives, by Thomas Flanagan, at p. 8–3, published by MacMillan.

In formulating adhesives all the ingredients should be compatible, so the formulation does not separate in the molten storage tank. Separation would result in the inability to apply the adhesive and also poor adhesive performance. The closer the solubility parameters of the different components are to each other, the greater the compatibility. See "Some Factors Affecting the Solubility of Polymers", by P. A. Small, J. Appl. Chem., 3, February 1953 (which teaches how to predict solubility parameters).

The cloud point temperature is the temperature at which a component begins to solidify or "cloud up" as it cools from a clear liquid phase to the solid phase. For example, for waxes, the cloud point is usually close to the melting point of the wax. Compatibility is related to cloud point temperature, where generally, the lower the cloud point temperature, the greater the compatibility. See "Adhesives and Coatings Manual" by National Distillers and Chemical Corporation (1983).

Most hot melt adhesive formulations utilize polymer resins having a low vinyl acetate content due to its lower cost relative to high vinyl acetate content polymers. Low vinyl acetate polymers are relatively non polar and can be formulated with other relatively non-polar tackifiers and waxes to yield compatible formulations. The commonly used waxes are non polar and can be formulated into compatible adhesives with low vinyl acetate containing polymer; these waxes include various grades of paraffin wax.

Higher vinyl acetate content polymer resins (>18% Vinyl acetate) are also used in hot melt adhesive formulations. The higher vinyl acetate content results in a stronger ionic bond to polar substrates such as paper, thereby creating a stronger adhesive. Vinyl groups are also known to modify polymer physical properties, making the composition more pliable and thereby increasing its adhesion performance, as known to those skilled in the art. The use of higher vinyl acetate

US 6,890,982 B2

3

content polymers requires formulating using more polar waxes and tackifiers to maintain formulation compatibility. These more polar waxes are generally more expensive than paraffin wax and the selection and supply of these more polar waxes is limited. Fischer-Tropsch ("FT") waxes are often used with higher vinyl acetate content polymer due to their better compatibility. From a supply standpoint however, Fischer-Tropsch waxes are not produced in the Americas. The two largest suppliers of FT waxes are Sasol from South Africa and Shell Oil from Malaysia; supplies of FT waxes are thus potentially subject to supply interruptions caused by world events.

Large oil companies such as Shell Oil, ExxonMobil and other oil refiners supply petroleum waxes used in these applications. Most of this wax is derived in the process of refining lube oil where the wax is separated from the lube oil stock and refined into various fractions of wax including paraffins, and microcrystalline waxes. Formulators such as Astor Wax, IGI and Moore & Munger also supply wax for these applications that is resold as is from the oil companies, and/or formulated and repackaged to meet the specific needs of customers.

A wax that is to be used in hot melt adhesives must have a relatively sharp melt point to yield an adhesive with a short 'set speed' and controllable open time. The melt point is another property in addition to compatibility. The wax must also allow for a reduction of overall adhesive viscosity to allow for the proper application or coating of the hot melt adhesive on the intended substrate. Generally, hot melt adhesive formulations are heated to 300–350 degrees F. prior to application in order to reduce viscosity. The wax must be stable at these temperatures to allow for extended periods as a molten product prior to application. It is well known to those versed in the art that stabilizers such as antioxidant (for example, hindered phenols) and free radical scavenger (such as, but not limited to, butylated hydroxy toluene "BHT", butylated hydroxyanisole "BHA", and Irganox 1010, supplied by Ciba Corp.) compounds can be added to the adhesive compound to further enhance thermal stability.

Synthetic ethylene vinyl acetate ("EVA") waxes have been developed and are commercially available for use with high vinyl acetate content polymer in adhesive formulations. Low molecular weight ethylene vinyl acetate waxes such as AC 400 (available from Honeywell); EVA1 (BASF); and MC400, available through Marcus Oil and Chemical, are examples of such commercially available materials. These waxes, however, are not widely used because of their relatively high cost to manufacture and resulting high selling price. These waxes also have relatively poor set speed characteristics when incorporated into adhesive formulations due to their low crystallinity and a lack of a sharp melting point.

Various attempts to utilize alternatives to imported and/or petroleum derived waxes have been reported (U.S. Pat. No. 4,749,739, U.S. Pat. No. 4,396,673 and U.S. Pat. No. 4,388,138; these patents are incorporated by reference herein).

For example, Foster, et al. (U.S. Pat. No. 4,749,739) discloses incorporation of a synthetic polyethylene wax, hydrocarbon tackifier and amorphous propylene polymer to create a low viscosity hot melt adhesive.

Ball, et al. (U.S. Pat. Nos. 4,396,673 and 4,388,138) mentions use of vegetable wax in combination with an isocyanate binder as a release agent in the manufacture of particleboard.

4

Mehaffy, et al (U.S. Pat. No. 6,117,945) highlights the need for low application temperature (between 200 to 300 degrees. F.) hot melt adhesives and suggests a styrene, alpha-methylstyrene and/or vinyltoluene polymer combined with ethylene vinyl acetate polymer and paraffin wax.

The prior art thus illustrates the use of petroleum-derived waxes and synthetic waxes for formulating hot melt adhesive compounds. There are no mentions of vegetable derived triglyceride waxes for use in hot melt adhesive formulations, yet there is a recognized and long-felt need to find alternatives to products such as petroleum waxes that are derived from scarce and limited natural resources. There is also a recognized and long-felt need to use materials in hot melt adhesives that are considered safe to humans because of the adhesives' use in the manufacture of containers used to transport and store foodstuffs. There is also a recognized and long-felt need to use materials in hot melt adhesives that are naturally derived and can be easily recycled back into the environment without long-term adverse effects; corrugated cartons having wax-based coatings and adhesives, for example, are known to be difficult to recycle. Therefore, there is a need for employing a wax, which has similar properties of petroleum derived or synthetic waxes used in hot melt adhesive formulations. Due the large volume of waxes consumed in these applications it is also preferred that the compositions be readily available. From both a supply and a natural resource viewpoint, it is preferred that the compositions be obtained from a source that preferably is renewable, such as from plant extracts.

There is a need for a wax that is compatible with high vinyl acetate content polymer resins, has a sharp melting point, low viscosity, does not adversely affect adhesion and is thermally stable. It is also desirable to have a wax that does not have to be imported, and produced at a cost which is competitive with that of the paraffin and microcrystalline waxes. Given that the world's petroleum supply is finite, and dwindling, it is also desirable to have a wax that can be obtained from a renewable source, such as plants, rather than being petroleum based. Further, because hot melt adhesives are frequently used in food packaging applications, it is also desirable for the wax to have food grade properties for safety. The waxes of the present invention meet the rigorous requirements for this and other applications.

The present invention is a natural wax for use in hot melt adhesive formulations. The product is a commercially available high triglyceride wax derived from the processing of natural oil containing commodities such as soybeans, palm and other crops from which oil can be obtained. Hydrogenated vegetable oils are widely used in the food industry. Products of the present invention are highly hydrogenated to minimize un-saturation. Although commercially available, these materials are not widely produced or used due to their limited applications in the food industries. The materials are processed and supplied by Archer Daniels Midland (Decatur Ill.) designated by their product number 86-197-0, Cargill Incorporated (Wayzata, Minn.) designated by their product number 800mrcs0000u and other sources under a generic name 'hydrogenated soybean oil'. Palm oil wax was supplied by Custom Shortenings & Oils (Richmond, Va.) and was designated as their product Master Chef Stable Flake-P.

BRIEF SUMMARY OF THE INVENTION

It is an object of the present invention to provide a composition that can be incorporated into hot melt adhesive formulations.

Another object of the present invention is to provide an adhesive composition which can be subsequently applied to

5

articles such as paper, paperboard and the like to bond them for use in consumer and other packaged goods applications.

It is an object of the present invention to provide a composition that can be incorporated into hot melt adhesive formulations as a substitute for petroleum-derived waxes currently used in such formulations.

Another object of the present invention is to provide a composition that when incorporated into hot melt adhesive formulations, is compatible with the other components of the formulations.

Still another object of the present invention is to provide a composition which when formulated into a hot melt adhesive, and which adhesive is applied to an article for the purpose of bonding that article to another article, the adhesive has adhesive performance characteristics similar to that of a conventional hot melt adhesive formulation prepared utilizing petroleum-derived wax.

Yet another object of the present invention is to provide a composition which can be derived from a renewable resource in place of non-renewable petroleum based compositions.

Still another object of the present invention is to provide a composition which can be derived from a renewable resource and which can be economically produced.

Another object of the present invention is to provide a composition for use in hot melt adhesives and for paper coating and have properties that are generally regarded as safe by the Food and Drug Administration.

The present inventors have unexpectedly discovered that highly hydrogenated oils such as palm and soybean can be converted into a wax that can be used effectively as substitutes for conventional petroleum and synthetic waxes in the formulation of hot melt adhesive compounds.

The present invention comprises a highly hydrogenated vegetable oil (derived from sources such as palm, soybean, corn or others) that has wax-like properties and can be formulated using conventional means with other components in the manufacture of hot melt adhesive compounds, to produce adhesive compositions which have adhesive characteristics similar to adhesive formulations containing petroleum derived wax. The inventive waxes consists essentially of a hydrogenated oil that comprises >90% triglyceride, and whose fatty acid components have a range of carbon numbers, with stearic acid ($C_{18}$) being the most predominant (>50%). The wax compositions have a low iodine value (between 2–5), and melting points between approximately 120–165 degrees F. (Mettler Drop Point). The wax compositions of the present invention can also be used as an additive (as a coating) in the manufacture of wax coated boxes, which can then be recycled more readily than boxes prepared using conventional waxes.

BRIEF DESCRIPTION OF THE SEVERAL VIEWS OF THE DRAWING

FIG. 1 is a flow chart illustrating a process for the manufacture of hydrogenated oils.

FIG. 2 illustrates the open time parameter of adhesive of adhesive formulations of the present invention.

FIG. 3 illustrates the viscosity of adhesive formulations of the present invention.

FIG. 4 compares the adhesive properties of the present invention with a control hot melt adhesive, using the Shear Adhesion Failure Test ("SAFT").

FIG. 5 illustrates the melting points of adhesive formulations of the present invention, as determined by Differential Scanning Calorimetry.

6

DETAILED DESCRIPTION OF THE INVENTION

The present invention is a wax composition, derived from compounds of plant origin, which can be used as an alternative to petroleum derived wax in formulating hot melt adhesives that are subsequently used to bond articles, yet which composition yields adhesive properties similar to adhesives containing petroleum derived waxes.

As known in the art, triglycerides are fatty acid esters of glycerol. As used herein, the term "free fatty acid" will refer to a fatty acid that is not covalently bound through an ester linkage to glycerol. Additionally, as used herein, the term "fatty acid component" will be used to describe a fatty acid that is covalently bound through an ester linkage to glycerol.

Naturally occurring carboxylic acids ("fatty acids") and their derivatives, most commonly the glyceryl derivatives in which all three hydroxy groups of the glycerol molecule are esterified with a carboxylic acid, are used commercially. The carboxylic acids may be saturated or unsaturated. The tri-substituted glycerols (triglycerides, also referred to as triacylglycerols) are major components of most animal and plant fats, oils and waxes. When all three hydroxy groups of a glyceryl molecule have been esterified with the same fatty acid, it is referred to as a monoacid triglyceride. Whether one refers to triglycerides as "waxes," "fats," or "oils" depends upon the chain lengths of the esterified acids and their degree of saturation or unsaturation as well as the ambient temperature at which the characterization is made. Generally, the greater the degree of saturation and the longer the chain length of the esterified acids, the higher will be the melting point of the triglyceride.

Naturally occurring and synthetic waxes are extensively used in a wide cross-section of industries including the food preparation, pharmaceutical, cosmetic, and personal hygiene industries. The term wax is used to denote a broad class of organic ester and waxy compounds, which span a variety of chemical structures and display a broad range of melting temperatures. Often the same compound may be referred to as either a "wax," "fat" or an "oil" depending on the ambient temperature. By whatever name it is called, the choice of a wax for a particular application is often determined by whether it is a liquid or solid at the temperature of the product with which it is to be used. Frequently it is necessary to extensively purify and chemically modify a wax to make it useful for a given purpose. Despite such efforts at modification, many of the physical characteristics of waxes still prevent them from being used successfully or demand that extensive, and oftentimes, expensive, additional treatments be undertaken to render them commercially useable.

Many commercially utilized triglycerides and free fatty acids are obtained preferably from plant sources, including soybean, cottonseed, corn, sunflower, canola and palm oils. The triglycerides are used after normal refining processing by methods known in the art. For example, plant triglycerides may be obtained by solvent extraction of plant biomass using aliphatic solvents. Subsequent additional purification may involve distillation, fractional crystallization, degumming, bleaching and steam stripping. The triglycerides obtained are partially or fully hydrogenated. Furthermore, fatty acids may be obtained by hydrolysis of natural triglycerides (e.g., alkaline hydrolysis followed by purification methods known in the art, including distillation and steam stripping) or by synthesis from petrochemical fatty alcohols. The free fatty acids and triglycerides may further be obtained from commercial sources, including Cargill, Archer Daniels Midland, Central Soya and other suppliers.

US 6,890,982 B2

7

In the present invention, the free fatty acids and fatty acid components of the triglycerides are preferably saturated, and have various chain lengths. The free fatty acids and fatty acid components of the triglycerides may be unsaturated, provided that the coating composition will be a solid at the temperature at which the coating is used. The properties of the free fatty acid/triglyceride mixture, such as melting point, varies as a function of the chain length and degree of saturation of the free fatty acids and the fatty acid components of the triglycerides. For example, as the degree of saturation decreases, the melting point decreases. Similarly, as the chain length of the fatty acids decreases, the melting point decreases. Preferred free fatty acids are saturated fatty acids, such as palmitic acid, and other saturated fatty acids having longer carbon chain lengths, such as arachidic acid and behenic acid. Stearic acid is further preferred.

The iodine value ("I.V."), also referred to as the iodine number, is a measure of the degree of saturation or unsaturation of a compound. The iodine value measures the amount of iodine absorbed in a given time by a compound or mixture. When used in reference to an unsaturated material, such as a vegetable oil, the IV is thus a measure of the unsaturation, or the number of double bonds, of that compound or mixture.

Vegetable oils or animal fats can be synthetically hydrogenated, using methods known to those skilled in the art, to have low or very low iodine values. Fats naturally composed primarily of saturated triglycerides (such as palm oil or fractionated fats) can be used alone or in blend formulations with adhesives/laminants to achieve an enhanced water tolerance for composite materials (U.S. Pat. No. 6,277,310). The major components of plant oils are triacylglycerols.

Saturated triglycerides having a low iodine value (range of iodine values of about 0–70 with 0–30 preferred) may be produced by hydrogenation of a commercial oil, such as oils of soybean, soy stearine, stearine, corn, cottonseed, rape, canola, sunflower, palm, palm kernel, coconut, crambe, linseed, peanut, fish and tall oil; or fats, such as animal fats, including lard and tallow, and blends thereof. These oils may also be produced from genetically engineered plants to obtain low IV oil with a high percentage of fatty acids.

Fats are commonly fractionated by a process known as "winterization", wherein the mixture is chilled for a period of time which is long enough to allow the harder fractions of the fats to crystallize. This chilling is followed by filtration, with the harder fractions being retained on a filter cake. These harder fractions have a lower iodine value and, therefore, a melting point that is higher than the melting point of the fat from which it has been separated. Hence, winterization can be used as a source for lower IV fats.

The winterization process is generally used to fractionate animal fats, and can thus produce a variety of animal fat fractions, having differing iodine values and consequently, differing chemical properties. These fractions can be blended with fatty acids and free fatty acids obtained from other sources, such as plant or vegetable extracts referred to above, and these blends can also be used in the present invention.

