IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DOW CHEMICAL CANADA INC., on its       :
behalf and as assignee of THE DOW      :
CHEMICAL COMPANY,                      :
                                       :
        Plaintiff,                     :
                                       :
    v.                                 :
                                       :
HRD CORPORATION (d/b/a Marcus Oil &    :
Chemical),                             :
                                       : Civil Action No. 05-023-JJF
        Defendant/Counterclaim         :
        Plaintiff,                     :
                                       :
    v.                                 :
                                       :
DOW CHEMICAL CANADA INC., on its       :
behalf and as assignee of THE DOW      :
CHEMICAL COMPANY, and THE DOW          :
CHEMICAL COMPANY,                      :
                                       :
        Counterclaim Defendants        :

---

Andrew Weissmann, Esquire; Katya Jestin, Esquire and Brian J.
Fischer, Esquire of JENNER & BLOCK LLP, New York, New York.
Aaron A. Barlow, Esquire of JENNER & BLOCK LLP, Chicago,
Illinois.
Kenneth J. Nachbar, Esquire and Christine Dealy Haynes, Esquire
of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware.

Attorneys for Plaintiff and Counterclaim Defendants.

William C. Ferebee, Esquire and Michael Landrum, Esquire of
O'DONNELL FEREBEE MEDLEY & KEISER, PC, Houston, Texas.
W. Harding Drane, Jr., Esquire and Suzanne M. Hill, Esquire of
POTTER ANDERSON & CORROON LLP, Wilmington, Delaware.

Attorneys for Defendants/Counterclaim Plaintiff.

---

**OPINION**

July 30, 2009
Wilmington, Delaware

Farnan, District Judge

Pending before the Court is the Motion Of Defendant Counterclaim Plaintiff HRD Corporation For Discovery Abuse Sanctions (D.I. 247). For the reasons discussed, the Court will deny HRD's Motion and award Dow the costs of defending HRD's Motion.

## I.   BACKGROUND

This litigation stems from a failed business relationship between Dow Chemical Canada Inc. and The Dow Chemical Company (collectively "Dow") on one side and HRD Corporation ("HRD") on the other side. In short, the parties contracted to, first, jointly develop certain polyethylene wax products and, second, at the conclusion of development, for Dow to be HRD's exclusive supplier of the new wax products.

Dow initiated this action in January 2005, asserting one claim for breach of contract. Briefly, Dow alleges that pursuant to the parties' business agreements, it provided certain services and polyethylene wax products to HRD and that HRD failed to pay for these services and products. By its Answer, HRD raised numerous counterclaims, including, most importantly, multiple claims for breach of contract and trade secret misappropriation. HRD now seeks damages exceeding $700 million. (D.I. 247 at 2.)

The parties have not had an amicable litigation relationship. Indeed, by the Court's count, the parties filed at least eight discovery related motions, including six HRD motions

to compel, at least one of which requested sanctions. (See D.I. 71; D.I. 95; D.I. 119; D.I. 140; D.I. 152; D.I. 171.) Accordingly, on November 6, 2008, the Court appointed Special Master Wilson B. Redfearn to assist the parties in resolving their ongoing discovery disputes. By March 2009, the Special Master had resolved these disputes, many simply by agreement between the parties.

Nevertheless, on April 16, 2009, HRD brought the instant Motion For Sanctions. HRD alleges eight distinct discovery misdeeds by Dow, including, for instance, the withholding of documents, failure to provide adequately indexed documents, and misrepresentations to the Special Master. (See D.I. 247 at 4.) Many of these alleged misdeeds overlap with the issues previously addressed by the Special Master. By its Motion, HRD requests that the Court strike Dow's breach of contract claim and all of its defenses to HRD's counterclaims. Thus, HRD essentially requests a $700 million judgment in its favor. In addition, HRD seeks an award of attorneys' fees.

