IN THE UNTIED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DOW CHEMICAL CANADA, INC., on its own behalf and as assignee of THE DOW CHEMICAL COMPANY,<br><br>  Plaintiff<br><br>vs.<br><br>HRD CORPORATION, (d/b/a Marcus Oil & Chemical),<br><br>  Defendant,<br>  Counterclaim Plaintiff<br><br>vs.<br><br>DOW CHEMICAL CANADA, INC., on its own behalf and as assignee of THE DOW CHEMICAL COMPANY,<br><br>  Counterclaim Defendants | Case No. 05-023-(JJF) |

# RULINGS ON DOW'S OBJECTIONS TO HRD'S DEPOSITION DESIGNATIONS

## December 11, 2009

B. Wilson Redfearn, Esquire
Special Master
TYBOUT, REDFEARN & PELL
750 Shipyard Drive, Suite 400
P.O. Box 2092
Wilmington, DE 19899
(302) 658-6901

**Dow's Objections to HRD's Deposition Designations**

1. 02/11/09 Deposition of Kurt Swogger, 56:19 – 58:2

2. Deposition of Asanti Ayoub, 22:9 – 14

3. 02/04/09 Deposition of Abbas Hassan, 222:20 – 223:18

## 1. 02/11/09 Deposition of Kurt Swogger, 56:19-58:2

The testimony at issue is that of Kurt Swogger, a Vice President at Dow, who signed the Joint Development Agreement (JDA) for Dow.[1] At the time of his deposition, when asked who at Dow had the responsibility for delivering descriptions of consequential inventions to HRD, Mr. Swogger stated that he didn't know. He also stated that he didn't know who, if anyone, had the responsibility to provide the required semi-annual status reports if Dow concluded that any JDA patent rights were implicated.

HRD essentially argues that it has been unable to determine who at Dow had the obligation to provide it with the required notification under its contract with Dow, and that this is substantiating evidence for its position that Dow failed to meet its reporting responsibilities under the JDA.

Dow objects to this testimony. It argues that Mr. Swogger's lack of personal knowledge is not significant and is inadmissible because he was neither responsible for the reporting, nor involved in the daily activities of the Dow employees who performed these tasks. Thus, Dow maintains that the testimony creates a risk that the jury might improperly conclude that Mr. Swogger's lack of awareness regarding the responsibility for these communications indicates that Dow breached the JDA notice provision.

In my initial ruling, I stated:

> "As Vice President, Mr. Swogger signed the JDA on behalf of Dow. He is capable of explaining why he did or did not comply with the obligation under the JDA to provide HRD with information concerning intellectual property."

HRD is entitled to take the position that no one at Dow was aware of its responsibility to advise HRD about patentable information and/or the research findings which were required to be

---

[1] Exhibit 1.

disclosed under the terms of the JDA. D.R.E. 401; *Farmer v. State, 698 A.2d 946 (Del. 1997)* (relevancy turns on the purpose for which the evidence is offered and whether that purpose accommodates the concepts of materiality and probative value).

While Dow suggests that Mr. Swogger did not have the responsibility to advise HRD regarding these matters, and that the admission of this testimony creates a risk that a jury could improperly conclude Mr. Swogger's lack of awareness might be misconstrued, Dow can easily remedy this through testimony showing who at Dow was responsible for the communication and what he/she did to meet that responsibility.

Recommended to the Court on December 11, 2009.

_____
B. WILSON REDFEARN
Special Master

## 2. Deposition of Asanti Ayoub 22:9-14.

The designated testimony[2] is:

"Q: Okay. Did you sign a confidential agreement when you started working at Marcus Oil?

A: No.

Q: Have you ever signed a confidentiality agreement at Marcus Oil?

A: No."

Dow argues that Ms. Ayoub should have been required to sign a confidentiality agreement prior to employment and that the failure to do this is proof of the fact that HRD failed to protect its proprietary information. HRD points out that Ms. Ayoub did not have access to confidential information, did not interact with the testing labs, and knows nothing about product specifications or anything else of a consequential nature.

