IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DOW CHEMICAL CANADA INC., on its : 
behalf and as assignee of THE DOW : 
CHEMICAL COMPANY, : 
 : 
    Plaintiff, : 
 : 
    v. : 
 : 
HRD CORPORATION (d/b/a Marcus Oil : 
& Chemical), :   C.A. 05-023-RGA
 : 
    Defendant/Counterclaim : 
    Plaintiff, : 
 : 
    v. : 
 : 
DOW CHEMICAL CANADA INC., on its : 
behalf and as assignee of THE : 
DOW CHEMICAL COMPANY, and the : 
DOW CHEMICAL COMPANY, : 
 : 
    Counterclaim Defendants. : 

## MEMORANDUM OPINION

Kenneth J. Nachbar, Esq., Wilmington, Delaware; Harry J. Roper, Esq., Chicago, Illinois; Attorneys for Plaintiff Dow Chemical Canada Inc. and Counterclaim Defendants Dow Chemical Canada Inc. and The Dow Chemical Company.

John A. Sensing, Esq., Wilmington, Delaware; William C. Ferebee, Esq., Houston, Texas; Attorneys for Defendant and Counterclaim Plaintiff HRD Corporation (d/b/a Marcus Oil & Chemical).

December _18_, 2012
Wilmington, Delaware

1

*[signature: Richard G. Andrews]*

**ANDREWS, UNITED STATES DISTRICT JUDGE:**

This memorandum opinion considers a motion for summary judgment (D.I. 790) brought by Dow Chemical Canada, Inc. and The Dow Chemical Company (collectively "Dow"). This motion attacks HRD Corporation's remaining counterclaims for contractual ownership of two Dow patent applications, U.S. Patent Application Nos. 2006/0199897 and 2008/0306217 (the "'897 Application" and the "'217 Application"), and for misappropriation of trade secrets.

The facts and procedural history of this case are well-known to the parties. Dow and HRD contracted to jointly develop customized Polyethylene wax ("PE wax") according to a Joint Development Agreement ("JDA"). (D.I. 495, Exh. 1). The JDA called for a confidential and exclusive relationship. Dow was to conduct the actual research and development of the PE wax product with HRD to share the costs. The JDA also allotted to the parties ownership of intellectual property interests according to certain defined criteria. Once the developmental goals of the JDA were met, the parties entered into the commercial phase of the collaboration. This phase was governed by the Supply Agreement. (D.I. 240, Exh. 2). The Supply Agreement called for Dow to exclusively supply HRD with PE wax for a period of approximately four years. Once Dow began actually supplying HRD with the PE wax, however, HRD determined that the PE wax did not meet the needs of its customers. HRD refused to accept further deliveries of the PE wax on these grounds. Although the parties attempted to work through their differences, eventually it became clear that their differences were irreconcilable. Dow filed a suit for breach of contract, and HRD answered with counterclaims.

This Court granted summary judgment in favor of Dow on its contract claim, determining that Dow's deliveries of PE wax met the requirements of the Supply Agreement. (D.I. 444).

2

HRD's refusal to accept delivery of the PE wax was a corresponding breach of the Supply Agreement. The Court also granted Dow's motion for summary judgment on most, but not all, of HRD's counterclaims. HRD's remaining counterclaims allege that it is the rightful owner of the two Dow patent applications according to the JDA's allocation of intellectual property developments. HRD also claims misappropriation of four trade secrets, arguing that Dow wrongfully disclosed its trade secrets in patent filings.

Dow now moves for summary judgment on HRD's remaining counterclaims.

## DISCUSSION

As this is a motion for summary judgment, it may only be granted "where the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Azur v. Chase Bank, USA, Nat'l Ass'n*, 601 F.3d 212, 216 (3d Cir. 2010).

