IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DOW CHEMICAL CANADA INC., on its behalf and as assignee of THE DOW CHEMICAL COMPANY, | : : : | |
| | : | |
| Plaintiff, | : : | |
| v. | : : | |
| | : | |
| HRD CORPORATION (d/b/a Marcus Oil & Chemical), | : : | C.A. 05-023-RGA |
| | : | |
| Defendant/Counterclaim Plaintiff, | : : | |
| | : | |
| v. | : : | |
| | : | |
| DOW CHEMICAL CANADA INC., on its behalf and as assignee of THE DOW CHEMICAL COMPANY, and the DOW CHEMICAL COMPANY, | : : : : | |
| | : | |
| Counterclaim Defendants. | : | |

## **MEMORANDUM OPINION**

---

Kenneth J. Nachbar, Esq., Wilmington, Delaware; Attorney for Plaintiff Dow Chemical Canada Inc. and Counterclaim Defendants Dow Chemical Canada Inc. and The Dow Chemical Company.

John A. Sensing, Esq., Wilmington, Delaware; Attorney for Defendant and Counterclaim Plaintiff HRD Corporation (d/b/a Marcus Oil & Chemical).

---

December 19, 2012
Wilmington, Delaware

**ANDREWS, UNITED STATES DISTRICT JUDGE:**

Plaintiff Dow Chemical Canada, Inc. brings this supplemental motion for summary judgment (D.I. 481) in order to prove up damages on its contract claim against Defendant HRD Corporation. A previous order of this Court (D.I. 444) granted Dow's motion for summary judgment and established HRD's breach of contract, but did not determine Dow's damages. This opinion will determine Dow's claims for damages.

## BACKGROUND

On July 1, 2002, Dow and HRD entered into two contracts: the Joint Development Agreement ("JDA") and the Supply Agreement. (D.I. 483, Exhs. 1, 2). The parties agreed to jointly develop polyethylene wax products. (D.I. 483, Exh. 1 at ¶ 1.3). After product development, Dow was to manufacture and supply HRD with the wax products. (D.I. 483, Exh. 2, ¶ (D)). They were to be produced from a Dow manufacturing plant (the "Sarnia Plant") specifically customized for this purpose. (*Id.*). The JDA governed the collaboration to develop the wax products, and the Supply Agreement governed the subsequent commercial phase of the relationship. (D.I. 483, Exh. 1 at ¶¶ 1.3, 2.2, 10.18, 10.19). The parties' rights to payment hinged on certain agreed upon developmental and commercial milestones. One of these milestones was known as the "Implementation Date," or the date that marked the beginning of the conversion process of Dow's Sarnia Plant. (D.I. 483, Exh. 2 at ¶ 3.1) Another important milestone was known as "Beneficial Manufacture," defined as Dow's "first Delivery of Product to HRD." (*Id.* at ¶ 1). "Delivery" occurred when "the Product is declared by [Dow] to be Prime Product or Off-Spec Product and (ii) when the Railcar is full or otherwise declared by [Dow] to

2

be ready to be transported."[1]  Thereafter, Dow would supply the wax products to HRD for four years, and HRD would purchase the output of the Sarnia Plant (up to 60 million pounds per year).  (*Id.* at ¶¶ 2.1, 6.1, 6.2).  Dow promised to sell the wax products only to HRD during these four years.  (*Id.* at ¶ 31).

The parties reached the Implementation Date on February 28, 2003, triggering the Sarnia Plant's conversion process.  (D.I. 483, Exhs. 3 at pp. 2-3, 3B, 3D).  The conversion was successful and Dow began actual wax production on May 2, 2004.  (D.I. 483, Exh. 4).  On May 11, 2004, Dow notified HRD that two railcars of Prime Product were available for transport.  (D.I. 483, Exhs. 4, 5).  Those two railcars were shipped, followed by two more on May 14, 2004 and a fifth railcar on June 4, 2004.  (D.I. 483, Exh. 3H, 3I).  The deliveries constituted Beneficial Manufacture.[2]

On July 30, 2004, HRD requested that Dow halt production at the Sarnia Facility, alleging that the wax product did not meet its requirements and it was not marketable.  (D.I. 483, Exh. 8).  The parties entered discussions to find a solution to HRD's issues with the wax product, with Dow conducting additional production research at HRD's request.  (D.I. 483, Exhs. 9, 10, 11, 12).  These discussions failed and production never resumed.  (D.I. 483, Exh. 12).  On January 18, 2005, Dow informed HRD that the Supply Agreement was terminated due to HRD's failure to pay the "Capacity Rights Payment" and the "Annual Operating Payment."  (D.I. 1, Exhs. G-L).  That same day, Dow filed the breach of contract action initiating this case.  (D.I. 1).

---

[1] "Product" was defined as wax manufactured with the intent to be delivered to HRD and to meet the specifications of the agreement, regardless of whether the wax actually met those specifications (i.e., "Prime Product") or not (i.e., "Off-Spec Product").  (*Id.*).

[2] This was an issue decided by this Court's opinion granting Dow's motion for summary judgment for breach of contract.  (D.I. 444, pp. 5-7, 29).