The present invention performs best with a hydrogenated triglyceride where the iodine value is close to zero thereby rendering the triglyceride more thermally stable. The triglycerides can be chosen from those having an iodine value of between 0–30, but a triglyceride having an iodine value of between 2–5 is preferred.

Adhesives generally comprise a wax, a tackifying agent and a polymeric resin. When an adhesive is applied to a

8

substrate, such as, for example only, paper or other cellulose based products, and the substrates joined to each other, the adhesive serves to bond the substrates together. Hot melt adhesives are routinely used in the manufacture of corrugated cartons, boxes and the like. They are also used in diverse areas, such as bookbinding; sealing the ends of paper bags; furniture manufacturing; and adhering other articles, such as glass, metals and various plastics, including attaching paper labels to plastic containers. Additional uses of hot-melt adhesives include, but are not limited to, carpet seam sealing tape, lamination, product assembly, nonwoven construction, and potting and encapsulation compounds. For the manufacture of corrugated cartons, especially those used for shipping refrigerated or frozen foods, or for shipping foods packed in ice, hot melt adhesives are generally selected because of their ability to maintain a strong bond under the difficult conditions, such as stress and shock in handling, high humidity and variations in the environmental temperature. The wax component of adhesives affects properties such as its setting speed and thermal stability.

Prior art hot-melt adhesive compositions generally utilize waxes derived from petroleum products, and include the paraffins and microcrystalline waxes described previously Oxidized polyethylene waxes, also derived from petroleum products, may be used. Additionally, Fischer-Tropsch waxes can be utilized, but they are not preferred because of their having to be imported and their generally higher cost compared to the petroleum-derived waxes.

The ratio of polymer to tackifier to wax is generally specific to a particular application's need. In general, the percent wax is minimized and added in sufficient quantities to achieve desired viscosity and set speeds. The level of wax is generally in the range of approximately 15% to approximately 75% by weight of the formulation. The waxes employed in most hot melt adhesive compositions are waxes which are derived from petroleum, such as the paraffins and microcrystalline waxes. Preferably, the level of wax in the formulation is in the range of approximately 25%–approximately 35% by weight of the formulation. More preferably, the level of wax in the formulations of the present invention is in the range of approximately 3-%–approximately 35% by weight of the formulation.

The tackifier allows the polymer to be more adhesive by improving wetting during the application. Tackifying agents are added to give tack to the adhesive and also to lower viscosity. Tack is required in most adhesive formulations to allow for proper joining of articles prior to the hot melt adhesive solidifying. Effective tackifiers include: glycerol and pentaerythritol esters of natural and chemically modified rosins; naturally occurring and chemically modified resins, such as wood rosin, gum rosin, tall oil rosin, distilled rosin, and rosins modified by processes such as polymerization, hydrogenation, maleation and dimerization; polyterpene resins; modified terpene resins, such as chlorinated terphenyl resins and phenolic-modified terpene resins; and aliphatic petroleum hydrocarbon resins, such as those resulting from polymerization of olefin and diolefin monomers.

Tackifiers added to hot-melt adhesives can be characterized by parameters such as their softening points, specific gravities, or by acid number. A tackifier can be selected from among the variety of tackifiers, as described above but not limited thereto, and from tackifiers characterized by a range of acid numbers, such as acid numbers between 3 and 100, more preferably between 3 and 25, and most preferably a tackifier having an acid number between 3–10. The tackifier can be used in amounts ranging from approximately 2% by weight to approximately 70% by weight. The tackifier is

US 6,890,982 B2

9 | 10

preferably used in amounts between approximately 15% by weight to approximately 40% by weight, and more preferably in amounts ranging from approximately 30% to approximately 35% by weight in the present invention. is typically necessary in preferred compositions.

In the composition of the present invention, a preferred tackifying agent is FORAL® 85 (Hercules, now available from Eastman). This agent is a hydrogenated glycerol ester, with a softening point between 80–88 degrees C., and characterized by having a specific gravity of 1.07 at 73 degrees, C., and an acid number ranging from 3–10 (Table 3).

The copolymer can be selected from one or more reagents, such as copolymers of ethylene; or copolymers of ethylene and vinyl acetate (ethylene-vinyl acetate, "EVA"). The copolymer can be chosen from the group consisting of, but not limited to, ethylene acrylic acid copolymers, ethylene ethyl acrylate copolymers; ethylene methacrylic acid copolymers; ethylene vinyl acetate terpolymers and other copolymers derived from ethylene, such as polyamides, polyethylene, polyesters, and polypropylenes; natural or synthetic rubbers, including styrene-isoprene and styrene-butadiene random and block copolymers, polyvinyl acetate and vinyl acetate/unsaturated carboxylic acid copolymers, polyvinyl acetals, polyurethanes and ethyl cellulose.

In the present invention, the copolymer is selected from the ULTRATHENE® (trademark of Equistar Chemicals, Houston Tex.) group of polymers. The ULTRATHENE®s are described as ethylene vinylacetate copolymers, whose relevant properties are listed in Table 3. ULTRATHENE® UE 612-04 comprises 18% vinyl acetate, and ULTRATHENE® UE 646-04 comprises 28% vinyl acetate. The copolymer is used in the adhesive compositions of the present invention in concentrations ranging from approximately 5% by weight to approximately 50% by weight of the composition. The copolymer can more preferably be used at concentrations ranging from about 25% to about 35% by weight of the composition, and is most preferably employed at concentrations from about 30% to about 35% by weight of the composition (Table 4).

The adhesives of the present invention preferably also contain a number of additional components, such as a stabilizer, plasticizer, filler or antioxidant. Among the applicable stabilizers and antioxidants which can be included in the adhesive composition of the present invention are high molecular weight hindered phenols and multifunctional phenols, such as sulfur-containing and phosphorous-containing phenols. Hindered phenols, known to those skilled in the art, may be described as phenolic compounds, which also contain sterically bulky radicals in close proximity to the phenolic hydroxyl group. Specifically, tertiary butyl groups generally are substituted onto the benzene ring in at least one of the ortho positions relative to the phenolic hydroxyl group. The presence of these sterically bulky substituted radicals in the vicinity of the hydroxyl group serves to retard its stretching frequency, and correspondingly, its reactivity. It is this hindrance that provides the stabilizing properties of these phenolic compounds.

Representative hindered phenols include; but are not limited to:

2,4,6-trialkylated monohydroxy phenols; 1,3,5-trimethyl-2,4,6-tris-(3,5-di-tert-butyl-4-hydroxybenzyl)-benzene; pentaerythritol tetrakis-3(3,5-di-tert-butyl-4-hydroxyphenyl)-propionate, commercially available under the trademark IRGANOX® 1010; n-octadecyl-3(3,5-di-tert-

butyl-4-hydroxyphenyl)-propionate; 4,4'-methylenebis (4-methyl-6-tert-butyl-phenol); 4,4'-thiobis (6-tert-butyl-o-cresol); 2,6-di-tertbutylphenol; 6-(4-hydroxyphenoxy)-2,4-bis(n-octyl-thio)-1,3,5 triazine; 2-(n-octylthio)ethyl 3,5-di-tert-butyl-4-hydroxy-benzoate; di-n-octadecyl 3,5-di-tert-butyl-4-hydroxy-benzylphosphonate; and sorbitol hexa[3,3,5-di-tert-butyl-4-hydroxy-phenyl)-propionate.

Antioxidants include, but are not limited to, butylated hydroxy anisole ("BHA") or butylated hydroxy toluene ("BHT") which may also be utilized to render the formulation more thermally stable These stabilizers and antioxidants are added in amounts ranging approximately 0.01% to approximately 5% by weight of the formulation.

The performance of these antioxidants may be further enhanced by utilizing known synergists in conjunction with the antioxidants. Some of these known synergists are, for example, thiodipropionate esters and phosphates. Chelating agents and metal deactivators, may also be used. Examples of these compounds include ethylenediaminetetraacetic acid ("EDTA"), and more preferably, its salts, and disalicylal-propylenediimine. Distearylthiodipropionate is particularly useful. When added to the adhesive composition, these stabilizers, if used, are generally present in amounts of about 0.1 to about 1.5 weight percent, and more preferably in the range of about 0.25 to about 1.0 weight percent.

The present invention also contemplates the addition of a polymeric additive to the adhesive. The polymeric additive can be selected from the group consisting of ethylene methyl acrylate polymers containing 10 to 28 weight percent by weight methyl acrylate; ethylene acrylic acid copolymers having an acid number of 25 to 150; polyethylene; polypropylene; poly(butene-1-co-ethylene) polymers and low molecular weight and/or low melt index ethylene n-butyl acrylate copolymers. When such a polymeric additive is added, it is present in amounts up to about 15 weight percent by weight of composition.

Depending on the contemplated end uses of the adhesive composition, other additives such as plasticizers, pigments and dyestuffs that are conventionally added to hot-melt adhesives may be included. In addition, small amounts of additional (secondary) tackifiers and/or waxes such as microcrystalline waxes, hydrogenated castor oil and vinyl acetate modified synthetic waxes may also be incorporated in minor amounts, i.e., up to about 10 weight percent by weight, into the formulations of the present invention. A plasticizer may be used in lieu of, or in combination with, the secondary tackifier to modify viscosity and improve the tack properties of the adhesive composition.

A dispersant can also be added to these compositions. The dispersant can be a chemical, which may, by itself, cause the composition to be dispersed from the surface to which it has been applied, for example, under aqueous conditions. The dispersant may also be an agent which when chemically modified, causes the composition to be dispersed from the surface to which it has been applied. As known to those skilled in the art, examples of these dispersants include surfactants, emulsifying agents, and various cationic, anionic or nonionic dispersants. Compounds such as amines, amides and their derivatives are examples of cationic dispersants. Soaps, acids, esters and alcohols are among the known anionic dispersants. The addition of a dispersant may affect the recyclability of products to which a hot-melt adhesive may been applied.

The surfactants can be chosen from a variety of known surface-active agents. These can include nonionic compounds such as ethoxylates available from commercial sup-

US 6,890,982 B2

| 11 | 12 |

pliers. Examples include alcohol ethoxylates, alkylamine ethoxylates, alkylphenol ethyoxylates, octylphenol ethoxy-lates and the like. Other surfactants, such as a number of fatty acid esters may be employed; for example, but not limited to, glycerol esters, polyethyleneglycol esters and sorbitan esters.

The present invention is a natural wax for use in hot melt adhesive formulations. The product is a commercially available high triglyceride wax derived from the processing of natural oil-containing commodities such as soybeans, palm and other crops from which oil can be obtained. The waxes used in the present invention are a palm oil wax and a soybean wax, prepared from hydrogenated oil. The materials are processed and supplied by Archer Daniels Midland (Decatur Ill.) designated by their product number 86-197-0; Cargill Incorporated (Wayzata, Minn.) designated by their product number 800mrcs0000u; and other sources under a generic name 'hydrogenated soybean oil'. Palm oil wax was supplied by Custom Shortenings & Oils (Richmond, Va.) and was designated as their product Master Chef Stable Flake-P. The soybean wax is also distributed by Marcus Oil and Chemical Corp., Houston, Tex. under the designation Marcus Nat 155; these waxes can also be used as food additives.

Generally, the vegetable-derived waxes that can be employed in the present invention have melting points that are in the range of between about 130 degrees F. to about 180 degrees F.

The properties of the two waxes are summarized in Tables 1 and 2, where it can be seen that these waxes have IV's of between 5 and 2, respectively.

The soybean oil wax has a melting point, as measured by Mettler Drop Point, of between 155–160 degrees F., while that of the palm oil wax is between 136–142 degrees F.

These waxes are further characterized by having a viscosity of between 10–200 cps at a temperature of 210 degrees F.,

Each wax comprises 98% triglyceride by weight with trace amounts of fatty acids. The triglyceride can be saponified through the addition of a base such as KOH to yield a saponification value. Saponification values will vary depending mainly upon the chain length of the fatty acids, which is a function of the source from which the vegetable wax was derived. For the hydrogenated soy and palm waxes used in the present invention, the saponification (SAP) value is in the range of 180–200 mg KOH/g.

When the waxes were analyzed for their fatty acid content using known methods of Gas Liquid Chromatography ("GLC"), the soybean wax was found to comprise between 82–94% stearic acid ($C_{18:0}$) and between 3–14% palmitic acid ($C_{16:0}$). By comparison, the palm oil wax comprises approximately 55% stearic acid ($C_{18:0}$), 39.5% palmitic acid ($C_{16:0}$), 1.1% myristic acid ($C_{14:0}$) and approximately 1.0% oleic acid ($C_{18:1}$).

The adhesive compositions of the present invention can be utilized for adhering corrugated carton members to each other, for adhering paper and other items manufactured from cellulosic fibers, for use in furniture manufacturing, plastics manufacturing, and adhesion of paper substrates to items such as other paper items, corrugated materials, kraft paper and the like, linerboard, glass and plastic items

Although the present invention has been described with a certain degree of particularity, it is to be understood that the examples below are merely for purposes of illustrating the present invention, the scope of the present invention intended to be defined by the claims.

PREPARATION OF EXAMPLES

Example 1

Preparation and Evaluation of Adhesive Formulations

For the purpose of illustrating the invention, evaluations were conducted to determine the performance of wax material versus a 'control' petroleum derived microcrystalline wax in standard hot melt EVA formulations.

The following materials were used to make the EVA adhesive formulations.

1. EVA resin with 18% VA content, ULTRATHENE® 612-04 made by Equistar Chemical, LP.
2. EVA resin with 28% VA content, ULTRATHENE® 646-04 made by Equistar Chemicals, LP.
3. Rosin Ester tackifier, FORAL® 85 made by Hercules.
4. Microcrystalline Controll Wax, 1251/7 supplied by Frank B. Ross Co.
5. Thermal stabilizer IRGANOX® 1010 made by Ciba-Geigy.

The compositions of the formulations used are in Table 4; the ingredients were added on a weight basis, and were designated as either "High VA" (indicating the use of the 28% EVA content resin), or "Low VA" (indicating the use of the 18% EVA content resin). Ingredients were blended in a quart can heated by a glass-heating mantle. Tackifier resin and Anti-oxidant were added into the can and allowed to heat for 10 minutes. Mixing was started at a moderate rate of speed while the EVA was slowly added over 25 minutes. While mixing continued the wax was slowly added over a 15-minute period into the adhesive. The adhesive was allowed to mix an additional 15 minutes to assure uniformity. The final adhesive temperature was 350–360 degrees F.

Example 2

Compatibility Testing of Waxes with Adhesive Formulation Components

To determine whether the waxes were compatible with the other components of the hot melt adhesive formulations, 25 grams of adhesive were placed into a 4-ounce glass jar. The jar was placed in an oven at 350 degrees F. and the adhesive examined visually every half hour for 2 hours for evidence of phasing or incompatibility. The results showed that after 2 hours at 350 degrees F., the adhesive formulations were crystal clear and uniform in appearance, indicating that the soy and palm waxes were compatible with the other components of the adhesive formulations, in formulations having high and low VA content.

Example 3

Adhesive Properties of the Inventive Formulations

To evaluate the adhesive properties of the inventive formulations, the hot melt formulations were coated onto 56# basis weight paper typically used in the manufacture of cardboard boxes. The formulations were coated at both 5 and 10 mil thickness.

Coatings were made using a wet film applicator (Bird type) with a 5 or 10 mil gap. The adhesive composition, the 4 inch wide applicator and sheets of ½ inch thick plate glass were placed into an oven for equilibration. After the appropriate time interval, the glass was removed from the oven and strips of the 56# basis weight paper, were placed onto the glass. A volume of the specific coating was placed at one end of the paper, the applicator applied to the paper and the hot molten adhesive drawn by hand to coat the paper. Equivalent coating weights were calculated as 73 g/1000 square feet for the 5 mil coating, and 146 g/1000 square feet for the 10 mil coating.