## II. DISCUSSION

### A. Legal Standard

Pursuant to Rule 37(d), "[i]f a party . . . fails . . . to appear for that person's deposition, . . . or to serve its answers, objections, or written response [to interrogatories or a request for production] . . . then the court may [order

sanctions] . . . listed in Rule 37(b)(2)(A)(i)-(vi)."  Fed. R.
Civ. P. 37(d).  Likewise, pursuant to Rule 37(b), "[i]f a party
or a party's officer, director, or managing agent . . . fails to
obey an order to provide or permit discovery, including an order
under Rule 26(f), 35, or 37(a), the court where the action is
pending may issue further just orders."  Fed. R. Civ. P.
37(b)(2)(A).  These may include, <u>inter</u> <u>alia</u>, the striking of
pleadings, a finding of contempt of court, an order directing
that disputed facts be taken as established, and, in extreme
cases, dismissal of an action in whole or in part.  <u>Id.</u>  However,
punitive dismissal is a drastic remedy and must be considered in
light of the factors set forth in <u>Poulis v. State Farm Fire and</u>
<u>Casualty Co.</u>, 747 F.2d 863, 868 (3d Cir. 1984).[1]

**B.  Decision**

    **1.  Whether the Court Should Sanction Dow**

HRD has presented the Court with a piñata of alleged Dow
discovery abuses, most of which totally lack merit.  Accordingly,
the Court concludes that sanctions as requested by HRD are not
appropriate against Dow.  The Court will not address each and

---

[1] These factors include "(1) the extent of the party's
personal responsibility; (2) the prejudice to the adversary
caused by the failure to meet scheduling orders and respond to
discovery; (3) a history of dilatoriness; (4) whether the conduct
of the party or the attorney was willful or in bad faith; (5) the
effectiveness of sanctions other than dismissal, which entails an
analysis of alternative sanctions; and (6) the meritoriousness of
the claim or defense."  <u>Poulis</u>, 747 F.2d at 868.

every discovery abuse alleged by HRD.  To the extent the Court
chooses not to address a particular alleged discovery abuse, the
Court simply notes that it has reviewed the allegation and
concluded that it does not merit a sanctions award.  However, as
explained more fully below, the Court identifies two alleged
discovery abuses that, while not rising to the level of
sanctionable conduct, merit some comment.  Below, the Court first
addresses a selection of alleged violations that illustrate the
overall inappropriateness of HRD's Motion.  Then, the Court
considers two alleged discovery abuses that appear to have some
small amount of merit and that therefore require the Court's
attention.

### a.    The Alleged Discovery Abuses Are Largely Meritless

The bulk of HRD's abuse allegations lack merit.
Consequently, the overall credibility of HRD's Motion is
seriously undermined.  As a first example of a meritless
allegation of discovery abuse, HRD complains that Dow violated
Fed. R. Civ. P. 34(b) by producing roughly 153,000 pages of
documents that are a "jumbled mess."  (D.I. 247 at 6.)
Specifically, HRD contends that Dow failed to organize documents
"by custodian, by HRD's requests for production, chronologically,
or in any other meaningful manner."  (Id.)  However, in July
2007, Dow agreed to produce documents on a custodian-by-custodian
basis and, for a particular custodian, to organize documents by

4

date.  (D.I. 282, Exh. 23.)  On reviewing the record, the Court

concludes that Dow largely abided by this agreement.  Indeed, HRD

identifies only one subsequent Dow document production that was

not properly organized by custodian.  And, after HRD notified Dow

of this miscue, Dow promptly corrected it.[2]  (See D.I. 282, Exh.

25.)  Furthermore, the record shows that in May 2008, Dow agreed

to prepare a searchable, sortable Excel spreadsheet correlating

individual documents to particular custodians.  (See D.I. 284,

Exh. 28.)  On reviewing the record, it appears that HRD failed to

directly respond to this offer.  Instead, in October 2008 –

roughly five months after the offer – HRD simply sent a letter to

Dow complaining of Dow's continuing failure to provide a

custodian list.  (See D.I. 247, Exh. 9.)  Shortly thereafter, Dow

provided HRD with the spreadsheet that it had offered to provide

earlier.  (See D.I. 284, Exh. 30.)  HRD's allegations are made

all the more perplexing by the fact that all of Dow's document

productions included optical character recognition ("OCR") data.