In my initial ruling, I stated that under the facts presented, this testimony had little significance and created a collateral issue which would distract the jury.

While Dow may be correct in its argument that it is entitled to show that reasonable efforts were not made by HRD to guard its trade secrets, based on the current record this particular testimony is inadmissible.

At trial, Dow is entitled to ask Ms. Ayoub's supervisor if Ms. Ayoub had access to confidential information and, if it is shown that she did, why she was not asked to sign a confidentiality agreement. Dow is also entitled to ask supervisory personnel who had access to confidential information and who was required to sign confidentiality agreements. What Dow cannot do is ask a clerical employee, who apparently did not have access to confidential

---

[2] Exhibit 2

information, why she did not sign a confidentiality agreement, in an attempt to show that HRD failed to protect its proprietary information.

Based on the testimony presented concerning Ms. Ayoub's level of involvement, her cross-examination relative to the signing of the confidentiality agreements would not be probative and, in fact, has the possibility of confusing the jury, prejudicing HRD and wasting the time of the court. D.R.E. 401; 403.

I can only rule on the basis of the facts presented. If there were additional facts presented at trial showing that Ms. Ayoub was other than a clerical employee, it would be up to the trial judge to determine if the designated testimony should be considered as admissible.

Recommended to the Court on December 11, 2009.

_____
B. WILSON REDFEARN
Special Master

### 3. 02/04/09 Deposition of Abbas Hassan 222:20 – 223:18

Abbas Hassan is the President of HRD. In his deposition, he testified, inter alia, that in preparing for his deposition, he (1) did not give any detailed thought to HRD's trade secret claim; (2) did not recently read that part of the Complaint relative to HRD's trade secret claim; and (3) is not aware "on the top of [his] head" of any trade secrets communicated to Dow, with the possible exception of the two-pack product.[3]

Included in these questions is mention of HRD's initial 2.6 billion dollar counterclaim.

It is my understanding that Abbas Hassan was designated as a Rule 30(b)(6) witness on behalf of HRD. As the corporate designee, Mr. Hassan should have been prepared for the deposition and should have been knowledgeable about relevant facts, including those that pertain to HRD's claim for trade secret misappropriation. "When a corporation or association designates a person to testimony on its behalf, the corporation appears vicariously through that agent. If that agent is not knowledgeable about relevant facts, and the principal has failed to designate available, knowledgeable, and readily identifiable witnesses, then the appearance is, for all practical purposes, no appearance at all." *Black Horse Lane Assoc., L.P. v. Dow Chemical Company*, 228 F.3d 275, 303 (3rd Cir. 2000).

On reflection, I believe that Mr. Hassan's evasive answers can be used by Dow on cross-examination should Mr. Hassan testify in any detail about the trade secret misappropriation claim.

I do not believe that the testimony contained at 222:24 through 223:1 and 223:16 through 223:18 is admissible. The question asked at 222:24 is now irrelevant. Dow's argument that the

---

[3] Exhibit 3

test mony relating to the initial amount of the claim is probative of HRD's motivation eludes me. The question at 223:16 is argumentative and was inappropriate.

Recommended to the Court on December 11, 2009.

_____
B. WILSON REDFEARN
Special Master

# Exhibit 1

HIGHLY CONFIDENTIAL
KURT W. SWOGGER

Page 1

HIGHLY CONFIDENTIAL - KURT W. SWOGGER
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DOW CHEMICAL CANADA INC., on its )
own behalf and as assignee of THE)
DOW CHEMICAL COMPANY, )
)
        Plaintiff, )
)
       -vs- )   No. 05-023-JJF
)
HRD CORPORATION (d/b/a Marcus )
Oil & Chemical) )
)
      Defendant/ )
  Counterclaim Plaintiff; )
)
       -vs- )
)
DOW CHEMICAL CANADA INC., on its )
own behalf and as assignee of THE)
DOW CHEMICAL COMPANY, and THE DOW)
CHEMICAL COMPANY, )
)
  Counterclaim Defendants. )

    Videotaped deposition of KURT W. SWOGGER taken before TRACY L. BLASZAK, CSR, CRR, and Notary Public, pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, at Suite 4000, 330 North Wabash Avenue, in the City of Chicago, Cook County, Illinois at 9:10 a.m. on the 11th day of February, A.D., 2009.