### I. The Citron Declaration

As an initial matter, HRD relies on the expert declaration of Dr. Joel David Citron to establish facts in support of its counterclaims. (D.I. 809). Dow argues that it is prejudiced by the Citron Declaration, as it was submitted after the deadline for expert reports and provides new opinions on various topics. Dow argues that it would be unfair to permit HRD to raise entirely new theories of liability at this time. The Court agrees. The Court may refuse to consider an expert report submitted after the deadline while considering a summary judgment motion. *Mosaid Technologies Inc. v. Samsung Electronics Co., Ltd.*, 362 F. Supp. 2d 526, 544 (D. N.J. 2005). The deadline for the submission of expert reports by the party bearing the burden of

3

proof was September 25, 2012. (D.I. 713, ¶ 2).[1] HRD filed the declaration of Dr. Citron on November 11, 2012. (D.I. 809). This declaration contains new opinions on facts germane to the summary judgment motion, including whether work giving rise to the '897 Application was conducted in connection with the JDA project (*Id.* at ¶¶ 9-23) and whether the '217 Application discloses an invention that falls within the definition of an intellectual property "Development" under the JDA. (*Id.* at ¶¶ 24-29). Dow was never given the opportunity to confront Dr. Citron on any of the new opinions,[2] and it thus would be prejudicial to allow HRD to now rely on these opinions in opposition to the summary judgment motion.[3] The declaration is struck as an improper and prejudicial attempt to circumvent the expert discovery schedule established by this Court.

## II. HRD's Contract Claim for the '897 and '217 Applications

Dow has moved for summary judgment on HRD's contract claim for the '897 and '217 applications, arguing that HRD has failed to show that these patents were actually reduced to practice as a result of work performed in connection with the JDA. HRD argues that that the JDA does not require that the applications were conceived in connection with the JDA project; so long as they were developed by Dow during the JDA's "Activity period" and relate to PE wax, they are allocated to HRD. The Court agrees with Dow. The JDA only dictates the ownership of intellectual property "Developments" created in connection with the JDA project. HRD fails to submit any evidence showing that the patent applications in suit are so connected.

---

[1] HRD bears the burden of proof on its contract claim for the patent applications and for misappropriation of trade secrets.
[2] Dr. Citron's deposition was noticed for October 23, 2012. (D.I. 772).
[3] Briefing on the summary judgment motion was completed November 29, 2012. (D.I. 853). The pretrial conference is December 14, 2012, and the trial is scheduled for January 7, 2013. The case is eight years old.

4

The interpretation of a contract is a question of law. *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 286 (Del. 2001).[4] The JDA states that HRD owns certain intellectual property "Developments," including, "(1) products made from or containing Polyethylene Waxes, (2) process for making products made from or containing Polyethylene Waxes, and/or (3) methods of use of Polyethylene Waxes." (D.I. 495, Exh. 1 at § 4.2(a)). Dow owns "all other Developments, including Polyethylene Waxes, processes for making Polyethylene Waxes, and catalysts used for making Polyethylene Waxes." (*Id.* at § 4.2(b)). The JDA later defines "Development" more specifically:

> "Development" means any invention, whether patentable or unpatentable. . . . which invention is first actually reduced to practice by a Party (and/or by its participating Affiliates or subcontractors), alone or with others, and which reduction to practice occurs both during the Activity Period and as a result of work performed in connection with this JDA.

(D.I. 495, Exh. 1 at § 10.7). The JDA defines a "Development" as an invention that is reduced to practice "as a result of work performed in connection with this JDA." This requires HRD to submit evidence that the '897 and '217 patent applications were conceived of in connection with Dow's research and development on the JDA project.

HRD argues against this easily understandable definition of "Developments." HRD argues that a separate "Exclusive Development" provision of the JDA renders *any* Dow invention relating to PE waxes and arising during the Activity Period a "Development," even if it arose from work completely unconnected to the JDA Project. This "Exclusive Development" provision states, "The Parties' relationship to develop jointly Polyethylene Waxes that meet the Success Criteria is to be exclusive, during the Activity Period." (*Id.* at § 3.1). HRD argues that because the collaboration is defined as "exclusive," any Dow effort to develop PE waxes falls

---

[4] Delaware law applies. (JDA, § 9.6).

5

within the ambit of the JDA. Accordingly, it does not matter whether the patent applications were conceived in connection with the JDA project. If such applications claim products, processes for products, or methods of use related to PE waxes, HRD argues that the contract provides they are inherently the property of HRD.