3

This Court has held that HRD breached the Supply Agreement after the contract's Beneficial Manufacture milestone. (D.I. 444, pp. 6-7, 29). As this is a motion to establish damages, the payment provisions of the Supply Agreement are key. The Supply Agreement details three different types of payments to Dow. They are the Capacity Rights Payment ("CRP"), the Annual Operating Payment ("AOP") and the Variable Cost Payment ("VCP"). The CRP was intended to compensate Dow for its costs of converting the Sarnia Plant. (D.I. 483, Exh. 2 at ¶ 8.1.1). The CRP had two components; the "Estimated CRP," due within 15 days of the Implementation Date, and the Final CRP, intended to "true up" the difference between the Estimated CRP and Dow's actual conversion costs.[3] (*Id.* at ¶¶ 8.1.1, 8.2.1). The Final CRP was to be invoiced within 90 days of the Beneficial Manufacture. (*Id.* at ¶ 8.1.1). The second type of payment, the AOP, was an annual fee of $16,500,000 Canadian Dollars [CAN] to be invoiced in monthly installments. (*Id.* at ¶¶ 8.1.2, 8.2.2). It was intended to compensate Dow for the operational costs of the Sarnia Plant and to include a profit margin. (*Id.* at ¶ 8.1.2). The third type of payment, the VCP, compensated Dow for the market cost of the raw materials used to make the wax product. (*Id.* at ¶ 8.1.3). Dow admits that HRD met its obligations with respect to the Estimated CRP of $6,792,000, the first AOP monthly installment invoice, and the VCP for each railcar. (D.I. 482, p. 5).

Dow argues that this breach triggered various enforceable stipulated damages provisions of the Supply Agreement. One provision requires HRD to pay Dow the unpaid AOP for the rest of the year of contract termination. (D.I. 483, Exh. 2 at ¶ 21.5.1.1.2). Because Dow did not send notice of termination to HRD until January 18, 2005, Dow argues it is owed the AOP for the entire year of 2005 as well as the unpaid 2004 installments. Another provision requires HRD to

---

[3] The original Estimated CRP was fixed at $4,000,000. (D.I. 483, Exh. 2 ¶8.1.1). This was amended to $6,792,000 by the parties. (D.I. 483, Exh. 3D).

pay Dow the Final CRP payment. (*Id.* at ¶ 21.5.1.1.1). A third provision requires HRD to pay

Dow $.05 per pound, multiplied by three times the Sarnia Plant's Annual Capacity of 60 million

pounds. (*Id.* at ¶ 21.5.1.1.3). According to Dow, this provision is intended to compensate Dow

for its "lost opportunity," as another provision of the Supply Agreement prohibited Dow from

selling wax products for three years after contract termination. Finally, Dow argues that it is

owed monthly interest of 1.5% on these damages as well as costs and attorneys' fees. (*Id.* at ¶

8.2.5).

     Dow now moves for summary judgment on all of these damages claims.

## DISCUSSION

     Dow argues that it is owed the AOP for the entire year of 2005, as the Supply Agreement

calls for HRD to pay Dow the AOP for the entire calendar year of its termination and Dow

communicated contract termination on January 18, 2005. HRD disagrees for three reasons: (1)

the contract was constructively terminated in 2004; (2) the 2005 AOP damages stipulation is

invalid as a penalty; (3) and Dow's request fails to reflect Dow's mitigation of its damages by

closing the Sarnia Plant in 2004.

### (a) Constructive termination

     HRD argues that the Supply Agreement was constructively terminated in 2004. If HRD

is correct, then it does not owe any AOP for 2005, because the Supply Agreement only entitles

Dow to the unpaid AOP for the year of the Supply Agreement's termination. The AOP was an

annual fee of $16,500,000 CAN. (*Id.* at ¶ 8.1.2). The AOP was intended to compensate Dow for

Sarnia Plant operating costs and related profits during the wax producing phase of the agreement.

(*Id.*). HRD's duty to pay AOP was triggered once Dow achieved Beneficial Manufacture, i.e.,

5

delivered the first two railcars of the product wax. (*Id.* at ¶ 8.2.2). This phase was expected to last 48 months, with HRD expected to pay monthly installments. (*Id.* at ¶¶ 2.1, 8.1.2). The AOP was "payable regardless of the amount of Product taken by HRD in the year." (*Id.* at ¶¶ 8.1.2, 8.2.2). In the event of contract termination due to HRD's breach, the stipulated damages provision required HRD to pay Dow "the remainder of the AOP for the Year." (*Id.* at ¶ 21.5.1.1.2). The contract, however, did not automatically terminate by virtue of HRD's act of breach; termination did not officially occur until Dow provided HRD with written notification that the Supply Agreement was terminated. (*Id.* at ¶ 21.1.2). Dow did not send this letter until January 18, 2005, despite the fact that HRD stopped making its agreed upon payments in June 2004. (D.I. 1, Exhs. G-L). The earliest that Dow could have given notice of the Supply Agreement's termination was sixty days after Dow notified HRD that it was in breach, which Dow did on October 5, 2004. (D.I. 1, ¶ 88; Exh. G). Thus, Dow could not terminate the contract any earlier than December 4, 2004.