Example 3A

Open Time

Open time evaluations were conducted on the adhesive formulations according to the ASTM D-4497 test procedure.

US 6,890,982 B2

13

For this evaluation, a 10 mil thick layer of each formulation is coated onto 56# basis weight paper, and 1x4 inch strips of standard kraft paper (1810A) was laid onto the warm adhesive at timed intervals ranging from 0, 5, 10, 15, 20 and 25 seconds. Following complete cooling, the strips were removed, and the removed strips evaluated for the degree of paper tearing. If greater than 50% paper tear was evident, the hot melt was considered 'open'. The results (FIG. 2) indicated that the open time for both the soy and palm wax formulations was slightly longer than the open time for the control. This can be advantageous for applications where there needs to be some time allowed before the articles are bonded. In other applications a change in the formulation (i.e. more wax or the addition of a small quantity of higher melting wax) can result in matching the open time of the control formulation.

Example 3B

Viscosity

The adhesive formulations were evaluated for viscosity by using a Brookfield Viscosity measurement device according to ASTM test method D3236. Formulations were analyzed using a Brookfield LVDV II+ viscometer, HT-2 Sample Chamber and a number 27 spindle with a rotation speed of 20 rotations per minute. A sample chamber was filled with 10.5 grams of each formulation and then placed into the Thermosel that had been preheated to 300 degrees F. and allowed to stabilize for 10 minutes. After the sample chamber had come to temperature the spindle was inserted. When the spindle was in place, the sample was given 30 minutes to equilibrate, and the first viscosity was measured at 300 degrees F. The temperature was then increased to 350 degrees F. and the final viscosities were recorded after 30 minutes at 350 degrees F. The results (FIG. 3) indicate that both the soy and palm wax viscosity were slightly higher than that of the control, but are still within acceptable limits for hot melt adhesives.

Example 3C

Peeling Test

The T-peel test is a standard test method for measuring adhesive performance, and is familiar to those skilled in the art. Briefly, the extent of paper tearing is a measure of adhesion; the greater the force needed to achieve a tear, the stronger the bond. To evaluate the adhesive properties of the present invention, a standard T-Peal test method (ASTM D-1876) was utilized. T-peel testing was performed on a ChemInstruments TT-1000 Tensile Tester. The results show that there was paper tear for all samples except for the palm oil high EVA content formulation. Paper tear indicates good bonding and the actual value is a function of the strength of the adhesive bond. For these tests paper tear values ranged from 12 to 15 oz/in.

Example 3D

Shear Adhesion Failure Temperature Test

The Shear Adhesion Failure Temperature ("SAFT") test is another commonly used test to evaluate adhesive performance, and well known to those versed in the industry. The SAFT test measures the temperature at which an adhesive fails. The formulations of the present invention were evaluated using a standard SAFT test method (ASTM D-4498). SAFT tests were run using a ChemInstruments HT-8 Oven Shear Tester. The tests were started at room

14

temperature (25° C./77° F.) and the temperature increased at the rate of 0.5 degrees C./min. The results were converted and reported in degrees F. (FIG. 4). The SAFT values for both the soy and palm wax formulations were slightly lower than the control formulation, but this is to be expected given the lower melting points of the palm and soy wax relative to the control wax

Example 3E

Adhesive Parameter: Melting Point

To measure the melting points of the adhesive formulations of the present invention a technique called Differential Scanning Calorimetry ("DSC") was utilized, a method commonly used to determine the melting point of various substances. DSC measures the heat flow into a substance as a function of sample temperature. An exothermic transition is noted by absorption of energy while an endothermic transition is when a substance gives off energy. A few milligrams of sample are placed into the instrument and the temperature is then increased from 0 degrees C. to a desired temperature at the rate of 10 degrees C./min. The thermogram results are plotted as watts/gram (energy) versus temperature. An exothermic (i.e. melting or sublimation) transition will show as a positive peak. The results of this test are shown in FIG. 5, where it can be seen that the melting points of formulations containing the soy and palm wax were lower than the melting point of the control formulation, regardless of vinyl acetate content.

TABLE 1

Typical properties of Hydrogenated Soybean Oil (Archer Daniels Midland (Decatur Ill.) designated by their product number 86-197-0)

| Property | Typical analysis |
|---|---|
| Lovibond Red Color | 2.0 max |
| Saponification | 180 mgKOH/g |
| Viscosity | 60SUS @ 210 F. |
| Hardness (needle penetration) | 2 dmm @ 77 F. |
| % FFA Max." | 0.10 max |
| Flavor Min. | Characteristic |
| P.V. Mil eq/kg/max. | 1.0 max |
| F.I. min** | 8.0 min |
| Specific gravity (H2O = 1) | 0.92 |
| % Moisture max. | 0.05 max |
| I.V. by R.I. | 2.0 max |
| Iron (ppm) | 0.3 max |
| Soap (ppm) | 3.0 max. |
| Nickel (ppm) | 0.02 max |
| Copper (ppm) | 0.05 max. |
| Phosphorous (ppm) | 5.0 Max |
| Residual Citric Acid (ppm) | 15.0 max |
| Mettler Drop Point (F) | 155–160 |
| Typical Fatty Acid Composition (by GLC) | |
| C 14:0*** | 3.0 max |
| C 16:0 | 3–14 |
| C 18:0 | 82–94 |
| C 20:0 | 5 max |

*FFA: Free Fatty Acids.
**F.I.: Flavorindex
***number of carbon atoms:number of double bonds (e.g., 18:2 refers to linoleic acid palmitic acid (16:0), stearic acid (18:0), oleic acid (18:1), arachidic acid (20:0) and behenic acid (22:0)

US 6,890,982 B2

15

16

### TABLE 2

Typical properties of Hydrogenated Palm Oil
(Custom Shortenings & Oils (Richmond, Va) product Master
Chef Stable Flake-P.)

| Property | Typical analysis |
|---|---|
| Lovibond Red Color | 4.0 max |
| % Free Fatty Acids Max. | 0.10 max |
| Flavor Min. | Bland |
| Iodize Value. by R.I. | 5.0 max |
| Mettler Drop Point (F) | 136–142 |
| Saponification | 185 mgKOH/g |
| Viscosity | 65 SUS @ 210 F. |
| Hardness (needle penetration) | 2–3 dmm @ 77 F. |
| Typical Fatty Acid Composition (by GLC) | |
| C 8:0* | 0.3% max |
| C 10:0 | 0.3 max |
| C 12:0 | 0.5% max |
| C 14:0 | 1.1% max |
| C 16:0 | 39.5% min |
| C 18:0 | 53.0% min |
| C 18:1 | 1.0% max |
| C 18:2 | 0.5% max |

*number of carbon atoms:number of double bonds (e.g., 18:2 refers to linoleic acid)

### TABLE 3

Properties of Other Materials Used in Compositions

| Ingredient | Property | Nominal Value | Units | Test Method |
|---|---|---|---|---|
| Ultrathene ® | Equivalent melt index | 150 | G/10 min | ASTMD1238 |
| UE 612-04* | Vinyl acetate content | 18 | % | ETM 15 A (FTIR) |
| | Viscosity @ 150 C. (302 F.) | 105,000 | CP | ASTM D3236 |
| | Density | 0.94 | G/cc | ASTM D1505 |
| | Peak Melt Point | 82/180 | ° C./° F. | ASTM D3418 |
| Ultrathene ® | Equivalent melt index | 25 | G/10 min | ASTMD1238 |
| UE 646-04* | Vinyl acetate content | 28 | % | ETM 15 A (FTIR) |
| | Viscosity @ 150 C. (302 F.) | 580,000 | CP | ASTM D3236 |
| | Density | .95 | G/cc | ASTM D1505 |
| | Peak Melt Point | 70/158 | ° C./° F. | ASTM D3418 |
| Ross | Melting Point | 150–150 | ° F. | ASTM D3954 |
| Microcrystalline Wax 1251/7** | Needle Penetration | 10–15 | dmm | ASTM D1321 |
| Foral ®85 | Softening Point | 80–88 | ° C. | Hercules Method |
| Synthetic Resin*** | Acid Number | 3–10 | Mg KOH/g | |
| | Specific Gravity | 1.07 | @ 25° C. | |

*Equistar Chemicals, Houston Tx
**Frank Ross Co, Inc, Jersey City, NJ
***Hercules Corp, Wilmington, DE

### TABLE 4

Composition of Hot-Melt Adhesive Formulations (all units in grams)

| | Control | SOY WAX | PALM WAX |
|---|---|---|---|
| High VA Content Formulations (28% VA in resin) | | | |
| EVA (28% VA) | 200 | 200 | 200 |
| Tackifier (FORAL 85) | 200 | 200 | 200 |
| Wax-control | 200 | | |
| Wax-soy | | 200 | |
| Wax-palm | | | 200 |
| Thermal stabilizer | 6 | 6 | 6 |

### TABLE 4-continued

Composition of Hot-Melt Adhesive Formulations (all units in grams)

| | Control | SOY WAX | PALM WAX |
|---|---|---|---|
| Low VA Content Formulations (18% VA in resin) | | | |
| EVA (18% VA) | 200 | 200 | 200 |
| Tackifier (FORAL 85) | 200 | 200 | 200 |
| Wax-control | 200 | | |
| Wax-soy | | 200 | |
| Wax-palm | | | 200 |
| Thermal stabilizer | 6 | 6 | 6 |

We claim:

1. A hot-melt adhesive composition, the adhesive composition comprising:

(a) from about 25% to about 35% by weight of a thermoplastic copolymer consisting essentially of an ethylene containing copolymer, the copolymer being selected from the group consisting of an ethylene copolymer, an ethylene vinyl acetate copolymer, and copolymers and terpolymers thereof,

the copolymer having a vinyl acetate content from about 18% to about 28%, the copolymer having a melt viscosity of from about 100,000–about 600,000 cP at 302 degrees F.;

(b) from about 15% to about 40% by weight of a tackifier resin, the tackifier resin being characterized by having an acid number of from about 3 to about 10;

(c) from about 15 –about 35% by weight of a wax derived from a hydrogenated vegetable oil (a vegetable derived wax), the wax being characterized by having a melt viscosity of from about 50 to about 70 SUS at 210 degrees F., and a Mettler drop point of from about 130 degrees to about 170 degrees F.; and

(d) the adhesive composition being characterized by having a DSC melt point of from about 50 degrees C. to about 80 degrees C., and a melt viscosity of from about 1000–about 5000 cps at 350 degrees F., the adhesive

US 6,890,982 B2

17

composition being capable of binding a fibrous cellulosic article to an article selected from the group consisting of a fibrous cellulosic article, wood, metal, glass and plastic.

2. The adhesive as described in claim 1, wherein the vegetable derived wax is selected from the group consisting of soybean, corn, cottonseed, rape, canola, sunflower, palm, palm kernel, coconut, crambe, linseed and peanut wax.

3. The composition as described in claim 2, wherein the vegetable derived wax is derived from soybean.

4. The composition as described in claim 2, wherein the vegetable derived wax is derived from palm.

5. The adhesive as described in claim 2, wherein the adhesive composition is further characterized by having a DSC melting point which is preferably from about 53 degrees to about 58 degrees C.

6. The adhesive as described in claim 2, wherein the wax more preferably comprises from about 25%–about 35% by weight of the composition.

7. The adhesive as described in claim 6, wherein the wax most preferably comprises from about 30%–about 35% by weight of the composition.

8. The adhesive as described in claim 2, wherein the copolymer preferably comprises from about 30% to about 35% by weight of the composition.

9. The adhesive as described in claim 1, wherein the fibrous cellulosic article is chosen from the group consisting of corrugated paper, kraft paper, linerboard and paper.

10. The adhesive as described in claim 9, further comprising one or more compounds chosen from the group consisting of stabilizers, plasticizers, fillers, antioxidants, preservatives, synergists, dyes, pigments, and waxes.

11. A hot-melt adhesive composition, the adhesive composition comprising:

(a) from about 25% to about 35% by weight of a thermoplastic copolymer selected from the group consisting of a copolymer consisting essentially of an ethylene containing copolymer or a copolymer consisting essentially of an ethylene vinyl acetate ("EVA") copolymer, ethylene acrylic acid copolymers, ethylene ethyl acrylate copolymers; ethylene methacrylic acid copolymers; ethylene/vinyl acetate/acid terpolymers, polymers derived from ethylene, polyamides, polyethylene, polyester, and polypropylene;

(b) from about 15% to about 40% by weight of a tackifier resin, the tackifier selected from the group consisting of a rosin ester, a hydrogenated rosin, a high acid number rosin, and a maleic modified rosin and wherein the tackifier resin is characterized by having an acid number of about 3 to about 10;

c) from about 15–about 35% by weight of a wax derived from a hydrogenated vegetable oil (a vegetable derived wax), the wax being characterized by having a melt viscosity of from about 50 to about 70 SUS at 210 degrees F., and a Mettler drop point of from about 130 degrees to about 170 degrees F.; and

(d) the adhesive composition being characterized by having a DSC melt point of from about 50 degrees C. to about 80 degrees C., a melt viscosity of from about 1000–about 5000 cps at 350 degrees F., the adhesive composition being capable of binding a fibrous cellulosic article to an article selected from the group consisting of a fibrous cellulosic article, wood, metal, glass and plastic.

12. The adhesive as described in claim 11, wherein the preferred copolymer is a copolymer consisting essentially of an ethylene containing copolymer selected from the group

18

consisting of an ethylene vinyl acetate polymer; and copolymers and terpolymers thereof.

13. The adhesive as described in claim 12, wherein the ethylene vinyl acetate copolymer is characterized by having a vinyl acetate content of from about 18% to 28%, the copolymer having a melt viscosity of from about 100,000–about 600,000 cP at 302 degrees F.

14. The adhesive as described in claim 12, wherein the vegetable derived wax is selected from the group consisting of soybean, corn, cottonseed, rape, canola, sunflower, palm, palm kernel, coconut, crambe, linseed and peanut wax.

15. The composition as described in claim 14, wherein the vegetable derived wax is derived from soybean.

16. The composition as described in claim 14, wherein the vegetable derived wax is derived from palm.

17. The adhesive as described in claim 14, wherein the adhesive composition is further characterized by having a DSC melting point which is preferably from about 53 degrees to about 58 degrees C.

18. The adhesive as described in claim 17, wherein the wax more preferably comprises from about 25%–about 35 % by weight of the composition.

19. The adhesive as described in claim 18, wherein the wax most preferably comprises from about 30%–about 35 % by weight of the composition.

20. The adhesive as described in claim 17, wherein the copolymer preferably comprises from about 30 to about 35 % by weight of the composition.

21. A composition for application to an article intended to be bonded to another article, the composition consisting essentially of a polymer, tackifier and a wax derived from a hydrogenated vegetable oil (a vegetable-derived wax),

the polymer comprising from about 30% to about 35% by weight of the composition, the polymer being a thermoplastic copolymer consisting essentially of an ethylene containing copolymer, the copolymer being selected from the group consisting of an ethylene copolymer, an ethylene vinyl acetate copolymer, and copolymers and terpolymers thereof, the copolymer having a vinyl acetate content of from about 18%, the polymer having a melt viscosity of about 105,000 cp at 302 degrees F.;

the tackifier comprising from about 30% to about 35% by weight of the composition, the tackifier being characterized by having an acid number of from about 3 to about 10; and the wax comprising from about 30% to about 35% by weight of the composition, the wax comprising a triglyceride having a melting point between 136–160 degrees F., the triglyceride being characterized by having an iodine value of between 2 and 5, the composition being characterized by a viscosity of between 10 to 200 cps at 140 degrees F., wherein the triglyceride comprises a fatty acid, the fatty acid being stearic acid.