This data enabled HRD to search and sort Dow's document

production by name, date, keyword, or any other parameter that

could be reduced to a text string.  On these facts, the Court

---

[2] With respect to whether Dow properly sorted documents for
a particular custodian by date, HRD identifies a few additional
instances where Dow may have failed to do this.  (See D.I. 308 at
40:6 - 41:15.)  However, in the Court's view, Dow's alleged
failure to fully carry out this particular level of document
sorting does not substantially contribute to a sanctions award.

concludes that HRD's complaints regarding Dow's allegedly disorganized document production do not remotely support a sanctions award.

Insisting that a sanctionable discovery abuse is nevertheless present in this incident, HRD further complains that Dow's October 2008 Excel spreadsheet correlating documents to custodians was inaccurate. (D.I. 247 at 7-8.) In particular, HRD complains that Dow designated employee Cyndi Rickey as the custodian of a number of documents, but that she failed to recognize a number of these documents during her deposition. Specifically, HRD claims that it showed Ms. Rickey 91 exhibits during her deposition, but that she was able to recognize only 20 of them. (Id.) However, for a number of reasons, this situation is unsurprising and does not, without more, indicate misconduct or bad faith that could support a sanctions award. Indeed, a custodian of a particular document is not necessarily an individual having detailed knowledge of a particular document. Rather, it is merely an individual who happens to have physical control over it at the time when documents are collected for production. In this day and age - where documents can be delocalized, distributed, and stored inexpensively in countless physical and electronic formats - it is entirely unremarkable that an individual may not have knowledge over a range of documents for which he or she is nonetheless designated as the

6

custodian.  For this reason, in complex cases, it is helpful for
litigants to exchange documents with searchable OCR data, as was
done here.  This enables the recipient of the documents to search
and sort documents by, for example, name and keyword, and then,
in advance of a deposition, formulate a general picture of the
role a particular custodian played in the events giving rise to
the litigation, in the process culling documents that a custodian
is unlikely to be particularly knowledgeable about.  In these
circumstances, the Court is unpersuaded that HRD was so misled by
Dow's designation of Ms. Rickey as a document custodian that it
was forced to confirm at her deposition that she had no knowledge
of 71 documents.  Indeed, to the extent there was some
uncertainty about whether Ms. Rickey was knowledgeable of certain
documents, the Court sees no reason why HRD could not have simply
used introductory topical questions to focus the subject matter
of Ms. Rickey's deposition.  The Court further notes that the
events giving rise to this litigation took place roughly five
years ago.  Thus, the natural fading of memories will likely
force some custodians to disclaim knowledge of long-forgotten
documents that they may have at one point reviewed or worked on.
Accordingly, these are not the circumstances that substantiate a
sanctions award.[3]

_____

[3] The Court notes that Special Master Redfearn chose to
address this issue by having the deponent conduct an advance
review of documents that he or she was identified as the

As yet another example of a meritless complaint of discovery abuse, HRD alleges that Dow failed to fully comply with the Court's order to provide a page-by-page redaction log. (D.I. 247 at 9.) As background, in January 2008, in response to an HRD Motion to Compel, the Court concluded that Dow's document production was too heavily redacted and ordered Dow to provide a page-by-page explanation for its redactions. (See D.I. 121 at 3.) In response, Dow identified 17 potential explanations for a redaction, and then produced a "Redaction Key" listing one or more of these reasons for each redacted document. In the context of this particular case, this was reasonable compliance with the Court's order. It does not support a sanctions award.

Finally, the Court notes HRD's complaint regarding an "egregious" instance of Dow allegedly "hid[ing] its most damaging documents," which HRD was able to discover only by "sheer luck." (D.I. 247 at 5.) Specifically, in July 2007, Dow produced to HRD a CD containing several thousand documents. Two days later, Dow, explaining that the CD contained an error, asked that it be returned. However, prior to returning the CD, HRD printed at least one document from the CD. This particular document, a January 29, 2005 e-mail, stated that "Marcus boys have lots of problems right now. With a little digging, we could probably

custodian of. The fact that Special Master attempted to streamline the discovery process in this manner does not, in the Court's view, indicate that HRD's allegation has merit.