Page 54

1 HIGHLY CONFIDENTIAL - KURT W. SWOGGER
2 practice while you were employed there that Dow should
3 have honored section 4.2(a)?
4 A My practice was we would honor an agreement we
5 signed.
6 Q Under 4.3, the ownership of and access to JDA
7 information, the second sentence, each party will keep
8 complete and accurate written records of all information
9 developed by or for it. Each party will make those
10 records available for review by the other party at
11 reasonable time during regular working hours.
12 Was there anyone under your supervision that
13 was appointed to keep these written records of
14 information developed under the JDA?
15 A There would have been someone. I don't know who
16 that would have been.
17 Q How can I go about determining who that would
18 be?
19 A My recommendation for how you would do that is
20 you would ask The Dow Chemical Company please produce
21 these results.
22 Q Did, while you were in charge of R & D, was
23 there a specific criteria when you had a joint
24 development agreement that all of the documents that --
25 the complete and accurate written records were all kept

Page 55

1 HIGHLY CONFIDENTIAL - KURT W. SWOGGER
2 in one central spot or under one heading in some form or
3 fashion that they could be easily identified?
4 A I would say we could access them. I wished I
5 could say it would be easily identified. So I can't say
6 specifically to this particular system. But typically
7 we would set it up so we could retrieve documents.
8 Q If you were still employed at Dow in the
9 position you were in 2002 and you wanted those
10 documents, what procedure would you go through to obtain
11 them?
12 A I would pick one of my staff members and say
13 please go get them. And there are a variety of places
14 you'd look, CR -- basically, we write research reports,
15 and that's probably where I would have them start.
16 Q Is that called CRIs?
17 A CRIs, yes, sir.
18 Q Looking at paragraph 4.4, after a party becomes
19 aware that an invention has been conceived or first
20 reduced to practice that may be a development, the party
21 must promptly deliver a written description of the
22 invention to the other party's corresponding
23 administrator.
24 Do you know if Dow ever delivered any such
25 writing to HRD?

Page 56

1 HIGHLY CONFIDENTIAL - KURT W. SWOGGER
2 A No, I do not.
3 Q How would I find out if that occurred?
4 MR. NIMROD: Mr. Swogger, he is not looking for
5 any guesses. He just wants to know if you know. If you
6 don't know, don't guess.
7 THE WITNESS: I don't know, I don't. I'm
8 sitting here thinking, I don't know how.
9 BY MR. FEREBEE:
10 Q In this particular case, you had Brian
11 Kolthammer with some responsibilities, Selim Yalvac with
12 some responsibilities, and you had Teresa Karjala with
13 some responsibilities.
14 Would any one of those three have the specific
15 responsibility with regard to potentially patentable
16 information?
17 MR. NIMROD: Once again, he is looking for your
18 knowledge, not speculation or guessing.
19 THE WITNESS: My knowledge would be that we had
20 a group headed up by Bruce Story, who was -- oh, gosh,
21 what do we even call it? Intellectual capital group.
22 And typically they are the ones that would harvest is
23 what we call it, any inventions, and they would collect
24 it.
25 So on this particular one, what I would do is I

Page 57

1 HIGHLY CONFIDENTIAL - KURT W. SWOGGER
2 would go to Bruce and say what did we have? I think
3 Bruce is now retired, but the leader of that group.
4 BY MR. FEREBEE:
5 Q So, in other words, if someone under your
6 supervision thought they had a patentable invention,
7 they would take that to Bruce Story, and the process
8 then would work from there?
9 A Yes, sir.
10 Q Looking at page 4 of Exhibit 2 under 4.7, if a
11 party has JDA patent rights, its administrator will
12 provide semi-annually a status report in a mutually
13 agreed format and medium on all of that party's JDA
14 patent rights to the other party's administrator.
15 Do you know if any communications were ever
16 made with HRD under 4.7?
17 A No, sir, I don't.
18 Q Would that be a communication that would have
19 come from Mr. Story, also?
20 A Highly likely, but not guaranteed.
21 Q Looking at page 5 of Exhibit 2, article 5, under
22 5.1, the parties desire to have each party profit from
23 this collaboration by fostering the development and
24 commercialization of polyethylene waxes.
25 What do you mean by commercialization there?