This interpretation is at odds with the plain language of the JDA viewed in its entirety. First, it attaches much greater significance to the "Exclusive Development" provision than appropriate. In this context, "Exclusive" means "excluding others from participation." The JDA project's "exclusive" nature thus prohibits Dow and HRD from working with third parties to develop PE waxes. This has no effect, however, on Dow's independent research and development efforts that do not involve third parties. Further, the plain language of the exclusivity provision limits its application to the development of PE waxes that meet the JDA's "Success Criteria."[5] The provision has no effect on research and development efforts that are not aimed at this goal. The mere fact that someone, somewhere within Dow, is conducting research on PE waxes does not make that research part of the JDA.

This interpretation is bolstered by the fact that HRD's intellectual property interests are defined elsewhere in the JDA, and HRD's interpretation would conflict with this definition. As already discussed, the intellectual property allocations are controlled by the definition of "Development" in section 10.7 of the JDA. "Development" is strictly defined as "any invention" that is "actually reduced to practice. . . .both during the Activity Period and as result of work performed in connection with this JDA." Courts must strive to give effect to all provisions of a contract and not render any provision meaningless. *Elliott Assocs., L.P. v. Avatex Corp.*, 715

---

[5] "Success Criteria" is defined in the JDA at § 10.19 to mean "the technical and business parameters to be met for the JDA to be considered successfully completed."

6

A.2d 843, 854 (Del. 1998). The contract as written requires that the invention occur during a certain time period and as a result of the JDA. HRD's interpretation renders superfluous the requirement that the invention be a result of the JDA. HRD's interpretation is that, if it happened during the time period, it is theirs, whether or not it is as a result of the JDA. This cannot be a correct interpretation of the contract, as it would render a Dow employee's research on PE wax a "Development" under the JDA, even if the Dow employee never worked on the JDA project and knew nothing about it. Thus, HRD's interpretation is erroneous. For HRD to have an interest in the patent applications, it must show that an application was reduced to practice "as a result of work performed in connection with [the] JDA."

Dow submits evidence that there was no connection. This includes an affidavit from Teresa P. Karjala. (D.I. 792). Karjala is a named inventor of both the '897 and '217 applications. (*Id.* at ¶¶ 1-3). Karjala also worked on the JDA project. (*Id.* at ¶ 2). Karjala averred that she was familiar with the scope of the JDA project and the subject matter of the patent applications. (*Id.* at ¶¶ 2-3). She averred that none of the work disclosed in either application was performed in connection with the JDA. (*Id.* at ¶ 3). Dow further submits that the '897 application is a continuation-in-part of an earlier patent application that was filed by inventors who never worked on the JDA. (D.I. 245, Exh. 46). The earlier application is PCT Publication No. WO 2005/090427 ("'427 Application"). (D.I. 736, Exh. JC22). Dow submitted an Excel spreadsheet that recorded the names and hours of each Dow employee who worked on the JDA, as well as a list of the named inventors for the '427 application. (D.I. 794, Exh. 11; 736, Ex. JC22). There is no overlap between the two groups.[6]

---

[6] The named Dow employees who worked on the JDA are S. Campbell, T Castelluccio, F. Cerk, S. Cloudt, B. Garcia, D. Gifford, T. Karjala, B. Kolthammer, W. Konze, M. Pollard, C. Rickey, D. Vanderlende, and S. Yalvac. (*See* D.I. 794, Exh. 11). The inventors of the '427 application are D. Arriola, E. Carnahan, Y. Cheung, D. Devore,

7

The Karjala affidavit is based on personal knowledge and is sufficient evidence from which to conclude that the two patent applications were not reduced to practice in connection with the JDA. This places the burden on HRD to submit evidence of disputed material facts. HRD submits an email between Dow personnel that supposedly refers to the underlying technology of the patent applications in connection with the JDA project. This effort to support a connection between the applications and the JDA project fails. The email follows:

> Although there is likely some technology here that can be applied to the wax case, it is critical that we get full buy in from Tony Frencham before we proceed. This opportunity is a great departure from the project we have with HRD as defined by the scope of the agreement. In order to achieve commercial status with chain-shuttling, we will need to spend significant resources. Given the history of the wax effort, it is not apparent we would do this, and we certainly would not do this on our dime.
>
> As Teresa [Karjala] has already scheduled a meeting, we can develop a project timeline and cost for Tony, to give him an option outside of the current program. However, it is absolutely critical that HRD not be apprised of a 'potential' solution to their current product predicament or that Dow may have some as 'special' technology that is not being made available.