HRD argues that it should not be required to pay the 2005 AOP. HRD relies on a theory of "constructive termination." According to HRD, Dow's acts made it clear that Dow considered the business relationship with HRD terminated in 2004. These acts include Dow holding a "project closure meeting" to "review the project experiences, including the startup, and gather recommendations for improvement on future projects" as described in an internal Dow memo. (D.I. 495, Exh. 5 at 2). HRD argues that the Dow memo shows that Dow was already in the process of closing the Sarnia Plant in 2004. HRD then cites a Dow timeline indicating that Dow originally planned to notice termination of the contract to HRD on December 31, 2004. (D.I. 495, Exh. 6 at 30733). HRD further relies on an email exchange between Dow employees Tony Frencham and Michael Gillis on December 14 and 15, 2004. (D.I. 495, Exh. 7 at 31974). In this

exchange, Mr. Gillis requested that Dow delay communicating the termination of the contract to HRD until January 3, 2005. *Id.* This was to minimize the chance for leak of the project shutdown to Sarnia Plant employees. *Id.* Mr. Frencham responded, "I'd like to stay with Dec 31 for now until I have discussed further with Dave Fifeld. We certainly need to have all materials ready to go well before Dec 31 as we have the potential for a leak anytime. By the way, I have another discussion with [HRD] tomorrow on a possible go-forward settlement – stay optimistic." *Id.* HRD argues that this exchange further proves that Dow considered the Supply Agreement terminated.

HRD next relies on a December 21, 2004 Dow estimation that Dow's costs to shut down the plant were $9.7 million, argued by HRD to be the exact number Dow seeks for the 2004 AOP payment. (D.I. 495, Exh. 8 at 35375). HRD further relies on a spreadsheet Dow created to "capture the costs of potentially stopping the Wax Project in Sarnia." (D.I. 495, Exh. 9 at 47109). This spreadsheet contained a line item for "Termination Fee remainder of AOP for Year (5 months)." (D.I. 495, Exh. 10 at 580). It also states that "Legal Review indicates calandar [sic] year will end in 2004 for definition of when 'breach' is. Thus, no amount to be paid." (*Id.* at 47581). HRD argues that it can be deduced from this evidence that there exists a genuine issue of fact as to whether Dow "constructively terminated" the contract in 2004.

The problem with HRD's argument is that the theory of "constructive termination" is not applicable to the circumstances of this case. HRD cites two cases supporting the legal proposition that Delaware recognizes "constructive termination." The first is *Lipson v. Anesthesia Services, P.A.*, 790 A.2d 1261 (Del. Super. 2001). The *Lipson* case is completely inapposite, as *Lipson* involved a wrongful employment termination claim supported by allegations of constructive discharge. *Id.* at 1290. The issue was whether the defendant

7

constructively terminated the plaintiff by making his work environment so intolerable that the plaintiff was left with no choice but to resign. *Id.* It had nothing to do with the termination of a supply contract, let alone the particular question of whether a supply contract requiring written notice of termination to the party in breach is subject to an earlier constructive termination by virtue of a party's internal decision that the contractual relationship is over. It does nothing to support HRD's theory.

HRD's second case, *In re Kirkwood Kin Corp. v. Dunkin' Donuts, Inc.*, 1997 WL 529587 (Del. Super. 1997), is also inapposite. *In re Kirkwood Kin Corporation* involved a dispute between a national franchiser and its former franchisee. *Id.* at 9. In that case, the court determined that the Franchise Security Law permitted a cause of action for constructive or *de facto* termination of a franchise agreement. *Id.* The plaintiff franchisee had argued that the defendant franchiser violated the Franchise Security Law by effectuating an unjust termination of the franchise agreement. *Id.* at 8. The plaintiff argued that the defendant constructively terminated the franchise agreement when the defendant allowed another franchise to enter the plaintiff's territory and otherwise acted in ways to cause a decline in the plaintiff's business. *Id.* This decline in business arguably caused plaintiff's nonpayment of franchise fees to the defendant and the defendant's resulting explicit termination of the agreement. *Id.* The court noted that Delaware Franchise Security Law did not expressly recognize constructive termination. *Id.* at 9. Nevertheless, the purpose of the Franchise Security Law was to remedy the imbalance of power in the franchiser-franchisee relationship. *Id.* The court reasoned that requiring the franchisee to receive a formal termination notice before triggering the statute's protections would render those protections illusory. *Id.* at 9. Thus, the Court ruled that formal notice of termination was not required.

8

This case has little apparent application to the termination of the Supply Agreement, as the Supply Agreement obviously is not a franchise agreement and is not governed by the Franchise Security Law.  The underlying rationale likewise does not apply, as HRD does not argue that it entered into the JDA and the Supply Agreement in a position of weakness relative to Dow's power.  HRD provided no evidence that Dow's oppressive behavior jeopardized HRD's business or financial condition in a way that rendered HRD unable to pay monies owed under the contract.  To the contrary, this Court has already held that Dow complied with all of its obligations under the JDA and the Supply Agreement in relation to Dow's contract claim.  The business relationship between Dow and HRD is simply not at all analogous to *In re Kirkwood Kin Corporation*, and thus that case provides no rationale to adopt a "constructive termination" theory here.