22. The composition as described in claim 21, wherein the vegetable derived wax is derived from soybean.

23. The composition as described in claim 21, wherein the vegetable derived wax is derived from palm.

24. A composition for application to an article intended to be bonded to another article, the composition consisting essentially of a polymer resin, tackifier and a wax derived from a hydrogenated vegetable oil (a vegetable-derived wax,

a. the polymer resin comprising from about 30% to about 35% by weight of the composition, the polymer being a thermoplastic copolymer consisting essentially of an ethylene containing copolymer, the copolymer selected from the group consisting of an ethylene copolymer an

US 6,890,982 B2

19

ethylene vinyl acetate copolymer; and copolymers and terpolymers thereof, the ethylene vinyl acetate copolymer having a vinyl acetate content of 28%, the polymer having a melt viscosity of about 580,000 cp at 302 degrees F.;

b. the tackifier comprising from about 30% to about 35% by weight of the composition, the tackifier being characterized by having an acid number of from about 3 to about 10; and

c. the wax comprising from about 30% to about 35% by weight of the composition, the wax comprising a triglyceride having a melting point between 136–160

20

degrees F, the triglyceride being characterized by having an iodine value of between 2 and 5, the composition being characterized by a viscosity of between 10 to 200 cps at 140 degrees F., wherein the triglyceride comprises a fatty acid, the fatty acid being stearic acid.

25. The composition as described in claim 24, wherein the vegetable derived wax is derived from soybean.

26. The composition as described in claim 24, wherein the vegetable derived wax is derived from palm.

* * * * *

# Exhibit 8

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DOW CHEMICAL CANADA, INC. | § | |
| on its own behalf and as assignee of | § | |
| THE DOW CHEMICAL COMPANY | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | C.A. No. 05-23 (JJF) |
| | § | |
| HRD CORPORATION (d/b/a | § | |
| Marcus Oil & Chemical) | § | |
| Defendant, Counterclaim Plaintiff | § | |
| | § | |
| vs. | § | |
| | § | |
| DOW CHEMICAL CANADA, INC. | § | |
| on its own behalf and as assignee of | § | |
| THE DOW CHEMICAL COMPANY and | § | |
| THE DOW CHEMICAL COMPANY, | § | |
| Counterclaim Defendants. | § | |

## HRD CORPORATION'S ANSWERS AND OBJECTIONS TO DCCI'S AND TDCC'S FIRST SET OF REQUESTS FOR ADMISSION TO HRD CORPORATION

Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure, on the basis of information now known and without waiving any objections or admitting the relevance or materiality of the information sought, Defendant/Counterclaim-Plaintiff HRD Corporation (d/b/a Marcus Oil & Chemical) ("HRD") serves its responses to Plaintiffs' First Set of Requests for Admission to HRD Corporation, as attached.

<u>**GENERAL OBJECTIONS TO**</u>
<u>**FIRST SET OF REQUESTS FOR ADMISSION**</u>

HRD objects to Definition 5 because it attempts to elicit information protected by the attorney client and attorney work product privileges. HRD advises Dow that it will not waive these privileges in answering these Requests for Admissions.

HRD objects to Instruction 1 because it makes every Request for Admission containing the word "and" or "or" so confusing that they cannot be answered.

HRD objects to Instruction 4 because HRD is not required to divulge all unprivileged information in an answer to a Request for Admission.

HRD objects to Instruction 7 because it is not required to conduct a search of all of its records and employees just to answer a Request for Admission.

<u>**OBJECTIONS AND ANSWERS TO**</u>
<u>**FIRST SET OF REQUEST FOR ADMISSIONS**</u>

<u>**REQUEST FOR ADMISSION NO. 1:**</u>

Admit that Dow and HRD executed Schedules 1, 2 and 3 of the Supply Agreement in a document entitled "Sarnia PE Wax Supply Agreement – January 2003" with Aziz Hassan signing on behalf of HRD with a signature date of February 28, 2003 ("February 2003 Schedules"), a copy of which is attached as Exhibit B.

**ANSWER:**

**Admit.**

<u>**REQUEST FOR ADMISSION NO. 2:**</u>

Admit that Dow and HRD executed revised Schedules 1, 2 and 3 of the Supply Agreement in a document entitled "Sarnie PE Wax Supply Agreement – April 19, 2004" with Aziz Hassan signing on behalf of HRD with a signature date of April 28, 2004 ("April 2004 Schedules"), a copy of which is attached as Exhibit C.

**ANSWER:**

**Admit.**

2

**REQUEST FOR ADMISSION NO. 3:**

Admit that Dow and HRD executed an Amendment to the Supply Agreement with an effective date of March 28, 2003 ("March 2003 Agreement"), with Abbas Hassan signing on behalf of HRD, a copy of which is attached as Exhibit D.

**ANSWER:**

**Admit.**

**REQUEST FOR ADMISSION NO. 4:**

Admit that on June 11, 2004, Dow sent HRD Invoice No. 42510259 for an Annual Operating Payment ("AOP") installment in the amount of C$1,375,000.00, a copy of which is attached as Exhibit E.

**ANSWER:**

**Admit.**

**REQUEST FOR ADMISSION NO. 5:**

Admit that HRD paid Dow's Invoice No. 42510259 with Check No. 46599 dated July 2, 2004 which included the following description of the item to be paid: "ANNUAL OPERATING PAYMENT – JUNE 2004," a copy of which is attached as Exhibit F.

**ANSWER:**

**Admit.**

**REQUEST FOR ADMISSION NO. 6:**

Admit that Dow sent HRD Invoices No. 42510381 dated July 5, 2004; 42510455 dated July 29, 2004; 42510725 dated September 4, 2004; 42510955 dated October 4, 2004; 42511129 dated November 4, 2004; 42511333 dated December 6, 2004; and 42511500 dated January 4, 2005 each for a monthly AOP installment in the amount of C$1,375,000, and HRD has not paid any these invoices, copies of which are attached as Exhibit G.

**ANSWER:**

**Admit.**

3

**REQUEST FOR ADMISSION NO. 7:**

Admit that on or about May 14, 2004 Dow shipped HRD railcar UTLX645943 containing a composition having a viscosity of 75 cP plus or minus 15% using the Viscosity Test Method designated in Schedule 1 of the Supply Agreement, a density of 0.9050 g/cm$^3$ plus or minus 0.0025 using the Density Test Method designated in Schedule 1 of the Supply Agreement, and a color measurement less than 2 using the Gardner Color Method designated in Schedule 1 of the Supply Agreement.

**ANSWER:**

**Denied.**

**REQUEST FOR ADMISSION NO. 8:**

Admit that on or about May 14, 2004 Dow shipped HRD railcar UTLX645983 containing a composition having a viscosity of 75 cP plus or minus 15% using the Viscosity Test Method designated in Schedule 1 of the Supply Agreement, a density of 0.9050 g/cm$^3$ plus or minus 0.0025 using the Density Test Method designated in Schedule 1 of the Supply Agreement, and a color measurement less than 2 using the Gardner Color Method designated in Schedule 1 of the Supply Agreement.

**ANSWER:**

**Denied.**

**REQUEST FOR ADMISSION NO. 9:**

Admit that on or about May 14, 2004 Dow shipped HRD railcar UTLX645985 containing a composition having a viscosity of 75 cP plus or minus 15% using the Viscosity Test Method designated in Schedule 1 of the Supply Agreement, a density of 0.9050 g/cm$^3$ plus or minus 0.0025 using the Density Test Method designated in Schedule 1 of the Supply Agreement, and a color measurement less than 2 using the Gardner Color Method designated in Schedule 1 of the Supply Agreement.

**ANSWER:**

**Denied.**

4

**REQUEST FOR ADMISSION NO. 10:**

Admit that on or about May 14, 2004 Dow shipped HRD railcar UTLX644754 containing a composition having a viscosity of 75 cP plus or minus 15% using the Viscosity Test Method designated in Schedule 1 of the Supply Agreement, a density of 0.9050 g/cm$^3$ plus or minus 0.0025 using the Density Test Method designated in Schedule 1 of the Supply Agreement, and a color measurement less than 2 using the Gardner Color Method designated in Schedule 1 of the Supply Agreement.

**ANSWER:**

Denied.

**REQUEST FOR ADMISSION NO. 11:**

Admit that on or about June 4, 2004 Dow shipped HRD railcar UTLX644274 containing a composition having a viscosity of 75 cP plus or minus 15% using the Viscosity Test Method designated in Schedule 1 of the Supply Agreement, a density of 0.9050 g/cm$^3$ plus or minus 0.0025 using the Density Test Method designated in Schedule 1 of the Supply Agreement, and a color measurement less than 2 using the Gardner Color Method designated in Schedule 1 of the Supply Agreement.

**ANSWER:**

Denied.

**REQUEST FOR ADMISSION NO. 12:**

Admit that on or about June 16, 2004 Dow shipped HRD railcar UTLX644322 containing a composition having a viscosity of 30 cP plus or minus 35% using the Viscosity Test Method designated in Schedule 1 of the Supply Agreement, a density of 0.896 g/cm$^3$ plus or minus 0.0025 using the Density Test Method designated in Schedule 1 of the Supply Agreement, and a color measurement less than 2 using the Gardner Color Method designated in Schedule 1 of the Supply Agreement.

**ANSWER:**

Denied.

**REQUEST FOR ADMISSION NO. 13:**

Admit that Dow sent HRD Invoice No. 12561593 dated May 17, 2004 for the Variable Cost Payment ("VCP") for railcars UTLX645966, UTLX644947,

UTLX644346, UTLX645943, UTLX645983, UTLX645985 and UTLX644754 in the amount of USD $461,215.86, and HRD paid this invoice with Check No. 46281 dated June 1, 2004 and signed by Aziz Hassan, copies of which are attached as Exhibit H.

**ANSWER:**

**Admit.**

**REQUEST FOR ADMISSION NO. 14:**

Admit that Dow sent HRD Invoice No. 12589992 dated June 7, 2004 for the VCP for railcars UTLX644274 in the amount of USD $47,801.60, and HRD paid this invoice with Check No. 46342 dated June 8, 2004 and signed by Aziz Hassan, copies of which are attached as Exhibit I.

**ANSWER:**

**Admit.**

**REQUEST FOR ADMISSION NO. 15:**

Admit that Dow sent HRD Invoice No. 12609743 dated June 21, 2004 for the VCP for railcars UTLX645986, UTLX644342, UTLX642842, UTLX644338, UTLX644322 and UTLX641176 in the amount of USD $409,096.47, and HRD paid this invoice with Check No. 46634 dated July 13, 2004 and signed by Aziz Hassan, copies of which are attached as Exhibit J.

**ANSWER:**

**Admit.**

**REQUEST FOR ADMISSION NO. 16:**

Admit that neither HRD nor any of HRD's potential or actual customers detected unacceptable levels of light ends or "smoking" in any samples of the 2-pack product.

**ANSWER:**

**Denied.**

6

**REQUEST FOR ADMISSION NO. 17:**

Admit that HRD never did any testing to detect the presence of an unacceptable level of light ends nor did any customers report the presence of light ends or smoking problems in ay of the products contained in the following railcars shipments: UTLX645943, UTLX645983, UTLX645985, UTLX644274, UTLX644754 and UTLX644322.

**ANSWER:**

Denied.

**REQUEST FOR ADMISSION NO. 18:**

Admit that as of April 2004 HRD instructed Dow not to produce any ethylene octene product (Grade 1) under the Supply Agreement during production at Sarnia.

**ANSWER:**

Denied.

**REQUEST FOR ADMISSION NO. 19:**

Admit that HRD agreed that the first prime product produced under the Supply Agreement at Sarnia would be Grade 2 according to the April 2004 Schedules. (See Exhibit C).

**ANSWER:**

Admit.

**REQUEST FOR ADMISSION NO. 20:**

Admit that HRD's concept of a 2-pack product was presented to members of the adhesives industry at the September 2003 Adhesives and Sealants Counsel meeting in Chicago.

**ANSWER:**

Admit.

7

**REQUEST FOR ADMISSION NO. 21:**

Admit that HRD's two-pack United States application Serial No. 10/666,488 ("488 application"), identified and described in HRD Corporation's Supplemental Responses to Plaintiff/Counterclaim-Defendants' First Set of Interrogatories, was published on November 25, 2004.

**ANSWER:**

**Admit.**

**REQUEST FOR ADMISSION NO. 22:**

Admit that the written description in the "488 application would allow a person of ordinary skill in the art of formulate a hot melt adhesive incorporating a 2-pack polymer formulated with a dual catalyst system.

**ANSWER:**

**Can neither admit or deny.  This is to be determined by the U. S. Patent office.**

**REQUEST FOR ADMISSION NO. 23:**

Admit that when Abbas Hassan, on behalf of HRD, made the representation to Dow under the Evaluation Agreement that "HRD has filed one or more United States patent applications disclosing and claiming the [MTO conversion] Technology" the only United States patent application that had been filed on the MTO conversion technology was Serial No. 10/833,735 ("'735 application").

**ANSWER:**

**HRD objects to Request 23 because it seeks information related to an Evaluation Agreement between Dow and HRD that is unrelated to this litigation. This is an attempt to circumvent the court's earlier ruling on this issue.**

**REQUEST FOR ADMISSION NO. 24:**

Admit that the subject matter disclosed and claimed in the '735 application is not entirely of United States origin.

8

**ANSWER:**

HRD objects to Request 23 because it seeks information related to an Evaluation Agreement between Dow and HRD that is unrelated to this litigation. This is an attempt to circumvent the court's earlier ruling on this issue. Subject to that objection this request of Denied.

**REQUEST FOR ADMISSION NO. 25:**

Admit that when Abbas Hassan, on behalf of HRD, made the representation to Dow under the Evaluation Agreement that "HRD does not have, nor will it have, any obligation to Iran, the Iranian government, or any other Iranian entity with respect to the [MTO conversion] Technology," National Petrochemical Company, Petrochemical Research & Technology Company Iran ("NPC") was the sole owner of the subject matter in Canadian Patent Application 2427722 ("Canadian Application"), which was invented by HRD employee Dr. Ebrahim Bagherzadeh.

**ANSWER:**

HRD objects to Request 25 because it seeks information related to an Evaluation Agreement between Dow and HRD that is unrelated to this litigation. This is an attempt to circumvent the court's earlier ruling on this issue. Subject to that objection this request is Denied.

**REQUEST FOR ADMISSION NO. 26:**

Admit that the only difference between Claim 1 of the Canadian Application and Claim 1 of the '735 application is that Claim 1 of the Canadian Application discloses 'forming a slurry in water of' and Claim 1 of the '735 application discloses "forming an aqueous slurry comprising."

**ANSWER:**

HRD objects to Request 26 because it seeks information related to an Evaluation Agreement between Dow and HRD that is unrelated to this litigation. This is an attempt to circumvent the court's earlier ruling on this issue. Subject to that objection this request is Denied.