8

come up with their customer list . . . ." (D.I. 247, Exh. 5.)
According to HRD, none of Dow's subsequent document productions –
including a revised version of the July 2007 production –
contained "this damaging document." In its brief in support of
its Motion For Sanctions, HRD asks "[h]ow can this document not
be relevant?" (Id. at 5.) Likewise, during the evidentiary
hearing on this Motion, HRD stated that it "believes [this] is a
relevant document that should have been produced." (D.I. 308 at
58:1-12.) But HRD never actually explains the relevance of this
document to any claims at issue in this case. Likewise, the
Court, which is by now quite familiar with the legal claims in
this case, fails to see the relevance of this document. In spite
of its scandalous overtones, there is, in fact, reason to believe
that the document is actually irrelevant. Indeed, as Dow notes,
the document was prepared after the litigation began and HRD
never sought to depose the author of the e-mail. As to the
recipient of the e-mail, Dow apparently deposed him in February
2009, yet asked no questions about this document. What's more,
it appears that HRD raised this issue for the first time in its
sanctions Motion, failing to raise it beforehand with Dow, the
Court, or Special Master Redfearn.[4] Simply put, the Court does

_____

[4] After HRD raised the issue in its sanctions Motion, Dow
promptly provided a second replacement CD, containing an
additional 49 documents that were omitted from the July 2007
revised production. (See D.I. 282, Exh. 19.)

not understand why it is now taking the time to write about this incident.  It does not support a sanctions award.

### b. Two Alleged Dow Discovery Abuses Merit Further Comment

Despite the foregoing, the Court identifies two alleged discovery abuses that, while not rising to the level of sanctionable conduct, require the Court's attention.  First, HRD alleges that Dow spoliated evidence when it dismantled the facility used to manufacture the wax products at issue in this case.  Second, HRD alleges that Dow failed to produce process flow diagrams, which describe the retrofit of the facility used to manufacture the wax products at issue in this case.  The Court will address these two allegations in turn.

#### i. Sarnia Facility Inspection

The dispute over the destruction of the Sarnia wax production facility may be summarized as follows.  In December 2007, HRD suggested that an inspection of the facility in Sarnia, Canada - where the wax products at issue in this case were to have been manufactured - could help resolve a discovery dispute over document redactions.  (See D.I. 282, Exh. 21 at Exh. C.)  In January 2008, HRD repeated its request to inspect the Sarnia facility.  (Id. at Exh. E.)  The parties subsequently discussed this request by telephone and by letter, and Dow explained to HRD that the facility would be dismantled starting in April 2008 (Id. at Exh. G.)  Thus, Dow further advised HRD that if it wished

10

to inspect the facility, HRD would need to move quickly in making
the appropriate arrangements, which HRD did.  (See id.)  In
response to a Dow question as to the reason for and scope of
HRD's proposed inspection, HRD explained as follows:

> As to the scope of the inspection, HRD simply wants to
> see the physical site so they can understand how the
> plant was operated.  Because of the extensive redaction
> of documents, this inspection is very important.  In
> addition, as a matter of due diligence, my experts want
> to be able to tell a jury that they physically saw the
> plant.

(Id. at Exh. H.)  After a small amount of additional negotiation,
Dow permitted HRD to conduct an inspection of the Sarnia facility
on April 8, 2008.  (Id. at Exh. K.)

At the inspection, a dispute apparently arose as to (1)
whether HRD would be allowed to photograph and/or videotape the
plant, (2) whether HRD could photograph the plant using its own
equipment, and (3) whether Dow would review HRD's photographs
before releasing them to HRD.  (D.I. 247 at 10-11.)  Dow
ultimately permitted HRD to take its own photographs, but only
with a Dow-provided digital camera.  (D.I. 308 at 31:18-32:8.)
Over the course of roughly four and one-half hours, HRD used this
camera to take 144 photographs, which Dow subsequently reviewed
and sent to HRD.  (D.I. 281 at 16.)  Unhappy with the
circumstances of the inspection, HRD filed an "emergency" motion
to compel a new inspection of the Sarnia facility.  (D.I. 140.)
However, before the Court had an opportunity to address this

motion, Dow, having already substantially delayed demolition of the Sarnia facility, informed HRD that it would proceed with demolition in July 2008.  Shortly thereafter, Dow dismantled the Sarnia facility.