15 (Pages 54 to 57)

Page 58

HIGHLY CONFIDENTIAL - KURT W. SWOGGER
2    A    That's selling polyethylene waxes to the
3 marketplace.
4    Q    So what you're doing there is under this
5 statement of intent, article 5, is you're trying to
6 develop a product that the marketplace will purchase,
7 correct?
8    A    Between the partnership, what Dow was going to
9 do was supply products that Marcus Oil said were useful
10 in the marketplace.
11    Q    That they could sell commercially?
12    A    Yes, sir.
13    Q    Okay. Under 6.5, page 6, article 6.5, during
14 the JDA, it is anticipated that HRD may receive one or
15 more of Dow's samples for evaluation. Except with Dow's
16 prior written consent, HRD will, and then under subpart
17 (c), not analyze those samples to determine their
18 chemical composition or physical properties other than
19 those physical analyses reasonably necessary for the
20 JDA.
21    Was that a typical clause in a Dow joint
22 development agreement back in 2002?
23    A    I can't tell you that, I don't know.
24    Q    Do you know why 6.5 subpart (c) was included in
25 this joint development agreement?

Page 59

HIGHLY CONFIDENTIAL - KURT W. SWOGGER
2    A    No, sir.
3    Q    Do you know whether or not that Dow performed
4 its obligations under section 2.3 of the joint
5 development agreement, that is, to maintain detailed and
6 accurate records?
7    MR. NIMROD: Objection, calling for a legal
8 conclusion.
9    You can answer if you think you can.
10    THE WITNESS: I can only tell you I assume we
11 did.
12 BY MR. FEREBEE:
13    Q    And if Dow did not, then that would be a breach
14 of section 2.3 of this agreement, correct?
15    MR. NIMROD: Objection. Now this is definitely
16 asking for a legal opinion. He is not a lawyer. He is
17 not going to answer a question about breaches.
18    THE WITNESS: I don't know.
19 BY MR. FEREBEE:
20    Q    Do you know whether Dow performed or did not
21 perform any of the obligations under the joint
22 development agreement that we've marked as Exhibit 2?
23    A    Our obligation was to produce four products that
24 Marcus Oil said were acceptable to them in the
25 marketplace. And one of my questions that I asked my

Page 60

HIGHLY CONFIDENTIAL - KURT W. SWOGGER
2 people, did we do that? And the answer was, yes, we did
3 that. And they said, these are the products, these are
4 the four products.
5    Therefore, as far as I was concerned, we had
6 fulfilled this joint development agreement.
7    Q    Did you make any independent investigation to
8 determine whether or not the people under your
9 supervision had complied with the terms of the joint
10 development agreement?
11    MR. NIMROD: Objection, vague.
12    You can answer.
13    THE WITNESS: As I said before, I asked the
14 question did Marcus Oil sign off on the four products,
15 and the answer was yes. And I said great. That was my
16 extent of making sure that we complied because that was
17 the main purpose of this JDA.
18 BY MR. FEREBEE:
19    Q    Who are the people that you asked?
20    A    I don't recall.
21    Q    Did you ask one person or more than one?
22    A    I would say I don't recall, but typically I
23 asked more than one.
24    Q    And was the limit of your inquiry whether or not
25 Dow produced the four products listed in the supply