(D.I. 808, Exh. 9). HRD argues that the "chain shuttling" mentioned here refers to a technology described by the "F10 Family" of patents, of which the '897 and '217 applications are supposedly members. This email, however, still does nothing to connect "chain shuttling" with work done on the JDA project. To the contrary, the email specifically states that "chain shuttling" is "a great departure from the project we have with HRD as defined by the scope of the agreement." This alone renders the email unsupportive of HRD's burden. Moreover, HRD relies on the now struck Citron Declaration to argue that "chain shuttling" is related to the '897 and '217 applications. This expert opinion cannot serve as evidence, and HRD submits no further evidence to connect the JDA project with the two applications. Thus, HRD fails to

---

D. Graf, P. Hustad, R. Kuhlman, C. Li Pi Shan, B. Poon, G. Roof, J. Stevens, P. Stirn and T. Wenzel. (*See* D.I. 736, Exh. JC22).

8

submit material facts disputing Dow's validly submitted evidence that the patent applications are unrelated to the JDA project. For this reason, the Court will grant Dow's motion for summary judgment on HRD's contract claim for the '897 and '217 applications.

## II. Misappropriation of Trade Secrets

HRD's second claim is for misappropriation of trade secrets. Delaware has adopted the Uniform Trade Secrets Act, codified at 6 Del. C. § 2001. The party seeking to make a misappropriation claim must establish four elements: (1) the existence of a trade secret; (2) the communication of a trade secret by plaintiff to the defendant; (3) which was pursuant to an express or implied understanding that the secrecy of the matter would be respected; and (4) the secret information has been improperly used or disclosed by the defendant to harm the plaintiff. *Savor, Inc. v. FMR Corp.*, 2004 WL 1965869, *5 (Del. Super. 2004).

HRD initially alleged that Dow misappropriated 41 trade secrets. All but four of these trade secret claims were disposed of by the Court's previous summary judgment opinion. (D.I. 444). The remaining claims are known as Trade Secret Nos. 13, 23, 24, and 40. To meet the first element of the test, HRD must show the existence of a trade secret with "reasonable degree of precision and specificity . . . such that a reasonable jury could find that plaintiff established each statutory element of a trade secret."[7] This identification must be particular enough as to separate the trade secret from matters of general knowledge in the trade or of special knowledge

---

[7] The statutory elements of a trade secret follow:

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique or process [that d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use [and i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

6 Del. C. § 2001(4).

9

of persons skilled in the trade. *See Imax Corp. v. Cinema Technologies, Inc.*, 152 F.3d 1161, 1164 (9th Cir. 1998). The identification must clearly refer to trade secret material. *Id.* at 1167. For example, in *Imax*, summary judgment was granted on the plaintiff's claim for its failure to clearly identify alleged trade secrets of film projector designs. *Id.* The plaintiff relied on the following patent claim element in order to identify its trade secret: "every dimension and tolerance that defines or reflects [the cam unit] design." *Id.* This did not satisfy the particularity requirement because it did not "clearly refer to tangible trade secret material." *Id.* "Rather, it refer[red] to a patented projector system which *potentially* qualifie[d] for trade secret protection." *Id.* In that case, "reasonable specificity could only be achieved by identifying the precise numerical dimensions and tolerances as trade secrets." *Id.*