HRD fails to persuade the Court that Delaware law recognizes the theory of "constructive termination" in the context of this Supply Agreement.  As such, Dow complied with the Supply Agreement's clear mandate that termination was to occur only by written notice to the party in breach.  Dow may have made its decision to terminate the contract at an earlier date, but Dow's internal machinations regarding an anticipated breakdown of the business relationship did not modify the requirements of the termination provision.[4]  Only an outward manifestation of intent to terminate the contract sufficed and that manifestation did not occur until January 2005.  The fact that Dow's suspicions that wax production would not resume arose in 2004 does not backdate the date of termination to that year.  HRD argues that it is an unfair result for Dow to

---

[4] In any event, HRD's evidence that Dow had settled on ending the business relationship in the middle of 2004 is not entirely convincing.  For example, Mr. Frencham's mid-December email to Mr. Gillis indicated optimism regarding resolutions of differences with HRD.  Further, the spreadsheet HRD relies upon heavily to show that Dow had committed to termination concerned the "costs of *potentially* stopping the Wax Project" (emphasis added).  For purposes of this decision, however, the Court assumes that Dow intended to send the notice of termination as of December 4, 2004, and delayed doing so for its own reasons.  Nothing in the Supply Agreement requires that termination be noticed at the earliest available opportunity.

9

reap a windfall of $16,500,000 CAN based on Dow's unilateral decision to delay mailing a letter a matter of weeks, but this result stays true to the agreed upon method of termination.

### (b) Liquidated Damages

The parties dispute the enforceability of the clause providing Dow up to a year's worth of AOP in the event of HRD's breach. Dow moves to enforce the provision, while HRD argues that the provision is an unenforceable penalty. The Supreme Court of Delaware uses the two-pronged *Lee Builders* test to determine the validity of an asserted liquidated damages provision. *Brazen v. Bell Atlantic Corp.*, 695 A.2d 43, 48 (Del. 1997) (citing *Lee Builders v. Wells*, 103 A.2d 918, 919 (Del Ch. 1954)); *Delaware Bay Surgical Services, P.C.* v. *Swier*, 900 A.2d 646, 651 (Del. 2006). The first prong of *Lee Builders* asks whether damages were uncertain at the time of contracting. *Brazen*, 695 A.2d at 48. If damages are certain, then the provision is not enforceable. *Id.* The second prong of *Lee Builders* asks whether the amount contracted for was reasonable. *Id.* If the contracted for amount is not reasonable, the provision is a penalty and is void as against public policy. *Id.*

The clause at issue defines damages owed to Dow in the event that HRD is responsible for the Supply Agreement's termination. This Court previously determined that Dow met its obligations to produce the wax product and that HRD wrongfully failed to make payment. Thus, it is undisputed that HRD is the party responsible for the termination of the supply agreement. This triggered the liquidated damages clause at issue, which states that HRD shall pay to Dow the "remainder of the AOP for the Year." (D.I. 495, Exh. 2 at ¶ 21.5.1.1.2). The AOP was designed to compensate Dow for its operation costs related to the Sarnia Plant with a profit margin. The Court has determined that the contract was officially terminated on January 18,

2005. Thus, according to the letter of the contract, Dow is owed the AOP amount for the remainder of the year of 2005.[5]

The Court will begin with the first prong. HRD argues that Dow's damages flowing from HRD's breach after Dow began wax production could have been estimated with certainty. HRD points out that Dow is a sophisticated chemical company and competent to calculate the costs of halting production and mothballing the Sarnia plant, especially considering the costs to operate the plant were calculable. Further, the Sarnia facility was mothballed for the two years prior to its refurbishment for the project. This ostensibly offered Dow a reference point to estimate costs incurred should HRD breach and Dow be forced to mothball the plant again. Dow responds by pointing out that the Supply Agreement was signed in 2002, at a time when the parties had not yet designed the wax products to be produced or even the plant that would produce them. Production would not occur until nearly two years after the Supply Agreement was executed. Thus, costs of operation, maintenance, overhead, as well as lost profits, were unknown when the contract was entered. According to Dow, this prohibits HRD from carrying its burden of showing certainty.

The Court agrees with Dow. At the time of the signing of the contract, Dow and HRD anticipated entering a business relationship with many unknowns. To get the project off the ground, extensive research and development had to occur. The product wax needed to be invented, and the customization plan for the Sarnia factory needed to be put together. It is hard to understand how damages for the termination of a complex collaborative engineering project could be estimated with certainty years before the details of the project itself were finalized.

---

[5] This is in addition to monies owed for the six unpaid 2004 and the single unpaid 2005 AOP monthly installments. The January 2005 AOP monthly installment had been invoiced January 4, 2005. (D.I. 1, ¶ 86). Thus, the liquidated damages in dispute are 11/12 of $16,500,000 CAN, or $15,125,000 CAN.

HRD's argument that Dow, as a sophisticated party, could easily determine the cost of mothballing the Sarnia Facility over-simplifies the damages calculation. It fails, for example, to account for the financial costs of layoffs for a yet to be defined workforce hired to manufacture a then unknown product. Further, the costs to mothball a factory not yet designed can fairly be considered indeterminate. For these reasons, the Court holds that the AOP damages provision satisfies the first prong of the liquidated damages test.