9

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

William C. Ferebee
Michael Landrum
O'DONNELL FEREBEE MEDLEY &
KEISER, PC
450 Gears, Eighth Floor
Houston, TX 77067-4512
(281) 875-8200 (telephone)
(281) 875-4962 (facsimile)


Dated: December 17, 2007

By: */s/ W. Harding Drane, Jr.*
    W. Harding Drane, Jr. (#1023)
    Richard L. Horwitz (#2246)
    Suzanne M. Hill (#4414)
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    Wilmington, DE 19899-0951
    (302) 984-6000
    wdrane@potteranderson.com
    rhorwitz@potteranderson.com
    shill@potteranderson.com

*Attorneys for HRD Corporation (d/b/a Marcus Oil & Chemical)*

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned counsel hereby certifies that on December 17, 2007, a copy of the foregoing   **HRD CORPORATION'S ANSWERS AND OBJECTIONS TO DCCI's and TDCC's FIRST SET OF REQUESTS FOR ADMISSION** was served upon the following in the manner indicated:

**BY HAND**

Kenneth Nachbar
Thomas W. Briggs
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
PO Box 1347
Wilmington, DE 19899-1347

I also certify that a copy was delivered via Electronic Mail to the following persons:

Harry J. Roper
Raymond N. Nimrod
Aaron A. Barlow
Jenner & Block LLP
One IBM Plaza
Chicago, IL 60611

**POTTER ANDERSON & CORROON LLP**

By   */s/ W. Harding Drane, Jr.*
      Richard L. Horwitz (#2246)
      W. Harding Drane, Jr. (#1023)
      Suzanne M. Hill (#4414)
      1313 North Market Street
      Hercules Plaza, 6th Floor
      P.O. Box 951
      Wilmington, DE 19889-0951
      (302) 984-6000 (Tel)
      (302) 658-1192 (Fax)
      rhorwitz@potteranderson.com
      wdrane@potteranderson.com
      shill@potteranderson.com
      *Attorneys for Defendants HRD Corporation*

# Exhibit 9

# This Exhibit Was Redacted In Its Entirety

# Exhibit 10 – Part 1

# This Exhibit Was Redacted In Its Entirety

# Exhibit 10 – Part 2

# This Exhibit Was Redacted In Its Entirety

# Exhibit 10 – Part 3

This Exhibit Was
Redacted In Its Entirety

# Exhibit 11

# This Exhibit Was Redacted In Its Entirety

# Exhibit 12

**Westlaw.**

Slip Copy                                                                                    Page 1
Slip Copy, 2007 WL 4247767 (M.D.Fla.)
(Cite as: 2007 WL 4247767 (M.D.Fla.))

Only the Westlaw citation is currently available.

United States District Court, M.D. Florida,
Tampa Division.
Alma June MOROCK, Plaintiff,
v.
CHAUTAUQUA AIRLINES, INC., Defendant.
No. 8:07-cv-210-T-17-MAP.

Dec. 3, 2007.

Michael J. Trentalange, Melissa M. Polo, Trentalange
& Kelley, P.A., Tampa, FL, for Plaintiff.

John G. McAuley, Kerry A. Bute, Adler Murphy &
McQuillen, Chicago, IL, John M. Murray, Kenneth
Charles Whalen, Murray, Marin & Herman, PA,
Tampa, FL, for Defendant.

**ORDER**

MARK A. PIZZO, United States Magistrate Judge.

*1 This cause is before the Court on the Plaintiff's
two motions to compel (doc. 51 and doc. 55). For the
reasons that follow, these motions are granted in part
and denied in part.

The Plaintiff propounded Requests to Produce on
August 24, 2007, and Interrogatories on August 28,
2007. The Defendant failed to submit timely
responses. With the October 31, 2007, discovery
deadline looming, on October 22, the Plaintiff sent a
facsimile and a letter to the Defendant, requesting
responses to the outstanding discovery. The facsimile
requested a response by 5 p.m. on October 22, and
the letter requested a response by October 24 at noon.
The Plaintiff's counsel also stated that she conferred
in person with the Defendant's counsel, but was
unable to get responses. On October 24, the Plaintiff
filed a motion to compel responses to the outstanding
discovery (doc. 51). On October 31, the Defendant
served its responses to the discovery. On November
6, the Plaintiff filed a second motion to compel,
alleging that the Defendant's responses to the
discovery were inadequate.

The Defendant has offered no explanation for its
failure to timely respond to the discovery, other than

stating that its failure was "inadvertent[ ]." See
Defendant's Response to Plaintiff's Motion to
Compel, doc. 56, at 1. Because of the Defendant's
failure to make timely objections to the discovery, the
Defendant's objections are waived. See Middle
District Discovery (2001) at § III.A.6 ("Absent
compelling circumstances, failure to assert an
objection to a request for production within the time
allowed for responding constitutes a waiver and will
preclude a party from asserting the objection in
response to a motion to compel.") and § IV.A.4
(stating the same rule for objections to
interrogatories); see also Third Party Verification,
Inc. v. SignatureLink, Inc., 2007 WL 1288361 at *2
(M.D.Fla.2007) ("A party failing to serve an
objection to a discovery request within the time
required by Fed.R.Civ.P. 33 or 34, in the absence of
good cause or of an extension of time to do so,
waives the right to later raise objections.").

As to Interrogatory 3, the Plaintiff's motion is
granted. Interrogatory 3 asks the Defendant to
"[d]escribe in detail how the incident described in the
complaint happened, including all actions taken by
you to prevent the incident." The Defendant
responded, "See pilot and flight attendant Incident
Reports previously produced. See also, the transcript
of Captain Hilliard's deposition." This response is
inadequate. "Because a party is entitled to discovery
both by deposition and interrogatory, it is ordinarily
insufficient to answer an interrogatory by reference to
an extrinsic matter, such as 'see deposition of James
Smith' or 'see insurance claim.' " See Middle District
Discovery (2001) at IV .A.9. If the Defendant intends
to adopt a portion of Captain Hilliard's deposition as
its official corporate response, it should state the
particular pages of the deposition testimony that it
intends to adopt. See id. (stating that an appropriate
response might use language such as "Acme Roofing
Company adopts as its answer to this interrogatory
the deposition testimony of James Smith, its
Secretary, on pages 127-145 of his deposition
transcript").

*2 The Defendant's reference to the pilot and flight
attendant Incident Reports is likewise inadequate. A
party may respond to an interrogatory by identifying
specific business records from which the answer may
be derived only when "the burden of deriving or
ascertaining the answer is substantially the same for

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2007 WL 4247767 (M.D.Fla.)
(Cite as: 2007 WL 4247767 (M.D.Fla.))

the party serving the interrogatory as for the party served." See Fed.R.Civ.P. 33(d). Reliance on Rule 33(d) is appropriate when the interrogatory requests objective facts that are obvious from the specified documents, but is generally inappropriate when the interrogatory asks a party to state its contentions or to state facts supporting its allegations. See *United Oil Co., Inc. v. Parts Assocs., Inc.*, 227 F.R.D. 404, 419 (D.Md.2005) (stating that Rule 33(d) is "well-suited to reply to inquiries of an intensely objective nature," but was inappropriate where "the interrogatories pose questions of fact or mixed questions of law and fact which require the exercise of particular knowledge and judgment on the part of the responding party"); *U.S. S.E.C. v. Elfindepan, S.A.*, 206 F.R.D. 574, 576-77 (M.D.N.C.2002) ("[D]ocuments themselves rarely, if ever, reveal contentions of fact or law.... Rule 33(d) was intended to be used in the situation where an interrogatory makes broad inquiries and numerous documents must be consulted to ascertain facts, such as identities, quantities, data, action, tests, results, etc." Contention interrogatories or interrogatories requesting statements of fact "do not lend themselves to answer by use of Rule 33(d)."); *In re Savitt/Adler Litigation*, 176 F.R.D. 44, 49 (N.D.N.Y.1997) (where interrogatories asked a party to "state the facts" supporting various allegations, resorting to Rule 33(d) was inappropriate). This is not a situation where the burden on both parties is substantially the same--rather, by relying on documents rather than stating its position in a narrative, the Defendant is essentially asking the Plaintiff to read its mind and guess at the Defendant's official corporate position regarding how the incident occurred and what actions the Defendant took to prevent it. See *Elfindepan*, 206 F.R.D. at 577 n. 5 ("Only plaintiff can identify its own contentions and the burden on defendants to try and divine plaintiff's contentions from documents obviously imposes a greatly unequal burden on defendants."). Accordingly, the Defendant is directed to answer in narrative form.

As to Interrogatory 4, the Plaintiff's motion is granted. Interrogatory 4 asks the Defendant to "[d]escribe in detail each act or omission on the part of any party to this lawsuit that you contend constituted negligence that was a contributing legal cause of the incident in question." The Defendant responded, "See Defendants (sic) Answer and Affirmative Defenses to plaintiff's Complaint. See also, the pilot and flight attendant Incident Reports previously produced. See also answer to number 6,

below." This response is inadequate for the reasons stated with respect to Interrogatory 3. The reference to the Defendant's Answer is likewise deficient. See *Hawn v. Shoreline Towers Phase I Condominium Ass'n, Inc.*, 2007 WL 2298009 (N.D.Fla.2007) ("[I]t is insufficient to answer an interrogatory by merely referencing allegations of a pleading.").

*3 As to Interrogatory 5, the Plaintiff's motion is granted. Interrogatory 5 asks the Defendant to "[s]tate the facts upon which you rely for each affirmative defense in your answer." The Defendant responded, "Affirmative Defenses are legal issues raised by Defendant, with the assistance of counsel, in order to bring those issues before the Court. See pilot and flight attendant Incident Reports. See also the deposition testimony of the plaintiff and Mary Groves, admitting that they did not request the assistance of a mechanical lift ... and did not request the assistance of an attendant for descending the aircraft stairs." This response is inadequate for the reasons stated with respect to Interrogatory 3. Moreover, the Defendant's answer lists fifteen affirmative defenses, and the Defendant's answer is non-responsive as to some of the affirmative defenses. For instance, the Defendant's Fourth Affirmative Defense asserts the fault of "other parties or entities over whom Defendant has no control," but the Defendant does not identify in response to Interrogatory 5 who these other parties are or what they did. If the Defendant is abandoning some of these fifteen affirmative defenses, its response should make that clear.

As to Interrogatory 7, the Plaintiff's motion is granted insofar as the Defendant is directed to provide the address of Daniel E. Murphy, M.D.; however, the Plaintiff's request is otherwise denied. Although the Plaintiff states that Defendant's response to Interrogatory 7 was "unacceptable" because the Defendant referred to its "incomplete" Rule 26 disclosures, the Plaintiff does not explain in what way the Rule 26 disclosures were "incomplete." Additionally, although the Plaintiff contends that the Defendant's response was inadequate because it listed "EMS personnel and Tampa Airport Police officers who arrived" as persons who may have knowledge of the issues in the case, without listing the names and addresses of specific personnel, the Defendant states that it has no knowledge of any specific names of personnel who responded other than those provided by Plaintiff or those which may be contained on official public records.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2007 WL 4247767 (M.D.Fla.)
(Cite as: 2007 WL 4247767 (M.D.Fla.))

As to Interrogatory 11, the Plaintiff's motion is granted. The Defendant asserts that this interrogatory is overbroad and burdensome, and that may well be true, but the Defendant waived this objection by failing to timely file its responses and objections.

As to Interrogatories 12, 13, and 14, the Plaintiff's motion is denied because the Defendant's responses are adequate.

As to Request 2, in light of the considerable costs of making the aircraft available for inspection in Tampa, the Defendant is directed to advise the Plaintiff of the aircraft's availability for inspection at the closest commercially available airport while that aircraft is in routine transit. If a like model of the aircraft would be identical in all material respects, the Defendant may make available that like model.

*4 As to Requests 6, 8, and 9, the Plaintiff's motion is granted. Although the Defendant asserts in its response to the motion to compel that these requests seek documents that are privileged and confidential, it did not make these objections in its responses to the discovery, and they are therefore waived. *See Sonnino v. Univ. Kansas Hosp. Auth.*, 220 F.R.D. 633, 647 (D.Kan.2004) ("It is well settled that a party may not assert a privilege for the first time in its response to a motion to compel; a privilege not timely asserted in the initial response to a request for production is deemed waived.").

As to Requests 4 and 12, the Plaintiff's motion is denied as moot because the Defendant states that it has provided the requested documents.

Plaintiff's October 24, 2007, motion to compel is denied as moot to the extent that it seeks to compel responses to the discovery, since the responses have now been provided. However, to the extent that this motion seeks an award of fees and costs incurred in filing the motion to compel, that request is granted. Rule 37(a)(4)(A) of the Federal Rules of Civil Procedure provides that if a motion to compel discovery is granted or if the discovery is provided after the motion to compel is filed, the Court shall require the party whose conduct necessitated the motion to pay to the moving party the reasonable expenses incurred in making the motion, including attorney's fees. However, these sanctions are inappropriate if the party's failure to respond was

substantially justified or if the moving party failed to make a good faith effort to obtain disclosure without court intervention. *See* Fed.R.Civ.P. 37(a)(4). The Defendant contends that the Plaintiff did not make a good faith effort to obtain responses without Court intervention, because when the Plaintiff sent the October 22, 2007, letter demanding responses, defense counsel John McAuley was out of his office for depositions scheduled in Tampa on October 22, 23, and 24, 2007. Even if Mr. McAuley was not in his office, the Plaintiff's letter also was addressed and faxed to Mr. John M. Murray, and the Defendant has not explained why Mr. Murray was unable to respond to the Plaintiff and, at a minimum, arrange for an extension. The Plaintiff's request for sanctions in the November 6, 2007, motion is likewise granted.

Accordingly, it is ORDERED:

1. Plaintiff's October 24, 2007, motion to compel (doc. 51) is DENIED as moot to the extent that it requests responses to the discovery, but is GRANTED to the extent that it requests an award of sanctions.

2. Plaintiff's November 6, 2007, motion to compel (doc. 55) is GRANTED in part and DENIED in part as discussed above.

3. The Defendant is directed to provide supplemental responses to the discovery addressing the inadequacies discussed above on or before December 12, 2007.

4. The Defendant shall pay the Plaintiff's reasonable fees and costs of counsel incurred as a result of Plaintiff's preparing and presenting its motions to compel (doc. 51 and doc. 55).

*5 DONE and ORDERED.

Slip Copy, 2007 WL 4247767 (M.D.Fla.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

# Exhibit 13

This Exhibit Was
Redacted In Its Entirety

# Exhibit 14

Westlaw.                                                          NewsRoom

9/15/99 BEVWLD 117                                                Page 1


9/15/99 Beverage World 117
1999 WLNR 5480253

                          Beverage World
                 COPYRIGHT 1999 Bill Communications, Inc.

                          **September 15, 1999**

                        Volume 118; Issue 1680


           HIGH-PERFORMANCE ADHESIVES.(Statistical Data Included)

 H.B. Fuller Company of St. Paul, MN has released a new brochure featuring its
expanding line of high-performance **Advantra** packaging hot melt adhesives. The
brochure highlights special features and key performance characteristics of the
adhesives in this product family. The clean machining **Advantra** packaging adhes-
ives typically improve mileage by 15 to 30 percent over conventional hot melt
products. Further, they deliver stronger, more reliable bonds in addition to lower
costs for equipment maintenance and downtime.

                    ---- INDEX REFERENCES ----

COMPANY: FULLER (H B) CO

INDUSTRY:  (Adhesives, Abrasives & Coatings (1AD31))

Language:  EN

OTHER INDEXING:  (STATISTICAL DATA INCLUDED)  (H.B. Fuller)  (Trade; COMPANY;
Statistical Data Included)  (Any type of business (BUSN); Food, Beverages and Nu-
trition (FOOD); New Products/Services (57))  (Marketing procedures (240))  (United
States (1USA))

COMPANY TERMS: HB **FULLER** CO

PRODUCT: Adhesives NEC; Adhesive Manufacturing2891490

NAICS CODE: 32552

Word Count: 104
9/15/99 BEVWLD 117
END OF DOCUMENT

                © 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw                                         NewsRoom

10/19/98 CMKRABS 16                                      Page 1

10/19/98 Chem. Mkt. Rep. (Abstracts) 16
1998 WLNR 5287978

Chemical Market Reporter
Copyright © 2003 The Gale Group. All rights reserved.Copyright 1998 Schnell Pub-
lishing

October 19, 1998

Volume 254; Issue 16

**Fuller  Acquires Coating Technologies From NiTech**

HB   **Fuller**  Co purchases NiBlock and NiDel coating technologies from NiTech Corp;
will commercialize the technologies outside the areas of adhesives, sealants and
coatings

By Dan Scheraga

H.B. **Fuller** Company is building upon its already formidable adhesives presence
with the purchase of NiBlock and NiDel coating technologies from Hickory,
N.C.-based NiTech Corporation. The technologies will be used to manufacture free-
flowing pressure sensitive adhesives (PSAs) in a pelletized form.