HRD claims that it was prejudiced by the circumstances of the inspection and the subsequent demolition of the plant in three ways.  First, HRD contends that Dow had, in fact, begun dismantling the Sarnia facility prior to the April 2008 inspection.  In this regard, HRD directs the Court to photographs that allegedly depict missing equipment.  (See D.I. 308 at 30:5-31:9.)  Thus, HRD contends that its inspection was tainted. Second, Dow apparently contends that because the Sarnia facility has been demolished, certain witnesses may no longer have access to information necessary to fully respond to questioning about the plant.  (Id. at 34:5 - 35:22.)  Finally, HRD contends that the 144 pictures it took during the inspection are inadequate for use as trial exhibits because they are of insufficient resolution to permit enlargement.  In other words, HRD argues that its "ability to walk into this courtroom in front of a jury and put up pictures of the plant on a screen like this has been denied." (D.I. 308 at 32:19-21.)

The Court is unpersuaded that HRD has experienced any prejudice by the dismantling of the Sarnia facility.  Critical to this conclusion is the fact that although this action was

12

initiated in January 2005, HRD waited until December 2007 (almost
three years) before making its initial request to inspect the
Sarnia facility. During this period, as Dow set in motion plans
to dismantle the Sarnia facility, HRD otherwise vigorously
pursued discovery, even filing numerous motions to compel. In
the Court's view, had a thorough inspection of the Sarnia
facility been as critical as HRD now contends, HRD surely would
have pursued this inspection earlier in discovery. It did not,
and the Court is thus highly skeptical of any HRD complaints that
its inspection was tainted by Dow's alleged partial dismantling
of the facility. Furthermore, after HRD requested an inspection
of the Sarnia facility, Dow ultimately offered HRD a full day to
inspect the facility. But HRD's inspection lasted only about
four and one-half hours. Again, HRD's failure to take full
advantage of discovery opportunities betrays its complaints of
prejudice. Finally, to the extent Dow complains that its 144
pictures are of inadequate quality for review by the jury, the
Court disagrees. Although the pictures, when enlarged, exhibit
some small amount of graininess when inspected closely, they are
nonetheless of sufficient resolution to adequately depict the
details of the facility and are more than adequate for display to

a jury and for an expert witness to rely upon.[5]  This incident
does not support a sanctions award.

Nevertheless, in the Court's view, Dow is not entirely
blameless here.  Indeed, prohibiting HRD from using its own
camera to take photographs of the Sarnia plant was overzealous,
unnecessary, and an exercise of poor judgment.  The same may be
said with regard to Dow's initial insistence that it take all
photographs on behalf of HRD.  Unfortunately, when it comes to
discovery, Dow has too frequently exercised an unwarranted level
of protectionism.  This is reflected, for instance, in the
excessive number of sealed Dow filings in this case.  Likewise,
it has been reflected in Dow's withholding of documents over
speculative concerns that HRD may export technology to Iran in
violation of export control laws.  (See D.I. 92.)  Similarly, it
is exemplified by Dow's overly extensive document redactions.
(See D.I. 121.)  Simply put, Dow's approach to discovery appears
to have been guided by an undue level of distrust for its
adversary, which seems to have again manifested itself during

_____

[5] HRD further complains that Dow did not permit counsel for
HRD to "walk around the plant and video and talk into the video,
making my own notes of my observations that I use later as
attorney work product."  (D.I. 308 at 18-23.)  However, this is a
patently unreasonable request.  Indeed, for HRD to legitimately
protect such audio notes as work product, Dow would have had to
allow HRD to roam about the plant without any supervision from
either Dow's counsel or Dow employees, who would have otherwise
overheard HRD's "work product."  For reasons related to safety
and the protection of HRD trade secrets, this is simply not
feasible.

14

HRD's inspection of the Sarnia facility.  Thus, although the
Court concludes that Dow did not commit any sanctionable conduct
in connection with HRD's inspection of the Sarnia facility, the
Court nevertheless takes this opportunity to note that, during
discovery, Dow has not always been reasonable.