Page 61

HIGHLY CONFIDENTIAL - KURT W. SWOGGER
2 agreement?
3    A    My inquiry was did Marcus Oil sign off on the
4 four products, and the answer was yes.
5    Q    And beyond that, you made no additional inquiry?
6    A    Not to my recollection, that's correct.
7    (Exhibit 3 marked as requested.)
8 BY MR. FEREBEE:
9    Q    Let me hand you what has been marked as Exhibit
10 3 and ask you if you can identify that document?
11    A    Apparently it's the supply agreement between
12 Marcus Oil and Dow Chemical Company.
13    Q    Did you review this document before it was
14 executed?
15    A    I don't know.
16    Q    I notice unlike Exhibit 2, if you go to page 28,
17 someone other than yourself signed the supply agreement?
18    A    Yes.
19    Q    And who is that?
20    A    Let me look. I'm getting there. Oh, Len
21 Azzaro, okay.
22    Q    And who was Len Azzaro?
23    A    Len Azzaro was the business vice-president for
24 the polyethylene business at the time, and he would be a
25 peer of mine.

# Exhibit 2

26590

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DOW CHEMICAL CANADA, INC.,            )
on its own behalf and as assignee     )
of THE DOW CHEMICAL COMPANY           )
vs.                                   )
HRD CORPORATION (d/b/a MARCUS         )
OIL & CHEMICAL)                       ) CASE NO. 05-023 (JJF)
vs.                                   )
DOW CHEMICAL CANADA, INC., on its     )
own behalf and as assignee            )
of THE DOW CHEMICAL COMPANY           )
and THE DOW CHEMICAL COMPANY          )


ORAL VIDEOTAPED DEPOSITION
ASHANTI AYOUB
February 9, 2009


THE ORIGINAL OF THIS TRANSCRIPT
WILL BE IN THE CUSTODY OF:

Mr. Matthew Lord
Jenner & Block, LLP
330 N. Wabash Avenue
Chicago, Illinois 60611-7603

### Page 22

13:17:39 1  Q. Okay. Who did you interview with?
13:17:42 2  A. Angie.
13:17:42 3  Q. With Angie Shelley?
13:17:44 4  A. Yes.
13:17:45 5  Q. Okay. And how long was that interview?
13:17:48 6  A. Around 35 minutes.
13:17:50 7  Q. Okay. And what happened after that?
13:17:55 8  A. I got hired, I guess.
13:18:00 9  Q. Okay. Did you sign a confidentiality agreement
13:18:03 10 when you started working at Marcus Oil?
13:18:05 11 A. No.
13:18:06 12 Q. Have you ever signed a confidentiality
13:18:08 13 agreement at Marcus Oil?
13:18:09 14 A. No.
13:18:11 15 Q. Okay. What's your office like at Marcus Oil?
13:18:17 16 Do you have an office?
13:18:18 17 A. No.
13:18:19 18 Q. No. Do you sit at like a front desk?
13:18:23 19 A. It's a cubicle.
13:18:25 20 Q. A cubicle. Okay. About how big is it?
13:18:31 21 A. I don't know.
13:18:34 22 Q. Like what do you have in there?
13:18:37 23 A. A desk -- well, like a desk that's attached to
13:18:42 24 a panel, and a computer.
13:18:46 25 Q. A desk and a computer. Do you have any file

### Page 23

13:18:49 1  cabinets?
13:18:50 2  A. Yes.
13:18:51 3  Q. How many?
13:19:04 4  A. Around three, four.
13:19:06 5  Q. Okay. And what do you have in those cabinets?
13:19:20 6  A. Different files like files for fax cover sheets
13:19:25 7  and stuff like that.
13:19:29 8  Q. How are the files organized? Like in your
13:19:41 9  cabinets, how are your files organized?
13:19:44 10 A. Alphabetically.
13:19:45 11 Q. Alphabetically. Is it based on whichever other
13:19:47 12 business the files pertain to?
13:19:51 13 A. Yes.
13:19:52 14 Q. So alphabetically by business?
13:19:54 15 A. Uh-huh.
13:19:54 16 Q. And are they all customers?
13:19:56 17 A. No.
13:19:56 18 Q. No. What other types of businesses?
13:20:09 19 A. Maybe my file cabinet just has blank forms in
13:20:14 20 it.
13:20:14 21 Q. So blank forms for other businesses that
13:20:18 22 someone at Marcus Oil would communicate with?
13:20:20 23 A. Yes.
13:20:21 24 Q. Okay. And do you know if it's all customers?
13:20:30 25 A. I don't understand what you mean.