Dow argues that HRD failed to specify the alleged trade secrets with sufficient particularity. In support of this argument, Dow submits certain HRD interrogatory answers, arguing that these discovery responses represent the extent of HRD's deficient identification. (D.I. 240, Exh. 33 at 2-8). HRD responds with a citation to supplemental interrogatories. (D.I. 808, Exh. 11). HRD argues that Dow should have filed a motion to compel if it was unsatisfied with HRD's identifications. This would be true if Dow now claimed that it was prejudiced by HRD's answers or if Dow sought additional discovery. This is not a discovery motion, however; it is summary judgment motion that seeks to determine whether HRD has sufficient facts to support its claims. It is HRD's burden to establish facts from which one could conclude the existence of trade secrets. *See* Fed. Civ. P. 56(c)(1)(A). Because HRD makes no effort to

identify trade secrets in any greater detail than what is identified in its discovery responses, those responses are the focus of the Court's analysis as to the identification element.[8]

From HRD's responses, it is immediately apparent that HRD fails to sufficiently identify Trade Secret No. 24. HRD's answer to Dow's initial interrogatory on this trade secret yielded the following identification:

> Trade Secret 24—HRD gave the list of chemical characteristics that a 2-pack product would need to meet the requirements of the hot melt adhesive market.

(D.I. 241, Exh. 33 at 6). Here, HRD refers to a list of chemical characteristics given to Dow, without actually identifying what comprises that list. In HRD's later answer to Dow's supplemental interrogatory, HRD merely referred to its previous interrogatory responses without giving any hint as to how those answers specify this trade secret. (D.I. 808, Exh. 11 at 10). Such conclusory identification is inadequate. For this reasons, HRD fails to meet its burden to clearly identify trade secret material in regards to Trade Secret No. 24.

Likewise, HRD fails to clearly identify alleged Trade Secret 40. HRD's answer to Dow's first interrogatory for identification of this trade secret follows:

> Trade Secret 40—HRD gave Dow the concept of using dual catalysts to manufacture a 2-pack product.

(D.I. 241, Exh. 33 at 6). Here, HRD states that it gave Dow a certain "concept" without any details as to the specifics of this concept. HRD's answer to Dow's supplemental interrogatory request for more details on Trade Secret No. 40 is similarly deficient, as HRD merely stated that "two-pack products can be made in multiple ways, as described in numerous Dow patents/patent

---

[8] HRD's briefing (D.I. 805, pp. 15-17) on this point is inadequate, as it completely fails to explain how the interrogatory responses meet the statutory requirements of what constitutes a trade secret. Nevertheless, the Court will explore the responses to determine whether the existence of trade secrets may be reasonably found. The Court is not, however, searching the record for evidence that has not been cited to it. *See* Fed. R. Civ. P. 56(e)(2) & (3)

11

applications, [citations to patents and patent applications]." (D.I. 808, Exh. 11 at 10-11). This generic statement about the manufacturing of two-pack products is not a clear identification of a trade secret. HRD's misappropriation claim for Trade Secret No. 40 thus fails.

This brings the Court to Trade Secret No. 23. HRD responded to Dow's initial interrogatory on Trade Secret No. 23 as follows:

> Trade Secret 23—HRD gave Dow the list of physical characteristics that a 2-pack and wax product would need to meet the requirements of the hot melt adhesive market, including those listed above and additionally needed a molecular weight distribution of less than 2 to avoid the undesirable effects that very low molecular weight polymer fractions had on hot melt adhesive performance and to achieve the desired set speed and open time requirements of the marketplace and that the molecular weight of the 2-pack needed to be between the wax and the polymer but favoring the polymer to give the need [sic] strength in the overall HMA and not contain light ends.

(D.I. 241, Exh. 33 at 6). Here, HRD indicates that it gave Dow a "list of physical characteristics." HRD, however, never explains the details of the list. HRD does separately state that a "molecular weight distribution of less than 2" is desirable for certain aspects of the two-pack. In one supplemental interrogatory answer, however, HRD states, "[t]here was no one ideal molecular weight distribution for the two-pack." (D.I. 808, Exh. 11 at 6). This undermines the position that a molecular weight distribution of less than 2 is a trade secret. In another supplemental interrogatory answer related to this trade secret, HRD states that it "disclosed to Dow the benefit of having a two-pack product" and that "[p]art of HRD's trade secret was the ability to custom manufacture a variety of adhesive products for each manufacturer to make an ideal adhesive for each of its different customers." (D.I. 808, Exh. 11 at 9-10). The reference to unspecified benefits of the two-pack product, however, can hardly constitute sufficient description of a trade secret. HRD also fails to explain the specifics of the "ability to custom manufacture a variety of adhesive products." These disjointed and contradictory responses are

12

not a clear identification of a trade secret. For this reason, HRD's claim for Trade Secret No. 23 fails.