This brings the Court to the second prong of *Lee Builders*. The Court must determine whether the damages provision awarding Dow nearly a year's worth of AOP damages is reasonable. *Brazen*, 695 A.2d at 48. The parties disagree as to how the reasonableness of the damages provision should be determined. HRD cites the *Lee Builders* case itself, which generally refers to the necessity that the amount agreed upon be reasonable. *Lee Builders*, 103 A.2d at 919. Dow argues that *Lee Builders* only offers a "cursory summary" of the standard, and that more recent cases require HRD to show that the stipulated damages provision is unreasonable with respect to estimated damages at the time of contracting and in light of Dow's actual damages. (D.I. 505, p.2 n.2). Dow relies on *W&G Seaford Assoc., L.P. v. Eastern Shore Markets, Inc.*, 714 F. Supp. 1336, 1352 (D. Del. 1989). *W&G Seaford* states, "the stipulated damages amount must be reasonable in light of the anticipated *or* actual loss. This is a disjunctive, not a conjunctive, standard." *Id.* Dow argues that this requires HRD to prove that the AOP stipulated damages amount is unreasonable both with respect to what was anticipated at the time of contracting and with respect to Dow's actual damages.

There are two more recent liquidated damages cases promulgated by the Delaware Supreme Court. The first case, *Brazen*, gave content to the second prong of *Lee Builders*: "[T]o fail the second prong of *Lee Builders*, the amount at issue must be unconscionable or not

12

rationally related to any measure of damages a party might conceivably sustain." *Brazen*, 695 A.2d at 48. In *Brazen*, a liquidated damages provision was inserted into a merger agreement contract. *Id.* at 45. This provision was a \$550 million termination fee incurred by one party in the event that the merger did not take place because of certain enumerated events. *Id.* The Supreme Court noted that the provision was a negotiated fee amount that took into account (a) the lost opportunity costs associated with a contract to deal exclusively with each other; (b) the expenses incurred during the course of negotiating the transaction; (c) the likelihood of a higher bid emerging for the acquisition of either party; and (d) the size of termination fees in other merger transactions. *Id.* at 48-49. The Supreme Court also recognized that the \$550 million fee represented only two percent of the party's market capitalization of \$28 billion. *Id.* at 48. The provision was thus upheld as reasonable and not a penalty. *Id.* at 49.

*Delaware Bay Surgical Services* is the most recent Delaware Supreme Court case concerning an asserted liquidated damages provision. 900 A.2d at 651. There, the Supreme Court repeated *Brazen*'s standard for the reasonableness prong: the provision must be rationally related to any conceivable damages a party might sustain and not be unconscionable. *Id.* In that case, the Delaware Supreme Court evaluated an employment contract requiring a \$25,000 payment in case of employee breach. *Id.* at 649. The Supreme Court relied upon the expenses the employer incurred hiring the employee to uphold the stipulated damages provision as "a reasonable forecast, rationally related and not unconscionable." *Id.*

Dow argues that HRD must affirmatively prove that the amount of damages dictated in the termination provision is unreasonable in light of Dow's actual damages to negate the termination provision as a penalty. Accordingly, because HRD has not provided evidence of Dow's actual damages, it cannot prove that the stipulated damages amount is unreasonable. The

Delaware Supreme Court, however, twice visited this issue and never imposed this strict requirement. Although a close relationship with actually incurred damages is clearly relevant to the question of whether the stipulated amount is "rationally related to any measurable damages conceived" or "unconscionable," this Court would be straying from Delaware binding precedent to impose such a requirement as a necessity. This makes sense considering that liquidated damages provisions are contemplated where damages are often difficult to measure even after the harm from a breach is finalized.[6]

Thus, to meet its burden under the second prong of *Lee Builders*, HRD must show either that (1) the stipulated damages clause is unconscionable or (2) that it is not rationally related to any measure of damages Dow could have reasonably sustained. The termination provision here states that Dow should be paid the AOP for the rest of the year of contract termination in the event that HRD materially breaches the Supply Agreement after "Beneficial Manufacture" has occurred.[7] This was in order to compensate Dow for costs related to the early shutdown of the Sarnia Plant operation.[8] This Court's previous Summary Judgment opinion held that there had been a material breach of the Supply Agreement due to HRD's failure to accept Dow's delivery of PE wax product. As discussed in this opinion, the Supply Agreement's termination did not occur automatically when HRD rejected delivery. Written notice from Dow to HRD that Dow considered the Supply Agreement terminated was required. This is significant, because there was a lag in time between HRD's breach and Dow's eventual notice of termination. HRD

---

[6] Businesses use stipulated damages clauses to save litigation expenses over difficult to prove damages. It would defeat this purpose to require litigants to prove that which they attempted to avoid having to prove.

[7] "Beneficial Manufacture" is defined by the Supply Agreement as Dow's first delivery of the wax product to HRD.

[8] While the AOP was intended to compensate Dow for profits during the normal performance of the Supply Agreement, in the event of breach, "lost profits" were addressed by the Annual Capacity Payment portion of the Stipulated Damages provision. (*See infra* at pp. 20-23).

became in breach when it instructed Dow to halt delivery of the wax product on July 30, 2004. HRD and Dow then held various discussions in attempt to resolve their differences and save the business relationship. These reconciliation efforts failed, and Dow finally notified HRD of the Supply Agreement's termination on January 18, 2005.