Under the deal, **Fuller** has licensed NiTech to commercialize the two technologies
outside the adhesives, sealants and coatings areas. Additionally, **Fuller** will de-
velop NiDel so it can coat both conventional and pressure sensitive hot melt pel-
lets with a range of additives or processing aids.

"This important acquisition reflects our commitment to maintaining our leadership
in hot melt technology," says John Ray, senior vice-president and general manager
of **Fuller's** North American adhesives, sealants and coatings group. "We remain very
focused on building our core strengths in key areas. These new technologies take
us a step forward in offering customers more choices in this versatile adhesive
form."

**Fuller** says that products made through the NiBlock process present a strong re-
placement for solvent-based PSAs which require high heat resistance. Pelletized
PSAs create high-quality bond lines because their minimized exposure to high tem-
peratures cuts back on heat degradation, according to the company.

The pellets also improve operational efficiency, **Fuller** says, as they do not re-
quire dram unloaders, unlike their conventional counterparts. **Fuller** adds that it
is also developing NiBlock technology for other PSA applications.

PSA consumption in the US is estimated at 850 million pounds in 1995, worth $900
million, by the Manchester Center, Vt.-based consultancy Impact Marketing Consult-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

ants Inc. The vast majority of PSAs are incorporated into pressure sensitive tapes and labels, which account for more than $9 billion in sales per year and have an annual growth rate in the 10 to 12 percent range, the firm says.

Sealing and packaging applications are the largest end use for pressure sensitive tapes and labels, accounting for nearly 40 percent of consumption.

Other major applications include medical products (21 percent) and office and graphic arts (17 percent). The remainder goes into masking, splicing, construction, automotive, electronic, and corrosion protection applications, according to Impact Marketing.

**Fuller** also ramped up its adhesives presence with its introduction of **Advantra** hot melt packaging adhesives. The products keep a stable viscosity, with clean dispensability and consistent bead size, avoiding the tailing, oozing, thickening and gelling that afflict some other packaging hot melts, the company says.

Additionally, **Fuller** has undertaken several purchases this year to expand in the adhesives arena. Datac Adhesives Ltd., Datac Klebstoffe GmbH and Industrial Adhesives Ltd.'s Chesham, UK-based subsidiary comprise **Fuller's** adhesives acquisitions this year. The three acquisitions have combined annual sales of $67 million.

                    ---- INDEX REFERENCES ----

COMPANY: ADVANTRA

INDUSTRY:  (Fillers & Sealants (1FI96); Chemicals (1CH04); Polymers (1PO43); Commodity Chemicals (1CO31))

Language:  EN

OTHER INDEXING:  (**ADVANTRA**; DATAC ADHESIVES LTD; DATAC KLEBSTOFFE GMBH; **FULLER** ACQUIRES COATING TECHNOLOGIES; IMPACT MARKETING; IMPACT MARKETING CONSULTANTS INC; INDUSTRIAL ADHESIVES LTD; MANCHESTER CENTER; NITECH; NITECH CORP; NITECH HB **FULLER** CO; PSA; PSAS)  (Dan Scheraga; Fuller; H.B. Fuller; John Ray; NiBlock; NiDel; Sealing)  (All company; All market information; Consumption; Mergers & acquisitions; Sales)  (North America (NOAX); United States (USA))

COMPANY TERMS: **FULLER** (HB) CO; NITECH INC (HICKORY NC)

PRODUCT: Gummed paper and tape; Adhesives and sealants267229; 289100

Word Count: 595
10/19/98 CMKRABS 16
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

# Exhibit 15

# JENNER & BLOCK

October 25, 2007

Jenner & Block LLP          Chicago
330 N. Wabash Avenue        Dallas
Chicago, IL 60611           New York
Tel 312-222-9350            Washington, DC
www.jenner.com

**VIA FACSIMILE**

William Ferebee
O'Donnell, Ferebee, Medley & Keiser, P.C.
450 Gears, Eighth Floor
Houston, Texas 77067-4512

Aaron A. Barlow
Tel  312 923-8308
Fax  312 923-8408
abarlow@jenner.com

Re:    **Dow Chemical Canada v. HRD Corp.,**
       **Case No. 05-023 (JJF)**

Dr. Bill,

I am writing regarding several outstanding discovery matters. Specifically, Dow is concerned with: (1) HRD's failure to specifically identify the trade secrets that HRD claims were allegedly misappropriated, (2) HRD's failure to provide any information to support its ███████ claim for damages, and (3) HRD's failure to provide the documents you agreed to produce at our last meet and confer. (See my letter on September 28, 2007). We would like to discuss these concerns in a meet and confer before filing a motion to compel.

First, with regard to HRD's trade secret misappropriation counterclaim, we request that HRD further supplement its responses to Interrogatory Nos. 3 and 4. To date, HRD has failed to specifically identify the trade secrets allegedly at issue in this case. Nor has it explained how Dow misappropriated these trade secrets. Without this information Dow is unable to adequately prepare its defense to this counterclaim.

For example, Interrogatory No. 3 asks HRD to identify each trade secret that Dow allegedly misappropriated, and with respect to each trade secret, identify the date the trade secret was communicated, the person making the communication and the recipient of the communication. In response to this interrogatory, HRD asserts that it "introduced Dow to its customers and prospective customers, revealed marketing ideas and market information, and HRD's pricing, margin and other confidential business information." HRD also asserts that it revealed the "concept for the 'two-pack' product," results of prior research, and the special needs of certain customers. This answer is inadequate and fails to identify the trade secrets that Dow allegedly misappropriated.

To adequately support this claim and to give Dow sufficient information to prepare its defenses, HRD must: (1) identify the specific names of HRD's customers and prospective customers; (2) identify the dates Dow was introduced to these customers; (3) identify the persons who introduced Dow to these customers; (4) identify the alleged "special needs" relating to each customer that HRD revealed to Dow; (5) identify the specific "marketing ideas and market information" that were revealed to Dow and the products they relate to; (6) identify with specificity the confidential "pricing [and] margin" information HRD disclosed to Dow and the

William Ferebee
October 25, 2007
Page 2

products it relates to; (7) provide a detailed explanation of the "concept for the two-pack
product" that you allege was a trade secret of HRD; (8) identify the person(s) at Dow to whom
that the "two-pack" concept was disclosed and the date(s) of such disclosure(s); (9) identify with
specificity the "prior research that HRD had funded" which was shared with Dow; and (10)
identify what "other confidential business information" HRD refers to. Without this information,
Dow is deprived of the opportunity to adequately prepare its defense to this counterclaim,
particularly with respect to potential third party discovery Dow may need to pursue.

Interrogatory No. 4 asks HRD to identify the manner in which HRD alleges each trade
secret was misappropriated. HRD failed to provide any information in response to this
interrogatory. HRD must specifically identify which, if any, trade secrets were allegedly
misappropriated by Dow and the manner of misappropriation. If HRD alleges that Dow
misappropriated a particular trade secret by disclosing it to a third party, HRD must identify: (1)
each specific trade secret that was allegedly misappropriated, (2) the third party recipient of the
alleged communication, (3) the date that Dow allegedly communicated the trade secret to the
third party, and (4) each person at Dow responsible for making the alleged communication. If
HRD alleges that Dow has misappropriated a particular trade secret through some alleged
internal use at Dow, HRD must identify: (1) each specific trade secret that was allegedly
misappropriated in this manner, (2) the specific acts that allegedly comprise the misappropriation
of such trade secrets, and (3) the date (or initial date) that Dow allegedly made the
misappropriation.

For example, HRD alleged that its proposal for a "two-pack" product was a trade secret
that was disclosed to Dow, but HRD never revealed how or when it has been misappropriated by
Dow. We note that HRD has on a number of occasions publicly disclosed its proposal for a
"two-pack" product to the adhesives industry. In order for Dow to prepare its defense to this
counterclaim, please identify the dates and specific acts that HRD alleges constitute Dow's
misappropriation of this trade secret.

Second, we also request that you agree to immediately produce information relating to
HRD's damages claims. This case has been pending for over two years, and Dow has received
no discovery relating to your client's damages claims. We need this information in order to
determine what additional discovery is needed, including discovery from third parties, to prepare
defenses to HRD's counterclaims.

As you know, as part of its initial disclosures, any party claiming damages is required to
produce a computation of any category of damages claimed, and is under an ongoing obligation
to update these disclosures as its investigation continues. Despite these obligations, HRD's
initial disclosures did not include any computation of damages and stated that "HRD does not
and cannot know . . . all of the damages suffered." Further, in response to Dow's Document
Request No. 111, which sought any documents relating to HRD's damages, you stated that
documents relating to HRD's damages will be produced by HRD's damages expert. These
responses are wholly inadequate.

William Ferebee
October 25, 2007
Page 3

You have obviously performed some investigation into your client's damages, as you claimed in your May 10, 2006 letter to Lise Spacapan that your client has suffered ████████ in lost profits. You must have had some evidence to support your assertions regarding HRD's lost profits. Your client has failed to produce, however, any documents or evidence of any kind to support the figures included in that letter, which was sent more than six months before your response to Document Request No. 111 referenced above.

Your client has had over two years to investigate the damages it has purportedly suffered. In light of your ongoing duty to produce information relating to your client's damages, and the fact that you have already calculated a figure representing HRD's alleged lost profits, we request that you immediately produce the following:

- Separately identify each item of damages claimed for each of HRD's counterclaims of Breach of the Supply Agreement, Breach of the Joint Development Agreement, Misappropriation of Trade Secrets by Improper Means and Failure to Give Adequate Assurance of Future Performance.

- For each item of damages, disclose the amount of damages claimed, provide a computation or calculation for each such amount and disclose the method used to perform each such computation or calculation.

- For any claim of damages based on lost profits identify: (1) each potential customer from whom HRD's profits were lost; (2) which product grades were intended to generate the profits from each potential customer; (3) the percent of the hot melt adhesives market represented by each potential customer; (4) HRD's projected annual sales volume for each product to each potential customer for the next ten years; (5) the sales price and profit margin for each product that was intended to be sold to each potential customer; (6) each competitor and each competitive product for each product grade; and (7) any Dow commercial product that you allege is causing you damage or relates in any way to your damages claim (and describe how the Dow product has caused you damage or relates to your damages claim).

Additionally, please produce all of the data and other facts you used or relied upon in computing, calculating or estimating any of HRD's items of damages. These documents and facts should include evidence to support HRD's projected sales to each potential customer and should provide support for each figure included in your May 10, 2006 letter to Lise Spacapan.

Finally, you agreed to produce corporate minute documents, financial information and emails regarding polyethylene wax and two-packs and other documents requested in our document requests No.107-109. To date, we have not received this information. Please let us know when we can expect production of these documents. We also ask that you identify all of the firms that have provided professional services to HRD from 2000 to the present, such as accounting, consulting, insurance or other tax-related services. Please let us know if you are willing to provide this information.

William Ferebee
October 25, 2007
Page 4

        We request that the parties meet and confer to address these deficiencies in HRD's
discovery responses.   We are available to meet and confer on Monday or Tuesday of next week.


Very truly yours,


Aaron A. Barlow

# FAX TRANSMITTAL        JENNER & BLOCK

Jenner & Block LLP          Chicago
330 N. Wabash Avenue         Dallas
Chicago, IL 60611            New York
Tel 312 222-9350             Washington, DC
www.jenner.com

Date:           October 25, 2007

To:             William C. Ferebee           Fax:        (281) 875-4962
                O'Donnell Ferebee Medley & Keiser,   Voice:      (281) 875-8200
                P.C.

From:           Aaron A. Barlow              Fax:        312 923-8408
                abarlow@jenner.com           Voice:      312 923-8308

Employee Number:  027981                     Client Number:   37571-11117

**Important:** This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is attorney work product, privileged, confidential, and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone, and return the original message to us at the above address via postal service. Thank you.

**Message:**

Total number of pages including this cover sheet: 5        Time Sent: 4:24 p.m.

If you do not receive all pages, please call: 312 222-9350    Sent By: Pat Sotiropoulos

Secretary: Pat Sotiropoulos                                   Extension: 4791

```
************** -COMM. JOURNAL- **************** DATE OCT-25-2007 ***** TIME 16:30 *** P.01


    MODE = MEMORY TRANSMISSION              START=OCT-25 16:27      END=OCT-25 16:30

    FILE NO.= 068

STN     COMM.       ONE-TOUCH/   STATION NAME/EMAIL ADDRESS/TELEPHONE NO.   PAGES    DURATION
NO.                 ABBR. NO.

001     OK          ☎           912818754962---3757111117                 005/005   00:02:15


************************************** -        - **** -              - ********
```

# FAX TRANSMITTAL         J E N N E R & B L O C K

Jenner & Block LLP        Chicago
330 N. Wabash Avenue      Dallas
Chicago, IL 60611         New York
Tel 312 222-9350          Washington, DC
www.jenner.com

| | |
|---|---|
| Date: | October 25, 2007 |

| | | | |
|---|---|---|---|
| To: | William C. Ferebee | Fax: | (281) 875-4962 |
| | O'Donnell Ferebee Medley & Keiser, P.C. | Voice: | (281) 875-8200 |
| From: | Aaron A. Barlow | Fax: | 312 923-8408 |
| | abarlow@jenner.com | Voice: | 312 923-8308 |
| Employee Number: | 027981 | Client Number: | 37571-11117 |

Important: This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is attorney work product, privileged, confidential, and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone, and return the original message to us at the above address via postal service. Thank you.

**Message:**

---

| | |
|---|---|
| Total number of pages including this cover sheet: 5 | Time Sent: 4:24 p.m. |
| If you do not receive all pages, please call: 312 222-9350 | Sent By: Pat Sotiropoulos |
| Secretary: Pat Sotiropoulos | Extension: 4791 |

# Exhibit 16

11/08/2007 11:04 FAX                                                      ☒001/007

# O'Donnell, Ferebee, Medley & Keiser, P.C.

ATTORNEYS AND COUNSELORS AT LAW
450 GEARS - EIGHTH FLOOR
HOUSTON, TEXAS  77067-4584
www.ofmklaw.com

Telephone: (281) 875-8200                    Telecopier: (281) 875-4962

## TELEFAX TRANSMISSION SHEET

DATE:        November 8, 2007

TO:        MR. AARON BARLOW

FROM:        WILLIAM C. FEREBEE

FAX #: (312) 923-8408        PHONE #: (312) 923-8308

RE:  Dow v. HRD Corporation

OUR FILE #:    M313.00026

NUMBER OF PAGES, INCLUDING THIS PAGE:        __7__

### CONFIDENTIALITY NOTICE

The information contained in this facsimile message is legally privileged and confidential information intended only for the use of the individual or entity named above.  If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this telecopy is strictly prohibited.  If you have received this telecopy in error, please immediately notify us by telephone and return the original message to us at the address above, via the United States Postal Service.  We will gladly reimburse any expenses attendant to the return of the original message.