## ii.  Process Flow Diagrams

HRD contends that the "biggest problem in discovery"
involves Dow's alleged failure to promptly produce process flow
diagrams for the Sarnia facility, which HRD maintains "are the
heart and soul of any plant reconstruction or retrofit."  (D.I.
308 at 48:15-17; D.I. 247 at 11.)  HRD contends that, beginning
in April 2006, it sought process flow diagrams from Dow, but that
Dow falsely asserted that it had never prepared process flow
diagrams for the retrofit of the Sarnia facility.  HRD notes that
as late as December 2008, Dow asserted before the Special Master
that there were no such diagrams for the Sarnia plant.  (See D.I.
247, Exh. 24.)  However, in March 2009, HRD deposed Dow engineer
Frank Cerk, who testified that there were, in fact, process flow
diagrams for the Sarnia facility.  (Id., Exh. 26.)  Shortly
thereafter, Dow produced to HRD process flow diagrams for the
Sarnia plant.  HRD now contends that its expert witnesses are
unable to accurately state whether these or some other documents
were actually used to retrofit the Sarnia facility.  (See D.I.
308 at 48:14-19.)

Dow responds that their failure to promptly produce process flow diagrams was an "innocent mistake" that was "promptly corrected." (Id. at 88:12-13.) Furthermore, Dow points out that it had previously produced numerous Aspen process simulations, "which present and depict, inter alia, process conditions, lines and equipments in the plant, and stream compositions pressures, and temperatures." (D.I. 281 at 19.) In this regard, Dow contends that it has produced documents containing information cumulative to that which is contained in the process flow diagrams.

The Court does not see sufficient evidence to conclude that Dow's admitted failure to promptly produce process flow diagrams was anything more than a mistake. In these circumstances, sanctions are not appropriate.

Nevertheless, the Court finds the mistake significant and worthy of further comment. Indeed, the process flow documents are unquestionably relevant, and the record reflects that HRD had repeatedly requested that they be produced. Dow's failure to produce these documents may well have been the result of a lack of reasonable effort on the part of Dow's counsel to thoroughly determine whether such documents exist. Similarly, the failure of individuals within Dow itself to conduct a thorough search for these documents may have contributed to the error. Or, the mistake make may have been attributable to a communication

16

breakdown between Dow and its counsel.  Possibly, the error arose
from a combination of these factors.  Whatever the case, although
the Court is aware that innocent mistakes occasionally occur
during discovery, the Court notes that such mistakes are not
necessarily acceptable.  In this regard, when considered against
the backdrop of Dow's occasional unreasonable conduct in
discovery matters, the Court concludes that Dow's failure to
produce process flow diagrams suggests more systemic problems
with Dow's approach to discovery.  Going forward, especially in
connection with continuing discovery disputes before the Special
Master, the Court advises Dow to address these issues.

### 2.    Whether The Court Should Award Dow The Cost Of Defending HRD's Motion For Sanctions

"It is inherent in the court's discretionary power to award
attorneys' fees 'when a party has acted in bad faith,
vexatiously, wantonly, or for oppressive reasons.'"  In re Elonex
Phase II Power Mgmt. Litig., 279 F. Supp. 2d 521, 525 (D. Del.
2003) (quoting Chambers v. NASCO, Inc., 501 U.S. 32, 45-46
(1991)).  Furthermore, "[a]ny attorney or other person admitted
to conduct cases in any court of the United States or any
Territory thereof who so multiplies the proceedings in any case
unreasonably and vexatiously may be required by the court to
satisfy personally the excess costs, expenses, and attorneys'
fees reasonably incurred because of such conduct."  28 U.S.C. §
1927.

17

Given the Court's conclusion that, although Dow did not commit sanctionable conduct, it has sometimes acted unreasonably in discovery matters, the Court is reluctant to award Dow the cost of defending HRD's Motion For Sanctions. However, the Court also advised the parties certain conditions would apply to the continued litigation of the current Motion. Specifically, during an April 23, 2009 hearing regarding HRD's Motion, the Court advised the parties that it was struck by the seriousness of the allegations. The Court further advised the parties that unless they resolved the Motion on their own terms, one of them would ultimately pay the costs of the Motion. (D.I. 282, Exh. 6 at 13:13 - 14:2 (emphasis added).) As explained above HRD's allegations fall well short of supporting the requested sanctions. Accordingly, the Court will award Dow the cost of defending HRD's Motion For Sanctions.

## III. CONCLUSION

For the reasons discussed, HRD's Motion For Sanctions (D.I. 247) will be denied. In addition, Dow will be awarded the costs of defending HRD's Motion.