### Page 24

13:20:31 1  Q. I guess the files that you have that relate to
13:20:33 2  other businesses, are there any businesses in those
13:20:37 3  files other than a customer?
13:20:42 4  A. I'm kind of lost here. The businesses
13:20:45 5  related -- I'm confused. You said related to other
13:20:50 6  businesses?
13:20:50 7  Q. Yeah. I guess I mean any other businesses
13:20:52 8  other than a customer. Like somebody, a toll processer
13:21:00 9  or a testing lab or a shipping company.
13:21:06 10 A. Okay. No.
13:21:09 11 Q. No. Just customers?
13:21:10 12 A. No, the files that I have are blank forms, like
13:21:19 13 blank fax cover sheets and stuff like that in my file
13:21:22 14 cabinets.
13:21:23 15 Q. Okay. But you said they were broken down or
13:21:26 16 organized by business name?
13:21:29 17 A. Right. I did not understand you. It's not.
13:21:31 18 Q. It's not organized like that?
13:21:32 19 A. No.
13:21:32 20 Q. Okay. So how is it organized? You said
13:21:35 21 alphabetically?
13:21:36 22 A. Uh-huh.
13:21:37 23 Q. And so what are the different files that you
13:21:39 24 have sorted alphabetically?
13:21:41 25 A. Like fax cover sheets, different files like

### Page 25

13:21:52 1  invoice forms.
13:21:54 2  Q. Okay. So nothing relating to specific
13:21:58 3  third-party businesses?
13:21:59 4  A. No.
13:22:00 5  Q. Okay. Who sits near you in your office area?
13:22:07 6  A. Suzanna.
13:22:08 7  Q. I guess so your office is in the -- you said
13:22:11 8  before there is a warehouse, a processing area, and then
13:22:15 9  an office area.
13:22:17 10 A. Uh-huh.
13:22:17 11 Q. So is your office is in the office area?
13:22:19 12 A. Uh-huh.
13:22:20 13 Q. Okay. So Suzanna Acensio sits next to you?
13:22:26 14 A. Somewhat.
13:22:27 15 Q. Somewhat. How far away does she sit from you?
13:22:32 16 A. There's a cubicle in between.
13:22:34 17 Q. Okay. Is that an empty cubicle?
13:22:38 18 A. Uh-huh.
13:22:38 19 Q. Okay. Who else has offices in that office
13:22:40 20 area?
13:22:42 21 A. Craig and Raghu.
13:22:48 22 Q. Is that Craig Cawley?
13:22:50 23 A. Yes.
13:22:50 24 Q. And Raghu Palla?
13:22:52 25 A. Yes.

# Exhibit 3

Page 1

24987

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DOW CHEMICAL CANADA, INC., )
on its own behalf and as assignee )
of THE DOW CHEMICAL COMPANY )
vs. )
HRD CORPORATION (d/b/a MARCUS )
OIL & CHEMICAL) ) CASE NO. 05-023 (JJF)
vs. )
DOW CHEMICAL CANADA, INC., )
on its own behalf and as assignee )
of THE DOW CHEMICAL COMPANY )
and THE DOW CHEMICAL COMPANY )

ORAL VIDEOTAPED DEPOSITION
ABBAS HASSAN
February 4, 2009

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

THE ORIGINAL OF THIS TRANSCRIPT
WILL BE IN THE CUSTODY OF:

Mr. Andrew Weissmann
Jenner & Block, LLP
919 Third Avenue, 37th Floor
New York, New York 10022-3908