In contrast to the previously mentioned alleged trade secrets, HRD does provide some objective parameters in relation to Trade Secret No. 13. HRD describes Trade Secret No. 13 in an initial interrogatory answer as follows:

> Trade Secret 13—HRD disclosed to Dow the ideal molecular weight distribution for the two pack and wax products as well as the ideal adhesive properties, viscosity and heat stability sought by HRD customers. Viscosity range for the finished 2 pack being in the 800 to 1500 cps range with SAFT and PAFT in excess of 130 F and fiber tear at 0 to 140F of 100%.

(D.I. 241, Exh. 33 at 4). Here, HRD provides numerical ranges regarding viscosity, Peel Adhesion Failure Temperature ("PAFT"), and Shear Adhesion Failure Temperature ("SAFT") for the two-pack product. In the supplemental interrogatory answer relating to Trade Secret 13, HRD states that this information "allowed it to custom manufacture a variety of adhesive products for each manufacturer to make an ideal adhesive." (D.I. 808, Exh. 11 at 8). This is the type of particularity required to meet the identification element. That being said, other portions of the initial discovery response are not sufficient, as HRD refers to the "ideal molecular weight distribution for the two pack" without identifying exactly what this weight distribution is. As already discussed, HRD contradicted the notion that any ideal molecular weight distribution exists in a subsequent discovery answer. Nevertheless, since HRD has identified some trade secret material with particularity, Trade Secret No. 13 meets the first element of the misappropriation of trade secret analysis.

The second element of a misappropriation of trade secrets claim requires HRD to show that it communicated the trade secret to Dow. *Accenture Global Services GMBH v. Guidewire*

13

*Software Inc.*, 581 F. Supp. 2d 654, 662 (D. Del. 2008). HRD argues that "while it did communicate certain trade secrets to Dow, the confidentiality and ownership provisions of the JDA also vested in HRD rights to information developed during the pendency of the JDA." (D.I. 805, p. 15). HRD's first assertion that it communicated trade secrets to Dow is unsupported by any evidence. HRD's second assertion states that by virtue of the confidential relationship between Dow and HRD, Dow was contractually obligated to protect and keep secret any novel research developments flowing from the JDA project. HRD argues that Dow violated this obligation when it disclosed HRD's trade secrets through its patent filings, which describe certain compounds that may meet the definition of PE waxes related to the JDA project. The implication is that this violation is sufficient to support a misappropriation of trade secrets claim.

It may be factually true that Dow had the obligation to keep the intellectual property developments of the JDA project confidential, but this does not alter the legal requirement that a trade secret must be communicated from the plaintiff to the defendant. As already discussed, HRD failed to establish that any patents or patent applications arose in connection with the JDA. Even assuming, however, that they did arise in connection with the JDA, fatal to HRD's theory is the fact that the supposed trade secret is actually a Dow invention. Dow thus never learned about any identified trade secret from HRD. Delaware law requires that the trade secret be communicated from the plaintiff to the defendant. *Accenture Global Services GMBH*, 581 F. Supp. 2d at 662. As the developer of the PE waxes under the JDA, it was Dow who conducted the research and development activities to create the PE wax for HRD. (*See* D.I. 495, Exh. 1). It is true that Dow had contractual obligations to keep information related to Dow's research and development secret, but the breach of this obligation should give rise to a contract claim, not a

14

misappropriation of trade secrets claim.[9] Because HRD has failed to show that it communicated any trade secrets to Dow, HRD's claim for misappropriation of trade secrets fails.

HRD has failed to establish facts in support of both the contract claim for patent applications and the claim for misappropriation of trade secrets. Dow's motion for summary judgment is thus granted. An appropriate order will follow.

---

[9] As already discussed, HRD failed to establish any contract claim against Dow.