The consequence of this delayed termination looms large for the parties, as the provision requires HRD to pay Dow "the remainder of the AOP for the year" of the Supply Agreement's termination. In other words, because Dow sent the termination notice in January 2005, Dow is entitled to the AOP amount of $16.5 million CAN for the year of 2005. Had the notice been sent December 31, 2004 (which was apparently contemplated by Dow at one point in time), Dow would have received no additional AOP payment for 2005, as the "remainder" AOP for the year of termination would only accrue through 2004. By postponing notice a few weeks into January 2005, Dow captured $16.5 million CAN it would not have been owed had notice been given in 2004.

Dow does not argue that it suffered any substantial increased damages purely because of the delay in termination into January 2005 rather than December 2004. Thus, it is apparent that the termination provision triggered starkly divergent outcomes solely based on the arbitrary condition of the calendar date of termination. This represents a swing of $15,125,000 CAN[9] purely based on an arbitrary temporal condition that has been shown to be essentially disconnected from damages suffered by Dow. There is no reason to believe that this result was related to a rational estimation of Dow's damages at the time of contracting. The arbitrariness is illustrated by two scenarios that were possible at the time of contracting. In both scenarios, Dow

---

[9] Because the contract was terminated in January 2005, HRD owed 1/12 of the 2005 AOP ($1.375 million CAN) pursuant to the contract. (D.I. 483, Exh. 2 at §8.2.2).

15

and HRD agree to the Supply Agreement. The business relationship then progresses in a manner nearly identical to this case, eventually resulting in HRD's breach of the contract after "Beneficial Manufacture" has been reached. The only distinction between scenarios is that, in one, Dow communicates termination to HRD on December 31, 2004, whereas in the other, Dow communicates termination on January 1, 2005. In the latter scenario, Dow is entitled to $16.5 million CAN as stipulated damages. In the former scenario, Dow is entitled to no stipulated damages whatsoever. This is despite the fact that Dow's actual damages are exactly the same in both scenarios.

Dow argues that the AOP termination provision reasonably estimated Dow's losses in the event of a post "Beneficial Manufacture" breach by HRD. Dow argues that its costs related to labor, overhead, taxes, and insurance justify the provision, especially considering Dow (lacking expertise in the wax industry) could not have sold the product manufactured at the PDP plant to any other customer. The Court does not doubt that Dow did in fact suffer these types of losses due to HRD's breach of the contract. Dow fails, however, to explain how compensation for these losses was reasonably related to an AOP termination provision that offered the opportunity for wildly divergent compensation arbitrarily dependent on the time of year the contract was terminated. There is no evidence explaining why sending notice in January 2005 as opposed to December 2004 justifies an extreme swing in damages. There further is no reason to believe that Dow suffered increased actual damages.

Although the Court ruled that it is not necessary for HRD to affirmatively prove that Dow's actual damages are not reasonably related to those defined under the provision, this fact is still relevant to the question of whether the provision was reasonable under *Lee Builders*. The contract vested Dow, as the nonbreaching party, the sole authority to determine the termination

16

date. Evidence shows that Dow at least contemplated terminating the contract December 31, 2004. Leading up to this date, Dow conducted some preliminary predictions and analysis regarding possible costs and damages relating to the Sarnia plant shutdown. (D.I. 495, Exh. 8-10). None of Dow's documents suggest that its financial position significantly worsened due to delaying contract termination into 2005. To the contrary, the AOP termination provision made it highly profitable for Dow to purposefully delay triggering the termination provision until after the beginning of the new calendar year. The fact that Dow suffered no new costs due to the delay highlights the termination provision's irrationality. The Court thus views the AOP damages provision as arbitrary and lacking a rational basis as required for a damages provision to pass the "reasonableness" prong of *Lee Builders*. *See Brazen*, 695 A.2d at 48. While it is true that Dow's damages were uncertain at the time of contracting, that does not empower the parties to adopt a damages provision that is not rationally related to the measure of damages that Dow might reasonably have expected to incur. Thus, the stipulated damages provision of § 21.5.1.1.2 will not be enforced. The provision is severable. (D.I. 483, Exh. 2 at § 22.1.1). Dow will be allowed to prove its actual damages instead.

### (c) Dow's Mitigation

HRD next argues that Dow failed to mitigate its damages. To support this argument, HRD cites to a spreadsheet summarizing Dow's expected Sarnia Plant shutdown costs for a total expense of $10.7 million. (D.I. 495, Exh. 10). According to HRD, this shows that Dow's damages request of $34,186,793 does not take into account Dow's successful mitigation and therefore should be reduced. Dow, however, correctly points out that the matters at issue relate to stipulated damages provisions, and arguments regarding mitigation of damages have no place in this context. *See Princess Hotels, Int'l Inc. v. Del. State Bar Ass'n*, 1997 WL 817853, *3

17

(Del. Super. Ct. 1997). There may be a time for mitigation of damages arguments in relation to proving up Dow's actual damages for losses that were intended to be covered by the invalidated AOP damages provision, but that time is not now.