MESSAGE:

If you have problems receiving this transmission, please call (281) 875-8200



**O'F M&K**   O'DONNELL FEREBEE MEDLEY & KEISER, P.C.

William C. Ferebee          **ATTORNEYS AT LAW**          (281) 875-8200

November 8, 2007

Mr. Aaron Barlow                                    VIA FAX (312) 923-8408
Jenner & Block LLP
One IBM Plaza
Chicago, IL 60611-7603

   RE: Dow v. HRD Corporation; *Our File No. M313.00026.*

Dear Mr. Barlow:

  This letter is in response to your letter of October 25, 2007, and Ray Nimrod's letter of November 6, 2007. First, I did not receive your letter until the end of October because I was out of the country for a week. As you might imagine, since my return I have been swamped with court hearings, depositions and general catch-up work.

  With regard to your complaints on HRD's answers to Interrogatories 3 and 4, HRD will agree to supplement its previous answers. The supplemental answers should be in your hands within one week.

  With regard to your concern about damages, HRD will provide you with the information on how it calculated the ████████ However, that is not to say that HRD's expert will come to the same conclusion. HRD's expert needs information from Dow to either calculate or confirm HRD's damages. As a result, our expert will not prepare a report until the Court has ruled on our pending Motion to Compel and until the time for expert reports has arrived.

  As to the corporate minute book, it was destroyed in the fire. However, attached to this letter are the corporate documents that have been recovered from the Secretary of State.

  Ray Nimrod's letter of November 7, 2007, asks for additional information regarding Interrogatory 6. This appears to be the same information sought in your recent Interrogatory 15. We should have this information before the end of November.

2

Very Truly Yours,

O'DONNELL, FEREBEE, MEDLEY & KEISER, P.C.

*William C. Ferebee*

WILLIAM C. FEREBEE

WCF/cm

cc:    CLIENT, *via fax*

Enclosures

11/08/2007 11:05 FAX    ☑004/007



# The State of Texas

## SECRETARY OF STATE

IT IS HEREBY CERTIFIED, that
Articles of Incorporation
of

**H R D CORPORATION**
**CHARTER# 586596**

were filed in this office and a certificate of Incorporation was issued on

**NOVEMBER 24, 1981;**

IT IS FURTHER CERTIFIED, that no certificate of dissolution has been issued, and that the corporation is still in existence.



IN TESTIMONY WHEREOF, I have hereunto signed my name officially and caused to be impressed hereon the Seal of State at my office in the City of Austin, on July 12, 1996.

Antonio O. Garza, Jr.
Secretary of State                    RAM

## ARTICLES OF INCORPORATION

### OF

### H R D CORPORATION

FILED
In the Office of the
Secretary of State of Texas

NOV 24 1981

CLERK IF
Corporation Division

The undersigned natural person of the age of eighteen (18) years or more

acting as incorporator of a corporation under the Texas Business Corporation Act, hereby

adopts the following Articles of Incorporation for such corporation:

### ARTICLE ONE

The name of the corporation is H R D CORPORATION.

### ARTICLE TWO

The period of its duration is perpetual.

### ARTICLE THREE

The purposes for which the corporation is organized are:

To purchase, lease and sell trucks and tractor-trailers, to
engage in the shipping and freight hauling business, and to buy,
sell, lease and deal in services, personal property and real
property subject to Part Four of the Texas Miscellaneous
Corporation Laws Act, and for any lawful purpose under the
Texas Business Corporation Act.

### ARTICLE FOUR

The aggregate number of shares which the corporation shall have authority

to issue is 100,000 shares of the par value of $1.00 each.

### ARTICLE FIVE

The Corporation will not commence business until it has received for the

issuance of its shares consideration of the value of One Thousand and No/100 ($1,000.00)

Dollars, consisting of money, labor done or property actually received.

### ARTICLE SIX

The street address of its initial registered office is 2302 Fannin, Suite 500,

and the name of its registered agent at such address is Jon M. Wagner.

### ARTICLE SEVEN

The number of Directors constituting the initial Board of Directors is two

(2), and the names and addresses of the persons who are to serve as Directors until the

first annual meeting or until their successors are elected and qualified are:

☒ 006/007

| **NAME** | **ADDRESS** |
|----------|-------------|
| Aziz A. Hassan | 11800 F.M. 1960<br>Huffman, Texas 77336 |
| Abbas A. Hassan | 11800 F.M. 1960<br>Huffman, Texas 77336 |

### ARTICLE EIGHT

The name and address of the incorporator is:

| **NAME** | **ADDRESS** |
|----------|-------------|
| Abbas A. Hassan | 11800 F.M. 1960<br>Huffman, Texas 77336 |

IN WITNESS WHEREOF, the undersigned has executed these Articles of Incorporation on this the 23rd day of *NOVEMBER*, 19 *81* .

_____
Abbas A. Hassan

THE STATE OF TEXAS       §
                         §
COUNTY OF HARRIS         §

I, the undersigned authority, do hereby certify that on this the 23rd day of November, 1981, personally appeared before me Abbas A. Hassan, who being by me first duly sworn, declared that he is the person who signed the foregoing document as incorporator, and that the statements therein contained are true and correct.

_____
Notary Public in and for
The State of T E X A S

My Commission Expires:

4-17-85

-2-

FILED
In the Office of the
Secretary of State of Texas

## ASSUMED NAME CERTIFICATE
## FOR AN INCORPORATED BUSINESS OR PROFESSION

APR 2 9 2002

Corporations Section

1. The name of the incorporated business or profession as stated in its Articles of Incorporation or comparable document is H.R.D. CORPORATION.

2. The assumed name under which the business or professional service is to be conducted or rendered is MARCUS OIL & CHEMICAL.

3. The state, county, or other jurisdiction under the laws of which it was incorporated is Texas, and the address of its registered or similar office in that jurisdiction is 14549 Minetta, Houston, Texas 77035.

4. The period, not to exceed ten years, during which the assumed name will be used is ten (10) years.

5. The corporation is a business corporation.

6. If the corporation is required to maintain a registered office in Texas, the address of the registered office is 14549 Minetta, Houston, Texas 77035, and the name of its registered agent at such address is Aziz Hassan. The address of the principal office is 14549 Minetta, Houston, Texas 77035.

7. The county or counties where business or professional services are being or are to be conducted or rendered under such assumed name are (if applicable, use the designation "ALL"): ALL.

Michael L. Landrum,
Attorney in Fact for H.R.D. Corporation

BEFORE ME on this 24 day of April , 2002, personally appeared Michael L. Landrum and acknowledged to me that he executed the foregoing certificate for the purposes therein expressed.

MELINDA M. GOVER
MY COMMISSION EXPIRES
July 19, 2003

Notary Public, State of Texas

# Exhibit 17

**Lord, Matthew T**

| | |
|---|---|
| **From:** | Nimrod, Raymond N |
| **Sent:** | Wednesday, November 21, 2007 3:14 PM |
| **To:** | wferebee@ofmklaw.com |
| **Cc:** | Barlow, Aaron A |
| **Subject:** | Dow HRD |

Bill,

In your letter to Aaron Barlow dated November 8, 2007 you promised that HRD would supplement its previous answers to Dow's Interrogatories relating to HRD's trade secret allegations within one week, i.e. by November, 15, 2007. It has now been nearly two weeks and HRD has not supplemented its answers. You also stated that HRD would provide information on how it calculated its ███████ damages estimate. We have not received this information either.

Please provide the promised information immediately so that we can avoid the need to bring these matters to the Court's attention.

Regards,

Ray Nimrod

---

**Raymond N. Nimrod**
Jenner & Block LLP
330 N. Wabash Avenue
Chicago, IL 60611-7603
Tel (312) 923-8306
Fax (312) 923-8406
RNimrod@jenner.com
www.jenner.com

919 Third Avenue
New York, NY 10022-3823
Tel (212) 891-1653
Fax (312) 923-8406

---

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

1/7/2008

# Exhibit 18

JENNER&BLOCK

December 3, 2007

Jenner & Block LLP          Chicago
One IBM Plaza               Dallas
Chicago, IL 60611-7603      New York
Tel 312 222-9350            Washington, DC
www.jenner.com

VIA FACSIMILE & E-MAIL

Aaron A. Barlow
Tel  312 923-8308
Fax  312 923-8408
abarlow@jenner.com

William C. Ferebee
O'Donnell Ferebee Medley & Keiser, P.C.
450 Gears - 8th Floor
Houston, TX 77067-4512

Re:    Dow v. HRD Corporation

Dear Bill,

Dow has tried to be patient with HRD's continued failure to provide sufficient answers to Interrogatory Nos. 3 and 4.  For nearly two years, we have attempted to work with HRD to understand the basis for HRD's claim for trade secret misappropriation.  It appears that we have reached an impasse concerning the Interrogatory responses, and Dow feels that it needs to involve the Court.

HRD has now amended its answers to Interrogatory Nos. 3 and 4 twice, and has still failed to provide the information required to answer them.  First, HRD has failed to provide any information responsive to Interrogatory No. 4 part (a), which asks HRD to identify the manner in which Dow allegedly misappropriated HRD's trade secrets.  HRD's response simply refers to its answer to Interrogatory No. 3, which does not even attempt to state a single example of misappropriation.  In fact most of the alleged trade secrets identified in HRD's answer to Interrogatory No. 3 relate to properties and uses of waxes — since Dow does not sell waxes, it cannot have misappropriated the alleged trade secrets by sales of these products.

Second, most, if not all, of the thirty-nine items listed in HRD's amended response to Interrogatory No. 3 do not identify anything that could be considered a trade secret.  For example, in numbers 15-19 HRD claims that it disclosed to Dow the physical and/or chemical characteristics of various wax and adhesive products.  Properties of these products are public knowledge and can be determined by anyone with a sample of the product and a basic knowledge of chemistry.

Third, Interrogatory No. 3 asks to you identify each communication where HRD's alleged trade secrets were communicated to Dow.  In response, HRD stated that Dow can review the emails that HRD produced and its own records to determine when these communications took place.  Responding to an interrogatory by referring to a group of undifferentiated documents is impermissible; while Rule 33(d) permits reference to documents, the documents must be identified in "sufficient detail to permit the interrogating party to locate and identify" the responsive documents.  Moreover, we have reviewed all of the documents referred to, and the information does not exist.  In its review, Dow was unable identify a single document reflecting a communication or meeting in which HRD disclosed potential trade secrets to Dow.

William C. Ferebee
December 3, 2007
Page 2

We believe that we have satisfied our meet and confer requirements under Local Rule 7.1.1. However, if you believe that further discussions would be helpful, and you can and will provide the required information, let us know immediately so that we can promptly set up another meet and confer on this issue. Otherwise we will begin preparing our motion.

Very truly yours,

Aaron A. Barlow

# FAX TRANSMITTAL         JENNER & BLOCK

Jenner & Block LLP          Chicago
330 N. Wabash Avenue        Dallas
Chicago, IL 60611           New York
Tel 312 222-9350            Washington, DC
www.jenner.com

| | | | |
|---|---|---|---|
| Date: | December 3, 2007 | | |
| To: | William C. Ferebee | Fax: | (281) 875-4962 |
| | O'Donnell Ferebee Medley & Keiser, P.C. | Voice: | (281) 875-8200 |
| From: | Aaron A. Barlow | Fax: | 312 923-8408 |
| | abarlow@jenner.com | Voice: | 312 923-8308 |
| | | Client Number: | 37571-11117 |

**Important:** This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is attorney work product, privileged, confidential, and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone, and return the original message to us at the above address via postal service. Thank you.

Total number of pages including this cover sheet: 3          Time Sent:

If you do not receive all pages, please call: 312 222-9350          Sent By: Pat Sotiropoulos

Secretary: Pat Sotiropoulos          Extension: 4791

*********** -         - ***** -         - ***************************
-                                 -JENNER BLOCK LLP

00:01:00  003/003        91281875496237571111117              OK      001
                                       ABBR. NO.                     STN NO.
DURATION  PAGES  STATION NAME/EMAIL ADDRESS/TELEPHONE NO.  ONE-TOUCH/  COMM.

                              FILE NO. = 010

                                                        MODE = MEMORY TRANSMISSION

17:47 :END=DEC-03 17:45    START=DEC-03 17:47

P.01  *** 17:47 TIME ***** DEC-03-2007 DATE *-JOURNAL COMM.- ***************

# Exhibit 19

12/07/2007 16:21 FAX                                                    ☒001/004

# O'Donnell, Ferebee, Medley & Keiser, P.C.
ATTORNEYS AND COUNSELORS AT LAW
450 GEARS - EIGHTH FLOOR
HOUSTON, TEXAS 77067-4584
www.ofmklaw.com

Telephone: (281) 875-8200                  Telecopier: (281) 875-4962

## TELEFAX TRANSMISSION SHEET

### DATE:        December 7, 2007

**TO:**    MR. AARON BARLOW

**FROM:**    WILLIAM C. FEREBEE

**FAX #: (312) 923-8408    PHONE #: (312) 923-8308**

**RE:  Dow v. HRD Corporation**

**OUR FILE #:    M313.00026**

**NUMBER OF PAGES, INCLUDING THIS PAGE:        __3__**

**CONFIDENTIALITY NOTICE**
The information contained in this facsimile message is legally privileged and confidential information intended only for the use of the individual or entity named above.  If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this telecopy is strictly prohibited.  If you have received this telecopy in error, please immediately notify us by telephone and return the original message to us at the address above, via the United States Postal Service.  We will gladly reimburse any expenses attendant to the return of the original message.

MESSAGE:

If you have problems receiving this transmission, please call (281) 875-8200

12/07/2007 16:21 FAX                                                    ☒002/004

# O'Donnell, Ferebee, Medley & Keiser, P.C.
### ATTORNEYS AND COUNSELORS AT LAW .
### 450 GEARS - EIGHTH FLOOR
### HOUSTON, TEXAS  77067-4584
### www.ofmklaw.com

Telephone: (281) 875-8200                    Telecopier: (281) 875-4962

# TELEFAX TRANSMISSION SHEET

### DATE:        December 7, 2007

**TO:**      **MR. W. HARDING DRANE**

**FROM:**    **WILLIAM C. FEREBEE**

**FAX #: (302) 778-6019     PHONE #: (302) 984-6019**

**RE:  Dow v. HRD Corporation**

**OUR FILE #:    M313.00026**

**NUMBER OF PAGES, INCLUDING THIS PAGE:    __3__**

---

**CONFIDENTIALITY NOTICE**

The information contained in this facsimile message is legally privileged and confidential information intended only for the use of the individual or entity named above.  If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this telecopy is strictly prohibited.  If you have received this telecopy in error, please immediately notify us by telephone and return the original message to us at the address above, via the United States Postal Service.  We will gladly reimburse any expenses attendant to the return of the original message.

---

MESSAGE:

If you have problems receiving this transmission, please call (281) 875-8200



# O'DONNELL FEREBEE MEDLEY & KEISER, P.C.

William C. Ferebee                **ATTORNEYS AT LAW**                (281) 875-8200

December 7, 2007

Mr. Aaron Barlow                                    VIA FAX (312) 923-8408
Jenner & Block LLP
One IBM Plaza
Chicago, IL 60611-7603

RE:    Dow v. HRD Corporation; *Our File No. M313.00026.*

Dear Mr. Barlow:

I am in receipt of your letter dated December 3, 2007, regarding HRD's Amended Answers to Interrogatories No. 3 and No. 4.

One complaint is that HRD failed to provide any information which identified each communication in which Dow misappropriated HRD's trade secrets. The first two paragraphs of Interrogatory No. 3 HRD describe how and when Dow obtained this information. HRD's trade secrets were communicated to Dow prior to and as part of the preparation for meetings with customers and in meetings with customers. The reference to emails was to enable Dow to identify the meetings that it attended since HRD no longer has documents to identify the dates.

I believe that a fair reading of Interrogatory No. 3 states that Dow misappropriated HRD's trade secrets for its own use. However HRD will amend its Answer to Interrogatory No. 4 to clarify this point.