Page 222

1  right?
2          MR. LANDRUM: Objection.
3      A   I know I had e-mail exchanges. If you have
4  provided the e-mails, we'll have them.
5      Q   (BY MR. WEISSMANN) Great. We'll look forward
6  to getting them.
7      A   Thank you.
8      Q   No. Thank you.
9          Are you aware of any trade secret that you
10 told Dow about?
11     A   I have to really sit down and think and start
12 writing down all the trade secrets, you know. Offhand I
13 cannot think at the spur of the moment, you know, but
14 I'm sure in the meetings we had the were a lot of, you
15 know, things that were discussed that would have been
16 trade secrets.
17     Q   What are they?
18     A   I don't recall offhand, you know, and point by
19 point.
20     Q   Yes. You didn't really think about that before
21 you came here?
22     A   No. I didn't know what questions you were
23 going to ask me.
24     Q   You filed a counterclaim for $2.6 billion,
25 right?

Page 223

1      A   Sure.
2      Q   And did you read the part that said what all
3  the trade secrets are that you have?
4      A   No.
5      Q   You didn't bother reading that?
6      A   No, I haven't read it lately, no. Nothing. I
7  haven't prepared for this, you know, by reading
8  everything.
9      Q   What about before it was filed?
10     A   That was three years ago it was filed, you
11 know. I have not kept up, you know, as to what. You
12 know, I have other things going on. You know, I have
13 not read. You know, before the trial I'll definitely
14 read it to go and sit down before the 12 people and go
15 through that.
16     Q   But not now in a way that could help Dow in
17 discovery, right?
18     A   I did not, to be honest, look at it.
19     Q   So sitting here today, you're not aware of any
20 trade secret that you communicated to Dow?
21     A   On the top of my head, no.
22     Q   What trade secrets did you actually use in
23 connection with the JDA and the Supply Agreement?
24     A   You know, Dow made a product that was going
25 into hot melt. We told them what we were looking for

Page 224

1  that can supply a 2-pack, meaning both products will be
2  supported, the wax portion and the resin portion. Dow
3  was not in it. So that was a trade secret.
4      Q   So 2-pack was a trade secret?
5      A   They were not in it.
6      Q   Anything else?
7      A   I mean, that's the only one I can think of
8  offhand right now.
9      Q   Okay. How do you factor into the -- by the
10 way, let me withdraw that.
11         On the 2-pack, that's part of the claim,
12 then, that you have against Dow, that they
13 misappropriated your 2-pack trade secret?
14     A   You know, if you want to, you know, start
15 breaking it down, I have to really look at how, you
16 know, we broke the numbers down. I have not seen those
17 numbers, you know, lately to break it down. We are
18 comfortable that the numbers we gave, you know, 2.6 is a
19 very low number and we are very comfortable to go in
20 front of 12 people.
21     Q   So is that part of the claim, the 2-pack, that
22 Dow misappropriated the 2-pack?
23     A   Our contention was the 2-pack and the other
24 product, each product that we tried to get them to make,
25 every one had light ends. That was our biggest

Page 225

1  contention.
2      Q   Now, let's focus on trade secrets.
3      A   Trade secrets would be in that area, too.
4      Q   Right. First, is 2-pack one of the trade
5  secrets that you say that Dow misappropriated?
6      A   I would say.
7      Q   Any others?
8      A   Offhand, I cannot think of it, you know.
9      Q   How, in terms of your claim, do you factor in
10 that you were at a conference where you talked about the
11 2-pack concept publicly?
12     A   You know, we would not have done it -- Kurt
13 Swogger said you need to drum up, after the patent is
14 filed, because that way the patent goes very smoothly.
15 He taught us how to do it, suggested how to do it. We
16 abided because, you know, Dow is very big in this patent
17 at that time. We learned from him. We made the
18 presentation, you know; and Dow approved it. A lot of
19 changes were made between Dow and Marcus on those
20 presentations, and it was internally approved by Dow.
21 So we were comfortable. We were very comfortable after
22 it was approved by Dow. We thought we were legally
23 covered.
24     Q   Legally covered for what?
25     A   Legally covered on the 2-pack concept. You