### (d) Final Capacity Rights Payment

Dow asserts that it is owed $1,948,000 CAN in Capacity Rights Payment ("CRP") under the Supply Agreement. (D.I. 495, Exh. 3 at ¶8.1). The Supply Agreement required Dow to refurbish the Sarnia Plant to meet the needs of production for the wax product. The CRP was intended to compensate Dow for "the actual costs to engineer and build the Facility...and a 10% project management fee[.]" (*Id.*). The CRP was to be comprised of two payments, the "Estimated" CRP and the "Final" CRP. The "Estimated" CRP was originally fixed at $4,000,000 and then increased to $6,792,000 through an amendment to the supply agreement. (*Id.*; D.I. 483, Exh. 3D). The "Final" CRP was intended to "true up" the difference between the "Estimated" CRP and the actual costs incurred by Dow converting the Sarnia Plant. (D.I. 495, Exh. 3 at ¶8.1). It is undisputed that Dow received the amended "Estimated" CRP Payment in the amount of $6,792,000. HRD argues that this payment was intended to satisfy the entirety of its CRP obligations, while Dow argues that it is still owed the "Final" CRP in the amount of $1,948,000 CAN.

HRD argues that it has met its CRP obligations under the Supply Agreement and that Dow fails to establish that it is owed any further CRP. HRD points to various Dow internal project slides. (D.I. 495, Exhs. 12-13). One slide states that the "Original" CRP was "$4.0MM" and the "Final" CRP was "$6.792 MM." (D.I. 495, Exh. 13 at 37686). Added together, this equals the amount Dow admits HRD has paid. HRD also cites a Dow slide anticipating HRD's

payment of the "entire new capital (~$6.8MM) in exchange for 4 years of capacity rights." (D.I. 495, Exh. 12 at 40005). HRD's final slide lists the status of "Key Milestones." One milestone states, "HRD pays first $4.0MM of conversion costs, and pre-engineering commences – Apr '03." (D.I. 495, Exh. 14 at 3). This milestone is marked as "Done." (*Id.*). A second relevant milestone states, "HRD pays remaining $2.8 MM of CRP." (*Id.*). This is also marked "Done." According to HRD, these slides suggest that HRD completely satisfied its CRP payments.

Dow responds to this argument with reference to the parties' amendment to the CRP provision of the Supply Agreement. This March 31, 2003 amendment "revised" the "Estimated CRP" from $4,000,000 to $6,792,000. [10] (D.I. 495, Exh. 3C). HRD was to pay two sums in part payment of the revised Estimated CRP in the amount of $4,000,000 by April 15, 2003 and $2,792,000 by July 15, 2003. (*Id.*). According to Dow, the slides HRD relies on that indicate that HRD made two CRP payments are in reference to these two-part payments of the revised Estimated CRP. The Court agrees. The amount HRD paid is precisely the amount required by the amendment revising the Estimated CRP. Further, the amendment itself only expressly modified the "Estimated" CRP amount and payment schedule of Paragraph 8.2.1. to the Supply Agreement. (*Id.*). It did nothing to modify the portions of the Supply Agreement spelling out Dow's right to "true up" the actual costs incurred with the CRP and invoice them to HRD. This means that the possibility for a further "true up" Final CRP payment remained live. Dow further provides undisputed evidence that it did indeed incur actual conversion costs in excess of the revised Estimated CRP. Dow submits an invoice dated September 16, 2004 for this "Final" CRP in the amount of $1,948,000. (D.I. 506, Exh. 20C at 4). Dow also submits an email to HRD from Dow employee Tony Frencham indicating that a "true up" Final CRP charge would be

---

[10] The amendment states, "[Dow] has advised HRD that as an outcome of the JDA it has revised the Estimated CRP (Capacity Rights Payment) up from $4,000,000 to $6,792,000." (D.I. 483, Exh. 3D).

forthcoming. (D.I. 506, Exh. 21). Finally, Dow submits a table entitled "Capacity Rights Payment (CRP) Reconciliation." (D.I. 506, Exh. 22). The table lists the various system components Dow purchased for the plant conversion. (D.I. 506, Exh. 22). The table also contains a detailed accounting of Dow's costs with a separate table for "Net Additional Conversion Costs." (*Id.*). These additional conversion costs equal a total amount of $1,950,000 CAN, essentially the same amount Dow invoiced HRD and the amount Dow now requests as compensation for the Final CRP Payment. (*Id.*). HRD has offered no evidence to dispute that Dow sustained these conversion costs or to show that HRD ever paid for them. The Court thus rules that Dow has established it is owed the Final CRP amount of $1,948,000 CAN.

### (e) Annual Capacity Payment

The parties dispute the validity of Section 21.5.1.1.3 of the Supply Agreement. It calls for Dow to be paid "$.05 per pound times three (3) times the Annual Capacity." (*Id.*). This section becomes effective once HRD became in material breach of the Supply Agreement after the date of Beneficial Manufacture. (D.I. 495, Exh. 3 at ¶ 21.5.1.1.3). It is undisputed that this amount equals $9,000,000. (D.I. 494, p. 20). HRD argues that the Annual Capacity provision is an unenforceable penalty and not liquidated damages. This brings the Court to the now familiar *Lee Builders* test. The first prong of *Lee Builders* prong asks whether damages were uncertain at the time of contracting. *Brazen*, 695 A.2d at 48. The second prong of *Lee Builders* asks whether the amount contracted for was reasonable. *Id.* An amount is reasonable if it is rationally related to any measure of damages a party might conceivably sustain and is not unconscionable. *Id.* The parties dispute the purpose of this termination provision. Dow argues that this provision is intended to compensate Dow for its lost opportunity in the event of HRD's breach. Dow had agreed that it would stay out of the wax market for three years should HRD breach the contract

20

after the date of Beneficial Manufacture. According to Dow, the Annual Capacity termination provision provides Dow with corresponding compensation for this lost opportunity, as Dow would be paid an amount equivalent to what it would have been selling over that three year time period. HRD argues that there is no evidence in the contract that the Annual Capacity termination provision was intended to compensate Dow for this lost opportunity. HRD states the the 2004 AOP and its already paid CRP reasonably compensate Dow for its damages. HRD further argues that the Annual Capacity provision is clearly a penalty, because the provision did not hinge on prospective production losses at the Sarnia Plant. This is supposedly demonstrated by the provision's mandate that HRD make the same $9,000,000 payment regardless of whether HRD breached the Supply Agreement in the first month or the last month of the four year production period. According to HRD, this makes the provision unreasonably unrelated to Dow's losses due to HRD's breach.