As to your reference to Rule 33(d), you are correct; the documents must be identified in "sufficient detail to permit the interrogating party to locate and identify" the responsive documents. Dow's Answers to Interrogatories 3-13 and 15-16 do not comply with Rule 33(d). Given that Dow has produced around 100,000 documents, this requirement is particularly important.

Please advise me if Dow will voluntarily comply with Rule 33(d) in its answers to Interrogatories 3-13 and 15-16. If I have not heard from you within 10 days I will assume that Dow is not willing to voluntarily comply with Rule 33(d).

Very Truly Yours,

O'DONNELL, FEREBEE, MEDLEY & KEISER, P.C.

*William C. Ferebee*

WILLIAM C. FEREBEE

cc:    CLIENT, *via fax*
       Hardy Drane, *via fax*

WCF/cm

# Exhibit 20

**JENNER&BLOCK**

December 11, 2007

Jenner & Block LLP     Chicago
350 N. Wabash Avenue   Dallas
Chicago, IL 60611-7603  New York
Tel 312 222-9350    Washington, DC
www.jenner.com

VIA FACSIMILE

Aaron A. Barlow
Tel 312 923-8308
Fax 312 923-8408
abarlow@jenner.com

William C. Ferebee
O'Donnell Ferebee Medley & Keiser, P.C.
450 Gears - 8th Floor
Houston, TX 77067-4512

Re:   <u>Dow v. HRD Corporation</u>

Dear Bill,

Your letter of Friday purporting to respond to my letter of December 3 regarding HRD's incomplete Amended Answers to Interrogatory Nos. 3 and 4 is evasive and fails to address the concerns raised in my letter.

In my letter, I pointed out that HRD has failed to provide any response to Interrogatory No. 4 identifying acts of misappropriation by Dow. You stated that "[t]he first two paragraphs of Interrogatory No. 3 [] describe how and when Dow obtained this information." The interrogatories seek HRD's basis for alleging Dow misappropriated HRD's trade secrets. An essential element of such a claim is proof that Dow disclosed or used HRD's trade secrets without HRD's consent. DEL. CODE ANN. TIT. 6, § 2001. However, HRD fails to provide any basis to support any contention that Dow has disclosed or used HRD's trade secrets. Your allegation that Dow "misappropriated HRD's trade secrets for its own use" is conclusory, and your offer to amend HRD's answer to include this language is inadequate. Instead, HRD must identify the specific acts of Dow on which HRD relies to support its claim of trade secret misappropriation.

Second, you completely ignored the assertion in my letter that most, if not all, of the items provided in HRD's amended response to Interrogatory No. 3 fail to identify anything that could be considered a trade secret. None of the items in HRD's list is identified with sufficient particularity to determine whether it is a trade secret, and many of them describe information that is indisputably public knowledge. We assume from your decision not to address this point that HRD does not intend to amend its answer to sufficiently identify its trade secrets. Please let me know immediately if this assumption is incorrect.

Third, you conceded that the manner of HRD's reliance on Rule 33(d) was improper, but you did not indicate whether HRD would amend its response to remedy this admitted deficiency. Please immediately inform us whether you intend to correct your response to remedy this problem. Furthermore, HRD cannot satisfy its discovery obligations by responding to a contention interrogatory by referring to Dow's documents. Rule 33(d) only applies where an interrogatory answer can be derived from the business records "of the party upon whom the interrogatory has been served." HRD may respond to an interrogatory identifying its own

William C. Ferebee
December 11, 2007
Page 2

business records using Rule 33(d), but not Dow's. More importantly, reliance on Rule 33(d) is inappropriate where, as here, the interrogatory asks a party to state facts supporting its contentions. Therefore, to adequately answer this interrogatory HRD must identify the specific communications in which the trade secrets were communicated to Dow.

We have repeatedly asked HRD to identify the basis for its trade secret claim without obtaining a satisfactory response from HRD. Based on your letter, it appears that you are unwilling to provide us with the required information regarding HRD's trade secret claim. If you are willing to change your position, please provide us with the required information by this Friday.

Finally, with respect to your new complaint regarding Dow's reliance on Rule 33(d) in responding to Interrogatory Nos. 3-13, 15 and 16, your letter of last Friday was the first time you ever raised this objection despite the fact that you were served with Dow's answers to HRD's interrogatories over a year and half ago. Nevertheless, we will take this under advisement and will respond promptly.

Very truly yours,

Aaron A. Barlow

# FAX TRANSMITTAL    JENNER&BLOCK

Jenner & Block LLP          Chicago
330 N. Wabash Avenue        Dallas
Chicago, IL  60611          New York
Tel 312 222-9350            Washington, DC
www.jenner.com

| | | | |
|---|---|---|---|
| Date: | December 11, 2007 | | |
| To: | William C. Ferebee<br>O'Donnell Ferebee Medley & Keiser, P.C. | Fax:<br>Voice: | (281) 875-4962<br>(281) 875-8200 |
| From: | Aaron A. Barlow<br>abarlow@jenner.com | Fax:<br>Voice: | 312 923-8408<br>312 923-8308 |
| Employee Number: | 027981 | Client Number: | 37571-11117 |

**Important:** This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is attorney work product, privileged, confidential, and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone, and return the original message to us at the above address via postal service. Thank you.

**Message:**

Total number of pages including this cover sheet: 3          Time Sent:  11:30 a.m.

If you do not receive all pages, please call: 312 222-9350          Sent By:  Pat T. Sotiropoulos

Secretary:  Pat T. Sotiropoulos          Extension:  4791

```
************** -COMM. JOURNAL- ****************** DATE DEC-11-2007 **** TIME 11:39 *** P.01

       MODE = MEMORY TRANSMISSION              START=DEC-11 11:37    END=DEC-11 11:39

       FILE NO.= 159

STN    COMM.    ONE-TOUCH/    STATION NAME/EMAIL ADDRESS/TELEPHONE NC.    PAGES    DURATION
NO.             ABBR. NO.

001    OK       ≋            912818754962---3757111117                  003/003  00:01:31


************************************ -          - **** -          - ********
```

# FAX TRANSMITTAL          J E N N E R & B L O C K

Jenner & Block LLP          Chicago
330 N. Wabash Avenue        Dallas
Chicago, IL 60611           New York
Tel 312 222-9350            Washington, DC
www.jenner.com

Date:          December 11, 2007

To:            William C. Ferebee                Fax:      (281) 875-4962
               O'Donnell Ferebee Medley & Keiser,   Voice:    (281) 875-8200
               P.C.

From:          Aaron A. Barlow                   Fax:      312 923-8408
               abarlow@jenner.com                Voice:    312 923-8308

Employee Number:    027981                       Client Number:    37571-11117

Important: This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is attorney work product, privileged, confidential, and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone, and return the original message to us at the above address via postal service. Thank you.

Message:

---

Total number of pages including this cover sheet: 3          Time Sent: 11:30 a.m.

If you do not receive all pages, please call: 312 222-9350   Sent By: Pat T. Sotiropoulos

Secretary: Pat T. Sotiropoulos                               Extension: 4791

# Exhibit 21

12/20/2007 16:51 FAX                                    ☑001/002

# O'Donnell, Ferebee, Medley & Keiser, P.C.

ATTORNEYS AND COUNSELORS AT LAW
450 GEARS - EIGHTH FLOOR
HOUSTON, TEXAS 77067-4584
www.ofmklaw.com

Telephone: (281) 875-8200          Telecopier: (281) 875-4962

## TELEFAX TRANSMISSION SHEET

### DATE:        December 20, 2007

**TO:**    MR. AARON BARLOW

**FROM:**    WILLIAM C. FEREBEE

**FAX #: (312) 923-8408    PHONE #: (312) 923-8308**

**RE: Dow v. HRD Corporation**

**OUR FILE #:    M313.00026**

**NUMBER OF PAGES, INCLUDING THIS PAGE:    __2__**

CONFIDENTIALITY NOTICE

The information contained in this facsimile message is legally privileged and confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this telecopy is strictly prohibited. If you have received this telecopy in error, please immediately notify us by telephone and return the original message to us at the address above, via the United States Postal Service. We will gladly reimburse any expenses attendant to the return of the original message.

MESSAGE:

If you have problems receiving this transmission, please call (281) 875-8200

12/20/2007 16:51 FAX                                          ☒002/002



William C. Ferebee          **ATTORNEYS AT LAW**          (281) 875-8200

December 20, 2007

Mr. Aaron Barlow                              VIA FAX (312) 923-8408
Jenner & Block LLP
One IBM Plaza
Chicago, IL 60611-7603

        RE:    Dow v. HRD Corporation; *Our File No. M313.00026.*

Dear Mr. Barlow:

        This letter is in response to your letter dated December 11, 2007 related to Interrogatories
3 and 4. HRD will amend its answer to state how Dow disclosed or used HRD's trade secrets.

        Your letter states that HRD's concedes that its reliance on Rule 33 (d) was improper. I
am not sure where you think that concession is made. For the record, HRD believes that its use
of Rule 33 (d) for the limited purpose of identifying dates of meetings is proper.

                Very Truly Yours,

                O'DONNELL, FEREBEE, MEDLEY & KEISER, P.C.

                *William C. Ferebee*

                WILLIAM C. FEREBEE


cc:    CLIENT, *via fax*

WCF/cm

450 Gears - Eighth Floor■Houston, Texas 77067-4512■Fax (281) 875-4962■Email: wferebee@ofmklaw.com

# Exhibit 22

# JENNER&BLOCK

December 21, 2007

VIA FACSIMILE

William C. Ferebee
O'Donnell Ferebee Medley & Keiser, P.C.
450 Gears - 8th Floor
Houston, TX 77067-4512

Jenner & Block LLP    Chicago
330 N. Wabash Avenue    Dallas
Chicago, IL 60611-7603    New York
Tel 312 222-9550    Washington, DC
www.jenner.com

Aaron A. Barlow
Tel  312 923-8308
Fax  312 923-8408
abarlow@jenner.com

Re:   <u>Dow v. HRD Corporation</u>

Dear Bill,

   I am in receipt of your letter of December 20, 2007 and HRD's amended responses to Interrogatory Nos. 3 and 4 which were served the same day. After three rounds of evasive and non-responsive amendments to HRD's answers to these interrogatories, it is clear that you and/or your client are acting in bad faith with respect to HRD's trade secrets counterclaim.

   First, HRD has still refused to provide the details as to when HRD communicated its alleged trade secrets to Dow. You now state that HRD's reference to documents to identify the meetings at which HRD's trade secrets were communicated to Dow is proper, after you acknowledged in your letter dated December 7, 2007 that an interrogatory answer invoking Rule 33(d) may not refer to an undifferentiated group of documents.

   In its answer to Interrogatory No. 3, HRD states that the documents that reflect the communications of HRD's trade secrets are in "the emails that were recovered after the fire" and in "your own records." Regardless of whether you conceded anything in your December 7, 2007 letter, you cannot possibly believe in good faith that HRD has identified documents in *sufficient detail* to allow Dow to locate and identify the documents that demonstrate HRD's communication of trade secrets to Dow. Additionally, as I previously explained, Rule 33(d) only allows a party to refer to its *own records*, and reliance on Rule 33(d) is improper when a party is asked to state facts in support of its own allegations.

   Second, your letter did not address the fact that most, if not all, of the items on HRD's list and in the attached presentation slides could not possibly be trade secrets, and HRD's amended interrogatory responses include the exact same list and the exact same slides. Following are a few particularly egregious examples:

- The first item on HRD's list describes the markets available for metallocene waxes, and each of these markets were published on HRD's website before the Dow/HRD project even began.
- Item 9 on HRD's list refers to a chart in the attached slides that HRD copied from a journal article published in 1951.

William C. Ferebee
December 21, 2007
Page 2

- Item 20 on HRD's list doesn't even profess to identify an HRD trade secret, but instead makes an allegation about a representation made by Dow.
- HRD continues to identify the two-pack concept as a trade secret even after admitting that it disclosed the two-pack to the adhesives industry in 2003.

Each of the items in HRD's list and in the attached presentation slides suffer from similar deficiencies.

Finally, HRD's amended interrogatory response for the first time purports to include supposed acts of misappropriation by Dow. However, many of your allegations on this subject are frivolous. For example, ███████████████████████████████████████ ████████████████████ HRD also claims that Dow misappropriated the 2-pack concept by disclosing it in a paper that was published in 2004. However, HRD disclosed that concept to the adhesives industry in 2003. Consequently, it was no longer a trade secret in 2004. HRD's most recent amended interrogatory responses do nothing to shed light on what basis it has for believing that Dow used or disclosed any of HRD's trade secrets (or that HRD even had any trade secrets to begin with).

I assume that you are unwilling to change your position on these matters. Let me know by next Friday if this assumption is incorrect as we intend to take this matter to the Court.

Very truly yours,

Aaron A. Barlow

# FAX TRANSMITTAL        JENNER&BLOCK

Jenner & Block LLP          Chicago
330 N. Wabash Avenue        Dallas
Chicago, IL 60611           New York
Tel 312 222-9350            Washington, DC
www.jenner.com

| | | | |
|---|---|---|---|
| Date: | December 21, 2007 | | |
| To: | William Ferebee<br>O'Donnell, Ferebee, Medley &<br>Keiser, P.C. | Fax:<br>Voice: | 281-875-4962<br>281-875-8200 |
| From: | Aaron A. Barlow<br>abarlow@jenner.com | Fax:<br>Voice: | 312-923-8408<br>312-923-8308 |
| Employee Number: | | Client Number: | 37571-11117 |

**Important:** This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is attorney work product, privileged, confidential, and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone, and return the original message to us at the above address via postal service. Thank you.

**Message:**

| | |
|---|---|
| Total number of pages including this cover sheet: 3 | Time Sent: |
| If you do not receive all pages, please call: 312 222-9350 | Sent By: |
| Secretary: Rosalind G. Singleton | Extension: 7883 |

```
*************** -COMM. JOURNAL- ******************* DATE DEC-21-2007 ***** TIME 14:57 *** P.01

    MODE = MEMORY TRANSMISSION              START=DEC-21 14:55      END=DEC-21 14:56

    FILE NO.= 107

 STN   COMM.   ONE-TOUCH/    STATION NAME/EMAIL ADDRESS/TELEPHONE NO.    PAGES   DURATION
 NO.            ABBR. NO.

 001    OK       5           912618754962                               003/003  00:01:16


************************************** -        - ***** -    312 640 4907- ***********
```

# FAX TRANSMITTAL        J E N N E R & B L O C K

Jenner & Block LLP          Chicago
330 N. Wabash Avenue        Dallas
Chicago, IL 60611           New York
Tel 312 222-9350            Washington, DC
www.jenner.com

| | | | |
|---|---|---|---|
| Date: | December 21, 2007 | | |
| To: | William Ferebee<br>O'Donnell, Ferebee, Medley &<br>Keiser, P.C. | Fax:<br>Voice: | 281-875-4962<br>281-875-8200 |
| From: | Aaron A. Barlow<br>abarlow@jenner.com | Fax:<br>Voice: | 312-923-8408<br>312-923-8308 |
| Employee Number: | | Client Number: | 37571-11117 |

**Important:** This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is attorney work product, privileged, confidential, and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone, and return the original message to us at the above address via postal service. Thank you.

**Message:**

| | |
|---|---|
| Total number of pages including this cover sheet: 3 | Time Sent: |
| If you do not receive all pages, please call: 312 222-9350 | Sent By: |
| Secretary: Rosalind G. Singleton | Extension: 7883 |

# Exhibit 23

# This Exhibit Was Redacted In Its Entirety

# Exhibit 24

# This Exhibit Was Redacted In Its Entirety