The Court views that the Annual Capacity termination provision is essentially intended to compensate Dow for its lost opportunity costs (which the Court understands to be essentially the same thing as "lost profits").[11] It further holds that this provision is a valid liquidated damages provision and is not a penalty. Paragraph 21.5.1.2 of the Supply Agreement prohibited Dow from selling PE Wax for a period of three years after a post-Beneficial Manufacture breach by HRD. (D.I. 483, Exh. 2 at 25). This paragraph is directly after the Annual Capacity termination provision entitling Dow to "$.05 per pound times three (3) times the Annual Capacity." The Annual Capacity termination provision offers compensation exactly proportional to Dow's losses correlated to the prohibition, i.e., three years of profits from the right to make and sell the wax

---

[11] Lost opportunity costs are the return or profit that Dow would have made selling PE wax to others for three years. Dow expected to make a profit from selling the PE wax to HRD instead. Dow would gain a double recovery if Dow's damages included the lost profits from not selling PE wax to HRD and the lost profits from not selling the same PE wax to third parties.

21

product up to the Sarnia Plant's capacity. The Court does not view this as coincidence. The provisions are directly proportional to one another, indicating they are interrelated. As a logical matter, it makes sense for Dow to gain recompense after bargaining away its right to use the Sarnia Plant for its intended purpose. With this sensible reason for the provision's existence readily apparent, the Court sees no evidence to conclude that the provision was arbitrarily inserted into the Supply Agreement.[12]

Similar provisions elsewhere in the contract confirm this judgment. The Supply Agreement provided for a different set of stipulated damages provisions to be triggered had HRD's breach occurred after the Implementation Date but prior to Beneficial Manufacture.[13] (D.I. 483, Exh. 2 at 24). One of these provisions imposed the same type of prohibition on Dow, banning it from selling the product wax, although in this case for only two years rather than three. (*Id.*). Likewise, there is an adjacent provision requiring HRD to pay Dow an Annual Capacity payment of "$.05 per pound times twice the Annual Capacity." (*Id.*). Thus, Dow would be compensated for its lost opportunities during the two year prohibition. In both sets of stipulated damages provisions, Dow would have been paid an amount of money exactly proportional to the time period it promised to stay out of the wax market. This parallelism indicates that the Annual Capacity termination provision is not arbitrary. The Court thus rules that the Annual Capacity termination provision satisfies both prongs of *Lee Builders*. First, lost opportunity costs are inherently uncertain and difficult to measure at the time of contracting. There was no way for Dow to know exactly what the demand in the market would be for the yet

---

[12] Even the now held invalid AOP termination provision had a purpose in the document; it was not held invalid for having no purpose, but because its method of achieving that purpose was irrational and completely unrelated to damages Dow may have sustained. The Annual Capacity provision, on the other hand, is calculated to provide Dow with proportional compensation due to rights it bargained away.

[13] As discussed, the three year prohibition was triggered here because HRD's breach occurred after Beneficial Manufacture.

22

to be designed wax product. Second, the provision bears a rational relation to Dow's losses as a result of staying out of the market. It set a price the parties determined reasonable and entitled Dow to payment for that price during the period its business was restricted. There is further no reason for the Court to believe it is unconscionable. For these reasons, the Court holds that HRD must pay Dow $9,000,000 for the Annual Capacity termination payment.

### (f) Interest Payments

The parties dispute whether Dow is owed interest on its established damages. HRD points to Paragraph 8.2.5 of the Supply Agreement, which states, "[Dow] may charge HRD interest at the rate of one and one half percent (1-1/2%) per month...on all undisputed overdue amounts." (D.I. 483, Exh. 2 at 12). HRD contends that it has disputed all overdue amounts, as evidenced by its communication with Dow and this very lawsuit, and therefore the interest provision does not apply. Dow does not contend that HRD failed to dispute the overdue charged amounts. Thus, the contract does not provide for Dow to collect 1-1/2% interest per month on these damages.

### (g) Conclusion

Thus, the Court enters partial summary judgment that HRD owes Dow stipulated damages of $9,000,000 U.S. for lost profits in connection with the Annual Capacity provision, $1,948,000 CAN for the true-up payment in connection with the CRP provision, and $9,650,000 CAN in connection with the past-due AOP installments from June 2004 through January 2005.[14] Dow also will have the opportunity to prove its actual damages in connection with the intended scope of the unenforceable AOP stipulated damages provision.

---

[14] These amounts do not include attorney's fees or any applicable statutory interest calculations.

An appropriate order will issue.